RON BENDER (SBN 143364)
JACQUELINE L. RODRIGUEZ (SBN 198838)
TODD M. ARNOLD (SBN 221868)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com;
jpf@lnbrb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## (SANTA ANA DIVISION)

In re:

WESTCLIFF MEDICAL
LABORATORIES, INC.,

              Debtor.

-------------------------------

BIOLABS, INC.,

              Debtor.

-------------------------------

☒ Affects Both Debtors

☐ Affects WESTCLIFF MEDICAL
    LABORATORIES, INC. only

☐ Affects BIOLABS, INC. only

[Proposed]
Lead Case No. 8:10-bk-16743
[Proposed] Jointly Administered
with Case No. 8:10-bk-16746[1]

Chapter 11 Cases

DEBTORS' EMERGENCY MOTION FOR
APPROVAL OF A STIPULATED ORDER
(1) AUTHORIZING THE DEBTORS TO
USE CASH COLLATERAL ON AN
INTERIM BASIS PENDING A FINAL
HEARING AND PROVIDE ADEQUATE
PROTECTION THEREFOR, (2)
GRANTING OTHER RELATED RELIEF,
AND (3) SCHEDULING A FINAL
HEARING; MEMORANDUM OF POINTS
AND AUTHORITIES; DECLARATIONS
OF ROBERT E. WHALEN, MATTHEW
PAKKALA AND MONICA KIM, ESQ.
IN SUPPORT THEREOF

Court Scheduled Hearing:
Date:  May 25, 2010
Time:  10:00 a.m.
Place: Courtroom "5D"
       411 West Fourth Street
       Santa Ana, CA 92701

-------------------------------

[1] Motion for Joint Administration pending.

**SUMMARY**

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2, 9075-1, and Section 363(c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure, Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs" and, together with Westcliff, the "Debtors"), the Chapter 11 debtors and debtors in possession in the above-captioned, (proposed) jointly administered cases, hereby move, on an emergency basis (the "Motion"), for approval of a stipulated order (1) authorizing the Debtors to use cash collateral on an interim basis pending a final hearing in accordance with the Debtors' post-petition operating budget (the "Budget"), a copy of which is attached as Exhibit "1" to the annexed Declaration of Matthew Pakkala (the "Pakkala Declaration") and provide adequate protection therefore, (2) granting other related relief, and (3) scheduling a final hearing.

The Debtors filed their voluntary Chapter 11 bankruptcy cases on May 19, 2010 (the "Petition Date"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Biolabs owns 100% of the equity of Westcliff and has no other material assets. Biolabs likely does not have any cash collateral, as defined by Section 363(a) of the Bankruptcy Code,

1   and has filed this Motion in its case merely out of an abundance
2   of caution.

3       Westcliff is the owner and operator of approximately 170
4   branded and stand-alone patient service center laboratories and
5   STAT labs located throughout California. Westcliff has
6   approximately 1,000 employees and is currently generating
7   approximately $100 million of annual revenue.

8       Prior to the Petition Date, pursuant to the Credit Agreement
9   dated as of June 30, 2006, as amended (the "Credit Agreement"),
10  by and among (a) Biolabs as the "Parent Borrower," (b) Westcliff
11  as the "Opco Borrower," (c) GE Business Financial Services, Inc.
12  ("Agent") (formerly known as Merrill Lynch Capital, a division of
13  Merrill Lynch Business Financial Services, Inc.), as
14  administrative agent, lender, and sole bookrunner and sole lead
15  arranger, (d) CapitalSource Finance, LLC, as lender
16  ("CapitalSource"), and (e) Sandelman Finance 2006-1, Ltd.
17  ("Sandelman" and, together with "Agent" and CapitalSource (the
18  "Lenders"), Biolabs and Westcliff obtained credit and working
19  capital loan facilities for funding necessary to enable Biolabs
20  to acquire Westcliff and to provide the Debtors with working
21  capital to enable them to operate their business.

22      In particular, pursuant to the Credit Agreement, the Lenders
23  made three term loans and provided a revolving line of credit to
24  the Debtors (collectively, the "Initial Loans"). In addition,
25  pursuant to certain related agreements (the "Related Agreements")
26  entered into by and among the Debtors and the Lenders, the
27  Lenders made certain protective advances to the Debtors (the
28

3

1  "Advances").   The Initial Loans and the Advances are collectively
2  referred to herein as the "Loans".  As of the Petition Date, the
3  outstanding balance owing by the Debtors to the Lender as a
4  result of the Loans was approximately $56 million.  The Debtors'
5  obligations to the Lenders are secured by a first priority lien
6  and security interest against substantially all of the Debtors'
7  personal property.

8      In addition to the Lenders, the UCC-1 lien reports (the "UCC
9  Reports") obtained by the Debtors in their respective states of
10  incorporation (which is California for Westcliff and Delaware for
11  Biolabs) indicate that additional other individuals and entities
12  (the "Other Secured Parties") may have liens upon certain of the
13  Debtors' assets.  The Debtors believe that the liens of the Other
14  Secured Parties only relate to particular equipment leased or
15  purchased by the Debtors.  Therefore, the Debtors do not believe
16  that the liens of the Other Secured Parties extend to Westcliff's
17  cash collateral, or any alleged cash collateral of Biolabs.

18      As set forth in numerous concurrently filed pleadings, the
19  Debtors have determined that an expedited sale of substantially
20  all of the Debtors' assets is in the overwhelming best interests
21  of the Debtors' estates and their creditors.  Just prior to their
22  bankruptcy filings, the Debtors signed an asset purchase
23  agreement with Laboratory Corporation of America and its wholly-
24  owned subsidiary Wave Newco, Inc. (collectively, "Purchaser").
25  Pending the Debtors' consummation of their asset sale to
26  Purchaser (or to a successful overbidder), the Debtors have a
27  need to use the revenue generated from the operation of their

28

1   business (i.e., cash collateral) to pay their post-petition
2   operating expenses, including payroll, rent, utilities,
3   insurance, taxes, costs related to the purchase of inventory and
4   supplies, etc.  Without the ability to use cash collateral for
5   these purposes, Westcliff would be forced to immediately shut
6   down its business and cease operations, which would decimate the
7   going concern value of Westcliff's business and certainly cause
8   Purchaser to terminate its purchase.

9        The Debtors' proposed operating budget (the "Budget"), a
10  copy of which is attached as Exhibit "1" to the Pakkala
11  Declaration, contains the expenses the Debtors believe must be
12  paid in order for the Debtors to continue to operate and preserve
13  the value of their business pending completion of the sale of the
14  Debtors' assets.  The expenses contained in the first few weeks
15  of the Budget are those expenses the Debtors believes must be
16  paid to enable the Debtors to avoid immediate and irreparable
17  harm to the Debtors' business and bankruptcy estates.  The
18  revenues projected in the Budget are the revenues the Debtors
19  project receiving if business proceeds as planned.

20       The Debtors submit that the relief requested herein is
21  appropriate, as the Lenders have already agreed to the Debtors'
22  use of cash collateral pursuant to the agreed Interim Order (A)
23  Authorizing Use of Cash Collateral, and (B) Granting Agent
24  Business Services, Inc. Adequate Protection attached hereto as
25  Exhibit "2" (the "Interim Order"), the terms of which are further
26  discussed in the annexed Memorandum of Points and Authorities.
27
28

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on this Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtors to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. Such an expedited procedure is routine in Chapter 11 as it is the rare Chapter 11 debtor that can survive for 14 days or more without use of any funds.

## ADDITIONAL INFORMATION

Pursuant to Local Bankruptcy Rule 4001-2, the Debtors make the following statements regarding the relief requested in the Motion for the use of cash collateral and approval of the proposed Interim Order and any final order thereon:

| Provision | Description and Location |
|---|---|
| Cross-collateralization clauses | No – except to the extent the Lenders are already cross-collateralized by the Debtors' assets, such cross-collateralization shall also apply to any replacement liens granted herein by this Motion and the Interim Order and any final order thereon. |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's lien or debt. | Yes – the findings of fact are binding on the Debtors.  Interim Order, ¶ C(2)-(4). |

| Provision | Description and Location |
|---|---|
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not party to the stipulation, or which create a lien senior or equal to any existing lien. | No. |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No. |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No. |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No. |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No. |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No – except for standard replacement lien language in the proposed order.<br><br>Interim Order, ¶ 8. |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No. |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent. | No. |

| Provision | Description and Location |
|---|---|
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No. |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No. |
| Findings of fact on matters extraneous to the approval process. | No. |

The relief sought in this Motion is based upon this Motion, the annexed Memorandum of Points and Authorities and declarations in support of this Motion, and any exhibits thereto, the arguments and representations of counsel made at the hearing on this Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Motion.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order in substantially the form of the Interim Order attached hereto as Exhibit "2" to the Pakkala Declaration and order as follows:

1. finding, among other things, that notice of this Motion was appropriate under the circumstances and complied with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules;

2. granting this Motion on an interim basis pending a final hearing;

3. authorizing the Debtors, subject to the terms of the Interim Order, to use cash collateral to pay all of the expenses set forth in the Budget on an interim basis pending a final hearing;

1      4.   providing the Lenders with a replacement lien and

2  super-priority administrative claim as adequate protection as set

3  forth in the Interim Order;

4      5.   setting a final hearing on this Motion; and

5      6.   granting such other and further relief as the Court

6  deems just and proper.

7  Dated: May 19, 2010          WESTCLIFF MEDICAL LABORATORIES,
                           INC.

8
                           -and-

9
                           BIOLABS, INC.

10
                           */s/ Ron Bender*

11                             RON BENDER
                           JACQUELINE L. RODRIGUEZ

12                             TODD M. ARNOLD

13                             JOHN-PATRICK M. FRITZ
                           LEVENE, NEALE, BENDER, RANKIN

14                             & BRILL L.L.P.
                           (Proposed) Attorneys for Chapter 11

15                             Debtors and Debtors in Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..........................10

I.    STATEMENT OF FACTS ......................................10

    A. BACKGROUND ...........................................10

    B. THE NECESSITY FOR FILING BANKRUPTCY ..................11

    C. THE IMMEDIATE NEED FOR USE OF CASH COLLATERAL ........13

    D. THE LENDERS' LOANS AND LIENS .........................14

    E. OTHER LIENS. .........................................15

    F. THE NECESSITY FOR USING CASH COLLATERAL AND
        PROPOSED USES ......................................16

    G. THE LENDERS' CONSENT TO THE DEBTORS' USE OF CASH
        COLLATERAL AND THE TERMS OF THE INTERIM ORDER ........17

II.   DISCUSSION ............................................23

    A. THE DEBTORS MUST BE AUTHORIZED TO USE CASH
        COLLATERAL TO OPERATE, MAINTAIN, AND PRESERVE
        THEIR BUSINESS IN ACCORDANCE WITH THE BUDGET .........23

    B. THE LENDERS AND ANY OTHER CREDITORS WITH AN INTEREST
        IN THE DEBTORS' CASH COLLATERAL ARE ADEQUATELY
        PROTECTED ..........................................25

    C. THE PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF
        THIS MOTION HAVE BEEN SATISFIED ......................26

III. CONCLUSION .............................................27

DECLARATION OF ROBERT E. WHALEN .............................29

DECLARATION OF MATTHEW PAKKALA .............................33

DECLARATION OF MONICA Y. KIM ...............................41

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

In re Dynaco Corporation
  162 B.R. 389 (Bankr. D.N.H. 1993) ...........................24

IN RE MCCOMBS PROPERTIES VI, LTD.
  88 B.R. 261 (BANKR. C.D. CAL. L988) .........................25

IN RE MELLOR
  734 F.2D 1396 (9TH CIR. 1984) ...............................25

IN RE O'CONNOR
808 F.2D 1393 (10TH CIR. 1987) ...............................25

In re Oak Glen R-Vee
  8 B.R. 213 (Bankr. C.D. Cal. 1981) .........................24

In re Stein
  19 B.R. 458 (Bankr. E.D. Pa. 1982) .........................26

IN RE TRIPLETT
  87 B.R. 25 (BANKR. W.D.TEX. 1988) ..........................25

In re Tucson Industrial Partners
  129 B.R. 614 (B.A.P. 9th Cir. 1991) ........................24

STATUTES

11 U.S.C. § 101. ...............................................2

11 U.S.C. §§ 330 and 331 .....................................21

11 U.S.C. § 361 ..............................................25

11 U.S.C. § 363(a) ...............................2, 10, 23, 25

11 U.S.C. § 363(c)(2)(A) .....................................24

11 U.S.C. § 363(c)(2)(B) .....................................24

11 U.S.C. § 363(c)(2)(B) ..................................7, 24

11 U.S.C. § 503(b)(9) ........................................19

11 U.S.C. §§ 503(b) and 507(b) ...............................20

11 U.S.C. § 506(c) ............................................7

11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549 ...............7

11 U.S.C. §§ 1107 and 1108 ................................2, 10

11 U.S.C. § 1107(a) ..........................................23

**OTHER AUTHORITES**

Title 28 of the United States Code § 1930 .....................21

FRBP 4001(b) and 9014 .........................................2

LBR 2081-1(a)(9), 4001-2, 9075-1 ..............................2

LBR 4001-2 ....................................................6

LBR 4001(b)(1)(C) ............................................26

LBR 4001(b)(2) ............................................6, 16

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### STATEMENT OF FACTS

4

**A.   BACKGROUND.**

5      The Debtors filed their voluntary Chapter 11 bankruptcy

6   cases on May 19, 2010 (the "Petition Date").   The Debtors

7   continue to operate their business, manage their financial

8   affairs, and operate their bankruptcy estates as debtors in

9   possession pursuant to Sections 1107 and 1108 of the Bankruptcy

10   Code.

11      Biolabs owns 100% of the equity of Westcliff and has no

12   other material assets.   Biolabs likely does not have any cash

13   collateral, as defined by Section 363(a) of the Bankruptcy Code,

14   and has filed this Motion in its case merely out of an abundance

15   of caution.

16      Westcliff, which was founded in 1964 as a community-based

17   laboratory, is the owner and operator of approximately 170

18   branded and stand-alone patient service center laboratories and

19   STAT labs that provide various services, including clinical

20   testing, pathology, reporting and support services for the

21   benefit of thousands of out-patients throughout California.

22   Westcliff has approximately 1,000 employees and is currently

23   generating approximately $100 million of annual revenue.

24      Westcliff's main clinical hub is an 80,000 square foot

25   facility located in Santa Ana, California that opened in 2006.

26   Westcliff's primary anatomical pathology lab is a 12,800 square

27

28

foot facility located in Monrovia, California that opened in 2008.

Working directly with patients and with contracted payors, including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and Medicare, Westcliff has grown and become a leading out-patient laboratory service company. Westcliff's lab operations demonstrate industry-leading results, with low testing turn-around times, high quality control scores, and a strong and experienced sales and marketing team.

Westcliff averages approximately 8,500 clinical requests per day and approximately 1,200 pathology requests per day, and performs approximately 250,000 cytology and 70,000 biopsy tests on an annual basis. Based on this performance, Westcliff is the third largest clinical laboratory in California.

The California clinical laboratory testing market is the largest in the nation, with estimated revenues of approximately $2 billion. Approximately 8% of the nations' tests are performed in California, and over 200 million of California's tests are conducted by independent labs (excluding hospital based labs). Based on current volume, Westcliff accounts for approximately 5% of the California market.

B.    **THE NECESSITY FOR FILING BANKRUPTCY**.

While the Debtors' revenue is significant, due to the small profit margins in this business, despite significant and continuing cost cutting measures undertaken by the Debtors, the Debtors are simply not able to operate sufficiently profitably to enable the Debtors to repay their debts.

1   The Debtors suffered a net loss of approximately $87 million
2   in 2008 (including expenses and write offs of approximately $171
3   million) on net revenue of approximately $84 million. The
4   Debtors suffered a net loss of approximately $13 million in 2009
5   (including expenses and write offs of approximately $110 million)
6   on net revenue of approximately $97 million.

7   While the Debtors instituted as many expense reductions as
8   were reasonably possible, the Debtors' losses continued. Since
9   the beginning of 2009, the Debtors have been unable to make any
10  debt service payments to Agent (defined below), and the Debtors
11  have been unable to remain current with their other debt
12  obligations, including payments owing to former owners of
13  companies the Debtors previously purchased as part of the
14  Debtors' overall growth strategy. Indeed, the Debtors were only
15  able to survive financially over the past approximately seventeen
16  months because Agent agreed to provide the Debtors with
17  additional funding.

18  The only way the Debtors can survive as a stand alone going
19  concern business would be for the Debtors to raise many millions
20  of dollars of additional equity which is not possible given the
21  Debtors' debt structure.

22  As set forth in numerous concurrently filed pleadings, the
23  Debtors have determined that an expedited sale of substantially
24  all of the Debtors' assets is in the overwhelming best interests
25  of the Debtors' estates and their creditors. Just prior to their
26  bankruptcy filings, the Debtors signed an asset purchase
27
28

1  agreement with Laboratory Corporation of America and its wholly-

2  owned subsidiary Wave Newco, Inc. (collectively, "Purchaser").

3  **C.   THE IMMEDIATE NEED FOR USE OF CASH COLLATERAL**.

4       Pending the Debtors' consummation of their asset sale to

5  Purchaser (or to a successful overbidder), the Debtors have a

6  need to use the revenue generated from the operation of their

7  business (i.e., cash collateral) to pay their post-petition

8  operating expenses, including payroll, rent, utilities,

9  insurance, taxes, costs related to the purchase of inventory and

10 supplies, etc.  Without the ability to use cash collateral for

11 these purposes, Westcliff would be forced to immediately shut

12 down its business and cease operations, which would decimate the

13 going concern value of Westcliff's business and certainly cause

14 Purchaser to terminate its purchase.

15      The Debtors' proposed operating budget (the "Budget"), a

16 copy of which is attached as Exhibit "1" to the Pakkala

17 Declaration, contains the expenses the Debtors believe must be

18 paid in order for the Debtors to continue to operate and preserve

19 the value of their business pending completion of the sale of the

20 Debtors' assets.  The expenses contained in the first few weeks

21 of the Budget are those expenses the Debtors believes must be

22 paid to enable the Debtors to avoid immediate and irreparable

23 harm to the Debtors' business and bankruptcy estates.   The

24 revenues projected in the Budget are the revenues the Debtors

25 project receiving if business proceeds as planned.

26

27

28

13

D.     **THE LENDERS' LOANS AND LIENS**.

Prior to the Petition Date, pursuant to the Credit Agreement dated as of June 30, 2006, as amended (the "Credit Agreement"), by and among (a) Biolabs as the "Parent Borrower," (b) Westcliff as the "Opco Borrower," (c) GE Business Financial Services, Inc. ("Agent") (formerly known as Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc.), as administrative agent, lender, and sole bookrunner and sole lead arranger, (d) CapitalSource Finance, LLC, as lender ("CapitalSource"), and (e) Sandelman Finance 2006-1, Ltd. ("Sandelman" and, together with "Agent" and CapitalSource (the "Lenders"), Biolabs and Westcliff obtained credit and working capital loan facilities for funding necessary to enable Biolabs to acquire Westcliff and to provide the Debtors with working capital to enable them to operate their business.

In particular, pursuant to the Credit Agreement, the Lenders made three term loans and provided a revolving line of credit to the Debtors (collectively, the "Initial Loans"). In addition, pursuant to certain related agreements (the "Related Agreements") entered into by and among the Debtors and the Lenders, the Lenders made certain protective advances to the Debtors (the "Advances"). The Initial Loans and the Advances are collectively referred to herein as the "Loans". As of the Petition Date, the outstanding balance owing by the Debtors to the Lender as a result of the Loans was approximately $56 million. The Debtors' obligations to the Lenders are secured by a first priority lien

1  and security interest against substantially all of the Debtors'

2  personal property.

3  **E.    OTHER LIENS.**

4  In addition to the Lenders, the UCC-1 lien reports (the "UCC

5  Reports") obtained by the Debtors in their respective states of

6  incorporation, true and correct copies of which are attached

7  hereto as Exhibit "3" (the UCC Report for Westcliff for

8  California, the state in which Westcliff is incorporated) and

9  Exhibit "4" (the UCC Report for BioLabs for Delaware, the state

10 in which BioLabs is incorporated), indicate that additional other

11 parties ("Other Secured Parties") may have liens upon certain of

12 the Debtors' assets. The Other Secured Parties appearing in the

13 UCC Reports that have alleged non-lapsed, non-terminated liens

14 against certain of the Debtors' assets consist of the following:

| Name | Address | City | St. | Zip |
|------|---------|------|-----|-----|
| Bank of America, N.A., as Successor by Merger to LaSalle Bank Nat'l Assn. | 135 South LaSalle Street | Chicago | IL | 60603 |
| Becton Dickinson & Co. | 1 Becton Drive | Franklin Lakes | NJ | 07417 |
| BMT Leasing, Inc. | P.O. Box 692 | Bryn Mawr | PA | 19010 |
| Cisco Systems Capital Corp. | 170 W. Tasman Drive, MS SJ13-3 | San Jose | CA | 95134 |
| CYTYC Limited Partnership | 250 Campus Drive | Marlborough | MA | 01752 |
| Diasorin, Inc. | 1951 Northwestern Avenue | Stillwater | MN | 55082 |
| Jules and Associates, Inc. | 515 S. Figueroa St., Suite 1950 | Los Angeles | CA | 90071 |
| Leasing Associates of Barrington, Inc. | 33 W. Higgins Road, Suite 1030 | South Barrington | IL | 60010 |
| M & I Marshall & Ilsley Bank | 770 N. Water Street | Milwaukee | WI | 53202 |
| Norlease, Inc. | 50 South LaSalle Street | Chicago | IL | 60675 |

| Olympus America, Inc. | 3500 Corporate Parkway | Center Valley | PA | 18034 |
|---|---|---|---|---|
| Phadia US Inc. | 4169 Commercial Ave. | Portage | MI | 49002 |
| Pitney Bowes Credit Corp. | 27 Waterview Drive | Shelton | CT | 06484 |
| Roche Diagnostics Corporation | 9115 Hague Road | Indianapolis | IN | 46250 |
| TCF Equipment Finance, Inc. | 11100 Wayzata Blvd., Suite 801 | Minnetonka | MN | 55305 |

The Debtors believe that the liens of the Other Secured Parties only relate to particular equipment leased or purchased by the Debtors. Therefore, the Debtors do not believe that the liens of the Other Secured Parties extend to any of the Debtors' cash collateral. Notwithstanding the foregoing, all of the Other Secured Parties appearing on the UCC Reports that have alleged non-lapsed, non-terminated liens on the Debtors' assets were provided with notice of the Motion and a copy of the Motion.

F.   **THE NECESSITY FOR USING CASH COLLATERAL AND PROPOSED USES.**

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on this Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtors to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing.

Pending the Debtors' consummation of their asset sale to Purchaser (or to a successful overbidder), the Debtors have a need to use the revenue generated from the operation of their business (i.e., cash collateral) to pay their post-petition operating expenses, including payroll, rent, utilities,

1  insurance, taxes, costs related to the purchase of inventory and
2  supplies, etc.  Without the ability to use cash collateral for
3  these purposes, Westcliff would be forced to immediately shut
4  down its business and cease operations, which would decimate the
5  going concern value of Westcliff's business and certainly cause
6  Purchaser to terminate its purchase.

7       The Debtors' proposed Budget contains the expenses the
8  Debtors believe must be paid in order for the Debtors to continue
9  to operate and preserve the value of their business pending
10 completion of the sale of the Debtors' assets.  The expenses
11 contained in the first few weeks of the Budget are those expenses
12 the Debtors believes must be paid to enable the Debtors to avoid
13 immediate and irreparable harm to the Debtors' business and
14 bankruptcy estates.  The revenues projected in the Budget are the
15 revenues the Debtors project receiving if business proceeds as
16 planned.

17 G.   **THE LENDERS' CONSENT TO THE DEBTORS' USE OF CASH COLLATERAL**
18      **AND THE TERMS OF THE INTERIM ORDER**.

19      The Debtors submit that the relief requested herein is
20 clearly warranted as being in the best interests of the Debtors'
21 estates.   The Debtors believe that the Lenders are the only
22 parties with an interest in any cash collateral of the Debtors,
23 and the Lenders have already agreed to the Debtors' use of cash
24 collateral pursuant to the terms of the Interim Order.

25      In summary, the Interim Order provides as follows:[2]

26 _____

27 [2] This summary is for informational purposes.  If there is any disagreement
   between this summary and the terms of the Interim Order, the terms of the
28 Interim Order will govern.

17

- The Debtors will be able to use cash collateral pursuant to the terms of the Interim Order and Budget, subject to a 15% cumulative variance on a weekly basis, with any unused budgeted amount to carry-forward into subsequent weeks on the Budget.

- Upon the closing of the proposed asset sale, the Debtors shall delver to Agent a new budget that reflects the actual closing date of the proposed asset sale. The new budget shall be generally consistent with the initial Budget, but shall reflect the actual closing date of the proposed asset sale. The new budget shall be subject to the reasonable approval of Agent and, upon such approval, shall become the "Budget" under the Interim Order (and any final cash collateral order) and shall replace and supersede the earlier Budget. Thereafter, the Debtors may from time to time submit to Agent a new proposed budget reflecting changed circumstances and, if such proposed budget is approved by Agent in its sole and absolute discretion, such new budget shall become the "Budget" under the Interim Order (and any final cash collateral order) and replace any earlier Budget. The Debtors authority to use Cash Collateral shall terminate on the "Termination Date" (as defined below); provided, however, that the Debtors have authority to use Cash Collateral after the Termination Date to pay expenses incurred or accrued in accordance with the Budget prior

to the Termination Date.

- The ("Termination Date") shall be the earliest of the following: (a) June 25, 2010, if the proposed asset sale has not occurred by such date, (b) October 29, 2010, if the proposed asset sale occurs on or before June 25, 2010, and (c) the occurrence of an Event of Default (as defined in the Interim Order).

- Compliance with the disbursement provisions of the Budget shall be measured by line item on a cumulative basis at the end of each week. The Debtors may request Agent's consent to use cash collateral in excess of the budgeted amounts or beyond the Termination Date, but shall only be authorized to use such additional cash collateral upon receipt of Agent's prior written consent or order of the Court. To the extent Agent consents to use of additional cash collateral, all such additional amounts shall be governed by and subject to the terms of the Interim Order (or any final cash collateral order). In no event shall the cash collateral be used by the Debtors to pay any claim arising prior to the Petition Date (including any claim arising under section 503(b)(9) of the Bankruptcy Code) unless payment of such claim shall have been approved by the Court or consented to by Agent.

- The Debtors will provide adequate protection to the Lenders by providing the Lenders with (1) a valid, binding, perfected, enforceable, unavoidable

replacement lien upon all pre-petition assets and all
assets of the Debtors' estates (other than avoidance
causes of actions under Chapter 5 of the Bankruptcy
Code), to the extent of any decrease in the value of
the Lenders' interest in the pre-petition collateral
occurring after the Petition Date, with such
replacement lien to have the same validity, priority,
and scope as the Lenders' pre-petition liens, except
that the replacement lien shall be subordinate to the
Carve Out (as defined below) and to any valid,
perfected, and unavoidable liens on the post-petition
collateral in existence on the Petition Date, and (2) a
"superpriority" administrative claim pursuant to
sections 503(b) and 507(b) of the Bankruptcy Code, to
the extent of any decrease in the value of the Lenders'
interest in the pre-petition collateral occurring after
the Petition Date, senior to all other administrative
expenses, other than the Carve Out.

- The "Carve Out" shall mean (a) the unpaid fees and
expenses incurred by professionals retained by the
Debtors and the Committee that have been approved by
this Court pursuant to sections 327, 328, and 1103 or
363 of the Bankruptcy Code, (collectively, the
"Retained Professionals") that were incurred (i) on and
after the Petition Date and before the Termination Date
(both only if the Lenders terminate the Debtors' use of
cash collateral as a result of the occurrence of the

Termination Date and the Agent delivers notice to counsel for the Debtors and the Committee informing them that Agent has exercised its right to terminate the Debtors' use of cash collateral as a result of the occurrence of a Termination Date which shall be referred to herein as a "Trigger Date"), but not in excess of the total aggregate amounts set forth in the Budget through the Trigger Date, and (ii) that were incurred on or after the Trigger Date in an aggregate amount not exceeding $150,000; provided that, in each case, such fees and expenses are ultimately allowed on a final basis by this Court pursuant to sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve Out under the later provisions of this paragraph; and (b) any unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.

- Notwithstanding any other provision of the Interim Order, no portion of the cash collateral or the Carve Out may be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with: (w) objecting, contesting or raising any defense to the validity, perfection, priority, or enforceability of, or any amount due under the Loan or any liens or rights granted to the Lenders under the Loans; (x) asserting any claims, actions or causes of action against the Lenders or any of their respective

employees, agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (y) preventing, hindering or otherwise delaying enforcement or realization by the Lenders on any pre-petition collateral; or (z) seeking to amend or modify any of the rights granted to the Lenders under the Interim Order or taking any other action adverse to the interests of the Lenders or opposed by the Lenders; provided, however, that no more than $25,000 in the aggregate of the cash collateral and the Carve Out may be used by the Committee to analyze or investigate (but not prosecute or challenge) the pre-petition liens of the Lenders.   All of the claims and liens of the Lenders shall be subordinate to the Carve Out regardless of the occurrence of the Termination Date; provided, however, that obligations constituting the Carve Out shall first be paid from any unencumbered funds of the Debtors' estate before being paid from any collateral the Lenders.   The claims and liens of the Lenders do not attach to any pre-bankruptcy retainers paid to any professionals employed by the Debtors, unless those retainers have been returned to the estate by order of the Court.

///

///

///

II.

DISCUSSION

A.   THE DEBTORS MUST BE AUTHORIZED TO USE CASH COLLATERAL TO
OPERATE, MAINTAIN, AND PRESERVE THEIR BUSINESS IN ACCORDANCE
WITH THE BUDGET.

The Debtors' use of property of their estates is governed by
Section 363 of the Bankruptcy Code.  Section 363(c)(1) provides
in pertinent part:

> If the business of the debtor is authorized
> to be operated under section . . .1108. . .
> of this title and unless the court orders
> otherwise, the trustee may enter into
> transactions, including the sale or lease of
> property of the estate, in the ordinary
> course of business, without notice or a
> hearing, and may use property of the estate
> in the ordinary course of business without
> notice or a hearing.

11 U.S.C. §363(c)(1).  A debtor in possession has all of the
rights and powers of a trustee with respect to property of the
estate, including the right to use property of the estate in
compliance with Section 363.  See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable
instruments, documents of title, securities, deposit accounts or
other cash equivalents in which the estate and an entity other
than the estate have an interest. . . ."  11 U.S.C. §363(a).
Section 363(c)(2) allows the use of "cash collateral" under
subsection (c)(1) if:

> (A)  each entity that has an interest in
> such cash collateral consents; or
> (B)  the court, after notice and a hearing,
> authorizes such use, sale or lease in

23

accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (B.A.P. 9th Cir. 1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  In re Dynaco Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

Pursuant to the Interim Order, the Lenders have already consented to the Debtors' use of cash collateral.  Based on the foregoing, and because none of the Other Secured Parties appear to have an interest in the Debtors' cash collateral, the Motion should be granted, and the Debtors should be authorized to use cash collateral pursuant to Section 363(c)(2)(A) of the Bankruptcy Code.

In addition, the Debtors submit that there is good cause to grant the Motion and authorize the Debtors' use of cash collateral pursuant to Section 363(c)(2)(B) of the Bankruptcy Code.  As discussed above, the only source of revenue available to the Debtors to use to operate, maintain, and preserve their

1  business is the revenue generated from the operation of the

2  Debtors' business.   The Debtors must be able to use cash

3  collateral until the closing of the sale of the Debtors' assets

4  to the Purchaser (or to a successful overbidder).   Without the

5  use of cash collateral, Debtors would not be able to continue

6  operating their business and would be forced to shut down which

7  would result in the loss of the jobs of all of the Debtors'

8  employees and the complete decimation of the going concern value

9  of the Debtors' business.   The Debtors would be left with no

10 option other than to liquidate which would result in a nominal

11 recovery by the Debtors' estates.

12 **B.    THE LENDERS AND ANY OTHER CREDITORS WITH AN INTEREST IN THE**

13      **DEBTORS' CASH COLLATERAL ARE ADEQUATELY PROTECTED.**

14      To the extent that an entity has a valid security interest

15 in the revenues generated by property, those revenues constitute

16 "cash collateral" under Section 363(a) of the Bankruptcy Code.

17 Pursuant to Section 363(c)(2), the Court may authorize the debtor

18 to use a secured creditor's cash collateral if the secured

19 creditor is adequately protected.   In re Mellor, 734 F.2d 1396,

20 1400 (9th Cir. 1984).   See also In re O'Connor, 808 F.2d 1393,

21 1398 (10th Cir. 1987); In re McCombs Properties VI, Ltd., 88 B.R.

22 261, 265 (Bankr. C.D. Cal. 1988).

23      Adequate protection can come in a number of forms.   11

24 U.S.C. § 361.   Cases have held that the preservation of the value

25 of a secured creditor's lien is sufficient to provide adequate

26 protection to a secured creditor when a debtor seeks to use cash

27 collateral.   In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988).

28

1   See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982).

2       As discussed above, the Lenders have consented to the

3   Debtors' use of cash collateral pursuant to the Interim Order,

4   which provides the Lenders with adequate protection in the form

5   of standard replacement liens and a "superpriority"

6   administrative claim to protect against any diminution in the

7   value of the Lenders' collateral occurring after the Petition

8   Date.

9       Since the Debtors do not believe that any Other Secured

10  Party has an interest in the Debtors' cash collateral, there is

11  no interest for which to provide adequate protection.

12  Notwithstanding the foregoing, the Debtors submit that any

13  alleged interests of the Other Secured Parties in cash collateral

14  will be adequately protected by the continued operation of the

15  Debtors' business pending the proposed sale.

16  C.  **THE PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THIS**

17      **MOTION HAVE BEEN SATISFIED**.

18

19      Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtors are

20  required to serve a copy of this Motion on any entity with an

21  alleged interest in the Debtors' cash collateral, any committee

22  appointed or on the 20 largest unsecured creditors if no

23  committee has been appointed, and any other entity that the Court

24  directs.  The Debtors have complied with the foregoing by serving

25  notice of the hearing on this Motion upon the Office of the

26  United States Trustee, all alleged secured creditors and their

27  counsel (if known), the Debtors' 20 largest unsecured creditors,

28  and other parties in interest via email, telephone, facsimile,

1   and/or overnight mail (to the extent that contact information was

2   available).   Moreover, the Debtors served a copy of this Motion

3   and   all   supportive   papers   by   overnight   mail   upon   the

4   aforementioned parties concurrently with the filing of such

5   papers with the Court.   Such parties should receive delivery by

6   overnight mail of the notice of the Motion, the Motion and all

7   supporting documents by not later than the morning following the

8   filing of these papers with the Court.

9                                    III.

10                               CONCLUSION

11      **BASED UPON ALL OF THE FOREGOING**, the Debtors respectfully

12  request that the Court enter an order in substantially the form

13  of the Interim Order attached hereto as Exhibit "2" to the

14  Pakkala Declaration and order as follows:

15      1.   finding, among other things, that notice of this Motion

16  was appropriate under the circumstances and complied with all

17  applicable provisions of the Bankruptcy Code, the Bankruptcy

18  Rules, and the Local Bankruptcy Rules;

19      2.   granting this Motion on an interim basis pending a

20  final hearing;

21      3.   authorizing the Debtors, subject to the terms of the

22  Interim Order, to use cash collateral to pay all of the expenses

23  set forth in the Budget on an interim basis pending a final

24  hearing;

25      4.   providing the Lenders with a replacement lien and

26  super-priority administrative claim as adequate protection as set

27  forth in the Interim Order;

28

1          5.    setting a final hearing on this Motion; and

2          6.    granting such other and further relief as the Court

3    deems just and proper.

4    Dated: May 19, 2010              WESTCLIFF MEDICAL LABORATORIES,
                                      INC.
5
                                      -and-
6
                                      BIOLABS, INC.
7

8                                     /s/ Ron Bender
                                      RON BENDER
9                                     JACQUELINE L. RODRIGUEZ
                                      TODD M. ARNOLD
10                                    JOHN-PATRICK M. FRITZ
                                      LEVENE, NEALE, BENDER, RANKIN
11                                    & BRILL L.L.P.
                                      (Proposed) Attorneys for Chapter 11
12                                    Debtors and Debtors in Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                        **DECLARATION OF ROBERT E. WHALEN**

3          I, ROBERT E. WHALEN, HEREBY DECLARE AS FOLLOWS:

4          1.    I have personal knowledge of the facts set forth below

5    and, if called to testify, would and could competently testify

6    thereto.

7          2.    I am the Chief Executive Officer and Chairman of the

8    Board of Directors of Westcliff Medical Laboratories, Inc.

9    ("Westcliff") and its parent corporation, BioLabs, Inc.

10   ("BioLabs" and, together with Westcliff, the "Debtors"), the

11   Chapter 11 debtors and debtors in possession in the above-

12   captioned, (proposed) jointly administered cases.  I have been

13   Board Chairman since 2007 and Chief Executive Officer since July,

14   2009.  I have approximately thirty-two years of experience in the

15   medical lab and related business.

16         3.    I make this declaration in support of the Motion to

17   which this declaration is attached.  Unless otherwise stated, all

18   capitalized terms herein have the same meanings as in the Motion.

19         4.    The Debtors filed their voluntary Chapter 11 bankruptcy

20   cases on May 19, 2010 (the "Petition Date").  The Debtors

21   continue to operate their business, manage their financial

22   affairs, and operate their bankruptcy estates as debtors in

23   possession pursuant to Sections 1107 and 1108 of the Bankruptcy

24   Code.

25         5.    Biolabs owns 100% of the equity of Westcliff and has no

26   other material assets.  I believe that Biolabs likely does not

27   have any cash collateral, as defined by Section 363(a) of the

28

1  Bankruptcy Code.  Biolabs has filed this Motion in its case
2  merely out of an abundance of caution.

3      6.   Westcliff, which was founded in 1964 as a community-
4  based laboratory, is the owner and operator of approximately 170
5  branded and stand-alone patient service center laboratories and
6  STAT labs that provide various services, including clinical
7  testing, pathology, reporting and support services for the
8  benefit of thousands of out-patients throughout California.
9  Westcliff has approximately 1,000 employees and is currently
10 generating approximately $100 million of annual revenue.

11     7.   Westcliff's main clinical hub is an 80,000 square foot
12 facility located in Santa Ana, California that opened in 2006.
13 Westcliff's primary anatomical pathology lab is a 12,800 square
14 foot facility located in Monrovia, California that opened in
15 2008.

16     8.   Working directly with patients and with contracted
17 payors, including United Health, Aetna, Cigna, Blue Cross, Medi-
18 Cal and Medicare, Westcliff grew and became a leading out-patient
19 laboratory service company.     Westcliff's lab operations
20 demonstrate industry-leading results, with low testing turn-
21 around times, high quality control scores, and a strong and
22 experienced sales and marketing team.

23     9.   Westcliff averages approximately 8,500 clinical
24 requests per day and approximately 1,200 pathology requests per
25 day, and performs approximately 250,000 cytology and 70,000
26 biopsy tests on an annual basis.  Based on this performance,
27 Westcliff is the third largest clinical laboratory in California.

28

1    10.   The California clinical laboratory testing market is
2    the  largest  in  the  nation,  with  estimated  revenues  of
3    approximately $2 billion.  Approximately 8% of the nations' tests
4    are performed in California, and over 200 million of California's
5    tests are conducted by independent labs (excluding hospital based
6    labs).   Based  on  current  volume,  Westcliff  accounts  for
7    approximately 5% of the California market.

8    11.   While the Debtors' revenue is significant, due to the
9    small profit margins in this business, despite significant and
10   continuing cost cutting measures undertaken by the Debtors, the
11   Debtors are simply not able to operate sufficiently profitably to
12   enable the Debtors to repay their debts.

13   12.   The Debtors suffered a net loss of approximately $87
14   million  in  2008  (including  expenses  and  write  offs  of
15   approximately $171 million) on net revenue of approximately $84
16   million.   The Debtors suffered a net loss of approximately $13
17   million  in  2009  (including  expenses  and  write  offs  of
18   approximately $110 million) on net revenue of approximately $97
19   million.

20   13.   While the Debtors instituted as many expense reductions
21   as  were  reasonably  possible,  the  Debtors'  losses  continued.
22   Since the beginning of 2009, the Debtors have been unable to make
23   any debt service payments to Agent (as defined in the Motion),
24   and the Debtors have been unable to remain current with their
25   other debt obligations, including payments owing to former owners
26   of companies the Debtors previously purchased as part of the
27   Debtors' overall growth strategy.   Indeed, the Debtors were only

28

31

1  able to survive financially over the past approximately seventeen

2  months  because  Agent  agreed  to  provide  the  Debtors  with

3  additional funding.

4      14.  In my opinion, the only way the Debtors can survive as

5  a stand alone going concern business would be for the Debtors to

6  raise many millions of dollars of additional equity which is not

7  possible given the Debtors' debt structure.

8      15.  As set forth in numerous concurrently filed pleadings,

9  the Debtors senior management has determined that an expedited

10  sale  of  substantially  all  of  the  Debtors'  assets  is  in  the

11  overwhelming best interests of the Debtors' estates and their

12  creditors.   Just prior to their bankruptcy filings, the Debtors

13  signed an asset purchase agreement with Laboratory Corporation of

14  America  and  its  wholly-owned  subsidiary  Wave  Newco,  Inc.

15  (collectively, "Purchaser").

16      I declare and verify under penalty of perjury that the

17  foregoing  is  true  and  correct  to  the  best  of  my  knowledge,

18  information and belief.

19      Executed this 19th day of May 2010, at Santa Ana, California.

20

21                          ROBERT E. WHALEN

22

23

24

25

26

27

28

                          32

## DECLARATION OF MATTHEW PAKKALA

I, MATTHEW PAKKALA, HEREBY DECLARE AS FOLLOWS:

1.   I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.   I am a Managing Director of FTI Consulting, Inc. ("FTI"), which maintains its main offices at 500 E. Pratt Street Suite 1400 Baltimore, MD 21202. My business office is located at 633 West 5th Street, 16th Floor, Los Angeles, California, 90071.

3.   I hold a B.A. from the University of California, San Diego, a J.D. from Loyola Law School, and an M.B.A. from the Anderson School of Business at UCLA. I have more than 13 years of restructuring and related advisory and management experience. My work focuses on advising distressed and underperforming companies, their lenders, creditors and other constituencies on restructuring alternatives and strategies for maximizing performance and value, and my expertise includes providing financial and operational advisory with respect to asset sales and estate wind-downs in the healthcare, retail, manufacturing and airline industries. Prior to joining FTI, I worked in the restructuring groups of PricewaterhouseCoopers and Price Waterhouse in Los Angeles.

4.   FTI is a global business advisory firm that specializes in business reorganization consulting and financial restructuring. Founded in 1982, FTI has more than 3,500 professionals in most major business centers in the world, and their client list comprises many of the Global 1000, as well as a

1  majority of the largest 25 banks and top 100 law firms in the
2  world.   FTI is designed to address the interrelated challenges
3  that can affect an organization's enterprise value and offers
4  highly specialized expertise in the areas of compliance, risk,
5  reputation, liability, performance, finance and information.   In
6  particular, FTI's market-leading corporate finance division has
7  advised management, senior lenders and unsecured creditors in
8  many of the most significant restructurings and turnarounds in
9  recent years, including Northwest Airlines, American Home
10 Mortgage, Bombay Company, Calpine, Global Power, Tower
11 Automotive, Winn Dixie, Refco, Delphi, Dana Corporation, Bally
12 Total Fitness, Circuit City, Delphi, Flying J / Big West Oil,
13 Fremont Investment & Loan, Gottschalks, Hawaiian Telecom,
14 Intermet, Lehman Brothers, LyondellBassell, Townsends, Inc.,
15 Tribune Company, Nortel Networks, Washington Mutual and WCI
16 Communities.

17        5.   FTI has advised management, senior lenders and
18 unsecured creditors in many of the most significant
19 restructurings and turnarounds in recent years.   FTI and its
20 professionals have also recently provided interim management
21 services in a number of healthcare and other restructurings
22 including, but not limited to, Downey Regional Medical Center,
23 Fremont Investment & Loan, SyntaxBrillian, Daughters of Charity
24 Health System, Methodist Hospital, Gary, IN, Quincy Medical
25 Center, Nanticoke Memorial, Northern Berkshire, Regional Medical
26 Center Memphis, and Boca Raton Community Hospital.

27

28

6.    Effective on or about April 1, 2010, I became the Chief Restructuring Officer ("CRO") for Westcliff Medical Laboratories, Inc. ("Westcliff") and its parent corporation, BioLabs, Inc. ("BioLabs"), Chapter 11 Debtors and Debtors in Possession (collectively, the "Debtors").

7.    The Debtors filed their voluntary Chapter 11 bankruptcy cases on May 19, 2010 (the "Petition Date").    The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

8.    My understanding is that the only material asset owned by BioLabs is its stock interest in Westcliff.

9.    My primary functions serving as the CRO for the Debtors was to manage the Debtors' business operations in the optimal manner given the financial constraints facing the Debtors and to assist the Debtors to consummate a going concern sale of their business for the most money possible in the most expeditous manner possible.

10.    Westcliff was founded in 1964 as a community-based laboratory and is headquartered in Santa Ana, California. Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California.    The Debtors have nearly 1,000 employees.

1    11.   In my opinion, the only way the Debtors can survive as
2  a stand alone going concern business would be for the Debtors to
3  raise many millions of dollars of additional equity which is not
4  possible given the Debtors' debt structure.

5    12.   As set forth in numerous concurrently filed pleadings,
6  the Debtors senior management has determined that an expedited
7  sale of substantially all of the Debtors' assets is in the
8  overwhelming best interests of the Debtors' estates and their
9  creditors.   Just prior to their bankruptcy filings, the Debtors
10  signed an asset purchase agreement with Laboratory Corporation of
11  America and its wholly-owned subsidiary Wave Newco, Inc.
12  (collectively, "Purchaser").

13    13.   Pending the Debtors' consummation of their asset sale
14  to Purchaser (or to a successful overbidder), the Debtors have a
15  need to use the revenue generated from the operation of their
16  business (i.e., cash collateral) to pay their post-petition
17  operating expenses, including payroll, rent, utilities,
18  insurance, taxes, costs related to the purchase of inventory and
19  supplies, etc.   Without the ability to use cash collateral for
20  these purposes, Westcliff would be forced to immediately shut
21  down its business and cease operations, which would result in the
22  loss of the jobs of all of the Debtors' employees, the decimation
23  of the going concern value of Westcliff's business, and, in my
24  opinion, certainly cause the Purchaser to terminate its purchase.
25  At that point, the Debtors would be left with no option other
26  than to liquidate which would likely result in a nominal recovery
27  by the Debtors' estates.

28

14. The Debtors' proposed operating budget (the "Budget"), a copy of which is attached hereto as Exhibit "1," contains the expenses I believe must be paid in order for the Debtors to continue to operate and preserve the value of their business pending completion of the sale of the Debtors' assets. The expenses contained in the first few weeks of the Budget are those expenses I believe must be paid to enable the Debtors to avoid immediate and irreparable harm to the Debtors' business and bankruptcy estates. The revenues projected in the Budget are the revenues the Debtors project receiving if business proceeds as planned.

15. Prior to the Petition Date, pursuant to the Credit Agreement dated as of June 30, 2006, as amended (the "Credit Agreement"), by and among (a) Biolabs as the "Parent Borrower," (b) Westcliff as the "Opco Borrower," (c) Agent Business Financial Services, Inc. ("Agent") (formerly known as Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc.), as administrative agent, lender, and sole bookrunner and sole lead arranger, (d) CapitalSource Finance, LLC, as lender ("CapitalSource"), and (e) Sandelman Finance 2006-1, Ltd. ("Sandelman" and, together with "Agent" and CapitalSource (the "Lenders"), Biolabs and Westcliff obtained credit and working capital loan facilities for funding necessary to enable Biolabs to acquire Westcliff and to provide the Debtors with working capital to enable them to operate their business.

16. In particular, pursuant to the Credit Agreement, the Lenders made three term loans and provided a revolving line of

37

1  credit to the Debtors (collectively, the "Initial Loans"). In
2  addition, pursuant to certain related agreements (the "Related
3  Agreements") entered into by and among the Debtors and the
4  Lenders, the Lenders made certain protective advances to the
5  Debtors (the "Advances"). The Initial Loans and the Advances are
6  collectively referred to herein as the "Loans". As of the
7  Petition Date, the outstanding balance owing by the Debtors to
8  the Lender as a result of the Loans was approximately $56
9  million. The Debtors' obligations to the Lenders are secured by
10 a first priority lien and security interest against substantially
11 all of the Debtors' personal property.

12     17. Based on the Kim Declaration, and the UCC Reports from
13 the Debtors' respective states of incorporation, which are
14 attached to the Kim Declaration as Exhibits "3" and "4," I am
15 informed and believe that the Other Secured Parties appearing in
16 the UCC Reports that have alleged non-lapsed, non-terminated
17 liens against certain of the Debtors' assets consist of the
18 following:

| Name | Address | City | St. | Zip |
|---|---|---|---|---|
| Bank of America, N.A., as Successor by Merger to LaSalle Bank Nat'l Assn. | 135 South LaSalle Street | Chicago | IL | 60603 |
| Becton Dickinson & Co. | 1 Becton Drive | Franklin Lakes | NJ | 07417 |
| BMT Leasing, Inc. | P.O. Box 692 | Bryn Mawr | PA | 19010 |
| Cisco Systems Capital Corp. | 170 W. Tasman Drive, MS SJ13-3 | San Jose | CA | 95134 |
| CYTYC Limited Partnership | 250 Campus Drive | Marlborough | MA | 01752 |
| Diasorin, Inc. | 1951 Northwestern Avenue | Stillwater | MN | 55082 |
| Jules and | 515 S. Figueroa | Los Angeles | CA | 90071 |

| | | | | |
|---|---|---|---|---|
| Associates, Inc. | St., Suite 1950 | | | |
| Leasing Associates of Barrington, Inc. | 33 W. Higgins Road, Suite 1030 | South Barrington | IL | 60010 |
| M & I Marshall & Ilsley Bank | 770 N. Water Street | Milwaukee | WI | 53202 |
| Norlease, Inc. | 50 South LaSalle Street | Chicago | IL | 60675 |
| Olympus America, Inc. | 3500 Corporate Parkway | Center Valley | PA | 18034 |
| Phadia US Inc. | 4169 Commercial Ave. | Portage | MI | 49002 |
| Pitney Bowes Credit Corp. | 27 Waterview Drive | Shelton | CT | 06484 |
| Roche Diagnostics Corporation | 9115 Hague Road | Indianapolis | IN | 46250 |
| TCF Equipment Finance, Inc. | 11100 Wayzata Blvd., Suite 801 | Minnetonka | MN | 55305 |

18. Based on the Kim Declaration, and the UCC Reports from the Debtors' respective states of incorporation, which are attached to the Kim Declaration as Exhibits "3" and "4," I am informed and believe that the liens of the Other Secured Parties only relate to particular equipment leased or purchased by the Debtors. Therefore, I do not believe that the liens of the Other Secured Parties extend to any of the Debtors' cash collateral. Notwithstanding the foregoing, all of the Other Secured Parties appearing on the UCC Reports that have alleged non-lapsed, non-terminated liens on the Debtors' assets were provided with notice of the Motion and a copy of the Motion.

19. I believe that the relief requested herein is clearly warranted as being in the best interests of the Debtors' estates. I believe that the Lenders are the only parties with an interest in any cash collateral of the Debtors, and the Lenders have

1  already agreed to the Debtors' use of cash collateral pursuant to

2  the terms of the Interim Order.

3      I declare and verify under penalty of perjury that the

4  foregoing is true and correct to the best of my knowledge,

5  information and belief.

6      Executed on this 19th day of May, 2010, at Santa Ana,

7  California.

8

9                            MATTHEW PAKKALA, Declarant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF MONICA Y. KIM

2      I, MONICA Y KIM, HEREBY DECLARE AS FOLLOWS:

3      1.   I have personal knowledge of the facts set forth

4   herein, and, if called as a witness, could and would testify

5   competently with respect thereto.

6      2.   I am a member of Levene, Neale, Bender, Rankin & Brill

7   L.L.P. ("LNBRB"), proposed counsel to Westcliff Medical

8   Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"

9   and, together with Westcliff, the "Debtors"), the Chapter 11

10  debtors and debtors in possession in the above-captioned,

11  (proposed) jointly administered cases. I am licensed to practice

12  law in the State of California and before this Court.

13     3.   I make this declaration in support of the Motion to

14  which this declaration is attached. Unless otherwise stated, all

15  capitalized terms herein have the same meanings as in the Motion.

16     4.   I am informed and advised by Westcliff that it is a

17  corporation incorporated in the State of California. As of the

18  filing date of its case, the Debtors' business office was located

19  at 1821 East Dyer Road, Suite 100, Santa Ana, CA 92705.

20     5.   I am informed and advised by Biolabs that it is a

21  corporation incorporated in the State of Delaware.

22     6.   On May 13, 2010, I obtained a UCC Report for Westcliff

23  covering the state of California, which summarizes all UCC-1

24  Financing Statements recorded with the California Secretary of

25  State and includes a copy of all such UCC-1 Financing Statements.

26  The UCC Report for Westcliff is attached hereto as Exhibit "3."

27

28

1   Briefly, the active filings as of the Petition Date appear to be
2   as follows:

3      (a)   **GE Business Financial Services, Inc. formerly known as**
4   **Merrill Lynch Capital, a division of Merril Lynch Business**
5   **Financial Services Inc. ( "Agent")**.   Agent has two active
6   financing statements as follows, covering all of Westcliff's
7   assets and proceeds thereof:

8         •  File number 20067076047653 filed June 30, 2006 (with
9            amendments filed July 3, 2006, August 18, 2008 and
10           September 2, 2008)
11        •  File number 30067076462442 filed July 5, 2006 (with
12           amendments filed August 18, 2008 and September 2, 2008)

13

14     (b)   **Cisco Systems Capital Corporation ("Cisco")**.   Cisco has
15  one active financing statement as follows, which appears to be an
16  equipment lease filing:

17        •  File number 20057027925875 filed May 23, 2005

18

19     (c)   **CYTYC Limited Partnership ("CYTYC")**.   CYTYC has one
20  active financing statement as follows, which appears to cover
21  certain equipment relating to image processing:

22        •  File number 20057044249348 filed October 3, 2005

23

24     (d)   **Jules and Associates, Inc./TCF Equipment Finance, Inc.**
25  **("Jules/TCF")**.   Jules/TCF has five active financing statements as
26  follows, all of which appear to be equipment lease filings:

27        •  File number 20057046283661 filed October 20, 2005

28

- File number 20067053848920 filed December 29, 2005
- File number 20067056775265 filed January 24, 2006
- File number 20087142579518 filed on January 7, 2008 (as to Jules and Associates, Inc. only)
- File number 20087159238285 filed on May 27, 2008 (as to Jules and Associates, Inc. only)

(e) **Pitney Bowes Credit Corporation ("Pitney")**. Pitney has one active financing statement as follows, which appears to cover equipment manufactured, sold, distributed or financed by Pitney or its subsidiaries, and proceeds therefrom:

- File number 20057053694180 filed December 30, 2005

(f) **Norlease, Inc. ("Norlease")**. Norlease has three active financing statements as follows, all of which appear to be equipment lease filings:

- File number 20067081998664 filed August 18, 2006 (obtained by assignment from Leasing Associates of Barrington, Inc. filed August 7, 2007)
- File number 20067081998785 filed August 18, 2006 (obtained by assignment from Leasing Associates of Barrington, Inc. filed November 3, 2006)
- File number 20077106070735 filed on March 13, 2007 (obtained by assignment from Leasing Associates of Barrington, Inc. filed May 10, 2007)

1   (g) **Olympus America Inc. ("Olympus")**.   Olympus has one

2   active financing statement as follows, which appears to be an

3   equipment lease filing:

4   • File number 20067083020450 filed August 28, 2006

5

6   (h) **M&I Marshall & Ilsley Bank ("M&I")**.   M&I has one active

7   financing statement as follows, which appears to be an equipment

8   lease filing:

9   • File number 20067087720380 filed October 10, 2006

10   (obtained by assignment from Leasing Associates of

11   Barrington, Inc. filed April 9, 2007)

12

13   (i) **Becton Dickinson & Co. ("Becton")**.   Becton has one

14   active financing statement, which appears to cover certain

15   equipment and related accessories and peripherals:

16   • File number 20077114693735 filed February 15, 2007

17

18   (j) **Diasorin Inc. ("Diasorin")**.   Disorin has two active

19   financing statements as follows, all of which appear to cover

20   certain equipment (Eti-Max instrument and other equipment

21   provided by Diasorin):

22   • File number 20077103396187 filed on February 15, 2007

23   • File number 20077106956364 filed on March 20, 2007

24

25   (k) **Roche Diagnostic Corporation ("Roche")**.   Roche has two

26   active financing statements as follows, all of which appear to be

27   equipment lease filings:

28

44

- File number 20077114693735 filed May 22, 2007
- File number 20097188621143 filed on February 24, 2009

(1) **Leasing Associates of Barrington, Inc. ("Leasing Associates").** Leasing Associates has three active financing statements as follows, all of which appear to be equipment lease filings:

- File number 20087153046125 filed April 7, 2008 (obtained by assignment from Bank of America, N.A. filed June 29, 2009; also with amendment filed September 15, 2008)
- File number 20087163605844 filed July 1, 2008 (obtained by assignment from Bank of America, N.A. filed June 23, 2005)
- File number 20087171928679 filed September 15, 2008

(m) **Pitney Bowes Global Financial Services LLC ("Pitney Global").** Pitney Bowes has one active financing statement as follows, which appears to cover equipment manufactured, sold, distributed or financed by Pitney Global or any of its subsidiaries, and all proceeds therefrom:

- File number 2097195614961 filed May 6, 2009

(n) **Phadia US Inc. ("Phadia").** Phadia has one active financing statement as follows, which appears to cover all equipment described in the Instrumentation Use Agreement between the parties:

- File number 20097198072841 filed June 2, 2009

(o) **BMT Leasing, Inc. ("BMT")**.   BMT has one active financing statement as follows, which appears to one piece of equipment:

- File number 2008717096463 filed September 8, 2008

7.   On May 13, 2010, I obtained a UCC Report for Biolabs covering the state of Delaware, which summarizes all UCC-1 Financing Statements recorded with the Delaware Secretary of State and includes a copy of all such UCC-1 Financing Statements. The UCC Report for Biolabs is attached hereto as Exhibit "4." Briefly, the active filings as of the Petition Date appear to be as follows:

(a) **Agent**.   Agent has two active financing statements as follows, covering all of Biolab's assets and proceeds thereof:

- File number 6227327 4 filed June 30, 2006 (with amendments filed July 3, 2006, August 18, 2008 and September 2, 2008)
- File number 30067076462442 filed July 5, 2006 (with amendments filed August 18, 2008 and September 2, 2008)

(b) **Roche**.   Roche has two active financing statements as follows, all of which appear to be equipment lease filings:

- File number 6326229 2 filed September 21, 2006
- File number 2007 2750130 filed on July 20, 2007

8.    The foregoing is provided for information purposes only.  Nothing contained herein is intended to be, and nothing contained herein shall be, construed or interpreted as the provision of any legal opinion by the declarant or LNBRB, or acknowledgement by the Debtors, regarding the validity, priority and extent of any liens asserted by any of the Debtors' creditors against the Debtors or otherwise, or the legal nature and character of the parties' pre-petition agreements.  The rights of the Debtors and all of its creditors which respect to the claims, liens and interests asserted by such creditors are fully preserved except as agreed by the Debtors in the proposed Interim Order (as defined in the Motion).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of May 2010 at Los Angeles, California.

/s/ Monica Y. Kim
MONICA Y. KIM