RON BENDER (SBN 143364)
JACQUELINE L. RODRIGUEZ (SBN 198838)
TODD M. ARNOLD (SBN 221868)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com

Proposed Counsel for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## (SANTA ANA DIVISION)

| | |
|---|---|
| In re:<br><br>WESTCLIFF MEDICAL LABORATORIES, INC.,<br><br>        Debtor.<br>——————————————<br>BIOLABS, INC.,<br><br>        Debtor.<br>——————————————<br>——————————————<br>☒ Affects Both Debtors<br><br>☐ Affects WESTCLIFF MEDICAL<br>   LABORATORIES, INC. only<br><br>☐ Affects BIOLABS, INC. only | [Proposed]<br>Lead Case No. 8:10-bk-16743<br>[Proposed] Jointly Administered<br>with Case No. 8:10-bk-16746[1]<br><br>Chapter 11 Cases<br><br>**APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION TO EMPLOY MTS HEALTH PARTNERS L.P. AS THEIR INVESTMENT BANKER AND FINANCIAL ADVISOR; DECLARATION OF CURTIS S. LANE IN SUPPORT THEREOF**<br><br>Court Scheduled Hearing:<br>Date:  To be scheduled by the Court<br>Time:  To be scheduled by the Court<br>Place: Courtroom "5D"<br>       411 West Fourth Street<br>       Santa Ana, CA 92701-4593 |

[1] Motion for Joint Administration pending.

In support of this Application to employ MTS Health Partners L.P. ("MTS") as its investment banker and financial advisor, Westcliff Medical Laboratories, Inc. ("Westcliff") and Biolabs Inc. ("Biolabs"), the debtors and debtors in possession in the above-entitled Chapter 11 bankruptcy cases (the "Debtors") hereby allege as follows:

1. The Debtors commenced their chapter 11 bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101, *et seq.,* as amended (the "Bankruptcy Code") on May 19, 2010 (the "Petition Date"). The Debtors are operating their business and managing their financial affairs and administering their estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. Biolabs owns 100% of the equity of Westcliff and has no other material assets.

3. Westcliff, which was founded in 1964 as a community-based laboratory, is the owner and operator of approximately 170 branded and stand-alone patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California.

4. As set forth in numerous concurrently filed pleadings, the Debtors have determined that an expedited sale of their business and certain of their assets is in the overwhelming best

2

1  interests of the Debtors' estates and their creditors.   Just

2  prior to their bankruptcy filings, the Debtors signed an asset

3  purchase agreement with Laboratory Corporation of America and its

4  wholly-owned   subsidiary   Wave   Newco,   Inc.   (collectively,

5  "Purchaser").

6

7       5.   The Debtors require the services of an investment

8  banking   and   financial   advisory   firm   to   assist   them   in

9  facilitating a sale, or other disposition, of their business

10 and/or assets referred to herein as a "Sale Transaction" to the

11 Purchaser or an overbidder.[2]   In that regard, the Debtors believe

12 that the immediate employment of an investment banking and

13 financial advisory firm such as MTS, which is qualified to

14 accomplish the Debtors' objectives, is essential to the Debtors'

15 pursuit of their strategy in these cases.

16

17

18

19

20

[2] For the purpose of this Application and the agreement by and between MTS and
21 the Debtors, which is attached as Exhibit "A" to the Declaration of Curtis S.
Lane, appended hereto, a "Sale Transaction" is defined as "a transaction or
22 plan pursuant to which more than 50% of the voting equity is, or assets of
[the Debtors or their subsidiaries] are, transferred through an asset sale,
23 merger business combination, consolidation, Restructuring or other similar
transaction, or series of related transactions, in each case whether or not
24 pursuant to Chapter 11 of the Bankruptcy Code, any of which, the Debtors
acknowledge, would be subject to Court approval." (Exhibit "A" at Section 1.)
25 A "Restructuring" shall mean "any restructuring, reorganization and/or
recapitalization of the Company (whether or not pursuant to Chapter 11 of the
26 Bankruptcy Code) compromising, refinancing, modifying or otherwise materially
revising the terms of its senior credit agreement, dated as of June 30, 2006
27 (as amended)." (Exhibit "A" at Section 1).

28

6.   Specifically, the Debtors require the assistance of an investment banker and financial advisor to provide them with the following types of services:

(a)  reviewing and analyzing the Debtors' business, including without limitation its operations and financial projections in connection with a Sale Transaction;

(b)  evaluating the Debtors' potential debt capacity in light of their historical and projected cash flows from each line of business;

(c)  assisting in the preparation and analysis of business plans, financial projections, and other reports or analyses in connection with a Sale Transaction;

(d)  assisting in the analysis and determination of various capital structures for the Debtors in connection with any potential Sale Transaction, and analyzing the potential impact of these structures on the recoveries of those stakeholders impacted by such a Sale Transaction;

(e)  advising the Debtors on tactics and strategies for negotiating with the various creditors under their senior credit agreement dated as of June 30, 2006 (the "Credit Agreement") and with the holders of equity interests in the Debtors (the "Holders") and creditors;

(f)  rendering financial advice to the Debtors and participating in meetings or negotiations with the Holders,

4

1

2    creditors and/or other appropriate parties in connection with

any Sale Transaction;

3

4        (g) advising the Debtors on the timing, nature, and

terms of new securities, other consideration or other

5

inducements to be offered pursuant to any Sale Transaction;

6

7        (h) assisting in identifying and evaluating candidates

8    for a potential Sale Transaction involving all or a portion

9    of the Debtors' assets or their businesses, advising the

10   Debtors in connection with such negotiations and aiding in

11   the consummation of a Sale Transaction;

12       (i) providing, as required and appropriate, any

13   testimony concerning any of the services detailed herein;

14

15       (j) assisting in the preparation of documentation for

16   the Court and creditors and communicating with their

17   respective financial advisors;

18       (k) at the Debtors' request, rendering a written

19   opinion to the Debtors' Board of Directors as to the fairness

20   to Debtors, from a financial point of view, of the

21   consideration to be received by the Debtors or the Holders or

22   others in connection with a Sale Transaction, or, in the case

23   of a stock-for-stock merger, the fairness of the exchange

24   ratio (the "Fairness Opinion");

25

26       (l) providing such other investment banking and/or

27   financial advisory services as are customarily provided in

28

5

1    connection with the analysis and negotiation of a Sale

2    Transaction, as mutually agreed; and

3        (m) providing such other financial advisory and/or

4    investment banking services as Debtors and/or the Debtors'

5    counsel may request.

6

7    7.    By this Application, the Debtors seek to employ MTS as

8    their investment banker and financial advisor for the purposes

9    set forth above, pursuant to 11 U.S.C. §§ 327(a) and 328, at the

10   expense of the their bankruptcy estates, and to have their

11   employment of MTS be deemed effective as of the Petition Date.

12

13   8.    The Debtors believe that MTS is exceptionally well

14   qualified to provide the services described above.    MTS has

15   extensive transactional experience and investment banking,

16   strategic, financial, capital markets, executive management and

17   operational expertise.   MTS also has an in-depth knowledge of the

18   healthcare industry, its trends, transactions and decision-

19   makers.   Its senior personnel have decades of healthcare-focused

20   experience as well as cumulative team experience in working on

21   over 1000 transactions.     This experience allows MTS to

22   understand the markets served by the Debtors' business and its

23

24   competitive position, which knowledge will allow MTS to maximize

25   the value to the Debtors' estates.   Attached as Exhibit "B" to

26   the Declaration of Curtis S. Lane, annexed hereto (the "Lane

27   Declaration") is MTS's biographical information, which provides

28

6

general background information about the firm and its experience.

9.  MTS also has a history with the Debtors.  Prepetition, MTS was engaged to assist in the sale of the Debtors' business after Bank of America and Wachovia (who were previously employed as the Debtors' investment bankers) spent a substantial amount of time and effort attempting to locate a buyer for the Debtors' business and assets, but failed.

10.  Specifically, starting in October 2009, MTS helped the Debtors create materials describing their business and assets for distribution to potential buyers in the healthcare industry, MTS marketed the Debtors' business and assets to its extensive network of healthcare related companies and others, and MTS communicated with potential purchasers or counterparties to a potential Sale Transaction to encourage those parties to make an offer.  As a result of MTS's efforts, the Debtors were able to locate a buyer (the "Purchaser") for their business and certain assets (the "Assets").  Concurrently herewith, the Debtors have filed a motion for approval of a sale of the Assets to the Purchaser subject to overbidding.

11.  To make absolutely certain that the highest possible price is paid for the Assets, the Debtors and the Purchaser have agreed to various overbid procedures and the Debtors have filed a motion, concurrently herewith, seeking the approval of those procedures.

7

12.  MTS is knowledgeable about the parties who could possibly be interested in paying more for the Debtors' business and assets than what the Purchaser has offered, and MTS will make every reasonable effort to attempt to facilitate an overbid.

13.  As MTS is familiar with the Debtors' industry and with their business, with the terms of the proposed sale, with the Purchaser and the potential overbidders, the Debtors believe that the employment of another investment banking and financial advisory firm would substantially delay the sale process.  Thus, the Debtors believe that MTS's assistance is essential in these cases.

14.  Curtis S. Lane, the Senior Managing Director and Founder of MTS, will be the individual who will be primarily responsible for rendering and/or supervising the services described above.  Mr. Lane's professional biography is included in Exhibit "B" to the Lane Declaration (at page 14).  Brad Sitko, an associate of MTS, and others, will assist Mr. Lane in providing services to the Debtors.  Mr. Sitko's biography and the biographies of all of MTS's other team members are included in pages 14 through 18 of Exhibit "B".

15.  The Debtors seek to employ MTS under the terms and conditions set forth in that certain engagement letter agreement executed by the Debtors and MTS on or about May 19, 2010 (the "Engagement Agreement").  A true and correct copy of the

1  Engagement Agreement is attached to the Lane Declaration as

2  Exhibit "A".

3      16.   The following is a summary of the terms and conditions

4  of the proposed employment, which is fully described in the

5  Engagement Agreement.[3]

6

7      a.   EXCLUSIVITY:  During the term of MTS's employment,

8  MTS shall serve as the Debtors' exclusive financial advisor.

9      b.   RETAINERS:  Prepetition, the Debtors paid MTS (among

10  other amounts described below), a retainer in the amount of

11  $75,000 to be used by MTS towards its fees and expenses.

12  The Debtors agree that, post petition, they will pay MTS an

13  additional retainer in the amount of $50,000 to be used by

14  MTS towards its fees and expenses by no later than June 2,

15  2010 (which is two weeks from the date of the full execution

16  of the Engagement Agreement);

17

18      c.   FEES:

19          (i)   Monthly Fees:  The Debtors shall pay MTS a

20          monthly fee of $100,000 per month (the "Monthly Fee")

21          due and payable on the 19th of each month starting in

22          June 2010 until the later of: (a) the consummation of a

23          Sale Transaction, (b) four months and one day after the

24

25  _____

26  [3] The following is intended to be a summary of the compensation terms between
    MTS and the Debtors.  To the extent there is a conflict between the terms of
27  the Engagement Agreement and this summary, the terms of the Engagement
    Agreement shall control.

28

execution of the Engagement Agreement, and (c) the Engagement Agreement has been terminated pursuant to the terms of the Engagement Agreement. Each Monthly Fee shall be fully earned on the date that it is paid in accordance with the terms of the Engagement Agreement.

(ii) Success Fee: In the event that a Sale Transaction is consummated, or the Debtors enter into an agreement regarding a Sale Transaction that is subsequently consummated, during the Term of MTS's employment or within 12 months thereafter, the Debtors agree to pay MTS a fee of $900,000 (the "Success Fee") in cash and out of the sale proceeds to the extent not previously paid in accordance with the terms of the Engagement Agreement.

(iii) Fairness Opinion Fee: In the event that the Debtors should ask MTS to prepare a Fairness Opinion, the fee for the preparation of such an opinion shall be as agreed to by and between the Debtors and MTS, but shall not exceed $500,000.

(iv) Cap on Fees: In any event, MTS's total fees shall not exceed $1.425 million.

d.    EXPENSE REIMBURSEMENT:

(i)    The Debtors agree to promptly reimburse MTS,

1   upon its monthly request, for its reasonable out-of-
2   pocket expenses incurred in connection with the
3   services to be provided as described in the Engagement
4   Agreement (the "Expenses") provided that the total
5   Expenses shall not exceed, in the aggregate, the sum of
6   $50,000; however, the Expenses may include, subject to
7   the Debtors' prior approval, the reasonable fees and
8   expenses of one legal counsel for MTS.

10      (ii) The Debtors agree to pay an additional
11  $50,000 to MTS as an expense advance post petition,
12  which advance (the "Expense Advance") will be credited
13  by MTS against any Expenses to be reimbursed by the
14  Debtors to MTS in accordance with the Engagement
15  Agreement.

17      (iii) Any portion of the Expense Advance that is
18  not required to reimburse MTS for Expenses will be
19  returned to the Debtors within three business days
20  following the termination of the Engagement Agreement.

21      e.   PAYMENT FROM SALE PROCEEDS:  In the event that a Sale
22  Transaction is consummated, all fees and expenses payable to
23  MTS under the Engagement Agreement, including but not
24  limited to the Monthly Fee and the Success Fee, shall be
25  paid out of the proceeds from such Sale Transaction unless
26  such fees and expenses have previously been paid to MTS in

1       accordance with the terms of the Engagement Agreement.

2              f.   INDEMNIFICATION:   The   Debtors   agree   to   the

3       indemnification and contribution provisions set forth in

4       Attachment  "A"  to  the  Engagement  Agreement  (the

5       "Indemnification Letter"), which, in summary, provide as

6       follows:[4]

7

8              (i)  In  the  event  that  MTS  or  any  of  MTS's

9              members, employees, affiliates or controlling persons,

10             if any (each of the foregoing, including MTS, being an

11             "Indemnified Person") become involved in any capacity,

12             in  any  action,  claim,  proceeding  or  investigation

13             brought  or  threatened  by  or  against  any  person,

14             including  the  Debtors'  shareholders,  related  to,

15             arising out of or in connection with MTS's engagement,

16             the  Debtors  will  promptly  reimburse  each  such

17             Indemnified Person for its reasonable legal fees and

18             expenses and other expenses (including the cost of any

19             investigation and preparation) as and when they are

20             incurred in connection therewith.

21

22             (ii) The Debtors shall indemnify and hold harmless

23             each Indemnified Person from and against any losses,

24

25      _____

26      [4] The following description is only a summary of certain of the terms of the
        Indemnification Letter.  Interested Parties should review the Indemnification
        Letter in its entirety to determine its contents.  To the extent that the
27      description of the terms of the Indemnification Letter should differ from the
        actual terms of the Indemnification Letter, the terms of the Indemnification

28

                                      12

claims, damages, liabilities or expenses to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with MTS's engagement, whether or not in connection with any action, proceeding or investigation in which the Debtors or such Indemnified Persons are a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment to have resulted from such Indemnified Person's actual fraud, bad faith, gross negligence or willful misconduct.

(iii) If for any reason the foregoing indemnification is finally judicially determined to be unenforceable, then the Debtors shall contribute to the loss, claim, damage, liability or expense for which such indemnification is held unenforceable in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by the parties in the matters contemplated by the MTS engagement as well as the relative fault of the Debtors and the party entitled to contribution with respect to such loss, claim, damage, liability or expense and any

Letter shall control.

other relevant equitable considerations.

(iv) The Debtors agree that for the purposes of the Indemnification Letter, the relative benefits received, or sought to be received, by the Debtors and their shareholders and MTS shall be deemed to be in the same proportion as (a) the total value paid or proposed to be paid or received by the Debtors or their shareholders pursuant to a Sale Transaction (whether or not consummated) for which MTS has been engaged to perform financial advisory services bears to (b) the fees paid or proposed to be paid to MTS in connection with such Engagement.

(v) Notwithstanding the foregoing, to the extent permitted by applicable law, in no event shall MTS or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to MTS pursuant to the Engagement Letter.

g. AGREEMENT TERM AND TERMINATION:

(i) The Engagement Agreement shall continue in effect until terminated by either party at any time upon fifteen (15) days prior written notice (the "Term").

(ii) In the event of any such termination: (a) the expense reimbursement provisions of Section 3(d) and

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

the indemnification provisions in Attachment "A" to the

Engagement Agreement will remain operative regardless

of any such termination.

(iii)  In  addition,  in  the  event  of  any  such

termination, the Debtors' remaining obligations to MTS

following such termination shall be: (a) to pay Monthly

Fees, without duplication, through the end of the month

in which the termination occurs, plus any additional

Monthly Fees required to ensure that MTS has received

an aggregate sum of five Monthly Fees during the period

prior to or post-termination, so long as a definitive

agreement for a Sale Transaction (without material

diligence  or  other  contingencies)  has  not  been

executed; and (b) to pay the Success Fee to MTS

(assuming no Success Fee was previously paid and as it

may be reduced pursuant to Section 3(b)) in the event

that a Sale Transaction is consummated during the one-

year period following the date of termination, or a

definitive agreement for a Sale Transaction (without

material diligence or other contingencies) has been

executed during such one-year period and subsequently

consummated, with the Success Fee being paid out of the

proceeds from any Sale Transaction to the extent it has

not previously been paid to MTS in accordance with the

15

1          terms of this Agreement.

2     17. Prepetition, MTS received fees from the Debtors

3  totaling $150,000 in connection with services that MTS provided

4  to the Debtors for the period from October 2009 through the

5
6  Petition Date.  Prepetition, MTS also received an expense advance

7  in the amount of $25,000, which was used in full by MTS

8  prepetition, and a $75,000 retainer for future fees and expenses

9  (described in Paragraph 16b).

10    18. The source of the payments to be made to MTS will be

11  the Debtors' operating revenue and/or the proceeds from the

12  closing of a Sale Transaction approved by the Court.

13
14    19. The Debtors have discussed the proposed terms of MTS's

15  employment and compensation with their senior secured lenders --

16  GE Business Financial Services, Inc., CapitalSource Finance, LLC,

17  and Sandelman Finance 2006-1, Ltd. (collectively referred to

18  herein as the "Lenders").  The Debtors believe that the Lenders

19  are the only creditors who assert a security interest in the

20  Debtors' revenue.

21    20. The Debtors and MTS negotiated the terms of the

22
23  Engagement Agreement based upon a number of factors, including,

24  but not limited to, the size and substantial complexity of the

25  engagement and the significant amount of time that MTS expects to

26  devote to providing services to the Debtors and the opportunity

27  cost to MTS.

28

16

1     21. As set forth in the Lane Declaration, MTS understands

2 the provisions of 11 U.S.C. Section 328 which provides, among

3 other things, that after the conclusion of MTS's employment, the

4 Court may allow compensation different from the compensation

5

6 provided for in the Application herein if the terms of the

7 Application prove to be improvident in view of circumstances

8 "that were not capable of being anticipated" at the time the

9 Application was approved.

10     22. MTS understands the provisions of 11 U.S.C. Sections

11 327, 328, 330 and 331 which require, among other things, Court

12 approval of the Debtors' employment of MTS as an investment

13 banker and financial advisor and of any compensation that MTS

14

15 will receive from the Debtors' estates. MTS is familiar with the

16 Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy

17 Rules for the Central District of California, and will comply

18 with them.

19     23. As set forth in the Lane Declaration, the Debtors owe

20 MTS $450,000 for prepetition fees and expenses (the "Prepetition

21 Claim"). However, upon the entry of an Order approving MTS's

22

23 employment in accordance with the terms of the Engagement

24 Agreement, MTS has agreed to waive the Prepetition Claim. MTS has

25 not received, and has no present plan to receive, any lien or

26 other interest in property of the Debtors or of a third party to

27 secure payment of its fees.

28

17

1    24.  Additionally, as set forth in the Lane Declaration, MTS

2  is a "disinterested person" within the meaning of Section 101(14)

3  of the Bankruptcy Code.  MTS is not an equity security holder of

4  the Debtors or an insider of the Debtors.  MTS is not, and was

5
   not, within 2 years before the date of the filing of the
6
   petition, a director, officer or employee of the Debtors.  MTS
7
8  does not have an interest materially adverse to the interests of

9  the estate or of any class of creditors or equity holders, by

10  reason of any direct or indirect relationship to, connection

11  with, or interest in, the Debtors, or for any other reason.

12  Neither MTS nor any of its members, professionals or employees

13
   have any "connections" or hold or represent any interests adverse
14
15  to the Debtors, any insider of the Debtors, or any other related

16  entities in which the Debtors may have an interest, its

17  creditors, or any party in interest in this case, including the

18  Office of the United States Trustee, or their respective

19  attorneys or accountants.

20    25.  As the Debtors have filed an emergency motion to have

21  this Application heard on an emergency basis, and notice of a

22
   hearing on regular notice has not been sent out concurrently with
23
24  the filing of this Application, a copy of a notice of a hearing

25  of this Application on regular time cannot be attached hereto in

26  accordance with Local Bankruptcy Rule 2014-1(b)(2).

27  Nevertheless, notice of the hearing on this Application will be

28

18

1 │ sent out as soon as the Court schedules a hearing date for the

2 │ Application.

3 │     26.  For the foregoing reasons, the Debtors believe that

4 │ MTS' employment as their investment banker and financial analyst,

5 │

6 │ at the expense of their estates, is necessary and in the best

7 │ interests of the Debtors, their estates and their creditors.

8 │     **WHEREFORE**, the Debtors respectfully request that the Court

9 │ enter an order:

10 │     a.  approving the Engagement Agreement in its

11 │     entirety;

12 │     b.  approving the Debtors' employment of MTS as their

13 │

14 │ investment banker and financial advisor effective as of the

15 │ Petition Date upon the terms and conditions set forth in the

16 │ Engagement Agreement; and

17 │     c.  granting such other relief as the Court may deem

18 │     appropriate under the circumstances.

19 │ Dated: May 19, 2010          WESTCLIFF  MEDICAL  LABORATORIES,

20 │                         INC. and BIOLABS, INC.,

21 │

22 │                     By: _____

23 │                         Robert E. Whalen
                        Chief Executive Officer and
                        Chairman of the Board

24 │

25 │

26 │

27 │

28 │

1   Submitted By:
    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
2

3   By:    _/s/ Jacqueline L. Rodriguez_____
4          RON BENDER
           JACQUELINE L. RODRIGUEZ
5          TODD M. ARNOLD
           JOHN-PATRICK M. FRITZ
6          LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
           Proposed Counsel for Debtors and Debtors in Possession
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF CURTIS S. LANE

I, Curtis S. Lane, hereby declare as follows:

1.    I am the Founder and Senior Managing Director of MTS Health Partners, L.P. ("MTS").  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    Westcliff Medical Laboratories, Inc. ("Westcliff") and Biolabs Inc. ("Biolabs"), the debtors and debtors in possession in the above-entitled Chapter 11 bankruptcy cases (the "Debtors"), commenced their chapter 11 bankruptcy cases by filing voluntary petitions under 11 U.S.C. §101 *et seq.*, as amended (the "Bankruptcy Code") on May 19, 2010.

3.    Biolabs owns 100% of the equity of Westcliff and has no other material assets.

4.    Westcliff, which was founded in 1964 as a community-based laboratory, is the owner and operator of approximately 170 branded and stand-alone patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California.

5.    The Debtors seek to consummate an expedited sale of their business and certain of their assets.

6.    The Debtors require the services of an investment

banking and financial advisory firm to facilitate and assist them with the sale of their business, or other disposition of their assets.

7. Just prior to their bankruptcy filings, the Debtors signed an asset purchase agreement with Laboratory Corporation of America and its wholly-owned subsidiary Wave Newco, Inc. (collectively, "Purchaser").

8. I make this declaration in support of the Debtors' application (the "Application") to employ MTS as their investment banker and financial advisor for the purposes set forth below, pursuant to 11 U.S.C. §§ 327(a) and 328, at the expense of the their bankruptcy estates, and to have their employment of MTS be deemed effective as of the Petition Date.

9. The Debtors seek to employ MTS under the terms and conditions set forth in that certain engagement letter agreement executed by the Debtors and MTS on or about May 19, 2010 (the "Engagement Agreement"). A true and correct copy of the Engagement Agreement is attached hereto as Exhibit "A".

10. Specifically, the Debtors have asked MTS to provide them with the following types of services:

    (a) reviewing and analyzing the Debtors' business, including without limitation its operations and financial projections;

(b)   evaluating the Debtors' potential debt capacity in light of their historical and projected cash flows from each line of business;

(c)   assisting in the preparation and analysis of business plans, financial projections, and other reports or analyses;

(d)   assisting in the analysis and determination of various capital structures for the Debtors in connection with any potential Sale Transaction, and analyzing the potential impact of these structures on the recoveries of those stakeholders impacted by such a Sale Transaction;

(e)   advising the Debtors on tactics and strategies for negotiating with the various creditors under their senior credit agreement dated as of June 30, 2006 (the "Credit Agreement") and with the holders of equity interests in the Debtors (the "Holders") and creditors;

(f)   rendering financial advice to the Debtors and participating in meetings or negotiations with the Holders, creditors and/or other appropriate parties in connection with any Sale Transaction;

(g)   advising the Debtors on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to any Sale Transaction;

(h) assisting in identifying and evaluating candidates for a potential Sale Transaction involving all or a portion of the Debtors' assets or their businesses, advising the Debtors in connection with such negotiations and aiding in the consummation of a Sale Transaction;

(i) providing, as required and appropriate, any testimony concerning any of the services detailed herein;

(j) assisting in the preparation of documentation for the Court and creditors and communicating with their respective financial advisors;

(k) at the Debtors' request, rendering a written opinion to the Debtors' Board of Directors as to the fairness to Debtors, from a financial point of view, of the consideration to be received by the Debtors or the Holders or others in connection with a Sale Transaction, or, in the case of a stock-for-stock merger, the fairness of the exchange ratio (the "Fairness Opinion");

(l) providing such other investment banking and/or financial advisory services as are customarily provided in connection with the analysis and negotiation of a Sale Transaction, as mutually agreed; and

(m) providing such other financial advisory and/or investment banking services as Debtors and/or the Debtors' counsel may request.

24

11.   MTS is qualified to accomplish the Debtors' objectives. I believe that the employment of MTS is essential to the Debtors' pursuit of their strategy in these cases.

12.   As reflected in the materials attached as Exhibit "B" hereto, which provide general background information about the firm and its experience, MTS has extensive transactional experience and investment banking, strategic, financial, capital markets, executive management and operational expertise.  MTS also has an in-depth knowledge of the healthcare industry, its trends, transactions and decision-makers.  Its senior personnel have decades of healthcare-focused experience as well as cumulative team experience in working on over 1000 transactions. This experience allows MTS to understand the markets served by the Debtors' business and its competitive position, which knowledge will allow MTS to maximize the value to the Debtors' estates.

13.   MTS also has a history with the Debtors.  Prepetition, MTS was engaged to assist in the sale of the Debtors' business after Bank of America and Wachovia (who were previously employed as the Debtors' investment bankers) spent a substantial amount of time and effort attempting to locate a buyer for the Debtors' business and assets, but failed.

14.   Specifically, starting in October 2009, MTS helped the Debtors create materials describing their business and assets for

distribution to potential buyers in the healthcare industry, MTS marketed the Debtors' business and assets to its extensive network of healthcare related companies and others, and MTS communicated with potential purchasers or counterparties to a potential Sale Transaction to encourage those parties to make an offer. As a result of MTS's efforts, the Debtors were able to locate a buyer (the "Purchaser") for their business and certain assets (the "Assets"). Concurrently herewith, the Debtors have filed a motion for approval of a sale of the Assets to the Purchaser subject to overbidding.

15. To make absolutely certain that the highest possible price is paid for the Assets, the Debtors and the Purchaser have agreed to various overbid procedures and the Debtors have filed a motion, concurrently herewith, seeking the approval of those procedures.

16. MTS is knowledgeable about the parties who could possibly be interested in paying more for the Debtors' business and assets than what the Purchaser has offered, and MTS will make every reasonable effort to attempt to facilitate an overbid.

17. As MTS is familiar with the Debtors' industry and with their business, with the terms of the proposed sale, with the Purchaser and the potential overbidders, the Debtors believe that the employment of another investment banking and financial advisory firm would substantially delay the sale process. Thus,

1  the Debtors believe that MTS's assistance is essential in these

2  cases.

3      18. I will be the individual who will be primarily

4  responsible for rendering and/or supervising the services

5  described above.   My professional biography is included in

6

7  Exhibit "B" hereto (at page 14).   Brad Sitko, an associate of

8  MTS, and others, will assist me in providing services to the

9  Debtors.   Mr. Sitko's biography and the biographies of all of

10 MTS's other team members are included in pages 14 through 18 of

11 Exhibit "B".

12     19. The source of the payments to be made to MTS will be

13 the Debtors' operating revenue and/or the proceeds from the

14
   closing of a Sale Transaction approved by the Court.
15

16     20. I believe that the Debtors have discussed the proposed

17 terms of MTS's employment and compensation with their senior

18 secured lenders -- GE Business Financial Services, Inc.,

19 CapitalSource Finance, LLC, and Sandelman Finance 2006-1, Ltd.

20 (collectively referred to herein as the "Lenders").

21     21. The Debtors and MTS negotiated the terms of the

22
   Engagement Agreement based upon a number of factors, including,
23

24 but not limited to, the size and substantial complexity of the

25 engagement and the significant amount of time that MTS expects to

26 devote to providing services to the Debtors and the opportunity

27 cost to MTS.

28

22. MTS understands the provisions of 11 U.S.C. Section 328 which provides, among other things, that after the conclusion of MTS's employment, the Court may allow compensation different from the compensation provided for in the Application herein if the terms of the Application prove to be improvident in view of circumstances "that were not capable of being anticipated" at the time the Application was approved.

23. MTS understands the provisions of 11 U.S.C. Sections 327, 328, 330 and 331 which require, among other things, Court approval of the Debtors' employment of MTS as an investment banker and financial advisor and of any compensation that MTS will receive from the Debtors' estates. MTS is familiar with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules for the Central District of California, and will comply with them.

24. The Debtors owe MTS $450,000 for prepetition fees and expenses (the "Prepetition Claim"). However, upon the entry of an Order approving MTS's employment in accordance with the terms of the Engagement Agreement, MTS has agreed to waive the Prepetition Claim. MTS has not received, and has no present plan to receive, any lien or other interest in property of the Debtors or of a third party to secure payment of its fees.

25. MTS is a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code. MTS is not an equity

security holder of the Debtors or an insider of the Debtors.  MTS is not, and was not, within 2 years before the date of the filing of the petition, a director, officer or employee of the Debtors. MTS does not have an interest materially adverse to the interests of the estate or of any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason. Neither MTS nor any of its members, professionals or employees have any "connections" or hold or represent any interests adverse to the Debtors, any insider of the Debtors, or any other related entities in which the Debtors may have an interest, its creditors, or any party in interest in this case, including the Office of the United States Trustee, or their respective attorneys or accountants.

26.  As the Debtors have filed an emergency motion to have this Application heard on an emergency basis, I am informed and believe that a notice of a hearing on regular notice has not been sent out concurrently with the filing of this Application. Nevertheless, I am informed and believe that notice of the hearing on this Application will be sent out as soon as the Court schedules a hearing date for the Application.

29

27. For the foregoing reasons, I believe that MTS' employment as the Debtors' investment banker and financial analyst, at the expense of their estates, is necessary and in the best interests of the Debtors, their estates and their creditors.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 19th day of May 2010 at New York, New York.



_____
CURTIS S. LANE

**Exhibit A**

# MTS HEALTH PARTNERS, L.P.

As of May 13, 2010

Robert E. Whalen
Biolabs, Inc.
Westcliff Medical Laboratories, Inc.
1821 E. Dyer Road, Suite 100
Santa Ana, CA 92705

Dear Bob,

This engagement letter (this "Agreement"), as hereby amended and restated on May 12, 2010, details the retention of MTS Health Partners, L.P. ("MTS") by Biolabs, Inc., Westcliff Medical Laboratories, Inc. and their subsidiaries, on a joint and several basis (collectively, the "Company"), as exclusive financial advisor for the purposes set forth herein.

## 1.    Assignment and Scope

The Company hereby retains MTS, effective as of the date hereof, as its financial advisor to provide it with advice in connection with any Sale Transaction (as defined below) or such other advisory services as may be provided herein. As used in this Agreement, a "Sale Transaction" shall mean a transaction or plan pursuant to which more than 50% of the voting equity or assets of the Company is transferred through an asset sale, merger, business combination, consolidation, Restructuring (as defined below) or other similar transaction, or series of related transactions, in each case whether or not pursuant to Chapter 11 of the Bankruptcy Code. By signing this Agreement, MTS accepts its appointment as financial advisor to the Company under the terms hereof. As used in this Agreement, a "Restructuring" shall mean any restructuring, reorganization, and/or recapitalization of the Company (whether or not pursuant to Chapter 11 of the Bankruptcy Code) compromising, refinancing, modifying or otherwise materially revising the terms of its senior credit agreement, dated as of June 30, 2006 (as amended) (the "Credit Agreement").

## 2.    Description of Services

MTS agrees, in consideration of the compensation provided in Section 3 below, to perform each of the following investment banking services in furtherance of a Sale Transaction, as the Company may reasonably request, including:

(a)    A review and analysis of the Company's businesses, including without limitation the operations and financial projections of the businesses operated by the Company;

(b)    Evaluating the Company's potential debt capacity in light of its historical and projected cash flows from each line of business;

623 Fifth Avenue, 15th Floor  New York, NY 10022  Tel. 212.887.2100  Fax 212.887.2111

15657294

Mr. Robert E. Whalen
As of May 13, 2010
Page 2

(c)     Assisting in the preparation and analysis of business plans and other
projections, reports or analyses;

(d)     Assisting in the analysis and determination of various capital structures for the
Company in connection with any potential Sale Transaction, and analyzing the
potential impact of these structures on the recoveries of those stakeholders
impacted by such Sale Transaction;

(e)     Advising the Company on tactics and strategies for negotiating with the various
creditors under the Credit Agreement (as defined below) and of any equity
interests in the Company (the "Holders");

(f)     Rendering financial advice to the Company and participating in meetings or
negotiations with the Holders and/or other appropriate parties in connection
with any Sale Transaction;

(g)     Advising the Company on the timing, nature, and terms of new securities, other
consideration or other inducements to be offered pursuant to any Sale
Transaction;

(h)     Assisting in identifying and evaluating candidates for a potential Sale
Transaction involving all or a portion of the Company, advising the Company
in connection with negotiations and aiding in the consummation of a Sale
Transaction;

(i)     Providing, as required and appropriate, any testimony in any Chapter 11 case
concerning any of the subjects encompassed by this Agreement;

(j)     Assisting in the preparation of documentation for creditors and communicating
with their respective financial advisors;

(k)     Providing such other financial advisory services as are customarily provided in
connection with the analysis and negotiation of a Sale Transaction, as mutually
agreed.

3.    **Fees**

As compensation for our advisory services under this Agreement, the Company shall pay MTS
certain fees as follows:

(a)     Monthly fees (the "Monthly Fee") of **$100,000** shall be payable in cash on each
monthly anniversary date the date of this Agreement until the later of (x) the
consummation of a Sale Transaction at which time all remaining payments shall
be immediately payable in cash and shall be payable out of sale proceeds to the
extent not previously paid in accordance to the terms of this Agreement, (y)
four (4) months and one day after the execution of this Agreement, and (z) this
Agreement has been terminated pursuant to Section 5(c) below (subject to the
terms of Section 5(c)). Each Monthly Fee shall be fully earned on the date it is
paid in accordance with the terms of this Agreement.

Mr. Robert E. Whalen
As of May 13, 2010
Page 3

(b)    If, during the Term or within twelve months thereafter, (i) a Sale Transaction is consummated or (ii) the Company enters into an agreement regarding a Sale Transaction that is subsequently consummated, then a success fee of $900,000 (the "Success Fee") shall be payable in cash and shall be payable out of sale proceeds to the extent not previously paid in accordance to the terms of this Agreement.

(c)    In addition to fees payable to MTS under this letter agreement, the Company agrees to promptly reimburse MTS, upon monthly request, for its reasonable out-of-pocket expenses incurred in connection with our activities under this letter agreement, including, without limitation, the reasonable fees and expenses of one legal counsel, subject to the prior approval of the Company; provided that such fees and expenses shall not exceed in the aggregate the sum of $50,000. An advance in the amount of $50,000 shall be payable in cash to MTS on execution of this Agreement will be credited against any expenses to be reimbursed by the Company to MTS under this Section 3(c). Any portion of such $50,000 advance that is not required to reimburse MTS for out-of-pocket expenses incurred by MTS will be returned within three business days following the termination of this Agreement.

(d)    As part of the compensation payable to MTS hereunder, the Company agrees to the indemnification and contribution provisions (the "Indemnification Letter") attached to this Agreement as Attachment A and incorporated herein in their entirety.

(e)    In the event that a Sale Transaction is consummated, all fees and expenses payable to MTS under this Agreement, including, without limitation, the Monthly Fee and the Success Fee, shall be paid out of the proceeds from such Sale Transaction unless any fees and expenses have previously been paid to MTS in accordance with the terms of this Agreement.

(f)    The Company shall provide MTS with a retainer in the amount of $125,000 payable in cash as follows: (i) $75,000 on the date of this Agreement, (ii) $50,000 within two weeks of the date of this Agreement. This retainer shall be used by MTS for its fees and expenses (including attorneys' fees) incurred on or after the date of this Agreement which have not been otherwise paid by the Company in accordance with the terms of this Agreement. To the extent the retainer is not provided to MTS before the commencement of a Chapter 11 case, the order approving MTS' retention by the Company in connection with such Chapter 11 case shall provide for the provision of the retainer.

(g)    In the event that a Sale Transaction is consummated under this Agreement, if requested by the Company, MTS will prepare a fairness opinion relating to the Sale Transaction for the Company and its Board of Directors. The fee for this fairness opinion shall be agreed by the Company and MTS, but shall not exceed $500,000.

(h)    The fees payable (excluding expenses) to MTS by the Company under this Agreement shall not exceed $1,425,000.

Mr. Robert E. Whalen
As of May 13, 2010
Page 4

4.    **Retention in Chapter 11 Cases**

    (a)    This Section 4 shall be applicable in the event of a commencement of Chapter 11 cases with respect to the Company. In that event, the Company agrees that it will use best efforts to promptly apply for and obtain prompt authorization under the provisions of Sections 327 and 328 of the Bankruptcy Code from the Bankruptcy Court for this Agreement and the retention of MTS on the terms and conditions set forth in this Agreement, subject to the standard of review in Section 328(a) of the Bankruptcy Code and not to any other standard of review under Section 330 of the Bankruptcy Code. The Company will afford MTS and its counsel with reasonable opportunity to review and comment on any such application and proposed order relating thereto in advance of the filing thereof and MTS will cooperate with the Company in executing an affidavit for retention as required by the Bankruptcy Court. Subject to being so retained under Section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court and no longer subject to appeal, rehearing, reconsideration or petition for certiorari, MTS agrees that while the retention application is pending or/on appeal, it shall continue to perform its obligations under this Agreement and that it shall file interim and final applications for allowance of the fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and the local rules and order of the Bankruptcy Court. The Company shall use its best efforts to ensure that MTS's fees and expenses are included in any carve out for professional fees in connection with any DIP financing/use of cash collateral and shall be paid out of the proceeds from any Sale Transaction to the extent such fees and expenses have not previously been paid to MTS in accordance with the terms of this Agreement. The order of the Bankruptcy Court approving the Agreement and authorizing MTS's retention shall be acceptable to MTS in its reasonable discretion. MTS acknowledges that its fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code and any applicable fee and expense guidelines. If this Agreement is approved by the Bankruptcy Court, the Company will promptly pay all fees and expenses due hereunder in accordance with its terms.

    (b)    In so agreeing to seek MTS's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that MTS's knowledge of the healthcare industry, its prior retention by the Company and its knowledge base concerning the Company, the general restructuring experience and expertise of MTS's professionals, its experience and knowledge of the capital markets and its merger and acquisition and financing capabilities will inure to the benefit of the Company in pursuing any Sale Transaction, that the value to the Company of MTS's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees hereunder are reasonable under Section 328(a) of the Bankruptcy Code. The

Mr. Robert E. Whalen
As of May 13, 2010
Page 5

Company also acknowledges that the ultimate benefit of MTS's retention
hereunder to the Company cannot be measured merely by reference to the
number of hours expended on this engagement by the MTS professionals;
accordingly, MTS shall not be required to maintain detailed time records. The
Company realized in agreeing to the various fees herein that the parties hereto
anticipate that substantial efforts and time commitments would be required of
MTS professionals over the life of this engagement, precluding MTS potentially
from undertaking other opportunities.

5.    **Other**

(a)    The Company will furnish MTS (and will request that any party with which the
Company enters into negotiations for any Sale Transaction furnish MTS) with
complete and accurate financial and other information as MTS believes is
appropriate to its assignment hereunder (all such information so furnished
being the "Information"). The Company shall also keep MTS abreast of all
material developments that would affect our work hereunder to the extent the
Company gains actual knowledge thereof. The Company recognizes and
confirms that MTS (I) will use and rely primarily on the Information and on
information available from generally recognized public sources in performing
the services contemplated by this letter agreement without having
independently verified the same, (II) do not assume responsibility for the
accuracy or completeness of the Information and such other information and
(III) will not make an appraisal of any assets of the Company or any
prospective counterparty or counterparties to a Sale Transaction with the
Company. Except as legally required, any advice to be provided by MTS under
this Agreement shall not be disclosed publicly or made available to third parties
without the prior written consent of MTS. All services, advice, information and
reports provided by MTS to the Company in connection with this assignment
shall be for the sole benefit of the Company and shall not be relied upon by any
other person. MTS shall not disclose or provide any of the Information to any
third party unless and until the third party signs a confidentiality or non-
disturbance agreement in a form provided to MTS by the Company, or which is
otherwise acceptable to the Company in the Company's sole and absolute
discretion.

(b)    The Company acknowledges and agrees that MTS will provide its financial
advice exclusively to the Company through the members of its board of
directors and senior management of the Company and not to the Company's
shareholders or other constituencies; provided, however, that MTS's scope of
engagement shall specifically contemplate discussions on behalf of the
Company with its senior creditors and other stakeholders in furtherance of a
Sale Transaction. The Company's board of directors and senior management
will make all decisions for the Company regarding whether and how the
Company will pursue a Sale Transaction and on what terms and by what
process.    In doing so, the Company's board of directors and senior

Mr. Robert E. Whalen
As of May 13, 2010
Page 6

management will also obtain the advice of the Company's legal, tax and other business advisors and consider such other factors which it considers appropriate before exercising their independent business judgment in respect of a Sale Transaction. The Company further acknowledges and agrees that MTS has been retained to act solely as financial advisor to the Company and does not in such capacity act as a fiduciary for the Company or any other person. MTS shall act as an independent contractor and any duties of MTS arising out of its engagement pursuant to this Agreement shall be owed solely to the Company.

(c)     This Agreement shall continue in effect until terminated by either party at any time upon fifteen (15) days prior written notice (the "Term") and without liability or continuing obligation to us or to you; provided, however, that, in the event of any such termination (I) the reimbursement provisions of Section 3(d) (to the extent such out-of-pocket expenses were incurred on or prior to the date of termination) and the indemnification provisions in Attachment A will remain operative regardless of any such termination and (II) the Company's remaining obligations to MTS following such termination shall be:

a.  So long as a definitive agreement for a Sale Transaction (without material diligence or other contingencies) has not been executed, to pay Monthly Fees, without duplication, through the end of the month in which the termination occurs, plus any additional Monthly Fees required to ensure that MTS has received an aggregate sum of five Monthly Fees during the period prior to or post-termination; and

b.  To pay the Success Fee to MTS (assuming no Success Fee was previously paid and as it may be reduced pursuant to Section 3(b)) in the event that a Sale Transaction is consummated during the one-year period following the date of termination, or a definitive agreement for a Sale Transaction (without material diligence or other contingencies) has been executed during such one-year period and subsequently consummated, with the Success Fee being paid out of the proceeds from any Sale Transaction to the extent it has not previously been paid to MTS in accordance with the terms of this Agreement.

(d)     MTS shall not use the Information other than in connection with its engagement hereunder unless the Company has provided its prior written consent.

(e)     This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) shall be governed and construed in accordance with the laws of the State of New York (without giving regard to the conflicts of law provisions thereof). Each of the parties hereto consents and voluntarily submits to personal jurisdiction in the State of New York in the courts in such state located in the City of New York and the United States District Court for the State of New York in any proceedings arising out of or relating to this Agreement and agrees

Mr. Robert E. Whalen
As of May 13, 2010
Page 7

that all claims in respect of any such proceeding may be heard and determined in any such court. Each of the Parties hereto further consents and agrees that such Party may be served with process by U.S. registered mail to the address of each party set forth herein. The parties agree that any action instituted by any of them against any other party with respect to this Agreement will be instituted exclusively in the United States District Court for the State of New York or, if such Court does not have jurisdiction to adjudicate such action, in the courts of the State of New York located in the City of New York. The parties irrevocably and unconditionally waive and agree not to plead, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of venue or the convenience of the forum of any action with respect to this Agreement in the United States District Court for the State of New York and the courts of the State of New York located in City of New York.

We look forward to working with you and your team on this important assignment.

Very truly yours,

MTS HEALTH PARTNERS, L.P.

By: _____
Authorized Signatory

Agreed to and Accepted as of the Date
First Written Above:

BIOLABS, INC.

By: _____
Authorized Signatory

WESTCLIFF MEDICAL LABORATORIES, INC.

By: _____
Authorized Signatory

# MTS HEALTH PARTNERS, L.P.

**Attachment A**

As of May 13, 2010

Robert E. Whalen
Biolabs, Inc.
Westcliff Medical Laboratories, Inc.
1821 E. Dyer Road, Suite 100
Santa Ana, CA 92705

Dear Bob,

In connection with our engagement to advise and assist you pursuant to the engagement letter, dated as of October 8, 2009 (as amended and restated on May 12, 2010, the "Engagement Letter"), you and we are entering into this letter Agreement. Capitalized terms define in the Engagement Letter and not defined herein have the meanings set forth in the Engagement Letter. It is understood and agreed that in the event that MTS or any of MTS's members, employees, affiliates or controlling persons, if any (each of the foregoing, including MTS, being an "Indemnified Person") become involved in any capacity in any action, claim, proceeding or investigation brought or threatened by or against any person, including your shareholders, related to, arising out of or in connection with our engagement, the Company will promptly reimburse each such Indemnified Person for its reasonable legal fees and expenses and other expenses (including the cost of any investigation and preparation) as and when they are incurred in connection therewith, subject to receipt of an undertaking from such Indemnified Person, in form and substance reasonably acceptable to the Company to repay such amounts in the event that it is finally judicially determined that such Indemnified Person is not entitled to indemnification hereunder.

The Company will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expenses to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with our engagement, whether or not in connection with any action, proceeding or investigation in which you or such Indemnified Persons are a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted from such Indemnified Person's actual fraud, bad faith, gross negligence or willful misconduct. The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to

you or your stock holders or creditors related to, arising out of or in connection with our engagement except to the extent that any loss, claim, damage or liability is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted from such Indemnified Person's actual fraud, bad faith, gross negligence or willful misconduct.

If for any reason the foregoing indemnification is finally judicially determined to be unenforceable, then the Company shall contribute to the loss, claim, damage, liability or expense for which such indemnification is held unenforceable in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by the Company and their shareholders on the one hand and the party entitled to contribution (other than as a result of such party's gross negligence, actual fraud, bad faith or willful misconduct) on the other hand in the matters contemplated by our engagement as well as the relative fault of yourselves and such party with respect to such loss, claim, damage, liability or expense and any other relevant equitable considerations. The Company agree that for the purposes hereof the relative benefits received, or sought to be received, by you and your shareholders and ourselves shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received by you or your shareholders, as the case may be, pursuant to a Sale Transaction (whether or not consummated) for which we have been engaged to perform financial advisory services bears to (ii) the fees paid or proposed to be paid to us in connection with such engagement; provided, however, that, to the extent permitted by applicable law, in no event shall we or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to us pursuant to the Engagement Letter. The reimbursement, indemnity and contribution obligations under this letter shall be in addition to any liability which the parties may otherwise have, shall not be limited by any rights any party or other Indemnified Person may otherwise have and shall be binding upon and insure to the benefit of any successors, assigns, heirs and personal representatives of yourselves, ourselves, and any other Indemnified Persons.

An Indemnified Person shall promptly notify the Company in writing as to any indemnification claim for which indemnity may be sought, but the omission so to notify the Company will not relieve the Company from any liability which it may have to any Indemnified Person hereunder to the extent that the Company is not materially prejudiced as a result of such failure. After such notice to the Company, the Company shall be entitled to participate in, and to the extent that it shall elect by written notice delivered to such Indemnified Person promptly after receiving the aforesaid notice of such Indemnified Person, to assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person in such indemnification claim and shall pay as incurred the fees and expenses of such counsel related to such indemnification claim. In any indemnification claim, any Indemnified Person shall have the right to retain its own separate counsel at such Indemnified Person's own expense and not subject to reimbursement by the Company; provided, however, that the Company shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any indemnification claim if (i) the parties to such indemnification claim include both the Indemnified Person and the Company and there may be legal defenses available to such Indemnified Person which are different from or additional to

9

those available to the Company; (ii) the use of counsel chosen by the Company to represent both the Company and such Indemnified Person would present, in the judgement of counsel to such Indemnified Person, such counsel with an actual or potential conflict of interest; (iii) the Company shall not have employed reasonably satisfactory counsel to represent the Indemnified Person within a reasonable time after notice of the institution of such indemnification claim; or (iv) the Company shall authorize the Indemnified Person to employ separate counsel (in addition to any local counsel) at the expense of the Company. The Company shall not, in connection with any indemnification claim, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Persons, except to the extent the use of one counsel to represent all Indemnified Persons would present, in the judgement of counsel to such Indemnified Persons, such counsel with an actual or potential conflict of interest, and in the event that separate counsel is to be retained to represent one or more Indemnified Persons, such separate counsel shall be chosen by MTS.

The Company agrees that it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, or proceeding or investigation in respect of which indemnification or contribution could be sought hereunder, unless the Company have included in such settlement, compromise or consent an unconditional release of each Indemnified Person. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) shall be governed and construed in accordance with the laws of the State of New York (without giving regard to the conflicts of law provisions thereof). Each of the parties hereto consents and voluntarily submits to personal jurisdiction in the State of New York in the courts in such state located in the City of New York and the United States District Court for the State of New York in any proceedings arising out of or relating to this Agreement and agrees that all claims in respect of any such proceeding may be heard and determined in any such court. Each of the Parties hereto further consents and agrees that such Party may be served with process by U.S. registered mail to the address of each party set forth herein. The parties agree that any action instituted by any of them against any other party with respect to this Agreement will be instituted exclusively in the United States District Court for the State of New York or, if such Court does not have jurisdiction to adjudicate such action, in the courts of the State of New York located in the City of New York. The parties irrevocably and unconditionally waive and agree not to plead, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of venue or the convenience of the forum of any action with respect to this Agreement in the United States District Court for the State of New York and the courts of the State of New York located in City of New York.

We and you (on your own behalf and, to the extent permitted by applicable law, on behalf of your shareholders and creditors) waive all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of or in connection with our engagement. This Agreement shall remain in effect indefinitely, notwithstanding any termination of our engagement.

Very truly yours,

**MTS HEALTH PARTNERS, L.P.**

By: _____

Authorized Signatory

Agreed to and Accepted as of the Date
First Written Above:

**BIOLABS, INC.**

By: _____

Authorized Signatory

**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____

Authorized Signatory

11

**Exhibit B**

STRATEGIC ADVICE AND FINANCING

**MTS**
HEALTH PARTNERS

# Introduction to MTS Health Partners

## April 2010



Introduction to MTS

# MTS Health Partners

MTS' Approach Provides the Perspective of Both a Strategic Advisor and a Principal

## MTS Health Partners, LP
### Merchant Banking







### Strategic Advisory

- Like a bulge-bracket healthcare industry group, MTS has provided advisory services across a variety of healthcare sub-sectors to companies with valuations ranging from $20 million to over $9 billion

- Unlike a bulge-bracket bank, MTS approaches every advisory assignment as a partnership, working with management to accomplish their short-term and long-term objectives

### Financing

- MTS has significant experience advising public and private healthcare companies in financings across a wide range of structures and uses of funds

- Through our strong investor relationships and experience in the private financing market, as well as our expertise in public financings, MTS can deliver a superior value proposition to our clients while working closely with management and boards to achieve their goals

### Private Equity

- MTS' private equity funds target controlling interests in healthcare companies for which MTS can add value through the experience and in-depth involvement of its principals

- MTS is one of a limited number of private equity sponsors focused exclusively on healthcare transactions

MTS Health Partners

3

# MTS Health Partners
## Overview

**MTS is a healthcare-focused merchant bank that provides aligned strategic and financial advisory services distinguished by experienced, attentive and independent counsel in the context of long-term relationships**

**Experienced**
- Senior personnel – decades of healthcare-focused experience
- Extensive strategic, operational, financial and capital markets expertise
- Creative solutions rather then the "standard" banker playbook

**Attentive**
- Boutique environment – ensures personal commitment and focus
- Team of 21 professionals, larger than many bulge-bracket healthcare teams

**Independent**
- Unencumbered by balance sheet conflicts or commoditized financing solutions
- Stability of franchise and execution in turbulent banking environment

**Long-Term Partnership**
- Long-term relationships rather than short-term transactions
- Translates to unbiased and objective evaluation and advice

**Aligned**
- Economics – compensation model that transcends annual Wall Street bonus cycle
- Culture – private equity mentality allows for investor-focused perspective
- "Success" – defined through achievement of client goals rather than mere transaction execution

**Healthcare-Focused**
- Unparalleled network provides broadest reach of any healthcare advisor
- In-depth knowledge of healthcare industry, trends, transactions, decision-makers and their personalities

# MTS Health Partners
## The MTS Network

# MTS Health Partners
The MTS Approach

## Traditional Investment Banks

- Senior oversight reserved for largest transactions

- Primarily focused on mega-cap clients

- Competing clients; competing constituencies; competing objectives

- Pressure to produce most profitable outcome for the bank – not necessarily for the client

- Transaction-oriented within a set bonus cycle

- "Churn" mentality

- One of many projects

## MTS Health Partners

- Senior level focus and attention on each transaction

- Experience with large-cap, public M&A as well as in the middle-market and small-cap

- Unconflicted

- Key financial and strategic relationships to maximize value

- Focused on the best alternatives for our clients over the long-term

- Dedicated resources

- Exceptional commitment



# MTS Health Partners
## Distinguished Experience and Approach in Private Financings

- The MTS team has significant experience advising public and private companies in private financings across a wide range of structures and uses of funds, including;

  - □ Traditional private convertible preferred issuances
  - □ Cross-over focused / convertible transactions
  - □ Common stock and structured / convertible PIPEs
  - □ Registered direct financings
  - □ Mezzanine debt financings
  - □ Acquisition financings
  - □ Secondary sales
  - □ Special situations

- We are intensely focused on maximizing our value to our clients:

  - □ Clearly identify specific goals of the engagement
  - □ Develop creative structures and negotiate the most detailed of terms to optimize the client's transaction
  - □ Target the right mix of investors given the goals of the financing, the client's existing investor base and the longer term objectives of the client
  - □ Realistically assess the achievable value ranges with our clients and implement strategies to maximize in the market

- Our ability to deliver for our clients is driven by:

  - □ Unparalleled experience in the healthcare private financing market
  - □ Strong investor relationships spanning both traditional venture capital / private equity sources and the hedge fund / alternative investor universe
  - □ Commitment of senior team members to both execution and outcomes

# MTS Health Partners
Selected Historical Healthcare Services Clients



**Sun Healthcare Group**

*PacifiCare* ®



**Blue Cross Blue Shield** of Michigan







**CORAM** specialty infusion services



**SCHEIN** PHARMACEUTICAL

H E A L T H S O U R C E



**Watson**



AmerisourceBergen®


**CardinalHealth**

**UNIVERSAL AMERICAN**

W E L L P O I N T

**CAREMARK**
It all starts with care"




**SCA** Surgical Care Affiliates

**MAGELLAN** HEALTH SERVICES
Getting Better All the Time

# MTS Health Partners

MTS and its Principals Have Advised Across a Broad Spectrum of Healthcare Sectors

**July 2009**



Blue Cross Blue Shield of Michigan

Divestiture of



DENTEMAX

**November 2008**

InnerView. MANAGEMENT INTELLIGENCE FOR HEALTHCARE

Sale to

 NATIONAL RESEARCH Corporation

**December 2007**

CORAM. specialty infusion services

$350,000,000

Sale to

 APRIA HEALTHCARE®

**November 2007**

Blue Cross Blue Shield of Michigan

$125,000,000

Acquisition of

CompWest

**July 2007**

CORAM. specialty infusion services

Sale of Canadian Infusion Assets to

Bayshore Home Health

**May 2007**

UNIVERSAL AMERICAN

$630,000,000

Acquisition of

MemberHealth.

**April 2007**

 Sun Healthcare Group

$625,000,000

Acquisition of

 HARBORSIDE Healthcare

**December 2006**

Blue Cross Blue Shield of Michigan

$240,000,000

Acquisition of

MCARE®

# MTS Health Partners

MTS and its Principals Have Advised Across a Broad Spectrum of Healthcare Sectors

**April 2006**



Sale of Respiratory Therapy Assets to



**December 2005**

*PacifiCare®*
Caring is good. Doing something is better.™

$8,970,000,000

Sale to

UnitedHealth Group

**December 2005**

Blue Cross Blue Shield of Michigan

Acquisition of

United Heartland

**December 2005**

Sun Healthcare Group

$246,000,000

Acquisition of


PEAK MEDICAL CORPORATION

**April 2005**

*PacifiCare®*
Caring is good. Doing something is better.™

Acquisition of


PACIFIC LIFE

**December 2004**

*PacifiCare®*
Caring is good. Doing something is better.™

$532,000,000

Acquisition of

American Medical Security™

**October 2004**


PresGar

$135,000,000

Debt Restructuring

**July 2004**


PresGar

Sale of Assets to


RADIOLOGIX®

11

# MTS Health Partners

MTS and its Principals Have Advised Across a Broad Spectrum of Healthcare Sectors

**June 2004**



SLOANS LAKE
MANAGED CARE

$45,000,000

Sale to

H:MS
HEALTHCARE INC.

---

**February 2004**

 Sun Healthcare Group

$1,438,000,000

Restructuring

---

**November 2003**

Blue Cross
Blue Shield
of Michigan

$150,000,000

Private Debt Placement

---

**September 2003**

Sun Healthcare Group

$75,000,000

Senior Debt
Financing

---

**July 2003**

Sun Healthcare Group

$90,000,000

Sale to

Omnicare®

---

**August 2001**

 MAGELLAN
HEALTH SERVICES

$250,000,000

High Yield Financing

---

**May 2002**

*PacifiCare®*
Caring is good. Doing something is better.™

$200,000,000

High Yield Financing

---

**July 2000**

 SCHEIN
PHARMACEUTICAL

$1,400,000,000

Sale to

 WATSON®

---

12

MTS Team

# The MTS Team

## MTS Health Partners Professionals

**Mark Epstein**
*Senior Managing Director,*
*Advisory Services*

- Prior to joining MTS in January of 2008, Mark was a Managing Director and co-head of Banc of America Securities' Private Equity Placements Group.
- Mark has fifteen years of direct private equity placement experience with a strong focus on transactions within the healthcare sector. Mark has significant transaction experience across a wide range of private equity and equity-linked products, including traditional private equity financings, common stock and structured PIPEs, mezzanine financings and special purpose vehicles. The range of activities Mark has financed include traditional growth equity, spinouts, acquisition financings, secondary sales, start-ups, sidecars and a variety of special situations.
- Mark has completed approximately 100 private financings for clients, raising over $5 billion in private capital.
- Mark was previously at Merrill Lynch & Co. where he was a Vice President and co-head of direct private equity placements. Mark also helped establish the private equity placement practice at Prime Charter, where he spent four years. He began his career at Dean Witter Reynolds in 1992.
- Mark earned his B.S. from The Wharton School of Business at the University of Pennsylvania. He graduated magna cum laude.

**Curtis S. Lane**
*Senior Managing Director,*
*Founding Partner*

- Curtis Lane founded MTS in March of 2000 after realizing the value and need for a dedicated healthcare-focused merchant banking effort. Previously he had been with Evercore Capital Partners, a New York-based investment and M&A advisory boutique with over $1.2 billion under management.
- From 1986 to 1998, Mr. Lane lead one of the most active healthcare investment banking groups on Wall Street, completing 107 financing transactions with an aggregate value of $17.4 billion and 56 M&A and advisory assignments with an aggregate value of $20.4 billion over the last five years under Mr. Lane's leadership. In his position as head of healthcare investment banking at Bear Stearns, Mr. Lane either directly handled or oversaw numerous financing and advisory transactions across all segments of healthcare. Mr. Lane advised and financed companies through all stages of their development and maturation, ranging from private equity placements to public offerings of debt and equity securities. His particular focus was on the initiation and consummation of strategic M&A transactions within the context of an overall investment banking relationship.
- Mr. Lane initiated transactions for, and served as financial advisor to, a variety of companies, including: The BLP Group Companies, Charter Medical (now Magellan Health Services), Copley Pharmaceuticals, Counsel Corporation, Damon Corporation, Diagnostek Corporation, Foundation Health Systems International, Gentle Dental Service Corporation, Healthcare and Retirement Corporation of America, Healthwise Corporation, Omega Healthcare Investors Inc., Oxford Health Plans, Physician Corporation of America, Schein Pharmaceutical Inc., Sun Healthcare Group, Surgical Care Affiliates, Thomas-Davis Medical Centers, United Payors & United Providers, Inc., Watson Pharmaceuticals and WellPoint, Inc.
- Prior to joining Bear Stearns in 1985, Mr. Lane worked in the Corporate Finance department of Smith Barney, Harris Upham & Co., Inc. as a generalist investment banker. He became a Senior Managing Director of Bear Stearns in 1990.
- Mr. Lane graduated from the University of Pennsylvania in 1979 and earned his MBA from The Wharton School in 1980.

# The MTS Team

## MTS Health Partners Professionals

**Jay A. Shiland**
*Senior Managing Director,
Advisory Services*

- Prior to joining MTS Health Partners in 2001, Mr. Shiland was a Vice President at Fenway Partners, a New York City-based private equity firm specializing in leveraged buyouts and early-stage technology investments, with over $1.4 billion under management. While at Fenway, Mr. Shiland was responsible for day-to-day management of Fenway's portfolio investments, as well as identifying, recommending and executing upon new investment opportunities.
- From 1997 through 2000, Mr. Shiland was a Vice President in the Mergers and Acquisitions Group of Merrill Lynch & Co., where he worked on a variety of strategic advisory assignments for both public and private companies across multiple industries, including healthcare.
- From 1994 to 1997, Mr. Shiland was an associate in the Corporate Practice Group of Simpson Thacher & Bartlett, a New York City-based law firm, where he spent the majority of his time representing financial sponsors on acquisitions and related bank and high yield financings.
- Mr. Shiland received his J.D. from Harvard Law School in 1994 and his Bachelor of Science in Economics (concentration in Finance and Accounting) from The Wharton School of the University of Pennsylvania in 1991.

**Andrew J. Weisenfeld**
*Senior Managing Director,
Advisory Services*

- Andrew became a senior member of the MTS team in January 2008, primarily responsible for the development of the life sciences and medical technology practices.
- Prior to joining, Andrew was a Managing Director in Banc of America Securities' Corporate and Investment Banking Healthcare Group for five years. Andrew co-led the firm's life sciences practice, providing capital raising and advisory services to both publicly traded and private companies.
- Prior to joining Banc of America in 2003, Andrew was a Managing Director at JP Morgan, leading its Healthcare M&A business across all sectors of healthcare since 1999. Andrew joined Chase Securities, a predecessor company to JP Morgan, in 1997. Prior to joining Chase, Andrew spent over five years in the M&A Group at Merrill Lynch.
- Throughout his career, Andrew has worked on a range of advisory transactions including acquisitions, sale transactions and strategic relationships. Selected transactions include Genzyme's acquisition of Bioenvision, the sale of Nabi's Phoslo product and Biologics business to Fresenius and Biotest, respectively, the sale of Corixa to GlaxoSmithKline, the sale of TKT to Shire, Genzyme's acquisition of Impath, the sale of ALZA to J&J, the sale of BioChem Pharma to Shire, Lundbeck's acquisition of Synaptic, Genta's collaboration with Aventis, the sale of Summit-Autonomous to Alcon Laboratories, and the sale of Gilead's oncology assets to OSI. Andrew was also responsible for many of Banc of America's life sciences financings, including private capital raises for Acadia Pharmaceuticals, Acorda Therapeutics, Allos Therapeutics, Memory Pharmaceuticals, Pharmasset, and Pontard Pharmaceuticals.
- Andrew holds an MBA from The Wharton School at the University of Pennsylvania and a BS from Cornell University.

# The MTS Team

## MTS Health Partners Professionals

**Oliver T. Moses**
*Senior Managing Director, Private Equity*

- Mr. Moses has over 12 years of investment banking and private equity experience, exclusively in healthcare services.
- Prior to joining MTS in early 2006, Mr. Moses was a founding partner of MBF Healthcare Partners, a healthcare-focused private equity firm.
- Previously, Mr. Moses was a Director in Merrill Lynch's healthcare investment banking group.
- During his investment banking career, Mr. Moses raised $6 billion for his clients and advised on M&A transactions with an aggregate value of more than $17 billion.
- Prior to investment banking, Mr. Moses was a healthcare securities analyst in Merrill Lynch's equity research department, where he was ranked as one of Wall Street's "Up and Comers" by Institutional Investor's All-America Research Team Survey.
- Mr. Moses holds a BA from Bowdoin College, where he was named a James Bowdoin Scholar.

**Peter Collum**
*Director*

- Mr. Collum joined MTS Health Partners in 2009, where he is primarily focused on the life sciences investment banking advisory practice
- Prior to joining the MTS team, Mr. Collum was a member of the Healthcare Investment Banking Group at Bank of America from 2003 to 2009, most recently as a Director, where he focused on life sciences and executed over $20B in M&A, debt and equity transactions
- Prior to Bank of America, Mr. Collum was a Technical Development Engineer at Hoffmann-La Roche from 1996 to 2000
- Mr. Collum has an MBA from the University of Chicago Booth School of Business and a BS from Rutgers University, College of Engineering

**Sooin Kwon**
*Director*

- Prior to joining MTS Health Partners, Ms. Kwon was a Principal in the Equity Capital Markets Group at Bank of America, where she advised healthcare clients and originated and executed public equity financing transactions.
- Before Bank of America, Ms. Kwon was an equity research analyst on both the buy-side and sell-side at Merlin Biomed Asset Management and UBS, respectively. Her research coverage included a broad spectrum of U.S. and European life science companies.
- Prior to business school, she worked at the Equinox Group, a pharmaceutical/biotech consulting firm, focusing on market analyses and forecasts for drugs in development for multi-national biotech and pharmaceutical companies.
- Ms. Kwon has an MBA from the Graduate School of Business at Columbia University and a BA from Tufts University.

# The MTS Team

## MTS Health Partners Professionals

**Alexander Buzik**
*Vice President*

- Prior to joining MTS Health Partners, Mr. Buzik was as member of the Investment Banking Division of Lehman Brothers, where he focused on mergers and acquisitions as well as capital financings within the healthcare industry.
- Mr. Buzik received his Masters of Business Administration from the Wharton School at the University of Pennsylvania (majoring in Finance and Healthcare Management) and his Bachelor of Arts in Biochemistry from Dartmouth College.

**Adrian Susmano**
*Vice President*

- Mr. Susmano has over 14 years of experience in healthcare including 6 years as a management consultant where he assisted healthcare organizations to build and implement information technology strategies; 4 years of equity research experience following the healthcare technology, PBM, and distribution sectors; and over 4 years of healthcare investment banking experience.
- Prior to joining MTS Health Partners, Mr. Susmano was a Vice President in Lazard's healthcare investment banking group and was previously a member of the healthcare investment banking team at Lehman Brothers. Mr. Susmano has also held positions with CIBC World Markets and KPMG.
- Mr. Susmano received his Masters of Business Administration from The Fuqua School of Business at Duke University (majoring in Finance and Health Sector Management) and a Bachelor of Science in Industrial Engineering from the University of Wisconsin-Madison.

**Scott A. Freishtat**
*Associate*

- Prior to joining MTS Health Partners, Mr. Freishtat was a founding member of Marwood Group's private equity advisory practice where he advised investors on the regulatory and reimbursement issues pertaining to their healthcare investments. He has also worked in McKesson Corp.'s Corporate Strategy and Business Development Group and as an Associate at Housatonic Partners.
- Mr. Freishtat received his Masters of Business Administration from The Wharton School at the University of Pennsylvania (majoring in Finance and Health Care Management) and a Bachelor of Arts in Politics from Princeton University. He is a Chartered Financial Analyst.

**Michael Maloney**
*Associate*

- Prior to joining MTS Health Partners in August of 2008, Mr. Maloney worked for 2 years in the Healthcare Investment Banking group at J.P. Morgan, focusing on mergers and acquisitions and capital raising across the life sciences, medical technology and healthcare services sectors. Prior to working in J.P. Morgan's Healthcare Investment Banking group, Mr. Maloney worked as an analyst in J.P. Morgan's Leveraged Finance group, where he focused on capital raising in the leveraged loan and high yield bond markets.
- Mr. Maloney received a Bachelor of Business Administration from the Isenberg School of Management at the University of Massachusetts Amherst, with majors in Finance and Operations Management and a minor in Economics.

# The MTS Team

## MTS Health Partners Professionals

**Brad Sitko**
*Associate*

- Before joining MTS Health Partners in 2009, Mr. Sitko worked in the Business Development and Strategic Planning functions at Pfizer. Prior to that, he advised domestic and international pharma and biotech companies on strategic issues including: licensing, M&A, spin-outs, portfolio optimization and clinical development at Frankel Group and Datamonitor.
- Mr. Sitko received his Masters of Business Administration from Columbia Business School (concentrating in Finance and Health Care & Pharmaceutical Management) and a Bachelor of Arts from the University of Pennsylvania (Pre-Med).

**Joshua Moradfar**
*Associate*

- Prior to joining MTS Health Partners, Mr. Moradfar worked as member of the Investment Banking Division at Bear, Stearns & Co. Inc., where he focused on both capital financings and mergers and acquisitions within the healthcare industry.
- Mr. Moradfar graduated with distinction from the Stephen M. Ross School of Business at the University of Michigan where he received a Bachelor of Business Administration with emphasis on both finance and accounting.

**Roseann Wang**
*Associate*

- Prior to joining MTS Health Partners, Ms. Wang worked in the Investment Banking Division of Merrill Lynch & Co., where she focused on mergers and acquisitions as well as capital financings within the healthcare industry.
- Ms. Wang received her Bachelor of Arts in Economics from the University of California, Los Angeles.

**James Albietz**
*Analyst*

- Having worked at MTS since August 2006 predominately on the private equity side of the business, Mr. Albietz is now focused on M&A activity and capital raises within the healthcare services and life sciences industries.
- Mr. Albietz graduated from Monash University (Melbourne, Australia), with Bachelor of Engineering and Bachelor of Commerce degrees and is currently a candidate for the CFA Level III exam.

**Michael Betourney**
*Analyst*

- Mr. Betourney received his Bachelor of Science in Neurobiology and Applied Economics & Management from Cornell University.
- Prior to joining MTS Health Partners in 2009, Mr. Betourney worked in the Trading and Investments Group at Samsung C&T Corporation.

**Christopher Fusco**
*Analyst*

- Prior to joining MTS Health Partners as an analyst in 2007, Mr. Fusco worked as an intern at MTS, supporting both the private equity and advisory teams. He now focuses primarily on mergers and acquisitions as well as capital financings within the healthcare services and life sciences industries.
- Mr. Fusco received his Bachelor of Arts in Management, with a minor in Economics, from Gettysburg College in Pennsylvania.

**David M. Pontius**
*Analyst*

- Mr. Pontius received his Bachelor of Science in Business Administration from The University of North Carolina at Chapel Hill.
- Prior to joining MTS Health Partners 2008, Mr. Pontius worked in the Healthcare Investment Banking Group of Oppenheimer & Co. (formerly CIBC World Markets), where he focused on strategic advisory, mergers and acquisitions, and public and private company financings.

MTS Health Partners

18

1

2  In re:
   WESTCLIFF MEDICAL LABORATORIES, INC., Debtor(s).
   BIOLABS, INC.,
3  Debtor.

CHAPTER   11
[Proposed] Lead Case No. 8:10-bk-16743
[Proposed] Jointly Administered with Case
No. 8:10-bk-16746

4

5  # PROOF OF SERVICE OF DOCUMENT

6  I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
   10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

7  The foregoing document described as APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION
   TO EMPLOY MTS HEALTH PARTNERS L.P. AS THEIR INVESTMENT BANKER AND FINANCIAL
8  ADVISOR; DECLARATION OF CURTIS S. LANE IN SUPPORT THEREOF will be served or was served
   (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner
9  indicated below:

10  I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to
    controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served
11  by the court via NEF and hyperlink to the document. On **May 20, 2010,** I checked the CM/ECF docket for
    this bankruptcy case or adversary proceeding and determined that the following person(s) are on the
12  Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

13      • Ron Bender    rb@lnbrb.com
        • Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
14      • United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

15                          ☐   Service information continued on attached page

16  II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
17  On **May 20, 2010,** I served the following person(s) and/or entity(ies) at the last known address(es) in this
    bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope
18  in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as
    follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later
19  than 24 hours after the document is filed.

20  Via Federal Express or Overnight Mail
                          ☒   Service information continued on attached page

21  III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for
22  each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 20, 2010,** I served
    the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to
23  such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes
    a declaration that personal delivery on the judge will be completed no later than 24 hours after the
24  document is filed.

25  **Via email**
    Frank.Cadigan@usdoj.gov,  nancy.goldenberg@usdoj.gov, Terry.Biers@usdoj.gov (U.S. Trustee's Office)
26  rrogers@winston.com (Counsel to GE Business Financial Services, Inc)

27

28

                                        1

1 | **VIA MESSENGER SERVICE**
Hon. Robert Kwan
2 | United States Bankruptcy Judge
United States Bankruptcy Court
3 | Courtroom 5D
411 West Fourth Street
4 | Santa Ana, CA 92701

☐   Service information continued on attached page

5

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true

6 | and correct.

7 | **May 20, 2010**          Jason Klassi                    /s/ Jason Klassi
    *Date*                    *Type Name*                     *Signature*

8 | This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

9 | *January 2009*                                                              **F 9013-3.1**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Westcliff Medical Laboratories, Inc.
File No. 4367
Secured Creditors

Debtor
Westcliff Medical Laboratories, Inc
1821 E. Dyer Road, #100
Santa Ana, CA 92705-0000

Frank Cadigan
Nancy Goldenberg
Terry Biers
Office of the U.S. Trustee
411 West Fourth St. Suite 9041
Santa Ana, CA 92701

Bank of America, N.A.
As Successor by Merger to LaSalle
Bank N
135 South LaSalle Street
Chicago, IL 60603

Becton Dickinson & Co.
Attn: Officer/Director/Legal Dept.
1 Becton Drive
Franklin Lakes, NJ 07417

BMT Leasing, Inc.
Attn: Officer/Director/Legal Dept.
P.O. Box 692
Bryn Mawr, PA 19010

CapitalSource Finance LLC
Gregory Browne, Managing Partner
4445 Willard Avenue, Twelfth Floor
Chevy Chase, MD 20815

Cisco Systems Capital Corp.
Attn: Officer/Director/Legal Dept.
170 W. Tasman Drive, MS SJ13-3
San Jose, CA 95134

CYTYC Limited Partnership
Attn: Officer/Director/Legal Dept.
250 Campus Drive
Marlborough, MA 01752

Diasorin, Inc.
Attn: Officer/Director/Legal Dept.
1951 Northwestern Avenue
Stillwater, MN 55082

GE Business Financial Serv., Inc.
Attn: Officer/Director/Legal Dept.
2 Bethesda Metro Ctr., Suite 600
Bethesda, MD 20814

GE Capital Business Fin. Serv., Inc
Attn: Officer/Director/Legal Dept.
2 Bethesda Metro Center, Suite 600
Bethesda, MD 20814

Jules and Associates, Inc.
Attn: Officer/Director/Legal Dept.
515 S. Figueroa St., Suite 1950
Los Angeles, CA 90071

Leasing Assoc. of Barrington, Inc.
Attn: Officer/Director/Legal Dept.
33 W. Higgins Road, Suite 1030
South Barrington, IL 60010

M & I Marshall & Ilsley Bank
Attn: Officer/Director/Legal Dept.
770 N. Water Street
Milwaukee, WI 53202

Merril Lynch Capital
Attn: Officer/Director/Legal Dept.
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Merril Lynch Capital, a Division of
Merril Lynch Bus. Fin. Serv., Inc., as A
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Norlease, Inc.
Attn: Officer/Director/Legal Dept.
50 South LaSalle Street
Chicago, IL 60675

Olympus America, Inc.
Attn: Officer/Director/Legal Dept.
3500 Corporate Parkway
Center Valley, PA 18034

Phadia US Inc.
Attn: Officer/Director/Legal Dept.
4169 Commercial Ave.
Portage, MI 49002

Pitney Bowes Credit Corp.
Attn: Officer/Director/Legal Dept.
27 Waterview Drive
Shelton, CT 06484

Pitney Bowes Global Fin. Serv., Inc
Attn: Officer/Director/Legal Dept.
27 Waterview Drive
Shelton, CT 06484

Roche Diagnostics Corporation
Attn: Officer/Director/Legal Dept.
9115 Hague Road
Indianapolis, IN 46250

Sandelman Finance 2006-1, Ltd
C/O Sandelman Partners LP, Bill Brown
500 Park Avenue, 3rd Fl.
New York, NY 10022

TCF Equipment Finance, Inc.
Attn: Officer/Director/Legal Dept.
11100 Wayzata Blvd., Suite 801
Minnetonka, MN 55305

Counsel to GE Business Financial
Services, Inc.
Randy Rogers
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

In re Westcliff Medical Laboratories
File No. 4367
20 Largest

SPECIALTY LABORATORIES, INC.
Attn: Anna Tutunjian
27027 Tourney Road
Valencia, CA 91355

SIEMENS HEALTHCARE DIAGNOSTICS
Attn: Paul Dinapoli
DEPT. 1102
P.O. BOX 121102
Dallas, TX 75312-1102

VWR INTERNATIONAL
Attn: John Johnson
P O BOX 31001-1257
Pasadena, CA 91110-1257

ROCHE DIAGNOSTICS
CORPORATION
Attn: Karen Gorman
DEPT AT 952243
Atlanta, GA 31192-2243

CYTYC HOLOGIC LIMITED
PARTNERSHIP
Attn: Cherl Corey
24506 NETWORK PLACE
Chicago, IL 60673-1245

IRVINE CORPORATE CENTER, LLC.
c/o BROE COMPANIES
P.O. BOX 974568
Dallas, TX 75397-4568

DIASORIN INC.
Attn: Debbie Hakala
NW 8678
P.O.BOX 1450
MINNEAPOLIS, MN 55485-8678

GRIFOLS USA, LLC
PO BOX 515037
Los Angeles, CA 90051-5037

GENZYME GENETICS
PO BOX 223614
Pittsburgh, PA 15251-2614

PHADIA
Attn: Billing Customer Service
22973 NETWORK PLACE
Chicago, IL 60673-1229

QIAGEN INC
Attn: Windy Corea
P.O. BOX 5132
Carol Stream, IL 60197-5132

TRIPATH IMAGING, INC
23934 NETWORK PLACE
Chicago, IL 60673-1239

FISHER HEALTHCARE
Attn: Janet Opperman
2000 PARK LANE, 5th Floor
Pittsburgh, PA 15275

BIOMERIEUX VITEK, INC.
P.O.BOX 500308
ST LOUIS, MO 63150-0308

BECTON DICKINSON
DEPT LA 21445
PASADENA, CA 91185-1445

AT & T
4441 AUBURN BLVD 36
Sacramento, CA 95841

MCKESSON INFO SOLUTIONS
P.O. BOX 98347
Chicago, IL 60693-8347

ALPHA SCIENTIFIC MEDICAL, INC
1751 YEAGER AVENUE,
La Verne, CA 91750

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

BECKMAN COULTER, INC
DEPT CH 10164
PALATINE, IL 60055-0164

BioLabs
20 Largest

BioLabs, Inc.
1821 E. Dyer Road, #100
Santa Ana, CA 92705

U.S. Trustee - Santa Ana
411 West Fourth Street
Suite 9041
Santa Ana, CA 92701-8000

CapitalSource Finance LLC
Gregory Browne, Managing Partner
4445 Willard Avenue, Twelfth Floor
Chevy Chase, MD 20815

GE Business Fin. Services, Inc.
2 Bethesda Metro Ctr., Suite 600
Bethesda, MD 20814

Merril Lynch Capital
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Merril Lynch Capital, a Division of
Merril Lynch Bus. Fin. Serv., Inc.
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Sandelman Finance 2006-1, Ltd
c/o Sandelman Prtnrs., Bill Brown
500 Park Avenue, 3rd Fl.
New York, NY 10022