1   RON BENDER (SBN 143364)
    JACQUELINE L. RODRIGUEZ (SBN 198838)
2   TODD M. ARNOLD (SBN 221868)
    JOHN-PATRICK M. FRITZ (SBN 245240)
3   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
    10250 Constellation Boulevard, Suite 1700
4   Los Angeles, California 90067
5   Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
    Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
6
    Proposed Attorneys for
7   Chapter 11 Debtors and Debtors in Possession

8                **UNITED STATES BANKRUPTCY COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**
9                    **(SANTA ANA DIVISION)**

10  In re:                          [Proposed]
                                    Lead Case No. 8:10-bk-16743
11  WESTCLIFF MEDICAL               [Proposed] Jointly Administered
12  LABORATORIES, INC.,             with Case No. 8:10-bk-16746[1]

13           Debtor.                Chapter 11 Cases

14  ─────────────────────────       **DEBTORS' EMERGENCY MOTION FOR AN
                                    ORDER: (1) APPROVING AUCTION SALE
15  BIOLABS, INC.,                  FORMAT, BIDDING PROCEDURES AND
                                    STALKING HORSE BID PROTECTIONS;
16           Debtor.                (2) APPROVING FORM OF NOTICE TO BE
                                    PROVIDED TO INTERESTED PARTIES;
17  ─────────────────────────       (3) APPROVING FORM OF ASSET
                                    PURCHASE AGREEMENT FOR PROSPECTIVE
18  ☒ Affects Both Debtors          OVERBIDDERS TO USE; AND (4)
                                    SCHEDULING A COURT HEARING TO
19  ☐ Affects WESTCLIFF MEDICAL     CONSIDER APPROVAL OF THE SALE TO
      LABORATORIES, INC. only       THE HIGHEST BIDDER; MEMORANDUM OF
                                    POINTS AND AUTHORITIES;
20  ☐ Affects BIOLABS, INC. only    DECLARATIONS OF ROBERT E. WHALEN,
21                                  MATTHEW PAKKALA AND CURTIS LANE IN
                                    SUPPORT THEREOF**
22
23                                  Court Scheduled Hearing:
24                                  Date:  May 25, 2010
                                    Time:  10:00 a.m.
25                                  Place: Courtroom "5D"
26                                         411 West Fourth Street
                                           Santa Ana, CA 92701-4593
27  ─────────────────────────

28  [1] Motion for Joint Administration pending.

1

1

2        Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy

3 Code, Rules 2002, 6003, 6004 and 9014 of the Federal Rules of

4 Bankruptcy Procedure, and Local Bankruptcy Rules 2081-1(a)(10),

5 6004-1(b) and 9075-1, Westcliff Medical Laboratories, Inc.

6 ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11

7 debtors and debtors in possession herein (collectively, the

8 "Debtors"), hereby move, by way of this Emergency Motion

9
("Motion"), for entry of the Order in substantially the form

10
attached as Exhibit "1" to the annexed Declaration of Matthew

11
Pakkala (the "Bidding Procedures Order"), which, among other

12

13 things, provides for:

14     1.   approval of the auction sale format, bidding procedures

15 and bid protections described below in the annexed Memorandum of

16 Points and Authorities.

17
    2.   approval of the Debtors' proposed form of notice to be

18
provided to creditors, prospective overbidders and other parties

19

20 in interest in the form attached as Exhibit "2" to the annexed

21 Declaration of Matthew Pakkala.

22     3.   approval of the form of asset purchase agreement for

23 prospective overbidders to use by requiring prospective

24 overbidders either to use the same form of asset purchase

25 agreement (the "APA") agreed to by the Debtors and Laboratory

26
Corporation of America ("LabCorp") and its wholly-owned

27
subsidiary Wave Newco, Inc. ("Purchaser"), on the other hand, or

28

to submit a redlined version of a proposed asset purchase agreement which indicates the prospective overbidder's changes to the APA. A copy of the APA is attached as Exhibit "3" to the annexed Declaration of Matthew Pakkala.

4. the scheduling of an expedited Court hearing to consider approval of the sale of the Purchased Assets (defined below) to Purchaser, or such other prevailing bidder, pursuant to the terms and conditions of the APA.

Westcliff is the owner and operator of approximately 170 branded and stand-alone patient service center laboratories and STAT labs located throughout California. The Debtors have approximately 1,000 employees and are currently generating approximately $100 million of annual revenue. BioLabs does not operate any business and its only material asset is its 100% equity interest in Westcliff, which is a wholly-owned subsidiary of BioLabs.

The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens

against only certain of the Debtors' equipment. The Debtors also have a substantial amount of unsecured debt.

The Debtors suffered a net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171 million) on net revenue of approximately $84 million. The Debtors suffered a net loss of approximately $13 million in 2009 (including expenses and write offs of approximately $110 million) on net revenue of approximately $97 million.

While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued. Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy. Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

The only way the Debtors can survive as a stand alone going concern business would be for the Debtors to raise many millions of dollars of additional equity which is not possible given the Debtors' debt structure. It therefore became clear to the Debtors in early 2009 that the only viable option available to

4

the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder.   The Debtors have therefore been engaged in an active sale process since early 2009.

To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009 as a financial advisor to assist the Debtors with their sale process.[2] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers.[3]

After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that LabCorp was the optimal buyer of the Debtors' assets for three primary reasons.   First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets.   Second, it was clear that LabCorp as a strategic buyer was willing to pay a substantially higher price for the Debtors' assets than any other

---

[2] The Debtors had used other professionals for this same purpose in the past.
[3] A complete listing of the parties contacted by MTS is attached as Exhibit "4" to the annexed Declaration of Curtis Lane.

prospective buyer.    Third, LabCorp clearly has the financial means to consummate its purchase of the Debtors' assets.[4]

As indicated in Section 3.1 of the APA, subject to certain adjustments, Purchaser has agreed to pay to the Debtors the sum of \$57.5 million for the Purchased Assets, while leaving with the Debtor, among other things, all of the Debtors' accounts receivable (which the Debtors estimate will result in an additional net recovery of approximately \$8,000,000 for the Debtors' estates) and all of the Debtors' cash.    The Debtors and MTS believe that the purchase price offered by Purchaser is substantially higher than the purchase price that any other buyer would be willing to pay for the Purchased Assets.

While the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), the Debtors and MTS believe that it is highly unlikely that there is any other buyer that will be willing to pay more for the Purchased Assets than Purchaser has offered.    Moreover, the Debtors and MTS do not believe that the prospect for a successful overbid would increase with the passage of time.    To the contrary, the Debtors believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of

---

[4] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp solely for the purpose of acquiring the Purchased Assets.

1  Westcliff's business resulting from the Debtors' bankruptcy
2  filings. This is a highly sensitive and extremely competitive
3  industry, and the Debtors and Purchaser do not believe that
4  Westcliff will be able to retain its customer base for any
5  extended period of time while operating as a debtor in
6
7  bankruptcy. The Debtors believe that an expedited sale of the
8  Debtors' business is necessary to avoid immediate and irreparable
9  harm to the Debtors' business, creditors and bankruptcy estates.

10      As set forth in Section 3.1 of the APA, the purchase price
11  being paid by Purchaser will be adjusted downward if there is a
12  meaningful reduction in Westcliff's post-petition business volume
13  pending the closing of the sale[5]. Moreover, should that
14  reduction reach the level of a Material Adverse Change[6],
15
16  Purchaser has the ability walk away from this transaction
17  completely. The risks to the Debtors' estates of failing to
18  close the sale of the Purchased Assets to Purchaser on an
19  expedited basis are therefore severe. The Debtors have no doubt
20  that if they fail to consummate the sale to Purchaser, the
21

22  [5] Purchase Price Decrease Adjustment is defined in the definitional Section of
    the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement
23  Period Volume) times (b) $1,202.00.
    [6] Material Adverse Change is defined in the definitional Section of the APA as
24  an amount equal to 0.17 or more determined using the following formula: the
    quotient of (a) (the Baseline Volume minus the Measurement Period Volume);
25  divided by (b) the Baseline Volume. For purposes of clarification, the
    Material Adverse Change may be expressed as a percentage equal to or greater
26  than Seventeen Percent (17%). By way of example, if the Baseline Volume is
    9,500 and the Measurement Period Volume is 7,885, then the calculation shall
27  be equal to 0.17 and a Material Adverse Change shall have occurred.

28

7

1 Debtors will either be forced to sell their business for
2 substantially less money than Purchaser has offered, or, worse,
3 the Debtors will have to shut down their business and liquidate,
4 which would result in the loss of approximately 1,000 jobs and
5
6 the decimation of any going concern value of the Debtors'
7 business. A liquidation of the Debtors' business would have
8 minimal value.

9 While section 7.3(c)(ix) of the APA only requires that the
10 hearing on the Sale Motion be no more than twenty-five days after
11 the Petition Date (which would be by June 13, 2010), the Debtors
12 strongly urge the Court to conduct the hearing on the Sale Motion
13 no later than Thursday, May 27, 2010.[7]
14

15 The Debtors believe that proceeding with a sale in such an
16 expedited manner serves only to the substantial benefit of the
17 Debtors' estates. Given the lengthy and exhaustive pre-petition
18 sale process that the Debtors embarked upon, with the valuable
19 assistance of MTS, the Debtors and MTS are highly confident that
20 any potential overbidder has been identified and is extremely
21 knowledgeable about the Debtors' business and the opportunity to
22
23 purchase the Purchased Assets. The Debtors and MTS therefore
24 believe that if there is any party willing and able to pay more

25

26 [7] Section 7.3(c)(ix) requires the Debtors to use their best efforts to have
the hearing on the Sale Motion occur no more than twelve calendar days
27 following the Petition Date (which would be Monday, May 31, 2010. However,
the parties wish to make every effort to obtain an entered sale order on
28 Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

1   for the Debtors' business than Purchaser has offered, they can do

2   so within the time frame requested by the Debtors and nothing

3   would change for the better if that time frame were expanded.    To

4   the contrary, the risk to the Debtors' business of customer

5
6   attrition and a corresponding reduction in the purchase price to

7   be paid by Purchaser (or worse a complete walk away by Purchaser)

8   from a protracted sale process is severe and significantly

9   greater than any possible benefit that could be obtained from

10  speculating that a higher price might be paid for the Purchased

11  Assets.

12       The APA was extensively negotiated between the Debtors and

13  Purchaser in good faith, arms-length negotiations, including

14
15  exchanges of multiple drafts of asset purchase agreements over an

16  extended period of time.   The Debtors and MTS have no doubt that

17  the result obtained from the sale of the Purchased Assets to

18  Purchaser is the overwhelmingly optimal result for the Debtors'

19  estates.

20       Consistent with this very expedited time frame for

21  conducting the hearing on the Sale Motion, the Debtors obtained a

22
23  hearing on this Emergency Motion on shortened time.[8]

24  _____

25  [8] While Section 10.1(g) of the APA only requires that an order approving the
    relief requested in this Emergency Motion be entered within seven days after
26  the Petition Date (which would be Wednesday, May 26, 2010), the Debtors
    believe that it would be beneficial to have the order entered before that
27  date to provide the maximum number of days possible between the date of entry
    of the order approving the relief request in this Emergency Motion and the
28  date of the hearing on the Sale Motion.

As indicated in Section 7.3(c) of the APA, the following bidding procedures have been agreed to by the Debtors and Purchaser, all of which the Debtors believe to be reasonable and appropriate under the circumstances of these cases and in compliance with applicable law:

1.   Purchaser will receive a break-up fee in the amount of $2.25 million in the event of a successful overbid where a buyer other than Purchaser is the winning bidder. This is less than 4% of the $57.5 million purchase price being paid by Purchaser and is even a lower percentage when taking into account the fact that Purchaser is leaving the Debtors with their substantial accounts receivable which Purchaser has agreed not to take.

2.   In order to overbid Purchaser's bid, the minimum initial overbid must be at least $2.95 million higher than Purchaser's bid, with minimum subsequent bid increments of $100,000.

3.   In order to be considered a "qualified bidder", a bidder must, on or before two business days before the sale hearing, submit evidence of its financial ability to close the transaction.

4.   In order to be considered a "qualified bidder", prospective overbidders are required to provide the same good faith deposit of $4 million as Purchaser has provided.

As previously indicated, the Debtors and MTS believe that the prospects for any overbid to Purchaser's offer are very remote. The Debtors and MTS therefore have concluded that the foregoing overbid procedures and protections for Purchaser are very reasonable and are of inconsequential significance to the Debtors' estates when weighed against the extraordinary benefit of having a locked in buyer (i.e., bird in the hand) in Purchaser, particularly since the offer from Purchaser is substantially higher than any other offer the Debtors received.

Local Bankruptcy Rule 6004-1(b)(1) provides as follows: "A hearing on a Motion to Establish Procedures for the Sale of the Estate's Assets may be scheduled on not less than 7 days notice to applicable parties, unless an order shortening the time for a hearing is obtained under Local Bankruptcy Rule 9075-1(b)." However, Local Bankruptcy Rules 2081-1(a)(10) and 9075-1(a) allow a debtor to obtain a hearing date on an emergency motion to establish procedures for the sale of an estate's assets by calling the Court and requesting a hearing on emergency notice. In these cases, the Debtors called the Court and obtained the above-referenced hearing date and time.

As indicated above, while the APA only requires the Debtors to obtain an entered order approving sale procedures within seven days following the Petition Date (i.e., by May 26, 2010), the Debtors believe that there is no benefit to the Debtors' estates

of delaying Court approval of those sale procedures so that MTS has the maximum amount of time possible to notify prospective overbidders of the overbid opportunity, while still making sure that the sale hearing occurs in time for the Debtors to close their sale quickly and minimize the risk of a purchase price reduction or complete walk away by LabCorp resulting from a reduction in the Debtors' business volume caused by the Debtors' bankruptcy filings.

Concurrently with the filing of this Emergency Motion with the Court (on May 19, 2010), the Debtors served a copy of this Emergency Motion and all supportive papers upon the Office of the United States Trustee, all known secured creditors, the Debtors' twenty largest unsecured creditors, Purchaser and all parties who have requested special notice, by overnight mail.

The relief sought in this Emergency Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities and Declarations of Robert E. Whalen, Matthew Pakkala and Curtis Lane annexed hereto, the statements, arguments and representations of counsel to be made at the hearing on this Emergency Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Emergency Motion.

1    **WHEREFORE**, the Debtors respectfully request that this Court:

2        1.    approve the auction sale format, bidding procedures and

3    stalking horse bid protections described herein;

4        2.    approve the Debtors' proposed form of notice to be

5    provided to creditors, prospective overbidders and other parties

6    in interest in the form attached as Exhibit "2" to the annexed

7    Declaration of Matthew Pakkala;

8

9        3.    approve the form of asset purchase agreement for

10   prospective overbidders to use by requiring prospective

11   overbidders either to use the same form of APA agreed to by the

12   Debtors and Purchaser or to submit a redlined version of a

13   proposed asset purchase agreement which indicates the changes to

14   the asset purchase agreement requested by the prospective

15   overbidder;

16

17       4.    schedule a Court hearing to consider approval of the

18   sale of the Purchased Assets to Purchaser, or to a prevailing

19   overbidder, with such hearing to be held May 27, 2010 or the

20   first available date thereafter;

21       5.    enter the form of Bidding Procedures Order attached as

22   Exhibit "1" to the annexed Declaration of Matthew Pakkala; and

23   ///

24   ///

25   ///

26

27

28

1    6.    grant such other and further relief as the Court deems

2  just and proper.

3  Dated: May 19, 2010                    WESTCLIFF MEDICAL LABORATORIES,
                                          INC.
4
                                          -and-
5
                                          BIOLABS, INC.
6
                                          */s/ Ron Bender*
7                                         RON BENDER
                                          JACQUELINE L. RODRIGUEZ
8                                         TODD M. ARNOLD
                                          JOHN-PATRICK M. FRITZ
9                                         LEVENE, NEALE, BENDER, RANKIN
                                             & BRILL L.L.P.
10                                        (Proposed) Attorneys for Chapter 11
                                          Debtors and Debtors in Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          14

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..........................15

I.   COMPANY BACKGROUND AND CHAPTER 11 BANKRUPTCY FILINGS ....15

II.  THE ASSET SALE PROCESS .................................18

III. THE ASSET PURCHASE AGREEMENT WITH PURCHASER .............20

IV.  THE OVERBID PROCESS ....................................22

V.   THE CRITICAL NEED FOR AN EXPEDITED SALE CLOSING .........24

VI.  DISCUSSION .............................................27

VII.   CONCLUSION ...........................................34

DECLARATION OF ROBERT E. WHALEN .............................36

DECLARATION OF MATTHEW PAKKALA .............................45

DECLARATION OF CURTIS LANE ..................................59

# **TABLE OF AUTHORITIES**

**CASES**

**Page(s)**

Cottle v. Storer Communication Inc.,
   849 F.2d 570 (11th Cir. 1988) ..............................30

In re 995 Fifth Ave. Assoc., L.P.,
   96 B.R. 24 (Bankr. S.D.N.Y. 1989) ..........................30

In re Atlanta Packaging Products, Inc.,
   99 B.R. 124 (Bankr. N.D. Ga. 1988) .........................28

In re Crowthers McCall Pattern, Inc.,
   114 B.R. 877 (Bankr. S.D.N.Y. 1990) ....................28, 29

In re Financial News Network, Inc.,
   126 B.R. 152 (Bankr. S.D.N.Y. 1991) ........................29

In re Integrated Resources, Inc.,
   147 B.R. 650 (S.D.N.Y. 1992), *app dismissed on
   jurisdictional grounds,* 3 F.3d 49 (2d Cir. 1993) ....29, 31, 32

In re S.N.A. Nut Co.,
   186 B.R. 98 (Bankr. N.D.Ill. 1995) .........................30

**STATUTES**

U.S.C. Section 101 ....................................2, 14, 15

U.S.C. Section 105(a) .........................................27

U.S.C. Sections 105(a), 363 and 365 ...........................2

U.S.C. Section 363(b)(1) ......................................27

U.S.C. Sections 1107 and 1108 ................................15

**OTHER AUTHORITIES**

Local Bankruptcy Rules

LBR 6003 ......................................................33

LBR 6004-1(b)(1) ..............................................11

LBR 6004(f) ..................................................28

LBR 2081-1(a)(10), 6004-1(b) and 9075-1 ........................2

LBR 2081-1(a)(10) and 9075-1(a) ...............................11

LBR 9075-1(b) .................................................11

Federal Rules of Bankruptcy Procedure

FRBP 2002, 6003, 6004 and 9014 .................................2

FRBP 2002 and 6004 ...........................................27

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

### COMPANY BACKGROUND AND CHAPTER 11 BANKRUPTCY FILINGS

4

5

6

7

8

9

10

11

12

13

14

Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on May 19, 2010 (the "Petition Date"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

15

16

17

18

19

BioLabs is the parent company to Westcliff, which is the operating company. The only material asset owned by BioLabs is its stock interest in the Debtor. Biolabs was organized for the purposes of acquiring 100% of the capital stock and other equity interests of Westcliff.

20

21

22

23

24

25

26

27

28

Westcliff was founded in 1964 as a community-based laboratory and is headquartered in Santa Ana, California. Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of

out-patients throughout California. The Debtors have nearly 1000 employees.

The Debtors' main clinical hub is an 80,000 square foot facility located in Santa Ana, California that opened in 2006. The Debtors' primary anatomical pathology lab is a 12,800 square foot facility located in Monrovia, California that opened in 2008.

Working directly with patients and with contracted payors, including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and Medicare, Westcliff has grown and become a leading out-patient laboratory service company. Westcliff's lab operations demonstrate industry-leading results, with low testing turn-around times, high quality control scores, and a strong and experienced sales and marketing team.

Westcliff averages approximately 8,500 clinical requests per day and approximately 1,200 pathology requests per day, and performs approximately 250,000 cytology and 70,000 biopsy tests on an annual basis. Based on this performance, the Debtors had approximately $97 million in net revenue in 2009 and are the third largest clinical laboratory in California.

The California clinical laboratory testing market is the largest in the nation, with estimated revenues of approximately $2 billion. Approximately 8% of the nations' tests are performed in California, and over 200 million of California's tests are

conducted by independent labs (excluding hospital based labs). Based on current volume, the Debtors account for approximately 5% of the California market.

Much of the Debtors' growth has come from the acquisition of other labs, which caused the Debtors to incur a substantial amount of debt. The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment. The Debtors also have a substantial amount of unsecured debt.

While the Debtors' revenue is significant, due to the small profit margins in this business, despite substantial and continuing cost cutting measures undertaken by the Debtors, the Debtors are simply not able to operate sufficiently profitably to enable the Debtors to repay their debts.

The Debtors suffered a net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171 million) on net revenue of approximately $84 million. The Debtors suffered a net loss of approximately $13 million in 2009

(including expenses and write offs of approximately \$110 million) on net revenue of approximately \$97 million.

While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued. Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy. Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

The only way the Debtors can survive as a stand alone going concern business would be for the Debtors to raise many millions of dollars of additional equity which is not possible given the Debtors' debt structure.

II.

THE ASSET SALE PROCESS

It therefore became clear to the Debtors in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder. The Debtors

1   have therefore been engaged in an active sale process since
2   early, 2009.

3       To assist the Debtors with this sale process, the Debtors
4   engaged MTS Health Partners, LP ("MTS") in October, 2009 as a
5
6   financial advisor to assist the Debtors with their sale process.[9]
7   MTS, working closely with the Debtors, conducted an exhaustive
8   sale process, having prepared detailed sale materials and having
9   had extensive discussions and interactions with numerous
10  prospective buyers, both strategic buyers and financial buyers.[10]

11      After having engaged in substantial due diligence and
12  negotiations with a number of different prospective buyers over
13
14  the past many months, MTS and the Debtors collectively concluded
15  that LabCorp was the optimal buyer of the Debtors' assets for
16  three primary reasons.    First, LabCorp, which is in the same
17  business as Westcliff but is a much larger company, expressed the
18  greatest interest in purchasing the Debtors' assets.    Second, it
19  was clear that LabCorp as a strategic buyer was willing to pay a
20  substantially higher price for the Debtors' assets than any other
21  prospective buyer.    Third, LabCorp clearly has the financial
22  means to consummate its purchase of the Debtors' assets.[11]
23

24

25

26  [9] The Debtors had used other professionals for this same purpose in the past.
    [10] A complete listing of the parties contacted by MTS is attached as Exhibit
27  "4" to the annexed Declaration of Curtis Lane.

    [11] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp
28  solely for the purpose of acquiring the Purchased Assets.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III.

## THE ASSET PURCHASE AGREEMENT WITH PURCHASER

A copy of the Asset Purchase Agreement (the "APA") entered into between the Debtors, LabCorp and Purchaser is attached as Exhibit "3" to the annexed Declaration of Matthew Pakkala.

A description of the assets to be purchased by Purchaser free and clear of all liens, claims and interests (defined as the "Purchased Assets") is set forth in full in Section 2.1 of the APA.  As set forth therein, the Purchased Assets consist of the Debtors' executory contracts and unexpired leases that Purchaser elects to acquire and substantially all of the Debtors' personal property assets with the exception of the Debtors' cash and accounts receivable, which are included within the "Excluded Assets" as set forth in Section 2.2 of the APA.  Also part of the "Excluded Assets" are all avoidance causes of action of the Debtors' bankruptcy estates.  As set forth in Section 2.3(a), Purchaser is assuming certain limited liabilities of the Debtors.

As set forth in Section 3.1 of the APA, Purchaser's purchase price for the Purchased Assets will be $57.5 million subject to certain adjustments, while leaving with the Debtors, among other things, all of the Debtors' accounts receivable (which the Debtors estimate will result in an additional net recovery of approximately $8,000,000 for the Debtors' estates) and all of the Debtors' cash.

As indicated in Section 3.1 of the APA, a meaningful reduction in the Debtors' business volume will result in a decrease in the purchase price paid by Purchaser pursuant to a Purchase Price Decrease Adjustment. Moreover, if there is a Material Adverse Change (which translates into an even bigger reduction in the Debtors' business volume), then Purchaser is not required to close the transaction.

The possibility of the Debtors suffering a reduction in revenue as a result of their bankruptcy filings in this very competitive industry and the resulting negative impact on the purchase price to be paid by Purchaser, or, worse, a complete walk away by Purchaser, is the reason why it is so critical that this sale transaction occur on an expedited basis. As indicated in Section 3.2 of the APA, Purchaser has already delivered a $4 million deposit to the Debtors.

The APA was extensively negotiated between the Debtors and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements over an extended period of time. The Debtors and MTS have no doubt that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates.

No insider of the Debtors has any interest in or connection with Purchaser, and no insider of the Debtors will be receiving

any special benefit as a result of the Debtors' sale of the Purchased Assets to Purchaser. The Debtors have entered into the APA with Purchaser and are filing this Emergency Motion with the Court solely because the Debtors, after consultation with and upon the advise of MTS, have concluded that doing so is in the best interest of the Debtors' creditors and their estates. The Debtors and MTS believe that the purchase price offered by Purchaser is substantially higher than the purchase price that any other buyer would be willing to pay for the Purchased Assets.

IV.

### THE OVERBID PROCESS

To make absolutely certain that the highest price possible is paid for the Purchased Assets, the Debtors and Purchaser have agreed to various overbid procedures. MTS has extensively marketed the Debtors' business for sale. MTS is therefore knowledgeable about those parties who could possibly be interested in paying more for the Debtors' business than Purchaser has offered. MTS will make every reasonable effort to attempt to facilitate an overbid.

As indicated in Section 7.3(c) of the APA, the following bidding procedures have been agreed to by the Debtors and Purchaser, all of which the Debtors believe to be reasonable and appropriate under the circumstances of these cases and in compliance with applicable law:

22

1.    Purchaser will receive a break-up fee in the amount of $2.25 million in the event of a successful overbid where a buyer other than Purchaser is the winning bidder. This is less than 4% of the $57.5 million purchase price being paid by Purchaser and is even a lower percentage when taking into account the fact that Purchaser is leaving the Debtors with their substantial accounts receivable which Purchaser has agreed not to take.

2.    In order to overbid Purchaser's bid, the minimum initial overbid must be at least $2.95 million higher than Purchaser's bid made in the APA, with minimum subsequent bid increments of $100,000.

3.    In order to be considered a "qualified bidder", a bidder must, on or before two business days before the sale hearing, submit evidence of its financial ability to close the transaction.

4.    In order to be considered a "qualified bidder", prospective overbidders are required to provide the same good faith deposit of $4 million as Purchaser has provided.

As previously indicated, the Debtors and MTS believe that the prospects for any overbid to Purchaser's offer are very remote. The Debtors and MTS therefore have concluded that the foregoing overbid procedures and protections for Purchaser are very reasonable and are of inconsequential significance for the Debtors' estates when weighed against the extraordinary benefit

23

of having a locked in buyer (i.e., bird in the hand) in Purchaser, particularly since the offer from Purchaser is substantially higher than any other offer the Debtors received.

V.

## THE CRITICAL NEED FOR AN EXPEDITED SALE CLOSING

While the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken for the sale of the Debtors' business, the Debtors and MTS believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, the Debtors and MTS do not believe that the prospect for a successful overbid would increase with the passage of time. To the contrary, the Debtors and LabCorp believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors' business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and the Debtors and LabCorp do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy. The Debtors believe that an expedited sale of the Debtors' business is necessary to avoid immediate and

1  irreparable harm to the Debtors' business, creditors and
2  bankruptcy estates.

3      As set forth in Section 3.1 of the APA, a meaningful
4  reduction in the Debtors' business volume will result in a
5  decrease in the purchase price paid by Purchaser pursuant to a
6
7  Purchase Price Decrease Adjustment. Moreover, if there is a
8  Material Adverse Change (which translates into an even larger
9  reduction in the Debtors' business volume), then Purchaser is not
10  required to close the transaction.

11      The risks to the Debtors' estates of failing to close the
12  sale of the Purchased Assets to Purchaser on an expedited basis
13  are therefore severe. The Debtors have no doubt that if they
14
15  fail to consummate their sale to Purchaser, the Debtors will
16  either end up selling their business for substantially less money
17  than Purchaser has offered, or, worse, the Debtors will have to
18  shut down their business and liquidate, which would result in the
19  loss of approximately 1,000 jobs and the decimation of any going
20  concern value of the Debtors' business. A liquidation of the
21  Debtors' business would have minimal value.
22

23      While section 7.3(c)(ix) of the APA only requires that the
24  hearing on the Sale Motion be no more than twenty-five days after
25  the Petition Date (which would be by June 13, 2010), the Debtors
26
27
28

1    strongly urge the Court to conduct the hearing on the Sale Motion

2    no later than Thursday, May 27, 2010.[12]

3        The Debtors believe that proceeding with a sale in such an

4    expedited manner serves only to the substantial benefit of the

5    
6    Debtors' estates.  Given the lengthy and exhaustive pre-petition

7    sale process that the Debtors have embarked upon, with the

8    assistance of MTS, the Debtors and MTS are highly confident that

9    any potential overbidder has been identified and is extremely

10   knowledgeable about the Debtors' business and the opportunity to

11   purchase the Purchased Assets.  The Debtors and MTS therefore

12   believe that if there is any party willing and able to pay more

13   for the Debtors' business than Purchaser has offered, they can do

14   
15   so within the time frame requested by the Debtors and nothing

16   would change for the better if that time frame was expanded.   To

17   the contrary, the risk to the Debtors' business of customer

18   attrition and a corresponding reduction in the purchase price to

19   be paid by Purchaser (or worse a complete walk away by Purchaser)

20   from a protracted sale process is severe and significantly

21   greater than any possible benefit that could be obtained from

22   
23   speculating that a higher price might be paid for the Purchased

24   Assets.

25   

26   [12] Section 7.3(c)(ix) requires the Debtor to use its best efforts to have the
     hearing on the Sale Motion occur no more than twelve calendar days following
27   the Petition Date (which would be Monday, May 31, 2010).   However, the
     parties wish to make every effort to obtain an entered sale order on
28   Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

1    Consistent with this very expedited time frame for

2    conducting the hearing on the Sale Motion, the Debtors obtained a

3    hearing on this Emergency Motion on shortened time.[13]

4                                    VI.

5                                DISCUSSION

6
7        Section 363(b)(1) of the Bankruptcy Code provides that

8    "[t]he trustee, after notice and a hearing, may use, sell, or

9    lease, other than in the ordinary course of business, property of

10   the estate…." 11 U.S.C. § 363 (b)(1). Section 105(a) of the

11   Bankruptcy Code provides in pertinent part that "[t]he Court may

12   issue any order, process or judgment that is necessary and

13   appropriate to carry out the provisions of this title." 11

14   U.S.C. § 105(a). Bankruptcy Rules 2002 and 6004 govern the scope
15
16   of the notice to be provided in the event a debtor elects to sell

17   property of the estate under Section 363; however, with respect

18   to the procedures to be adopted in conducting a sale outside the

19   ordinary course of a debtor's business, Bankruptcy Rule 6004

20   provides only that such sale may be by private sale or public

21   auction, and requires only that the debtor provide an itemized

22
     list of the property sold together with the prices received upon
23

24   _____

25   [13] While Section 10.1(g) of the APA only requires that an order approving the
     relief requested in this Emergency Motion be entered within seven days after
26   the Petition Date (which would be Wednesday, May 26, 2010), the Debtors
     believe that it would be beneficial to have the order entered before that
27   date to provide the maximum number of days possible between the date of entry
     of the order approving the relief request in this Emergency Motion and the
28   date of the hearing on the Sale Motion.

                                      27

1  consummation of the sale.  Bankr. R. 6004(f).

2      Neither the Bankruptcy Code nor the Bankruptcy Rules contain
3  specific provisions with respect to the procedures to be employed
4  by a debtor in conducting a public or private sale.  Nonetheless,
5
6  as one Court has stated, "It is a well-established principle of
7  bankruptcy law that the objective of bankruptcy rules and the
8  [Debtors'] duty with respect to such sales is to obtain the
9  highest price or greatest overall benefit possible for the
10  estate."   In re Atlanta Packaging Products, Inc., 99 B.R. 124,
11  131 (Bankr. N.D. Ga. 1988).

12      A corollary to these principles is that the Court should
13  not "cherry-pick" among contractual provisions, objecting to
14
15  select individual portions, if the agreement as a whole is
16  supported by an articulated business judgment.  At least one
17  bankruptcy court has expressly applied this corollary to a
18  transaction including breakup and overbid provisions in the sale
19  of the debtor's business.  In In re Crowthers McCall Pattern,
20  Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the Court approved a
21  transaction including provisions relating to a breakup fee and
22
23  minimum overbids.   In responding to objections to other
24  provisions of the agreement, the Court held that:

25          The  Court  is  not  to  second  guess  the
             inclusion of some provisions as long as the
26          Agreement  as  a  whole  is  within  reasonable
             business judgment, and the subject provisions
27          do not distort the balance Congress struck in
             Chapter 11.   Cf. In re Ames Dep't Stores,
28

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Inc., Eastern Retailers Service Corp., et
> al., 115 B.R. 34, 37-38 (Bankr. S.D.N.Y.
> 1990) (some contractual provisions may be
> justified by the need to attract a
> prospective investor.).

114 B.R. at 886.

The Debtors, consistent with the advice and recommendations of MTS, have concluded that the auction and bidding procedures outlined above (and in more detail in the APA) are designed to enable the Debtors' estates to obtain the highest price possible for the Purchased Assets and provide the greatest possible recovery for the Debtors' creditors.

A breakup fee such as the one which will be paid to Purchaser in the event of a successful overbid has been approved by numerous other courts. In general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode ... to attract other bidders to the auction." In re Financial News Network, Inc., 126 B.R. 152, 154 n. 5 (Bankr. S.D.N.Y. 1991); see also In re Integrated Resources, Inc., 147 B.R. 650, 653 (S.D.N.Y. 1992), *app dismissed on jurisdictional grounds,* 3 F.3d 49 (2d Cir. 1993) ["[a] break-up fee, or more appropriately, a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction"]. Agreements to provide breakup fees are designed to compensate the potential acquirer who serves as a catalyst or

1    "stalking horse' which attracts more favorable offers.   In re

2    S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D.Ill. 1995); In re

3    995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y.

4    1989).

5           Outside of bankruptcy, a break-up fee is generally allowed

6    as long as it "enhances" the bidding.   In re S.N.A. Nut Co., 186

7    B.R. at 102.   In the bankruptcy context, a break-up fee is

8    generally permissible "if reasonably related to the bidder's

9    efforts and the transaction's magnitude."   Cottle v. Storer

10   Communication Inc., 849 F.2d 570, 578 (11th Cir. 1988); In re

11   995 Fifth Ave., supra, 96 B.R. at 28.   Generally speaking,

12

13   whether the payment of a break-up fee is appropriate is

14   evaluated under the "business judgment rule."   In re S.N.A. Nut

15   Co., supra, 186 B.R. at 102.   Under this rule, there is a

16   presumption that, in making a business decision, the principals

17   of the debtor acted on an informed basis, in good faith and in

18   the honest belief that the action taken was in the best interest

19

20   of the company.   Therefore, procedures utilized by a corporate

21   debtor with respect to a proposed sale should be approved when

22   the Court determines that such procedures are fair and do not

23   violate any of the debtor's fiduciary duties.   Id.

24

25          In evaluating the appropriateness of a break-up fee, the

26   appropriate question for the Court to consider is "whether the

27   break-up fee served any of three possible useful functions:   (1)

28

1  to attract or retain a potentially successful bid; (2) to

2  establish a bid standard or minimum for other bidders to follow;

3  or (3) to attract additional bidders."   In re Integrated

4  Resources, Inc., 147 B.R. at 662.

5

6      The Debtors strongly believe that proceeding with an

7  auction sale of the Purchased Assets with a locked-in buyer (as

8  compared with proceeding with a blind auction with no actual sale

9  agreement in hand) is in the overwhelming best interests of their

10 estates and will result in the highest price possible being paid

11 for the Purchased Assets.   All of the prospective bidders the

12 Debtors were in discussions with, including Purchaser, were

13 understandably only willing to serve as the stalking horse bidder

14 if they received various forms of benefits for doing so,

15 including a break-up fee.   Without giving such benefits to a

16 stalking horse bidder, there would have been no way for the

17 Debtors to obtain a viable stalking horse bidder, and no buyer

18 would have the incentive to serve as the stalking horse bidder.

19 Purchaser's offer was substantially higher than any other offer

20 the Debtors received, and Purchaser would never have been willing

21 to serve as the stalking horse bidder without the various

22 protections that are being afforded to Purchaser.   The Debtors

23 submit that these protections are fair, reasonable and consistent

24 with market practice and unquestionably will result in the

25

26

27

28

31

1  Debtors' estates receiving a substantially higher purchase price

2  for the Purchased Assets than would otherwise be the case.

3      Accordingly, the Debtors believe that its proposed break-up

4  fee and other protections in favor of Purchaser satisfy the

5  
6  standards identified in Integrated Resources (i.e., serving "any

7  of three possible useful functions: (1) to attract or retain a

8  potentially successful bid; (2) to establish a bid standard or

9  minimum for other bidders to follow; or (3) to attract additional

10  bidders." Id. at 662.

11      Given the exhaustive marketing effort performed by MTS over

12  a very extended period of time, as well as MTS' vast knowledge of

13  the Debtors' industry, the Debtors and MTS are highly confident

14  
15  that if any buyer exists who is willing to pay more money for the

16  Purchased Assets than offered by Purchaser, they will submit an

17  overbid and participate in the overbid process and no additional

18  time is needed to flush this out. Moreover, the Debtors and MTS

19  believe strongly that there is no doubt that any theoretical

20  benefit from having more time to attempt to obtain overbidders is

21  dramatically outweighed by the risks that the Debtors' business

22  
23  will deteriorate with the passage of time resulting in a

24  reduction in the purchase price to be paid by Purchaser or,

25  worse, enabling Purchaser to terminate the APA altogether. The

26  Debtors and MTS are therefore highly confident that the sale

27  process established by the Debtors and agreed to by Purchaser is

28

properly designed to make sure that the highest price possible is paid for the Purchased Assets under these very precarious circumstances.

The Debtors therefore submit that the proposed bidding procedures and stalking horse bid protections described above and provided for in the APA are in the overwhelming best interests of their estates, are necessary and appropriate to maximize the value paid for the Purchased Assets, and should be approved by the Court as an exercise of the Debtors' sound business judgment. Importantly, the Debtors are not seeking at the hearing on this Emergency Motion to have the Court approve the asset sale to Purchaser.  That request will be set forth in a separate Sale Motion to be filed by the Debtors.

Bankruptcy Rule 6003 provides that except to the extent that relief is necessary to avoid immediate and irreparable harm, the Court shall not within 21 days after the filing of the bankruptcy petition, among other forms of relief, approve a motion to sell property of the estate or approve a motion to assume or assign an executory contract or unexpired lease.  For all of the reasons described herein, the Debtors believe that consummating their sale of the Purchased Assets to Purchaser (or to a successful overbidder) in less than 21 days is necessary to avoid immediate and irreparable harm because the Debtors believe that if they are required to wait at least 21 days to consummate their sale, the

Debtors bear a significant risk of a material price reduction by Purchaser pursuant to the terms of the APA or, worse, a completely walk away by Purchaser.

## VII.

## CONCLUSION

Based upon all of the foregoing, the Debtors respectfully request that this Court:

1.  approve the auction sale format, bidding procedures and stalking horse bid protections described herein;

2.  approve the Debtors' proposed form of notice to be provided to creditors, prospective overbidders and other parties in interest in the form attached as Exhibit "2" to the annexed Declaration of Matthew Pakkala;

3.  approve the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same form of APA agreed to by the Debtors and Purchaser or to submit a redlined version of a proposed asset purchase agreement which indicates the changes to the asset purchase agreement requested by the prospective overbidder;

4.  schedule a Court hearing to consider approval of the sale of the Purchased Assets to Purchaser, or to a prevailing overbidder, with such hearing to be held on May 27, 2010 or the first available date thereafter;

1     5.   enter the form of Bidding Procedures Order attached as

2  Exhibit "1" to the annexed Declaration of Matthew Pakkala; and

3     6.   grant such other and further relief as the Court deems

4  just and proper.

Dated: May 19, 2010             WESTCLIFF MEDICAL LABORATORIES,
INC.

                         -and-

                         BIOLABS, INC.

                         */s/ Ron Bender*
RON BENDER
JACQUELINE L. RODRIGUEZ
TODD M. ARNOLD
JOHN-PATRICK M. FRITZ
LEVENE, NEALE, BENDER, RANKIN
    & BRILL L.L.P.
(Proposed) Attorneys for Chapter 11
Debtors and Debtors in Possession

35

## DECLARATION OF ROBERT E. WHALEN

I, ROBERT E. WHALEN, HEREBY DECLARE AS FOLLOWS:

1.    I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am the Chief Executive Officer and Chairman of the Board of Directors of Westcliff Medical Laboratories, Inc. ("Westcliff") and of its parent corporation, BioLabs, Inc. ("BioLabs"), Chapter 11 Debtors and Debtors in Possession (collectively, the "Debtors"). I have been Board Chairman since 2007 and Chief Executive Officer since July, 2009.    I have approximately thirty-two years of experience in the medical lab and related business.

3.    The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 19, 2010.    The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession.

4.    The only material asset owned by BioLabs is its stock interest in Westcliff.  Biolabs was organized for the purposes of acquiring 100% of the capital stock and other equity interests of Westcliff.

5.    Westcliff was founded in 1964 as a community-based laboratory and is headquartered in Santa Ana, California.

36

Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California. The Debtors have nearly 1000 employees.

6.   The Debtors' main clinical hub is an 80,000 square foot facility located in Santa Ana, California that opened in 2006. The Debtors' primary anatomical pathology lab is a 12,800 square foot facility located in Monrovia, California that opened in 2008.

7.   Working directly with patients and with contracted payors, including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and Medicare, Westcliff has grown and become a leading out-patient laboratory service company.  Westcliff's lab operations demonstrate industry-leading results, with low testing turn-around times, high quality control scores, and a strong and experienced sales and marketing team.

8.   Westcliff averages approximately 8,500 clinical requests per day and approximately 1,200 pathology requests per day, and performs approximately 250,000 cytology and 70,000 biopsy tests on an annual basis.  Based on this performance, the Debtors had approximately $97 million in revenue in 2009 and are the third largest clinical laboratory in California.

37

9.     The California clinical laboratory testing market is the largest in the nation, with estimated revenues of approximately \$2 billion. Approximately 8% of the nations' tests are performed in California, and over 200 million of California's tests are conducted by independent labs (excluding hospital based labs). Based on current volume, the Debtors account for approximately 5% of the California market.

10.    Much of the Debtors' growth has come from the acquisition of other labs, which caused the Debtors to incur a substantial amount of debt. The Debtors owe approximately \$56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment. The Debtors also have a substantial amount of unsecured debt.

11.    While the Debtors' revenue is significant, due to the small profit margins in this business, despite substantial and continuing cost cutting measures undertaken by the Debtors, the Debtors are simply not able to operate sufficiently profitably to enable the Debtors to repay their debts. The Debtors suffered a

38

net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171 million) on net revenue of approximately $84 million.  The Debtors suffered a net loss of approximately $13 million in 2009 (including expenses and write offs of approximately $110 million) on net revenue of approximately $97 million.

12.  While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued. Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy.  Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

13.  I believe that the only way the Debtors can survive as a stand alone going concern business would be for the Debtors to raise many millions of dollars of additional equity which I believe is not possible given the Debtors' debt structure.

14.  It therefore became clear to the Debtors' Board in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment

1    by all of the Debtors' employees would be for the Debtors to sell

2    their business as a going concern to the highest bidder.    The

3    Debtors have therefore been engaged in an active sale process

4    since early 2009.

5

6        15.    To assist the Debtors with this sale process, the

7    Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009

8    as a financial advisor to assist the Debtors with their sale

9    process.[14]    MTS, working closely with the Debtors, conducted an

10   exhaustive sale process, having prepared detailed sale materials

11   and having had extensive discussions and interactions with

12   numerous prospective buyers, both strategic buyers and financial

13   buyers.

14

15       16.    After having engaged in substantial due diligence and

16   negotiations with a number of different prospective buyers over

17   the past many months, MTS and the Debtors collectively concluded

18   that LabCorp was the optimal buyer of the Debtors' assets for

19   three primary reasons.    First, LabCorp, which is in the same

20   business as Westcliff but is a much larger company, expressed the

21   greatest interest in purchasing the Debtors' assets.    Second, it

22   was clear that LabCorp as a strategic buyer was willing to pay a

23   substantially higher price for the Debtors' assets than any other

24

25

26

27

28   [14] The Debtors had used other professionals for this same purpose in the past.

1  prospective buyer.   Third, LabCorp clearly has the financial

2  means of consummating its purchase of the Debtors' assets.[15]

3      17.  As set forth in Section 3.1 of the Asset Purchase

4  Agreement (the "APA"), Purchaser's purchase price for the

5
6  Purchased Assets will be \$57.5 million subject to certain

7  adjustments (exclusive of the Debtors' cash and accounts

8  receivable which the Debtors will retain).  I believe that under

9  the circumstances facing the Debtors, the purchase price that

10  Purchaser has agreed to pay is a very favorable price for the

11  Debtors.

12      18.  Based upon my vast experience in this industry, I

13  believe that there is a high probability, if not a certainty,

14
15  that the Debtors will suffer a substantial reduction in their

16  revenue in this very competitive industry as a result of their

17  bankruptcy filings.  As a result, I firmly believe that unless

18  the Debtors are able to consummate an expedited sale of their

19  business (ideally in less than two weeks), the Debtors are likely

20  to suffer a substantial reduction in the purchase price to be

21  paid by Purchaser pursuant to the formula set forth in Section

22
23  3.1 of the APA, or, worse, a complete walk away by Purchaser.  I

24  believe that the Debtors' consummating their sale of the

25  Purchased Assets to Purchaser (or to a successful overbidder) in

26

27
28  [15] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp
   solely for the purpose of acquiring the Purchased Assets.

41

less than 21 days is necessary to avoid immediate and irreparable harm because I believe that if the Debtors are required to wait at least 21 days to consummate their sale, the Debtors bear a significant risk of a material price reduction by Purchaser pursuant to the terms of the APA or, worse, a completely walk away by Purchaser.

19. I have no doubt that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates. While I understand that the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken for the sale of the Debtors' business, I believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, I do not believe that the prospect for a successful overbid would increase with the passage of time. To the contrary, I believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors' business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and I do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor

in bankruptcy.  I believe that an expedited sale of the Debtors'
business  is  critical  and  necessary  to  avoid  immediate  and
irreparable  harm  to  the  Debtors'  business,  creditors  and
bankruptcy estates.

    20.  I believe that the risks to the Debtors' estates of
failing to close the sale of the Purchased Assets to Purchaser on
an expedited basis are severe.  I have no doubt that if the
Debtors fail to consummate their sale to Purchaser, the Debtors
will either end up selling their business for substantially less
money than Purchaser has offered, or, worse, the Debtors will
have to shut down their business and liquidate, which would
result in the loss of approximately 1,000 jobs and the decimation
of any going concern value of the Debtors' business.  I believe
that a liquidation of the Debtors' business would have minimal
value.

///

///

///

43

1      21.  To the best of my knowledge, no insider of the Debtors

2   has any interest in or connection with Purchaser, and no insider

3   of the Debtors will be receiving any special benefit as a result

4   of the Debtors' sale of the Purchased Assets to Purchaser.

5      I declare and verify under penalty of perjury that the

6   foregoing is true and correct to the best of my knowledge,

7   information and belief.

8   

9      Executed on this 20th day of May, 2010, at Santa Ana,

10  California.

11  

12                   ROBERT E. WHALEN

13  

14  

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28  

44

1

### DECLARATION OF MATTHEW PAKKALA

2

I, MATTHEW PAKKALA, HEREBY DECLARE AS FOLLOWS:

3

1.    I have personal knowledge of the facts set forth below

4

and, if called to testify, would and could competently testify

5

thereto.

6

7

2.    I  am  a  Managing  Director  of  FTI  Consulting,  Inc.

8

("FTI"), which maintains its main offices at 500 E. Pratt Street,

9

Suite 1400, Baltimore, MD 21202.  My business office is located

10

at 633 West 5th Street, 16th Floor, Los Angeles, California,

11

90071.

12

3.    I hold a B.A. from the University of California, San

13

Diego, a J.D. from Loyola Law School, and an M.B.A. from the

14

Anderson School of Business at UCLA.  I have more than 13 years

15

16

of restructuring and related advisory and management experience.

17

My  work  focuses  on  advising  distressed  and  underperforming

18

companies  on  restructuring  alternatives  and  strategies  for

19

maximizing performance and value, and my expertise  includes

20

providing financial and operational restructuring, asset sales

21

and   expert   witness   services   in   the   healthcare,   retail,

22

manufacturing and airline industries.  Prior to joining FTI, I

23

worked in the restructuring groups of PricewaterhouseCoopers and

24

25

Price Waterhouse in Los Angeles.

26

4.    FTI is a global business advisory firm with over 3,000

27

professionals located in major business centers around the world.

28

45

FTI provides services in areas ranging from corporate finance and interim management to economic consulting, forensic and litigation consulting, strategic communications and technology. FTI's clients include many corporations in the Global 1000 as well as a majority of the largest 25 banks and top 100 law firms in the world.

5.   FTI has advised management, senior lenders and unsecured creditors in many of the most significant restructurings and turnarounds in recent years.   FTI and its professionals have also recently provided interim management services in a number of healthcare and other restructurings including, but not limited to, Downey Regional Medical Center, Fremont Investment & Loan, SyntaxBrillian, Daughters of Charity Health System; Methodist Hospital, Gary, IN; Quincy Medical Center; Nanticoke Memorial; Northern Berkshire; Regional Medical Center Memphis; and Boca Raton Community Hospital.

6.   Effective on or about April 1, 2010, I became the Chief Restructuring Officer ("CRO") for Westcliff Medical Laboratories, Inc. ("Westcliff") and its parent corporation, BioLabs, Inc. ("BioLabs"), Chapter 11 Debtors and Debtors in Possession (collectively, the "Debtors").

7.   The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 19, 2010.   The Debtors continue to operate their business,

1   manage their financial affairs, and operate their bankruptcy
2   estates as debtors in possession.

3       8.    My understanding is that the only material asset owned
4   by BioLabs is its stock interest in Westcliff.

5       9.    My primary functions serving as the CRO for the Debtors
6   was to manage the Debtors' business operations in the optimal
7   manner given the financial constraints facing the Debtors and to
8   assist the Debtors to consummate a going concern sale of their
9   business for the most money possible in the most expeditious
10  manner possible.

11      10.   Westcliff was founded in 1964 as a community-based
12  laboratory and is headquartered in Santa Ana, California.
13  Westcliff is the operator of approximately 170 branded, stand-
14  alone, patient service center laboratories and STAT labs that
15  provide various services, including clinical testing, pathology,
16  reporting and support services for the benefit of thousands of
17  out-patients throughout California.  The Debtors have nearly 1000
18  employees.

19      11.   At the time that I became the CRO of the Debtors, the
20  Debtors were already engaged in serious negotiations with LabCorp
21  regarding a possible purchase of the Debtors' assets.    I was
22  advised that after having engaged in substantial due diligence
23  and negotiations with a number of different prospective buyers
24  over the past many months, MTS and the Debtors collectively

47

concluded that LabCorp was the optimal buyer of the Debtors' assets for three primary reasons. First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets. Second, it was clear that LabCorp as a strategic buyer was willing to pay a substantially higher price for the Debtors' assets than any other prospective buyer. Third, LabCorp clearly has the financial means of consummating its purchase of the Debtors' assets.[16]

12. Since the time that I became the CRO of the Debtors, I became the principal point person for the Debtors tasked with negotiating and documenting the best possible sale of the Debtors' business to LabCorp. In this regard, I worked closely with MTS and the Debtors' various counsel. In an effort to finalize an asset purchase agreement with LabCorp, I participated in numerous telephone conferences with various principals of LabCorp and professionals representing LabCorp, and I attended an all-day, in-person meeting in North Carolina with LabCorp's principals and professionals.

13. On or about May 17, 2010, the Debtors, LabCorp and Purchaser entered into an asset purchase agreement ("APA"), a copy of which is attached hereto as Exhibit "3". As set forth in

---

[16] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp solely for the purpose of acquiring the Purchased Assets.

1   Section 3.1 of the APA, Purchaser's purchase price for the

2   Purchased Assets will be $57.5 million subject to certain

3   adjustments, while leaving with the Debtors, among other things,

4   all of the Debtors' accounts receivable (which I estimate will

5
6   result in an additional net recovery of approximately $8,000,000

7   for the Debtors' estates) and all of the Debtors' cash.

8         14.  A description of the assets to be purchased by

9   Purchaser free and clear of all liens, claims and interests

10  (defined as the "Purchased Assets") is set forth in full in

11  Section 2.1 of the APA.  As set forth therein, the Purchased

12  Assets consist of the Debtors' executory contracts and unexpired

13
14  leases that Purchaser elects to acquire and substantially all of

15  the Debtors' personal property assets with the exception of the

16  Debtors' cash and accounts receivable, which are included within

17  the "Excluded Assets" as set forth in Section 2.2 of the APA.

18  Also part of the "Excluded Assets" are all avoidance causes of

19  action of the Debtors' bankruptcy estates.  As set forth in

20  Section 2.3(a), Purchaser is assuming certain limited liabilities

21  of the Debtors.  As indicated in Section 3.2 of the APA,

22
23  Purchaser has already delivered a $4 million deposit to the

24  Debtors.

25        15.  The APA was extensively negotiated between the Debtors

26  and Purchaser in good faith, arms-length negotiations, including

27  exchanges of multiple drafts of asset purchase agreements over an

28

1  extended period of time.    From everything I have seen, I have no

2  doubt that the result obtained from the sale of the Purchased

3  Assets to Purchaser is the overwhelmingly optimal result for the

4  Debtors' estates.

5

6      16.  To the best of my knowledge, no insider of the Debtors

7  has any interest in or connection with Purchaser, and no insider

8  of the Debtors will be receiving any special benefit as a result

9  of the Debtors' sale of the Purchased Assets to Purchaser.    The

10  Debtors have entered into the APA with Purchaser and are filing

11  this Emergency Motion with the Court solely because the Debtors,

12  after consultation with and upon the advise of MTS, have

13
14  concluded that doing so is in the best interest of the Debtors'

15  creditors and their estates.    The Debtors and MTS believe that

16  the purchase price offered by Purchaser is substantially higher

17  than the purchase price that any other buyer would be willing to

18  pay for the Purchased Assets.

19      17.  To make absolutely certain that the highest price

20  possible is paid for the Purchased Assets, the Debtors and

21  Purchaser have agreed to various overbid procedures.    MTS has

22
23  extensively marketed the Debtors' business for sale.    MTS is

24  therefore knowledgeable about those parties who could possibly be

25  interested in paying more for the Debtors' business than

26  Purchaser has offered.    MTS will make every reasonable effort to

27  attempt to facilitate an overbid.

28

50

1    18.  As  indicated  in  Section  7.3(c)  of  the  APA,  the

2  following bidding procedures have been agreed to by the Debtors

3  and  Purchaser,  all  of  which  I  believe  to  be  reasonable  and

4  appropriate  under  the  circumstances  of  these  cases  and  in

5  compliance with applicable law:

6

7          i.  Purchaser  will  receive  a  break-up  fee  in  the

8  amount of $2.25 million in the event of a successful overbid

9  where a buyer other than Purchaser is the winning bidder.  This

10  is less than 4% of the $57.5 million purchase price being paid by

11  Purchaser and is even a lower percentage when taking into account

12  the  fact  that  Purchaser  is  leaving  the  Debtors  with  their

13  substantial accounts receivable which Purchaser has agreed not to

14  take.

15

16          ii.  In order to overbid Purchaser's bid, the minimum

17  initial  overbid  must  be  at  least  $2.95  million  higher  than

18  Purchaser's bid made in the APA, with minimum subsequent bid

19  increments of $100,000.

20          iii. In order to be considered a "qualified bidder", a

21  bidder  must,  on  or  before  two  business  days  before  the  sale

22  hearing, submit evidence of its financial ability to close the

23  transaction.

24

25          iv.  In order to be considered a "qualified bidder",

26  prospective overbidders are required to provide the same good

27  faith deposit of $4 million as Purchaser has provided.

28

51

19. Senior representatives of the Debtors and MTS have advised me that they believe that the prospects for any overbid to Purchaser's offer are extremely remote. From everything I have seen, I believe they are correct. I therefore have concluded that the foregoing overbid procedures and protections for Purchaser are very reasonable and are of inconsequential significance for the Debtors' estates when weighed against the extraordinary benefit of having a locked in buyer (i.e., bird in the hand) in Purchaser, particularly since the offer from Purchaser is substantially higher than any other offer the Debtors received.

20. While the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken for the sale of the Debtors' business, and from everything I have seen, I believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, from everything I have seen, I do not believe that the prospect for a successful overbid would increase with the passage of time. To the contrary, I believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors' business resulting from the Debtors' bankruptcy filings. This is

a highly sensitive and extremely competitive industry, and I do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy.  I therefore believe that an expedited sale of the Debtors' business is necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

21.  As set forth in Section 3.1 of the APA, a meaningful reduction in the Debtors' business volume will result in a decrease in the purchase price paid by Purchaser pursuant to a Purchase Price Decrease Adjustment.  Moreover, if there is a Material Adverse Change (which translates into an even bigger reduction in the Debtors' business volume), then Purchaser is not required to close the transaction.

22.  I therefore believe that the risks to the Debtors' estates of failing to close the sale of the Purchased Assets to Purchaser on an expedited basis are severe.  I have no doubt that if the Debtors fails to consummate their sale to Purchaser, the Debtors will either end up selling their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business.  I believe that a liquidation of the Debtors' business would have minimal value.

53

1    23.   While section 7.3(c)(ix) of the APA only requires that

2  the hearing on the Sale Motion be no more than twenty-five days

3  after the Petition Date (which would be by June 13, 2010), on

4  behalf of the Debtors, I strongly urge the Court to conduct the

5
   hearing on the Sale Motion no later than Thursday, May 27, 2010.[17]
6

7    24.   I believe that proceeding with a sale in such an

8  expedited manner serves only to the benefit of the Debtors'

9  estates.   Given the lengthy and exhaustive pre-petition sale

10  process that the Debtors have embarked upon, with the assistance

11  of MTS, I am highly confident that any potential overbidder has

12  been identified and is extremely knowledgeable about the Debtors'

13
   business and the opportunity to purchase the Purchased Assets.   I
14
   therefore believe that if there is any party willing and able to
15
16  pay more for the Debtors' business than Purchaser has offered,

17  they can do so within the time frame requested by the Debtors and

18  nothing would change for the better if that time frame was

19  expanded.   To the contrary, I believe that the risk to the

20  Debtors' business of customer attrition and a corresponding

21  reduction in the purchase price to be paid by Purchaser (or worse

22
   a complete walk away by Purchaser) from a protracted sale process
23
   is severe and significantly greater than any possible benefit
24

25

26  [17] Section 7.3(c)(ix) requires the Debtors to use their best efforts to have
   the hearing on the Sale Motion occur no more than twelve calendar days
27  following the Petition Date (which would be Monday, May 31, 2010).   However,
   the parties wish to make every effort to obtain an entered sale order on
28  Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

54

that could be obtained from speculating that a higher price might be paid for the Purchased Assets. I therefore believe that the Debtors' consummating their sale of the Purchased Assets to Purchaser (or to a successful overbidder) in less than 21 days is necessary to avoid immediate and irreparable harm because I believe that if the Debtors are required to wait at least 21 days to consummate their sale, the Debtors bear a significant risk of a material price reduction by Purchaser pursuant to the terms of the APA or, worse, a completely walk away by Purchaser.

25. Consistent with this expedited time frame for conducting the hearing on the Sale Motion, the Debtors obtained a hearing on this Emergency Motion on shortened time.[18]

26. Consistent with the advice and recommendations of MTS, I have concluded that the auction and bidding procedures outlined above (and in more detail in the APA) are designed to enable the Debtors' estates to obtain the highest price possible for the Purchased Assets and provide the greatest possible recovery for the Debtors' creditors.

[18] While Section 10.1(g) of the APA only requires that an order approving the relief requested in this Emergency Motion be entered within seven days after the Petition Date (which would be Wednesday, May 26, 2010), the Debtors believe that it would be beneficial to have the order entered before that date to provide the maximum number of days possible between the date of entry of the order approving the relief request in this Emergency Motion and the date of the hearing on the Sale Motion.

27.   I believe that the breakup fee which will be paid to Purchaser in the event of a successful overbid is reasonable and appropriate under the circumstances facing the Debtors.

28.   I strongly believe that proceeding with an auction sale of the Purchased Assets with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the overwhelming best interests of these estates and will result in the highest price possible being obtained for the Purchased Assets.   I am advised that all of the prospective bidders the Debtors were in discussions with, including Purchaser, were understandably only willing to serve as the stalking horse bidder if they received various forms of benefits for doing so, including a break-up fee.   Without giving such benefits to a stalking horse bidder, there would have been no way for the Debtors to obtain a viable stalking horse bidder, and no buyer would have the incentive to serve as the stalking horse bidder.   Purchaser's offer was substantially higher than any other offer the Debtors received, and Purchaser would never have been willing to serve as the stalking horse bidder without the various protections that are being afforded to Purchaser.   I therefore submit that the protections being afforded to Purchaser are fair, reasonable and consistent with market practice and unquestionably will result in the Debtors' estates receiving a

1   substantially higher purchase price for the Purchased Assets than
2   would otherwise be the case.

3       29.  Given the exhaustive marketing effort performed by MTS
4   over a very extended period of time, as well as MTS' vast
5   knowledge of the Debtors' industry, I am highly confident that if
6
7   any buyer exists who is willing to pay more money for the
8   Purchased Assets than offered by Purchaser, they will submit an
9   overbid and participate in the overbid process and no additional
10  time is needed to flush this out.  Moreover, I strongly believe
11  that there is no doubt that any theoretical benefit from having
12  more time to attempt to obtain overbidders is dramatically
13  outweighed by the risks that the Debtors' business will
14
15  deteriorate with the passage of time resulting in a reduction in
16  the purchase price to be paid by Purchaser or, worse, enabling
17  Purchaser to terminate the APA altogether.  I am therefore highly
18  confident that the sale process established by the Debtors and
19  agreed to by Purchaser is properly designed to make sure that the
20  highest price possible is paid for the Purchased Assets under
21  these very precarious circumstances.
22

23      30.  I therefore submit that the proposed bidding procedures
24  and stalking horse bid protections described above and provided
25  for in the APA are in the overwhelming best interests of these
26  estates, are necessary and appropriate to maximize the value paid
27  for the Purchased Assets, and should be approved by the Court as
28

1  an   exercise   of   the   Debtors'   sound   business   judgment.

2  Importantly, the Debtors are not seeking at the hearing on this

3  Emergency Motion to have the Court approve the asset sale to

4  Purchaser.   That request will be set forth in a separate Sale

5  Motion to be filed by the Debtor.

6

7       I declare and verify under penalty of perjury that the

8  foregoing is true and correct to the best of my knowledge,

9  information and belief.

10       Executed on this 20th day of May, 2010, at Santa Ana,

11  California.

12

13                              MATTHEW PAKKALA, Declarant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF CURTIS LANE

2

I, CURTIS LANE, HEREBY DECLARE AS FOLLOWS:

3

4

5

6

1. I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

7

8

9

10

11

12

2. I am a Senior Managing Director of MTS Health Partners, LP ("MTS"), which I founded in 2000. MTS is headquartered at 623 Fifth Avenue, New York, NY 10022. MTS is a healthcare-focused merchant bank that provides aligned strategic and financial advisory services distinguished by experienced, attentive and independent counsel in the context of long-term relationships.

13

14

15

16

3. I hold a B.S. from the University of Pennsylvania and an M.B.A. from the Wharton School of Business. I have approximately thirty years of investment banking experience.

17

18

19

20

21

22

23

24

25

26

27

4. From 1986 to 1998, I led the healthcare investment banking group at Bear Stearns which was one of the most active healthcare investment banking groups on Wall Street, completing 107 financing transactions with an aggregate value of $17.4 billion and 56 M&A and advisory assignments with an aggregate value of $20.4 billion. In my position as head of healthcare investment banking at Bear Stearns, I either directly handled or oversaw numerous financing and advisory transactions across all segments of healthcare. I advised and financed companies through all stages of their development and maturation, ranging from

28

private equity placements to public offerings of debt and equity securities. My particular focus was on the initiation and consummation of strategic M&A transactions within the context of an overall investment banking relationship. Prior to joining Bear Stearns in 1985, I worked in the Corporate Finance Department of Smith Barney, Harris Upham & Co., Inc. as a generalist investment banker.

5.    At MTS, I have advised numerous companies in strategic and financial transactions including both acquisitions and sales. For example, I served as lead advisor on the restructuring of Sun Healthcare Group, the implementation of PacfiCare's strategic plan and ultimate merger with United Healthcare and the restructuring of Presgar Companies, an imaging services company.

6.    In October, 2009, MTS was employed as a financial advisor to Westcliff Medical Laboratories, Inc. ("Westcliff") and its parent corporation, BioLabs, Inc. ("BioLabs"). Westcliff and BioLabs are collectively referred to herein as the "Debtors".

7.    In connection with that engagement, MTS spearheaded the Debtors' sale process with the goal of effectuating a going concern sale of the Debtors' business for the most money possible in the most expeditious manner possible.

8.    During these past seven months, MTS prepared marketing materials for the Debtors, and, working closely with the Debtors' management, MTS had extensive discussions and interactions with

1  numerous prospective buyers, both strategic buyers and financial

2  buyers.   A list of the approximately twenty-five parties who were

3  contacted is attached hereto as Exhibit "1".    Those parties

4  identified as "Private Equity Firms" would be financial buyers

5
   (i.e., buyers who would be making a financial purchase but who
6
7  are not currently in the same business as Westcliff).    Those

8  parties identified as "Laboratory" (including LabCorp) would be

9  strategic buyers (i.e., buyer who are currently in the same

10 business as Westcliff).   MTS engaged in serious sale discussions

11 with approximately 3 strategic buyers (inclusive of LabCorp) and

12 approximately 3 financial buyers.

13
   9.    I   understand that    the    Debtors   commenced   their
14
15 bankruptcy cases by filing voluntary petitions under Chapter 11

16 of the Bankruptcy Code on May 19, 2010, and that the Debtors

17 continue   to   operate   their   business,   manage   their   financial

18 affairs, and operate their bankruptcy estates as debtors in

19 possession.    My understanding is that the only material asset

20 owned by BioLabs is its stock interest in Westcliff.

21
   10.   After having engaged in substantial due diligence and
22
23 negotiations with a number of different prospective buyers over

24 the past many months, MTS and the Debtors collectively concluded

25 that   Laboratory   Corporation   of   America   ("LabCorp")   was   the

26 optimal buyer of the Debtors' assets for three primary reasons.

27 First, LabCorp, which is in the same business as Westcliff but is

28

1  a  much  larger  company,  expressed  the  greatest  interest  in

2  purchasing  the  Debtors'  assets.  Second,  it  was  clear  that

3  LabCorp as a strategic buyer was willing to pay a substantially

4  higher price for the Debtors' assets than any other prospective

5
6  buyer.  Third,  LabCorp  clearly  has  the  financial  means  of

7  consummating its purchase of the Debtors' assets.[19]

8       11.  Due to a serious illness facing one of my partners, for

9  the past few months, I became the principal point person for MTS

10  tasked  with  working  with  the  Debtors'  senior  management  and

11  counsel to negotiate and document the best possible sale of the

12  Debtors' business to LabCorp.  In this regard, I worked closely

13
14  with LabCorp's senior management and outside professionals.  In

15  an effort to finalize an asset purchase agreement with LabCorp, I

16  participated  in  numerous  telephone  conferences  with  various

17  principals of LabCorp and professionals representing LabCorp, and

18  I attended an all-day, in-person meeting in North Carolina with

19  LabCorp's principals and professionals.

20       12.  On or about May 17, 2010, Westcliff, BioLabs, LabCorp

21  and Purchaser entered into an asset purchase agreement ("APA"), a

22
23  copy  of  which  is  attached  as  Exhibit  "3"  to  the  annexed

24  Declaration of Matthew Pakkala.

25       13.  A  description  of  the  assets  to  be  purchased  by

26

27
28  [19] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp
    solely for the purpose of acquiring the Purchased Assets.

1  Purchaser free and clear of all liens, claims and interests
2  (defined as the "Purchased Assets") is set forth in full in
3  Section 2.1 of the APA.  As set forth therein, the Purchased
4  Assets consist of the Debtors' executory contracts and unexpired
5
6  leases that Purchaser elects to acquire and substantially all of
7  the Debtors' personal property assets with the exception of the
8  Debtors' cash and accounts receivable, which are included within
9  the "Excluded Assets" as set forth in Section 2.2 of the APA.
10 Also part of the "Excluded Assets" are all avoidance causes of
11 action of the Debtors' bankruptcy estates.  As set forth in
12 Section 2.3(a), Purchaser is assuming certain limited liabilities
13 of the Debtors.  As indicated in Section 3.2 of the APA,
14
15 Purchaser has already delivered a $4 million deposit to the
16 Debtors.

17      14.  The APA was extensively negotiated between the Debtors
18 and Purchaser in good faith, arms-length negotiations, including
19 exchanges of multiple drafts of asset purchase agreements over an
20 extended period of time.  I am confident that the result obtained
21 from the sale of the Purchased Assets to Purchaser is the
22 overwhelmingly optimal result for the Debtors' estates.
23

24      15.  To the best of my knowledge, no insider of the Debtors
25 has any interest in or connection with Purchaser, and no insider
26 of the Debtors will be receiving any special benefit as a result
27 of the Debtors' sale of the Purchased Assets to Purchaser.
28

63

16.   I am confident that consummating the sale of the Purchased Assets to LabCorp (or to a successful overbidder) in accordance with the terms of the APA is in the overwhelming best interests of the Debtors' creditors and their estates as the purchase price offered by Purchaser is substantially higher than the purchase price that any other buyer indicated that it was willing to pay for the Purchased Assets.

17.   To make absolutely certain that the highest price possible is paid for the Purchased Assets, the Debtors and Purchaser have agreed to various overbid procedures.   MTS has extensively marketed the Debtors' business for sale.   MTS is therefore knowledgeable about those parties who could possibly be interested in paying more for the Debtors' business than Purchaser has offered.   MTS will make every reasonable effort to attempt to facilitate an overbid.

18.   As indicated in Section 7.3(c) of the APA, the following bidding procedures have been agreed to by the Debtors and Purchaser, all of which I believe to be reasonable and appropriate under the circumstances of these cases and in compliance with applicable law:

i.   Purchaser will receive a break-up fee in the amount of $2.25 million in the event of a successful overbid where a buyer other than Purchaser is the winning bidder.   This is less than 4% of the $57.5 million purchase price being paid by

Purchaser and is even a lower percentage when taking into account the fact that Purchaser is leaving the Debtors with their substantial accounts receivable which Purchaser has agreed not to take.

ii.   In order to overbid Purchaser's bid, the minimum initial overbid must be at least \$2.95 million higher than Purchaser's bid made in the APA, with minimum subsequent bid increments of \$100,000.

iii. In order to be considered a "qualified bidder", a bidder must, on or before two business days before the sale hearing, submit evidence of its financial ability to close the transaction.

iv.   In order to be considered a "qualified bidder", prospective overbidders are required to provide the same good faith deposit of \$4 million as Purchaser has provided.

19.  I believe that the prospects for any overbid to Purchaser's offer are remote.  I therefore have concluded that the foregoing overbid procedures and protections for Purchaser are very reasonable and are of inconsequential significance for the Debtors' estates when weighed against the extraordinary benefit of having a locked in buyer (i.e., bird in the hand) in Purchaser, particularly since the offer from Purchaser is substantially higher than any other offer the Debtors received.

20.    While the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken by MTS for the sale of the Debtors' business, and from everything I have seen, I believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, I do not believe that the prospect for a successful overbid would increase with the passage of time.    To the contrary, I believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors' business resulting from the Debtors' bankruptcy filings.  This is a highly sensitive and extremely competitive industry, and I do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy.    I therefore believe that an expedited sale of the Debtors' business is necessary to avoid immediate and irreparable harm to the Debtors' business, and the Debtors' creditors and bankruptcy estates.

21.    As set forth in Section 3.1 of the APA, a meaningful reduction in the Debtors' business volume will result in a decrease in the purchase price paid by Purchaser pursuant to a Purchase Price Decrease Adjustment.    Moreover, if there is a

1  Material Adverse Change (which translates into an even larger

2  reduction in the Debtors' business volume), then Purchaser is not

3  required to close the transaction.

4

5  22. I therefore believe that the risks to the Debtors'

6  estates of failing to close the sale of the Purchased Assets to

7  Purchaser on an expedited basis are severe.  I have no doubt that

8  if the Debtors fail to consummate their sale to Purchaser, the

9  Debtors will either end up selling their business for

10 substantially less money than Purchaser has offered, or, worse,

11 the Debtors will have to shut down their business and liquidate,

12 which would result in the loss of approximately 1,000 jobs and

13 the decimation of any going concern value of the Debtors'

14 business.  I believe that a liquidation of the Debtors' business

15 would have minimal value.

16

17 23. While section 7.3(c)(ix) of the APA only requires that

18 the hearing on the Sale Motion be no more than twenty-five days

19 after the Petition Date (which would be by June 13, 2010), on

20 behalf of the Debtors, I urge the Court to conduct the hearing on

21 the Sale Motion no later than Thursday, May 27, 2010.[20]

22

23 24. I believe that proceeding with a sale in such an

24 expedited manner serves only to the benefit of the Debtors'

25

26 [20] Section 7.3(c)(ix) requires the Debtor to use its best efforts to have the
   hearing on the Sale Motion occur no more than twelve calendar days following
27 the Petition Date (which would be Monday, May 31, 2010).  However, the
   parties wish to make every effort to obtain an entered sale order on
28 Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

estates.    Given  the  lengthy  and  exhaustive  pre-petition  sale process that MTS embarked upon, I am highly confident that any potential  overbidder  has  been  identified  and  is  extremely knowledgeable about the Debtors' business and the opportunity to purchase the Purchased Assets.  I therefore believe that if there is  any  party  willing  and  able  to  pay  more  for  the  Debtors' business than Purchaser has offered, they can do so within the time frame requested by the Debtors and nothing would change for the better if that time frame was expanded.   To the contrary, I believe  that  the  risk  to  the  Debtors'  business  of  customer attrition and a corresponding reduction in the purchase price to be paid by Purchaser (or worse a complete walk away by Purchaser) from  a  protracted  sale  process  is  severe  and  significantly greater than any possible benefit that could be obtained from speculating that a higher price might be paid for the Purchased Assets.

25.   Consistent  with  that  set  forth  above,  I  strongly believe that the auction and bidding procedures outlined above (and  in  more  detail  in  the  APA)  are  designed  to  enable  the Debtors'  estates  to  obtain  the  highest  price  possible  for  the Purchased Assets and provide the greatest possible recovery for the Debtors' creditors.

26.   I believe that the breakup fee which will be paid to Purchaser in the event of a successful overbid is reasonable and appropriate under the circumstances facing the Debtors.

27.   I strongly believe that proceeding with an auction sale of the Purchased Assets with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the overwhelming best interests of the Debtors' estates and will result in the highest price possible being obtained for the Purchased Assets.   All of the prospective bidders MTS was in discussions with, including Purchaser, were understandably only willing to serve as the stalking horse bidder if they received various forms of benefits for doing so, including a break-up fee.   Without giving such benefits to a stalking horse bidder, there would have been no way for the Debtors to obtain a viable stalking horse bidder, and no buyer would have the incentive to serve as the stalking horse bidder. Purchaser's offer was substantially higher than any other offer the Debtors received, and Purchaser would never have been willing to serve as the stalking horse bidder without the various protections that are being afforded to Purchaser.   I therefore submit that the protections being afforded to Purchaser are fair, reasonable and consistent with market practice and unquestionably will result in the Debtors' estates receiving a substantially

higher purchase price for the Purchased Assets than would otherwise be the case.

28.   Given the exhaustive marketing effort performed by MTS over a very extended period of time, as well as MTS' vast knowledge of the Debtors' industry, I am highly confident that if any buyer exists who is willing to pay more money for the Purchased Assets than offered by Purchaser, they will submit an overbid and participate in the overbid process and no additional time is needed to flush this out. Moreover, I strongly believe that there is no doubt that any theoretical benefit from having more time to attempt to obtain overbidders is dramatically outweighed by the risks that the Debtors' business will deteriorate with the passage of time resulting in a reduction in the purchase price to be paid by Purchaser or, worse, enabling Purchaser to terminate the APA altogether.   I am therefore highly confident that the sale process agreed to by the Debtors and Purchaser is properly designed to make sure that the highest price possible is paid for the Purchased Assets under these very precarious circumstances.

29.   I therefore submit that the proposed bidding procedures and stalking horse bid protections described above and provided for in the APA are in the overwhelming best interests of the

1  Debtors' estates, are necessary and appropriate to maximize the

2  value paid for the Purchased Assets, and should be approved by

3  the Court as an exercise of the Debtors' sound business judgment.

4       I declare and verify under penalty of perjury that the

5  foregoing is true and correct to the best of my knowledge,

6  information and belief.

7

8       Executed on this 20th day of May, 2010, at New York City,

9  New York.

10

11

12

13                                    _____
                                        CURTIS S. LANE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

1   RON BENDER (SBN 143364)
    JACQUELINE L. RODRIGUEZ (SBN 198838)
2   TODD M. ARNOLD (SBN 221868)
3   JOHN-PATRICK M. FRITZ (SBN 245240)
    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
4   10250 Constellation Boulevard, Suite 1700
    Los Angeles, California 90067
5   Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
    Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com;
6   jpf@lnbrb.com

7   Attorneys for Chapter 11 Debtors and Debtors in Possession

8

9                   UNITED STATES BANKRUPTCY COURT
                    CENTRAL DISTRICT OF CALIFORNIA
10                       SANTA ANA DIVISION

11  In re:                          )  [Proposed]
12                                  )  Lead Case No. 8:10-bk-16743
    WESTCLIFF MEDICAL LABORATORIES,  )  [Proposed] Jointly Administered
13  INC.,                           )  with Case No. 8:10-bk-16746[1]
                                    )
14          Debtor.                 )
15  _____)  Chapter 11 Cases
                                    )
16  BIOLABS, INC.,                  )  **ORDER SETTING HEARING ON SALE**
                                    )  **MOTION, APPROVING PROCEDURES**
17          Debtor.                 )  **FOR THE SALE OF SUBSTANTIALLY**
18  _____)  **ALL ASSETS OUT OF THE**
                                    )  **ORDINARY COURSE OF BUSINESS AND**
19  ☒ Affects Both Debtors          )  **FREE AND CLEAR OF LIENS,**
                                    )  **APPROVING BID PROTECTIONS AND**
20  ☐ Affects WESTCLIFF MEDICAL     )  **BREAK UP FEE FOR STALKING HORSE**
21     LABORATORIES, INC. only      )  **PURCHASER AND GRANTING OTHER**
                                    )  **RELIEF**
22  ☐ Affects BIOLABS, INC. only    )
                                    )  Court Scheduled Hearing:
23                                  )  Date:  May 25, 2010
                                    )  Time:  10:00 a.m.
24                                  )  Place: Courtroom "5D"
                                    )         411 West Fourth Street
25  _____)         Santa Ana, CA 92701-4593

26

27  _____

28  [1] Motion for Joint Administration pending.


RA-3004823 v3

The Court has considered the Emergency Motion filed on May 20, 2010 (the "Procedures Motion") by BIOLABS, INC. and WESTCLIFF MEDICAL LABORATORIES, INC., jointly administered, Chapter 11 debtors and debtors in possession (collectively, the "Debtors"), seeking the approval of the United States Bankruptcy Court for the Central District of California (the "Court") of certain sale procedures pursuant to various provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the local rules of this Court.  Under the terms proposed in the Procedures Motion (the "Sale Procedures"), the Debtors request authority to provide notice of and to employ the Sale Procedures to permit interested parties to seek to purchase certain assets, together with the assumption and assignment of certain executory contracts and unexpired leases; to provide the terms pursuant to which such interested parties may become a qualified bidder; and to have the winning bidder (the "Winning Bidder") for the sale of the assets be approved by the Court at a hearing (the "Sale Hearing") to be held no later than twelve calendar days after the Petition Date.  The Debtors also ask this Court to approve certain bid protections for WAVE NEWCO, INC., a Delaware corporation ("Stalking Horse Purchaser"), a wholly-owned subsidiary of LABORATORY CORPORATION OF

AMERICA, a Delaware corporation, or the assignee thereof, in connection with the Stalking Horse Purchaser's prepetition agreement with the Debtors to purchase substantially all of the Debtors' assets out of the ordinary course of business and free and clear of all liens, claims and interests pursuant to 11 U.S.C. §§105, 363(b) and (f), and 365 (the "APA"), which APA is the subject of a separate and simultaneously filed motion (the "Sale Motion").  This Court having reviewed the Procedures Motion and the Sale Motion, together with the Declarations of the Debtors' representatives filed in support thereof, found good and sufficient cause to enter this Order as requested in the Procedures Motion.

IT IS THEREFORE ORDERED AS FOLLOWS:

1.   The Procedures Motion is approved and allowed and the Sale Procedures set forth in the Procedures Motion are adopted in their entirety.

2.   Specifically, the Court approves the following Sale Procedures and provisions with respect to the transaction ("Transaction") as contemplated by the Procedures Motion:

a.   a break up fee in an amount equal to Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) (the "Break Up Fee") shall be immediately due and payable to Stalking Horse Purchaser from the proceeds of sale at Closing in the event another party is determined to be the Winning Bidder, and the Break Up Fee shall not

be subject to the lien of any Encumbrance that might otherwise attach to the proceeds of sale;

     b.    in the event there are one or more Qualified Bidders seeking to make a competing bid in respect to that of the Stalking Horse Purchaser, there shall be a required minimum initial overbid of Two Million Nine Hundred Fifty Thousand Dollars ($2,950,000) ("Initial Overbid Amount") above the purchase price offered by the Stalking Horse Purchaser;

     c.    in the event there are bids made by Qualified Bidders after an Initial Overbid Amount, then such additional bids shall be in increments of not less than One Hundred Thousand Dollars ($100,000);

     d.    in order for any interested party to be considered a "Qualified Bidder," such bidder must, on or before two (2) Business Days before the Sale Hearing, (i) submit to the Debtors and the Stalking Horse Purchaser at the notice addresses for their respective counsel on file with the Court, written confirmation of the existence of committed financing or other available funds that evidences that the proposed bidder has the financial ability to pay the Purchase Price plus the Initial Overbid Amount, and (ii) further must make a "good faith deposit" in an amount equal to Four Million Dollars ($4,000,000) in immediately available funds in escrow with counsel for the Debtors;

4

1     e.     the winning bid of a Qualified Bidder shall be the

2 highest bid (the "Winning Bid") in dollars; provided, however, that

3 if (x) the highest bid made by a Qualified Bidder other than the

4 Stalking Horse Purchaser minus the Break Up Fee is less than (y)

5
6 the highest bid of the Stalking Horse Purchaser, then the bid of

7 the Stalking Horse Purchaser shall be the Winning Bid;

8     f.     any Qualified Bidder shall be subject to be determined to

9 have provided a back up bid in connection with the Transaction (the

10 "Back Up Bid");

11     g.     A Back Up Bid shall be equal to one of the following: (a)

12
13 if the Winning Bid is made by the Stalking Horse Purchaser, the

14 highest bid made by a Qualified Bidder other than the Stalking

15 Horse Purchaser or (b) if the Winning Bid is made by a Qualified

16 Bidder other than the Stalking Horse Purchaser, the second highest

17 bid made by a Qualified Bidder; provided, however, that if (x) the

18 second highest bid made by a Qualified Bidder (other than the

19
20 Stalking Horse Purchaser) minus the Break Up Fee is less than (y)

21 the highest bid made by the Stalking Horse Purchaser, then the Back

22 Up Bid shall be the highest bid of the Stalking Horse Purchaser;

23     h.     the deposit posted by the maker of the Back Up Bid shall

24 not be refunded until five (5) Business Days following the closing

25 of the sale to the maker of the Winning Bid;

26     i.     the Sale Hearing shall be held on May __, 2010, at __:__

27 __.m.;

28

5

1         j.    in the event the Winning Bidder fails to close the

2    Transaction as required by the Orders of this Court, then the maker

3    of the Back Up Bid shall be required to consummate the Transaction

4    within ten (10) days following receipt of written notice from the

5    Debtors of the failure of the maker of the Winning Bid to

6    consummate the Transaction, provided such written notice is

7    consummate the Transaction, provided such written notice is

8    provided to the maker of the Back Up Bid within thirty-five (35)

9    days following the Petition Date; and

10        k.    In the event that the maker of the Back Up Bid fails to

11   consummate the Transaction as required by the preceding

12   subparagraph, then the maker of the Back Up Bid shall have

13   forfeited its entire good faith deposit to the Debtors.

14   3.    The Court has duly considered the Debtors' request with

15   respect to the procedures set forth in this Order and has concluded

16   that the terms are the best terms available under the circumstances

17   and that the sale to Stalking Horse Purchaser (unless there is a

18   higher Winning Bid, as defined above) is in the best interests of

19   the Debtors' estates.  In reaching this conclusion, the Debtors'

20   management has carefully weighed a number of considerations which

21   the Court finds persuasive, including the following:

22        a.    The Debtors undertook an intensive effort lasting more

23   than one year to identify a potential purchaser of their assets;

24        b.    The Stalking Horse Purchaser was the only party which

25   offered an acceptable proposal to the Debtors;

c.    The Debtors' Business may be deteriorating, and the Debtors are in immediate danger of losing both employees and their ongoing contracts to competitors, either of which would substantially impair the value of the Debtors' assets, which constitutes a danger of immediate and irreparable harm to the Debtors and their creditors;

d.    Any further delay by the Debtors to seek alternative or higher prices for their assets would instead likely result in further significant reduction in the size of the Debtors' business and asset values and likely impair the value of the Debtors' business in a significant manner;

e.    The Debtors are in default under their credit facility with their secured lender and their secured lender is no longer willing to fund the Debtors' ongoing and significant cash short falls and operating losses;

f.    The Debtors lack the cash necessary to sustain their operations or to satisfy their secured debt obligations absent the expedited sale of their assets as set forth in the APA.  Absent such an expedited sale of their assets, the Debtors will likely be forced to cease their business operations and liquidate their assets, with such liquidation likely producing insufficient sums to repay their secured creditor, let alone any unsecured creditors;

g.    The Debtors' operations have been hampered by ongoing litigation with the State of California, further reducing the prospect of a sale of the Debtors' assets outside of bankruptcy;

4.    The proposed sale procedures are reasonable under the exigent circumstances of these cases and create the greatest prospect for recovery by the Debtors' creditors.  The Debtors have demonstrated to the Court that an extended period of time of even 30 days in Bankruptcy results in a significant risk that the Debtors' asset value will deteriorate to a degree that the applicable Material Adverse Change provisions of the APA will become applicable, allowing the Stalking Horse Purchaser to either reduce the purchase price or terminate the Transaction entirely before consummation.

5.    An auction sale of the Debtors' assets pursuant to the Procedures Motion, including the proposed Break Up Fee and the other protections provided in this Order, together with the Sale Motion and the APA, is in the best interests of the Debtors, their creditors, and their bankruptcy estates.

6.    The Debtors are expressly authorized and empowered to offer their assets for sale pursuant to this Procedures Order.

7.    In the event that any terms, provisions, or conditions of any closing document or the APA conflict with the terms, provisions or conditions of this Order, then the terms, provisions and conditions of this Order shall control the implementation and interpretation of such documents.

8

8. Any capitalized, undefined terms contained in this Order shall have the meaning ascribed thereto in the APA.

9. Notice of the Entry of this Order, a copy of this Order, notice of the Sale Hearing and notice of the Sale Motion shall be served by the Debtors immediately upon entry of this Order and in no event more than 24 hours after entry of this Order pursuant to the forms of notice (which forms are hereby approved in all respects) attached to the Procedures Motion on the following:

> (i) all Persons that claim any interest in or Encumbrance upon the Purchased Assets;
> (ii) all parties to Designated Contracts;
> (iii) all Governmental Authorities with taxing power that have, or as a result of the sale of the Purchased Assets may have, claims, contingent or otherwise, against the Debtors;
> (iv) all Persons that file requests for notices under Bankruptcy Rule 9010(b);
> (v) all interested Governmental Authorities, including those administering Governmental Programs;
> (vi) the attorneys general of all states in which the Purchased Assets are located,
> (vii) the Office of the United States Trustee;
> (viii) all Persons that expressed to the Debtors an interest in purchasing the Purchased Assets in the twelve (12) months prior to the date of the APA;
> (ix) any other Person reasonably requested by Purchaser;
> (x) any patient who has notified or threatened the Debtors with any claim; and
> (xi) all interested Private Programs.

10. In addition, the Debtors shall serve Notice of the Sale Motion in the form approved by the Bankruptcy Court on the following:

9

1                    (i) all creditors (whether liquidated, unliquidated,
                contingent, noncontingent, unsecured, secured,
2               contested or uncontested) of the Debtors, including,
                without limitation all individuals employed by either
3               of the Debtors on or after January 1, 2008;
                     (ii) all other Persons entitled to notification under
4               Bankruptcy Rule 2002; and
                     (iii) all other Persons entitled to notice pursuant to
5               applicable Legal Requirements.
6
7   11.  Further, the Debtors shall post a copy of the Sale

8   Motion on its website and publish notice of the Sale Motion

9   in appropriate media outlets, including, without limitation,

10  the following: [Debtors to propose list to insert here

11  subject to the approval of Stalking Horse Purchaser].

12  12.  The provisions of this Order and any actions taken pursuant

13  hereto shall survive entry of any order which may be entered (a)

14  appointing a Chapter 11 Trustee in either or both of the Debtors'

15  cases; (b) converting the Chapter 11 cases to Chapter 7 cases; or

16  (c) dismissing the Chapter 11 cases, and the terms and provisions

17  of this Order shall continue in full force and effect

18  notwithstanding the entry of such order or conversion or dismissal.

19

20

21  Dated:                        _____
                                  UNITED STATES BANKRUPTCY JUDGE
22

23

24

25

26

27

28

10

# EXHIBIT "2"

1   RON BENDER (SBN 143364)
    JACQUELINE L. RODRIGUEZ (SBN 198838)
2   TODD M. ARNOLD (SBN 221868)
    JOHN-PATRICK M. FRITZ (SBN 245240)
3   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
    10250 Constellation Boulevard, Suite 1700
4   Los Angeles, California 90067
    Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
5   Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
6
    Proposed Attorneys for Chapter 11 Debtors
7   and Debtors in Possession

8                   UNITED STATES BANKRUPTCY COURT
                    CENTRAL DISTRICT OF CALIFORNIA
9                       (SANTA ANA DIVISION)

10  In re:                        [Proposed]
                                  Lead Case No. 8:10-bk-16743
11  WESTCLIFF MEDICAL             [Proposed] Jointly Administered
    LABORATORIES, INC.,           with Case No. 8:10-bk-16746[1]
12
13            Debtor.             Chapter 11 Cases
14  ────────────────────
15  BIOLABS, INC.,                **NOTICE OF AUCTION SALE OF
                                  SUBSTANTIALLY ALL OF THE DEBTORS'
16            Debtor.             PERSONAL PROPERTY ASSETS AND
                                  OPPORTUNITY TO OVERBID**
17  ────────────────────
18  ☒ Affects Both Debtors
                                  Auction Date and Time:
19  ☐ Affects WESTCLIFF MEDICAL   Date:  May __, 2010
       LABORATORIES, INC. only    Time:  __:__ __.m.
20  ☐ Affects BIOLABS, INC. only  Place: Courtroom "5D"
                                         411 West Fourth Street
21                                       Santa Ana, CA 92701-4593
22
23
24
25
26
27  ────────────────
    [1] Motion for Joint Administration pending.
28

                              1

PLEASE TAKE NOTICE that an auction sale of substantially all of the assets of Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), will take place on May __, 2010, at the above-referenced time and location.

The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 19, 2010. BioLabs is the parent company to Westcliff, which is the operating company. The only material asset owned by BioLabs is its stock interest in the Debtor.

Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California.

The Debtors' main clinical hub is an 80,000 square foot facility located in Santa Ana, California that opened in 2006. The Debtors' primary anatomical pathology lab is a 12,800 square foot facility located in Monrovia, California that opened in 2008.

Working directly with patients and with contracted payors, including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and

1   Medicare, Westcliff has grown and become a leading out-patient

2   laboratory service company. Westcliff's lab operations

3   demonstrate industry-leading results, with low testing turn-

4   around times, high quality control scores, and a strong and

5   experienced sales and marketing team.

6

7       Westcliff averages approximately 8,500 clinical requests per

8   day and approximately 1,200 pathology requests per day, and

9   performs approximately 250,000 cytology and 70,000 biopsy tests

10  on an annual basis. Based on this performance, the Debtors had

11  approximately $97 million in net revenue in 2009 and are the

12  third largest clinical laboratory in California. Based on

13  current volume, the Debtors account for approximately 5% of the

14  California clinical laboratory testing market, which has

15  estimated revenues of approximately $2 billion.

16

17      On May 17, 2010, the Debtors entered into an Asset Purchase

18  Agreement (the "APA") with a wholly-owned subsidiary of

19  Laboratory Corporation of America ("Purchaser") pursuant to which

20  the Debtors are seeking to sell substantially all of the Debtors'

21  personal property assets (excluding cash and accounts receivable)

22  to Purchaser for an aggregate purchase price of $57.5 million,

23  subject to certain adjustments.

24

25      The Debtors' asset sale to Purchaser is subject to overbid.

26  At a hearing held on May 25, 2010, the Court approved the

27  following overbid procedures:

28

3

1     1.    An auction sale (the "Auction Sale") will take place on

2  May __, 2010, at the above-referenced time and location.

3     2.    The opening bid at the auction sale will be the bid

4  submitted by Purchaser in the in the APA.  If no qualified bidder

5  appears at the Auction Sale and submits a qualified overbid, the

6

7  Debtors will proceed to request the Court to approve Purchaser as

8  the winning bidder at the hearing to be held on May __, 2010 in

9  accordance with the terms of the APA.

10     3.    In order to overbid Purchaser's bid, the minimum

11  initial overbid must be at least $2.95 million higher than

12  Purchaser's bid made in the APA, with minimum subsequent bid

13  increments of $100,000.

14

15     4.    In order to be considered a "qualified bidder", a

16  bidder must, on or before two business days before the Auction

17  Sale, submit evidence to the Debtors of its financial ability to

18  close the transaction, which means that the "qualified bidder" is

19  able to demonstrate that it has available to it committed

20  financing or other immediately available funds that indicate its

21  ability to pay the purchase price plus the minimum required

22  overbid.

23

24     5.    In order to be considered a "qualified bidder",

25  prospective overbidders must, on or before two business days

26  before the Auction Sale, provide the Debtors with the same good

27  faith deposit of $4 million as Purchaser has provided.

28

6.    In order to be considered a "qualified bidder", a bidder must, on or before two business days before the Auction Sale, advise the Debtors of its approval of the same form of asset purchase agreement agreed to by the Debtors and Purchaser, or submit to the Debtors a redlined version of a proposed asset purchase agreement which indicates the prospective overbidder's changes to the APA.  Prospective overbidders at the Auction Sale will also be required to provide as part of their bid package, evidence demonstrating that they can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code with respect to any unexpired leases and executory contracts that they wish to have assigned to them if they are the winning bidder at the Auction Sale.

7.    The winning bid at the Auction Sale will be the highest bid made; provided, however, that if (x) the highest bid made by a "qualified bidder" other than the Purchaser minus the break up fee which would be owed to Purchaser is less than (y) the highest bid of the Purchaser, then the bid of the Purchaser will be the winning bid.

8.    The winning back up bid will be (a) if the winning bid is made by the Purchaser, the highest bid made by a "qualified bidder" other than the Purchaser or (b) if the winning bid is made by a qualified bidder other than the Purchaser, the second highest bid made; provided, however, that if (x) such second

1  highest bid made by a "qualified bidder" other than the Purchaser

2  minus the break up fee to be paid to the Purchaser is less than

3  (y) the highest bid made by the Purchaser, then the back up bid

4  will be the highest bid made by the Purchaser.

5

6      9.    The deposit posted by the maker of the back up bid will

7  not be refunded until five business days following the closing of

8  the sale to the maker of the winning bid.

9      10.   The maker of the back up bid will be required to close

10  the sale within ten days following receipt of written notice from

11  the Debtors of the failure of the maker of the winning bid to

12  consummate the sale provided such written notice is provided to

13  the maker of the back up bid by June 23, 2010, with the maker of

14  the back up bid to be deemed to forfeit its good faith deposit if

15  it fails to consummate the sale within this time frame.

16

17      11.   Purchaser will receive a break-up fee in the amount of

18  $2.25 million in the event of a successful overbid where a buyer

19  other than Purchaser is the winning bidder.

20      PLEASE   TAKE   FURTHER   NOTICE   that   any   party   desiring

21  additional information about the Auction Sale should contact the

22  following:

23

24                          Curtis Lane/Brad Sitko
                         MTS Health Partners, L.P.
25                       623 Fifth Avenue, 15th Floor
                            New York, NY 10022
26                         Phone:  (212) 887-2103
                lane@mtspartners.com/sitko@mtspartners.com
27                          www.MTSPartners.com
            (Investment Banker and Financial Advisor to the Debtors)

28

1

2

Matthew Pakkala, CIRA
Managing Director/Corporate Finance
3

FTI Consulting
633 West Fifth Street, 16th Floor
4

Los Angeles, California 90071
Phone:  (213) 452-6008
5

Matthew.Pakkala@FTIConsulting.com
www.fticonsulting.com
6

(Senior Officer of the Debtors)

7

Ron Bender, Esq./Jacqueline L. Rodriguez, Esq./Todd M. Arnold,
8

Esq./John-Patrick M. Fritz, Esq.
Levene, Neale, Bender, Rankin & Brill L.L.P.
9

10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
10

Phone:  (310) 229-1234
rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
11

www.lnbrb.com
(Bankruptcy Counsel to the Debtors)
12

13

Dated: May 19, 2010                WESTCLIFF MEDICAL LABORATORIES,
                                   INC.
14

                                   -and-
15

                                   BIOLABS, INC.
16

17

                                   */s/ Ron Bender*
                                   ─────────────────────────
                                   RON BENDER
18

                                   JACQUELINE L. RODRIGUEZ
                                   TODD M. ARNOLD
19

                                   JOHN-PATRICK M. FRITZ
                                   LEVENE, NEALE, BENDER, RANKIN
20

                                       & BRILL L.L.P.
                                   (Proposed) Attorneys for Chapter 11
21

                                   Debtors and Debtors in Possession

22

23

24

25

26

27

28