1   RON BENDER (SBN 143364)
JACQUELINE L. RODRIGUEZ (SBN 198838)
2   TODD M. ARNOLD (SBN 221868)
JOHN-PATRICK M. FRITZ (SBN 245240)
3   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
4   Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
5   Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
6
  Proposed Attorneys for
7   Chapter 11 Debtors and Debtors in Possession

8             **UNITED STATES BANKRUPTCY COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
9                **(SANTA ANA DIVISION)**

10

| | |
|---|---|
| 11  In re:<br><br>12  WESTCLIFF MEDICAL<br>LABORATORIES, INC.,<br>13<br>14       Debtor.<br><br>15  BIOLABS, INC.,<br>16<br>17       Debtor.<br><br>18  ☒ Affects Both Debtors<br>19  ☐ Affects WESTCLIFF MEDICAL<br>    LABORATORIES, INC. only<br>20<br>21  ☐ Affects BIOLABS, INC. only<br>22<br>23<br>24<br>25<br>26 | Lead Case No. 8:10-bk-16743-TA<br>Jointly Administered with<br>Case No. 8:10-bk-16746-TA<br><br>Chapter 11 Cases<br><br>**DEBTORS' EMERGENCY MOTION TO APPROVE STIPULATION AND SETTLEMENT AGREEMENT AMENDING APRIL 30, 2010 LETTER AGREEMENT BETWEEN SPECIALTY LABORATORIES, INC. AND WESTCLIFF MEDICAL LABORATORIES, INC.; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF ROBERT E. WHALEN AND MATTHEW PAKKALA IN SUPPORT THEREOF**<br><br>Hearing:<br>  Date:     May 27, 2010<br>  Time:     11:00 a.m.<br>  Place:   Courtroom "5B"<br>              411 West Fourth Street<br>              Santa Ana, CA 92701 |

27       Pursuant  to  Section  105(a)  of  the  Bankruptcy  Code,  Rule
28   9019(a) of the Federal Rules of Bankruptcy Procedure, and Local

1   Bankruptcy Rules 2081-1(a)(12) and 9075-1, Westcliff Medical

2   Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"),

3   the Chapter 11 debtors and debtors in possession herein

4   (collectively, the "Debtors"), hereby move, by way of this

5   Emergency Motion (the "Motion"), for entry of an order approving

6   the Stipulation and Settlement Agreement (the "Settlement

7   Agreement") Amending April 30, 2010 Letter Agreement (the "Letter

8   Agreement") between Specialty and Westcliff pursuant to

9   Fed.R.Bankr.P. 9019(a).

10                                  **SUMMARY**

11       The Debtors filed their voluntary Chapter 11 bankruptcy

12   cases on May 19, 2010 (the "Petition Date").

13       Biolabs owns 100% of the equity of Westcliff and has no

14   other material assets. Westcliff is the owner and operator of

15   approximately 170 branded and stand-alone patient service center

16   laboratories and STAT labs located throughout California.

17       Prior to the Petition Date, Specialty and Westcliff entered

18   into a Laboratory Services Agreement (the "Prior Agreement")

19   pursuant to which Specialty agreed, among other things, to

20   provide (1) laboratory testing services to Westcliff, and (2)

21   third-party billing services to some of Westcliff's clients, by

22   which Specialty would invoice insurance companies and third-party

23   payors and collect from such parties for Westcliff.

24       Prior to March 30, 2010, Westcliff and Specialty entered

25   into discussions on a new multi-year agreement. As the stated

26   expiration date of April 30, 2010 of the original contract was

27   approaching, on April 30, 2010, the parties entered into the

28

2

1  Letter Agreement governing the terms on which Specialty would
2  continue to provide services to Westcliff for a period of not
3  longer than 45 days to and including June 14, 2010 (the "Term").
4  Specialty. Specialty asserts that this Letter Agreement is a
5  stand-alone contract between the parties; Westcliff disputes this
6  contention and believes the Letter Agreement was an extension of
7  the original contract for another 45 days.

8      A dispute arose between the parties as to the scope of
9  services to be provided and the prices to be charged by Specialty
10 to Westcliff under the Letter Agreement.    In particular,
11 Specialty asserted that (1) it was entitled to substantially
12 increase its prices for laboratory services than was previously
13 charged under the Prior Agreement, and (2) it was not required to
14 provide any third-party billing services.    Westcliff disputes
15 these assertions.  Conversely, Westcliff asserted that Specialty
16 received preferential transfers from Westcliff that Westcliff
17 could seek to avoid and recover under Chapter 5 of the Bankruptcy
18 Code.  Specialty disputes these assertions.

19     Also before the Petition Date, the Debtors entered into an
20 Asset Purchase Agreement (the "APA") to effectuate a sale (the
21 "Sale") of substantially all of the Debtors' assets to a wholly-
22 owned  subsidiary  of  Laboratory  Corporation  of  America
23 ("Purchaser"), or an overbidder.  Motions to approve the bidding
24 procedures and sale contemplated by the APA have already been
25 filed with the Court.  The purchase price under the APA is $57.5
26 million, subject to certain adjustments (the "Sale Price").    The
27 Debtors  and  MTS  Health  Partners,  LP  ("MTS"),  the  Debtors'
28

3

1 financial advisor that extensively marketed the Debtors' assets
2 pre-petition, believe that the purchase price offered by
3 Purchaser is substantially higher than the purchase price that
4 any other buyer would be willing to pay for such assets.

5    For reasons further discussed below, it is imperative that
6 the Sale close as soon as possible and that Westcliff does not
7 incur a Material Adverse Change (as defined in the interim) prior
8 to the Sale, as this may reduce the Sale Price or provide the
9 Purchaser with an opportunity to walk away from the Sale, which
10 would severally prejudice the creditors of the Debtors' estates.

11    In consideration of the foregoing, the parties have agreed
12 to settle certain claims on the terms set forth in the Settlement
13 Agreement, a true and correct copy of which is attached hereto as
14 Exhibit "1."    The terms of the Settlement Agreement are
15 summarized in the annexed Memorandum of Points and Authorities.
16 In short, under the Settlement Agreement, Westcliff is required
17 (1) to assume the Letter Agreement, as modified by the Settlement
18 Agreement, by Friday, May 28, 2010, (2) to pay a $175,000 cure
19 amount to Specialty within two (2) business days thereafter, (3)
20 to utilize a minimum of $125,000 in weekly services from
21 Specialty and pay for those services on a weekly basis, and (4)
22 to release all avoidance actions it may have against Specialty
23 under Chapter 5 of the Bankruptcy Code.    In exchange for the
24 foregoing, Specialty will (1) continue to provide nearly all
25 services under the Letter Agreement to Westcliff through the
26 earlier of the closing of the Sale or the end of the Term, and

27

28

4

1  (2) limit its increase in billing rates to three (3) times the
2  rates provided for under the Prior Agreement.

3      After considering the claims and defenses of the parties,
4  the interest in avoiding the costs and risks involved in
5  litigation, and the interest of assuring that the Sale closes as
6  soon as possible and that Westcliff does not incur a Material
7  Adverse Change in the interim before the closing of the Sale,
8  which may result if Specialty does not continue providing
9  services to Westcliff under the Letter Agreement, as modified by
10  the Settlement Agreement, Westcliff has determined, in an
11  exercise of its business judgment, that the Settlement Agreement
12  is fair, reasonable, and in the best interests of Westcliff's
13  estate.   Therefore, the Court should approve the Settlement
14  Agreement pursuant to Fed.R.Bankr.P. 9019(a).

15      **WHEREFORE**, the Debtors respectfully request that the Court
16  enter an order,

17      (1) finding, among other things, that notice of the Motion
18  was appropriate under the circumstances and complied with all
19  applicable provisions of the Bankruptcy Code, the Bankruptcy
20  Rules, and the Local Bankruptcy Rules;

21      (2) granting the Motion in its entirety;

22      (3) approving the Settlement Agreement pursuant to
23  Fed.R.Bankr.P. 9019(a);

24      (4) authorizing the Debtors and all other parties to the
25  Settlement Agreement to take all actions necessary to effectuate
26  the terms of the Settlement Agreement; and

27
28

5

1    (5) affording such further and other relief as is

2   appropriate under the circumstances.

3   Dated: May 25, 2010          WESTCLIFF MEDICAL LABORATORIES,
                                 INC.
4
                                 -and-
5
                                 BIOLABS, INC.
6
                                 */s/ Ron Bender*
7                                RON BENDER
                                 JACQUELINE L. RODRIGUEZ
8                                TODD M. ARNOLD
                                 JOHN-PATRICK M. FRITZ
9                                LEVENE, NEALE, BENDER, RANKIN
                                    & BRILL L.L.P.
10                               (Proposed) Attorneys for Chapter 11
                                 Debtors and Debtors in Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

**A.   BACKGROUND.**

Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on May 19, 2010 (the "Petition Date"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

BioLabs is the parent company to Westcliff, which is the operating company. Biolabs was organized for the purposes of acquiring 100% of the capital stock and other equity interests of Westcliff. The only material asset owned by BioLabs is its stock interest in the Debtor.

Westcliff was founded in 1964 as a community-based laboratory and is headquartered in Santa Ana, California. Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California. The Debtors have nearly 1,000 employees.

1       The Debtors' main clinical hub is an 80,000 square foot
2   facility located in Santa Ana, California that opened in 2006.
3   The Debtors' primary anatomical pathology lab is a 12,800 square
4   foot facility located in Monrovia, California that opened in
5   2008.

6       Working directly with patients and with contracted payors,
7   including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and
8   Medicare, Westcliff has grown and become a leading out-patient
9   laboratory service company.    Westcliff's lab operations
10  demonstrate industry-leading results, with low testing turn-
11  around times, high quality control scores, and a strong and
12  experienced sales and marketing team.

13      Westcliff averages approximately 8,500 clinical requests per
14  day and approximately 1,200 pathology requests per day, and
15  performs approximately 250,000 cytology and 70,000 biopsy tests
16  on an annual basis. Based on this performance, the Debtors had
17  approximately $97 million in net revenue in 2009 and are the
18  third largest clinical laboratory in California.

19      The California clinical laboratory testing market is the
20  largest in the nation, with estimated revenues of approximately
21  $2 billion. Approximately 8% of the nations' tests are performed
22  in California, and over 200 million of California's tests are
23  conducted by independent labs (excluding hospital based labs).
24  Based on current volume, the Debtors account for approximately 5%
25  of the California market.

26      Much of the Debtors' growth has come from the acquisition of
27  other labs, which caused the Debtors to incur a substantial
28

8

1  amount of debt.  The Debtors owe approximately $56 million to GE

2  Business Financial Services, Inc. ("GE"), which is secured by a

3  senior priority lien against all or substantially all of the

4  Debtors' assets.  Any other secured debt of the Debtors is

5  relatively small in nature and relates to liens against only

6  certain of the Debtors' equipment.  The Debtors also have a

7  substantial amount of unsecured debt.

8  **B.   THE NECESSITY FOR FILING BANKRUPTCY**.

9      While the Debtors' revenue is significant, due to the small

10  profit margins in this business, despite significant and

11  continuing cost cutting measures undertaken by the Debtors, the

12  Debtors are simply not able to operate sufficiently profitably to

13  enable the Debtors to repay their debts.

14      The Debtors suffered a net loss of approximately $87 million

15  in 2008 (including expenses and write offs of approximately $171

16  million) on net revenue of approximately $84 million.  The

17  Debtors suffered a net loss of approximately $13 million in 2009

18  (including expenses and write offs of approximately $110 million)

19  on net revenue of approximately $97 million.

20      While the Debtors instituted as many expense reductions as

21  were reasonably possible, the Debtors' losses continued.  Since

22  the beginning of 2009, the Debtors have been unable to make any

23  debt service payments to GE, and the Debtors have been unable to

24  remain current with their other debt obligations, including

25  payments owing to former owners of companies the Debtors

26  previously purchased as part of the Debtors' overall growth

27  strategy.  Indeed, the Debtors were only able to survive

28

9

1 | financially over the past approximately seventeen months because
2 | GE agreed to provide the Debtors with additional funding.

3 |     The only way the Debtors can survive as a stand alone going
4 | concern business would be for the Debtors to raise many millions
5 | of dollars of additional equity which is not possible given the
6 | Debtors' debt structure.

7 |     While the Debtors anticipate growth in Westcliff's business
8 | operations and reducing per patient costs and increasing profits
9 | in the years to come, the Debtors realized that they needed
10 | additional time and funding to accomplish such results.   The
11 | Debtors were not able to obtain such funding.   It therefore
12 | became clear to the Debtors in early 2009 that the only viable
13 | option available to the Debtors to avoid a shut down of their
14 | business and the loss of employment by all of the Debtors'
15 | employees would be for the Debtors to sell their business as a
16 | going concern to the highest bidder.   Therefore, as set forth in
17 | numerous concurrently filed pleadings, the Debtors determined
18 | that an expedited sale of substantially all of the Debtors'
19 | assets in bankruptcy followed by a liquidating plan was in the
20 | overwhelming best interests of the Debtors' estates and their
21 | creditors.

22 | **C.**  **THE PROPOSED SALE.**

23 |     In consideration of the foregoing, the Debtors have been
24 | engaged in an active sale process since early 2009.   To assist
25 | the Debtors with this sale process, the Debtors engaged MTS
26 | Health Partners, LP ("MTS") in October 2009 as a financial

27 |
28 |

10

1  advisor to assist the Debtors with their sale process.[1]  MTS,
2  working closely with the Debtors, conducted an exhaustive sale
3  process, having prepared detailed sale materials and having had
4  extensive discussions and interactions with numerous prospective
5  buyers, both strategic buyers and financial buyers.

6      After having engaged in substantial due diligence and
7  negotiations with a number of different prospective buyers over
8  the past many months, MTS and the Debtors collectively concluded
9  that a wholly-owned subsidiary of Laboratory Corporation of
10  America ("Purchaser") was the optimal buyer of the Debtors'
11  business.

12      Accordingly, before the Petition Date, after substantial,
13  arms-length negotiations, the Debtors entered into an Asset
14  Purchase Agreement (the "APA") to effectuate a sale (the "Sale")
15  of substantially all of the Debtors' assets to Purchaser, or an
16  overbidder.  Motions to approve the bidding procedures and sale
17  contemplated by the APA have already been filed with the Court.
18  The purchase price under the APA is $57.5 million, subject to
19  certain adjustments (the "Sale Price").  The Debtors and MTS
20  believe that the purchase price offered by Purchaser is
21  substantially higher than the purchase price that any other buyer
22  would be willing to pay for such assets.

23      As set forth in Section 3.1 of the APA, the purchase price
24  being paid by Purchaser will be adjusted downward if there is a
25  meaningful reduction in Westcliff's post-petition business volume
26  pending the closing of the sale[2].  Moreover, should that

27

---

[1] The Debtors had used other professionals for this same purpose in the past.

28

11

1   reduction reach the level of a Material Adverse Change[3],
2   Purchaser has the ability walk away from this transaction
3   completely.   The risks to the Debtors' estates of failing to
4   close the sale of the Purchased Assets to Purchaser on an
5   expedited basis are therefore severe.   The Debtors have no doubt
6   that if they fail to consummate the sale to Purchaser, the
7   Debtors will either be forced to sell their business for
8   substantially less money than Purchaser has offered, or, worse,
9   the Debtors will have to shut down their business and liquidate,
10  which would result in the loss of approximately 1,000 jobs and
11  the decimation of any going concern value of the Debtors'
12  business.   A liquidation of the Debtors' business would have
13  minimal value.

14  **D.   WESTCLIFF'S PRIOR AGREEMENTS WITH SPECIALTY LABORATORIES,**
15  **INC., THE DISPUTE BETWEEN THE PARTIES, AND THE SETTLEMENT**
16  **AGREEMENT**

17      Specialty Laboratories, Inc. ("Specialty") is in the
18  business of providing certain laboratory testing services to its
19  clients.   Specialty is a critical reference laboratory for
20  Westcliff.   If Westcliff cannot send out testing to Specialty so

21

22  [2] Purchase Price Decrease Adjustment is defined in the definitional Section of
    the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement
23  Period Volume) times (b) $1,202.00.
    [3] Material Adverse Change is defined in the definitional Section of the APA as
24  an amount equal to 0.17 or more determined using the following formula: the
    quotient of (a) (the Baseline Volume minus the Measurement Period Volume);
25  divided by (b) the Baseline Volume.   For purposes of clarification, the
    Material Adverse Change may be expressed as a percentage equal to or greater
26  than Seventeen Percent (17%).   By way of example, if the Baseline Volume is
    9,500 and the Measurement Period Volume is 7,885, then the calculation shall
27  be equal to 0.17 and a Material Adverse Change shall have occurred.

28

12

1  that Westcliff can provide ongoing quality services to its
2  customers, Westcliff has no doubt that it would immediately start
3  to lose customers.

4      On May 1, 2007, Westcliff and Specialty entered into a
5  Laboratory Services Agreement (the "Prior Agreement") pursuant to
6  which Specialty agreed to provide certain laboratory services to
7  Westcliff, and Westcliff agreed to pay for such services.  A true
8  and correct copy of the Prior Agreement is attached hereto as
9  Exhibit "2."

10      Pursuant to the Prior Agreement, Specialty agreed to bill
11 Westcliff directly for certain services ("First-Party Billing")
12 and provide third-party billing services ("Third-Party Billing")
13 to Westcliff's clients, by which Specialty would invoice
14 insurance companies and third-party payors for services and seek
15 to collect for services in the first instance from the third-
16 party payors, which reduced the amount Specialty billed to
17 Westcliff.

18      In the event that payment was not received from the third-
19 party payor, or in the event that Westcliff did not timely
20 provide Specialty with the Third-Party Billing information
21 necessary to perform the Third-Party Billing, Westcliff remained
22 liable to Specialty for any unpaid Third-Party Billing amounts.

23      In addition to the Third Party Billing, Westcliff and
24 Specialty contemplated in the Prior Agreement that Specialty may
25 agree to employ personnel who will work from within the principal
26 office of Westcliff to adequately address the referral testing
27 needs of Westcliff.  To the extent there was such an
28

13

1 | accommodation made, the employment of those personnel was subject
2 | to the terms and conditions of a separate "Technical Services
3 | Agreement."

4 |     The term of the Prior Agreement was 3 years.  On March 30,
5 | 2010, in accordance with the terms of the Prior Agreement,
6 | Specialty timely notified Westcliff that the Prior Agreement
7 | would not be renewed, and, accordingly, on April 30, 2010, the
8 | Prior Agreement expired.  However on April 30, 2010, Specialty
9 | and Westcliff entered into a letter agreement (the "Letter
10 | Agreement") governing the terms upon which Specialty would
11 | provide laboratory testing services to Westcliff for a period of
12 | not longer than 45 days (the "Term") commencing on May 1, 2010
13 | and expiring, unless terminated earlier, on June 14, 2010.
14 | Westcliff believes the Letter Agreement is an extension of the
15 | Prior Agreement and Specialty disputes this contention. A true
16 | and correct copy of the Letter Agreement is attached hereto as
17 | Exhibit "3."

18 |     Specialty contends that, pursuant to unambiguous terms of
19 | the Letter Agreement, Westcliff is obligated to compensate
20 | Specialty for all services provided during the Term by paying
21 | Specialty.

22 |     The Letter Agreement also provides for Specialty to have the
23 | right to increase its pricing to "list price" under certain
24 | circumstances, and Westcliff contends that the Letter Agreement
25 | does not define what "list price" means.  In accordance with the
26 | terms of the Letter Agreement, following Westcliff's announcement
27 | of the intended Sale on or about May 19, 2010, Specialty advised
28 |

14

1   Westcliff that Specialty was exercising its right to increase its
2   pricing to "list price."   Based on Westcliff's experience with
3   other reference laboratories, Westcliff expected some increase in
4   pricing over the rates in the Prior Agreement; however, Westcliff
5   disputes that Specialty's "list price" was what was intended by
6   the Prior Agreement.   However, the "list prices" requested by
7   Specialty turned out to be materially higher than the prices
8   charged under the Prior Agreement and outside of what Westcliff
9   believed to be reasonable.

10       Specialty also asserts that, pursuant to the Letter
11   Agreement, (1) it has no obligation to provide Third Party
12   Billing services during the term of the Letter Agreement, (2)
13   Westcliff is obligated to pay directly for all services provided
14   by Specialty during the Term of the Letter Agreement at list
15   price, and (3) Specialty has no obligation to provide billing and
16   processing personnel during the term of the Letter Agreement.
17   Westcliff disputes these assertions and asserts that it is
18   entitled to all services previously performed under the Prior
19   Agreement.

20       While Westcliff is prohibited from disclosing the exact
21   pricing for various tests, by virtue of the Debtor and Specialty
22   entering into the Settlement Agreement (as defined below), and by
23   Specialty agreeing to keep Third-Party Billing in place, and cap
24   the list prices as provided by the Settlement Agreement, the
25   Debtors are resolving the potential for costly and detrimental
26   litigation and saving an estimated $1.6 million in billings
27   between the Petition Date and June 14, 2010 (if the settlement
28

15

1   agreement is approved). Based on a review of Westcliff's books
2   and records maintained in the ordinary course of its business
3   and, in particular, the payment history between Westcliff and
4   Specialty, Westcliff determined that (1) Westcliff made total
5   payments of $1,138,075 to Specialty during the 90 day preference
6   period of Section 547(b), and (2) net of potential new value
7   defenses under Section 547(c)(4), but before ordinary course
8   defenses under Section 547(c)(2), Westcliff had a potential claim
9   against Specialty to avoid and recover, at most, approximately
10   $529,000 of the foregoing alleged preferential transfers pursuant
11   to Section 547(b). Specialty disputes Westcliff's assertions and
12   believes that after consideration of all available defenses,
13   Specialty would have no preference liability.

14      After careful consideration of merits of each other's claims
15   and defenses, and in the interests of avoiding the costs and
16   risks involved in litigation, Westcliff and Specialty concluded
17   that it was in their best interests to resolve their claims on
18   the issues presented and to move quickly toward the consummation
19   of the Sale.

20      In consideration of the foregoing, the parties agreed to
21   settle their claims pursuant to the terms of a Settlement
22   Agreement (the "Settlement Agreement"), a true and correct copy
23   of which is attached hereto as Exhibit "1." The Settlement
24   Agreement provides, among other things, as follows:[4]

25

26

27   [4] This summary is for informational purposes. If there is any disagreement
    between this summary and the terms of the Settlement Agreement, the terms of
28   the Settlement Agreement shall govern.

1         &bull;    Until the earlier of (1) June 14, 2010 or (2) the

2 date of the closing of the Sale (the "Closing"), Westcliff

3 shall continue to send laboratory testing services requests

4 to Specialty, and Specialty shall continue to pickup and

5 process such samples in the same manner in which it has done

6 so prior to the Petition Date.

7         &bull;    After the Closing of the Sale and through the

8 expiration of the Term, Westcliff or its subsequent

9 purchaser shall have the right to continue to send its

10 laboratory testing services to Specialty, and Specialty

11 shall continue to pickup and process such samples in the

12 same manner in which it has done so prior to the Petition

13 Date.

14         &bull;    During the Term, Specialty shall continue to

15 provide the same processing and billing staff to Westcliff

16 as Specialty was doing prior to the Petition Date, unless

17 such employees are presently working for Westcliff.

18         &bull;    During the Term, Specialty shall provide Third

19 Party Billing services to Westcliff; provided however, that

20 Specialty shall not, and shall have no obligation to,

21 provide Third Party Billing services to Westcliff with

22 respect to any services for which Blue Shield of California

23 is the third-party payor.

24         &bull;    Westcliff shall provide electronic third-party

25 billing information to Specialty on a daily basis in the

26 manner reasonably requested by Specialty.

27

28

17

1   • Westcliff shall pay Specialty for all actual
2   laboratory testing services requested by Westcliff on a
3   First-Party Billing at a multiple of three times (3x) the
4   rates provided for in the Prior Agreement as follows:

5   Subject to the later "True-Up" (as defined below),
6   during the Term, Westcliff shall pay to Specialty for
7   all First Party Billing, in advance, the sum of
8   $125,000 weekly, commencing as of the Petition Date,
9   but pro rating as appropriate for less than full weeks
10   prior to the effective date of the Settlement
11   Agreement;

12   Notwithstanding any True-Up, the $125,000 weekly
13   payments shall be the minimum guaranteed amount (the
14   "Minimum Weekly Amount") payable to Specialty by
15   Westcliff, and shall not be subject to reduction for
16   any reason, including, but not limited to, reduction
17   based upon True-Up of First Party Billing services
18   requested by the Debtor;

19   At the Closing of a Sale, Westcliff and Specialty
20   shall reconcile the amounts due to Specialty for First
21   Party Billing for the Term (the "True-Up"), and, if any
22   additional amount is due Specialty, Westcliff shall pay
23   Specialty the True Up not later than five (5) business
24   days after the Closing; and

25   To the extent necessary to effectuate these
26   provisions, any Minimum Weekly Amount and any True-Up

27

28

18

due to be paid to Specialty shall be deemed an allowed administrative expense pursuant to 11 U.S.C. § 503(b).

• No later than May 28, 2010, Westcliff shall assume the Letter Agreement as modified by the Settlement Agreement. Within two business days following the date of entry of the order approving such assumption by Westcliff, Westcliff shall pay to Specialty a cure amount of $175,000 for unpaid amounts due to Specialty from May 1, 2010 through May 18, 2010 (the "Cure Amount").

• Specialty shall have an allowed administrative expense pursuant to 11 U.S.C. § 503(b) against Westcliff's estate for any unpaid Third Party Billing from the period from May 19, 2010 through June 14, 2010. Upon the Closing, Westcliff shall also deposit into a segregated interest bearing trust account for the benefit of Specialty a reserve of $25,000 to cover any such unpaid Third Party Billing from the period from May 19, 2010 through June 14, 2010, which amount shall be subject to True Up within sixty (60) days following the end of the Term.

• Westcliff shall waive and release all claims, demands, rights, actions and causes of action, if any, against Specialty which arise in, arise under or relate to Chapter 5 of the Bankruptcy Code.

## II.

## DISCUSSION

**A.   THE COURT SHOULD APPROVE THE SETTLEMENT AGREEMENT PURSUANT TO**

**FED.R.BANKR.P. 9019(a).**

**1.   THE   STANDARD   FOR   THE   APPROVAL   OF   A   SETTLEMENT**

**AGREEMENT.**

Bankruptcy Rule 9019(a) provides that:

> On motion by the [debtor in possession] and
> after notice and hearing, the court may
> approve a compromise or settlement. Notice
> shall be given to creditors, the United
> States trustee, the debtor and indenture
> trustees as provided in [Bankruptcy Rule]
> 2002 and to any other entity as the court
> may direct.

Fed.R.Bankr.P. 9019(a).

The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988). "The purpose of a compromise agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986). Accordingly, in approving a compromise, the Court need not conduct an exhaustive investigation of the claims sought to be compromised. See United States v. Alaska National Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Court find that the compromise was negotiated in good faith and is reasonable, fair, and equitable. See In re A & C Properties, 784 F.2d at 1381.

1    The Court of Appeals for the Ninth Circuit has identified

2  the following factors for consideration in determining whether a

3  proposed compromise agreement is reasonable, fair, and equitable:

> (a)  the probability of success in the litigation;
> (b)  the difficulties, if any, to be encountered in the matter of collection;
> (c)  the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and
> (d)  the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In re A & C Properties, 784 F.2d at 1381 (the "A & C Factors").

      Consideration of these factors does not require the Court to

determine whether a compromise presented is the best one that

could possibly have been achieved.  Rather, the Court need only

canvass the issues to determine whether the compromise falls

"below the lowest point in the zone of reasonableness."  Newman

v. Stein, 464 F.2d 689, 698 (2d Cir. 1972) (emphasis added),

cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972); see

also Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services,

Inc.), 762 F.2d 185, 189 (2d Cir. 1985); Cosoff v. Rodman (In re

W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied

464 U.S. 822 (1983).  Finally, although the Court should give

deference to the reasonable views of creditors, "objections do

not rule.  It is well established that compromises are favored in

bankruptcy."  In re Lee Way Holding Co., 120 B.R. 881, 891

(Bankr. S.D. Ohio 1990).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2.    THE SETTLEMENT AGREEMENT IS FAIR AND REASONABLE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES**

a.    Probability of Success.

The potential claims between the parties only recently came to Westcliff's attention.  Until Specialty advised Westcliff of Specialty's intent to cease Third-Party Billing and the new List Prices, which shocked Westcliff, Westcliff did not consider the parties' claims and defenses under the Letter Agreement. Similarly, Westcliff only recently considered its potential claims to avoid and recover alleged preferential transfers to Specialty pursuant to Section 547(b), and defenses that Specialty may have to such claims pursuant to Section 547(c).

Accordingly, Westcliff does not have a firm belief at this time as to which party would prevail in litigation concerning the issues related to performance under the Letter Agreement.  On the other hand, based on its initial analysis, Westcliff has concluded that its maximum preference claim against Specialty, net of potential new value defenses under Section 547(c)(4), but before ordinary course defenses under Section 547(c)(2) is approximately $529,000.

While the merits of the claims and the defenses of the parties remain tentative at this time, as no thorough investigation or discovery has been conducted, it is clear that Westcliff would incur substantial attorneys' fees and costs in litigating the claims.  Further, the potential $529,000 in damages on the preference claim (before reductions for attorneys' fees and costs) would likely not exceed by a material amount, if

22

1  at all, the approximately \$1.6 million in cost savings that
2  Westcliff should obtain under the Settlement Agreement. On this
3  basis alone, the Settlement Agreement is likely in the financial
4  best interests of Westcliff and its estate.   This is before
5  considering (1) the substantial extra costs and expenses that
6  would be incurred by Westcliff in attempting to replace the
7  Third-Party Billing function currently being performed by
8  Specialty, and (2) more importantly, the potential for a Material
9  Adverse Change if customers move to other providers because
10 Westcliff is not able to properly operate its business
11 (Specialty's testing output and reporting is specialized for
12 Westcliff's medical customer base and they are sensitive to any
13 deviations from the expected reporting formats), which may result
14 in a substantial reduction of the Sale Price or jeopardize the
15 Sale altogether, all of which would severely prejudice creditors.

16         b.   Difficulties in Collection.

17         Even if Westecliff were to obtain a judgment against
18 Specialty, Specialty may force Westcliff to chase Specialty to
19 enforce such judgment. This would further reduce the net value
20 of any such judgment, which, as discussed above, appears would be
21 eclipsed by the cost savings afforded to Westcliff under the
22 Letter Agreement, as modified by the Settlement Agreement.

23         c.   Complexity of Litigation Involved and Delay.

24         The contract and avoidance action issues arising under the
25 Letter Agreement and based on Westecliff's payments to Specialty
26 within 90 days of the Petition Date are not overly complex.
27 However, as with all litigation, there would be delay in reaching

28

23

1  a resolution of the claims and defenses of the parties if such

2  claims and defenses are not consensually resolved by the

3  Settlement Agreement.

4       d.   Paramount Interests of Creditors.

5    See II.2.a and b above.

6    In consideration of the foregoing, Westcliff, in an exercise

7  of its business judgment, has determined that the Settlement

8  Agreement is fair, reasonable, and in the best interests of

9  Westcliff's estate and should be approved.  Therefore, the Court

10 should approve the Settlement Agreement pursuant to

11 Fed.R.Bankr.P. 9019(a).

12                   **III.**

13              **CONCLUSION**

14   **WHEREFORE**, the Debtors respectfully request that the Court

15 enter an order,

16   (1)  finding, among other things, that notice of the Motion

17 was appropriate under the circumstances and complied with all

18 applicable provisions of the Bankruptcy Code, the Bankruptcy

19 Rules, and the Local Bankruptcy Rules;

20   (2)  granting the Motion in its entirety;

21   (3)  approving the Settlement Agreement pursuant to

22 Fed.R.Bankr.P. 9019(a);

23   (4)  authorizing the Debtors and all other parties to the

24 Settlement Agreement to take all actions necessary to effectuate

25 the terms of the Settlement Agreement; and

26

27   (5)  affording such further and other relief as is

28

1  appropriate under the circumstances.

2  Dated: May 25, 2010              WESTCLIFF MEDICAL LABORATORIES,
3                                   INC.

                                    -and-
4
                                    BIOLABS, INC.
5

6                                   */s/ Ron Bender*
                                    RON BENDER
7                                   JACQUELINE L. RODRIGUEZ
                                    TODD M. ARNOLD
8                                   JOHN-PATRICK M. FRITZ
                                    LEVENE, NEALE, BENDER, RANKIN
9                                      & BRILL L.L.P.
                                    (Proposed) Attorneys for Chapter 11
10                                   Debtors and Debtors in Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF ROBERT E. WHALEN

2

I, ROBERT E. WHALEN, HEREBY DECLARE AS FOLLOWS:

3      1.   I have personal knowledge of the facts set forth below
4  and, if called to testify, would and could competently testify
5  thereto.

6      2.   I am the Chief Executive Officer and Chairman of the
7  Board of Directors of Westcliff Medical Laboratories, Inc.
8  ("Westcliff") and its parent corporation, BioLabs, Inc.
9  ("BioLabs" and, together with Westcliff, the "Debtors"), the
10  Chapter 11 debtors and debtors in possession in the above-
11  captioned, jointly administered cases.   I have been Board
12  Chairman since 2007 and Chief Executive Officer since July, 2009.
13  I have approximately thirty-two years of experience in the
14  medical lab and related business.

15      3.   I make this declaration in support of the Motion to
16  which this declaration is attached. To the extent necessary to
17  make this declaration, I have reviewed the Debtors' books and
18  records, created and maintained in the ordinary course of their
19  business. Unless otherwise stated, all capitalized terms herein
20  have the same meanings as in the Motion.

21      4.   The Debtors commenced their bankruptcy cases by filing
22  voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq.
23  (the "Bankruptcy Code") on May 19, 2010 (the "Petition Date").
24  The Debtors continue to operate their business, manage their
25  financial affairs, and operate their bankruptcy estates as
26  debtors in possession pursuant to Sections 1107 and 1108 of the
27  Bankruptcy Code.

28

1      5.   BioLabs is the parent company to Westcliff, which is

2  the operating company.  Biolabs was organized for the purposes of

3  acquiring 100% of the capital stock and other equity interests of

4  Westcliff.  The only material asset owned by BioLabs is its stock

5  interest in the Debtor.

6      6.   Westcliff was founded in 1964 as a community-based

7  laboratory and is headquartered in Santa Ana, California.

8  Westcliff is the operator of approximately 170 branded, stand-

9  alone, patient service center laboratories and STAT labs that

10 provide various services, including clinical testing, pathology,

11 reporting and support services for the benefit of thousands of

12 out-patients throughout California.  The Debtors have nearly

13 1,000 employees.

14     7.   The Debtors' main clinical hub is an 80,000 square foot

15 facility located in Santa Ana, California that opened in 2006.

16 The Debtors' primary anatomical pathology lab is a 12,800 square

17 foot facility located in Monrovia, California that opened in

18 2008.

19     8.   Working directly with patients and with contracted

20 payors, including United Health, Aetna, Cigna, Blue Cross, Medi-

21 Cal and Medicare, Westcliff has grown and become a leading out-

22 patient laboratory service company.  Westcliff's lab operations

23 demonstrate industry-leading results, with low testing turn-

24 around times, high quality control scores, and a strong and

25 experienced sales and marketing team.

26     9.   Westcliff averages approximately 8,500 clinical

27 requests per day and approximately 1,200 pathology requests per

28

1 | day, and performs approximately 250,000 cytology and 70,000
2 | biopsy tests on an annual basis. Based on this performance, the
3 | Debtors had approximately $97 million in net revenue in 2009 and
4 | are the third largest clinical laboratory in California.

5 |  10. The California clinical laboratory testing market is
6 | the largest in the nation, with estimated revenues of
7 | approximately $2 billion. Approximately 8% of the nations' tests
8 | are performed in California, and over 200 million of California's
9 | tests are conducted by independent labs (excluding hospital based
10 | labs). Based on current volume, the Debtors account for
11 | approximately 5% of the California market.

12 |  11. Much of the Debtors' growth has come from the
13 | acquisition of other labs, which caused the Debtors to incur a
14 | substantial amount of debt. The Debtors owe approximately $56
15 | million to GE Business Financial Services, Inc. ("GE"), which is
16 | secured by a senior priority lien against all or substantially
17 | all of the Debtors' assets. Any other secured debt of the
18 | Debtors is relatively small in nature and relates to liens
19 | against only certain of the Debtors' equipment. The Debtors also
20 | have a substantial amount of unsecured debt.

21 |  12. While the Debtors' revenue is significant, due to the
22 | small profit margins in this business, despite significant and
23 | continuing cost cutting measures undertaken by the Debtors, the
24 | Debtors are simply not able to operate sufficiently profitably to
25 | enable the Debtors to repay their debts.

26 |  13. The Debtors suffered a net loss of approximately $87
27 | million in 2008 (including expenses and write offs of
28 |

28

1   approximately $171 million) on net revenue of approximately $84
2   million.   The Debtors suffered a net loss of approximately $13
3   million  in  2009  (including  expenses  and  write  offs  of
4   approximately $110 million) on net revenue of approximately $97
5   million.

6        14.   While the Debtors instituted as many expense reductions
7   as  were  reasonably  possible,  the  Debtors'  losses  continued.
8   Since the beginning of 2009, the Debtors have been unable to make
9   any debt service payments to GE, and the Debtors have been unable
10  to remain current with their other debt obligations, including
11  payments  owing  to  former  owners  of  companies  the  Debtors
12  previously  purchased  as  part  of  the  Debtors'  overall  growth
13  strategy.   Indeed,  the  Debtors  were  only  able  to  survive
14  financially over the past approximately seventeen months because
15  GE agreed to provide the Debtors with additional funding.

16       15.   I believe that the only way the Debtors can survive as
17  a stand alone going concern business would be for the Debtors to
18  raise many millions of dollars of additional equity which is not
19  possible given the Debtors' debt structure.

20       16.   While  the  Debtors  anticipate  growth  in  Westcliff's
21  business operations and reducing per patient costs and increasing
22  profits in the years to come, the Debtors realized that they
23  needed additional time and funding to accomplish such results.
24  However, the Debtors were not able to obtain such funding.   It
25  therefore became clear, in early 2009, that the only viable
26  option available to the Debtors to avoid a shut down of their
27  business  and  the  loss  of  employment  by  all  of  the  Debtors'
28

29

employees would be for the Debtors to sell their business as a going concern to the highest bidder. Therefore, as set forth in numerous concurrently filed pleadings, the Debtors determined that an expedited sale of substantially all of the Debtors' assets in bankruptcy followed by a liquidating plan was in the overwhelming best interests of the Debtors' estates and their creditors.

17. In consideration of the foregoing, the Debtors have been engaged in an active sale process since early 2009. To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October 2009 as a financial advisor to assist the Debtors with their sale process.[5] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers.

18. After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that a wholly-owned subsidiary of Laboratory Corporation of America ("Purchaser") was the optimal buyer of the Debtors' business.

19. Accordingly, before the Petition Date, after substantial, arms-length negotiations, the Debtors entered into an Asset Purchase Agreement (the "APA") to effectuate a sale (the "Sale") of substantially all of the Debtors' assets to Purchaser,

---

[5] The Debtors had used other professionals for this same purpose in the past.

1 | or an overbidder.   Motions to approve the bidding procedures and
2 | sale contemplated by the APA have already been filed with the
3 | Court.    The purchase price under the APA is $57.5 million,
4 | subject to certain adjustments (the "Sale Price").   The Debtors
5 | and MTS believe that the purchase price offered by Purchaser is
6 | substantially higher than the purchase price that any other buyer
7 | would be willing to pay for such assets.

8 | 20.  As set forth in Section 3.1 of the APA, the purchase
9 | price being paid by Purchaser will be adjusted downward if there
10 | is a meaningful reduction in Westcliff's post-petition business
11 | volume pending the closing of the sale[6].  Moreover, should that
12 | reduction reach the level of a Material Adverse Change[7],
13 | Purchaser has the ability walk away from this transaction
14 | completely.   The risks to the Debtors' estates of failing to
15 | close the sale of the Purchased Assets to Purchaser on an
16 | expedited basis are therefore severe.  I have no doubt that if
17 | they fail to consummate the sale to Purchaser, the Debtors will
18 | either be forced to sell their business for substantially less
19 | money than Purchaser has offered, or, worse, the Debtors will
20 | have to shut down their business and liquidate, which would

21 |

22 | [6] Purchase Price Decrease Adjustment is defined in the definitional Section of
the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement
23 | Period Volume) times (b) $1,202.00.
[7] Material Adverse Change is defined in the definitional Section of the APA as
24 | an amount equal to 0.17 or more determined using the following formula: the
quotient of (a) (the Baseline Volume minus the Measurement Period Volume);
25 | divided by (b) the Baseline Volume.   For purposes of clarification, the
Material Adverse Change may be expressed as a percentage equal to or greater
26 | than Seventeen Percent (17%).  By way of example, if the Baseline Volume is
9,500 and the Measurement Period Volume is 7,885, then the calculation shall
27 | be equal to 0.17 and a Material Adverse Change shall have occurred.

28 |

31

1    result in the loss of approximately 1,000 jobs and the decimation

2    of any going concern value of the Debtors' business.  I believe

3    that a liquidation of the Debtors' business would have minimal

4    value.

5        I declare and verify under penalty of perjury that the

6    foregoing is true and correct to the best of my knowledge,

7    information and belief.

8        Executed this 25th day of May 2010, at Santa Ana, California.

9

                                      /s/ Robert E. Whalen
10                                    ROBERT E. WHALEN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**DECLARATION OF MATTHEW PAKKALA**

2

I, MATTHEW PAKKALA, HEREBY DECLARE AS FOLLOWS:

3
4
5

1.   I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

6
7
8
9
10

2.   I am a Managing Director of FTI Consulting, Inc. ("FTI"), which maintains its main healthcare offices at 500 E. Pratt Street Suite 1400 Baltimore, MD 21202.  My business office is located at 633 West 5th Street, 16th Floor, Los Angeles, California, 90071.

11
12
13
14
15
16
17
18
19
20
21
22
23

3.   I hold a B.A. from the University of California, San Diego, a J.D. from Loyola Law School, and an M.B.A. from the Anderson School of Business at UCLA.  I have more than 13 years of restructuring and related advisory and management experience. My work focuses on advising distressed and underperforming companies, their lenders, creditors and other constituencies on restructuring alternatives and strategies for maximizing performance and value, and my expertise includes providing financial and operational advisory with respect to  asset sales and estate wind-downs in the healthcare, retail, manufacturing and airline industries.  Prior to joining FTI, I worked in the restructuring groups of PricewaterhouseCoopers and Price Waterhouse in Los Angeles.

24
25
26
27

4.   FTI is a global business advisory firm that specializes in business reorganization consulting and financial restructuring.  Founded in 1982, FTI has more than 3,500 professionals in most major business centers in the world, and

28

33

1  their client list comprises many of the Global 1000, as well as a
2  majority of the largest 25 banks and top 100 law firms in the
3  world.   FTI is designed to address the interrelated challenges
4  that can affect an organization's enterprise value and offers
5  highly specialized expertise in the areas of compliance, risk,
6  reputation, liability, performance, finance and information.   In
7  particular, FTI's market-leading corporate finance division has
8  advised management, senior lenders and unsecured creditors in
9  many of the most significant restructurings and turnarounds in
10 recent years, including Northwest Airlines, American Home
11 Mortgage, Bombay Company, Calpine, Global Power, Tower
12 Automotive, Winn Dixie, Refco, Delphi, Dana Corporation, Bally
13 Total Fitness, Circuit City, Delphi, Flying J / Big West Oil,
14 Fremont Investment & Loan, Gottschalks, Hawaiian Telecom,
15 Intermet, Lehman Brothers, LyondellBassell, Townsends, Inc.,
16 Tribune Company, Nortel Networks, Washington Mutual and WCI
17 Communities.

18      5.   FTI has advised management, senior lenders and
19 unsecured creditors in many of the most significant
20 restructurings and turnarounds in recent years.   FTI and its
21 professionals have also recently provided interim management
22 services in a number of restructurings including, but not limited
23 to, Fairfield Residential LLC Fremont Investment and Loan, Magna
24 Entertainment, SyntaxBrillian, AaiPharma, Daughters of Charity
25 Health System, Methodist Hospital, Gary, IN, Quincy Medical
26 Center, Regional Medical Center Memphis, and Boca Raton Community
27 Hospital.

28

1      6.    Effective on or about April 1, 2010, I became the Chief

2    Restructuring Officer ("CRO") for Westcliff Medical Laboratories,

3    Inc. ("Westcliff") and its parent corporation, BioLabs, Inc.

4    ("BioLabs"), Chapter 11 Debtors and Debtors in Possession

5    (collectively, the "Debtors").

6      7.    I make this declaration in support of the Motion to

7    which this declaration is attached.  To the extent necessary to

8    make this declaration, I have reviewed the Debtors' books and

9    records, created and maintained in the ordinary course of their

10   business. Unless otherwise stated, all capitalized terms herein

11   have the same meanings as in the Motion.

12     8.    The Debtors commenced their bankruptcy cases by filing

13   voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq.

14   (the "Bankruptcy Code") on May 19, 2010 (the "Petition Date").

15   The Debtors continue to operate their business, manage their

16   financial affairs, and operate their bankruptcy estates as

17   debtors in possession pursuant to Sections 1107 and 1108 of the

18   Bankruptcy Code.

19     9.    Specialty Laboratories, Inc. ("Specialty") is in the

20   business of providing certain laboratory testing services to its

21   clients.    Specialty is a critical reference laboratory for

22   Westcliff.  If Westcliff cannot send out testing to Specialty so

23   that Westcliff can provide ongoing quality services to its

24   customers, Westcliff has no doubt that it would immediately start

25   to lose customers.

26     10.   On May 1, 2007, Westcliff and Specialty entered into a

27   Laboratory Services Agreement (the "Prior Agreement") pursuant to

28

1   which Specialty agreed to provide certain laboratory services to

2   Westcliff, and Westcliff agreed to pay for such services.  A true

3   and correct copy of the Prior Agreement is attached hereto as

4   Exhibit "2."

5        11.  Pursuant to the Prior Agreement, Specialty agreed to

6   bill  Westcliff  directly  for  certain  services  ("First-Party

7   Billing") and provide third-party billing services ("Third-Party

8   Billing")  to  Westcliff's  clients,  by  which  Specialty  would

9   invoice insurance companies and third-party payors for services

10  and seek to collect for services in the first instance from the

11  third-party payors, which reduced the amount Specialty billed to

12  Westcliff.

13       12.  In the event that payment was not received from the

14  third-party payor, or in the event that Westcliff did not timely

15  provide  Specialty  with  the  Third-Party  Billing  information

16  necessary to perform the Third-Party Billing, Westcliff remained

17  liable to Specialty for any unpaid Third-Party Billing amounts.

18       13.  In addition to the Third Party Billing, Westcliff and

19  Specialty contemplated in the Prior Agreement that Specialty may

20  agree to employ personnel who will work from within the principal

21  office of Westcliff to adequately address the referral testing

22  needs  of  Westcliff.    To  the  extent  there  was  such  an

23  accommodation made, the employment of those personnel was subject

24  to the terms and conditions of a separate "Technical Services

25  Agreement."

26       14.  The term of the Prior Agreement was 3 years.

27

28

36

1      15.  On March 30, 2010, in accordance with the terms of the
2   Prior Agreement, Specialty timely notified Westcliff that the
3   Prior Agreement would not be renewed, and, accordingly, on April
4   30, 2010, the Prior Agreement expired.  However on April 30,
5   2010, Specialty and Westcliff entered into a letter agreement
6   (the "Letter Agreement") governing the terms upon which Specialty
7   would provide laboratory testing services to Westcliff for a
8   period of not longer than 45 days (the "Term") commencing on May
9   1, 2010 and expiring, unless terminated earlier, on June 14,
10  2010.  Westcliff believes the Letter Agreement is an extension of
11  the Prior Agreement and Specialty disputes this contention.  A
12  true and correct copy of the Letter Agreement is attached hereto
13  as Exhibit "3."

14      16.  Specialty contends that, pursuant to unambiguous terms
15  of the Letter Agreement, Westcliff is obligated to compensate
16  Specialty for all services provided during the Term by paying
17  Specialty.

18      17.  The Letter Agreement also provides for Specialty to
19  have the right to increase its pricing to "list price" under
20  certain circumstances, and Westcliff contends that the Letter
21  Agreement does not define what "list price" means.  In accordance
22  with the terms of the Letter Agreement, following Westcliff's
23  announcement of the intended Sale on or about May 19, 2010,
24  Specialty advised Westcliff that Specialty was exercising its
25  right to increase its pricing to "list price."  Based on
26  Westcliff's experience with other reference laboratories,
27  Westcliff expected some increase in pricing over the rates in the
28

37

1  Prior Agreement; however, Westcliff disputes that Specialty's
2  "list price" was what was intended by the Prior Agreement.
3  However, the "list prices" requested by Specialty turned out to
4  be materially higher than the prices charged under the Prior
5  Agreement and outside of what Westcliff believed to be
6  reasonable.

7      18.  Specialty also asserts that, pursuant to the Letter
8  Agreement, (1) it has no obligation to provide Third Party
9  Billing services during the term of the Letter Agreement, (2)
10 Westcliff is obligated to pay directly for all services provided
11 by Specialty during the Term of the Letter Agreement at list
12 price, and (3) Specialty has no obligation to provide billing and
13 processing personnel during the term of the Letter Agreement.
14 Westcliff disputes these assertions and asserts that it is
15 entitled to all services previously performed under the Prior
16 Agreement.

17     19.  While Westcliff is prohibited from disclosing the exact
18 pricing for various tests, by virtue of the Debtor and Specialty
19 entering into the Settlement Agreement (as defined below), and by
20 Specialty agreeing to keep Third-Party Billing in place, and cap
21 the list prices as provided by the Settlement Agreement, the
22 Debtors are resolving the potential for costly and detrimental
23 litigation and saving an estimated $1.6 million in billings
24 between the Petition Date and June 14, 2010 (if the settlement
25 agreement is approved).

26     20.  Based on a review of Westcliff's books and records
27 maintained in the ordinary course of its business and, in
28

38

1 | particular, the payment history between Westcliff and Specialty,
2 | Westcliff determined that (1) Westcliff made total payments of
3 | $1,138,075 to Specialty during the 90 day preference period of
4 | Section 547(b), and (2) net of potential new value defenses under
5 | Section 547(c)(4), but before ordinary course defenses under
6 | Section 547(c)(2), Westcliff had a potential claim against
7 | Specialty to avoid and recover, at most, approximately $529,000
8 | of the foregoing alleged preferential transfers pursuant to
9 | Section 547(b). Specialty disputes Westcliff's assertions and
10 | believes that after consideration of all available defenses,
11 | Specialty would have no preference liability.

12 |     21. After careful consideration of merits of each other's
13 | claims and defenses, and in the interests of avoiding the costs
14 | and risks involved in litigation, Westcliff and Specialty
15 | concluded that it was in their best interests to resolve their
16 | claims on the issues presented and to move quickly toward the
17 | consummation of the Sale.

18 |     22. In consideration of the foregoing, the parties agreed
19 | to settle their claims pursuant to the terms of a Settlement
20 | Agreement (the "Settlement Agreement"), a true and correct copy
21 | of which is attached hereto as Exhibit "1." The Settlement
22 | Agreement provides, among other things, as follows:[8]

23 |     a. Until the earlier of (1) June 14, 2010 or (2) the
24 |     date of the closing of the Sale (the "Closing"),
25 |     Westcliff shall continue to send laboratory testing

26 |

27 | [8] This summary is for informational purposes. If there is any disagreement
   between this summary and the terms of the Settlement Agreement, the terms of
28 | the Settlement Agreement shall govern.

services requests to Specialty, and Specialty shall continue to pickup and process such samples in the same manner in which it has done so prior to the Petition Date.

b. After the Closing of the Sale and through the expiration of the Term, Westcliff or its subsequent purchaser shall have the right to continue to send its laboratory testing services to Specialty, and Specialty shall continue to pickup and process such samples in the same manner in which it has done so prior to the Petition Date.

c. During the Term, Specialty shall continue to provide the same processing and billing staff to Westcliff as Specialty was doing prior to the Petition Date, unless such employees are presently working for Westcliff.

d. During the Term, Specialty shall provide Third Party Billing services to Westcliff; provided however, that Specialty shall not, and shall have no obligation to, provide Third Party Billing services to Westcliff with respect to any services for which Blue Shield of California is the third-party payor.

e. Westcliff shall provide electronic third-party billing information to Specialty on a daily basis in the manner reasonably requested by Specialty.

f. Westcliff shall pay Specialty for all actual laboratory testing services requested by Westcliff on

40

1      a First-Party Billing at a multiple of three times

2      (3x) the rates provided for in the Prior Agreement as

3      follows:

4           i. Subject to the later "True-Up" (as defined

5              below), during the Term, Westcliff shall pay to

6              Specialty for all First Party Billing, in

7              advance, the sum of $125,000 weekly, commencing

8              as of the Petition Date, but pro rating as

9              appropriate for less than full weeks prior to

10             the effective date of the Settlement Agreement;

11          ii. Notwithstanding any True-Up, the $125,000 weekly

12             payments shall be the minimum guaranteed amount

13             (the "Minimum Weekly Amount") payable to

14             Specialty by Westcliff, and shall not be subject

15             to reduction for any reason, including, but not

16             limited to, reduction based upon True-Up of

17             First Party Billing services requested by the

18             Debtor;

19         iii. At the Closing of a Sale, Westcliff and

20             Specialty shall reconcile the amounts due to

21             Specialty for First Party Billing for the Term

22             (the "True-Up"), and, if any additional amount

23             is due Specialty, Westcliff shall pay Specialty

24             the True Up not later than five (5) business

25             days after the Closing; and

26          iv. To the extent necessary to effectuate these

27             provisions, any Minimum Weekly Amount and any

28

41

True-Up due to be paid to Specialty shall be deemed an allowed administrative expense pursuant to 11 U.S.C. § 503(b).

g. No later than May 28, 2010, Westcliff shall assume the Letter Agreement as modified by the Settlement Agreement. Within two business days following the date of entry of the order approving such assumption by Westcliff, Westcliff shall pay to Specialty a cure amount of $175,000 for unpaid amounts due to Specialty from May 1, 2010 through May 18, 2010 (the "Cure Amount").

h. Specialty shall have an allowed administrative expense pursuant to 11 U.S.C. § 503(b) against Westcliff's estate for any unpaid Third Party Billing from the period from May 19, 2010 through June 14, 2010. Upon the Closing, Westcliff shall also deposit into a segregated interest bearing trust account for the benefit of Specialty a reserve of $25,000 to cover any such unpaid Third Party Billing from the period from May 19, 2010 through June 14, 2010, which amount shall be subject to True Up within sixty (60) days following the end of the Term.

i. Westcliff shall waive and release all claims, demands, rights, actions and causes of action, if any, against Specialty which arise in, arise under or relate to Chapter 5 of the Bankruptcy Code.

1    23.  The potential claims between the parties only recently
2   came to Westcliff's attention.  Until Specialty advised Westcliff
3   of Specialty's intent to cease Third-Party Billing and the new
4   List Prices, which shocked Westcliff, Westcliff did not consider
5   the parties' claims and defenses under the Letter Agreement.
6   Similarly, I believe that Westcliff only recently considered its
7   potential claims to avoid and recover alleged preferential
8   transfers to Specialty pursuant to Section 547(b), and defenses
9   that Specialty may have to such claims pursuant to Section
10  547(c).

11   24.  Accordingly, Westcliff does not have a firm belief at
12  this time as to which party would prevail in litigation
13  concerning the issues related to performance under the Letter
14  Agreement.  On the other hand, based on its initial analysis,
15  Westcliff has concluded that its maximum preference claim against
16  Specialty, net of potential new value defenses under Section
17  547(c)(4), but before ordinary course defenses under Section
18  547(c)(2) is approximately $529,000.

19   25.  While the merits of the claims and the defenses of the
20  parties remain tentative at this time, as no thorough
21  investigation or discovery has been conducted, I am informed and
22  believe that Westcliff would incur substantial attorneys' fees
23  and costs in litigating the claims.  Further, I am informed and
24  believe that the potential $529,000 in damages on the preference
25  claim (before reductions for attorneys' fees and costs) would
26  likely not exceed by a material amount, if at all, the
27  approximately $1.6 million in cost savings that Westcliff should

28

43

1  obtain under the Settlement Agreement.   Therefore, on this basis
2  alone, it seems that the Settlement Agreement is likely in the
3  financial best interests of Westcliff and its estate.   This is
4  before considering (1) the substantial extra costs and expenses
5  that would be incurred by Westcliff in attempting to replace the
6  Third-Party  Billing  function  currently  being  performed  by
7  Specialty, and (2) more importantly, the potential for a Material
8  Adverse  Change  if  customers  move  to  other  providers  because
9  Westcliff  is  not  able  to  properly  operate  its  business
10 (Specialty's  testing  output  and  reporting  is  specialized  for
11 Westcliff's medical customer base and they are sensitive to any
12 deviations from the expected reporting formats), which may result
13 in a substantial reduction of the Sale Price or jeopardize the
14 Sale altogether, all of which would severely prejudice creditors.

15    26.  I  am  further  informed  and  believe  that,  even  if
16 Westcliff were to obtain a judgment against Specialty, Specialty
17 may force Westcliff to chase Specialty to enforce such judgment.
18 This  would  seem  to  further  reduce  the  net  value  of  any  such
19 judgment, which, as discussed above, appears would be eclipsed by
20 the  cost  savings  afforded  to  Westcliff  under  the  Letter
21 Agreement, as modified by the Settlement Agreement.

22    27.  I do not believe that the contract and avoidance action
23 issues  arising  under  the  Letter  Agreement  and  based  on
24 Westecliff's payments to Specialty within 90 days of the Petition
25 Date are not overly complex.   However, as with all litigation, I
26 believe that there would be delay in reaching a resolution of the
27 claims and defenses of the parties if such claims and defenses
28

1   are not consensually resolved by the Settlement Agreement.

2       28.   In consideration of the foregoing, I believe that the
3   Settlement  Agreement  is  fair,  reasonable,  and  in  the  best
4   interests  of  Westcliff's  estate  and  should  be  approved.
5   Therefore, I respectfully request that the Court grant the relief
6   requested in the Motion.

7       I  declare  and  verify  under  penalty  of  perjury  that  the
8   foregoing  is  true  and  correct  to  the  best  of  my  knowledge,
9   information and belief.

10      Executed  on  this  25th  day  of  May  2010,  at  Santa  Ana,
11  California.

                              /s/ Matthew Pakkala
12                               MATTHEW PAKKALA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 1**

Sharon Z. Weiss (SBN 169446)
HOLME ROBERTS & OWEN LLP
800 West Olympic Boulevard, 4th Floor
Los Angeles, CA
Tel: 213-572-4324
Fax: 213-572-4400
E-mail: Sharon.Weiss@hro.com
         and
Brett D. Fallon, Esq. (Pro Hac Vice Pending)
Carl N. Kunz, III, Esq. (Pro Hac Vice Pending)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: bfallon@morrisjames.com; ckunz@morrisjames.com
Counsel for Specialty Laboratories, Inc.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## (SANTA ANA DIVISION)

| | |
|---|---|
| In re:<br><br>WESTCLIFF MEDICAL<br>LABORATORIES, INC.,<br><br>Debtor.<br>_____<br><br>BIOLABS, INC.,<br><br>Debtor.<br>_____<br><br>☒ Affects Both Debtors<br><br>☐ Affects WESTCLIFF MEDICAL<br>   LABORATORIES, INC. only<br><br>☐ Affects BIOLABS, INC. only | Lead Case No. 8:10-bk-16743<br>Jointly Administered with Case No. 8:10-bk-16746<br><br>Chapter 11 Cases<br><br>**STIPULATION AND SETTLEMENT AGREEMENT AMENDING APRIL 30, 2010 LETTER AGREEMENT BETWEEN SPECIALTY LABORATORIES, INC. AND WESTCLIFF MEDICAL LABORATORIES**<br><br>Court Scheduled Hearing:<br>Date:  To be determined by Court<br>Time:  To be determined by Court<br>Place: Courtroom "5D"<br>          411 West Fourth Street<br>          Santa Ana, CA 92701-4593 |



Specialty Laboratories, Inc. ("Specialty"), a creditor and real party in interest in the above-captioned bankruptcy cases, and Westcliff Medical Laboratories, Inc. (the "Debtor") hereby enter into this Stipulation and Settlement Agreement Amending April 30, 2010 Letter Agreement between Specialty Laboratories, Inc. and Westcliff Medical Laboratories, Inc. (the "Stipulation and Settlement") as follows:

WHEREAS, Specialty is in the business of providing certain laboratory testing services to its clients, including the Debtor; and

WHEREAS, on May 1, 2007, the Debtor and Specialty entered into a Laboratory Services Agreement (the "Prior Agreement") pursuant to which Specialty agreed to provide certain laboratory services to the Debtor, and the Debtor agreed to pay for such services; and

WHEREAS, pursuant to the Prior Agreement, Specialty agreed to bill the Debtor directly for certain services ("First-Party Billing") and provide third-party billing services ("Third-Party Billing") to the Debtor's clients, by which Specialty would invoice insurance companies and third-party payors for services and seek to collect for services in the first instance from the third-party payors; and

WHEREAS, in the event that payment was not received from the third-party payor, or in the event that the Debtor did not timely provide Specialty with the third-party billing information necessary to perform the Third-Party Billing, the Debtor remained liable to Specialty for any unpaid Third-Party Billing amounts; and

WHEREAS, in addition to the Third Party Billing, the Debtor and Specialty contemplated in the Prior Agreement that Specialty "may agree to employ personnel who will work from within the principal office of [Debtor] to adequately address the referral

2

testing needs of [Debtor]." To the extent there was such an accommodation made, the employment of those personnel was subject to the terms and conditions of a separate "Technical Services Agreement."; and

WHEREAS, the term of the Prior Agreement was 3 years; and

WHEREAS, on March 30, 2010, in accordance with the terms of the Prior Agreement, Specialty timely notified the Debtor that the Prior Agreement would not be renewed, and, accordingly, on April 30, 2010, the Prior Agreement expired; and

WHEREAS, on April 30, 2010, Specialty and the Debtor entered into a new letter agreement (the "Letter Agreement") governing the terms upon which Specialty would provide laboratory testing services to the Debtor for a period of not longer than 45 days (the "Term") commencing on May 1, 2010 and expiring, unless terminated earlier, on June 14, 2010; and

WHEREAS Specialty contends that, pursuant to unambiguous terms of the Letter Agreement, the Debtor is obligated to compensate Specialty for all services provided during the Term by paying Specialty; and

WHEREAS, the Letter Agreement also provides for Specialty to have the right to increase its pricing to "list price" under certain circumstances, and the Debtor contends that the Letter Agreement does not define what "list price" means; and

WHEREAS, in accordance with the terms of the Letter Agreement, following the Debtor's announcement of its intention to sell substantially all of its assets (the "Sale"), Specialty advised the Debtor that it was exercising its right to increase its pricing to "list price"; and

3

WHEREAS, Specialty contends that, pursuant to the Letter Agreement, (i) it has
no obligation to provide Third Party Billing services during the term of the Letter
Agreement, (ii) the Debtor is obligated to pay directly for all services provided by
Specialty during the Term of the Letter Agreement at list price, and (iii) Specialty has no
obligation to provide billing and processing personnel during the term of the Letter
Agreement; and

WHEREAS, the Debtor disputes Specialty's contentions; and

WHEREAS, the Debtor and Specialty, after careful consideration of the time,
expense and merits of each other's positions believe it is in their best interests to resolve
their disagreements on the issues presented and move quickly toward the consummation
of the Sale.

IT IS HEREBY STIPULATED AND AGREED and the Letter Agreement is
hereby modified, as follows:

1.    Until the earlier of (i) June 14, 2010 or (ii) the date of the closing of the
      Sale (the "Closing"), unless mutually amended otherwise in writing by the
      Debtor and Specialty, the Debtor shall continue to send laboratory testing
      services requests to Specialty, and Specialty shall continue to pickup and
      process such samples in the same manner in which it has done so prior to
      the date of the Debtor's bankruptcy filing (the "Petition Date");

2.    After the Closing of the Sale and through the expiration of the Term, the
      Debtor or its subsequent purchaser shall have the right to continue to send
      its laboratory testing services to Specialty, and Specialty shall continue to

4

pickup and process such samples in the same manner in which it has done
so prior to the Petition Date;

3.    During the Term, unless terminated earlier, Specialty shall continue to
provide the same processing and billing staff to the Debtor as Specialty
was doing prior to the Petition Date, unless such employees are presently
working for the Debtor.

4.    During the Term, unless terminated earlier, Specialty shall provide Third
Party Billing services to the Debtor; provided however, that Specialty
shall not, and shall have no obligation to, provide Third Party Billing
services to the Debtor with respect to any services for which Blue Shield
of California is the third-party payor.

5.    The Debtor shall provide electronic third-party billing information to
Specialty on a daily basis in the manner reasonably requested by
Specialty.

6.    The Debtor shall pay Specialty for all actual laboratory testing services
requested by the Debtor on a First-Party Billing at a multiple of three
times (3x) the rates provided for in the Prior Agreement as follows:

a. Subject to the later "True-Up" (as defined below), during the Term,
the Debtor shall pay to Specialty for all First Party Billing, in advance,
the sum of $125,000 weekly, commencing as of the Petition Date, but
pro rating as appropriate for less than full weeks prior to the effective
date of this Stipulation and Settlement Agreement. The first payment
shall be paid on May 25, 2010 and each Monday weekly thereafter

5

(pro rating and delaying until the next day as appropriate for holidays) or as otherwise permitted by the Bankruptcy Court, and subject to deferral for the "Cure Amount" (as defined below) ;

b. Notwithstanding any True-Up, the $125,000 weekly payments shall be the minimum guaranteed amount (the "Minimum Weekly Amount") payable to Specialty by the Debtor, and shall not be subject to reduction for any reason, including, but not limited to, reduction based upon True-Up of First Party Billing services requested by the Debtor;

c. At the Closing of a Sale, the Debtor and Specialty shall reconcile the amounts due to Specialty for First Party Billing for the Term (the "True-Up"), and, if any additional amount is due Specialty, the Debtor shall pay Specialty the True Up not later than five (5) business days after the Closing;

d. To the extent necessary to effectuate these provisions, any Minimum Weekly Amount and any True-Up due to be paid to Specialty shall be deemed an allowed administrative expense pursuant to 11 U.S.C. § 503(b).

7.  No later than May 28, 2010, the Debtor shall assume the Letter Agreement as modified hereby. Within two business days following the date of entry of the Bankruptcy Court order approving such assumption by the Debtor, the Debtor shall pay to Specialty a cure amount of $175,000 for unpaid amounts due to Specialty from May 1, 2010 through May 18, 2010 (the "Cure Amount"), which cure amount shall be allocated as follows:

6

$150,000 for amount of First Party Billing billable to the Debtor from May 1, 2010 to May 18, 2010, and a reserve of $25,000 to be held by Specialty for reconciliation of unpaid Third-Party Billing relating to the period May 1, 2010 through May 18, 2010; provided however, that upon payment of the Cure Amount, the first $125,000 weekly payment described in paragraph 5(a) hereof shall be fully deferred until the Closing and shall be paid in full not later than five (5) business days after the Closing. The entire Cure Amount will be subject to True Up for actual First-Party Billing and unpaid Third-Party Billing from May 1, 2010 to May 18, 2010 and shall be deemed an allowed administrative expense pursuant to 11 U.S.C. § 503(b) against the Debtor's estate until paid.

8.  Specialty shall have an allowed administrative expense pursuant to 11 U.S.C. § 503(b) against the Debtor's estate for any unpaid Third Party Billing from the period from May 19, 2010 through June 14, 2010. Upon the Closing, the Debtor shall also deposit into a segregated interest bearing trust account for the benefit of Specialty a reserve of $25,000 to cover any such unpaid Third Party Billing from the period from May 19, 2010 through June 14, 2010, which amount shall be subject to True Up within sixty (60) days following the end of the Term.

9.  The Debtor shall, and hereby does, waive and release all claims, demands, rights, actions and causes of action, if any, against Specialty which arise in, arise under or relate to chapter 5 of title 11 of the United States Code.

7

10. During the Term, unless terminated earlier, the Debtor and Specialty mutually agree not to solicit each other's employees for employment by the other.

11. Except for continued First Party Billing, Third-Party Billing and subsequent True-Up relating solely to services rendered during the Term, the Debtor agrees that Specialty shall have no further obligation to provide any laboratory testing services, First Party Billing, Third-Party Billing or employees to the Debtor or any party after June 14, 2010.

12. Specialty shall be permitted to file a claim against the Debtor's bankruptcy estate for any unpaid amounts due under the Prior Agreement, and nothing herein shall be deemed to waive, release or relinquish Specialty's claim for such amounts. and, except as provided herein, the Debtor and all other parties in interest reserve all rights to object to any such claims asserted by Specialty.

13. The terms of this Stipulation and Settlement Agreement shall be binding upon the Debtor and any related debtor, including Biolabs, Inc., their respective estates, or anyone claiming in their name or on their behalf, and their successors and assigns including, but not limited to, any Chapter 11 Trustee, Chapter 7 Trustee or Official Committee of Unsecured Creditors appointed or to be appointed in these cases.

WESTCLIFF MEDICAL LABORATORIES, INC.
and BIOLABS INC., as Debtors and Debtors-in-Possession

By:_____

    Matthew L. Pakkala

8

Chief Restructuring Officer

Dated:_____

SPECIALTY LABORATORIES, INC.

By:_____ __
     Patricia A. O'Brien
     Managing Director

Dated:_____

This Exhibit has been intentionally omitted as a result of a confidentiality issue. However, the Court has been provided with a copy of this exhibit to review in camera.

EXHIBIT 2

This Exhibit has been
intentionally omitted
as a result of a
confidentiality issue.
However, the Court
has been provided
with a copy of this
exhibit to review in
camera.

EXHIBIT 3

1

2   In re:
    WESTCLIFF MEDICAL LABORATORIES, INC., Debtor(s).
    BIOLABS, INC.,

3   Debtor.

| CHAPTER 11 |
| Case No. 8:10-bk-16743-TA |
| Jointly Administered with |
| Case No. 8:10-bk-16746-TA |

4

5   # PROOF OF SERVICE OF DOCUMENT

6   I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
    10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

7   The foregoing document described as **DEBTORS' EMERGENCY MOTION TO APPROVE STIPULATION
    AND SETTLEMENT AGREEMENT AMENDING APRIL 30, 2010 LETTER AGREEMENT BETWEEN**
8   **SPECIALTY LABORATORIES, INC. AND WESTCLIFF MEDICAL LABORATORIES, INC.;
    MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF ROBERT E. WHALEN AND**
9   **MATTHEW PAKKALA IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers
    in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

10

11  I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to
    controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served
    by the court via NEF and hyperlink to the document. On **May 25, 2010**, I checked the CM/ECF docket for
12  this bankruptcy case or adversary proceeding and determined that the following person(s) are on the
    Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

13

14    • Todd M Arnold    tma@lnbrb.com
      • Ron Bender    rb@lnbrb.com
      • Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
15    • Michael J Heyman    michael.heyman@klgates.com
      • Michael B Lubic    mlubic@sonnenschein.com
16    • Jacqueline L Rodriguez    jlr@lnbrb.com
      • United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
17    • Sharon Z Weiss    sharon.weiss@hro.com

18                                ☐   Service information continued on attached page

19  II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
    On **May 25, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this
20  bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope
    in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as
21  follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later
    than 24 hours after the document is filed.*

22
    *Service via Overnight Mail or Federal Express*
23                                ☒   Service information continued on attached page

24  III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for
    each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 25, 2010**, I served
25  the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to
    such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes
26  a declaration that personal delivery on the judge will be completed no later than 24 hours after the
    document is filed.*

27

28

1

2   <u>VIA MESSENGER SERVICE</u>
    Hon. Theodor Albert
3   United States Bankruptcy Judge
    United States Bankruptcy Court
4   Courtroom 5B
    411 West Fourth Street
5   Santa Ana, CA 92701

6                               ☐    Service information continued on attached page

7   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true
8   and correct.

9   **May 25, 2010**              Jason Klassi                    /s/ Jason Klassi
    _____   _____   _____
    Date                          Type Name                      Signature

10  This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

    January 2009                                                    **F 9013-3.1**
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Westcliff Medical Laboratories, Inc.
File No. 4367
Secured Creditors

Debtor
Westcliff Medical Laboratories, Inc
1821 E. Dyer Road, #100
Santa Ana, CA 92705-0000

Frank Cadigan
Nancy Goldenberg
Terry Biers
Office of the U.S. Trustee
411 West Fourth St. Suite 9041
Santa Ana, CA 92701

Bank of America, N.A.
As Successor by Merger to LaSalle
Bank N
135 South LaSalle Street
Chicago, IL 60603

Becton Dickinson & Co.
Attn: Officer/Director/Legal Dept.
1 Becton Drive
Franklin Lakes, NJ 07417

BMT Leasing, Inc.
Attn: Officer/Director/Legal Dept.
P.O. Box 692
Bryn Mawr, PA 19010

CapitalSource Finance LLC
Gregory Browne, Managing Partner
4445 Willard Avenue, Twelfth Floor
Chevy Chase, MD 20815

Cisco Systems Capital Corp.
Attn: Officer/Director/Legal Dept.
170 W. Tasman Drive, MS SJ13-3
San Jose, CA 95134

CYTYC Limited Partnership
Attn: Officer/Director/Legal Dept.
250 Campus Drive
Marlborough, MA 01752

Diasorin, Inc.
Attn: Officer/Director/Legal Dept.
1951 Northwestern Avenue
Stillwater, MN 55082

GE Business Financial Serv., Inc.
Attn: Officer/Director/Legal Dept.
2 Bethesda Metro Ctr., Suite 600
Bethesda, MD 20814

GE Capital Business Fin. Serv., Inc
Attn: Officer/Director/Legal Dept.
2 Bethesda Metro Center, Suite 600
Bethesda, MD 20814

Jules and Associates, Inc.
Attn: Officer/Director/Legal Dept.
515 S. Figueroa St., Suite 1950
Los Angeles, CA 90071

Leasing Assoc. of Barrington, Inc.
Attn: Officer/Director/Legal Dept.
33 W. Higgins Road, Suite 1030
South Barrington, IL 60010

M & I Marshall & Ilsley Bank
Attn: Officer/Director/Legal Dept.
770 N. Water Street
Milwaukee, WI 53202

Merril Lynch Capital
Attn: Officer/Director/Legal Dept.
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Merril Lynch Capital, a Division of
Merril Lynch Bus. Fin. Serv., Inc., as A
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Norlease, Inc.
Attn: Officer/Director/Legal Dept.
50 South LaSalle Street
Chicago, IL 60675

Olympus America, Inc.
Attn: Officer/Director/Legal Dept.
3500 Corporate Parkway
Center Valley, PA 18034

Phadia US Inc.
Attn: Officer/Director/Legal Dept.
4169 Commercial Ave.
Portage, MI 49002

Pitney Bowes Credit Corp.
Attn: Officer/Director/Legal Dept.
27 Waterview Drive
Shelton, CT 06484

Pitney Bowes Global Fin. Serv., Inc
Attn: Officer/Director/Legal Dept.
27 Waterview Drive
Shelton, CT 06484

Roche Diagnostics Corporation
Attn: Officer/Director/Legal Dept.
9115 Hague Road
Indianapolis, IN 46250

Sandelman Finance 2006-1, Ltd
C/O Sandelman Partners LP, Bill Brown
500 Park Avenue, 3rd Fl.
New York, NY 10022

TCF Equipment Finance, Inc.
Attn: Officer/Director/Legal Dept.
11100 Wayzata Blvd., Suite 801
Minnetonka, MN 55305

Counsel to GE Business Financial
Services, Inc.
Randy Rogers
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

In re Westcliff Medical Laboratories
File No. 4367
Creditor Committee

SPECIALTY LABORATORIES
Attn: Sharon Z. Weiss
Holes Roberts & Owen LLP
800 W. Olympic Blvd., 4th Floor
Los Angeles, CA 90015-1367

SIEMENS HEALTHCARE DIAGNOSTICS
Attn: Yesim Brisbane
P.O. Box 6101, MS 802
Newark, DE 19714-6101

ROCHE DIAGNOSTICS CORPORATION
Attn: Wayne Mathias
9115 Hague Road
Indianapolis, IN 46250

DIASORIN INC.
Attn: Neal Domeyer
1951 Northwestern Avenue
P.O. Box 285
Stillwater, MN 55082

QIAGEN
Attn: Jonathan Isaac
1201 Clopper Road
Gaithersburg, MD 20878

IRVINE CORPORATE CENTER, LLC
Attn: Jim Savory
252 Clayton Street
Denver, CO 80206

GENZYME CORPORATION
Attn: D. Ross Martin
Ropes & Gray LLP
One International Place
Boston, MA 02110

Proposed Committee
Benjamin Siegel *
Buchalter Nemer
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017-2457