RON BENDER (SBN 143364)
JACQUELINE L. RODRIGUEZ (SBN 198838)
TODD M. ARNOLD (SBN 221868)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## (SANTA ANA DIVISION)

In re:

WESTCLIFF MEDICAL
LABORATORIES, INC.,

            Debtor.

_____

BIOLABS, INC.,

            Debtor.

_____

☒ Affects Both Debtors

☐ Affects WESTCLIFF MEDICAL
   LABORATORIES, INC. only

☐ Affects BIOLABS, INC. only

Lead Case No. 8:10-bk-16743-TA
Jointly Administered with Case
No. 8:10-bk-16746-TA
Chapter 11 Cases

**DEBTORS' MOTION FOR AN ORDER: (1)
APPROVING SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS (EXCLUDING
CASH AND ACCOUNTS RECEIVABLE) FREE
AND CLEAR OF ALL LIENS, CLAIMS AND
INTERESTS; (2) APPROVING OF DEBTORS'
ASSUMPTION AND ASSIGNMENT OF
UNEXPIRED LEASES AND EXECUTORY
CONTRACTS AND DETERMINING CURE
AMOUNTS; (3) WAIVING THE 14-DAY STAY
PERIODS SET FORTH IN BANKRUPTCY
RULES 6004(h) AND 6006(d); AND (4)
GRANTING RELATED RELIEF; MEMORANDUM
OF POINTS AND AUTHORITIES;
DECLARATIONS OF ROBERT E. WHALEN,
MATTHEW PAKKALA AND CURTIS LANE IN
SUPPORT THEREOF**

Court Scheduled Hearing:
Date:  June 3, 2010
Time:  2:00 p.m.
Place: Courtroom "5B"
        411 West Fourth Street
        Santa Ana, CA 92701-4593

Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), hereby file this Motion ("Motion") for entry of an order of the Court (A) pursuant to 11 U.S.C. § 363(f) approving the sale free and clear of all liens, claims and interests to Wave Newco, Inc. ("Purchaser"), a wholly-owned subsidiary of Laboratory Corporation of America ("LabCorp") or to a successful overbidder at an auction sale to be conducted by the Debtors, of substantially all of the Debtors' tangible and intangible assets designated for acquisition by Purchaser or the winning bidder (excluding the Debtors' cash, accounts receivable, avoidance causes of action and certain other excluded assets) (collectively, the "Purchased Assets"); (B) pursuant to 11 U.S.C. § 365, (i) authorizing the Debtors to assume executory contracts and unexpired leases ("Assumed Contracts") and assign them to Purchaser (or to a successful overbidder) and (ii) establishing the cure amounts, if any, payable under such Assumed Contracts; (C) waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d) to enable the sale to close as quickly as possible; and (D) granting certain other related relief, including authorizing the Debtors to enter into a Transition Agreement in connection with the sale closing.

A copy of the Asset Purchase Agreement ("APA") between the Debtors, LabCorp and Purchaser is attached as Exhibit "1" to the annexed Declaration of Matthew Pakkala. Attached as Exhibit "2" to the annexed Pakkala Declaration is a list of all of the Contracts that may become Assumed Contracts or Assumed Leases and the amount of money that the Debtors believe needs to be paid to other parties to the Assumed Contracts and Assumed Leases to satisfy the cure requirements of Section 365(b) of the Bankruptcy Code. Attached as Exhibit "3" to the annexed Pakkala Declaration is a form of Transition Agreement to be entered into in connection with the sale Closing.

Westcliff is the owner and operator of approximately 170 branded and stand-alone patient service center laboratories and STAT labs located throughout California. The Debtors have approximately 1,000 employees and are currently generating approximately $100 million of annual revenue. BioLabs does not operate any business and its only material asset is its 100% equity interest in Westcliff, which is a wholly-owned subsidiary of BioLabs.

The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or

substantially all of the Debtors' assets.  Any other secured debt
of the Debtors is relatively small in nature and relates to liens
against only certain of the Debtors' equipment.  The Debtors also
have a substantial amount of unsecured debt.

The Debtors suffered a net loss of approximately $87 million
in 2008 (including expenses and write offs of approximately $171
million) on net revenue of approximately $84 million.  The
Debtors suffered a net loss of approximately $13 million in 2009
(including expenses and write offs of approximately $110 million)
on net revenue of approximately $97 million.

While the Debtors instituted as many expense reductions as
were reasonably possible, the Debtors' losses continued.  Since
the beginning of 2009, the Debtors have been unable to make any
debt service payments to the Senior Lenders, and the Debtors have
been unable to remain current with their other debt obligations,
including payments owing to former owners of companies the
Debtors previously purchased as part of the Debtors' overall
growth strategy.  Indeed, the Debtors were only able to survive
financially over the past approximately seventeen months because
the Senior Loan Agent provided the Debtors with emergency funding
to cover payroll and other vital expenses.

The only way the Debtors can survive as a stand alone going
concern business would be for the Debtors to raise many millions
of dollars of additional equity which is not possible given the

Debtors' debt structure.   It therefore became clear to the Debtors in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder.   The Debtors have therefore been engaged in an active sale process since early 2009.

To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009 as a financial advisor to assist the Debtors with their sale process.[1] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers.[2]

After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that LabCorp was the optimal buyer of the Debtors' assets for three primary reasons.   First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets.   Second, it was clear that LabCorp as a strategic buyer was willing to pay a

---

[1] The Debtors had used other professionals for this same purpose in the past.
[2] A complete listing of the parties contacted by MTS is attached as Exhibit "5"

substantially higher price for the Debtors' assets than any other

prospective buyer.     Third, LabCorp clearly has the financial

means to consummate its purchase of the Debtors' assets.[3]

As indicated in Section 3.1 of the APA, subject to certain

adjustments, Purchaser has agreed to pay to the Debtors the sum

of $57.5 million for the Purchased Assets, while leaving with the

Debtor, among other things, all of the Debtors' accounts

receivable (which the Debtors estimate will result in an

additional net recovery of approximately $8,000,000 for the

Debtors' estates) and all of the Debtors' cash.  The Debtors and

MTS believe that the purchase price offered by Purchaser is

substantially higher than the purchase price that any other buyer

would be willing to pay for the Purchased Assets.

While the purchase price being paid by Purchaser is subject

to overbid (to insure that the highest price possible is paid for

the Purchased Assets), the Debtors and MTS believe that it is

highly unlikely that there is any other buyer that will be

willing to pay more for the Purchased Assets than Purchaser has

offered.  Moreover, the Debtors and MTS do not believe that the

prospect for a successful overbid would increase with the passage

of time.   To the contrary, the Debtors believe that it is

critical that the Debtors consummate an immediate sale of the

---

to the annexed Declaration of Curtis Lane.
[3] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp

Purchased Assets because of the severe risk of a deterioration of Westcliff's business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and the Debtors and Purchaser do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy. The Debtors believe that an expedited sale of the Debtors' business is necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

As set forth in Section 3.1 of the APA, the purchase price being paid by Purchaser will be adjusted downward if there is a meaningful reduction in Westcliff's post-petition business volume pending the closing of the sale[4]. Moreover, should that reduction reach the level of a Material Adverse Change[5], Purchaser has the ability to walk away from this transaction completely. The risks to the Debtors' estates of failing to close the sale of the Purchased Assets to Purchaser on an

solely for the purpose of acquiring the Purchased Assets.

[4] Purchase Price Decrease Adjustment is defined in the definitional Section of the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement Period Volume) times (b) $1,202.00.

[5] Material Adverse Change is defined in the definitional Section of the APA as an amount equal to 0.17 or more determined using the following formula: the quotient of (a) (the Baseline Volume minus the Measurement Period Volume); divided by (b) the Baseline Volume. For purposes of clarification, the Material Adverse Change may be expressed as a percentage equal to or greater than Seventeen Percent (17%). By way of example, if the Baseline Volume is 9,500 and the Measurement Period Volume is 7,885, then the calculation shall be equal to 0.17 and a Material Adverse Change shall have occurred.

expedited basis are therefore severe. The Debtors have no doubt that if they fail to consummate the sale to Purchaser, the Debtors will either be forced to sell their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. A liquidation of the Debtors' business would have minimal value.

While section 7.3(c)(ix) of the APA only requires that the hearing on the Sale Motion be no more than twenty-five days after the Petition Date (which would be by June 13, 2010), the Debtors strongly urge the Court to conduct the hearing on the Sale Motion no later than Thursday, May 27, 2010.[6]

The Debtors believe that proceeding with a sale in such an expedited manner serves only to the substantial benefit of the Debtors' estates. Given the lengthy and exhaustive pre-petition sale process that the Debtors embarked upon, with the valuable assistance of MTS, the Debtors and MTS are highly confident that any potential overbidder has been identified and is extremely knowledgeable about the Debtors' business and the opportunity to

---

[6] Section 7.3(c)(ix) requires the Debtors to use their best efforts to have the hearing on the Sale Motion occur no more than twelve calendar days following the Petition Date (which would be Monday, May 31, 2010). However, the parties wish to make every effort to obtain an entered sale order on Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

purchase the Purchased Assets.   The Debtors and MTS therefore believe that if there is any party willing and able to pay more for the Debtors' business than Purchaser has offered, they can do so within the time frame requested by the Debtors and nothing would change for the better if that time frame was expanded.   To the contrary, the risk to the Debtors' business of customer attrition and a corresponding reduction in the purchase price to be paid by Purchaser (or worse a complete walk away by Purchaser) from a protracted sale process is severe and significantly greater than any possible benefit that could be obtained from speculating that a higher price might be paid for the Purchased Assets.

The APA was extensively negotiated between the Debtors and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements over an extended period of time.   The Debtors and MTS have no doubt that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates.

The Debtor will conduct an auction sale of the Purchased Assets (in open court at the hearing on this Motion or prior to the hearing on this Motion outside of the Court, whichever the Court would prefer).   After the auction, the Debtor will request

1  the Court to approve the sale of the Purchased Assets to

2  Purchaser or to a successful overbidder.

3      While the Senior Lenders are owed approximately $56 million

4  on account of the Senior Debt which is secured by a first

5  priority security interest and lien against all or substantially

6  all of the Debtors' assets, in order to help facilitate an

7  expedited sale of the Debtors' business for the benefit of all

8  constituents in these cases, it is the Debtors' expectation based

9  upon numerous conversations with the Senior Lenders that the

10 Senior Lenders and the Debtors (along with any Creditors'

11 Committee which is appointed) will use their reasonable best

12 efforts to attempt to negotiate a mutually acceptable allocation

13 of the sale proceeds prior to the hearing on this Motion.

14     For all of the reasons set forth below and in the annexed

15 Declarations, the Debtors believe that selling the Purchased

16 Assets to Purchaser in accordance with the terms of the APA or to

17 a successful overbidder (in the event of a successful overbid

18 made at the auction) free and clear of all liens, claims,

19 encumbrances and interests ("Encumbrances") is in the

20 overwhelming best interests of the Debtors' estates.

21     The relief sought in this Motion is based upon this Motion,

22 the Memorandum of Points and Authorities and Declarations of

23 Robert E. Whalen, Matthew Pakkala and Curtis Lane annexed hereto,

24 the statements, arguments and representations of counsel to be

made at the hearing on this Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Motion.

**WHEREFORE,** the Debtors respectfully request that this Court:

1. approve the sale of the Purchased Assets to Purchaser in accordance with the terms of the APA (or to a successful overbidder) free and clear of all Encumbrances;

2. find that Purchaser (or a successful overbidder) is a good faith buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

3. approve (effective as of the date of the sale Closing) the Debtors' assumption and assignment to Purchaser (or to a successful overbidder) of all of the Debtors' unexpired leases and executory contracts which Purchaser (or a successful overbidder) desires to acquire in accordance with the procedures outlined below;

4. find that the cure amounts which must be paid in connection with the Debtors' assumption and assignment of any of their unexpired leases and executory contracts are as set forth in exhibit "2" to the Pakkala Declaration and that adequate assurance of future performance has been demonstrated, and order that any party that fails to file a timely objection to this Motion shall be deemed to have consented to the Debtors' proposed cure amount and be forever barred from challenging the Debtors'

proposed cure amount or from asserting any claims on account of cure costs against Purchaser or the winning bidder in respect of any such unexpired leases or executory contract;

5.    approve (effective as of the date of the sale Closing) the Debtors' rejection of all of the Excluded Contracts and all of the Excluded Leases (defined below), with the Debtors reserving the right to supplement this list as the Debtors obtain additional information from Purchaser;

6.    authorize the Debtors to enter into a Transition Agreement in connection with the sale Closing in a form which is substantially similar to the version attached as Exhibit "3" to the annexed Pakkala Declaration, subject to any subsequent modifications agreed by the Debtors and Purchaser;

7.    enter an order in a form substantially in conformity with the version of the proposed order attached hereto as Exhibit "4";

8.    waive the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

///

9.   grant such other and further relief as the Court deems just and proper.

Dated: May 19, 2010

WESTCLIFF MEDICAL LABORATORIES, INC.

-and-

BIOLABS, INC.

*/s/ Ron Bender*

RON BENDER
JACQUELINE L. RODRIGUEZ
TODD M. ARNOLD
JOHN-PATRICK M. FRITZ
LEVENE, NEALE, BENDER, RANKIN
    & BRILL L.L.P.
(Proposed) Attorneys for Chapter 11
Debtors and Debtors in Possession

TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES

I.    COMPANY BACKGROUND AND CHAPTER 11 BANKRUPTCY FILINGS .... 14

II.   THE ASSET SALE PROCESS ................................. 17

III.  THE ASSET PURCHASE AGREEMENT WITH PURCHASER ............ 19

IV.   THE OVERBID PROCESS ................................... 22

V.    THE CRITICAL NEED FOR AN EXPEDITED SALE CLOSING ........ 24

VI.   THE PROJECTED DISTRIBUTION OF THE SALE PROCEEDS ........ 27

VII.  DISCUSSION ........................................... 30

      A. The Court Should Authorize the Debtors to Sell
         the Purchased Assets to Purchaser (or to a
         Successful Overbidder) ............................ 30

         1. Sound Business Purpose ........................ 31
         2. Accurate and Reasonable Notice ................ 33
         3. Fair and Reasonable Price ..................... 35
         4. Good Faith .................................... 37

      B. Section 363(f) of the Bankruptcy Code Permits the
         Sale of the Purchased Assets to Be Free and Clear of
         Any and All Liens, Claims and Interests .......... 40

         1. The Debtors' Proposed Sale is Permissible
            Pursuant to 11 U.S.C. Section 363(f)(5) ....... 45

         2. The Debtors' Proposed Asset Sale is Also
            Permissible Pursuant to 11 U.S.C.
            Section 363(f)(2) ............................. 49

      C. The Court Should Authorize the Debtors to Assume
         and Assign to Purchaser (or to a Successful
         Overbidder) All Executory Contracts and Unexpired
         Leases that Purchaser (or a Successful Overbidder)
         Wishes to Have Assigned to it .................... 51

      D. The Debtors Request the Court to Waive the
         Fourteen-Day Waiting Periods Set Forth in
         Bankruptcy Rules 6004(h) and 6006(d) ............. 58

      E. The Debtors Request the Court to Waive the
         Twenty One-Day Restriction Set Forth in
         Bankruptcy Rule 6003 ............................. 59

VIII.   CONCLUSION ......................................... 59

DECLARATION OF_ROBERT E. WHALEN ............................... 63

DECLARATION OF_MATTHEW PAKKALA ............................... 72

DECLARATION OF_CURTIS LANE ................................... 94

TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re
    Coastal Indus., Inc.)
    63 B.R. 361 (Bankr. N.D. Ohio 1986) ........................ 35

Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel
    Corp.)
    722 F.2d 1063 (2d Cir. 1983) ....................... 30, 31, 32

In re Abbotts Dairies of Pennsylvania, Inc.
    788 F.2d 143 (3d Cir. 1986) ................... 30, 35, 37, 38

In re AEG Acquisition Corp.
    127 B.R. 34 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50
    (9th Cir. B.A.P. 1993) ..................................... 53

In re Alpha Industries, Inc.
    84 B.R. 703 (Bankr. D. Mont. 1988) ........................ 38

In re Apex Oil Co.
    92 B.R. 847 (Bankr. E.D. Mo. 1988) ........................ 38

In re Atlanta Packaging Products, Inc.
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ........................ 36

In re Bowman
    194 B.R. 227 (Bankr. D. Ariz. 1995) ....................... 52

In re Central Fla. Metal Fabrication, Inc.
    190 B.R. 119 (Bankr. N.D. Fla. 1995) ...................... 51

In re Continental Airlines, Inc.
    780 F.2d 1223 (5th Cir. 1986) ............................. 32

In re Continental Country Club, Inc.
    114 B.R. 763 (Bankr. M.D. Fla. 1990) ...................... 52

In re Delaware and Hudson Ry. Co.
    124 B.R. 169 (D. Del. 1991) ........................... 30, 34

In re Eliot
    94 B.R. 343 (E.D. Pa. 1988) ............................... 50

In re Embers 86th Street. Inc.
    184 B.R. 892 (Bankr. S.D.N.Y. 1995) ....................... 53

In re Ex-Cel Concrete Company, Inc.
    178 B.R. 198 (9th Cir. BAP 1995) ........................... 50

In re Filtercorp, Inc.
    163 F.3d 570 (9th Cir. 1998) .............................. 39

In re Gabel
    61 B.R. 661 (Bankr. W.D. La. 1985) ........................ 50

In re Grand Slam U.S.A., Inc.
    178 B.R. 460 (E.D. Mich. 1995) .................... 46, 47, 48

In re Gucci
    193 B.R. 411 (S.D.N.Y. 1996) .......................... 51, 52

In re Gulf States Steel, Inc. of Alabama
    285 B.R. 497 (Bankr. N.D. Ala. 2002) ...................... 47

In re Healthco Int'l Inc.
    174 B.R. 174 (Bankr. D. Mass. 1994) ................... 46, 47

In re Hunt Energy Co., Inc.
    48 B.R. 472 (Bankr. N.D. Ohio, E.D 1985) .................. 48

In re Huntington, Ltd.
    654 F.2d 578 (9th Cir. 1981) .............................. 30

In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.
    77 B.R. 15 (Bankr. E.D. Pa. 1987) ......................... 38

In re Integrated Resources, Inc.
    135 B.R. 746 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650
    (S.D.N.Y. 1992) ........................................... 36

In re Karpe
    84 B.R. 926 (Bankr. M.D. Pa. 1988) .................... 34, 35

In re Klein Sleep Products, Inc.
    78 F.3d 18 (2d. Cir. 1996) ................................ 51

In re Martin (Myers v. Martin)
    91 F.3d 389 (3d Cir. 1996) ................................ 30

In re Paddlewheels, Inc.
    2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ............ 51

In re Perroncello
    170 B.R. 189 (Bankr. D. Mass. 1994) ...................... 47

In re Prime Motors Inns
    124 B.R. 378 (Bankr. S.D. Fla. 1991) ....................... 52

In re Qintex Entertainment, Inc.
    950 F.2d 1492 (9th Cir. 1991) ............................. 31

In re Rock Indus. Mach. Corp.
    572 F.2d 1195 (7th Cir. 1978) ............................. 38

In re Sandy Ridge Dev. Corp.
    881 F.2d 1346 (5th Cir.1989) .............................. 48

In re The Seychelles, Partnership and Genius Corp. v. Banyan
    Corp.
    32 B.R. 708 (N.D. Tex. 1983) .............................. 35

In re Snyder
    74 B.R. 872 (Bankr. E.D. Pa. 1987) ....................... 35

In re Walter
    83 B.R. 14 (9th Cir. B.A.P. 1988) ................. 30, 31, 32

In re Wilde Horse Enterprises
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ................. 36, 38

P.K.R. Convalescent Centers, Inc. v. Commonwealth of
    Virginia, Dep't of Medical Assistance Serv. (In re P.K.R.
    Convalescent Centers, Inc.)
    189 B.R. 90 (Bankr. E.D. Va. 1995) ....................... 45

Scherer v. Federal National Mortgage Association (In re
    Terrace Chalet Apartments, LTD.)
    159 B.R. 821 (Bankr. N.D. Ill. 1993) ................. 46, 47

Titusville Country Club v. Pennbank (In re Titusville
    Country Club)
    128 B.R. 396 (Bankr. W.D. Pa. 1991) ...................... 31

Willemain v. Kivitz
    764 F.2d 1019 (4th Cir. 1985) ............................ 35

**FEDERAL STATUTES**

11 U.S.C. § 101 ...................................... passim
11 U.S.C. § 363 ....................................... 31, 33
11 U.S.C. § 363(b) ................................... passim
11 U.S.C. § 363(f) .......................... 2, 40, 44, 51
11 U.S.C. § 363(f)(2) ...................... 41, 49, 50, 51
11 U.S.C. § 363(f)(3) and (5) ......................... 44

v

11 U.S.C. § 363(f)(5) ................................. 45, 46, 47
11 U.S.C. § 363(m) ..................................... 11, 39, 59
11 U.S.C. § 365 ............................................. 57
11 U.S.C. § 365(b) ........................................... 3
11 U.S.C. § 365(b)(1)(A) .................................... 55
11 U.S.C. § 365(f)(2) ....................................... 52
11 U.S.C. § 365 (i) .......................................... 2
11 U.S.C. § 365(b)(1) ...................................... 52
11 U.S.C. § 365(b)(1)(C) ................................... 56
11 U.S.C. §§ 1107 and 1108 ................................. 14
11 U.S.C. § 1129(a)(3)-(b)(1) .............................. 48
11 U.S.C. § 1129(b)(1) ..................................... 48
11 U.S.C. § 1129(b)(1) and (2) ............................. 47
11 U.S.C. § 1129(b)(2)(A)(i)(II) ........................... 48
11 U.S.C. § 1129(b)(2)(A)(iii) ............................. 48

OTHER AUTHORITIES

Collier on Bankruptcy [6] (15th ed. rev. 2003) ........ 45, 46, 47
Fed. R. Bankr. P. 6003 ..................................... 58
Fed. R. Bankr. P. 6004(a) and (c) ...................... 34, 35
Fed. R. Bankr. P. 6004(h) .................................. 57
Fed. R. Bankr. P. 6004(h) and 6006(d) .................. passim
Fed. R. Bankr. P. 6006(d) .................................. 57

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### COMPANY BACKGROUND AND CHAPTER 11 BANKRUPTCY FILINGS

Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on May 19, 2010 (the "Petition Date"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

BioLabs is the parent company to Westcliff, which is the operating company. The only material asset owned by BioLabs is its stock interest in the Debtor. Biolabs was organized for the purposes of acquiring 100% of the capital stock and other equity interests of Westcliff.

Westcliff was founded in 1964 as a community-based laboratory and is headquartered in Santa Ana, California. Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of

out-patients throughout California. The Debtors have nearly 1000 employees.

The Debtors' main clinical hub is an 80,000 square foot facility located in Santa Ana, California that opened in 2006. The Debtors' primary anatomical pathology lab is a 12,800 square foot facility located in Monrovia, California that opened in 2008.

Working directly with patients and with contracted payors, including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and Medicare, Westcliff has grown and become a leading out-patient laboratory service company. Westcliff's lab operations demonstrate industry-leading results, with low testing turn-around times, high quality control scores, and a strong and experienced sales and marketing team.

Westcliff averages approximately 8,500 clinical requests per day and approximately 1,200 pathology requests per day, and performs approximately 250,000 cytology and 70,000 biopsy tests on an annual basis. Based on this performance, the Debtors had approximately $97 million in net revenue in 2009 and are the third largest clinical laboratory in California.

The California clinical laboratory testing market is the largest in the nation, with estimated revenues of approximately $2 billion. Approximately 8% of the nations' tests are performed in California, and over 200 million of California's tests are

conducted by independent labs (excluding hospital based labs). Based on current volume, the Debtors account for approximately 5% of the California market.

Much of the Debtors' growth has come from the acquisition of other labs, which caused the Debtors to incur a substantial amount of debt. The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment. The Debtors also have a substantial amount of unsecured debt.

While the Debtors' revenue is significant, due to the small profit margins in this business, despite substantial and continuing cost cutting measures undertaken by the Debtors, the Debtors are simply not able to operate sufficiently profitably to enable the Debtors to repay their debts.

The Debtors suffered a net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171 million) on net revenue of approximately $84 million. The Debtors suffered a net loss of approximately $13 million in 2009

(including expenses and write offs of approximately $110 million) on net revenue of approximately $97 million.

While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued.  Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy.  Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

The only way the Debtors can survive as a stand alone going concern business would be for the Debtors to raise many millions of dollars of additional equity which is not possible given the Debtors' debt structure.

II.

THE ASSET SALE PROCESS

It therefore became clear to the Debtors in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder.  The Debtors

have therefore been engaged in an active sale process since early, 2009.

To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009 as a financial advisor to assist the Debtors with their sale process.[7] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers.[8]

After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that LabCorp was the optimal buyer of the Debtors' assets for three primary reasons. First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets. Second, it was clear that LabCorp as a strategic buyer was willing to pay a substantially higher price for the Debtors' assets than any other prospective buyer. Third, LabCorp clearly has the financial means to consummate its purchase of the Debtors' assets.[9]

---

[7] The Debtors had used other professionals for this same purpose in the past.
[8] A complete listing of the parties contacted by MTS is attached as Exhibit "5" to the annexed Declaration of Curtis Lane.
[9] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp solely for the purpose of acquiring the Purchased Assets.

III.

THE ASSET PURCHASE AGREEMENT WITH PURCHASER

A copy of the Asset Purchase Agreement (the "APA") entered into between the Debtors, LabCorp and Purchaser is attached as Exhibit "1" to the annexed Declaration of Matthew Pakkala.

A description of the assets to be purchased by Purchaser free and clear of all Encumbrances (defined as the "Purchased Assets") is set forth in full in Section 2.1 of the APA. As set forth therein, the Purchased Assets consist of the Debtors' executory contracts and unexpired leases that Purchaser elects to acquire (the "Assumed Contracts") and substantially all of the Debtors' personal property assets with the exception of the Debtors' cash and accounts receivable, which are part of the "Excluded Assets" as set forth in Section 2.2 of the APA. Also part of the "Excluded Assets" are all avoidance causes of action of the Debtors' bankruptcy estates. As set forth in Section 2.3(a), Purchaser is assuming certain limited liabilities of the Debtors.

As set forth in Section 3.1 of the APA, Purchaser's purchase price for the Purchased Assets will be $57.5 million subject to certain adjustments, while leaving with the Debtors, among other things, all of the Debtors' accounts receivable (which the Debtors estimate will result in an additional net recovery of approximately $8,000,000 for the Debtors' estates) and all of the

1   Debtors' cash.

2       As set forth in Section 3.1 of the APA, the purchase price
3   being paid by Purchaser will be adjusted downward if there is a
4   meaningful reduction in Westcliff's post-petition business volume
5   pending the closing of the sale[10], and if that reduction becomes
6   too large and constitutes a Material Adverse Change[11], Purchaser
7   has the ability walk away from this transaction completely.
8

9       The possibility of the Debtors suffering a reduction in
10  revenue as a result of their bankruptcy filings in this very
11  competitive industry and the resulting negative impact on the
12  purchase price to be paid by Purchaser, or, worse, a complete
13  walk away by Purchaser, is the reason why it is so critical that
14  this sale transaction occur on an expedited basis.  As indicated
15  in Section 3.2 of the APA, Purchaser has already delivered a $4
16  million deposit to the Debtors.
17

18      The APA was extensively negotiated between the Debtors and
19  Purchaser in good faith, arms-length negotiations, including
20

21  _____

22  [10] Purchase Price Decrease Adjustment is defined in the definitional Section of
    the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement
    Period Volume) times (b) $1,202.00.

23  [11] Material Adverse Change is defined in the definitional Section of the APA as
24  an amount equal to 0.17 or more determined using the following formula: the
    quotient of (a) (the Baseline Volume minus the Measurement Period Volume);
25  divided by (b) the Baseline Volume.  For purposes of clarification, the
    Material Adverse Change may be expressed as a percentage equal to or greater
    than Seventeen Percent (17%).  By way of example, if the Baseline Volume is
26  9,500 and the Measurement Period Volume is 7,885, then the calculation shall
    be equal to 0.17 and a Material Adverse Change shall have occurred.

27

28

exchanges of multiple drafts of asset purchase agreements over an extended period of time. The Debtors and MTS have no doubt that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates.

No insider of the Debtors has any interest in or connection with Purchaser, and no insider of the Debtors will be receiving any special benefit as a result of the Debtors' sale of the Purchased Assets to Purchaser. The Debtors have entered into the APA with Purchaser and are filing this Emergency Motion with the Court solely because the Debtors, after consultation with and upon the advise of MTS, have concluded that doing so is in the best interest of the Debtors' creditors and their estates. The Debtors and MTS believe that the purchase price offered by Purchaser is substantially higher than the purchase price that any other buyer would be willing to pay for the Purchased Assets.

In connection with the sale Closing, the Debtors will be required to enter into a Transition Agreement with Purchaser and LabCorp in substantially the form attached as Exhibit "3" to the annexed Pakkala Declaration. The Transition Agreement will not cost the Debtors' estates any money as Purchaser will be reimbursing the Debtors for all expenses incurred thereunder. The purpose of the Transition Agreement is to facilitate as smooth a transition of the Debtors' business and their employees

to Purchaser as is possible under the circumstances.  Transition agreements such as this are common in sales of businesses such as this.

IV.

THE OVERBID PROCESS

To make absolutely certain that the highest price possible is paid for the Purchased Assets, the Debtors and Purchaser have agreed to various overbid procedures.  MTS has extensively marketed the Debtors' business for sale.  MTS is therefore knowledgeable about those parties who could possibly be interested in paying more for the Debtors' business than Purchaser has offered.  MTS will make every reasonable effort to attempt to facilitate an overbid.

As indicated in Section 7.3(c) of the APA, the following bidding procedures have been agreed to by the Debtors and Purchaser, all of which the Debtors believe to be reasonable and appropriate under the circumstances of these cases and in compliance with applicable law:

1.    Purchaser will receive a break-up fee in the amount of $2.25 million in the event of a successful overbid where a buyer other than Purchaser is the winning bidder.  This is less than 4% of the $57.5 million purchase price being paid by Purchaser and is even a lower percentage when taking into account the fact that

Purchaser is leaving the Debtors with their substantial accounts receivable which Purchaser has agreed not to take.

2.    In order to overbid Purchaser's bid, the minimum initial overbid must be at least $2.45 million higher than Purchaser's bid made in the APA, with minimum subsequent bid increments of $100,000.

3.    In order to be considered a "qualified bidder", a bidder must, on or before two business days before the sale hearing, submit evidence of its financial ability to close the transaction.

4.    In order to be considered a "qualified bidder", prospective overbidders are required to provide the same good faith deposit of $4 million as Purchaser has provided.

As previously indicated, the Debtors and MTS believe that the prospects for any overbid to Purchaser's offer are extremely remote.    The Debtors and MTS therefore have concluded that the foregoing overbid procedures and protections for Purchaser are very reasonable and are of inconsequential significance for the Debtors' estates when weighed against the extraordinary benefit of having a locked in buyer (i.e., bird in the hand) in Purchaser, particularly since the offer from Purchaser is substantially higher than any other offer the Debtors received. The Debtors will file the results of the Auction to be conducted prior to the hearing on this Motion.

V.

THE CRITICAL NEED FOR AN EXPEDITED SALE CLOSING

While the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken for the sale of the Debtors' business, the Debtors and MTS believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, the Debtors and MTS do not believe that the prospect for a successful overbid would increase with the passage of time. To the contrary, the Debtors and LabCorp believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors' business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and the Debtors and LabCorp do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy. The Debtors believe that an expedited sale of the Debtors' business is necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

As set forth in Section 3.1 of the APA, the purchase price being paid by Purchaser will be adjusted downward if there is a

meaningful reduction in Westcliff's post-petition business volume pending the closing of the sale[12], and if that reduction becomes too large and constitutes a Material Adverse Change[13], Purchaser has the ability walk away from this transaction completely.

The risks to the Debtors' estates of failing to close the sale of the Purchased Assets to Purchaser on an expedited basis are therefore severe. The Debtors have no doubt that if they fail to consummate their sale to Purchaser, the Debtors will either end up selling their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. A liquidation of the Debtors' business would have minimal value.

While section 7.3(c)(ix) of the APA only requires that the hearing on the Sale Motion be no more than twenty-five days after the Petition Date (which would be by June 13, 2010), the Debtors

---

[12] Purchase Price Decrease Adjustment is defined in the definitional Section of the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement Period Volume) times (b) $1,202.00.

[13] Material Adverse Change is defined in the definitional Section of the APA as an amount equal to 0.17 or more determined using the following formula: the quotient of (a) (the Baseline Volume minus the Measurement Period Volume); divided by (b) the Baseline Volume. For purposes of clarification, the Material Adverse Change may be expressed as a percentage equal to or greater than Seventeen Percent (17%). By way of example, if the Baseline Volume is 9,500 and the Measurement Period Volume is 7,885, then the calculation shall be equal to 0.17 and a Material Adverse Change shall have occurred.

strongly urge the Court to conduct the hearing on the Sale Motion no later than Thursday, May 27, 2010.[14]

The Debtors believe that proceeding with a sale in such an expedited manner serves only to the substantial benefit of the Debtors' estates.  Given the lengthy and exhaustive pre-petition sale process that the Debtors have embarked upon, with the assistance of MTS, the Debtors and MTS are highly confident that any potential overbidder has been identified and is extremely knowledgeable about the Debtors' business and the opportunity to purchase the Purchased Assets.  The Debtors and MTS therefore believe that if there is any party willing and able to pay more for the Debtors' business than Purchaser has offered, they can do so within the time frame requested by the Debtors and nothing would change for the better if that time frame was expanded.  To the contrary, the risk to the Debtors' business of customer attrition and a corresponding reduction in the purchase price to be paid by Purchaser (or worse a complete walk away by Purchaser) from a protracted sale process is severe and significantly greater than any possible benefit that could be obtained from speculating that a higher price might be paid for the Purchased Assets.

---

[14] Section 7.3(c)(ix) requires the Debtor to use its best efforts to have the hearing on the Sale Motion occur no more than twelve calendar days following the Petition Date (which would be Monday, May 31, 2010).  However, the parties wish to make every effort to obtain an entered sale order on Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

# VI.

## THE PROJECTED DISTRIBUTION OF THE SALE PROCEEDS

As described in detail in a concurrently filed settlement motion, Purchaser is not willing to consummate its purchase of the Debtors' business unless the Debtors are able to obtain an order of the Court approving a pre-bankruptcy settlement the Debtors reached with various "qui tam" litigants. (See Sections 8.4(b) and 8.8 of the APA). The "qui tam" litigants assert claims against the Debtors of more than $56 million. Absent a negotiated settlement, resolution of these litigation claims would have taken years, which would have made it impossible for the Debtors to consummate a going concern sale of their business to Purchaser. All other buyers would have required the same closing condition because any buyer of the Debtors' business would insist on knowing that it has no monetary liability to the qui tam claimants and no ongoing reporting requirements to the State of California. It would therefore not have been possible for the Debtors to have obtained Purchaser's pre-bankruptcy agreement to the APA had the Debtors not been able to obtain a pre-bankruptcy settlement with the qui tam claimants. Court approval of that settlement agreement is therefore critically important and a condition precedent to the Closing of the Debtors' sale of the Purchased Assets to Purchaser. Pursuant to that settlement agreement, the qui tam claimants will be

receiving 10% of the net sale proceeds (after a deduction for all transaction expenses).

Particularly given the expedited nature of this sale, both the Debtors and the Senior Lenders recognize that it is very important that the sale of the Purchased Assets to Purchaser inure to the benefit of all creditors. The Debtors and the Senior Lenders therefore engaged in a substantial amount of discussion in order to achieve this result.

While the Senior Lenders are owed approximately $56 million on account of the Senior Debt which is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets, in order to help facilitate an expedited sale of the Debtors' business for the benefit of all constituents in these cases, it is the Debtors' expectation based upon numerous conversations with the Senior Lenders that the Senior Lenders and the Debtors (along with any Creditors' Committee which is appointed) will use their reasonable best efforts to attempt to negotiate a mutually acceptable allocation of the sale proceeds prior to the hearing on this Motion.

The following is a detailed description of the Debtors' currently projected distributions in these cases based upon the best information available to the Debtors at this time[15]:

$57,500,000 – gross sale proceeds

1  ($2,850,000) – estimated reduction for lease and contract cure
2  costs and set aside of funds for Equipment Lenders

3  $54,650,000 – remaining net sale proceeds

4  ($5,200,000) – payment of qui tam settlement

5  ($1,150,000) – payment of MTS remaining unpaid transaction fee

6  $48,300,000 - net remaining sale proceeds

7  $1,086,000 – estimated remaining cash at Closing[16]

8  $8,000,000 – estimated net collections from outstanding accounts
9  receivable remaining at the Closing[17]

10  $57,386,000 – total projected funds available for wind-down costs
   of the Debtors and their bankruptcy estates and distribution to
11  pre-petition creditors

12  ($2,900,000) – total projected wind-down costs of the Debtors[18]

13  $54,486,000 – total estimated funds available to be distributed
14  to pre-petition creditors, including the Senior Lenders[19]

15

16

17

18  [15] This assumes no purchase price reduction by Purchaser.

19  [16] This figure is the Debtors' current best estimate based upon the Debtors'
   projections but this figure could be higher or lower depending upon a number
20  of factors, including the Debtors' operating performance pending the Closing,
   the timing of the Closing and any settlements with vendors (including pre-
21  closing assumption of vendor contracts).  This figure also does not take into
   account the $2 million that the Debtors are required to place into a
22  segregated Payroll Account for approximately 120 days pursuant to the
   Transition Agreement with Purchaser as the Debtors expect that they will
23  ultimately receive all of these funds back.
   [17] This figure assumes a net collection equal to 63% of the book amount of the
24  Debtors' accounts receivable which are projected to be approximately $12.6
   million at the time of the Closing.
25  [18] This figure assumes that the bankruptcy cases will be concluded in November,
   2010.
26  [19] As indicated above, it is the Debtors' expectation that the Senior
   Lenders and the Debtors (along with any Creditors' Committee which is
27  appointed) will use their reasonable best efforts to attempt to
   negotiate a mutually acceptable allocation of these remaining sale
28  proceeds prior to the hearing on this Motion.

1

2                                          VII.

3                                       DISCUSSION

4   A.    The Court Should Authorize the Debtors to Sell the Purchased

5         Assets to Purchaser (or to a Successful Overbidder).

6         Section 363(b) of the Bankruptcy Code provides that a debtor

7   "after notice and a hearing, may use, sell or lease, other than

8   in the ordinary course of business, property of the estate."  To

9   approve a use, sale or lease of property other than in the

10  ordinary course of business, the court must find "some

11  articulated business justification."  See, e.g., In re Martin

12  (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996) citing In re

13  Schipper (Fulton State Bank v. Schipper), 933 F.2d 513, 515 (7th

14  Cir. 1991); Comm. of Equity SEC Holders v. Lionel Corp. (In re

15  Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts

16  Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986)

17  (implicitly adopting the "sound business judgment" test of Lionel

18  Corp. and requiring good faith); In re Delaware and Hudson Ry.

19  Co., 124 B.R. 169 (D. Del. 1991) (concluding that the Third

20  Circuit adopted the "sound business judgment" test in the Abbotts

21

22  Dairies decision).

23

24        In the Ninth Circuit, "cause" exists for authorizing a sale

25  of estate assets if it is in the best interest of the estate, and

26  a business justification exists for authorizing the sale.  In re

27

28

                                    30

Huntington, Ltd., 654 F.2d 578 (9th Cir. 1981); In re Walter, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. In re Qintex Entertainment, Inc., 950 F.2d 1492 (9th Cir. 1991).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); see also, In re Walter, 83 B.R. at 19-20.

The Debtors submit that their proposed sale of the Purchased Assets to Purchaser (or to a successful overbidder) clearly comports with each of these four criteria and demonstrates that the Debtors' business judgment to proceed with the sale is sound.

1. Sound Business Purpose.

There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy court may order such disposition under Section

363(b).  In re Lionel Corp., 722 F.2d at 1070.  The Ninth Circuit

Bankruptcy Appellate Panel in Walter v. Sunwest Bank (In re

Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a

flexible case-by-case test to determine whether the business

purpose for a proposed sale justifies disposition of property of

the estate under Section 363(b).   In Walter, the Bankruptcy

Appellate Panel, adopting the reasoning of the Fifth Circuit in

In re Continental Airlines, Inc., 780 F.2d 1223 (5th Cir. 1986)

and the Second Circuit in In re Lionel Corp., supra, articulated

the standard to be applied under Section 363(b) as follows:

> Whether the proffered business justification is
> sufficient depends on the case.  As the Second Circuit
> held in Lionel, the bankruptcy judge should consider
> all salient factors pertaining to the proceeding and,
> accordingly, act to further the diverse interests of
> the Debtor, creditors and equity holders, alike.  He
> might, for example, look to such relevant facts as the
> proportionate value of the asset to the estate as a
> whole, the amount of elapsed time since the filing, the
> likelihood that a plan of reorganization will be
> proposed and confirmed in the near future, the effect
> of the proposed disposition on future plans of
> reorganization, the proceeds to be obtained from the
> disposition vis-a-vis any appraisals of the property,
> which of the alternatives of use, sale or lease the
> proposal envisions and, most importantly perhaps,
> whether the asset is increasing or decreasing in value.
> This list is not intended to be exclusive, but merely
> to provide guidance to the bankruptcy judge.

In Re Walter, 83 B.R. at 19-20, *citing* In re Continental Air

Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986).

The facts pertaining to the Debtors' proposed sale of the

Purchased Assets to Purchaser (or to a successful overbidder) clearly substantiate the Debtors' business decision that such contemplated sale serves the best interests of the Debtors' estates and their creditors and merits the approval of the Court.

As indicated above, the Debtors have no ability to survive on any long-term basis, and the Debtors believe that if they fail to consummate an expedited sale to Purchaser (or to a successful overbidder), the Debtors will either end up selling their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. The Debtors further believe that a liquidation of the Debtors' business would have minimal value, certainly a tiny fraction of the sale price being paid by Purchaser.

The Debtors have concluded that proceeding with an expedited sale to Purchaser (or a successful overbidder) is in the overwhelming best interests of their estates and their creditors and is the only positive result available to the Debtors. The Debtors therefore submit that their proposed sale is justified by sound business purposes, satisfying the first requirement for a sale under Section 363(b) of the Bankruptcy Code.

2.    <u>Accurate and Reasonable Notice</u>.

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors. The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate." In re Delaware & Hudson Railway Co., 124 B.R. 169, 180 (D. Del. 1991). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. In re Karpe, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. Id.

In connection with the Debtors' bid procedures motion, which the Court approved at a hearing held on May 25, 2010, the Court approved a very detailed service list for the Motion and the Notice, which includes service of a Court approved proposed form of notice which was sent to all creditors and other parties in interest. The Debtors also served all known prospective overbidders with written notice of the opportunity to overbid, and MTS contacted all such prospective overbidders to advise them of the Auction and the opportunity to overbid.

The Debtors submit that the foregoing satisfies the

requirements of Bankruptcy Rules 6004(a) and (c), which provide as follows:

> "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ...
> (c) ... A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession..."

Fed. R. Bankr. P. 6004(a)(c). The Debtors have complied with all noticing procedures required by the Bankruptcy Rules and the Court.

    3.   <u>Fair and Reasonable Price</u>.

In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase price must be fair and reasonable. <u>Coastal Indus., Inc. v. U.S. Internal Revenue Service</u> (<u>In re Coastal Indus., Inc.</u>), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986). Several courts have held that "fair value" is given for property in a bankruptcy sale when at least 75% of the appraised value of such property is paid. See <u>In re Karpe</u>, 84 B.R. at 933; <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143, 149 (3d Cir. 1986); <u>Willemain v. Kivitz</u>, 764 F.2d 1019 (4th Cir. 1985); <u>In re Snyder</u>, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); <u>In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.</u>, 32 B.R.

708 (N.D. Tex. 1983). However, the Debtor also realizes that "its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992). "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); see also In re Wilde Horse Enterprises, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ["in any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold"].

The sale process undertaken by the Debtors was specifically designed to insure that the highest price possible is obtained for the Purchased Assets. In MTS, the Debtors employed a highly experienced professional to assist and advise the Debtors through this sale process and to manage the sale process. MTS has engaged in an extensive and broad marketing and sale process, having facilitated due diligence with numerous parties. All interested and viable buyers were provided with equal access to the Debtors and their financial information and had the same opportunity to serve as the stalking horse bidder. For all of

the reasons described above, Purchaser proved to be the optimal stalking horse bidder, whose purchase offer was substantially higher than any other offer the Debtors received.

The Debtors and MTS have no doubt that the purchase price offered by Purchaser equates to the fair market value of the Debtors' business.  In addition, to make absolutely certain that no higher purchase price can be obtained, MTS will contact all potentially interested overbidders to advise them of the opportunity to participate in the Auction and to overbid the purchase price offered by Purchaser.  MTS is confident that if any party is interested in submitting a higher offer for the Purchased Assets than Purchaser has submitted, they will do so at the Auction, meaning that the highest price possible will be paid for the Purchased Assets.  Both the Debtors and MTS are highly confident that the highest bid submitted at the Auction (including the purchase offer made by Purchaser if no overbid is submitted for the Purchased Assets at the Auction) is fair and reasonable and equates to the fair market value of the Purchased Assets, and therefore should be approved by the Court.

    4.    Good Faith.

When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of Purchaser.  In re Abbotts Dairies, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1)

will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith. <u>Id.</u> at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction. <u>In re Wilde Horse Enterprises</u>, 136 B.R. at 842. With respect to the debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction." <u>See</u> <u>In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.</u>, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders." <u>In re Abbotts Dairies</u>, 788 F.2d at 147, <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978); <u>In re Wilde Horse Enterprises, Inc.</u>, 136 B.R. at 842; <u>In re Alpha Industries, Inc.</u>, 84 B.R. 703, 706 (Bankr. D. Mont. 1988). In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." <u>In re Apex Oil Co.</u>, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), *citing* <u>In re Exennium, Inc.</u>, 715 F.2d 1401, 1404-05 (9th Cir. 1983).

In *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'" [citations omitted.] [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" [citations omitted.]

*Filtercorp*, 163 F.3d at 577.

The Ninth Circuit made clear in **Filtercorp** that this standard for determining good faith is applicable even when the buyer is an insider.

Neither Purchaser nor any of the prospective overbidders that the Debtors are aware of is an "insider" of the Debtors or has received any special treatment from the Debtors or from MTS. Neither the Debtor nor MTS is aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Additionally, the APA was intensively negotiated at arm's length with all parties involved acting in good faith. Based on the foregoing, the Debtors submit that the Court should find that Purchaser (or a successful overbidder) is a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

B.    Section 363(f) of the Bankruptcy Code Permits the Sale of the
      Purchased Assets to Be Free and Clear of Any and All Liens,
      Claims and Interests.

Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

> The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if—
> (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; ...
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) Such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).    Section 363(f) of the Bankruptcy Code was drafted in the disjunctive.    Thus, a debtor need only meet the provisions of one of the five subsections of Section 363(f) in order for a sale of property to be free and clear of liens, claims and interests.

The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f) are easily satisfied with respect to the proposed sale of the Purchased Assets.    As indicated above, the Debtors owe approximately $56 million to the Senior Lenders, which Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets.    The Senior Lenders have consented to the

sale of the Purchased Assets to Purchaser in accordance with the terms of the APA.   The Debtors are therefore able to consummate their sale of the Purchased Assets to Purchaser free and clear of the liens, claims and interests of the Senior Lenders pursuant to the provisions of Section 363(f)(2) of the Bankruptcy Code.

The APA requires that, at the Closing, the Debtors deliver to Purchaser all instruments and documents necessary to release (or evidence the release of) any and all Encumbrances upon the Purchased Assets either by the payment in full of the debts giving rise to the Encumbrances or by the funding from the sale proceeds into a segregated account the total amount of the debts giving rise to the Encumbrances.  See Section 4.3(o) of the APA.

Other than the liens asserted by the Senior Lenders, the only other liens which the Debtors believe might exist against any of the Purchased Assets are those asserted by certain equipment lenders.   In particular, pre-petition, the Debtors entered into a number of lease agreements with equipment providers, which are not "true leases," but rather, leases intended as security (i.e., secured financing transactions). Typically, these agreements provide for the Debtors to purchase the affected equipment at the end of the lease terms with no or nominal additional consideration.

The Debtors' books and records show that there are eight (8)

leases which were intended as security, which have an aggregate unpaid balance of approximately $522,853.67. Six (6) of these secured equipment lenders recorded UCC financing statements with the California Secretary of State purporting to perfect their security interests and liens upon their respective equipment. These eight (8) purported secured equipment lenders (collectively, the "Equipment Lenders") and the unpaid balances owed to these Equipment Lenders are summarized as follows:

| Equipment agreement | Unpaid balance |
|---|---|
| 1. Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087153046125 recorded with the California Secretary of State on April 7, 2008. | $72,787.27 |
| 2. Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087163605844 recorded with the California Secretary of State on July 1, 2008 | $62,004.97 |
| 3. Liens asserted by Jules & Associates, Inc. with regard to property covered by UCC financing statement file number 20087142579518 recorded with the California Secretary of State on January 7, 2008. | $116,936.92 |
| 4. Liens asserted by M&I Marshall & Ilsley Bank with regard to property covered by UCC financing statement file number 20067087720380 recorded with the California Secretary of State on October 10. 2006. | $41,440.30 |
| 5. Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998664 recorded with the California Secretary of State on August 18, 2006. | $128,455.89 |
| 6. Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998785 recorded | $99,747.30 |

| | |
|---|---|
| with the California Secretary of State on August 18, 2006. | |
| 7.  Liens asserted by Baytree Leasing (with regard to Lease No. 2953 pertaining to a Dade Behring Dimension Xpand HM Plus Analyzer) – NO UCC financing statement recorded by Baytree Leasing with respect to this property. | $116,170 |
| 8.  Liens asserted by Americorp/ACL Elite (with regard to an ACL Elite Coagulation System) – NO UCC financing statement recorded by Americorp/ACL Elite with respect to this property. | $31,900 |
| **TOTAL** | **$522,953.67** |

The Debtors are required to deliver the Purchased Assets to Purchaser free and clear of all Encumbrances, including the liens asserted by the Equipment Lenders described above.  The Debtors' proposed Order approving the sale of the Purchased Assets to Purchaser, which is attached as Exhibit "4" to the annexed Pakkala Declaration, provides for all liens of the Equipment Lenders to attach to the net proceeds to be received by the Debtors in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing. Additionally, upon Closing, the Debtors will segregate and impound the total sum of $522,853.67 into a separate bank account in order to comply with the provisions of Section 4.3(o) of the APA, with the liens, claims and interests asserted by the Equipment Lenders to attach to such funds in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.  The Debtors reserve all of their

rights and claims with respect to any liens and claims asserted by the Equipment Lenders.

The Debtors submit that the foregoing treatment of the liens of the Equipment Lenders satisfies the requirements of Section 4.3(o) of the APA, and also satisfies the requirements of Section 363(f)(3) and (5) of the Bankruptcy Code to enable the Debtors to sell to Purchaser all of the Purchased Assets which may be encumbered by liens in favor of the Equipment Lenders free and clear of all Encumbrances.

Other than the liens of the Senior Lenders and those of the Equipment Lenders, all of which are being satisfied in the manner described above, the Debtors are not aware of the existence of any other Encumbrances against the Purchased Assets. If any other Encumbrances do exist, the sale order provides for all such liens to attach to the proceeds of the sale in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing, thereby satisfying the provisions of Section 363(f) of the Bankruptcy Code.

In addition to all of the foregoing, the Debtors also submit that they have satisfied at least one of the possible conditions of Section 363(f) for a free and clear sale to enable the Debtors to deliver the Purchased Assets to Purchaser free and clear of all Encumbrances as follows:

1        1.    The Debtors' Proposed Sale is Permissible Pursuant to
2   11 U.S.C. Section 363(f)(5).

3        Section 363(f)(5) of the Bankruptcy Code permits a sale of
4   property free and clear of liens and interests if "such entity
5   could be compelled, in a legal or equitable proceeding, to accept
6   a money satisfaction of such interest."  11 U.S.C. § 363(f)(5).
7

8        Pursuant to 11 U.S.C. §363(f)(5), a trustee may sell
9   property free and clear of any interest if the holder of that
10  interest "could be compelled, in a legal or equitable proceeding,
11  to accept a money satisfaction of such interest."  11 U.S.C. §
12  363(f)(5); P.K.R. Convalescent Centers, Inc. v. Commonwealth of
13  Virginia, Dep't of Medical Assistance Serv. (In re P.K.R.
14  Convalescent Centers, Inc.), 189 B.R. 90 (Bankr. E.D. Va. 1995)
15  (allowing sale of nursing home assets under §363(f)(5) over
16  objection of the Department of Medical Assistance Service where
17  its interest was reducible to a claim and subject to a
18  hypothetical money satisfaction).
19

20       Section 363(f)(5) has generally been interpreted to mean
21  that if, under applicable law, the holder of the lien or interest
22  could be compelled to accept payment in exchange for its
23  interest, the trustee (or debtor-in-possession) may take
24  advantage of that right by replacing the holder's lien or
25  interest with a payment or other adequate protection.  Collier on
26  Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier").
27

28

Applicable   nonbankruptcy   law   may   recognize   a   monetary
satisfaction when the lien holder is to be paid in full out of
the proceeds of the sale or otherwise.  Id.  Thus, for example, a
sale free of a first mortgage might be approved when the proceeds
are sufficient to pay in full the first mortgage and the second
mortgagee has consented to the sale.

However, Section 363(f)(5) does not require full payment to
the lien or interest holder if the trustee can demonstrate the
existence of another legal or equitable proceeding by which the
holder may be compelled to accept less than full satisfaction of
the secured debt.  In re Grand Slam U.S.A., Inc., 178 B.R. 460,
461-62 (E.D. Mich. 1995) (holding that the "money satisfaction"
language in § 363(f)(5) does not require full payment to the lien
holder); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr.
D. Mass. 1994) (construing "money satisfaction of such interest"
to mean a payment constituting less than full payment of the
underlying debt because any lien can always be discharged by full
payment of the underlying debt pursuant to § 363(f)(3)); Scherer
v. Federal National Mortgage Association (In re Terrace Chalet
Apartments, LTD.), 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993).

Courts have held that chapter 11 cramdown is a typical
"legal proceeding" by which an entity may be compelled to accept
less than full money satisfaction and which will permit the sale
of creditor's collateral free and clear of interest under Section

363(f)(5).   In re Gulf States Steel, Inc. of Alabama, 285 B.R.

497, 508 (Bankr. N.D. Ala. 2002)(holding that the liens or

interests identified in the sale motion could be compelled to

accept a money satisfaction in a cram down plan of reorganization

in a chapter 11 case); Scherer v. Federal National Mortgage

Association (In re Terrace Chalet Apartments, LTD.), 159 B.R. at

829 (finding that Section 1129(b)(2) cram down is such a

provision); In re Perroncello, 170 B.R. 189 (Bankr. D. Mass.

1994); Collier ¶ 363.06[6][a].   Thus, the trustee can sell

property free and clear of a creditor's lien it if demonstrates

it can cram down the creditor's interest pursuant to §

1129(b)(2).

Likewise, the holder of a tax lien that would be

subordinated under Section 724 can be compelled to accept less

than full payment.   In re Grand Slam U.S.A., Inc., 178 B.R. at

461-62 (holding that § 724(b)(2) is applicable for purposes of §

363(f)(5) because it creates a mechanism by which lien creditors

are compelled to receive less than full payment of their

interest); In re Healthco Int'l Inc., 174 B.R. 174, 176-78

(Bankr. D. Mass. 1994)(concluding that the Trustee may sell the

property pursuant to section 363(f)(5) free of the County's tax

lien lien); Collier, ¶ 363.06[6][a].

In addition to the legal arguments set forth above, the

ability of a debtor to "cram-down" a secured creditor under 11

U.S.C. Sec. 1129(b)(1) and (2) also constitutes a "legal proceeding" pursuant to which a secured creditor could be compelled to accept a money satisfaction. See, In re Grand Slam, U.S.A. Inc., 178 B.R. 460, 462 (E.D. Mich. 1995); 1129(b)(2)(A).

Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided that it receives "the indubitable equivalent" of its claim. A debtor can cram down a secured creditor if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, 11 U.S.C. § 1129(b)(1); (2) it is acting in good faith, 11 U.S.C. § 1129(a)(3)-(b)(1); and (3) the secured creditor is receiving the actual value of its claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II), 11 U.S.C. § 1129(b)(2)(A)(iii). See also In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir.1989) (holding that "indubitable equivalent" of a secured creditor's interest is the actual value of the claim).

In In re Hunt Energy Co., Inc., 48 B.R. 472, 485 (Bankr. N.D. Ohio, E.D 1985), the court found that a lien which attaches to the proceeds of a sale would necessarily be reduced by subsequent valuation at a hearing under Section 506(a) to meet the "indubitable equivalence" requirements of section 1129(b)(2)(A). Once Section 1129(b)(2)(A) is satisfied, the lienholder would be compelled through the cram-down process to accept such money satisfaction as dictated by the cram-down provisions. Id.

All of the above requirements for cram down are met in these cases.  The sale of the Purchased Assets to Purchaser (or to any successful overbidder) was negotiated and is being conducted in good faith.  While the Debtors do not believe that there are any secured creditors with valid liens against the Purchased Assets other than the Senior Lenders and possibly certain Equipment Lenders, if there are any, they are being treated fairly and in accordance with their respective lien priorities, so there is no unfair discrimination present in the proposed sale.  Finally, any such secured creditors will receive the actual value of its secured claim as measured by Section 506(a).

Based upon all of the foregoing, all creditors of the Debtors, including all secured creditors of the Debtors, could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interest.  The Debtors' proposed sale of the Purchased Assets to Purchaser or to a successful overbidder should therefore be free and clear of all Encumbrances.

2.    The Debtors' Proposed Asset Sale is Also Permissible Pursuant to 11 U.S.C. Section 363(f)(2).

Section 363(f)(2) of the Bankruptcy Code also authorizes a sale to be free and clear of an interest if the interest holder consents to the sale.  However, the "consent" of an entity asserting an interest in the property sought to be sold, as referenced in Section 363(f)(2) of the Bankruptcy Code, can be

implied if such entity fails to make a timely objection to the sale after receiving notice of the sale.  In re Eliot, 94 B.R. 343, 345 (E.D. Pa. 1988).  In the Eliot case, the bankruptcy court approved the sale by a trustee of certain real property that was subject to a mortgage in favor of Citibank.  Citibank had received notice of the sale, but did not file any timely objection to the sale.  After the sale occurred, Citicorp filed a motion to set aside the sale, which was handled by the bankruptcy court as an adversary proceeding.  The bankruptcy court dismissed the complaint to set aside the sale, and Citicorp appealed the ruling.  The district court affirmed the dismissal, and, in so doing, stated:

> "… if any of the five conditions of § 363(f) are met, the Trustee has the authority to conduct the sale free and clear of all liens.
>
> In this case, the authority for the sale can be found in 11 U.S.C. § 363(f)(2).  That section allows the Trustee to sell the property free and clear of all liens because Citicorp consented to the sale.  **Citicorp consented to the sale by failing to make any timely objection after receiving notice of the sale.**  Citicorp contends that implied consent is insufficient to satisfy the consent requirement of § 363(f)(2).  I disagree.  (emphasis added)

In its ruling, the Eliot court relied on In re Gabel, 61 B.R. 661 (Bankr. W.D. La. 1985), which held that implied consent is sufficient to authorize a sale under § 363(f)(2).  See also, In re Ex-Cel Concrete Company, Inc., 178 B.R. 198, 203 (9th Cir. BAP 1995) ["The issue here is whether there was consent or non-

opposition by Citicorp."]; _In re Paddlewheels, Inc._, 2007 WL

1035151 (Bankr. E.D.La. April 2, 2007) ["The Sale Motion complies

with section 363(f) of the Bankruptcy Code, in that the Trustee

either obtained the consent of Whitney to the sale of the Vessel

to Purchaser or Whitney had no objection to the Sale."].

As a result of the foregoing, the Debtors submits that the

Court should approve the sale of the Purchased Assets to

Purchaser (or to a successful overbidder) free and clear of all

Encumbrances of those parties who do not file a timely objection

to the sale, by deeming all such parties to have consented to the

proposed sale pursuant to Section 363(f)(2) of the Bankruptcy

Code.

C.    The Court Should Authorize the Debtors to Assume and Assign

      to Purchaser (or to a Successful Overbidder) All Executory

      Contracts and Unexpired Leases that Purchaser (or a

      Successful Overbidder) Wishes to Have Assigned to it.

Barring exceptions not herein relevant, Sections 365(a) and

1107(a) authorizes a debtor in possession, "subject to the

Court's approval, ... [to] assume or reject any executory

contract or unexpired lease of the debtor." A debtor in

possession may assume or reject executory contracts for the

benefit of the estate. _In re Klein Sleep Products, Inc._, 78 F.3d

18, 25 (2d. Cir. 1996); _In re Central Fla. Metal Fabrication,

Inc._, 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); _In re Gucci_, 193

B.R. 411, 415 (S.D.N.Y. 1996). In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it. In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); see also In re Gucci, 193 B.R. at 415. The business judgment standard requires that the court follow the business judgment of the debtor unless that judgment is the product of bad faith, whim, or caprice. In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), citing Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

Pursuant to Section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with Section 365(b)(1), and provides adequate assurance of future performance by the assignee. Pursuant to Section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D.

Ariz. 1995), <u>In re AEG Acquisition Corp.</u>, 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (9th Cir. B.A.P. 1993).

The assumption and assignment of executory contracts furthers the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred. <u>In re Embers 86th Street. Inc.</u>, 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

As set forth in Section 2.4 of the APA, Schedule 2.4(a) to the APA lists all of the Debtors' unexpired leases and executory contracts ("Contracts") that Purchaser may elect to have the Debtors assume and assign to Purchaser at or following the Closing. Purchaser shall have until the Closing to designate which of such Contracts it chooses to purchase and have the Debtors assume and assign to Purchaser at the Closing ("Initial Designated Contracts"). In addition, on or before the first Business Day following the 30th calendar day after the Closing Date with respect to Leases and the 180th calendar day after the Closing Date with respect to all other Contracts, Purchaser may designate additional Contracts it chooses to purchase and have the Debtors assume and assign to Purchaser ("Subsequent Designated Contracts" and, collectively with the Initial

Designated Contracts, the "Designated Contracts" and such date being referred to as the "Contract Designation Date").

In order to clarify the above among the parties, at the Closing the remaining Contracts listed on Schedule 2.4(a) shall be segregated into three (3) categories scheduled as follows. First, there shall be Contracts specifically rejected in writing by Purchaser on Closing, which shall be listed as Excluded Assets on Schedule 2.2, Schedule B-1 (Excluded Contracts) or Schedule B-2 (Excluded Leases), as the case may be. Second, there shall be certain Contracts that Purchaser identifies in writing at Closing that shall be specifically assumed by the Debtors and assigned to Purchaser at Closing, which shall be set forth on Schedule 2.4(a)-1 and upon assignment to Purchaser shall become an Assumed Contract or Assumed Lease, as the case may be; provided, that, in the event that any such Contract is listed on either Schedule 2.4(a)-2 or Schedule B-1 or Schedule B-2 as of the date of the APA, such Contract shall be treated as a Subsequent Designated Contract for purposes of Section 7.12 of the APA. Third, there shall be certain Contracts that Purchaser shall not purchase or reject at the Closing ("Potential Subsequent Designated Contracts"), which shall be set forth on Schedule 2.4(a)-2. The Potential Subsequent Designated Contracts shall become Subsequent Designated Contracts if Purchaser notifies the Debtors in writing before the first Business Day following the 30th calendar day

after the Closing Date or the 180th calendar day after the Closing Date, as applicable, of its intent to have any such Contract(s) assigned to it.

The Designated Contracts shall be identified by (i) the name and date of the Designated Contract, (ii) the other party to the Designated Contract and (iii) the address of such party for notice purposes, all included on Schedule 2.4(a)-1.  Attached as Exhibit "2" to the annexed Pakkala Declaration is a schedule which contains all of the foregoing information as well as a description of the amounts the Debtors believe are necessary to cure any defaults under each of the Contracts that Purchaser may elect to have the Debtors assume and assign to Purchaser at or following the Closing based on the Debtors' books and records, and a procedure for transferring to Purchaser the rights to any security deposits with the other party to any Designated Contract.

**In connection with this Motion, the Debtors are requesting an order of the Court providing that the cure amounts set forth in Exhibit "2" to the annexed Pakkala Declaration are the cure amounts which the Debtors must pay to the other parties to the Contracts that Purchaser may elect to have the Debtors assume and assign to Purchaser at or following the Closing to enable the Debtors to satisfy the cure requirements of Section 365(b)(1)(A) of the Bankruptcy Code.  The Debtors therefore submit that any**

party that fails to file a timely objection to this Motion should be deemed to have consented to the Debtors' proposed cure amount and be forever barred from challenging the Debtors' proposed cure amount.

In connection with this Motion, the Debtors are requesting an order of the Court providing that as of the Closing, all Initial Designated Contracts shall become Assumed Contracts or Assumed Leases, as the case may be, for purposes of the APA, which means that they will be assumed by the Debtors and assigned to Purchaser effective as of the Closing. In connection with this Motion, the Debtors are also requesting an order of the Court providing that as of the applicable Contract Designation Date, all Subsequent Designated Contracts shall become Assumed Contracts or Assumed Leases, as the case may be, for purposes of the APA, which means that they will be assumed by the Debtors and assigned to Purchaser effective as of the applicable Contract Designation Date.

In connection with the Debtors' assumption and assignment to Purchaser of the Designated Contracts, Purchaser shall be deemed to have assumed any on-going liabilities and obligations in connection with all Designated Contracts, and the Debtors will be responsible for the payment of all cure costs identified on Exhibit "2" to the annexed Pakkala Declaration.

Purchaser shall provide any other parties to any Designated Contracts who request in writing such financial information as is reasonably required to enable Purchaser to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all Designated Contracts. Purchaser will also otherwise cooperate with the Debtors to assist the Debtors to obtain an order of the Court approving of the Debtors' assumption and assignment to Purchaser of the Designated Contracts.

Prospective overbidders at the Auction will also be required to provide as part of their bid package, evidence demonstrating that they can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code with respect to any unexpired leases and executory contracts that they wish to have assigned to them if they are the winning bidder at the Auction.

In connection with this Motion, the Debtors are requesting an order of the Court providing that all of the Excluded Contracts and all of the Excluded Leases will be deemed rejected as of the Closing, with the Debtors reserving the right to supplement this list as the Debtors obtain additional information from Purchaser.

D.    The Debtors Request the Court to Waive the Fourteen-Day
Waiting Periods Set Forth in Bankruptcy Rules 6004(h) and
6006(d).

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise. Bankruptcy Rule 6006(d) has a similar provision with respect to an order approving of a debtor's assumption and assignment of unexpired leases and executory contracts.

For all of the reasons set forth above, the Debtors believe that it is critically important that the Debtors and Purchaser (or a successful overbidder) be permitted to consummate the Closing as soon after entry of the Sale Order as possible. Indeed, as previously indicated, it is the hope of the Debtors and Purchaser that the hearing on this Motion will be held on Thursday, May 27 with the Closing to occur the next day, on Friday, May 28, 2010. Any delay in the Closing risks a reduction in the purchase price to be paid by Purchaser or a complete walk away by Purchaser.

In order to facilitate the most expeditious sale closing possible, the Debtors request that any order approving the sale of the Purchased Assets and the Debtors' assumption and assignment of the Assumed Contracts be effective immediately upon

entry by providing that the fourteen-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are waived.

E.    The Debtors Request the Court to Waive the Twenty One-Day Restriction Set Forth in Bankruptcy Rule 6003.

Bankruptcy Rule 6003 provides that except to the extent that relief is necessary to avoid immediate and irreparable harm, the Court shall not within 21 days after the filing of the bankruptcy petition, among other forms of relief, approve a motion to sell property of the estate or approve a motion to assume or assign an executory contract or unexpired lease. For all of the reasons described herein, the Debtors believe that consummating their sale of the Purchased Assets to Purchaser (or to a successful overbidder) in less than 21 days is necessary to avoid immediate and irreparable harm because the Debtors believe that if they are required to wait at least 21 days to consummate their sale, the Debtors bear a significant risk of a material price reduction by Purchaser pursuant to the terms of the APA or, worse, a completely walk away by Purchaser.

VIII.

CONCLUSION

Based upon all of the foregoing, the Debtors respectfully request that this Court:

1.    approve the sale of the Purchased Assets to Purchaser in accordance with the terms of the APA (or to a successful overbidder) free and clear of all liens, claims and interests;

2.    find that Purchaser (or a successful overbidder) is a good faith buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

3.    approve (effective as of the date of the sale Closing) the Debtors' assumption and assignment to Purchaser (or to a successful overbidder) of all of the Debtors' unexpired leases and executory contracts which Purchaser (or a successful overbidder) desires to acquire in accordance with the procedures outlined below;

4.    find that the cure amounts which must be paid in connection with the Debtors' assumption and assignment of any of their unexpired leases and executory contracts are as set forth in exhibit "2" to the Pakkala Declaration and that adequate assurance of future performance has been demonstrated, and order that any party that fails to file a timely objection to this Motion shall be deemed to have consented to the Debtors' proposed cure amount and be forever barred from challenging the Debtors' proposed cure amount or from asserting any claims on account of cure costs against Purchaser or the winning bidder in respect of any such unexpired leases or executory contract;

5.    approve (effective as of the date of the sale Closing) the Debtors' rejection of all of the Excluded Contracts and all of the Excluded Leases, with the Debtors reserving the right to supplement this list as the Debtors obtain additional information from Purchaser;

6.    authorize the Debtors to enter into a Transition Agreement in connection with the sale Closing in a form which is substantially similar to the version attached as Exhibit "3" to the annexed Pakkala Declaration, subject to any subsequent modifications agreed by the Debtors and Purchaser;

7.    enter an order in a form substantially in conformity with the version of the proposed order attached hereto as Exhibit "4";

8.    waive the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

///

///

9.    grant such other and further relief as the Court deems just and proper.

Dated: May 19, 2010                    WESTCLIFF MEDICAL LABORATORIES,
                                       INC.

                                       -and-

                                       BIOLABS, INC.

                                       */s/ Ron Bender*
                                       _____
                                       RON BENDER
                                       JACQUELINE L. RODRIGUEZ
                                       TODD M. ARNOLD
                                       JOHN-PATRICK M. FRITZ
                                       LEVENE, NEALE, BENDER, RANKIN
                                           & BRILL L.L.P.
                                       (Proposed) Attorneys for Chapter 11
                                       Debtors and Debtors in Possession

DECLARATION OF ROBERT E. WHALEN

I, ROBERT E. WHALEN, HEREBY DECLARE AS FOLLOWS:

1.    I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am the Chief Executive Officer and Chairman of the Board of Directors of Westcliff Medical Laboratories, Inc. ("Westcliff") and of its parent corporation, BioLabs, Inc. ("BioLabs"), Chapter 11 Debtors and Debtors in Possession (collectively, the "Debtors").  I have been Board Chairman since 2007 and Chief Executive Officer since July, 2009.  I have approximately thirty-two years of experience in the medical lab and related business.

3.    The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 19, 2010.  The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession.

4.    The only material asset owned by BioLabs is its stock interest in Westcliff.  Biolabs was organized for the purposes of acquiring 100% of the capital stock and other equity interests of Westcliff.

5.    Westcliff was founded in 1964 as a community-based laboratory and is headquartered in Santa Ana, California. Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California.  The Debtors have nearly 1000 employees.

6.    The Debtors' main clinical hub is an 80,000 square foot facility located in Santa Ana, California that opened in 2006. The Debtors' primary anatomical pathology lab is a 12,800 square foot facility located in Monrovia, California that opened in 2008.

7.    Working directly with patients and with contracted payors, including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and Medicare, Westcliff has grown and become a leading out-patient laboratory service company.  Westcliff's lab operations demonstrate industry-leading results, with low testing turn-around times, high quality control scores, and a strong and experienced sales and marketing team.

8.    Westcliff averages approximately 8,500 clinical requests per day and approximately 1,200 pathology requests per day, and performs approximately 250,000 cytology and 70,000 biopsy tests on an annual basis.  Based on this performance, the

Debtors had approximately $97 million in revenue in 2009 and are the third largest clinical laboratory in California.

9.    The California clinical laboratory testing market is the largest in the nation, with estimated revenues of approximately $2 billion.    Approximately 8% of the nations' tests are performed in California, and over 200 million of California's tests are conducted by independent labs (excluding hospital based labs).    Based on current volume, the Debtors account for approximately 5% of the California market.

10.    Much of the Debtors' growth has come from the acquisition of other labs, which caused the Debtors to incur a substantial amount of debt.    The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent").    The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets.    Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment.    The Debtors also have a substantial amount of unsecured debt.

11.    While the Debtors' revenue is significant, due to the small profit margins in this business, despite substantial and continuing cost cutting measures undertaken by the Debtors, the

Debtors are simply not able to operate sufficiently profitably to enable the Debtors to repay their debts. The Debtors suffered a net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171 million) on net revenue of approximately $84 million. The Debtors suffered a net loss of approximately $13 million in 2009 (including expenses and write offs of approximately $110 million) on net revenue of approximately $97 million.

12. While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued. Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy. Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

13. I believe that the only way the Debtors can survive as a stand alone going concern business would be for the Debtors to raise many millions of dollars of additional equity which I believe is not possible given the Debtors' debt structure.

14. It therefore became clear to the Debtors' Board in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder. The Debtors have therefore been engaged in an active sale process since early 2009.

15. To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009 as a financial advisor to assist the Debtors with their sale process.[20] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers.

16. After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that LabCorp was the optimal buyer of the Debtors' assets for three primary reasons. First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets. Second, it was clear that LabCorp as a strategic buyer was willing to pay a

substantially higher price for the Debtors' assets than any other prospective buyer. Third, LabCorp clearly has the financial means of consummating its purchase of the Debtors' assets.[21]

17. As set forth in Section 3.1 of the Asset Purchase Agreement (the "APA"), Purchaser's purchase price for the Purchased Assets will be $57.5 million subject to certain adjustments (exclusive of the Debtors' cash and accounts receivable which the Debtors will retain). I believe that under the circumstances facing the Debtors, the purchase price that Purchaser has agreed to pay is a very favorable price for the Debtors.

18. Based upon my vast experience in this industry, I believe that there is a high probability, if not a certainty, that the Debtors will suffer a substantial reduction in their revenue in this very competitive industry as a result of their bankruptcy filings. As a result, I firmly believe that unless the Debtors are able to consummate an expedited sale of their business (ideally in less than two weeks), the Debtors are likely to suffer a substantial reduction in the purchase price to be paid by Purchaser pursuant to the formula set forth in Section 3.1 of the APA, or, worse, a complete walk away by Purchaser. I believe that the Debtors' consummating their sale of the

---

[20] The Debtors had used other professionals for this same purpose in the past.

Purchased Assets to Purchaser (or to a successful overbidder) in less than 21 days is necessary to avoid immediate and irreparable harm because I believe that if the Debtors are required to wait at least 21 days to consummate their sale, the Debtors bear a significant risk of a material price reduction by Purchaser pursuant to the terms of the APA or, worse, a completely walk away by Purchaser.

19. I have no doubt that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates. While I understand that the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken for the sale of the Debtors' business, I believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, I do not believe that the prospect for a successful overbid would increase with the passage of time. To the contrary, I believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors' business resulting from the Debtors' bankruptcy filings. This is

---

[21] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp solely for the purpose of acquiring the Purchased Assets.

a highly sensitive and extremely competitive industry, and I do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy. I believe that an expedited sale of the Debtors' business is critical and necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

20. I believe that the risks to the Debtors' estates of failing to close the sale of the Purchased Assets to Purchaser on an expedited basis are severe. I have no doubt that if the Debtors fail to consummate their sale to Purchaser, the Debtors will either end up selling their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. I believe that a liquidation of the Debtors' business would have minimal value.

21. To the best of my knowledge, no insider of the Debtors has any interest in or connection with Purchaser, and no insider of the Debtors will be receiving any special benefit as a result of the Debtors' sale of the Purchased Assets to Purchaser. To the best of my knowledge, neither Purchaser nor any of the prospective overbidders that the Debtors are aware of is an

1  insider of the Debtors or has received any special treatment from

2  the Debtors or from MTS.  I am not aware of any fraud, collusion

3  or attempt to take unfair advantage of other bidders.

4  Additionally, the APA was intensively negotiated at arm's length

5

6  with all parties involved acting in good faith.  Based on the

7  foregoing, I submit that Purchaser (or a successful overbidder)

8  is a good faith purchaser.

9      I declare and verify under penalty of perjury that the

10  foregoing is true and correct to the best of my knowledge,

11  information and belief.

12      Executed on this 19th day of May, 2010, at Santa Ana,

13  California.

14

15                                    ROBERT E. WHALEN, Declarant

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF MATTHEW PAKKALA

I, MATTHEW PAKKALA, HEREBY DECLARE AS FOLLOWS:

1.    I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am a Managing Director of FTI Consulting, Inc. ("FTI"), which maintains its main offices at 500 E. Pratt Street, Suite 1400, Baltimore, MD 21202.  My business office is located at 633 West 5th Street, 16th Floor, Los Angeles, California, 90071.

3.    I hold a B.A. from the University of California, San Diego, a J.D. from Loyola Law School, and an M.B.A. from the Anderson School of Business at UCLA.  I have more than 13 years of restructuring and related advisory and management experience. My work focuses on advising distressed and underperforming companies on restructuring alternatives and strategies for maximizing performance and value, and my expertise includes providing financial and operational restructuring, asset sales and expert witness services in the healthcare, retail, manufacturing and airline industries.  Prior to joining FTI, I worked in the restructuring groups of PricewaterhouseCoopers and Price Waterhouse in Los Angeles.

4.    FTI is a global business advisory firm with over 3,000 professionals located in major business centers around the world.

FTI provides services in areas ranging from corporate finance and interim management to economic consulting, forensic and litigation consulting, strategic communications and technology. FTI's clients include many corporations in the Global 1000 as well as a majority of the largest 25 banks and top 100 law firms in the world.

5.   FTI has advised management, senior lenders and unsecured creditors in many of the most significant restructurings and turnarounds in recent years.   FTI and its professionals have also recently provided interim management services in a number of healthcare and other restructurings including, but not limited to, Downey Regional Medical Center, Fremont Investment & Loan, SyntaxBrillian, Daughters of Charity Health System; Methodist Hospital, Gary, IN; Quincy Medical Center; Nanticoke Memorial; Northern Berkshire; Regional Medical Center Memphis; and Boca Raton Community Hospital.

6.   Effective on or about April 1, 2010, I became the Chief Restructuring Officer ("CRO") for Westcliff Medical Laboratories, Inc. ("Westcliff") and its parent corporation, BioLabs, Inc. ("BioLabs"), Chapter 11 Debtors and Debtors in Possession (collectively, the "Debtors").

7.   The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 19, 2010.   The Debtors continue to operate their business,

manage their financial affairs, and operate their bankruptcy estates as debtors in possession.

8.    My understanding is that the only material asset owned by BioLabs is its stock interest in Westcliff.

9.    My primary functions serving as the CRO for the Debtors was to manage the Debtors' business operations in the optimal manner given the financial constraints facing the Debtors and to assist the Debtors to consummate a going concern sale of their business for the most money possible in the most expeditious manner possible.

10.    Westcliff was founded in 1964 as a community-based laboratory and is headquartered in Santa Ana, California. Westcliff is the operator of approximately 170 branded, stand-alone, patient service center laboratories and STAT labs that provide various services, including clinical testing, pathology, reporting and support services for the benefit of thousands of out-patients throughout California.    The Debtors have nearly 1000 employees.

11.    At the time that I became the CRO of the Debtors, the Debtors were already engaged in serious negotiations with LabCorp regarding a possible purchase of the Debtors' business.    I was advised that after having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively

concluded that LabCorp was the optimal buyer of the Debtors'

assets for three primary reasons. First, LabCorp, which is in

the same business as Westcliff but is a much larger company,

expressed the greatest interest in purchasing the Debtors'

assets. Second, it was clear that LabCorp as a strategic buyer

was willing to pay a substantially higher price for the Debtors'

assets than any other prospective buyer. Third, LabCorp clearly

has the financial means of consummating its purchase of the

Debtors' assets.[22]

12. Since the time that I became the CRO of the Debtors, I

became the principal point person for the Debtors tasked with

negotiating and documenting the best possible sale of the

Debtors' business to LabCorp. In this regard, I worked closely

with MTS and the Debtors' various counsel. In an effort to

finalize an asset purchase agreement with LabCorp, I participated

in numerous telephone conferences with various principals of

LabCorp and professionals representing LabCorp, and I attended an

all-day, in-person meeting in North Carolina with LabCorp's

principals and professionals.

13. On or about May 17, 2010, the Debtors, LabCorp and

Purchaser entered into an asset purchase agreement ("APA"), a

copy of which is attached hereto as Exhibit "3". As set forth in

---

[22] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp
solely for the purpose of acquiring the Purchased Assets.

Section 3.1 of the APA, Purchaser's purchase price for the Purchased Assets will be $57.5 million subject to certain adjustments, while leaving with the Debtors, among other things, all of the Debtors' accounts receivable (which I estimate will result in an additional net recovery of approximately $8,000,000 for the Debtors' estates) and all of the Debtors' cash.

14. A description of the assets to be purchased by Purchaser free and clear of all liens, claims and interests (defined as the "Purchased Assets") is set forth in full in Section 2.1 of the APA. As set forth therein, the Purchased Assets consist of the Debtors' executory contracts and unexpired leases that Purchaser elects to acquire and substantially all of the Debtors' personal property assets with the exception of the Debtors' cash and accounts receivable, which are included within the "Excluded Assets" as set forth in Section 2.2 of the APA. Also part of the "Excluded Assets" are all avoidance causes of action of the Debtors' bankruptcy estates. As set forth in Section 2.3(a), Purchaser is assuming certain limited liabilities of the Debtors. As indicated in Section 3.2 of the APA, Purchaser has already delivered a $4 million deposit to the Debtors.

15. The APA was extensively negotiated between the Debtors and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements over an

extended period of time.  From everything I have seen, I have no doubt that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates.

16.  To the best of my knowledge, no insider of the Debtors has any interest in or connection with Purchaser, and no insider of the Debtors will be receiving any special benefit as a result of the Debtors' sale of the Purchased Assets to Purchaser.  To the best of my knowledge, neither Purchaser nor any of the prospective overbidders that the Debtors are aware of is an insider of the Debtors or has received any special treatment from the Debtors or from MTS.  I am not aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Additionally, the APA was intensively negotiated at arm's length with all parties involved acting in good faith.  Based on the foregoing, I submit that Purchaser (or a successful overbidder) is a good faith purchaser.  The Debtors have entered into the APA with Purchaser and are filing this Emergency Motion with the Court solely because the Debtors, after consultation with and upon the advise of MTS, have concluded that doing so is in the best interest of the Debtors' creditors and their estates.  The Debtors and MTS believe that the purchase price offered by Purchaser is substantially higher than the purchase price that any other buyer would be willing to pay for the Purchased Assets.

17. To make absolutely certain that the highest price possible is paid for the Purchased Assets, the Debtors and Purchaser have agreed to various overbid procedures. MTS has extensively marketed the Debtors' business for sale. MTS is therefore knowledgeable about those parties who could possibly be interested in paying more for the Debtors' business than Purchaser has offered. MTS will make every reasonable effort to attempt to facilitate an overbid. Section 7.3(c) of the APA sets forth the bidding procedures which have been agreed to by the Debtors and Purchaser. The Debtors will file the results of the Auction, if any, with the Court prior to the hearing on this Motion.

18. While the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken for the sale of the Debtors' business, and from everything I have seen, I believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, from everything I have seen, I do not believe that the prospect for a successful overbid would increase with the passage of time. To the contrary, I believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors'

business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and I do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy. I therefore believe that an expedited sale of the Debtors' business is necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

19. As set forth in Section 3.1 of the APA, a meaningful reduction in the Debtors' business volume will result in a decrease in the purchase price paid by Purchaser pursuant to a Purchase Price Decrease Adjustment. Moreover, if there is a Material Adverse Change (which translates into an even bigger reduction in the Debtors' business volume), then Purchaser is not required to close the transaction.

20. I therefore believe that the risks to the Debtors' estates of failing to close the sale of the Purchased Assets to Purchaser on an expedited basis are severe. I have no doubt that if the Debtors fails to consummate their sale to Purchaser, the Debtors will either end up selling their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors'

business.  I believe that a liquidation of the Debtors' business would have minimal value.

21.  While section 7.3(c)(ix) of the APA only requires that the hearing on the Sale Motion be no more than twenty-five days after the Petition Date (which would be by June 13, 2010), on behalf of the Debtors, I strongly urge the Court to conduct the hearing on the Sale Motion no later than Thursday, May 27, 2010.[23]

22.  I believe that proceeding with a sale in such an expedited manner serves only to the benefit of the Debtors' estates.  Given the lengthy and exhaustive pre-petition sale process that the Debtors have embarked upon, with the assistance of MTS, I am highly confident that any potential overbidder has been identified and is extremely knowledgeable about the Debtors' business and the opportunity to purchase the Purchased Assets.  I therefore believe that if there is any party willing and able to pay more for the Debtors' business than Purchaser has offered, they can do so within the time frame requested by the Debtors and nothing would change for the better if that time frame was expanded.  To the contrary, I believe that the risk to the Debtors' business of customer attrition and a corresponding reduction in the purchase price to be paid by Purchaser (or worse

_____

[23] Section 7.3(c)(ix) requires the Debtors to use their best efforts to have the hearing on the Sale Motion occur no more than twelve calendar days following the Petition Date (which would be Monday, May 31, 2010).  However, the parties wish to make every effort to obtain an entered sale order on Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

a complete walk away by Purchaser) from a protracted sale process is severe and significantly greater than any possible benefit that could be obtained from speculating that a higher price might be paid for the Purchased Assets.

23. Given the exhaustive marketing effort performed by MTS over a very extended period of time, as well as MTS' vast knowledge of the Debtors' industry, I am highly confident that if any buyer exists who is willing to pay more money for the Purchased Assets than offered by Purchaser, they will submit an overbid and participate in the overbid process and no additional time is needed to flush this out. Moreover, I strongly believe that there is no doubt that any theoretical benefit from having more time to attempt to obtain overbidders is dramatically outweighed by the risks that the Debtors' business will deteriorate with the passage of time resulting in a reduction in the purchase price to be paid by Purchaser or, worse, enabling Purchaser to terminate the APA altogether. I am therefore highly confident that the sale process established by the Debtors and agreed to by Purchaser is properly designed to make sure that the highest price possible is paid for the Purchased Assets under these very precarious circumstances.

24. As described in detail in a concurrently filed settlement motion, Purchaser is not willing to consummate its purchase of the Debtors' business unless the Debtors are able to

obtain an order of the Court approving a pre-bankruptcy settlement the Debtors reached with various "qui tam" litigants. (See Sections 8.4(b) and 8.8 of the APA). The "qui tam" litigants have advised me that they assert claims against the Debtors of more than $56 million. I was advised by the Debtors' special counsel handling this matter that absent a negotiated settlement, resolution of these litigation claims would have taken years, which would have made it impossible for the Debtors to consummate a going concern sale of their business to Purchaser. I believe that all other buyers would have required the same closing condition because any buyer of the Debtors' business would insist on knowing that it has no monetary liability to the qui tam claimants and no ongoing reporting requirements to the State of California. It would therefore not have been possible for the Debtors to have obtained Purchaser's pre-bankruptcy agreement to the APA had the Debtors not been able to obtain a pre-bankruptcy settlement with the qui tam claimants.

25. Since becoming the CRO to the Debtors, I personally made an exhaustive effort to finalize a settlement agreement with the qui tam claimants. During this process, I attended numerous in-person settlement meetings and telephonic conferences. It was clear to me that it would not be possible for the Debtors to consummate a sale of their business to Purchaser or to any other buyer without such a settlement agreement, and that given the

complexity of the dispute and the number of parties involved (including the Attorney General for the State of California), it was likely that any settlement was going to require my extensive personal involvement.

26. Since finalizing a settlement agreement with the qui tam claimants was a condition precedent to execution of the APA by Purchaser, it was critically important to finalize and document a pre-petition settlement agreement with the qui tam claimants, which was extremely difficult. Fortunately, with the assistance of the Debtors' professionals, I was able to negotiate a mutually acceptable settlement agreement under which the qui tam claimants will be receiving 10% of the net sale proceeds (after a deduction for all transaction expenses). That settlement agreement is the subject of a separate motion.

27. Particularly given the expedited nature of this sale, both the Debtors and the Senior Lenders recognize that it is very important that the sale of the Purchased Assets to Purchaser inure to the benefit of all creditors. The Debtors and the Senior Lenders therefore engaged in a substantial amount of discussion in order to achieve this result.

28. While the Senior Lenders are owed approximately $56 million on account of the Senior Debt which I understand is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets, in order to help

facilitate an expedited sale of the Debtors' business for the benefit of all constituents in these cases, it is my expectation based upon numerous conversations with the Senior Lenders that the Senior Lenders and the Debtors (along with any Creditors' Committee which is appointed) will use their reasonable best efforts to attempt to negotiate a mutually acceptable allocation of the sale proceeds prior to the hearing on this Motion.

29.   The following is a detailed description of the Debtors' currently projected distributions in these cases based upon the best information available to the Debtors at this time[24]:

$57,500,000 – gross sale proceeds

($2,850,000) – estimated reduction for lease and contract cure costs and set aside of funds for Equipment Lenders

$54,650,000 – remaining net sale proceeds

($5,200,000) – payment of qui tam settlement

($1,150,000) – payment of MTS remaining unpaid transaction fee

$48,300,000 - net remaining sale proceeds

$1,086,000 – estimated remaining cash at Closing[25]

$8,000,000 – estimated net collections from outstanding accounts receivable remaining at the Closing[26]

---

[24] This assumes no purchase price reduction by Purchaser.

[25] This figure is the Debtors' current best estimate based upon the Debtors' projections but this figure could be higher or lower depending upon a number of factors, including the Debtors' operating performance pending the Closing, the timing of the Closing and any settlements with vendors (including pre-closing assumption of vendor contracts).  This figure also does not take into account the $2 million that the Debtors are required to place into a segregated Payroll Account for approximately 120 days pursuant to the Transition Agreement with Purchaser as the Debtors expect that they will ultimately receive all of these funds back.

$57,386,000 – total projected funds available for wind-down costs of the Debtors and their bankruptcy estates and distribution to pre-petition creditors

($2,900,000) – total projected wind-down costs of the Debtors[27]

$54,486,000 – total estimated funds available to be distributed to pre-petition creditors, including the Senior Lenders[28]

30.    Other than the liens asserted by the Senior Lenders, the only other liens which I am aware of which could possibly exist against any of the Purchased Assets are those asserted by certain equipment lenders.    In particular, pre-petition, the Debtors entered into a number of lease agreements with equipment providers, which are not "true leases," but rather, leases intended as security (i.e., secured financing transactions). Typically, these agreements provide for the Debtors to purchase the affected equipment at the end of the lease terms with no or nominal additional consideration.

31.    The Debtors' books and records show that there are eight (8) leases which were intended as security, which have an aggregate unpaid balance of approximately $522,853.67.    Six (6) of these secured equipment lenders recorded UCC financing

---

[26] This figure assumes a net collection equal to 63% of the book amount of the Debtors' accounts receivable which are projected to be approximately $12.6 million at the time of the Closing.
[27] This figure assumes that the bankruptcy cases will be concluded in November, 2010.
[28] As indicated above, it is the Debtors' expectation that the Senior Lenders and the Debtors (along with any Creditors' Committee which is appointed) will use their reasonable best efforts to attempt to negotiate a mutually acceptable allocation of these remaining sale

statements with the California Secretary of State purporting to perfect their security interests and liens upon their respective equipment. These eight (8) purported secured equipment lenders (collectively, the "Equipment Lenders") and the unpaid balances owed to these Equipment Lenders are summarized as follows:

| Equipment agreement | Unpaid balance |
|---|---|
| 1.  Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087153046125 recorded with the California Secretary of State on April 7, 2008. | $72,787.27 |
| 2.  Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087163605844 recorded with the California Secretary of State on July 1, 2008 | $62,004.97 |
| 3.  Liens asserted by Jules & Associates, Inc. with regard to property covered by UCC financing statement file number 20087142579518 recorded with the California Secretary of State on January 7, 2008. | $116,936.92 |
| 4.  Liens asserted by M&I Marshall & Ilsley Bank with regard to property covered by UCC financing statement file number 20067087720380 recorded with the California Secretary of State on October 10. 2006. | $41,440.30 |
| 5.  Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998664 recorded with the California Secretary of State on August 18, 2006. | $128,455.89 |
| 6.  Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998785 recorded with the California Secretary of State on August 18, 2006. | $99,747.30 |
| 7.  Liens asserted by Baytree Leasing (with | $116,170 |

proceeds prior to the hearing on this Motion.

| | |
|---|---|
| regard to Lease No. 2953 pertaining to a Dade Behring Dimension Xpand HM Plus Analyzer) – NO UCC financing statement recorded by Baytree Leasing with respect to this property. | |
| 8.  Liens asserted by Americorp/ACL Elite (with regard to an ACL Elite Coagulation System) – NO UCC financing statement recorded by Americorp/ACL Elite with respect to this property. | $31,900 |
| **TOTAL** | **$522,953.67** |

32.   The Debtors are required to deliver the Purchased Assets to Purchaser free and clear of all Encumbrances, including the liens asserted by the Equipment Lenders described above.   The Debtors' proposed Order approving the sale of the Purchased Assets to Purchaser, which is attached hereto as Exhibit "4", provides for all liens of the Equipment Lenders to attach to the net proceeds to be received by the Debtors in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.   Additionally, upon the Closing, the Debtors will segregate and impound the total sum of $522,853.67 into a separate bank account in order to comply with the provisions of Section 4.3(o) of the APA, with the liens, claims and interests asserted by the Equipment Lenders to attach to such funds in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.   The Debtors reserve all of their rights and claims with respect to any liens and claims asserted by the Equipment Lenders.

33.   Other than the liens of the Senior Lenders and those of the Equipment Lenders, all of which are being satisfied in the manner described above, I am not aware of the existence of any other liens against the Purchased Assets.  If any other liens do exist, the sale order provides for all such liens to attach to the proceeds of the sale in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.

34.   As set forth in Section 2.4 of the APA, Schedule 2.4(a) to the APA lists all of the Debtors' unexpired leases and executory contracts ("Contracts") that Purchaser may elect to have the Debtors assume and assign to Purchaser at or following the Closing.  Purchaser shall have until the Closing to designate which of such Contracts it chooses to purchase and have the Debtors assume and assign to Purchaser at the Closing ("Initial Designated Contracts").   In addition, on or before the first Business Day following the 30th calendar day after the Closing Date, with respect to Leases and the 180th calendar day after the Closing Date with respect to all other Contracts, Purchaser may designate additional Contracts it chooses to purchase and have the Debtors assume and assign to Purchaser ("Subsequent Designated Contracts" and, collectively with the Initial Designated Contracts, the "Designated Contracts" and such date being referred to as the "Contract Designation Date").

35.    In order to clarify the above among the parties, at the Closing the remaining Contracts listed on Schedule 2.4(a) shall be segregated into three (3) categories scheduled as follows. First, there shall be Contracts specifically rejected in writing by Purchaser on Closing, which shall be listed as Excluded Assets on Schedule 2.2, Schedule B-1 (Excluded Contracts) or Schedule B-2 (Excluded Leases), as the case may be.   Second, there shall be certain Contracts that Purchaser identifies in writing at Closing that shall be specifically assumed by the Debtors and assigned to Purchaser at Closing, which shall be set forth on Schedule 2.4(a)-1 and upon assignment to Purchaser shall become an Assumed Contract or Assumed Lease, as the case may be; provided, that, in the event that any such Contract is listed on either Schedule 2.4(a)-2 or Schedule B-1 or Schedule B-2 as of the date of the APA, such Contract shall be treated as a Subsequent Designated Contract for purposes of Section 7.12 of the APA.   Third, there shall be certain Contracts that Purchaser shall not purchase or reject at the Closing ("Potential Subsequent Designated Contracts"), which shall be set forth on Schedule 2.4(a)-2.   The Potential Subsequent Designated Contracts shall become Subsequent Designated Contracts if Purchaser notifies the Debtors in writing before the first Business Day following the 30th calendar day after the Closing Date or the 180th calendar day after the Closing

Date, as applicable, of its intent to have any such Contract(s) assigned to it.

36.  The Designated Contracts shall be identified by (i) the name and date of the Designated Contract, (ii) the other party to the Designated Contract and (iii) the address of such party for notice purposes, all included on Schedule 2.4(a)-1.

37.  Attached hereto as Exhibit "2" is a schedule which contains all of the foregoing information as well as a description of the amounts the Debtors believe are necessary to cure any defaults under each of the Contracts that Purchaser may elect to have the Debtors assume and assign to Purchaser at or following the Closing based on the Debtors' books and records, and a procedure for transferring to Purchaser the rights to any security deposits with the other party to any Designated Contract.

38.  In connection with this Motion, the Debtors are requesting an order of the Court providing that the cure amounts set forth in Exhibit "2" hereto are the cure amounts which the Debtors must pay to the other parties to the Contracts that Purchaser may elect to have the Debtors assume and assign to Purchaser at or following the Closing to enable the Debtors to satisfy the cure requirements of Section 365(b)(1)(A) of the Bankruptcy Code.

39. In connection with this Motion, the Debtors are requesting an order of the Court providing that as of the Closing, all Initial Designated Contracts shall become Assumed Contracts or Assumed Leases, as the case may be, for purposes of the APA, which means that they will be assumed by the Debtors and assigned to Purchaser effective as of the Closing. In connection with this Motion, the Debtors are also requesting an order of the Court providing that as of the applicable Contract Designation Date, all Subsequent Designated Contracts shall become Assumed Contracts or Assumed Leases, as the case may be, for purposes of the APA, which means that they will be assumed by the Debtors and assigned to Purchaser effective as of the applicable Contract Designation Date.

40. In connection with the Debtors' assumption and assignment to Purchaser of the Designated Contracts, Purchaser shall be deemed to have assumed any on-going liabilities and obligations in connection with all Designated Contracts, and the Debtors will be responsible for the payment of all cure costs identified on Exhibit "2" hereto.

41. Purchaser has advised me that it will provide any other parties to any Designated Contracts who so desire such financial information as is reasonably required to enable Purchaser to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all

Designated Contracts.  Purchaser has advised me that it will also otherwise cooperate with the Debtors to assist the Debtors to obtain an order of the Court approving of the Debtors' assumption and assignment to Purchaser of the Designated Contracts.

42.  Prospective overbidders at the Auction will also be required to provide as part of their bid package, evidence demonstrating that they can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code with respect to any unexpired leases and executory contracts that they wish to have assigned to them if they are the winning bidder at the Auction.

43.  In connection with this Motion, the Debtors are requesting an order of the Court providing that all of the Excluded Contracts and all of the Excluded Leases will be deemed rejected as of the Closing, with the Debtors reserving the right to supplement this list as the Debtors obtain additional information from Purchaser.

44.  For all of the reasons set forth above, I believe that it is critically important that the Debtors and Purchaser (or a successful overbidder) be permitted to consummate the Closing as soon after entry of the Sale Order as possible.  Indeed, as previously indicated, it is the hope of the Debtors and Purchaser that the hearing on this Motion will be held on Thursday, May 27 with the Closing to occur the next day, on Friday, May 28, 2010.

1  Any delay in the Closing risks a reduction in the purchase price
2  to be paid by Purchaser or a complete walk away by Purchaser.

3      45.  I believe that the Debtors' consummating their sale of
4  the Purchased Assets to Purchaser (or to a successful overbidder)
5
6  in less than 21 days is necessary to avoid immediate and
7  irreparable harm because I believe that if the Debtors are
8  required to wait at least 21 days to consummate their sale, the
9  Debtors bear a significant risk of a material price reduction by
10 Purchaser pursuant to the terms of the APA or, worse, a
11 completely walk away by Purchaser.

12     46.  In order to facilitate the most expeditious sale
13 closing possible, the Debtors request that any order approving
14
15 the sale of the Purchased Assets and the Debtors' assumption and
16 assignment of the Assumed Contracts be effective immediately upon
17 entry by providing that the fourteen-day waiting periods of
18 Bankruptcy Rule 6004(h) and 6006(d) are waived.

19     I declare and verify under penalty of perjury that the
20 foregoing is true and correct to the best of my knowledge,
21 information and belief.
22
23     Executed on this 19th day of May, 2010, at Santa Ana,
24 California.
25
26 MATTHEW PAKKALA
27
28

## DECLARATION OF CURTIS LANE

I, CURTIS LANE, HEREBY DECLARE AS FOLLOWS:

1.    I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am a Senior Managing Director of MTS Health Partners, LP ("MTS"), which I founded in 2000.  MTS is headquartered at 623 Fifth Avenue, New York, NY 10022.  MTS is a healthcare-focused merchant bank that provides aligned strategic and financial advisory services distinguished by experienced, attentive and independent counsel in the context of long-term relationships.

3.    I hold a B.S. from the University of Pennsylvania and an M.B.A. from the Wharton School of Business.  I have approximately thirty years of investment banking experience.

4.    From 1986 to 1998, I led the healthcare investment banking group at Bear Stearns which was one of the most active healthcare investment banking groups on Wall Street, completing 107 financing transactions with an aggregate value of $17.4 billion and 56 M&A and advisory assignments with an aggregate value of $20.4 billion.  In my position as head of healthcare investment banking at Bear Stearns, I either directly handled or oversaw numerous financing and advisory transactions across all segments of healthcare.  I advised and financed companies through

all stages of their development and maturation, ranging from private equity placements to public offerings of debt and equity securities. My particular focus was on the initiation and consummation of strategic M&A transactions within the context of an overall investment banking relationship. Prior to joining Bear Stearns in 1985, I worked in the Corporate Finance Department of Smith Barney, Harris Upham & Co., Inc. as a generalist investment banker.

5. At MTS, I have advised numerous companies in strategic and financial transactions including both acquisitions and sales. For example, I served as lead advisor on the restructuring of Sun Healthcare Group, the implementation of PacfiCare's strategic plan and ultimate merger with United Healthcare and the restructuring of Presgar Companies, an imaging services company.

6. In October, 2009, MTS was employed as a financial advisor to Westcliff Medical Laboratories, Inc. ("Westcliff") and its parent corporation, BioLabs, Inc. ("BioLabs"). Westcliff and BioLabs are collectively referred to herein as the "Debtors".

7. In connection with that engagement, MTS spearheaded the Debtors' sale process with the goal of effectuating a going concern sale of the Debtors' business for the most money possible in the most expeditious manner possible.

8. During these past seven months, MTS prepared marketing materials for the Debtors, and, working closely with the Debtors'

management, MTS had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers. A list of the approximately twenty-five parties who were contacted is attached hereto as Exhibit "5". Those parties identified as "Private Equity Firms" would be financial buyers (i.e., buyers who would be making a financial purchase but who are not currently in the same business as Westcliff). Those parties identified as "Laboratory" (including LabCorp) would be strategic buyers (i.e., buyer who are currently in the same business as Westcliff). MTS engaged in serious sale discussions with approximately 3 strategic buyers (inclusive of LabCorp) and approximately 3 financial buyers.

9. I understand that the Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 19, 2010, and that the Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession. My understanding is that the only material asset owned by BioLabs is its stock interest in Westcliff.

10. After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that Laboratory Corporation of America ("LabCorp") was the optimal buyer of Westcliff's assets for three primary reasons.

First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets.    Second, it was clear that LabCorp as a strategic buyer was willing to pay a substantially higher price for the Debtors' assets than any other prospective buyer.    Third, LabCorp clearly has the financial means of consummating its purchase of the Debtors' assets.[29]

11.    Due to a serious illness facing one of my partners, for the past few months, I became the principal point person for MTS tasked with working with the Debtors' senior management and counsel to negotiate and document the best possible sale of the Debtors' business to LabCorp.    In this regard, I worked closely with LabCorp's senior management and outside professionals.    In an effort to finalize an asset purchase agreement with LabCorp, I participated in numerous telephone conferences with various principals of LabCorp and professionals representing LabCorp, and I attended an all-day, in-person meeting in North Carolina with LabCorp's principals and professionals.

12.    On or about May 17, 2010, Westcliff, BioLabs, LabCorp and Purchaser entered into an asset purchase agreement ("APA"), a copy of which is attached as Exhibit "1" to the annexed Declaration of Matthew Pakkala.

---

[29] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp

13.   A  description  of  the  assets  to  be  purchased  by
Purchaser  free  and  clear  of  all  liens,  claims  and  interests
(defined  as  the  "Purchased  Assets")  is  set  forth  in  full  in
Section  2.1  of  the  APA.   As  set  forth  therein,  the  Purchased
Assets  consist  of  the  Debtors'  executory  contracts  and  unexpired
leases  that  Purchaser  elects  to  acquire  and  substantially  all  of
the  Debtors'  personal  property  assets  with  the  exception  of  the
Debtors'  cash  and  accounts  receivable,  which  are  included  within
the  "Excluded  Assets"  as  set  forth  in  Section  2.2  of  the  APA.
Also  part  of  the  "Excluded  Assets"  are  all  avoidance  causes  of
action  of  the  Debtors'  bankruptcy  estates.   As  set  forth  in
Section  2.3(a),  Purchaser  is  assuming  certain  limited  liabilities
of  the  Debtors.   As  indicated  in  Section  3.2  of  the  APA,
Purchaser  has  already  delivered  a  $4  million  deposit  to  the
Debtors.

14.   The  APA  was  extensively  negotiated  between  the  Debtors
and  Purchaser  in  good  faith,  arms-length  negotiations,  including
exchanges  of  multiple  drafts  of  asset  purchase  agreements  over  an
extended  period  of  time.   I  am  confident  that  the  result  obtained
from  the  sale  of  the  Purchased  Assets  to  Purchaser  is  the
overwhelmingly  optimal  result  for  the  Debtors'  estates.

15.   To  the  best  of  my  knowledge,  no  insider  of  the  Debtors
has  any  interest  in  or  connection  with  Purchaser,  and  no  insider

solely for the purpose of acquiring the Purchased Assets.

of the Debtors will be receiving any special benefit as a result of the Debtors' sale of the Purchased Assets to Purchaser. To the best of my knowledge, neither Purchaser nor any of the prospective overbidders that I am aware of is an insider of the Debtors or has received any special treatment from the Debtors or from MTS. I am not aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Additionally, the APA was intensively negotiated at arm's length with all parties involved acting in good faith. Based on the foregoing, I submit that Purchaser (or a successful overbidder) is a good faith purchaser.

16. I am confident that consummating the sale of the Purchased Assets to LabCorp (or to a successful overbidder) in accordance with the terms of the APA is in the overwhelming best interests of the Debtors' creditors and their estates as the purchase price offered by Purchaser is substantially higher than the purchase price that any other buyer indicated that it was willing to pay for the Purchased Assets.

17. To make absolutely certain that the highest price possible is paid for the Purchased Assets, the Debtors and Purchaser have agreed to various overbid procedures. MTS has extensively marketed the Debtors' business for sale. MTS is therefore knowledgeable about those parties who could possibly be interested in paying more for the Debtors' business than

Purchaser has offered.   MTS will make every reasonable effort to attempt to facilitate an overbid.

18.   While the purchase price being paid by Purchaser is subject to overbid (to insure that the highest price possible is paid for the Purchased Assets), given the extensive pre-petition marketing process that was undertaken by MTS for the sale of the Debtors' business, and from everything I have seen, I believe that there is very little possibility that any other buyer will pay more for the Purchased Assets than Purchaser has offered. Moreover, I do not believe that the prospect for a successful overbid would increase with the passage of time.   To the contrary, I believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of the Debtors' business resulting from the Debtors' bankruptcy filings.   This is a highly sensitive and extremely competitive industry, and I do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy.   I therefore believe that an expedited sale of the Debtors' business is necessary to avoid immediate and irreparable harm to the Debtors' business, and the Debtors' creditors and bankruptcy estates.

19.   As set forth in Section 3.1 of the APA, a meaningful reduction in the Debtors' business volume will result in a

decrease in the purchase price paid by Purchaser pursuant to a Purchase Price Decrease Adjustment. Moreover, if there is a Material Adverse Change (which translates into an even larger reduction in the Debtors' business volume), then Purchaser is not required to close the transaction.

20. I therefore believe that the risks to the Debtors' estates of failing to close the sale of the Purchased Assets to Purchaser on an expedited basis are severe. I have no doubt that if the Debtors fail to consummate their sale to Purchaser, the Debtors will either end up selling their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. I believe that a liquidation of the Debtors' business would have minimal value.

21. While section 7.3(c)(ix) of the APA only requires that the hearing on the Sale Motion be no more than twenty-five days after the Petition Date (which would be by June 13, 2010), on behalf of the Debtors, I strongly urge the Court to conduct the hearing on the Sale Motion no later than Thursday, May 27, 2010.[30]

---

[30] Section 7.3(c)(ix) requires the Debtor to use its best efforts to have the hearing on the Sale Motion occur no more than twelve calendar days following the Petition Date (which would be Monday, May 31, 2010). However, the parties wish to make every effort to obtain an entered sale order on Thursday, May 27, 2010 and to close the sale on Friday, May 28, 2010.

22. I believe that proceeding with a sale in such an expedited manner serves only to the benefit of the Debtors' estates. Given the lengthy and exhaustive pre-petition sale process that MTS embarked upon, I am highly confident that any potential overbidder has been identified and is extremely knowledgeable about the Debtors' business and the opportunity to purchase the Purchased Assets. I therefore believe that if there is any party willing and able to pay more for the Debtors' business than Purchaser has offered, they can do so within the time frame requested by the Debtors and nothing would change for the better if that time frame was expanded. To the contrary, I believe that the risk to the Debtors' business of customer attrition and a corresponding reduction in the purchase price to be paid by Purchaser (or worse a complete walk away by Purchaser) from a protracted sale process is severe and significantly greater than any possible benefit that could be obtained from speculating that a higher price might be paid for the Purchased Assets.

23. Given the exhaustive marketing effort performed by MTS over a very extended period of time, as well as MTS' vast knowledge of the Debtors' industry, I am highly confident that if any buyer exists who is willing to pay more money for the Purchased Assets than offered by Purchaser, they will submit an overbid and participate in the overbid process and no additional

1  time is needed to flush this out.  Moreover, I strongly believe

2  that there is no doubt that any theoretical benefit from having

3  more time to attempt to obtain overbidders is dramatically

4  outweighed by the risks that the Debtors' business will

5
6  deteriorate with the passage of time resulting in a reduction in

7  the purchase price to be paid by Purchaser or, worse, enabling

8  Purchaser to terminate the APA altogether.  I am therefore highly

9  confident that the sale process agreed to by the Debtors and

10  Purchaser is properly designed to make sure that the highest

11  price possible is paid for the Purchased Assets under these very

12  precarious circumstances.

13
   I declare and verify under penalty of perjury that the
14
15  foregoing is true and correct to the best of my knowledge,

16  information and belief.

17   Executed on this 19th day of May, 2010, at New York City,

18  New York.

19

20

21
                        _____
22                        CURTIS S. LANE

23

24

25

26

27

28

103

# EXHIBIT "1"

*Execution Version*

ASSET PURCHASE AGREEMENT

BY AND AMONG

LABORATORY CORPORATION OF AMERICA,

WAVE NEWCO, INC.,

BIOLABS, INC.

AND

WESTCLIFF MEDICAL LABORATORIES, INC.

DATED MAY 17, 2010

# TABLE OF CONTENTS

Page

**ARTICLE I Definitions**...................................................................................... 1

   1.1   Definitions................................................................................ 1

**ARTICLE II Sale and Transfer of Assets**.......................................................... 10

   2.1   Purchased Assets..................................................................... 10

   2.2   Excluded Assets ...................................................................... 11

   2.3   Assumption of Liabilities......................................................... 11

   2.4   Assumption and Assignment of Contracts................................ 13

**ARTICLE III Purchase Price**............................................................................. 16

   3.1   The Aggregate Purchase Price ................................................ 16

   3.2   Deposit .................................................................................. 16

   3.3   Payment of the Aggregate Purchase Price ............................... 16

   3.4   Allocation of Purchase Price ................................................... 16

**ARTICLE IV Closing**........................................................................................ 17

   4.1   Closing .................................................................................. 17

   4.2   Closing Actions and Deliveries ............................................... 17

   4.3   Seller's Closing Deliveries ...................................................... 17

   4.4   Purchaser's Closing Deliveries ............................................... 19

**ARTICLE V Representations and Warranties of Seller**...................................... 19

   5.1   Organization; Subsidiaries; Ownership; Predecessors............... 19

   5.2   Due Authorization; No Conflict................................................ 20

   5.3   Financial Statements .............................................................. 21

   5.4   Absence of Changes............................................................... 22

   5.5   Title to Assets; Condition. ...................................................... 23

   5.6   Inventory ............................................................................... 23

| 5.7 | Real Property | 23 |
|---|---|---|
| 5.8 | Taxes. | 24 |
| 5.9 | Insurance | 25 |
| 5.10 | Governmental Authorizations | 25 |
| 5.11 | Compliance with Health Care Legal Requirements | 26 |
| 5.12 | Environmental Matters | 29 |
| 5.13 | Litigation | 29 |
| 5.14 | Employee Benefit Plans; Employees | 29 |
| 5.15 | Employee Relations | 31 |
| 5.16 | Contracts | 31 |
| 5.17 | No Broker | 32 |
| 5.18 | Large Customers | 32 |
| 5.19 | Intellectual Property | 32 |
| 5.20 | Accounts Receivable | 33 |
| 5.21 | [Intentionally Omitted] | 33 |
| 5.22 | Transactions with Related Parties | 33 |
| 5.23 | Privacy and Data Protection | 34 |

**ARTICLE VI Representations and Warranties of Purchaser and Parent.** 34

| 6.1 | Organization and Good Standing | 35 |
|---|---|---|
| 6.2 | Due Authorization; No Conflict | 35 |
| 6.3 | No Brokers | 35 |
| 6.4 | Litigation | 35 |
| 6.5 | Adequate Assurances Regarding Contracts | 35 |
| 6.6 | Sufficiency of Funds | 35 |
| 6.7 | Organization and Good Standing | 35 |
| 6.8 | Due Authorization; No Conflict | 36 |

6.9    Ownership of Purchaser ................................................................... 36

**ARTICLE VII Covenants and Agreements** ............................................. 36

7.1    Purchaser's Investigation ............................................................ 36

7.2    Consents of Third Parties ........................................................... 37

7.3    Bankruptcy Matters; Bidding Process .................................... 38

7.4    Operations of the Business Prior to the Closing ..................... 40

7.5    Notification of Certain Matters ................................................. 40

7.6    Takeover Proposals ..................................................................... 41

7.7    Consents, Approvals and Notifications ..................................... 41

7.8    Notices ........................................................................................... 41

7.9    Required Efforts ........................................................................... 41

7.10   Employee Matters. ....................................................................... 42

7.11   Adequate Assurances Regarding Assumed Contracts and Assumed Leases ........ 43

7.12   Cure Amounts ............................................................................... 43

7.13   Further Assurances. ..................................................................... 44

7.14   Prorations; Tax Cooperation ..................................................... 44

7.15   Accounts Receivable .................................................................... 44

7.16   Parent Obligations ....................................................................... 45

**ARTICLE VIII Conditions to Performance by Purchaser** .................. 45

8.1    Representations and Warranties ................................................ 45

8.2    Covenants and Agreements ........................................................ 45

8.3    Compliance Certificate ............................................................... 45

8.4    Absence of Litigation ................................................................... 45

8.5    Governmental Approvals ............................................................ 46

8.6    Bankruptcy Court Order ............................................................ 46

8.7    Material Consents ........................................................................ 46

8.8    Qui Tam ................................................................................................ 46

8.9    Deliveries ............................................................................................ 46

8.10    No Material Adverse Change........................................................... 46

**ARTICLE IX Conditions to Performance by Seller**................................. 46

9.1    Representations and Warranties.................................................... 47

9.2    Covenants and Agreements............................................................ 47

9.3    Compliance Certificate. ................................................................. 47

9.4    Absence of Litigation..................................................................... 47

9.5    Governmental Approvals ............................................................... 47

9.6    Bankruptcy Court Order ................................................................ 47

9.7    Deliveries ........................................................................................ 47

9.8    Fairness Opinion ............................................................................ 47

**ARTICLE X Termination**.......................................................................... 47

10.1    Termination .................................................................................... 47

10.2    Notice of Termination; Effect of Termination............................... 48

10.3    Return of Documentation .............................................................. 50

**ARTICLE XI Limitation of Liability**......................................................... 50

11.1    Limitation of Liability for Purchaser ............................................ 50

11.2    Limitation of Liability for Seller.................................................... 50

11.3    Survival of Representations and Warranties.................................. 50

11.4    Acknowledgments by Purchaser.................................................... 50

11.5    Acknowledgment by Seller ............................................................ 51

**ARTICLE XII General Provisions**............................................................. 51

12.1    Expenses; Transfer Taxes .............................................................. 51

12.2    Entire Agreement; No Third Party Beneficiaries; Amendment............ 52

12.3    Severability ..................................................................................... 52

12.4    Waiver .......................................................................................................... 52

12.5    Public Announcements ................................................................................. 52

12.6    Successors and Assigns ............................................................................... 52

12.7    Notice ........................................................................................................... 53

12.8    Section Headings; Counterparts; Facsimile Signatures ......................... 54

12.9    Governing Law ............................................................................................ 55

12.10   Jurisdiction    55

12.11   Interpretation  55

12.12   Disclosure Schedules .................................................................................. 56

EXHIBITS AND SCHEDULES ................................................................................... 2

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT is made and entered into this 17th day of May, 2010, by and among (i) **LABORATORY CORPORATION OF AMERICA**, a Delaware corporation ("Parent"); (ii) **WAVE NEWCO, INC.**, a Delaware corporation and wholly-owned subsidiary of Parent ("Purchaser"); (iii) **BIOLABS, INC.**, a Delaware corporation ("BioLabs"); and (iv) **WESTCLIFF MEDICAL LABORATORIES, INC.**, a California corporation ("WestCliff" and, together with BioLabs, collectively, "Seller").

WHEREAS, Seller is engaged in the business of providing clinical laboratory testing services to hospitals, physicians and other Persons (the "Business");

WHEREAS, Seller shall, not later than two (2) Business Days after the date of this Agreement, commence a bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code" and, the date on which the petition is filed, the "Petition Date") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), and intends to continue to operate the Business and to maintain possession of its property as a debtor and debtor in possession; and

WHEREAS, Seller desires to sell, or cause to be sold, the Purchased Assets and Purchaser desires to purchase such Purchased Assets and to assume all of the Assumed Liabilities, upon the terms and subject to the conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants hereinafter set forth, the parties, intending to be legally bound, hereby agree as follows:

**ARTICLE I**

**Definitions**.

1.1    Definitions.    All capitalized terms not otherwise defined elsewhere in this Agreement shall have the meanings ascribed to such terms in this Section 1.1.

"Agreement" means this Asset Purchase Agreement, including all Exhibits and Schedules hereto, as it may be amended, modified or supplemented from time to time in accordance with its terms.

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means (a) the possession, directly or indirectly, of the power to vote 50% or more of the securities or other equity interests of a Person having ordinary voting power, (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, by contract or otherwise or (c) being a director, officer, executor, trustee or fiduciary (or their equivalents) of a Person or

a Person that controls such Person. In addition to the foregoing, if the specified Person is an individual, the term "Affiliate" also includes (x) the individual's spouse, (y) the members of the immediate family (including parents, siblings and children) of the individual or of the individual's spouse and (z) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.

"Alternative Transaction" means any of the following transactions with or by a third Person resulting in the sale of the Business:  (a) the direct or indirect acquisition (whether in a single transaction or a series of related transactions) of all or substantially all  of the assets of Seller (other than Seller Accounts Receivable), (b) the direct or indirect acquisition (whether in a single transaction or a series of related transactions) of any class of equity securities of Seller, or (c) the merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Seller, in each case, other than the Transactions.

"Approval" means any authorization, approval, consent, ratification, or any extension, modification, amendment or waiver of any of the foregoing.

 "Assumed Non-Compete Payments" means the outstanding amounts, if any, required to be paid by Seller following the Closing under the Desired Existing Non-Competition Agreements.

"Assumption Date" means the date as of which an Assumed Contract or Assumed Lease is assumed by Seller in the Bankruptcy Case and assigned to Purchaser pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), in accordance with the terms of this Agreement.

"Auction" means the auction conducted by Seller pursuant to the Sales Procedure Order.

"Baseline Volume" means 45,676.

"Business Day" means a day other than a Saturday, a Sunday or a day on which commercial banks are authorized or required to be closed in the State of California.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" means the consummation of the transactions contemplated herein in accordance with Article IV.

"Closing Date" means the date on which the Closing occurs.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Plans" means all Employee Plans as to which Seller sponsors, maintains, contributes or is obligated to contribute, or under which Seller has or may have any Liability.

"Confidentiality Agreement" means that certain Confidentiality Agreement dated February 3, 2009 between Purchaser and Seller, as the same may be amended from time to time in accordance with its terms.

"Contract" means, with respect to any Person, any legally binding contract, agreement, deed, mortgage, lease, license, commitment, understanding, franchise, warranty, note, bond, option, warrant, right or other instrument or consensual obligation, which is binding upon such Person or pertains to any material assets of such Person.

"Copyrights" means works of authorship in which copyright protection subsists, whether registered or unregistered, and pending applications to register the same.

"Debt" means, with respect to any Person at any date, all indebtedness of such Person and its Subsidiaries (whether secured or unsecured), including: (a) all obligations for borrowed money (whether current or non-current, short-term or long-term), including, notes, loans, lines of credit, bonds, debentures, obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person and its Subsidiaries, and all associated Liabilities, (b) the outstanding indebtedness with respect to all equipment lease Contracts (capitalized or otherwise); (c) the maximum Liability under any payment obligations (whether or not contingent) with respect to acquisitions of assets or businesses in whatever form (including obligations with respect to non-compete, consulting or other arrangements), (d) all obligations with respect to the factoring and discounting of accounts receivable, (e) all obligations arising from cash/book overdrafts or negative cash balances, (f) all accrued but unpaid Tax Liabilities, (g) all Liabilities secured by an Encumbrance on any property or asset owned by such Person or its Subsidiary, (h) all guarantees, including guaranties of payment, collection and performance, (i) all Liabilities for the deferred purchase price of property or services (including accounts payable and liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property), (j) all Liabilities relating to unfunded, vested benefits under any Employee Plan; and (k) all accrued interest, prepayment premiums and penalties related to any of the foregoing; provided that the amount of any of the foregoing obligations at any date shall be the outstanding balance or accrued value at such date, assuming the maximum Liability of any contingent obligations at such date.

"Desired Existing Non-Competition Agreements" means the Non-Competition Agreements that are listed on Schedule C.

"Desired Leased Premises" means a Leased Premises that is listed as an Initial Designated Contract on Schedule 2.4(a)-1.

"Employee Plan" means any plan, program, agreement, policy or arrangement, whether or not reduced to writing, and whether covering a single individual or a group of individuals, that is (a) a welfare plan within the meaning of Section 3(1) of ERISA, (b) a pension benefit plan within the meaning of Section 3(2) of ERISA, (c) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right, profit sharing or similar equity-based plan or agreement, or (d) any other deferred-compensation, retirement, severance, retention, change-in-control, leave, vacation, welfare-benefit, bonus, incentive or material fringe-benefit plan, program, agreement or arrangement maintained for the benefit of any officers, directors, employees or consultants of the Business.

3

"Encumbrance" means any lien, license to a third party, option, warrant, pledge, security interest, Claim, mortgage, right of way, easement, encroachment, profit, servitude, community property interest, equitable interest, right of first offer or first refusal, buy/sell agreement and/or any other material restriction or covenant with respect to, or material condition governing the use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other material attribute of ownership.

"Enforceable" means, with respect to any Contract, that such Contract is a legal, valid and binding obligation of such Person enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy (including as a result of the Bankruptcy Case), insolvency and other similar laws of general application affecting the rights and remedies of creditors and general principles of equity.

"Environmental Laws" means any Legal Requirement relating to the environment, natural resources, pollutants, contaminants, wastes, chemicals or public health and safety, including any Legal Requirement pertaining to (a) treatment, storage, disposal, generation and transportation of toxic or hazardous substances or solid or hazardous waste, (b) air, water and noise pollution, (c) groundwater and soil contamination, (d) the release or threatened release into the environment of toxic or hazardous substances or solid or hazardous waste, including emissions, discharges, injections, spills, escapes or dumping of pollutants, contaminants or chemicals, (e) manufacture, processing, use, distribution, treatment, storage, disposal, transportation or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or oil or petroleum products or solid or hazardous waste, (f) underground and other storage tanks or vessels, abandoned, disposed or discarded barrels, containers and other closed receptacles, (g) public health and safety and (h) the protection of wild life, marine sanctuaries and wetlands, including all endangered and threatened species, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Hazardous Substances Transportation Act, 49 U.S.C. § 5101 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., and the regulations promulgated pursuant thereto, and all analogous state and local statutes and laws.

"ERISA" means the federal Employee Retirement Income Security Act of 1974, as amended.

"Existing Leases" means the Contracts of Seller under which Seller leases or subleases, as the case may be, the Leased Premises.

"Final Order" means an Order or an action taken or Governmental Order issued by the applicable Governmental Authority as to which:  (a) no request for stay of the Order, action or Governmental Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the Order, action or Governmental Order, or protest of any kind, is pending and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have the action or Governmental Order under reconsideration or review on its own motion and the time for such reconsideration or review has

passed; and (d) the Order, action or Governmental Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"GAAP" means generally accepted accounting principles in the United States as set forth in pronouncements of the Financial Accounting Standards Board (and its predecessors) and the American Institute of Certified Public Accountants and, unless otherwise specified, as in effect on the date hereof or, with respect to any financial statements (including the Financial Statements), the date such financial statements were prepared.

"Governmental Authority" means any United States federal, foreign, state or local government, or political subdivision thereof, or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body, and includes any contractor, (e.g. a Medicare fiscal intermediary), acting on behalf of a Governmental Authority.

"Governmental Authorization" means any consent, license, registration or permit issued, granted, given or otherwise made available by or under the authority of any Governmental Authority.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered, issued, made or rendered by or with any Governmental Authority.

"Governmental Programs" means any federal, state or local reimbursement or governmental programs for which the Business is eligible, including "Federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f), Medicare and Medicaid programs under Titles XVIII and XIX of the Social Security Act, Medicaid Waiver Program, and the TRICARE Program.

"Hazardous Materials" means (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, mold dielectric fluid containing levels of polychlorinated biphenyls, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law, and (c) any other material, substance or waste that is limited or regulated by any Governmental Authority or, even if not so limited or regulated, could pose a hazard to the health or safety of the occupants of the Leased Premises or adjacent properties or any property or facility formerly owned, leased or used by the Seller.

"Health Care Legal Requirement" means any Legal Requirement relating to healthcare regulatory matters, including, (i) 42 U.S.C. §§ 1320a-7, 7a and 7b, which are commonly referred to as the "Federal Fraud Statutes," (ii) 42 U.S.C. § 1395nn, which is commonly referred to as the "Stark Statute," (iii) 31 U.S.C. §§ 3729-3733, which is commonly referred to as the "Federal

False Claims Act," (iv) 42 U.S.C. §§ 1320d through 1320d-8 and 42 C.F.R. §§ 160, 162 and 164, which is commonly referred to as the "Health Insurance Portability and Accountability Act of 1996," (v) the Occupational Safety and Health Act and all regulations promulgated under such legislation, (vi) the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq., and all regulations promulgated thereunder, (vii) the Clinical Laboratory Improvement Amendments, 42 C.F.R. Part 493, and all regulations promulgated thereunder, (viii) applicable laws of the United States Drug Enforcement Administration and all regulations promulgated thereunder, (ix) applicable state anti-kickback, fee-splitting and patient brokering laws, (x) state information privacy and security laws, and (xi) state laws governing the licensure and operation of clinical laboratories.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property Rights" means Copyrights, Patent Rights, Trademarks and Trade Secrets.

"Knowledge" means (i) the actual knowledge, and belief of the directors and officers of Seller and (ii) any information which Seller's directors and officers would be expected to obtain after a reasonably comprehensive investigation concerning the matter at issue with the employees who are directly responsible for managing and reporting to such Persons on such matters.

"Leased Premises" means the real property, including facilities and patient service centers, leased by Seller in connection with the Business.

"Legal Requirement" means, to the extent binding upon the Seller, the Business or any Purchased Assets, any foreign, federal, state or local law, statute, ordinance, common law ruling or regulation, or any Governmental Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law, including any Health Care Legal Requirement or related or similar statutes pertaining to any Governmental Programs or the regulations or requirements promulgated pursuant to any of such statutes.

"Liability" means, with respect to any Person, any liability or obligation of such Person or Claim against such Person, whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due.

"Material Adverse Change" means an amount equal to 0.17 or more determined using the following formula:  the quotient of (a) (the Baseline Volume minus the Measurement Period Volume); divided by (b) the Baseline Volume.  For purposes of clarification, the Material Adverse Change may be expressed as a percentage equal to or greater than Seventeen Percent (17%).  By way of example, if the Baseline Volume is 9,500 and the Measurement Period Volume is 7,885, then the calculation shall be equal to 0.17 and a Material Adverse Change shall have occurred.

"Material Adverse Effect" means any event, circumstance, change, occurrence or development that (a) has a material adverse effect on, or results in a material adverse change in,

6

the Business, assets, properties, condition (financial or otherwise) or results of operations of Seller, or (b) prevents or materially delays or impairs the ability of Seller to consummate the transactions contemplated hereby; provided, however, that a Material Adverse Effect shall not be deemed to have occurred if such event, circumstance, change, occurrence or development, is caused by or a result of: (i) sudden and substantial changes in the generally economic conditions in the United States; (ii) the declaration of a national emergency; (iii) any substantial changes in GAAP that materially affects the financial statements of the Business after the date hereof; (iv) the announcement or pendency of the transactions contemplated hereby (including any claim, litigation, cancellation of or delay in customer orders, reduction in revenues or income, disruption of business relationships or loss of employees); or (v) as a result of any action or omission of Seller (x) pursuant to this Agreement, (y) with the consent of Purchaser or (z) by order of the Bankruptcy Court.  References in this Agreement to dollar amount thresholds shall not be deemed to be evidence of materiality or of a Material Adverse Effect.

"Measurement Period" means, as of the Closing Date, the last Business Day that was a Monday, the last Business Day that was a Tuesday, the last Business Day that was a Wednesday, the last Business Day that was a Thursday and the last Business Day that was a Friday; provided, however, that if May 28th was the last Business Day that was a Friday, then May 21st will be included in the Measurement Period and May 28th will be excluded.  By way of example, if the Closing Date is Wednesday, June 2, 2010, then the Measurement Period shall mean Monday, May 24, 2010 (noting that May 31 is not a Business Day); Tuesday, June 1, 2010; Wednesday, May 26, 2010; Thursday, May 27, 2010; and Friday, May 21, 2010.

"Measurement Period Volume" means the sum of the Seller's daily accessions, as prepared by the Seller from its daily volume reports consistent with past practices, on each Business Day in the Measurement Period; provided, however, that to the extent Seller's daily accessions are reduced as a result of Seller's customers using the services of Parent or any of its Affiliates during the time period beginning on the Petition Date and ending on the last Business Day prior to the Closing Date, inclusive of both such dates, the amount of such reduction shall be added to sum of Seller's daily accessions.

"Order" means an order of the Bankruptcy Court or such other court exercising jurisdiction over the Bankruptcy Case.

"Ordinary Course of Business" means an action taken by a Person in the ordinary course of such Person's business which is consistent with the past customs and practices in frequency and amount of such Person. With respect to the Seller subsequent to the commencement of the Bankruptcy Case, "Ordinary Course of Business" shall mean continuing operations of the Business in a manner that is consistent with past customs and practices; provided that Seller shall be deemed to be acting in the Ordinary Course of Business with respect to any action or omission (x) pursuant to this Agreement, (y) with the consent of Purchaser or (z) by order of the Bankruptcy Court.

"Organizational Documents" means, with respect to any Person (other than an individual), the certificate or articles of incorporation or organization, certificate of limited partnership and any joint venture, limited liability company, operating, voting or partnership agreement, by-laws, or similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"<u>Patent Rights</u>" means United States and foreign patents, patent applications, continuations, continuations-in-part, divisions, reissues, patent disclosures, inventions (whether patentable or not patentable) or improvements thereto.

"<u>Permit</u>" means, with respect to any Person, any Approval, bond, certificate of authority, certificate of need, accreditation, qualification, provider number, license, franchise, permit, order, registration, variance, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority or any other Person to which or by which such Person is subject or bound and to which or by which any property, business, operation or right of such Person is subject or bound.

"<u>Permitted Liens</u>" means (i) Encumbrances for ad valorem personal property Taxes not yet due and payable; (ii) Encumbrances acceptable to Purchaser in its sole discretion, including Encumbrances that secure only the Assumed Liabilities; (iii) mechanics liens and similar Encumbrances for labor, materials or supplies with respect to a landlord's management, repair and maintenance of any Leased Premises, (iv) easements, servitudes, covenants, conditions, restrictions, and other similar matters of record affecting title to the material Purchased Assets and other title defects that do not or would not materially impair the use or occupancy of such Purchased Assets in the operation of the Business taken as a whole, (v) any recorded easement, covenant, zoning or other restriction on the Leased Premises that, together with all other Permitted Liens, does not prohibit or impair the current use, occupancy, value or marketability of title of the property subject thereto, and (vi) Encumbrances set forth on Section 1 of the Disclosure Schedule.

"<u>Person</u>" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"<u>Possible Leased Premises</u>" means Leased Premises that are listed as a Potential Subsequent Designated Contract on <u>Schedule 2.4(a)-2</u>.

"<u>Private Programs</u>" means private, non-governmental reimbursement programs, including any private insurance program, in which Seller participates.

"<u>Proceeding</u>" means any litigation, action, suit, mediation, arbitration, assessment, investigation, hearing, grievance or similar proceeding (in each case, whether civil, criminal, administrative, investigative or informal) commenced, conducted, heard, pending by or before any Governmental Authority, arbitrator or mediator.

"<u>Provider Agreements</u>" means Contracts pursuant to which Seller participates in Governmental Programs.

"<u>Purchase Price Decrease Adjustment</u>" means the product of (a) ((Baseline Volume times 0.95) minus Measurement Period Volume)  times (b) $1,202.00.  In no event shall the Purchase Price Decrease Adjustment result in an increase in the Aggregate Purchase Price.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, trust or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, ten percent (10%)

or more of the stock or other equity interests in such entity, or of which such Person is a general partner, manager or managing member.

"Takeover Proposal" means any inquiry, proposal or offer from any third Person in writing relating to any Alternative Transaction.

"Tax" or "Taxes" means (a) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind, whether direct or indirect and whether imposed by way of a withholding or a deduction for or on an account of tax, or any charge of any kind in the nature of (or similar to) taxes whatsoever, however denominated or computed, including any interest, penalty, or addition thereto, whether disputed or not and (b) any Liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable as a transferee or successor, by contract or from any express or implied obligation to indemnify or otherwise assume or succeed to the Liability of another Person.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, trade dress and trade names, whether registered or unregistered, and pending applications to register the foregoing.

"Trade Secrets" means confidential and proprietary ideas, trade secrets, know how, concepts, methods, processes, formulae, reports, data, customer lists, mailing lists, business plans, or other proprietary information which derives independent commercial value from not being generally known or readily available.

"Transaction Documents" means this Agreement, the Deposit Escrow Agreement, the Non-Competition Agreement, the Assumption Agreement, the Lease Assignments, the General Assignment and Bill of Sale, the Transition Agreement and all other written agreements, documents and certificates contemplated by any of the foregoing documents.

"Transactions" means, collectively, the transactions contemplated by this Agreement.

"Treasury Regulations" means the final and temporary regulations of the U.S. Department of the Treasury promulgated under the Code.

# ARTICLE II

## Sale and Transfer of Assets.

2.1     Purchased Assets.    Upon the terms and subject to the conditions of this Agreement, at the Closing (and on the applicable Assumption Date with respect to the Purchased Assets consisting of rights under any Assumed Contract or Assumed Lease assumed by Seller and assigned to Purchaser after the Closing Date as provided herein), Seller shall transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, free and clear of all Encumbrances other than Permitted Liens, the following selected assets and properties of Seller which relate to the Business, other than the Excluded Assets, as the same shall exist on the Closing Date (collectively referred to herein as the "Purchased Assets"), including, all right, title and interest of Seller in, to and under:

(a)     selected personal property owned by Seller and used (or allocated for use) in the Business, including laboratory equipment, accessories, machinery, apparatus, furniture, fixtures, motor vehicles, computer hardware and office equipment, including those items identified on Schedule 2.1(a) attached hereto;

(b)     all inventory and supplies maintained by Seller in connection with the Business wherever located, including raw materials, goods consigned to vendors or subcontractors, works in process, finished goods, spare parts, goods in transit, products under research and development, demonstration equipment and inventory on consignment, including such inventory and supplies listed on Schedule 2.1(b) attached hereto;

(c)     to the extent assignable under applicable Legal Requirements, all Permits necessary for or incident to the operation of the Business (but excluding any provider numbers under any Governmental Programs), as listed on Schedule 2.1(c) attached hereto;

(d)     all of Seller's rights under the Contracts listed or described on Schedule 2.4(a)-1 as Initial Designated Contracts, as updated from time to time by Purchaser on or before the Contract Designation Date to include any Contracts that Purchaser elects to Purchase as Subsequent Designated Contracts (the "Assumed Contracts"), provided that no Seller Accounts Receivable shall be included as Purchased Asset;

(e)     all of Seller's rights under the Existing Leases listed or described on Schedule 2.4(a)-1 as Initial Designated Contracts, as updated from time to time by Purchaser on or before the Contract Designation Date to include Possible Leased Premises that Purchaser elects to Purchase as Subsequent Designated Contracts (the "Assumed Leases");

(f)     all of the intangible rights and property of Seller associated with the Business, including Seller's Intellectual Property Rights (including, specifically, all trade names and marks related to the Business), telephone and telecopy listings, websites and domain names, going concern value and goodwill;

(g)     with respect to the Business, any and all past and pending documents of sales and service information, customer lists, payor and supplier lists, inventory cost records, machinery and equipment records, mailing lists, sales and purchasing materials, employee policy manuals, quality control records and procedures, books of account, customer records, clinical

10

records, employment and personnel records, quotations, purchase orders, correspondence, sales, brochures, advertising materials, samples and display materials, provided that to the extent reasonably necessary, the Seller may keep a copy of any such document for the purpose of collecting Seller Accounts Receivable and any other purpose of this Agreement or Legal Requirement, subject to any confidentiality requirements;

(h)    all claims of Seller against third parties relating to the Purchased Assets, whether choate or inchoate, known or unknown, contingent or non-contingent, but excluding (i) Seller Accounts Receivable, (ii) claims relating to Excluded Assets or Excluded Liabilities and (iii) claims against National Union Fire Insurance Company;

(i)    all rights of Seller relating to deposits and prepaid expenses relating to the Business, including those listed on Schedule 2.1(i), but excluding deposits and prepaid expenses relating to Excluded Contracts and Excluded Leases;

(j)    all warranties (express and implied) that continue in effect with respect to any Purchased Asset; and

(k)    the covenants provided for in the Non-Competition Agreement.

2.2    <u>Excluded Assets</u>.  Notwithstanding the provisions of Section 2.1, the Purchased Assets shall not include any of the right, title or interest of Seller in, to and under the following (herein referred to as the "<u>Excluded Assets</u>"):  (a) all cash, bank deposits and cash equivalents of Seller; (b) all accounts receivable and notes receivable of Seller arising prior to and on the Closing Date ("<u>Seller Accounts Receivable</u>"); (c) Seller's minute books, stock books and other corporate records having to do with the corporate organization and capitalization of Seller; (d) all of Seller's Provider Agreements and all of Seller's provider numbers under any Governmental Programs or Private Programs; (e) any Contracts described in <u>Schedule B-1</u> (the "<u>Excluded Contracts</u>") and any deposits and prepaid expenses relating thereto; (f) any Existing Leases listed or described in <u>Schedule B-2</u> (the "<u>Excluded Leases</u>") and any deposits and prepaid expenses relating thereto; (g) all rights under this Agreement and the Transaction Documents; (h) all of the Company Plans; (i) all insurance policies and claims thereunder of Seller, claims for and rights to receive Tax refunds, all Tax Returns of Seller relating to the Business and any notes, worksheets, files or documents relating thereto, and any legal files or other documents covered by an evidentiary privilege that are not related to the Assumed Liabilities; (j) all rights under any director and officer insurance policies; (k) any asset of Seller that would constitute a Purchased Asset (if owned by Seller at Closing) that is conveyed or otherwise disposed of during the period from the date hereof until the Closing either in the Ordinary Course of Business, at the direction of the Bankruptcy Court or as otherwise permitted by the terms of this Agreement; (l) all of Seller's rights to recovery of collateral given to obtain letters of credit and rights to recover amounts drawn or paid on letters of credit; (m) any avoidance causes of action (including those which exist under any of Sections 541-553 of the Bankruptcy Code), all of which avoidance causes of action shall remain property of Seller's bankruptcy estate; and (n) the assets listed on <u>Schedule 2.2</u> attached hereto.

2.3    <u>Assumption of Liabilities</u>.

(a)     Subject to the terms and conditions of this Agreement, at the Closing (and with respect to Assumed Liabilities under any Assumed Contract or Assumed Lease assumed by Seller and assigned to Purchaser after the Closing Date as provided herein at the applicable Assumption Date), Purchaser shall assume and agree to perform (i) pursuant to an assignment and assumption agreement in the form of Exhibit 2.3(a)-1 attached hereto (the "Assumption Agreement"), the Liabilities of Seller under the Assumed Contracts solely to the extent arising after the Closing Date and excluding any Liability arising out of or relating to a breach, violation, default or failure to perform by Seller that occurred prior to the Closing Date,  (ii) pursuant to an assignment and assumption of leases in the form of Exhibit 2.3(a)-2 attached hereto (the "Lease Assignment"), the Liabilities of Seller under the Assumed Leases solely to the extent arising after the Closing Date and excluding any Liability arising out of or relating to a breach, violation, default or failure to perform by Seller that occurred prior to the Closing Date (collectively, the "Assumed Liabilities"), (iii) all Liabilities due to the operation of the Business after Closing, (iv) the Cost Reimbursement, and (v) Assumed Non-Compete Payments, if any.

(b)     Except as contemplated by Section 2.3(a), Purchaser shall not assume, nor shall it agree to pay, perform or discharge, any Liability of Seller or any Affiliate of Seller, whether or not arising from or relating to the conduct of the Business (the "Excluded Liabilities").  Without limiting the generality of the prior sentence, Excluded Liabilities shall include:

(i)     any Liability for Taxes (whether federal, state, local or foreign), including Taxes incurred in respect of or measured by (1) the sales of goods or services by Seller, (2) the wages or other compensation paid by Sellers to its employees and other service providers (other than Hired Employees and as provided for by the Transition Agreement), (3) the value of Seller's property (tangible and intangible personal as well as real property), (4) the income of Seller earned or realized on or prior to the Closing Date, and (5) any gain and/or income from the sale of the Purchased Assets and other transactions contemplated hereby, regardless of whether arising in connection with the consummation of the transactions contemplated hereby or otherwise;

(ii)     any Liability of Seller or its Affiliates for performance under this Agreement or any of the agreements contemplated hereby;

(iii)     any Liability under any Assumed Contract or Assumed Lease arising prior to the Assumption Date or relating to any breach, violation, default or failure to perform by Seller that occurred prior to the Assumption Date;

(iv)     any Liability relating to (A) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (B) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(v)     any Liability relating to any Debt of Seller or its Affiliates;

(vi)     any Liability of Seller with respect to any Proceeding;

12

(vii)    any Liability for any accounts payable or other accruals related to the Business arising on or prior to the Closing Date;

(viii)    any Liability arising out of Seller's agreements with any Governmental Programs (including pursuant to any Provider Agreements) or Private Programs;

(ix)    any Liability for any laboratory or medical malpractice claims arising from the operation of the Business on or prior to the Closing Date;

(x)    any Liability relating to the Excluded Assets;

(xi)    other than as otherwise provided under the Transition Agreement, any Liability relating to or arising out of any Company Plan, including, all Liabilities for or arising from any "COBRA" health care continuation coverage required to be provided under Section 4980B of the Code and Sections 601-608 of ERISA to employees, former employees and any other COBRA qualified beneficiaries of Seller, including those who incur a COBRA qualifying event in connection with the transactions contemplated by this Agreement;

(xii)    any Liability relating to Employee Claims other than as contemplated by the Transition Agreement;

(xiii)    any Liability relating to severance, termination, change of control or other similar payment obligations of Seller (whether arising prior to or after the Closing) other than as contemplated by the Transition Agreement;

(xiv)    any Liability (A) arising under Environmental Laws attributable to or incurred as a result of any acts, omissions or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, any Liability with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Materials at any location, (B) from claims relating to employee health and safety prior to the Closing, including claims for injury, sickness, disease or death of any Person or (C) compliance with any Legal Requirement relating to any of the foregoing; and

(xv)    any other Liability of Seller or its Affiliates that is not an Assumed Liability.

Without limitation of the foregoing and notwithstanding anything to the contrary set forth herein, in no event shall Purchaser assume or be deemed to assume any of Seller's Provider Agreements or any of Seller's provider numbers under any Governmental Programs or Private Programs and all Liabilities related thereto shall be deemed Excluded Liabilities, Liability for past overpayments, civil monetary penalties or false claims, and any Liabilities arising out of any failure of Seller to comply with any Legal Requirement, regulation, rule, manual provision or other requirement applicable to providers of services paid under any Governmental Programs or Private Programs.

2.4    <u>Assumption and Assignment of Contracts</u>.

13

(a)    Schedule 2.4(a) lists all Contracts of Seller that Purchaser may elect to have Seller assume and assign to Purchaser at Closing.  Schedule 2.4(a)-1 sets forth as of the date hereof such Contracts Purchaser shall purchase and Seller shall assume and assign to Purchaser at Closing ("Initial Designated Contracts").  In addition, on or before the first Business Day following the 30th calendar day after the Closing Date, with respect to Leases, and the 180th calendar day after the Closing Date with respect to all other Contracts, Purchaser may designate such additional Contracts it chooses to purchase and have Seller assume and assign to Purchaser ("Subsequent Designated Contracts" and, collectively with the Initial Designated Contracts, the "Designated Contracts" and such date being referred to as the "Contract Designation Date"); provided, however, that Purchaser may designate any Designated Contracts as an Excluded Contract or Excluded Lease, as applicable, at any time following the date hereof up to Closing with appropriate deletions to Schedule 2.4(a)-1 and Schedule 2.4(a)-2 (and corresponding additions to Schedule B-1 and Schedule B-2).  Further, at Closing the remaining Contracts listed on Schedule 2.4(a) shall be segregated into three (3) categories scheduled as follows.  First, there shall be Contracts specifically rejected in writing by Purchaser on Closing, which shall be listed as Excluded Assets on Schedule 2.2, Schedule B-1 (Excluded Contracts) or Schedule B-2 (Excluded Leases), as the case may be.  Second, there shall be certain Contracts that Purchaser identifies in writing at Closing that shall be specifically assumed by Seller and assigned to Purchaser at Closing, which shall be set forth on Schedule 2.4(a)-1 and upon assignment to Purchaser shall become an Assumed Contract or Assumed Lease, as the case may be; provided, that, in the event that any such Contract is listed on either Schedule 2.4(a)-2 or Schedule B-1 or Schedule B-2 as of the date hereof, such Contract shall be treated as a Subsequent Designated Contract for purposes of Section 7.12 below.  Third, there shall be certain Contracts that Purchaser shall not purchase or reject at the Closing ("Potential Subsequent Designated Contracts"), which shall be set forth on Schedule 2.4(a)-2.  The Potential Subsequent Designated Contracts shall become Subsequent Designated Contracts if Purchaser notifies Seller in writing before the first Business Day following the 30th calendar day after the Closing Date or the 180th calendar day after the Closing Date, as applicable, of its intent to have any such Contract(s) assigned to it.  In all cases, subject to the foregoing restrictions, appropriate additions and deletions to Schedule 2.4(a)-1 and Schedule 2.4(a)-2 (and corresponding additions to Schedule B-1 and Schedule B-2) shall be made to reflect such elections made by Purchaser.  The Designated Contracts shall be identified by (i) the name and date of the Designated Contract, (ii) the other party to the Designated Contract and (iii) the address of such party for notice purposes, all included on Schedule 2.4(a)-1 and an exhibit attached to either the motion filed in connection with the Sale Order, a motion for authority to assume and assign such Designated Contract or a notice filed pursuant to the Sale Procedures Order.  Schedule 2.4(a)-1 and such exhibit shall also (A) set forth the amounts necessary to cure any defaults under each of the Designated Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court, and (B) delineate a procedure for transferring to Purchaser the rights to any security deposits with the other party to any Designated Contract.  Upon the Closing, all Initial Designated Contracts (and any Subsequent Designated Contracts purchased by Purchaser upon the applicable Contract Designation Date) shall become Assumed Contracts or Assumed Leases, as the case may be, for purposes of this Agreement.  To the extent Purchaser does not notify Seller in writing of its election to purchase or reject any Potential Subsequent Designated Contract within the 30 calendar day or 180 calendar day time period, as applicable, as provided in this Section 2.4(a), each Potential Subsequent Designated Contract shall be deemed to have been rejected by Purchaser as of the date of the expiration of such 30 calendar day or 180 calendar day time period.  Notwithstanding anything herein to the contrary, Seller shall not have

14

any obligation to re-negotiate, extend the terms of, renew or otherwise amend or modify any Contract set forth on Schedule 2.4(a) (other than those Contracts set forth on Schedule C) (as the same may be amended or modified in accordance with the terms hereof).

(b)     If, at any time after the date hereof through the 180th Business Day after the Closing Date, any party to this Agreement becomes aware that Seller is a party to any Contract related to the Business that is not an Excluded Asset and is not disclosed on Schedule 2.4(a) or Sections 5.16(a) or 5.16(b) of the Disclosure Schedule (each, an "Undisclosed Contract"), the discovering party shall promptly notify the other parties in writing (the "Notification") of such Undisclosed Contract.  For a period of twenty (20) Business Days after the date of Purchaser's receipt or delivery, as the case may be, of the Notification, Purchaser shall have the right, in its sole discretion, to require Seller to file one or more motions with the Bankruptcy Court (which motion(s) shall be in form and substance reasonably satisfactory to Purchaser) seeking the entry of an order (the "Undisclosed Contract Assignment Order"), pursuant to Sections 363 and 365 of the Bankruptcy Code, to assign, transfer, convey and deliver to Purchaser or one or more of its designated Affiliates such Undisclosed Contract as if it had been disclosed on Schedule 2.4(a), or to otherwise transfer the benefits of such Undisclosed Contract to Purchaser or one or more of its designated Affiliates without any additional consideration.  In the event that Purchaser notifies Seller of Purchaser's desire to assume any Undisclosed Contract, Seller shall, promptly after receiving such notification, file with the Bankruptcy Court the motion(s) seeking the entry of the Undisclosed Contract Assignment Order.   In addition, Seller shall (i) use its commercially reasonable efforts to cause the Undisclosed Contract Assignment Order to become a Final Order and (ii) not take any action that would reasonably be expected to delay, prevent or impede the entry of, or result in the revocation, modification or amendment of, the Undisclosed Contract Assignment Order.  Any Undisclosed Contract that Purchaser elects to assume and for which an Undisclosed Contract Assignment Order is entered and becomes a Final Order shall constitute a Purchased Asset and added to Schedule 2.4(a)-1.

(c)     Seller shall promptly notify Purchaser in writing of any new Contract entered into after the commencement of the Bankruptcy Case (each a "Postpetition Contract"). No later than the date that is the later of (i) the Contract Designation Date and (ii) ten (10) Business Days subsequent to the date that a copy of such Postpetition Contract is delivered or made available to Purchaser, Purchaser shall notify Seller in writing whether it shall assume such Postpetition Contract; provided, however, Purchaser shall notify Seller in writing whether it shall assume any Postpetition Contract within five (5) Business Days if such Postpetition Contract was entered into with Purchaser's prior written consent.

(d)     The Sale Order shall provide that, as of the Closing (or, with respect to the Contracts designated after Closing, the Contract Designation Date), Seller shall (i) assume the Assumed Contracts and the Assumed Leases in the Bankruptcy Case and (ii) assign the Assumed Contracts and the Assumed Leases to Purchaser.

(e)     Notwithstanding anything to the contrary herein, this Agreement shall not constitute an agreement to assign or transfer any interest in any Assumed Contract or any claim or right arising thereunder if such assignment or transfer without the Approval of a third party would constitute a breach thereof or affect adversely the rights of Purchaser thereunder (after giving effect to the Sale Order and the Bankruptcy Code), and any such transfer or assignment

15

shall be made subject to such Approval being obtained.  In the event any such Approval is not obtained prior to Closing, Seller shall continue its commercially reasonable efforts to obtain any such Approval after Closing, and Seller shall cooperate with Purchaser in any lawful and economically feasible arrangement to provide that Purchaser shall receive the interest of Seller in the benefits under any such Assumed Contract, including performance by Seller as agent, provided that Purchaser shall undertake to pay or satisfy the corresponding Liabilities for the enjoyment of such benefit to the extent Purchaser would have been responsible therefor if such Approval had been obtained.

## ARTICLE III

## Purchase Price.

3.1    The Aggregate Purchase Price.  The aggregate purchase price to be paid by Purchaser for the Purchased Assets shall be an amount equal to Fifty Seven Million Five Hundred Thousand Dollars ($57,500,000) (the "Aggregate Purchase Price"), plus the Cost Reimbursement, less any Assumed Non-Compete Payments (net of any Assumed Non-Compete Payments paid by Seller prior to Closing or pursuant to Section 7.12), if any, less the Purchase Price Decrease Adjustment, if any.  For the sake of clarity, if the quotient of (a) (the Baseline Volume minus the Measurement Period Volume); divided by (b) the Baseline Volume is less than or equal to 0.05, then no Purchase Price Decrease Adjustment shall be applicable.

3.2    Deposit.  Concurrently with the execution and delivery of this Agreement by Purchaser and Seller, Purchaser shall deposit into an escrow account (the "Deposit Escrow Agent") an amount equal to Four Million Dollars ($4,000,000.00) (the "Deposit").  The Deposit shall be held pursuant to the terms of the Deposit Escrow Agreement in the form attached hereto as Exhibit 3.2 (the "Deposit Escrow Agreement") and shall not be withdrawn except pursuant to the terms of the Deposit Escrow Agreement or as otherwise agreed by the parties in writing or ordered by the Bankruptcy Court.

3.3    Payment of the Aggregate Purchase Price.  The Aggregate Purchase Price shall be paid as follows:

(a)    At the Closing, Purchaser shall pay to or on behalf of Seller by wire transfer of immediately available funds to an account or accounts designated by Seller (such designation to be set forth on the letterhead of Seller's bank and to be delivered to Purchaser at least two (2) Business Days prior to the Closing Date) an amount equal to the Aggregate Purchase Price less the Deposit.  All closing payments shall be reflected on a closing statement in form and substance reasonably satisfactory to Seller, to be executed by the parties at Closing.

(b)    At the Closing, Purchaser and Seller shall deliver joint written instructions to the Deposit Escrow Agent directing the Deposit Escrow Agent to deliver (i) the Deposit to Seller by wire transfer of immediately available funds to an account designated in writing by Seller and (ii) all interest thereon to Purchaser.

3.4    Allocation of Purchase Price.  The parties hereto agree to the allocation of the Aggregate Purchase Price among the Purchased Assets as indicated on Schedule 3.4 attached hereto for Tax reporting purposes (the "Allocation Schedule").  Seller and Purchaser and their

16

respective Affiliates shall report, act and file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation Schedule (as such Allocation Schedule may be adjusted pursuant to this Section 3.4). Neither Purchaser nor Seller shall file any Tax Returns in a manner that is inconsistent with such allocation.

# ARTICLE IV

## Closing.

4.1    Closing.  The Closing shall be consummated at 10:00 a.m., local time, at the offices of K&L Gates LLP, 4350 Lassiter at North Hills Avenue, Suite 300, Raleigh, North Carolina, 27609, on the second (2nd) Business Day after entry of the Sale Order; provided, that, all conditions set forth in Article VIII and Article IX have been satisfied or waived (other than conditions that by their terms are to be satisfied at Closing, but subject to the satisfaction or waiver of such conditions), or on such other date or at such other place or time as is mutually agreed upon by the parties hereto.  The Closing shall be effective for economic and accounting purposes as of the close of business local time for Seller on the Closing Date.

4.2    Closing Actions and Deliveries.  All actions to be taken and all documents to be executed and delivered by the parties at the Closing shall be deemed to have been taken and executed simultaneously, and no action shall be deemed taken nor any document executed and delivered until all have been taken, executed and delivered.

4.3    Seller's Closing Deliveries.  Subject to the fulfillment or waiver of the conditions set forth in Article IX, at Closing, Seller shall deliver to Purchaser the following:

(a)    An accurate and complete list of the customers of Seller who have received services provided by Seller during the 2009 calendar year, updated as of the Closing Date;

(b)    the Lease Assignments, duly executed by Seller;

(c)    the Assumption Agreement, duly executed by Seller;

(d)    the General Assignment and Bill of Sale, substantially in the form of Exhibit 4.3(d) attached hereto, duly executed by Seller;

(e)    the Non-Competition Agreement, substantially in the form of Exhibit 4.3(e) attached hereto (the "Non-Competition Agreement"), duly executed by Seller;

(f)    joint instructions releasing the Deposit in the Deposit Escrow Agreement, duly executed by Seller;

(g)    the Transition Agreement, substantially in the form of Exhibit 4.3(g) attached hereto, duly executed by Seller (the "Transition Agreement");

(h)    all Material Consents that are required by Section 7.2 hereof;

(i)      a certificate of the secretary of BioLabs, in form and substance reasonably satisfactory to Purchaser, certifying that (A) attached thereto is a true, correct and complete copy of (1)  the articles or certificate of incorporation of BioLabs, certified as of a recent date by the Secretary of State of the State of Delaware, and the bylaws of BioLabs, (2) to the extent applicable, resolutions duly adopted by the board of directors and shareholders of BioLabs authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Transaction Documents to which it is a party and (3) a certificate of existence or good standing as of a recent date of BioLabs from the Secretary of State of the State of Delaware and a certificate of good standing as of a recent date of BioLabs from each state in which it is qualified to conduct business, (B) the resolutions referenced in subsection (A)(2) are still in effect and (C) nothing has occurred since the date of the issuance of the certificate(s) referenced in subsection (A)(3) that would adversely affect BioLabs' existence or good standing in any such jurisdiction after giving effect to the Bankruptcy Case;

(j)      a certificate of the secretary of WestCliff, in form and substance reasonably satisfactory to Purchaser, certifying that (A) attached thereto is a true, correct and complete copy of (1) the articles or certificate of incorporation of WestCliff, certified as of a recent date by the Secretary of State of the State of California, and the bylaws of WestCliff, (2) to the extent applicable, resolutions duly adopted by the board of directors and shareholders of WestCliff authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Transaction Documents to which it is a party and (3) a certificate of existence or good standing as of a recent date of WestCliff from the Secretary of State of the State of California and a certificate of good standing as of a recent date of WestCliff from each state in which it is qualified to conduct business, (B) the resolutions referenced in subsection (A)(2) are still in effect and (C) nothing has occurred since the date of the issuance of the certificate(s) referenced in subsection (A)(3) that would adversely affect WestCliff's existence or good standing in any such jurisdiction after giving effect to the Bankruptcy Case;

(k)      Intentionally Omitted;

(l)      the certificate referred to in Section 8.3;

(m)      a certificate of Seller's non-foreign status as set forth in Treasury Regulation Section 1.1445-2(b);

(n)      to the extent in Seller's possession, (i) all lease files for the Assumed Leases (including copies of any plans of the Leased Premises), and (ii) keys for the Leased Premises, the combination of any safes or lock boxes located in the Leased Premises and the access codes for any electronic security systems located at the Leased Premises, in each case, in respect of Assumed Leases;

(o)      all instruments and documents necessary to release (or evidence the release of) any and all Encumbrances (other than Permitted Liens) set forth on Schedule 4.3(o), other than (i) with respect to any related Debt that is paid in full at or prior to Closing; or (ii) to the extent that the full amount of any related Debt that is provided for at Closing by funding from sale proceeds into a separate segregated account; and

18

(p)    such other bills of sale, assignments and other instruments of transfer or conveyance, including instruments of assignment of the Intellectual Property Rights, trade names and domain names included in the Purchased Assets, duly executed by Seller, as may be reasonably requested by Purchaser to effect the sale, conveyance and delivery of the Purchased Assets to Purchaser.

4.4    <u>Purchaser's Closing Deliveries</u>.    Subject to the fulfillment or waiver of the conditions set forth in Article VIII, at Closing, Purchaser shall:

(a)    pay the portion of the Aggregate Purchase Price due and payable to Seller in accordance with Section 3.3(a); and

(b)    execute and deliver to Seller (i) the certificate contemplated by Section 9.3, (ii) the Lease Assignment, (iii) the Assumption Agreement, (iv) the Non-Competition Agreement, (v) joint instructions releasing the Deposit in the Deposit Escrow Agreement, (vi) the Transition Agreement, and (vii) a certificate of the secretary of Purchaser, in form and substance reasonably satisfactory to Seller, certifying that the resolutions duly adopted by the board of directors and shareholders of Purchaser authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Transaction Documents to which it is a party and the resolutions are still in effect.

(c)    As of the Closing Date there may be located on the Leased Premises certain Excluded Assets.    Prior to the Closing, Seller and Purchaser shall agree on reasonable procedures to transfer such Excluded Assets to Seller at such location or locations as shall be determined by Seller, it being understood that the cost of transferring such Excluded Assets shall be borne by Seller.    After the Closing, Purchaser shall grant Seller and its representatives reasonable access to such Leased Premises, during normal business hours and upon reasonable notice, in order to permit Seller and its representatives to remove such Excluded Assets and to take such other necessary or appropriate action with respect thereto as Seller may reasonably determine.

## ARTICLE V

## <u>Representations and Warranties of Seller</u>.

In order to induce Purchaser to enter into and perform this Agreement and to consummate the transactions contemplated hereunder, Seller hereby makes the following representations and warranties to Purchaser as of the date hereof and as of the Closing Date, subject to the disclosures contained in <u>Schedule A</u> attached hereto (the "<u>Disclosure Schedule</u>"), which Disclosure Schedule shall, subject to Section 12.12, contain references to the representations and warranties to which the disclosures contained therein relate.

5.1    <u>Organization; Subsidiaries; Ownership; Predecessors</u>.

(a)    BioLabs is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the full corporate right, power and authority to own lease and operate all of its properties and assets and carry out its business as it is presently conducted.    WestCliff is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has the full corporate right, power and

authority to own lease and operate all of its properties and assets and carry out its business as it is presently conducted. Section 5.1(a) of the Disclosure Schedule sets forth each jurisdiction in which Seller is qualified or licensed to do business as a foreign Person and there are no other jurisdictions in which the character of Seller's properties or the nature of Seller's activities require it to be qualified.

(b)    The entire authorized capital stock of BioLabs consists of 20,000,000.00 shares of common stock and 80,000,000.00 shares of preferred stock. Of the common stock, only 10,776,987.00 shares are outstanding. Of the authorized preferred stock, 75,471,911.00 shares are authorized as Series A Redeemable Preferred Stock, of which only 74,865,901.00 shares are outstanding; 10,000.00 shares are authorized as Series B Convertible Preferred Stock, of which all 10,000.00 shares are outstanding; 4,000.00 shares are authorized as Series C Convertible Preferred Stock, none of which are outstanding; and 4,514,089.00 shares are undesignated, none of which are outstanding. Such outstanding shares of capital stock are owned of record and beneficially by the Persons and in the amounts set forth in Section 5.1(b) of the Disclosure Schedule. The entire authorized capital stock of WestCliff consists solely of 100,000.00 shares of capital stock, of which only 28,841 shares are outstanding. WestCliff is a wholly-owned Subsidiary of BioLabs. Other than WestCliff, BioLabs has no Subsidiaries. WestCliff has no Subsidiaries. All of the outstanding capital stock of each of BioLabs and WestCliff has been duly authorized and is validly issued, fully paid and nonassessable. Except as set forth in Section 5.1(b) of the Disclosure Schedule, there are no outstanding securities convertible or exchangeable into capital stock of Seller.

(c)    Section 5.1(c) of the Disclosure Schedule lists (i) each of Seller's prior legal names and any other trade name, fictitious name or other name under which Seller currently conducts business, or has ever conducted any business or activity, and (ii) to the Knowledge of Seller, each legal name, trade name, fictitious name or other name under which any predecessor to any part of the Business acquired by Seller conducted any business related to such acquired part of the Business.

5.2    Due Authorization; No Conflict.

(a)    Seller has the full corporate power and authority to execute, deliver and, subject to the Sale Order or other requirements of the Bankruptcy Court, perform this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Seller of this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith have been duly authorized by all necessary corporate action. Subject to the entry of the Sale Order or other requirements of the Bankruptcy Court, this Agreement, and all other agreements, certificates and documents executed or to be executed in connection herewith, constitute or, when executed and delivered, shall constitute a legal, valid and binding Contract of Seller, Enforceable against Seller in accordance with its terms.

(b)    Except for the entry of the Sale Order, other requirements of the Bankruptcy Court and any required Approvals in connection with the assignment of the Assumed Contracts and except as set forth in Section 5.2(b) of the Disclosure Schedule, the execution and delivery by Seller of this Agreement and the Transaction Documents, the

20

consummation of the transactions contemplated hereby and thereby, and the performance by Seller of its obligations hereunder and thereunder, shall not: (i) result in a material breach of the terms or conditions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any of the Purchased Assets under, (A) any Assumed Contract or Subsequent Designated Contract, (B) any of the Purchased Assets, or (C) any Legal Requirement or Governmental Order applicable to Seller, the Purchased Assets, the Business or the Assumed Liabilities; (ii) contravene the Organizational Documents of Seller; (iii) require Seller to make any declaration, filing or registration with, or provide any notice to, any Governmental Authority or obtain any Governmental Authorization (other than as required by the HSR Act); (iv) require any consent, approval or authorization of, declaration, filing or registration with, or notice to, any other Person; or (v) result in the creation or imposition of any Encumbrance upon any of the Purchased Assets.

5.3    Financial Statements.

(a)    Set forth in Section 5.3(a) of the Disclosure Schedule are the following financial statements (collectively, the "Financial Statements"): (i) the audited consolidated balance sheet of Seller as of December 31, 2007, and related consolidated statements of income, cash flow and changes in stockholders' equity, (ii) the unaudited consolidated balance sheets of Seller as of, December 31, 2008 and December 31, 2009, and the related unaudited consolidated statements of income, cash flow and changes in stockholders' equity for the fiscal years then ended, including in each case the notes thereto (collectively, the "Financial Statements"); and (iii) the monthly unaudited consolidated financial statements (including balance sheets and the related statements of income and cash flow) of Seller for each complete calendar month ending after December 31, 2009, through the date of this Agreement (the "Monthly Financial Statements"). Set forth in Section 5.3(a) of the Disclosure Schedule is the aged accounts payable report as of the date hereof (the "Aged Accounts Payable Report"). To the Knowledge of Seller, the Aged Accounts Payable Report is accurate and complete in all material respects.

(b)    Except as disclosed in Section 5.3(b) of the Disclosure Schedule, the Financial Statements (i) have been prepared in accordance with GAAP, (ii) present the financial condition and results of operations of Seller on a stand-alone basis and (iii) fairly present, in all material respects, the consolidated financial condition of Seller as at the respective dates thereof and the consolidated results of operations of Seller and changes in financial condition for the respective periods covered thereby, except that the Monthly Financial Statements do not contain notes and may be subject to normal audit adjustments, none of which adjustments are expected to be material.

(c)    Except as reflected on, reserved against or otherwise disclosed in the Financial Statements or as specifically set forth in Section 5.3(c) of the Disclosure Schedule, Seller is not subject to any Liability of a type that would be required to be disclosed on the face of a balance sheet prepared as of the date hereof in accordance with GAAP, whether absolute, contingent, accrued or otherwise other than Liabilities that (i) have arisen in the Ordinary Course of Business since the most recent balance sheet included in the Monthly Financial Statements and (ii) that individually, or in the aggregate, would not be expect to have a Material Adverse Effect.

21

5.4    <u>Absence of Changes</u>. Since March 31, 2010, except as set forth Section 5.4 of the Disclosure Schedule, Seller has conducted the Business only in the Ordinary Course of Business, and there has not been:

(a)    any event, development or circumstance that has had or would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    any material damage, destruction or other casualty loss (whether or not covered by insurance) affecting the Business or the Purchased Assets;

(c)    any amendment or modification of the Organizational Documents of Seller;

(d)    any incurrence of any Debt by Seller;

(e)    any creation or other incurrence of any Encumbrance upon any Purchased Asset of Seller, other than Permitted Liens;

(f)    Intentionally Omitted**.**

(g)    any sale, transfer, lease or other disposition of any asset of Seller, except for Inventory sold in the Ordinary Course of Business;

(h)    any capital expenditure, or commitments for capital expenditures, by Seller with respect to the Business in an amount in excess of $10,000 in the aggregate;

(i)    any cancellation, compromise, waiver or release of any right or claim (or series of related rights or claims) or any Debt owed to Seller, in any case involving more than $10,000;

(j)    any declaration, setting aside or payment of any dividend or other distribution with respect to, or any repurchase, redemption or other acquisition of, any equity interests of Seller;

(k)    any increase in the compensation payable or paid, whether conditionally or otherwise, to (i) any employee, consultant or agent of Seller whose annual base compensation exceeds $50,000 (or would exceed such amount after such increase), (ii) any director or officer of Seller, or (iii)   any Affiliate of Seller;

(l)    any Tax election made, changed or revoked, any settlement of any claim, assessment, Liability or Proceeding with respect to Taxes, any method of Tax accounting adopted, changed, modified, or revoked, any amendment of any Tax Return, any extension or waiver of the limitation period applicable to any Tax claim or assessment, or any other similar action relating to the filing of any Tax Return or the payment of any Tax in respect of, or that otherwise relates to, any of the Purchased Assets (whether directly or indirectly) or Seller;

(m)    any loss of any lab, sales location or source of supply of Inventory, utilities or contract services or the receipt of any notice that such a loss may be pending;

(n)    any change in the accounting principles and practices of Seller from those applied in the preparation of the Financial Statements; or

(o)    any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

5.5    Title to Assets; Condition.

(a)    Seller has good and marketable title to all of the Purchased Assets, free and clear of all Encumbrances, except Permitted Liens and except as set forth in Section 5.5(a) of the Disclosure Schedule. Subject to the terms of the Sale Order or other requirement of the Bankruptcy Court, upon delivery to Purchaser on the Closing Date of the instruments of transfer contemplated by Section 4.3 hereof, Seller shall thereby transfer to Purchaser good and marketable title to the Purchased Assets, free and clear of all Encumbrances except for Permitted Liens.

(b)    The tangible assets included in the Purchased Assets are in good working order, condition and repair, reasonable wear and tear excepted, and are not in need of maintenance or repairs except for maintenance or repairs which are routine, ordinary and are not material in costs or nature. Except as set forth in Section 5.5(b) of the Disclosure Schedule, all of the Purchased Assets are located at the Leased Premises.

5.6    Inventory. The inventory consists of a quality and quantity usable for its intended purpose and salable in the Ordinary Course of Business consistent with past practices and are not materially more or less than normal inventory levels except for obsolete items. All of the inventory is located on the Leased Premises or in transit to such Leased Premises.

5.7    Real Property.

(a)    Seller does not own any right, title or interest in any real property nor has any such owned real property ever been used in connection with the Business.

(b)    Section 5.7(b) of the Disclosure Schedule contains a list of all of the Leased Premises and identifies each Existing Lease. There are no subleases, licenses, concessions, occupancy agreements or other Contract granting to any other Person the right of use or occupancy of the Desired Leased Premises or Possible Leased Premises and there is no Person (other than Seller) in possession of the Desired Leased Premises or Possible Leased Premises. There is no pending or, to the Knowledge of the Seller, threatened eminent domain taking affecting any portion of the Desired Leased Premises or Possible Leased Premises which shall interfere with Seller's conduct of the Business. Seller has delivered to Purchaser true, correct and complete copies of the Existing Leases covering the Desired Leased Premises and Possible Leased Premises, including all amendments, modifications, notices or memoranda of lease thereto and all estoppel certificates or subordinations, non-disturbance and attornment agreements, if any, related thereto. To the Knowledge of the Seller, no event or condition currently exists which would create a legal or other impediment to the use of the Desired Leased Premises or Possible Leased Premises as currently used, or would increase the additional charges or other sums payable by the tenant under any Existing Lease for the Desired Leased Premises or Possible Leased Premises (including any pending Tax reassessment or other special assessment affecting the Desired Leased Premises or Possible Leased Premises). To Seller's Knowledge, the

23

Desired Leased Premises and Possible Leased Premises (including the roof, the walls and all plumbing, wiring, electrical, heating, air conditioning, fire protection and other systems, as well as all paved areas, included therein or located thereat) are in good working order, condition and repair, reasonable wear and tear excepted, and are not in need of maintenance or repairs except for maintenance or repairs which are routine, ordinary and are not material in costs or nature. Except as set forth in Section 5.7(b) of the Disclosure Schedule and/or disclosed to Purchaser in due diligence, each of the Desired Leased Premises and Possible Leased Premises and Seller's operation thereof fully complies with all applicable federal, state and local Legal Requirements and any restrictive covenants applicable to the Desired Leased Premises and Possible Leased Premises and with the terms and conditions of the applicable Existing Leases covering the Desired Leased Premises and Possible Leased Premises, other than to the extent would not reasonably be expected to result in a Material Adverse Effect. No Seller has received written notice from any Governmental Authority of any violations of any Legal Requirement affecting any portion of the Desired Leased Premises and Possible Leased Premises.

      5.8    <u>Taxes</u>.

      (a)    Seller has timely filed with the appropriate Governmental Authority all Tax Returns which are required to be filed prior to the date of this Agreement, and all such Tax Returns are true, correct and complete in all respects. All Taxes owed (or to be remitted) by Seller (whether or not shown or required to be shown on any Tax Return) have been paid or shall timely be paid to appropriate Governmental Authority. No event has occurred which could impose on Purchaser any successor or transferee liability for any Taxes in respect of Seller or the Purchased Assets. Seller has not waived or been requested to waive any statute of limitations in respect of Taxes. Since the date of the most recent Monthly Financial Statement, Seller has not incurred any Liability for Taxes outside the Ordinary Course of Business.

      (b)    Seller has withheld and paid proper and accurate Taxes and other amounts from or on behalf of, as the case may be, its employees, customers, creditors, stockholders, independent contractors and other third parties, in compliance with all withholding and similar provisions of the Code and any and all other applicable United States, foreign, state or local laws, statutes, codes, ordinances, rules and regulations. Seller shall not be required to deduct and withhold any amounts upon the transfer of the Purchased Assets to Purchaser.

      (c)    No examination or audit of any Tax Return of the Seller is currently in progress and no Governmental Authority is asserting or, to the Knowledge of the Seller, threatening to assert or expected to assert against Seller any deficiency, proposed deficiency or claim for additional Taxes or any adjustment thereof with respect to any period for which a Tax Return has been filed, for which Tax Returns have not yet been filed or for which Taxes are not yet due and payable. There are no Encumbrances on any of the Purchased Assets of Seller that arose in connection with, or otherwise relate to, any failure (or alleged failure) to pay any Tax.

      (d)    No Purchased Asset is an interest, directly or indirectly, in any joint venture, partnership, limited liability company or other entity that is treated as a partnership for income Tax purposes. Seller has no Liability for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of any other Legal Requirement), as a transferee or successor, by contract, or otherwise.

(e)      Section 5.8(e) of the Disclosure Schedule (i) contains a list of all states, territories and other jurisdictions (whether domestic or foreign) in which Seller has filed a Tax Return at any time during the six-year period ending on the date hereof, (ii) identifies those Tax Returns that have been audited, (iii) identifies those Tax Returns that currently are the subject of audit, (iv) lists all Tax rulings and similar determinations requested or received by, or otherwise relate to, Seller, and (v)  contains a complete and accurate description of all material Tax elections that were made by or on behalf of Seller. Seller has delivered or made available to Purchaser true, correct and complete copies of all Tax Returns filed by, and all examination reports, and statements of deficiencies assessed against or agreed to by, Seller during the six-year period ending on the date hereof.

(f)      Section 5.8(f) of the Disclosure Schedule lists each agreement, contract, plan or other arrangement (whether or not written and whether or not an Employee Plan) to which Seller is a party that is a "nonqualified deferred compensation plan" within the meaning of Code Section 409A and the Treasury Regulations promulgated thereunder. Each such nonqualified deferred compensation plan (i) complies, and is operated and administered in accordance, with the requirements of Code Section 409A, the Treasury Regulations promulgated thereunder and any other Internal Revenue Service guidance issued thereunder and (ii) has been operated and administered in good faith compliance with Code Section 409A from the period beginning on January 1, 2005.

5.9    Insurance.  Section 5.9 of the Disclosure Schedule sets forth a description of the current insurance policies maintained by Seller (each, an "Insurance Policy"), including policies by which Seller, or any of the Purchased Assets, or Seller's employees, officers or directors or the Business are insured. The description includes for each Insurance Policy the type of policy, policy number, name of insurer and expiration date. Seller has made available to Purchaser true, accurate and complete copies of all such Liability Policies, in each case, as amended or otherwise modified and in effect with respect to Seller. All Liability Policies provide occurrence-based coverage unless noted otherwise in Section 5.9 of the Disclosure Schedule. Seller is not in default with respect to its obligations under any Insurance Policy and has not failed to give any notice or present any claim thereunder in a due and timely manner.  Seller has not been denied insurance coverage or been subject to any gaps in insurance coverage in the two (2) year period immediately preceding the date of this Agreement. Except as disclosed in Section 5.9 of the Disclosure Schedule, since January 1, 2007, no insurer has to Seller's Knowledge threatened to cancel any Insurance Policy. Seller does not have any self-insurance or co-insurance programs.

5.10    Governmental Authorizations.

(a)      Seller owns, holds or possesses all Governmental Authorizations which are necessary to entitle Seller to own or lease, operate and use the Purchased Assets and to carry on and conduct the Business as currently conducted other than to the extent the failure to hold or possess such Governmental Authorization would not reasonably be expected to result in a Material Adverse Effect.  Each employee of Seller has all Governmental Authorizations required for the performance of his or her duties for Seller.  Other than State of California ex rel. Hunter Laboratories, LLC, et al. v. Quest Diagnostic Laboratories, Inc., et al., none of Seller or any of its officers, directors, shareholders or, to Seller's Knowledge, employees has been a party to or subject to any Proceeding seeking to revoke, suspend or otherwise limit any Governmental Authorization of Seller or such Person. Section 5.10(a) of the Disclosure Schedule sets forth a

list of each Governmental Authorization of Seller and indicates which of such Governmental Authorizations shall be assigned to Purchaser at the Closing. To Seller's Knowledge, the Governmental Authorizations to be assigned to Purchaser at the Closing, if any, constitute all of the Governmental Authorizations necessary to entitle Purchaser to own or lease, operate and use the Purchased Assets and to carry on and conduct the Business as currently conducted. Except as disclosed in Section 5.10(a) of the Disclosure Schedule or as otherwise disclosed to Purchaser in due diligence, (i) such Governmental Authorizations are valid and in full force and effect and (ii) Seller is not in material breach or violation of, or default under, any such Governmental Authorization.

(b)    To the Knowledge of the Seller, Seller has not received any written notice from any Governmental Authority that any of its properties, facilities, equipment, operations or business procedures or practices fails to comply in any material respects with any applicable Health Care Legal Requirement or Governmental Authorization. There is no pending, or to the Knowledge of the Seller, threatened, Proceeding or Governmental Order with respect to, any of the Governmental Authorizations listed or required to be listed in Section 5.10(a) of the Disclosure Schedule. Seller has not received any written notice of any Proceeding pending or recommended by any Governmental Authority having jurisdiction over the Governmental Authorizations listed or required to be listed in Section 5.10(a) of the Disclosure Schedule to revoke, withdraw or suspend any such Governmental Authorization or to terminate or modify the participation of Seller in any Program, other than State of California ex rel. Hunter Laboratories, LLC, et al. v. Quest Diagnostic Laboratories, Inc., et al. Except as disclosed to Purchaser in due diligence, to the Knowledge of Seller, no event has occurred that, with or without notice or the passage of time, would constitute a breach or violation of, or would constitute grounds for a Proceeding or Governmental Order with respect to any of the Governmental Authorizations listed or required to be listed in Section 5.10(a) of the Disclosure Schedule.

(c)    The Business is duly certified by and registered in accordance with the Clinical Laboratories Improvement Act of 1967 and Amendments of 1988 and the regulations, rules and guidance promulgated thereunder ("CLIA"). The certificates of accreditation issued by CLIA, and copies of the most recent CLIA and/or Medicare survey reports, including a list of deficiencies, if any, and proficiency test results have been provided to Purchaser and are listed in Section 5.10(c) of the Disclosure Schedule. The Business is in compliance in with CLIA requirements, and no suspension, revocation, termination, sanction, corrective action or limitation of any CLIA certification or accreditation is pending or, to the Knowledge of Seller, threatened.

5.11    Compliance with Health Care Legal Requirements.

(a)    Except as disclosed to Purchaser in due diligence, Seller is not in material breach or violation of, or material default under, and, has not been in material breach or violation of, or material default under any Legal Requirement (including under any Governmental Program) at any time within the applicable statutes of limitations.

(b)    Except as disclosed to Purchaser in due diligence, neither Seller nor any directors, officers, employees, or agents of Seller have directly or indirectly, overtly or covertly, in violation of any Health Care Legal Requirement in connection with the Business at any time within the applicable statute of limitations (i) made, or agreed to make, any contribution, gift,

26

bribe, rebate, payoff, influence payment, kickback or other payment to any Person (including, in the case of an individual, any family members of such Person and in the case of an entity, any Affiliates of such entity), regardless of form, whether in money, property or services, including (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, or (C) to obtain special concessions or pay for special concessions already obtained for or in respect of Seller, or (ii) established or maintained any fund or asset that has not been recorded in the books and records of Seller.

(c)    Except as disclosed to Purchaser in due diligence, neither Seller nor any of its officers, directors, principals or employees has engaged in any activity which would be likely to lead to an investigation by the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG"), any Medicare or Medicaid Fraud Control Unit, or other federal or state prosecutor or enforcement agency or which would be likely to lead to an action or proceeding for recoupment by any third party insurer or government agency or for mandatory or permissive exclusion under 42 U.S.C. Sec. 1320a7 or under any other federal or state law or for civil monetary penalties under 42 U.S.C.-Sec. 1320a-7a or for civil monetary penalties under 42 U.S.C. Sec. 1320a-7 or under any other federal or state law; and neither Seller nor any of its employees or agents has solicited or obtained specimen referrals by means of rebates, kickbacks or other unlawful arrangements or in a manner otherwise in violation of any federal, state or local statute or regulation. Billing by Seller has been true and correct and in compliance with applicable laws, regulations and policies.

(d)    Each clinical laboratory, draw station, collection station, patient service center, facility, center or location owned, operated or managed by Seller (i) is qualified (to the extent such qualification is required by applicable Health Care Legal Requirement) for participation in all Governmental Programs for which the Business seeks or receives reimbursement for services, (ii) is in compliance with the conditions of participation or coverage of such Governmental Programs, (iii) is in good standing with such Governmental Programs and (iv) has current and valid provider or other Contracts (the "Provider Agreements") with such Governmental Programs. The billing practices of the Business with respect to all patients and Governmental Programs have been in compliance with all applicable Health Care Legal Requirements. Except as disclosed to Purchaser in due diligence, Seller has not billed or received any payment or reimbursement in excess of amounts allowed by applicable Health Care Legal Requirements (other than routine and immaterial refunds, offsets and adjustments made in the ordinary course of business). Except as disclosed to Purchaser in due diligence, there are no pending, concluded in the last three (3) years or, to the Knowledge of the Seller, threatened investigations, audits or other Proceedings, relating to Seller's participation in any Governmental Program. Except as disclosed to Purchaser in due diligence, Seller is not subject to, nor in the last three (3) years has been subject to, any recoupment, refund or set-off in excess of $15,000, by any Governmental Program.

(e)    Except as disclosed to Purchaser in due diligence, Seller has filed timely and accurately all claims and other reports required to be filed prior to the date hereof with respect to all Governmental Programs, all fiscal intermediaries and/or carriers, and other insurance carriers ("Payor Claims"). All such Payor Claims and reports are true and correct. Seller has paid or caused to be paid all known and undisputed refunds, overpayments, discounts or adjustments that have become due pursuant to Payor Claims.

27

(f)      Seller is not in violation of the applicable Legal Requirements of the standards for Privacy or Security of Individually Identifiable Health Information, which were promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996, Title II, Subtitle F, Sections 261-264, Public Law 104-191, and the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160-164 and the implementing regulations thereunder (collectively, "HIPAA").

(g)      With respect to the Business:

(i)      All "financial relationships" (whether or not memorialized in writing), including any joint venture, partnership, co-ownership or other compensation arrangement, that Seller has had with any Person that is a physician or other healthcare provider or supplier of items or services payable under a Governmental Program, or an immediate family member of a physician or other healthcare provider or supplier of items or services payable under a Governmental Program have been disclosed to Purchaser in due diligence.  Except as disclosed to Purchaser in due diligence, no physician has ever made any "referrals" to Seller, or any predecessor entities, for "designated health services," as those terms are defined in 42 U.S.C. Section 1395nn and the regulations promulgated pursuant thereto (the "Stark Law"), during such time as such physician, or an immediate family member of the physician, has had a "financial relationship" with Seller, other than a "financial relationship" to which an exception under the Stark Law applies.  The foregoing representation and warranty shall similarly be true and correct as it relates to any prohibition under any similar California state "self-referral" laws.  For purposes of this Section 5.11(g)(i), the term "financial relationship" has the meaning set forth in the Stark Law.

(ii)      Except as disclosed to Purchaser in due diligence, neither Seller nor any director, officer, employee or agent of Seller:  (A) has been convicted of or charged with any violation of any Health Care Legal Requirements related to any Governmental Program; (B) has been convicted of, charged with, or investigated for any violation of Health Care Legal Requirements related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation, or controlled substances; or (C) is excluded, suspended or debarred from participation, or is otherwise ineligible to participate, in any Governmental Program or has committed any violation of Health Care Legal Requirements that could reasonably be expected to serve as the basis for any such exclusion, suspension, debarment or other ineligibility.

(h)      Seller (i) is not a party to a corporate integrity agreement with the OIG, (ii) does not have reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (iii) has not made any filings pursuant to the OIG's Self Disclosure Protocol, (iv) has not received written notice that it is or has been the subject of any inspection, investigation, survey, audit, monitoring or other form of review by any Governmental Authority, Governmental Program, professional review organization, accrediting organization or certifying agency, (v) has not been a defendant in any qui tam or False Claims Act litigation (other than State of California ex rel. Hunter Laboratories, LLC, et al. v. Quest Diagnostic Laboratories, Inc., et al.), or (vi) has not been served with or received any written search warrant, subpoena (other than those related to actions against third parties), civil investigative demand or contact letter from any Governmental Authority. For purposes hereof, a "contact letter" shall mean a

letter from a Governmental Authority notifying Seller of a potential violation under a Health Care Legal Requirement which allows Seller an opportunity to respond prior to the Governmental Authority taking further action.

(i)     Except for the representations and warranties set forth in <u>Section 5.10</u> herein and this <u>Section 5.11</u>, Seller makes no representations or warranties concerning Health Care Legal Requirements.

5.12    <u>Environmental Matters</u>.    Except as set forth in Section 5.12 of the Disclosure Schedule, (a) Seller has not at any time generated, used, treated or stored Hazardous Materials on, or transported Hazardous Materials to or from, the Leased Premises or any property adjoining or adjacent to the Leased Premises other than in compliance in all material respects with all Environmental Legal Requirements and, to the Knowledge of the Seller, no party has taken such actions on or with respect to the Leased Premises, (b) Seller has not at any time released or disposed of Hazardous Materials on the Leased Premises or any property adjoining or adjacent to the Leased Premises, and, to the Knowledge of Seller, no party has taken any such actions on the Leased Premises, other than such release or disposal as would not reasonably be expected to result in a Material Adverse Effect, (c) Seller has at all times been in compliance in all material respects with all Environmental Laws and the Legal Requirements of any Governmental Authorizations issued under such Environmental Laws with respect to the Leased Premises, the Purchased Assets and the operation of the Business, (d) there are no past, pending or, to the Knowledge of Seller, threatened environmental claims against Seller, the Leased Premises, any of the Purchased Assets or the Business, (e) to the Knowledge of Seller, there are no facts or circumstances, conditions or occurrences regarding Seller, the Leased Premises, any of the Purchased Assets or the Business that could reasonably be anticipated to form the basis of an environmental claim against Seller, any of the Purchased Assets or the Business or to cause the Leased Premises, the Purchased Assets or the Business to be subject to any restrictions on its ownership, occupancy, use or transferability under any Environmental Law, other than as would not reasonably be expected to result in a Material Adverse Effect, (f) there are not now and, to the Knowledge of Seller, there never have been, any underground storage tanks located on the Leased Premises, (g) other than in compliance in all material respects with Environmental Laws, Seller has not ever transported or arranged for the transportation of any Hazardous Materials to any site from the Leased Premises, and (h) Seller has not operated the Business at any location other than the Leased Premises.

5.13    <u>Litigation</u>.    Except as set forth in Section 5.13 of the Disclosure Schedule: (a) there is no Proceeding pending or, to the Knowledge of Seller, threatened (i) against Seller or affecting the Purchased Assets or the Business or (ii) which seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement or any of the conditions to consummation of such transactions and, (b) there is no Governmental Order outstanding or, to the Knowledge of Seller, threatened (i) against Seller or affecting the Purchased Assets or the Business, or (ii) which seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement or any of the conditions to consummation of such transactions.

5.14    <u>Employee Benefit Plans; Employees</u>.

(a)     Section 5.14(a) of the Disclosure Schedule lists all Employee Plans as to which Seller sponsors, maintains, contributes or is obligated to contribute, or under which Seller

has or may have any Liability. With respect to each Company Plan, Seller has delivered to Purchaser true, accurate and complete copies of each of the following: (i) if the Company Plan has been reduced to writing, the plan document together with all amendments thereto, (ii) if the Company Plan has not been reduced to writing, a written summary of all material plan terms, (iii) copies of any summary plan descriptions, employee handbooks or similar employee communications, (iv) in the case of any Company Plan that is intended to be qualified under Code Section 401(a), a copy of the most recent determination letter or opinion letter, as applicable, from the IRS and any related correspondence, and a copy of any pending request for such determination, (v) in the case of any funding arrangement intended to qualify as a VEBA under Code Section 501(c)(9), a copy of the IRS letter determining that it so qualifies, and (vi) in the case of any Company Plan for which Forms 5500 are required to be filed, a copy of the most recently filed Form 5500, with all required schedules attached.

(b)     Seller does not maintain, participate in or contribute to, and has never maintained, participated in or contributed to (i) an Employee Plan subject to Title IV of ERISA; (ii) a multiemployer plan within the meaning of Section 3(37) of ERISA; or (iii) an Employee Plan subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA. No Company Plan is a multiple employer plan within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA. Each Company Plan conforms to and has been operated and administered in all material respects in compliance with the requirements of ERISA, the Code and applicable Legal Requirements. Each Company Plan that is intended to qualify under Section 401(a) of the Code and each related trust intended to be exempt under Section 501 of the Code is so qualified or exempt and Seller has received a current favorable determination letter to such effect from the Internal Revenue Service or is properly relying on the Internal Revenue Service opinion letter issued with respect to the qualification of a prototype plan document that Seller has duly adopted. The amendments to and operation of each such Company Plan would not reasonably be expected to adversely affect the qualified or exempt status of such Company Plan or related trust. There are no facts relating to any Company Plans that (A) have resulted in a "prohibited transaction" under Section 4975 of the Code or Section 406 of ERISA or otherwise have resulted in or could result in the imposition of a material excise Tax, penalty or similar Liability under ERISA or the Code; or (B) have resulted in a breach of fiduciary duty or violation of Part 4 of Title I of ERISA. Seller is not delinquent as to contributions or payments to, or in respect of, any of its Company Plans and all amounts payable with respect to the portion of the plan year ending on the Closing Date shall be paid on or before the Closing Date. Seller is and has been in compliance in all material respects with the "COBRA" health care continuation requirements of Sections 601-608 of ERISA and Section 4980B of the Code and any applicable state Legal Requirements regarding health care continuation coverage. Seller has not made any promises or incurred any Liability under any Company Plan or otherwise to provide health or other welfare benefits to employees (or their spouses or dependents) following retirement or other termination of employment, except as specifically required by law.   There are no pending or, to the Knowledge of the Seller, threatened, claims (other than routine claims for benefits) or Proceedings with respect to the Company Plans. No termination, discontinuance, load or other similar fee or expense is payable or shall be assessed in connection with the discontinuance of contributions to, and/or the amendment or termination of, any of the Company Plans.

(c)     Seller has previously provided to Purchaser: (i) a list of all employees or commission salespersons of Seller as of the date hereof; (ii) the then-current annual or hourly

compensation and/or commission rate provided to such employees or salespersons; (iii) a list of all present employees or commission salespersons of Seller who have given notice of their intention to terminate their relationship with Seller; and (iv) a list of any increase, effective after December 31, 2009, in the rate of compensation of any employees or the commission rate of any commission salespersons (including independent sales representatives) of Seller.

5.15    Employee Relations.    Seller has complied in all material respects with all applicable Legal Requirements which relate to prices, wages, hours, discrimination in employment and collective bargaining and is not liable for any arrears of wages, Taxes or penalties for failure to comply with any of the foregoing.  No employee of Seller is a party to a collective bargaining agreement or any similar contract or agreement with a union.  Seller is not a party to or, to the Knowledge of the Seller, threatened with any dispute with a union.  To Seller's Knowledge, Seller's employees relating to the Business have not, while employed by Seller, been engaged in any union organizing or election activities. Seller has not received any correspondence from the Social Security Administration advising of a "no-match" between an employee's name and social security number. Within the past year, Seller has not incurred any Liability or obligation under the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act") or any similar state or local Legal Requirement that remains unsatisfied, and no terminations prior to the date hereof shall result in unsatisfied Liability or obligation under WARN or any similar state or local Legal Requirement.  No employee of Seller has experienced an employment loss, as defined by the WARN Act or any similar applicable state or local Legal Requirement, requiring notice to employees in the event of a closing or layoff, within ninety (90) days prior to the date of this Agreement.

5.16    Contracts.

(a)    Section 5.16(a) of the Disclosure Schedule contains a list of each oral or written Material Contract (as defined in Section 5.16(b) below) to which Seller is a party or by which Seller is bound and which (i) relates to the Business or the Purchased Assets and, (ii) may be assigned to Purchaser, including Initial Designated Contracts and Potential Subsequent Designated Contracts (collectively, the "Potential Assigned Contracts").

(b)    Except as disclosed in Section 5.16(b) of the Disclosure Schedule, Seller is not a party to, and none of the Potential Assigned Contracts is:  (i) a Contract providing annual revenues to Seller or requiring annual expenditures by Seller in excess of $50,000; (ii) an Employee Plan providing for deferred or other compensation to employees or any other Employee Plan or Contract with any labor union; (iii) a Contract relating to loans to officers, directors, or Affiliates; (iv) a Contract relating to the borrowing of money or the mortgaging, pledging or otherwise placing of an Encumbrance on any asset of Seller involving an amount in excess of $10,000; (v) a guarantee of any obligation; (vi) a Contract under which Seller has made advances or loans to any Person; (vii) a Contract pursuant to which Seller is lessor of any property, real or personal, owned or controlled by Seller; (viii) an employment, consulting, sales, commissions, advertising or marketing Contract which provide for annual payments in excess of $30,000, excluding bonuses and commissions; (ix) a Contract providing for "take or pay" or similar unconditional purchase or payment obligations; (x) a Provider Agreement; (xi) a Contract containing covenants not to compete, non-solicitation clauses or other restrictive covenants (other than customary confidentiality agreements) which limit the freedom of Seller to engage in any line of business or solicit or hire any Person in any geographical area or granting any "most

31

favored nations" or similar rights; (xii) a Contract entered into other than the Ordinary Course of Business or that provides for an express undertaking by the Seller to be responsible for consequential, incidental or punitive damages; (xiii) a joint venture, partnership or Contract involving a sharing of profits, losses, costs or Liabilities with any other Person; or (xiv) a power of attorney. Each of the Contracts listed under items (i) through (xiv) above being referred to individually as a "<u>Material Contract</u>" and collectively as the "<u>Material Contracts</u>."

(c)    Except as set forth in Section 5.16(c) of the Disclosure Schedule and/or disclosed to Purchaser in due diligence, each of the Potential Assigned Contracts is in full force and effect, is in compliance with all applicable Legal Requirements in all material respects provided that failure to comply with any Legal Requirements shall not have, individually or in the aggregate, a Material Adverse Effect, and constitutes a valid, legal, binding and enforceable obligation of Seller and, to the Knowledge of the Seller, the other parties thereto, subject, in each case, to (i) Legal Requirements of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) rules of Legal Requirements governing specific performance, injunctive relief and other equitable remedies. Seller is not in breach or default under and, to the Knowledge of Seller, no other party to any of the Potential Assigned Contracts has breached or defaulted thereunder.  Except as set forth in Section 5.16(c) of the Disclosure Schedule, Seller does not lease from any Shareholder or any Affiliate any real property or personal property used in connection with the Business.

5.17    <u>No Broker</u>.  Except as set for on Section 5.17 of the Disclosure Schedules, neither Seller nor any Person acting on behalf of Seller has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

5.18    <u>Large Customers</u>.  To Seller's Knowledge, since March 31, 2010, Seller has not received notice from any customer which represented more than two percent (2%) of the aggregate annual revenue of Seller during the 2009 calendar year (each a "<u>Large Customer</u>") and Seller has no Knowledge that any such Large Customer shall cease to do business with Purchaser, or shall materially decrease the volume or value of its business with Purchaser after, or as a result of, the consummation of the transactions contemplated hereby, or is threatened with bankruptcy or insolvency.  For purposes of this Section 5.18, "customer" is defined as a physician or other medical professional or organization ordering services from Seller.

5.19    <u>Intellectual Property</u>.

(a)    As used herein, (i) "<u>Copyrights</u>" means works of authorship in which copyright protection subsists, whether registered or unregistered, and pending applications to register the same; (ii) "<u>Intellectual Property Rights</u>" means Copyrights, Patent Rights, Trademarks and Trade Secrets; (iii) "<u>Patent Rights</u>" means United States and foreign patents, patent applications, continuations, continuations-in-part, divisions, reissues, patent disclosures, inventions (whether patentable or not patentable) or improvements thereto; (iv) "<u>Trademarks</u>" means United States, state and foreign trademarks, service marks, logos, trade dress and trade names, whether registered or unregistered, and pending applications to register the foregoing; and (v) "<u>Trade Secrets</u>" means confidential and proprietary ideas, trade secrets, know how, concepts, methods, processes, formulae, reports, data, customer lists, mailing lists, business

plans, or other proprietary information which derives independent commercial value from not being generally known or readily available.

(b)     Section 5.19(b) of the Disclosure Schedule contains a list and description of (i) all Patent Rights and Trademarks (including all assumed or fictitious names under which Seller is conducting business or has within the previous five (5) years conducted business), and all material Copyrights, owned by, licensed to or used by Seller (other than "shrink wrap" or other commercially available off-the-shelf non-customized software) and (ii) all agreements, contracts, licenses, sublicenses, assignments and indemnities (other than "shrink wrap" or other commercially available off-the-shelf non-customized software) which relate to (A) any such Copyrights, Patent Rights or Trademarks or (B) any Trade Secrets owned by, licensed to or used by Seller. Except as disclosed in Section 5.19(b) of the Disclosure Schedule, Seller either owns the entire right, title and interest in and to the Intellectual Property Rights which are included in the Purchased Assets, free and clear of any Encumbrance or has the worldwide, irrevocable, perpetual, transferable, sublicenseable royalty-free right to use the same.

(c)     Except as disclosed in Section 5.19(c) of the Disclosure Schedule: (i) all issued Patent Rights and registered Trademarks identified in Section 5.19(b) of the Disclosure Schedule are valid and enforceable; (ii) to the Knowledge of the Seller, all applications for issuance of Patent Rights and all applications to register Trademarks identified in Section 5.19(b) of the Disclosure Schedule are in good standing and without challenge by any Person; (iii) to the Knowledge of the Seller, there are no pending Proceedings which challenge the validity of any Intellectual Property Rights identified in Section 5.19(b) of the Disclosure Schedule or which form the basis for such Intellectual Property Rights being adjudicated invalid or unenforceable; and (iv) Seller has the sole and exclusive right to bring actions for infringement or unauthorized use of the Intellectual Property Rights which are included in the Purchased Assets, and to the Knowledge of the Seller, there is no basis for any such action.

(d)     Except as disclosed in Section 5.19(d) of the Disclosure Schedule, (i) no infringement of any Intellectual Property Rights of any other Person has occurred or results in any way from Seller's operation of the Business, (ii) no claim of any infringement of any Intellectual Property Rights of any other Person has been made or asserted against or to any Seller in respect of Seller's operation of the Business and (iii) no Seller has notice of, nor, to the Knowledge of the Seller, is there any basis for, a claim against Seller that the operations, activities, products, software, equipment, machinery or processes of Seller infringe any Intellectual Property Rights of any other Person.

5.20    Accounts Receivable.  All account receivable of Seller represent valid obligations arising from sales actually made or services actually performed by Seller in the Ordinary Course of Business, and Seller has attempted in good faith to collect its accounts receivables other than to the extent Seller has settled and/or discounted and written off certain aged accounts receivable in order to facilitate collection of current or future accounts receivable.

5.21    [Intentionally Omitted]

5.22    Transactions with Related Parties.  Except (a) for confidentiality, assignment of invention and non-competition agreements, employment agreements and (b) as set forth in Section 5.22 of the Disclosure Schedule, neither any present officer, director or shareholder of

Seller, or any other Person that, to the Knowledge of Seller, is an Affiliate of any of the foregoing, is currently a party to any transaction or Contract with Seller, including any loan, extension of credit or arrangement for the extension of credit, any Contract providing for the employment of, furnishing of services by, rental or sale of assets from or to, or otherwise requiring payments to or from, any such officer, director, shareholder or Affiliate.

5.23    <u>Privacy and Data Protection</u>.

(a)    Seller has established, implemented, updated and maintained such policies, programs, procedures, contracts and systems with respect to the collection, use, storage, transfer, retention, deletion, destruction, disclosure and other forms of processing of any and all data and information ("Company Data") including, any and all data or information collected, used, stored, transferred, retained, deleted, destroyed, disclosed or processed with respect to any of its customers or prospective customers ("Customer Data") as consistent and compliant with:

(i)    accepted industry practice and standards as are known in the information security industry to protect, physically and electronically, information and assets from unauthorized disclosure, access, use, dissemination or modification, including but not limited to the current publication of the National Institute of Standards and Technology data security guidelines to the extent endorsed by HIPAA; and

(ii)    all applicable federal, state or provincial Legal Requirements relating to privacy and data protection, including but not limited to HIPAA, as of the effective dates of such Legal Requirements.

(b)    Seller is not a party to or the subject of any pending or, to the Knowledge of Seller, threatened Proceeding, which involves or relates to a claim against Seller of any breach, misappropriation, unauthorized disclosure, access, use, dissemination, modification or any similar violation or infringement of any Company Data including any Customer Data.

(c)    Seller does not have any Knowledge of any actual, suspected or threatened (i) breach, misappropriation, or unauthorized disclosure, access, use, dissemination or modification of any Company Data including any Customer Data; or (ii) breach or violation of any of the policies, programs, procedures, contracts and systems described in Section 5.23(a) above.


# ARTICLE VI

## Representations and Warranties of Purchaser and Parent.

In order to induce Seller to enter into and perform this Agreement and to consummate the transactions contemplated hereunder, Purchaser hereby makes the following representations and warranties to Seller set forth in Sections 6.1, 6.2, 6.3, 6.4, and 6.5 and Parent hereby makes the following representations and warranties set forth in Sections 6.6, 6.7, 6.8 and 6.9 as of the date hereof and as of the Closing Date.

6.1    <u>Organization and Good Standing</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.  Purchaser has the required power and authority to enter into the Transaction Documents and perform its obligations hereunder and thereunder.

6.2    <u>Due Authorization; No Conflict</u>.

(a)    Purchaser has full corporate power and authority to execute, deliver and perform this Agreement and all other agreements, certificates, and documents executed or to be executed in connection herewith, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Purchaser of this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith have been duly authorized by all necessary corporate action.  This Agreement, and all other agreements, certificates and documents executed or to be executed in connection herewith, constitute or, when executed and delivered, shall constitute, a legal, valid and binding Contract of Purchaser Enforceable against Purchaser in accordance with its terms.

(b)    Except for the filings with the Bankruptcy Court, the execution and delivery by Purchaser of this Agreement and the agreements contemplated hereby, the consummation of the transactions contemplated hereby and thereby, and the performance by Purchaser of its obligations hereunder and thereunder, shall not (i) contravene the Organizational Documents of Purchaser or (ii) require the consent, authorization or Approval of, or notice to, or filing or registration with, any Governmental Authority or any other Person.

6.3    <u>No Brokers</u>.  Neither Purchaser nor any Person acting on behalf of Purchaser has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

6.4    <u>Litigation</u>.  There is no Proceeding pending or, to the Knowledge of Purchaser, threatened against Purchaser which seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement or any of the conditions to consummation of such transactions and there is no Governmental Order outstanding or, to the Knowledge of Purchaser, threatened against Purchaser which seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement or any of the conditions to consummation of such transactions.

6.5    <u>Adequate Assurances Regarding Contracts</u>.  Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

6.6    <u>Sufficiency of Funds</u>.  Parent has the immediately available funds sufficient to consummate the transactions contemplated by this Agreement and will  make such funds available to Purchaser at Closing.

6.7    <u>Organization and Good Standing</u>.  Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power

and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

6.8     Due Authorization; No Conflict.

(a)     Parent has full corporate power and authority to execute, deliver and perform this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. The execution, deliver and performance by Parent of this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith have been duly authorized by all necessary corporate action. This Agreement, and all other agreements, certificates and documents executed or to be executed in connection herewith, constitute or, when executed and delivered, shall constitute, a legal, valid and binding agreement of Parent enforceable against Parent in accordance with its terms.

(b)     The execution and delivery by Parent of this Agreement and the agreements contemplated hereby, the consummation of the transactions contemplated hereby and thereby, and the performance by Parent of its obligations hereunder and thereunder, shall not (i) contravene the Certificate of Incorporation or Bylaws of Parent or (ii) require the consent, authorization or approval of, or notice to, or filing or registration with, any Governmental Body or any other third party.

6.9     Ownership of Purchaser.  Parent owns all of the issued and outstanding capital stock of Purchaser.

## ARTICLE VII

## Covenants and Agreements

7.1     Purchaser's Investigation.

(a)     Prior to the Closing Date, Purchaser shall be entitled, upon reasonable request and at its own expense and risk, through its employees and representatives, including its attorneys to perform a due diligence investigation of the assets, properties, business and operations of Seller. Purchaser shall be permitted reasonable access during normal business hours and upon reasonable notice to the Leased Premises, books and records of Seller, including, the opportunity to observe and verify the Purchased Assets, provided, that (a) such access does not unreasonably interfere with the normal operations of Seller or the Business, and (b) nothing herein shall require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (x) would cause significant competitive harm to Seller or the Business if the transactions contemplated by this Agreement are not consummated or (y) would be in violation of applicable laws or regulations of any Governmental Authority (including the HSR Act and other anti-competition laws) or the provisions of any agreement to which Sellers are a party. Any such investigation and review shall be conducted at reasonable times and under reasonable circumstances. Purchaser agrees that any such investigation or review shall not unreasonably interfere with the ongoing operations of Seller. Subject to the foregoing, Seller will cooperate in all material respects with all reasonable requests and shall use reasonable efforts to

36

cause its officers, employees, consultants, agents, accountants and attorneys to cooperate with such review and investigation.

(b)     Following the Sale Procedures Order, Purchaser shall be entitled to (i) meet with Seller's customers in order to introduce such customers to Purchaser, educate such customers on using Purchaser's services, provide requisitions, supplies, etc. and determine the need for computers and printers and (ii) meet with Seller's employees in order to introduce such employees to Purchaser, complete paperwork for background checks and provide employee benefits orientation (collectively, the "Pre-Closing Activities").  Purchaser shall coordinate the conduct of the Pre-Closing Activities with Seller and the Pre-Closing Activities shall be conducted at mutually agreeable times.  Meetings with employees of Seller shall be conducted at times approved by Seller so as to minimize interference with the performance of such employee's duties to Seller.  Seller shall use commercially reasonable efforts to cooperate with Purchaser in completing the Pre-Closing Activities prior to the Closing Date.

(c)     The parties shall adhere to the terms and conditions of the Confidentiality Agreement; provided, however, Purchaser's obligations under the Confidentiality Agreement shall terminate upon the Closing, except to the extent such obligations relate to information about our Sellers stockholders, the Excluded Assets and Excluded Liabilities.  Except as and to the extent required by law, prior to the Closing, Purchaser shall not disclose or use, and shall direct its representatives not to disclose or use, to the detriment of Seller, any information disclosed pursuant to the Schedules or received by Purchaser from Seller in connection with Purchaser's due diligence investigation of the Business or received or disclosed to Purchaser in connection with the Pre-Closing Activities, except for disclosure to or use by any of Purchaser's accountants, attorneys, advisors or other agents who have need of such information in connection with such due diligence investigation and who agree to be bound by these confidentiality provisions.  In the event this Agreement is terminated for any reason, upon the written request of Seller, Purchaser shall promptly return to Seller, or destroy, any such information in its possession and certify in writing to Seller that it has done so.  The provisions of this Section 7.1(c) shall survive the termination of this Agreement.

7.2     Consents of Third Parties.

(a)     Seller shall act diligently and reasonably to secure, before the Closing Date, all Approvals, notices, filings and/or registrations in form and substance reasonably satisfactory to Purchaser and as necessary to the extent such Approvals, notices, filings and/or registrations are not provided for or satisfied by the Sale Order (collectively, the "Material Consents").

(b)     To the extent applicable and subject to the terms and conditions of this Agreement, each party shall use commercially reasonable efforts to (i) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Legal Requirements to consummate the transactions contemplated by this Agreement; (ii) file a notification and report form pursuant to the HSR Act with respect to the transactions contemplated hereby within five Business Days after the date hereof; (iii) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any antitrust law, including the HSR Act and (iv) cause the expiration or termination of the applicable waiting periods under the HSR Act or any other antitrust law as

soon as practicable.  For sake of clarity, if the Desired Existing Non-Competition Agreements are not satisfied by the Sale Order, the Desired Existing Non-Competition Agreements shall be deemed to be Material Consents.

7.3    Bankruptcy Matters; Bidding Process.

(a)    Seller and Purchaser acknowledge that this Agreement and the Transactions are subject to Bankruptcy Court approval.  Seller and Purchaser acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the Transactions to creditors and certain other interested Persons as required by applicable law or ordered by the Bankruptcy Court, and conducting an auction in respect of the Purchased Assets, and (ii) Seller must cure all defaults and Purchaser provide adequate assurance of future performance with respect to the Assumed Contracts and Assumed Leases.

(b)    On or before the first calendar day following the Petition Date:

(i)    Seller shall file with the Bankruptcy Court motions (the "Sale Motion" and the "Sale Procedures Motion") together with related notices, ex parte applications for an order shortening time and proposed orders, each in the form reasonably satisfactory to Purchaser;

(ii)    Seller shall seek the Bankruptcy Court's issuance of:

(A)    an order approving the process respecting the sale of the Purchased Assets in substantially the form attached as Exhibit 7.3(b)(ii)(A) (the "Sale Procedures Order"), and

(B)    an order approving this Agreement and the Transactions in substantially the form attached as Exhibit 7.3(b)(ii)(B) (the "Sale Order").

(c)    Without in any way limiting the foregoing, the Sale Procedures Order shall:

(i)    approve a break up fee payable to Purchaser upon and pursuant to the events set forth in the Sale Procedures Order in an amount equal to Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) (the "Break Up Fee");

(ii)    require a minimum initial overbid increment of  Two Million Nine Hundred Fifty Thousand Dollars ($2,950,000);

(iii)    require minimum subsequent bid increments of One Hundred Thousand Dollars ($100,000);

(iv)    require that, to be considered a "qualified bidder," a bidder must, on or before two (2) Business Days before the Sale Hearing, submit to Seller and Purchaser confirmation of financing committed or immediate funding available that indicates the financial ability to pay the Purchase Price;

(v)    provide that the winning bid shall be the highest bid (the "<u>Winning Bid</u>"); provided, however, that if (x) the highest bid made by a qualified bidder other than the Purchaser minus the Break Up Fee is less than (y) the highest bid of the Purchaser, then the bid of the Purchaser shall be the Winning Bid;

(vi)    provide that the back up bid (the "<u>Back Up Bid</u>") shall be (a) if the Winning Bid is made by the Purchaser, the highest bid made by a qualified bidder other than the Purchaser or (b) if the Winning Bid is made by a qualified bidder other than the Purchaser, the second highest bid made; provided, however, that if (x) such second highest bid made by a qualified bidder other than the Purchaser minus the Break Up Fee is less than (y) the highest bid made by the Purchaser, then the Back Up Bid shall be the highest bid made by the Purchaser;

(vii)    provide that the deposit posted by the maker of the Back Up Bid shall not be refunded until five (5) Business Days following the closing of the sale to the maker of the Winning Bid;

(viii)    require a "good faith deposit" from any qualified bidder in an amount equal to Four Million Dollars ($4,000,000) to be deposited in escrow in immediately available funds no later than two (2) Business Days before the Sale Hearing;

(ix)    establish a date for commencement of the hearing on the Sale Motion (the "<u>Sale Hearing</u>") no more than twelve (12) calendar days following the Petition Date unless otherwise ordered by the Bankruptcy Court but in no event to exceed twenty-five (25) calendar days following the Petition Date; and

(x)    provide that the maker of the Back Up Bid shall be required to consummate the Transactions within ten (10) days following receipt of written notice from Seller of the failure of the maker of the Winning Bid to consummate the Transactions, provided such written notice is provided to the maker of the Back Up Bid within thirty-five (35) days following the Petition Date, with the maker of the Back Up Bid to be deemed to forfeit its good faith deposit if it fails to consummate the Transactions within this time frame.

(d)    Without in any way limiting the foregoing, the Sale Order shall:

(i)    contain findings and conclusions of fact to the effect that Purchaser is a good faith purchaser and entitled to the protections of Section 363(m) of the Bankruptcy Code;

(ii)    authorize the sale of the Purchased Assets free and clear of all Claims and Encumbrances under and pursuant to Section 363(f) of the Bankruptcy Code; it being understood that such order (or an abstract thereof) shall be in form suitable for filing in applicable lien records and shall enjoin any holder of a claim against or interest in Seller from asserting any such claim or interest against Purchaser or the Purchased Assets; and

(iii)    authorize the assumption by Seller and assignment to Purchaser of the Assumed Contracts as of the Closing Date, and otherwise in accordance with the terms of this Agreement.

(e)    Seller shall serve a copy of the Sale Motion and all related pleadings on: (i) all Persons that claim any interest in or Encumbrance upon the Purchased Assets, (ii) all parties to Designated Contracts, (iii) all Governmental Authorities with taxing power that have, or as a result of the sale of the Purchased Assets may have, claims, contingent or otherwise, against Seller, (iv) all Persons that file requests for notices under Bankruptcy Rule 9010(b), (v) all interested Governmental Authorities, including those administering Governmental Programs (vi) the attorneys general of all states in which the Purchased Assets are located, (vii) the Office of the United States Trustee, (viii) all Persons that expressed to Seller an interest in purchasing the Purchased Assets in the twelve (12) months prior to the date of this Agreement; (ix) any other Person reasonably requested by Purchaser; (x) any patient who has notified or threatened Seller with any claim; and (xi) all interested Private Programs.  In addition, Seller shall serve notice of the Sale Motion in a form acceptable to Purchaser and approved by the Bankruptcy Court on (i) all creditors (whether liquidated, contingent or unsecured) of Seller, (ii) all other Persons entitled to notification under Bankruptcy Rule 2002 and (iii) all other Persons entitled to notice pursuant to applicable Legal Requirements.  Further, Seller shall post a copy of the Sale Motion on its website and publish notice of such Sale Motion in publications to be agreed upon.

(f)    Seller shall use commercially reasonable efforts to provide Purchaser with copies of all motions, applications and supporting papers prepared by or on behalf of Seller (including forms of orders and notices to interested Persons) directly relating to the Purchased Assets or this Agreement at least two (2) Business Days (unless the exigencies of time prevent the period from being that long) prior to the filing thereof in the Bankruptcy Case so as to allow Purchaser to provide reasonable comments for incorporation into same.

7.4    <u>Operations of the Business Prior to the Closing</u>.  During the period prior to the Closing Date, except as contemplated by this Agreement, Seller shall operate and carry on the Business only in the Ordinary Course of Business.  Consistent with the foregoing, Seller shall (a) keep and maintain in all material respects the Purchased Assets in good operating condition and repair subject to normal wear and tear; (b) use its commercially reasonable efforts consistent with good business practice to maintain the Business intact and to preserve the goodwill of the suppliers, licensors, employees, distributors and others having business relations with Seller; (c) maintain (except for expiration due to lapse of time) all Designated Contracts in effect without change, except those Designated Contracts which expire or terminate by their terms or as otherwise expressly provided herein; (d) comply in all material respects with the provisions of all Legal Requirements applicable to Seller, the Purchased Assets and the conduct of the Business; (e) not increase compensation of any of its officers, directors or employees other than in the Ordinary Course of Business; (f) not enter into any Contract with any shareholder of Seller or any Affiliate of any shareholder of Seller; and (g) not take any action to change accounting policies, estimates or procedures (including procedures with respect to revenue recognition, payments of accounts payable and collection of accounts receivable).

7.5    <u>Notification of Certain Matters</u>.  From the date of this Agreement until the Closing Date, Seller shall give Purchaser prompt written notice upon becoming aware of any material development affecting the Purchased Assets, the Assumed Liabilities, the Business,

financial condition, operations or prospects of Seller, or any event or circumstance that could reasonably be expected to result in a breach of, or inaccuracy in, any representation or warranty contained in Article V; provided, however, that no such disclosure shall be deemed to prevent or cure any such breach of, or inaccuracy in, amend or supplement any Schedule to, or otherwise disclose any exception to, any of the representations and warranties of Seller set forth in this Agreement. Seller shall prepare and furnish to Purchaser, promptly after becoming available and in any event within thirty (30) days of the end of each calendar month, Monthly Financial Statements for Seller for each month ending after the date of this Agreement through the Closing Date.

7.6     Takeover Proposals.  Seller shall not furnish information concerning the Business or the Purchased Assets to any third Person, except pursuant to either (a) an existing confidentiality agreement or (b) a confidentiality agreement with terms and conditions no less restrictive than the Confidentiality Agreement.  Seller shall not release any third Person from, or waive any provision of, any such confidentiality agreement or any similar confidentiality or standstill agreement to which Seller is a party.  To the extent that this Section 7.6 conflicts with the Sale Procedures Order, the Sale Procedures Order shall govern.  Seller shall promptly (and in any event within one (1) Business Day) notify Purchaser in writing at such time as any Takeover Proposal has been determined to be a Qualified Bid (as defined in the Sale Procedures Order).

7.7     Consents, Approvals and Notifications.  Purchaser shall use commercially reasonable efforts to obtain all consents and approvals of all Governmental Authorities, and all other Persons, required to be obtained by Purchaser and provide notifications to all Persons required to be notified by Purchaser to effect the transactions contemplated by this Agreement. Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Purchasers employees and representatives available to testify before the Bankruptcy Court.

7.8     Notices.  Purchaser shall provide Seller with prompt written notice if Mike Aicher or Sandra van der Vaart obtain actual knowledge of (i) any breach of any representation or warranty by Seller or (ii) any other material failure by Seller to comply with the obligations of this Agreement.

7.9     Required Efforts.  Seller and Purchaser shall, and shall cause their respective representatives to, use commercially reasonable efforts to take all of the actions necessary (including as necessary and appropriate, in obtaining all governmental and third party Approvals, licenses, change of ownership applications, billing numbers, provider applications and other Permits) to consummate the transactions hereunder including delivering all the various certificates, documents and instruments described in Article VIII and Article IX hereto, as the case may be.  Without limiting the foregoing, Seller shall not voluntarily dismiss the Bankruptcy Case once filed and shall use its commercially reasonable efforts to:

(a)     commence the Bankruptcy Case within two (2) Business Days of the date of this Agreement;

(b)    file the Sale Motion and the Sale Procedures Motion within one (1) calendar day of the Petition Date;

(c)    obtain the Sale Procedures Order which shall have been entered on or before two (2) calendar days following the Petition Date;

(d)    obtain the Sale Order which shall have been entered on or before twelve (12) calendar days following the Petition Date or the first court date thereafter;

(e)    cause the Closing to occur on or before twelve (12) calendar days following the Petition Date; and

(f)    subject to the fiduciary duties of the members of the board of directors of Seller, prevent the dismissal of the Bankruptcy Case, the appointment of a chapter 11 trustee or the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code.

7.10    <u>Employee Matters</u>.

(a)    Under no circumstances shall Purchaser assume or be obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any claims of Seller's employees, including but not limited to, any claims or Liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour Legal Requirements, any other state, federal or local labor and employment Legal Requirements, Liability under WARN, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension, profit sharing, retirement and/or deferred compensation and any other compensation or benefits (the "<u>Employee Claims</u>"), which Employee Claims shall be and remain the Liability, responsibility and obligations of Seller, except pursuant to the Transition Agreement.

(b)    Purchaser shall have the right (in its sole and absolute discretion), but not the obligation, to offer employment, on an at will basis, effective on the Closing Date, to any or all employees of Seller.  In no event shall Purchaser be obligated to hire or retain any employee of Seller for any period following the Closing.  The employees of Seller who accept Purchaser's offer of employment and who commence employment with Purchaser from and after the Closing Date shall be referred to herein as the "<u>Hired Employees</u>".  Under no circumstances shall any individual employed or formerly employed by Seller become an employee of Purchaser unless such individual becomes a Hired Employee.

(c)    With respect to each Hired Employee, Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by Seller on the employment activities or other conduct of such individuals after their termination of employment with Seller; <u>provided</u>, <u>however</u>, that Seller shall assign (to the extent unilaterally assignable) to Purchaser the rights of Seller to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

(d)    Except as expressly provided in this Agreement, nothing herein shall be construed as transferring to Purchaser (i) any Contract with any current or former employee of Seller or for the employment of any Person or engagement of any independent contractor by

42

Seller or (ii) any rights or obligations Seller may owe to or be owed by any current or former employee, officer, consultant, independent contractor or agent of Seller.

(e)    Nothing herein, express or implied, shall confer upon any employee or former employee of Seller any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement.  Purchaser and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise enforceable by, any third party, including any employee or former employee of Seller.

(f)    At least five (5) Business Days prior to the Auction, Seller shall deliver to Purchaser a list of all of Seller's employees, together with particulars of the date of commencement of employment or service, periods of continuous employment or service, job description or grade, date of birth, annual salary or hourly rate of pay and commissions.

(g)    Seller shall retain all Liability and responsibility for its Company Plans except as provided otherwise under the Transition Agreement.  Seller shall fully defray all costs attributable to any amendment and termination of Company Plans with no resulting Liability to the participants therein.  Notwithstanding the foregoing, Purchaser shall have the option, in its sole discretion and exercised by the delivery to Seller of a written request, to require Seller to transfer any or all of Seller's Company Plans or related insurance policies to Purchaser at the Closing, so long as any additional costs in transferring such Company Plans are paid by the Purchaser.

7.11    Adequate Assurances Regarding Assumed Contracts and Assumed Leases.  With respect to each Assumed Contract and each Assumed Lease, Purchaser shall use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by Purchaser of each such Assumed Contract and Assumed Lease.  Purchaser and Seller agree that they shall promptly take all commercially reasonable actions required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and there has been a demonstration of adequate assurance of future performance under the Assumed Contracts and Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making the respective employees and representatives of Purchaser and Seller available to testify before the Bankruptcy Court.

7.12    Cure Amounts.  Set forth on Schedule 2.4(a) is a list of the costs that pursuant to Bankruptcy Code Section 365(b) shall be required to cure any default on the part of Seller under the Designated Contracts, which costs must be delivered to the nondebtor under the Designated Contracts, or with respect to which adequate assurance of prompt delivery by Seller must be provided as a prerequisite to the assumption of such Designated Contracts under Bankruptcy Code 365(a) (the "Cure Costs").  Appropriate additions and deletions shall be made to Schedule 2.4(a)-1 and Schedule 2.4(a)-2, and the Cure Costs shall be correspondingly amended, to reflect additions and deletions to the schedules made from time to time in accordance with Section 2.4.  Prior to the Contract Designation Date, Seller shall cooperate with Purchaser to resolve any disputes with the nondebtor party to any of the Designated Contracts regarding the amount of the Cure Costs.  Seller shall pay all Cure Costs associated with respect to Initial Designated Contracts, Undisclosed Contracts that become Assumed Contracts, and the Leases that are

designated as Designated Contracts, such costs to be paid within two (2) Business Days (or such shorter period as may be required by the Bankruptcy Court) after the Closing or, with respect to Designated Contracts with an Assumption Date after the Closing Date, within two (2) Business Days after the Assumption Date. Further, Seller shall pay all pre-petition Cure Costs with respect to the Subsequent Designated Contracts (other than Leases) that are ultimately designated as Designated Contracts (the "Non-Lease Cure Expenses") to the extent such Subsequent Designated Contracts are set forth on Schedule 2.4(a)-2 as of the date hereof, such costs to be paid within two (2) Business Days (or such shorter period as may be required by the Bankruptcy Court) after the Closing or, with respect to Designated Contracts with an Assumption Date after the Closing Date, within two (2) Business Days after the Assumption Date; however, Purchaser shall reimburse Seller for Seller's Non-Lease Cure Expense (the "Cost Reimbursement") by the next Business Day following Seller's payment of such costs.  In addition, Purchaser shall reimburse Seller for Seller's Non-Lease Cure Expense incurred with respect to the period from the Closing Date to the date on which a Subsequent Designated Contract is either rejected or becomes a Designated Contract.

7.13    Further Assurances.  From and after the Closing Date, upon the request of either Seller or Purchaser, each of the parties hereto shall, at the sole expense of the requesting party, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as may be commercially reasonable to carry out the transactions contemplated hereunder.  Seller shall not take any action that is designed or intended to have the effect of discouraging any lessor, licensor, supplier, distributor or customer of Seller or other Person with whom Seller has a relationship from maintaining the same relationship with Purchaser after the Closing as it maintained with Seller prior to the Closing. Seller shall refer all customer inquiries relating to the Business to Purchaser from and after the Closing.

7.14    Prorations; Tax Cooperation.

(a)    Personal property, ad valorem, use and intangible Taxes and assessments, common area maintenance charges, utility charges and rental payments with respect to the Purchased Assets and the Leased Premises (collectively, "Charges") shall be prorated on a per diem basis and apportioned on a calendar year basis between Seller, on the one hand, and Purchaser, on the other hand, as of the date of the Closing. Seller shall be liable for that portion of such Charges relating to, or arising in respect of, periods on or prior to the Closing Date, and Purchaser shall be liable for that portion of such Charges relating to, or arising in respect of, any period after the Closing Date.

(b)    Purchaser and Seller shall cooperate, as and to the extent reasonably requested by any other party, in connection with the filing and preparation of Tax Returns related to the Purchased Assets and any Tax Proceeding related thereto.

7.15    Accounts Receivable.  Seller shall retain all Seller Accounts Receivable and specimens received by Seller prior to and including the Closing and Purchaser shall retain all accounts receivable arising out of the operation of the Business and specimens received by Purchaser after the Closing.  After the Closing, Purchaser and Seller shall forward to the other party any funds which are received by such party but relate to the accounts receivable of the

other party.  Notwithstanding anything to the contrary stated herein, neither party shall have any responsibility to collect any of the other party's accounts receivable.

7.16    Parent Obligations.    Parent shall cause the Purchaser to timely satisfy its obligations and comply with its agreements hereunder.  Without limiting the foregoing, Parent irrevocably guarantees the full payment of the Purchase Price; provided, however, that Parent only has such obligation if all conditions set forth in Article VIII are fulfilled and shall be subject to Purchaser's right to terminate this Agreement as provided in Article X.

## ARTICLE VIII

## Conditions to Performance by Purchaser.

The obligations of Purchaser to consummate the Closing is subject to the fulfillment of each of the following conditions (unless waived by Purchaser in accordance with Section 12.4):

8.1    Representations and Warranties.    Each of the representations and warranties of Seller contained in this Agreement and in any certificate delivered pursuant to this Agreement, shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or true and correct in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect), in either case, as of the date hereof and as of the Closing Date, other than representations and warranties that expressly speak only as of a specific date or time, which shall be true and correct as of such specified date or time.

8.2    Covenants and Agreements.    Seller shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by them prior to or at the Closing.

8.3    Compliance Certificate.    Seller shall have delivered to Purchaser a certificate dated as of the Closing Date, duly executed by an officer of Seller, certifying as to (i) the satisfaction of the conditions set forth in Sections 8.1 and 8.2, and (ii) the Measurement Period Volume.

8.4    Absence of Litigation.

(a)    No Proceeding shall be pending which may result in a Governmental Order (nor shall there be any Governmental Order in effect) (a) which would prevent consummation of any of the transactions contemplated hereunder, (b) which would result in any of the transactions contemplated hereunder being rescinded following consummation, (c) which would limit or otherwise adversely affect the right of Purchaser to operate all or any material portion of either the Business or the Purchased Assets or of the business or assets of Purchaser or any of its Affiliates, or (d) would compel Purchaser or any of its Affiliates to dispose of all or any material portion of either the Business or the Purchased Assets or the business or assets of Purchaser or any of its Affiliates.

(b)    Any qui tam Proceeding commenced against Seller after the date hereof or False Claims Act litigation against Seller shall have been fully and finally settled and resolved by the parties thereto, resulting in the dismissal with prejudice of any and all claims, issues,

demands, causes of action and/or controversies related to the Proceeding, including any and all claims, counterclaims or third-party claims that were or could have been included in the Proceeding.

8.5    <u>Governmental Approvals</u>.  All actions by (including any Approval) or in respect of (including notice to), or filings with, any Governmental Authority that are required to consummate the transactions contemplated hereunder shall have been obtained or made in a manner reasonably satisfactory in form and substance to Purchaser, and no such Approval filing or notice shall have been revoked.  Any waiting period under the HSR Act applicable to the transactions contemplated hereby shall have expired or have been terminated.

8.6    <u>Bankruptcy Court Order</u>.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not (a) have been vacated or reversed, (b) be subject to any injunction or stay of effectiveness, including any stay pending appeal or (c) except with the express written consent of Purchaser, amended, supplemented or otherwise modified.

8.7    <u>Material Consents</u>.  All Material Consents shall have been obtained and shall be in full force and effect and Seller shall have delivered to Purchaser evidence thereof reasonably satisfactory to Purchaser.

8.8    <u>Qui Tam</u>.  With respect to Settlement Agreement and Release (as amended, the "<u>Settlement Agreement</u>") with a Signature Date of May 5, 2010, as provided to Parent on May 13, 2010, among the State of California, acting through the California Department of Justice, Office of the Attorney General, Bureau of Medi-Cal Fraud and Elder Abuse, and the California Department of Health Care Services (formerly known as the California Department of Health Services prior to July 1, 2007); Qui Tam Plaintiffs Hunter Laboratories LLC and Chris Riedel; and defendant Westcliff Medical Laboratories, Inc., and Biolabs, Inc., (i) there shall be a full and final settlement by all parties thereto as evidenced in writing, (ii) concurrently with the Closing, the State of California shall have been paid in full all amounts due under the Qui Tam Settlement or consented in writing to alternate treatment such that the benefits of the releases of Purchaser in the Qui Tam Settlement shall be fully and indefeasibly enforceable by Purchaser, (iii) no party thereto shall have the right, as of the Closing Date, to void the Qui Tam Settlement; and (iv) the Settlement Agreement shall not have been amended or modified from the version with a Signature Date of May 5, 2010, as provided to Parent on May 13, 2010, without consent of Purchaser, if such amendment or modification would materially and adversely affect the Purchaser.

8.9    <u>Deliveries</u>.  Seller shall have made all of the deliveries required by Section 4.3.

8.10    <u>No Material Adverse Change</u>.  There shall not have been a Material Adverse Change.

## ARTICLE IX

## <u>Conditions to Performance by Seller</u>.

The obligations of Seller to consummate the Closing is subject to the fulfillment of each of the following conditions (unless waived by Seller in accordance with Section 12.4):

9.1     <u>Representations and Warranties</u>.  Each of the representations and warranties of Purchaser contained in this Agreement and in any document, instrument or certificate delivered pursuant to this Agreement, shall be true and correct in all respects (in the case of any representation or qualified by materiality) or true and correct in all material respects (in the case of any representation or warranty not qualified by materiality), in either case, as of the date hereof and as of the Closing Date, other than representations and warranties that expressly speak only as of a specific date or time, which shall be true and correct as of such specified date or time.

9.2     <u>Covenants and Agreements</u>.  Purchaser shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing.

9.3     <u>Compliance Certificate</u>.  Purchaser shall have delivered to Seller a certificate dated as of the Closing Date, duly executed by an officer of Purchaser, certifying as to the satisfaction of the conditions set forth in Sections 9.1 and 9.2.

9.4     <u>Absence of Litigation</u>.  No Proceeding shall be pending which may result in a Governmental Order (nor shall there be any Governmental Order in effect) (a) which would prevent consummation of any of the transactions contemplated hereunder, or (b) which would result in any of the transactions contemplated hereunder being rescinded following consummation.

9.5     <u>Governmental Approvals</u>.  All actions by (including any Approval) or in respect of (including notice to), or filings with, any Governmental Authority that are required to consummate the transactions contemplated hereunder shall have been obtained or made in a manner reasonably satisfactory in form and substance to Seller, and no such Approval filing or notice shall have been revoked.  Any waiting period under the HSR Act applicable to the transactions contemplated hereby shall have expired or have been terminated.

9.6     <u>Bankruptcy Court Order</u>.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not (a) have been vacated or reversed or (b) be subject to any injunction or stay of effectiveness.

9.7     <u>Deliveries</u>.  Purchaser shall have made all of the deliveries required by Section 4.4.

9.8     <u>Fairness Opinion</u>.  If requested by the board of directors of Westcliff (the "<u>Westcliff Board</u>"), MTS Health Partners, L.P. shall have delivered to the Westcliff Board a fairness opinion in form and substance acceptable to the Westcliff Board in its sole discretion.


# ARTICLE X

## Termination.

10.1     <u>Termination</u>.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Purchaser and Seller;

(b)    by either Purchaser or Seller, if (i) any Governmental Authority having competent jurisdiction over any party hereto shall have issued a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Governmental Order is or shall have become nonappealable or (ii) there shall be adopted any Legal Requirement that makes the transactions contemplated by this Agreement illegal or otherwise prohibited; provided, however, that the party seeking to terminate this Agreement pursuant to clause (i) above shall not have initiated such Proceeding or taken any action in support of such Proceeding and shall have used its reasonable best efforts to challenge such order or other action;

(c)    by Purchaser, in the event of a material breach of any representation, warranty, covenant or agreement on the part of Seller set forth in this Agreement which (i) would cause any of the conditions set forth in Article VIII not to be satisfied if such breach or failure to perform was continuing as of the Closing Date and (ii) cannot be or has not been cured within twenty (20) Business Days after the receipt of written notice thereof; provided, however, Purchaser may not terminate this Agreement pursuant to this Section 10.1(c) if Purchaser is in breach of any of its representations, warranties, covenants or agreements under this Agreement;

(d)    by Seller, in the event of a material breach of any representation, warranty, covenant or agreement on the part of Purchaser set forth in this Agreement which (i) would cause any of the conditions set forth in Article IX not to be satisfied if such breach of failure to perform was continuing as of the Closing Date and (ii) cannot be or has not been cured within twenty (20) Business Days after the receipt of written notice thereof; provided, however, Seller may not terminate this Agreement pursuant to this Section 10.1(d) if Seller is in breach of any of its representations, warranties, covenants or agreements under this Agreement;

(e)    by Purchaser, in the event of the dismissal of the Bankruptcy Case or conversion of the Bankruptcy Case to a proceeding under Chapter 7 of the Bankruptcy Code, or the appointment of a trustee under Chapter 11 of the Bankruptcy Code;

(f)    by Purchaser or Seller, in the event the Bankruptcy Court approves an Alternative Transaction or an Alternative Transaction is consummated;

(g)    by Purchaser, if the Sale Procedures Order has not been entered by the Bankruptcy Court within seven (7) calendar days (the "Entry Period") after the Petition Date; provided, that, Purchaser provides notice of its election to terminate this Agreement pursuant to this Section 10.1(g) no later than 5:00 p.m. Pacific time on the second (2nd) Business Day following the expiration of the Entry Period; or

(h)    by either Purchaser or Seller, if the Closing has not been consummated on or before thirty-five (35) calendar days following the Petition Date (the "Closing Date Deadline"); provided, that no party may terminate this Agreement pursuant to this Section 10.1(h) if such party's breach of this Agreement or failure to fulfill any obligation under this Agreement shall have been a principal cause of or resulted in the failure of the Closing to be consummated on or before the Closing Date Deadline.

    10.2    Notice of Termination; Effect of Termination.

(a)      The party desiring to terminate this Agreement pursuant to Sections 10.1(b) through 10.1(h) shall give written notice of such termination to the other party in accordance with Section 12.7, specifying the provision or provisions hereof pursuant to which such termination is effected.  The right of any party to terminate this Agreement pursuant to Section 10.1 shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any party hereto, whether prior to or after the execution of this Agreement.

(b)      In the event of termination of this Agreement pursuant to Section 10.1, this Agreement shall be of no further force or effect; provided, however, (i) the provisions of Section 7.1(c), Article X and Article XII shall survive termination and (ii) subject to Section 10.2(c), any termination pursuant to Section 10.1 shall not relieve any party of any Liability for breach of any representation, warranty, covenant or agreement hereunder occurring prior to such termination.

(c)      If this Agreement is terminated pursuant to Section 10.1 (other than pursuant to Section 10.1(d)), Purchaser and Seller shall promptly deliver a joint written instruction to the Deposit Escrow Agent directing the Deposit Escrow Agent to return the Deposit (plus any interest thereon) to Purchaser.  If this Agreement is terminated pursuant to Section 10.1(d), Purchaser and Seller shall promptly deliver a joint written instruction to the Deposit Escrow Agent directing the Deposit Escrow Agent to deliver the Deposit (plus any interest thereon) to Seller.  Purchaser and Seller agree that (i) the amount of the Deposit is a reasonable estimate of the damages which Seller would be likely to incur in the event of a breach by Purchaser of this Agreement, and that such amount is their best estimate under the circumstances of such likely damages, not a penalty or forfeiture of any sort, and (ii) if Seller elects to terminate this Agreement pursuant to Section 10.1(d), in lieu of any other remedy (including the remedy of specific performance), Seller shall be entitled to retain the Deposit as liquidated damages to compensate Seller for its loss arising from such breach.

(d)      If this Agreement is terminated by Purchaser pursuant to Section 10.1(f), Seller shall pay to Purchaser in cash an amount equal to the Break-Up Fee.

(e)      In the event this Agreement is terminated (i)(A) pursuant to Sections 10.1(b), 10.1(c), 10.1(e), 10.1(g) or 10.1(h), (B) Seller enters into an Alternative Transaction or announces an Alternative Transaction prior to termination of this Agreement, and (C) Seller subsequently consummates an Alternative Transaction within ninety (90) days following the termination of this Agreement that constitutes a higher and better offer for the Purchased Assets, or (ii) pursuant to Section 10.1(h) solely as a result of the failure of the condition to Closing set forth in Section 9.8, then Purchaser shall be entitled to payment of the Break Up Fee.

(f)      Any payment of the Break Up Fee pursuant to Sections 10.2(d) or 10.2(e) shall be made by Seller concurrently with the consummation of the applicable Alternative Transaction.

(g)      Purchaser and Seller hereby agree that the Break Up Fee (i) is a reasonable estimate of the damages which Purchaser would be likely to incur in the event the Transactions are not consummated under the circumstances set forth herein, (ii) are a necessary inducement for Purchaser to enter into this Agreement and (iii) shall be the sole remedy of Purchaser for

breach of this Agreement by Seller (other than for non-payment of the Break Up Fee) if this Agreement is terminated under circumstance where the Break Up Fee is payable.

10.3    Return of Documentation.    Following termination of this Agreement, (a) all filings, applications and other submissions made pursuant to this Agreement or prior to the execution of this Agreement in contemplation hereof shall, to the extent practicable, be withdrawn from the Governmental Authority to which made and (b) Purchaser shall return or destroy (and provide written proof of such destruction of) all agreements, documents, contracts, instruments, books, records, materials and other information (in any format) regarding Seller provided to Purchaser or its representatives in connection with the transactions contemplated hereunder other than as reasonably necessary to enforce its rights under this Agreement.

# ARTICLE XI

## Limitation of Liability.

11.1    Limitation of Liability for Purchaser.    Notwithstanding anything contained in this Agreement to the contrary,  Purchaser's maximum liability for its breach of this Agreement is an amount equal to the Deposit.

11.2    Limitation of Liability for Seller.    Notwithstanding anything contained in this Agreement to the contrary, Seller's maximum liability for its breach of this Agreement is an amount equal to the Break Up Fee.

11.3    Survival of Representations and Warranties.    The representations and warranties, and covenants and agreements set forth in this Agreement or in any Transaction Document to the extent contemplating or requiring performance prior to the Closing, shall not survive the Closing. Each of the representations and warranties set forth in this Agreement or in any Transaction Document shall terminate effective immediately as of the Closing such that no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or equity) may be brought after the Closing.  The covenants and agreements of any party set forth in this Agreement and in any Transaction Document, to the extent contemplating or requiring complete performance by such party prior to the Closing, shall terminate effective immediately as of the Closing.  Each covenant and agreement requiring performance at or after the Closing shall expressly survive Closing in accordance with its terms notwithstanding this Section 11.3; provided, that any covenants of and agreements requiring performance at or after the Closing by Seller shall terminate upon the completion of the Bankruptcy Case.

11.4    Acknowledgments by Purchaser.

(a)    Purchaser has conducted to its satisfaction, an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of Seller.  In making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation and verification and the representations and warranties of Seller expressly and specifically set forth in this Agreement, including the Disclosure Schedule attached hereto. SUCH REPRESENTATIONS AND WARRANTIES BY SELLER CONSTITUTE THE SOLE

AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND PURCHASER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF SELLER) ARE SPECIFICALLY DISCLAIMED BY SELLER. IN ADDITION, SELLER MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE PURCHASED ASSETS, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY MADE IN ARTICLE 5, INCLUDING ANY IMPLIED REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE PURCHASED ASSETS AND IT IS UNDERSTOOD THAT, EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN ARTICLE 5, PURCHASER TAKES THE ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.

(b)    No claim, whether pursuant to statute or the common law or at equity or otherwise (including with respect to any environmental, health or safety matters), may be brought or maintained by Parent or the Purchaser or their respective Related Persons against any current or former Related Person of Seller, and no recourse shall be sought or granted against any of them, by virtue of or based upon any alleged misrepresentation or inaccuracy in or breach of any of the representations, warranties or covenants of the Seller set forth or contained in this Agreement or any Transaction Document or any exhibit or schedule hereto or thereto or any certificate delivered hereunder or thereunder or otherwise with respect to the transactions contemplated by this Agreement or any Transaction Document, including fraud.  In no event shall the Seller or any Related Person of Seller have any shared or vicarious liability for the actions or omissions of any other Person.  For purposes of this Agreement, "Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, restructuring advisors, attorneys, accountants, investment bankers, Affiliates or representatives of (i) any such Person and (ii) of any Affiliate of such Person.

11.5    Acknowledgment by Seller.  SELLER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES BY PURCHASER CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF PURCHASER TO SELLER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY.

## ARTICLE XII

### General Provisions.

12.1    Expenses; Transfer Taxes.  Whether or not the transactions contemplated herein shall be consummated, except as otherwise expressly provided herein, the parties hereto shall pay their own respective expenses incident to the preparation of this Agreement and to the consummation of the transactions provided for herein.  All transfer, documentary, sales, use,

stamp, registrations and other such Taxes and fees applicable to, imposed upon or arising out of the transactions contemplated hereby ("Transfer Taxes") shall be borne by Purchaser. Seller shall, at its own expense, file when due all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and if required by Law, Purchaser shall, and shall cause its Affiliates, to join in the execution of any such properly completed Tax Returns and other documentation. Purchaser and Seller shall pay their respective fees and expenses incurred in connection or required by the HSR Act.

12.2   Entire Agreement; No Third Party Beneficiaries; Amendment. This Agreement, together with the Confidentiality Agreement and the Exhibits and Schedules hereto, embodies all of the representations, warranties and agreements of the parties hereto with respect to the subject matter hereof, and all prior understandings, representations and warranties (whether oral or written) with respect to such matters are superseded. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties hereto any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement; provided that the Seller Indemnitees are intended third party beneficiaries of Purchaser's obligations set forth in Article XI and shall be entitled to enforce the Agreement against Purchaser. This Agreement may not be amended, modified, waived, discharged or orally terminated except by an instrument in writing signed by the party or a duly authorized officer of a corporate party against whom enforcement of the change, waiver, discharge or termination is sought.

12.3   Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted. Furthermore, in lieu of such illegal, invalid or unenforceable provisions there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

12.4   Waiver. Any party to this Agreement may, by written notice to the other parties hereto, waive any provision of this Agreement from which such party is entitled to receive a benefit. The waiver by any party hereto of a breach by another party of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by such other party of such provision or any other provision of this Agreement.

12.5   Public Announcements. No party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other parties, unless a press release or public announcement is required by Law or the Bankruptcy Court. If any such announcement or other disclosure is required by Law or the Bankruptcy Court, the disclosing party shall give the nondisclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure. The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and Sales Procedures Order.

12.6   Successors and Assigns. This Agreement shall not be assignable by any party hereto without the prior written consent of the other parties; provided, however, Purchaser may, upon written notice to Seller, assign this Agreement in whole or in part to any affiliate of Purchaser, provided that such assignment shall not relieve Purchaser of its obligations hereunder.

This Agreement shall be binding upon, and shall inure to the benefit of, and be enforceable by, the parties and their respective legal representatives, heirs, legatees, successors and assigns.

12.7    <u>Notice</u>.  All notices or other communications required or permitted hereunder shall be in writing and shall be delivered personally or sent by registered or certified mail, by reputable overnight delivery or courier or by facsimile transmission, addressed as follows:

To Seller:                       BioLabs, Inc.
                                 c/o Parthenon Investors II, L.P.
                                 265 Franklin Street
                                 18th Floor
                                 Boston, MA 02110
                                 Telecopy No.: (619) 960-4010
                                 Attn:  William Kessinger


With a copy to (prior to Closing):   Westcliff Medical Laboratories, Inc.
                                 1821 E. Dyer Road, Suite 100
                                 Santa Ana, CA  92705
                                 Telecopy No.:  (949) 222-1153
                                 Attn:  Robert E. Whalen,


With a copy to (which shall          Kirkland & Ellis LLP
not constitute notice):          300 North LaSalle
                                 Chicago, Illinois 60654
                                 Telecopy No.: (312) 862-2200
                                 Attn:  Jeffrey Seifman, P.C.
                                        Jason D. Osborn, Esq.

| With a copy to (which shall not constitute notice): | Levene, Neale, Bender, Rankin & Brill L.L.P.<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, CA 90067<br>Telecopy No.: (310) 229-1244<br>Attn:  Ron Bender, Esq. |
|---|---|
| To Purchaser: | Wave Newco, Inc.<br>531 South Spring Street<br>Burlington, North Carolina 27215<br>Telecopy No.: (336) 436-4177<br>Attn:  General Counsel |
| With a copy to<br>(which shall not constitute notice): | K&L Gates LLP<br>4350 Lassiter at North Hills Avenue, Suite 300<br>Raleigh, North Carolina 27609<br>Telecopy No.: (919) 743-7358<br>Attn:  John R. Erwin, Esq. |
| With a copy to<br>(which shall not constitute notice): | K&L Gates LLP<br>10100 Santa Monica Blvd., 7th floor<br>Los Angeles, CA 90067<br>Telecopy No.:  (310) 552-5001<br>Attn:  Michael B. Lubic, Esq. |
| To Parent: | Laboratory Corporation of America<br>531 South Spring Street<br>Burlington, North Carolina 27215<br>Telecopy No.: (336) 436-4177<br>Attn:  General Counsel |
| With a copy to<br>(which shall not constitute notice): | K&L Gates LLP<br>4350 Lassiter at North Hills Avenue, Suite 300<br>Raleigh, North Carolina 27609<br>Telecopy No.: (919) 743-7358<br>Attn:  John R. Erwin, Esq. |

and in any case at such other address as the advisee shall have specified by written notice. Notice of change of address shall be effective only upon receipt thereof.  All such other notices and communications shall be deemed effective (a) if by personal delivery, upon receipt, (b) if by registered or certified mail, on the seventh business day after the date of mailing thereof, (c) if by reputable overnight delivery or courier, on the first business day after the date of mailing or (d) if by facsimile transmission, immediately upon receipt of a transmission confirmation, provided notice is sent on a business day between the hours of 9:00 a.m. and 5:00 p.m., recipient's time, but if not then upon the following business day.

    12.8    Section Headings; Counterparts; Facsimile Signatures.  The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  This Agreement may be executed in any

number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same instrument. The exchange of executed copies of this Agreement by facsimile transmission or other electronic transmission shall constitute effective execution and delivery of this Agreement.

12.9    Governing Law. The laws of the State of Delaware (without giving effect to its conflicts of law principles) and, to the extent applicable, the Bankruptcy Code, govern this Agreement and all matters arising out of or relating to this Agreement and any of the transactions contemplated hereby, including its negotiation, execution, validity, interpretation, construction, performance and enforcement.

12.10    Jurisdiction. During the pendency of the Bankruptcy Case, any Proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. At any time following the pendency of the Bankruptcy Case, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the State of California (or any federal court sitting in the State of California) over any action or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereto hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such courts. The parties hereto hereby irrevocably waive any objection which they may now or hereafter have to the laying of venue of any action or proceeding brought in such court or any claim that such action or proceeding brought in such court has been brought in an inconvenient forum. Each of the parties hereto agrees that a judgment in such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereto hereby irrevocably consents to process being served by any party to this Agreement in any action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.7.

12.11    Interpretation. The use of the masculine, feminine or neuter gender or the singular or plural form of words used herein (including defined terms) shall not limit any provision of this Agreement. The terms "include," "includes" and "including" are not intended to be limiting and shall be deemed to be followed by the words "without limitation" (whether or not they are in fact followed by such words) or words of like import. The term "or" has the inclusive meaning represented by the phrase "and/or." Reference to a particular Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement. Reference to a particular agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof. The terms "dollars" and "$" mean United States Dollars. The Exhibits and Schedules identified in this Agreement are incorporated into this Agreement by reference and made a part hereof. The Article, Section, paragraph, Exhibit and Disclosure Schedule headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. References to Articles, Sections, paragraphs, clauses, Exhibits or Schedules shall refer to those portions of this Agreement. The use of the terms "hereunder," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not

to any particular Article, Section, paragraph or clause of, or Exhibit or Schedule to, this Agreement.

      12.12   <u>Disclosure Schedules</u>.  Matters reflected in the Disclosure Schedules may include certain matters not required to be reflected in the Disclosure Schedules.  Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature.  A disclosure made by Seller in any section of the Disclosure Schedules that is sufficient on its face to reasonably inform Purchaser of information required to be disclosed in another section of the Disclosure Schedules in order to avoid a misrepresentation thereunder shall be deemed, for all purposes of this Agreement, to have been made with respect to such other Section of such Disclosure Schedules.  The inclusion of information in the Disclosure Schedules shall not be construed as or constitute an admission or agreement that a violation, right of termination, default, liability or other obligation of any kind exists with respect to any item, nor shall it be construed as or constitute an admission or agreement that such information is material to any of Seller.  Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedules is intended to imply that such item or matter, or other items or matters, are or are not in the Ordinary Course of Business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedules is or is not in the Ordinary Course of Business for purposes of this Agreement.

***(Signatures appear on the following page.)***

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

**PARENT:**                    **LABORATORY CORPORATION OF AMERICA**

By: _____
Name: _____
Its: _____


**PURCHASER:**                 **WAVE NEWCO, INC.**

By: _____
Name: _____
Its: _____


**SELLER:**                    **BIOLABS, INC.**

By: _____
Name: ___MATTHEW PAKKALA_____
Its: ___Chief Restructuring Officer_____


**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____
Name: ___MATTHEW PAKKALA_____
Its: ___Chief Restructuring Officer_____

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

**PARENT:**

**LABORATORY CORPORATION OF AMERICA**

By: _____

Name: F. SAMUEL EBERTS III

Its: Senior Vice President

**PURCHASER:**

**WAVE NEWCO, INC.**

By: _____

Name: President F. Samuel Eberts III

Its: President

**SELLER:**

**BIOLABS, INC.**

By: _____

Name: _____

Its: _____

**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____

Name: _____

Its: _____


Appvd As To Form
LAW DEPT.
By ___

## EXHIBITS AND SCHEDULES

<u>Exhibits</u>:

| | | |
|---|---|---|
| Exhibit 2.3(a)-1 | - | Form of Assumption Agreement |
| Exhibit 2.3(a)-2 | - | Form of Lease Assignment |
| Exhibit 3.2 | - | Form of Deposit Escrow Agreement |
| Exhibit 4.3(d) | - | Form of General Assignment and Bill of Sale |
| Exhibit 4.3(e) | - | Form of Non-Competition Agreement |
| Exhibit 4.3(g) | - | Form of Transition Agreement |
| Exhibit 7.3(b)(ii)(A) | | Form of Sale Procedures Order |
| Exhibit 7.3(b)(ii)(B) | - | Form of Sale Order |

<u>Schedules</u>:

| | | |
|---|---|---|
| Schedule A | - | Disclosure Schedule |
| Schedule B-1 | - | Excluded Contracts |
| Schedule B-2 | - | Excluded Leases |
| Schedule C | - | Desired Existing Non-Competition Agreements |
| Schedule 2.1(a) | - | Fixed Assets |
| Schedule 2.1(b) | - | Inventory and Supplies |
| Schedule 2.1(c) | - | Permits |
| Schedule 2.1(i) | - | Deposits |
| Schedule 2.2 | - | Excluded Assets |
| Schedule 2.4(a) | - | List of Contracts & Existing Leases |
| Schedule 2.4(a)-1 | - | Initial Designated Contracts |
| Schedule 2.4(a)-2 | - | Potential Subsequent Designated Contracts |
| Schedule 3.4 | - | Allocation Schedule |

<u>Disclosure Schedule</u>

| | | |
|---|---|---|
| Section 1 | - | Permitted Liens |
| Section 5.1(a) | - | Jurisdiction |
| Section 5.1(b) | - | Ownership |
| Section 5.1(c) | - | Predecessors |
| Section 5.2(b) | - | No Conflict |
| Section 5.3(a) | - | Financial Statements |
| Section 5.3(b) | - | Preparation of Financial Statements |
| Section 5.3(c) | - | No Undisclosed Liabilities |
| Section 5.4 | - | Absence of Changes |
| Section 5.5(a) | - | Title to Assets |
| Section 5.5(b) | - | Location of Purchased Assets |
| Section 5.7(b) | - | Leased Premises; Existing Leases |
| Section 5.8(e) | - | Taxes |
| Section 5.8(f) | | Compensation Plans |
| Section 5.9 | - | Insurance |
| Section 5.10(a) | - | Governmental Authorizations |
| Section 5.10(c) | - | CLIA Matters |
| Section 5.12 | - | Environmental Matters |
| Section 5.13 | - | Litigation |
| Section 5.14(a) | - | Employee Plans |
| Section 5.14(c) | - | Employees |
| Section 5.16(a) | - | Potential Assigned Contracts |
| Section 5.16(b) | - | Material Contracts |
| Section 5.16(c) | - | Consents re: Assigned Contracts |
| Section 5.17 | - | No Broker |
| Section 5.19(b) | - | Intellectual Property Rights |
| Section 5.19(c) | - | Validity and Enforceability of Intellectual Property Rights |
| Section 5.19(d) | - | Infringement |
| Section 5.22 | - | Transactions with Related Parties |

**Exhibit 2.3(a)-1**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement") is made as of this [___] day of [_____], 2010, by and between **BIOLABS, INC.**, a Delaware corporation ("BioLabs"), **WESTCLIFF MEDICAL LABORATORIES, INC.**, a California corporation ("Westcliff" and, together with BioLabs, collectively, "Seller"), and Wave Newco, Inc., a Delaware corporation ("Purchaser") and wholly-owned subsidiary of **LABORATORY CORPORATION OF AMERICA**, a Delaware corporation ("Parent").

## W I T N E S S E T H:

**WHEREAS**, Purchaser, Seller and Parent have entered into that certain Asset Purchase Agreement dated as of May ___, 2010 (as amended, the "Purchase Agreement"). Each capitalized term used herein but not defined herein shall have the respective meaning ascribed to such term the Purchase Agreement.

**WHEREAS**, Section 2.3(a) of the Purchase Agreement provides that Purchaser, at the Closing, will assume the Assumed Liabilities.

**NOW, THEREFORE,** in consideration for the mutual covenants and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Effective as of the date hereof and in accordance with and subject to the Purchase Agreement, Seller hereby assigns to Purchaser, and Purchaser hereby assumes and agrees to perform and discharge the Assumed Liabilities.

2.      This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its principles of conflicts of law.

3.      To the extent that any provision of this Agreement is inconsistent or conflicts with the Purchase Agreement, the Purchase Agreement shall control.

4.      This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same instrument. The exchange of executed copies of this Agreement by facsimile transmission or other electronic transmission shall constitute effective execution and delivery of this Agreement.

*(Signatures appear on following page)*

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment and Assumption Agreement as of the date and year set forth above.

**BIOLABS, INC.**

By: _____
Name: _____
Its: _____

**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____
Name: _____
Its: _____

**WAVE NEWCO, INC.**

By: _____
Name: _____
Its: _____

**LABORATORY CORPORATION OF AMERICA**

By: _____
Name: _____
Its: _____

### Exhibit 2.3(a)-2

### ASSIGNMENT AND ASSUMPTION OF LEASES

**THIS ASSIGNMENT AND ASSUMPTION OF LEASES** (this "**Agreement**") is made as of this _____ day of _____, 2010, by and among **WESTCLIFF MEDICAL LABORATORIES, INC.**, a California corporation ("WestCliff") (the "**Assignor**"), and **WAVE NEWCO, INC.**, a Delaware corporation (together with its successors and permitted assigns, the "**Assignee**").

### W I T N E S S E T H:

**WHEREAS**, Assignor is lessee pursuant to those certain Lease Agreements (each a "**Lease**" and collectively, the "**Leases**"), set forth on Exhibit A; and

**WHEREAS**, as contemplated by that certain Asset Purchase Agreement dated May ___, 2010, by and among Assignor, Assignee and certain other entities a party thereto (as amended, the "**Asset Purchase Agreement**"), Assignor desires to assign the Leases, upon the closing of the transactions contemplated thereby, to Assignee; and

**WHEREAS**, the parties desire to cause the Leases to be assigned to Assignee.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.      Effective as of the date of the closing of the transactions contemplated by the Asset Purchase Agreement (the "**Closing Date**"), Assignor hereby assigns and sets over unto Assignee all of Assignor's right, title and interest in and to each Lease, to have and to hold unto Assignee, its successors and assigns for the remainder of the term of each respective Lease.

2.      Effective as of the Closing Date, Assignee hereby assumes and agrees to perform and observe all of the terms, covenants and conditions of the Leases on the part of tenant thereunder to be performed and observed, including, without limitation, the payment of rent thereunder.

3.      Assignor hereby agrees that, with respect to matters arising prior to the Closing Date, Assignee shall have no liability and shall be indemnified by Assignor for, and held harmless by Assignor from, any such liability. Assignee hereby agrees that, with respect to matters arising after the Closing Date, Assignor shall have no liability.

4.      The provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, personal representatives, successors and assigns.

5.      To the extent that any provision of this Agreement is inconsistent or conflicts with the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

6.      This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same instrument. The exchange of executed copies of this Agreement by facsimile

transmission or other electronic transmission shall constitute effective execution and delivery of this Agreement.

*(Signatures on following page.)*

RA-3004952 v3

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

ASSIGNOR:                     **WESTCLIFF MEDICAL LABORATORIES, INC.,**
a California corporation

By: _____
Name: _____
Its: _____


ASSIGNEE:                    **WAVE NEWCO, INC.,**
a Delaware corporation

By: _____
Name: _____
Its: _____

## Exhibit A

[List of Leases to be attached.]

RA-3004952 v3

**Exhibit 3.2**

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT,** dated as of May 17, 2010 (this "<u>Escrow Agreement</u>"), is by and among **LABORATORY CORPORATION OF AMERICA**, a Delaware corporation, on behalf of its wholly-owned subsidiary Wave Newco, Inc., a Delaware corporation ("<u>Bidder</u>"); **BIOLABS, INC.**, a Delaware corporation ("<u>BioLabs</u>"), and **WESTCLIFF MEDICAL LABORATORIES, INC.**, a California corporation ("<u>Westcliff</u>" and, together with BioLabs, collectively, "<u>Seller</u>"); and **U.S. BANK NATIONAL ASSOCIATION,** a national banking association, as Escrow Agent hereunder ("<u>Escrow Agent</u>").

### BACKGROUND

A.      Bidder and Seller have entered into an Asset Purchase Agreement (as amended, the "<u>Asset Purchase Agreement</u>"), dated as of the date hereof, which provides for the sale of certain assets of Seller related to Seller's business of providing clinical laboratory testing services to hospitals, physicians and others.

B.      Pursuant to the Asset Purchase Agreement, Seller will, no later than two Business Days after the date of the Asset Purchase Agreement, commence a bankruptcy case by filing a voluntary bankruptcy petition pursuant to Chapter 11 of Title 11 of the United States Code, in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "<u>Bankruptcy Court</u>").

C.      Pursuant to Section 3.2 of the Asset Purchase Agreement, Bidder shall deposit Four Million Dollars ($4,000,000) (the "<u>Escrow Amount</u>") in a segregated escrow account to be held by Escrow Agent concurrently with the execution and delivery of the Asset Purchase Agreement.

D.      The Asset Purchase Agreement provides that Seller shall seek the Bankruptcy Court's issuance of a Sale Procedures Order requiring, among other things, any qualified bidder to make a good faith deposit in an amount equal to Four Million Dollars ($4,000,000), to be deposited in escrow in immediately available funds no later than two (2) Business Days before the Sale Hearing.

E.      Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement.

F.      Bidder and Seller have appointed the Representatives (as defined below) to represent them for all purposes in connection with the funds to be deposited with Escrow Agent and this Escrow Agreement.

G.      In order to establish the escrow of funds and to effect the provisions of the Asset Purchase Agreement, the parties hereto have entered into this Escrow Agreement.

### STATEMENT OF AGREEMENT

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency

of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

    1.    <u>Definitions</u>. Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Asset Purchase Agreement. The following terms shall have the following meanings when used herein:

    "<u>Bidder Representative</u>" shall mean the person so designated on <u>Schedule A</u> hereto or any other person designated in a writing signed by Bidder and delivered to Escrow Agent and the Seller Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

    "<u>Escrow Funds</u>" shall mean the Escrow Amount, together with any interest and other income thereon, and as reduced by any disbursements and/or losses on investments thereof.

    "<u>Joint Written Direction</u>" shall mean a written direction executed by the Representatives and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking an action pursuant to this Escrow Agreement. A "<u>Written Direction</u>" shall mean a written direction executed by either the Seller Representative or the Bidder Representative, as the case may be.

    "<u>Seller Representative</u>" shall mean the person so designated on <u>Schedule A</u> hereto or any other person designated in a writing signed by Seller and delivered to Escrow Agent and the Bidder Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

    "<u>Representatives</u>" shall mean, collectively, the Bidder Representative and the Seller Representatives.

    2.    <u>Appointment of and Acceptance by Escrow Agent</u>. Bidder and Seller hereby appoint Escrow Agent to serve as escrow agent hereunder. Escrow Agent hereby accepts such appointment and agrees to receive, accept, hold, invest and disburse the Escrow Funds in accordance with this Escrow Agreement.

    3.    <u>Deposit of Escrow Funds</u>. Simultaneously with the execution and delivery of this Escrow Agreement, Bidder will deposit the Escrow Amount, by wire transfer of immediately available funds, to the account of the Escrow Agent referenced on <u>Schedule A</u> hereto.

    4.    <u>Disbursements of Escrow Funds</u>.

    (a)    <u>Failure to Close</u>. In the event that the Asset Purchase Agreement is terminated pursuant to Section 10.1(c) or (d) thereof, Bidder and Seller shall deliver a Joint Written Instruction to the Escrow Agent directing the Escrow Agent to deliver the Escrow Funds to Bidder (if the Asset Purchase Agreement is terminated pursuant to Section 10.1(c) thereof) or to Seller (if the Asset Purchase Agreement is terminated pursuant to Section 10.1(d) thereof), within three (3) Business Days of such termination.

2

(b)     Unsuccessful Bid.

(i)     Subject to Section 4(a) of this Escrow Agreement, in the event that neither the Winning Bid nor the Back Up Bid is made by Bidder, then Seller and Bidder shall issue a Joint Written Direction to the Escrow Agent authorizing the release of the Escrow Funds to Bidder within three (3) Business Days after the date of the Sale Hearing.

(ii)    In the event that (A) the Back Up Bid is made by Bidder and (B) the maker of the Winning Bid closes the transactions contemplated by the Asset Purchase Agreement (the "Sale"), then Bidder and Seller shall issue a Joint Written Direction to the Escrow Agent authorizing the release of the Escrow Funds to Bidder within three (3) Business Days after the closing date of the Sale.

(c)     Successful Bid.  In the event that (i) the Winning Bid is made by Bidder or (ii) the Back Up Bid is made by Bidder and the maker of the Winning Bid fails to close the Sale, and the Bidder closes the Sale, then Seller and Bidder shall deliver a Joint Written Direction to the Escrow Agent authorizing the release of the Escrow Funds to Seller in accordance with the terms of the Asset Purchase Agreement as set forth in such joint written instructions or an order of the Bankruptcy Court.

(d)     Other Releases.  Notwithstanding the foregoing, from time to time the Escrow Agent shall make such distributions from the Escrow Funds as Bidder and Seller shall direct by a Joint Written Direction.  The Escrow Funds may also be distributed as provided in Section 5(b).

(e)     Disbursement Procedures.  All disbursements of the Escrow Funds hereunder shall be made by wire transfer of immediately available funds to the person(s) entitled thereto in accordance with wiring instructions furnished by such persons in writing to the Escrow Agent.

(f)     Liquidation of the Escrowed Funds.  Whenever the Escrow Agent shall be required to make a payment from the Escrow Funds, the Escrow Agent shall pay such amount by liquidating such investments of the Escrow Funds as are necessary to make such payment and the Escrow Agent shall not be responsible for any cost, depreciation in value, or penalty associated therewith; provided, that the Escrow Agent shall first sell or liquidate such investments (if any) which do not have or which sale or liquidation would not trigger any earlier withdrawal and/or redemption fee or penalty.

5.     Suspension of Performance: Disbursement Into Court.  If, at any time, (i) there shall exist any dispute between Bidder, Seller or the Representatives with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder, (ii) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) the Representatives have not within 30 days of the furnishing by Escrow Agent of a notice of resignation pursuant to Section 7 hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole

3

discretion, take either or both of the following actions:

        (a)     suspend the performance of any of its obligations (including, without limitation, any disbursement obligations) under this Escrow Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed (as the case may be); and/or

        (b)     petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Agent of all reasonable, out-of-pocket fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or reasonably expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to Bidder, Seller, their respective shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent.

        6.     _Investment of Funds._ The Escrow Agent is herein directed and instructed to initially invest and reinvest the Escrow Funds in the investment indicated under "Investment Instruction" on Schedule A hereto. With the execution of this document, Seller acknowledges receipt of prospectuses and/or disclosure materials associated with the investment vehicle, either through means of hardcopy or via access to the website associated with the investment selected by Seller. Seller may provide instructions changing the investment of the Escrow Funds (subject to applicable minimum investment requirements) by the furnishing of a Written Direction to the Escrow Agent; provided, however, that no investment or reinvestment may be made except in the following:

        (a)     direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United States of America;

        (b)     certificates of deposit issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates), which certificates of deposit are insured by the Federal Deposit Insurance Corporation or a similar governmental agency;

        (c)     repurchase agreements with any bank, trust company, or national banking association (including Escrow Agent and its affiliates);

        (d)     any institutional money market fund offered by Escrow Agent, including any institutional money market fund managed by Escrow Agent or any of its affiliates; or

4

(e)     any interest bearing deposits/interest bearing money market deposit account, with any bank or national banking association (including the Escrow Agent or its affiliates).

If Escrow Agent has not received a Written Direction from the Seller Representative specifically directing how investment shall be made, at any time that an investment decision must be made, Escrow Agent shall invest the Escrow Funds, or such portion thereof as to which no Written Direction has been received, in investments described in clause (e) above. Each of the foregoing investments shall be made in the name of Escrow Agent. No investment shall be made in any instrument or security that has a maturity of greater than six (6) months. Notwithstanding anything to the contrary contained herein, Escrow Agent may, without notice to the Representatives, sell or liquidate the minimum amount necessary of the foregoing investments at any time if the proceeds thereof are required for any disbursement of Escrow Funds permitted or required hereunder. All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds. Escrow Agent shall not be liable or responsible for loss in the value of any investment made pursuant to this Escrow Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the Escrow Funds, if undertaken in accordance with the terms and conditions of this Escrow Agreement. With respect to any Escrow Funds received by Escrow Agent after ten o'clock, a.m., Charlotte, North Carolina, time, Escrow Agent shall not be required to invest such funds or to effect any investment instruction until the next day upon which banks in Charlotte, North Carolina are open for business.

        7.     Resignation or Removal of Escrow Agent. Escrow Agent may resign and be discharged from the performance of its duties hereunder thereafter accruing at any time by giving ten (10) days' prior written notice to Bidder and Seller specifying a date when such resignation shall take effect. Similarly, the Escrow Agent may be removed by thirty (30) days' written notice from Bidder and Seller. Upon any such notice of resignation or removal, the Representatives jointly shall appoint a successor Escrow Agent hereunder prior to the effective date of such resignation. The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall deliver all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all reasonable, out-of-pocket fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or reasonably expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Agent's resignation, the provisions of this Escrow Agreement shall continue to apply as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's corporate trust line of business may be transferred, shall be the Escrow Agent under this Escrow Agreement without further act.

        8.     Liability of Escrow Agent.

        (a)     The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no other duties shall be implied. The Escrow Agent shall

have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith and pursuant to the terms and conditions of this Escrow Agreement, except to the extent that a court of competent jurisdiction determines that any loss of Bidder or Seller resulted from or arose out of the Escrow Agent's gross negligence or willful misconduct. Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement. Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. Except as otherwise provided in this Escrow Agreement, Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement or the Asset Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding. Escrow Agent may consult one legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. Bidder and Seller, severally (*i.e.* on a 50%/50% basis), shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel.

(b)     The Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Escrow Funds, without determination by the Escrow Agent of such court's jurisdiction in the matter. If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

9.     Indemnification of Escrow Agent.

(a)     From and at all times after the date of this Escrow Agreement, Bidder and Seller, severally (*i.e.* on a 50%/50% basis), shall, to the fullest extent

6

permitted by law, defend, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including, without limitation, Bidder or Seller, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Escrow Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; *provided, however,* that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted from or been based upon the gross negligence or willful misconduct of such Indemnified Party. The Indemnified Parties shall, in their sole discretion, have the right to select and employ one separate counsel with respect to any action or claim brought or asserted against them, and the reasonable fees of such counsel shall be paid upon demand by Bidder and Seller severally, so that each of Bidder and Seller bears one-half (1/2) of any such fees. The obligations of Bidder and Seller under this Section 9 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

(b)     The parties agree that neither the payment by Bidder or Seller of any claim by Escrow Agent for indemnification hereunder nor the disbursement of any amounts to Escrow Agent from the Escrow Funds in respect of a claim by Escrow Agent for indemnification shall impair, limit, modify, or affect, as between Bidder and Seller, the respective rights and obligations of Bidder, on the one hand, and Seller, on the other hand, under the Asset Purchase Agreement.

10.     Fees and Expenses of Escrow Agent. Bidder and Seller shall compensate Escrow Agent for its services hereunder in accordance with Schedule A attached hereto and, in addition, shall reimburse Escrow Agent for all of its reasonable out-of-pocket expenses, including attorneys' fees, travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), copying charges and the like incurred in connection with the provision of its services hereunder. The additional provisions and information set forth on Schedule A are hereby incorporated by this reference, and form a part of this Escrow Agreement. All of the compensation and reimbursement obligations set forth in this Section 10 shall be payable by Bidder and Seller, severally (*i.e.* on a 50%/50% basis), upon demand by Escrow Agent. The obligations of Bidder and Seller under this Section 10 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent. Escrow Agent is authorized to, and may, disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of reasonable, out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent or any

7

Indemnified Party is entitled to seek indemnification pursuant to Section 9 hereof). Escrow Agent shall notify the Representatives of any disbursement from the Escrow Funds to itself or any Indemnified Party in respect of any compensation or reimbursement hereunder and shall furnish to the Representatives copies of all related invoices and other statements. Seller, Bidder and the Representatives hereby grant to Escrow Agent and the Indemnified Parties a security interest in and lien upon the Escrow Funds to secure all obligations with respect to the right to offset the amount of any compensation or reimbursement due any of them hereunder (including any claim for indemnification pursuant to Section 9 hereof) against the Escrow Funds. If for any reason funds in the Escrow Funds are insufficient to cover such compensation and reimbursement, Bidder and Seller shall promptly pay such amounts to Escrow Agent or any Indemnified Party upon receipt of an itemized invoice.

11.     Identifying Information. Bidder and Seller acknowledge that a portion of the identifying information set forth on Schedule A is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "Act"), and Bidder and Seller each agrees to provide any additional information requested by the Escrow Agent in connection with the Act or any similar legislation or regulation to which Escrow Agent is subject, in a timely manner. Bidder and Seller each represent that all identifying information set forth on Schedule A, including, without limitation, its Taxpayer Identification Number assigned by the Internal Revenue Service or any other taxing authority, is true and complete on the date hereof and will be true and complete at the time of any disbursement of the Escrow Funds. To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust, or other legal entity, the Escrow Agent asks for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

12.     Consent to Jurisdiction and Venue. In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto hereby irrevocably submit to the sole and exclusive jurisdiction of the State of California (or any federal court sitting in the State of California) over any such proceeding. Any of these courts shall be proper venue for any such lawsuit or judicial proceeding and the parties hereto waive any objection to such venue. The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

13.     Notice. All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be deemed to have been given when the writing is delivered if given or delivered by hand, overnight delivery service or facsimile transmitter (with confirmed receipt) to the address or facsimile number set forth on Schedule A hereto, or to such other address as a party may designate for itself by like notice, and shall be deemed to have been given on the date deposited in the U.S. mail, if mailed, by first-class, registered or certified mail, postage prepaid, addressed as set forth on Schedule A hereto, or to such other address as a party may designate for itself by like notice.

14.    Amendment or Waiver. This Escrow Agreement may be changed, waived, discharged or terminated only by a writing signed by the Representatives and Escrow Agent. No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

15.    Severability. To the extent any provision of this Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

16.    Governing Law. This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of Delaware without giving effect to the conflict of laws principles thereof.

17.    Entire Agreement. This Escrow Agreement constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds.

18.    Binding Effect. All of the terms of this Escrow Agreement, as amended from time to time, shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of Bidder, Seller and Escrow Agent.

19.    Execution in Counterparts. This Escrow Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction.

20.    Termination. Upon the first to occur of the disbursement of all amounts in the Escrow Funds pursuant to Joint Written Directions or the disbursement of all amounts in the Escrow Funds into court pursuant to Section 5 or Section 8 hereof, this Escrow Agreement shall terminate and Escrow Agent shall have no further obligation or liability whatsoever with respect to this Escrow Agreement or the Escrow Funds.

21.    Dealings. The Escrow Agent and any stockholder, director, officer or employee of the Escrow Agent may buy, sell, and deal in any of the securities of Bidder or Seller and become pecuniarily interested in any transaction in which Bidder or Seller may be interested, and contract and lend money to Bidder or Seller and otherwise act as fully and freely as though it were not Escrow Agent under this Escrow Agreement. Nothing herein shall preclude the Escrow Agent from acting in any other capacity for Bidder or Seller or for any other entity.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

BIDDER:                          LABORATORY CORPORATION OF AMERICA

                                 By: _____
                                 Name: _____
                                 Title: _____

SELLER:                          BIOLABS, INC.

                                 By: _____
                                 Name: __MATTHEW PAKKALA_____
                                 Title: __Chief Restructuring Officer__

                                 WESTCLIFF MEDICAL LABORATORIES, INC.

                                 By: _____
                                 Name: __MATTHEW PAKKALA_____
                                 Title: __Chief Restructuring Officer__

ESCROW AGENT:                    U.S. BANK NATIONAL ASSOCIATION

                                 By: _____
                                 Name: Allison Lancaster-Poole
                                 Title: Vice-President

[Signature Page to Escrow Agreement]

**IN WITNESS WHEREOF,** the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

**BIDDER:**                **LABORATORY CORPORATION OF AMERICA**

By: _F N E4H_
Name: _F SAMUEL EBERTS III_
Title: _SENIOR VICE PRESIDENT_

**SELLER:**                **BIOLABS, INC.**

By: _____
Name: _____
Title: _____

**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____
Name: _____
Title: _____

**ESCROW AGENT:**          **U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name: Allison Lancaster-Poole
Title: Vice-President



[Signature Page to Escrow Agreement]

**IN WITNESS WHEREOF,** the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

**BIDDER:**                    **LABORATORY CORPORATION OF AMERICA**

By: _____
Name: _____
Title: _____

**SELLER:**                    **BIOLABS, INC.**

By: _____
Name: _____
Title: _____

**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____
Name: _____
Title: _____

**ESCROW AGENT:**              **U.S. BANK NATIONAL ASSOCIATION**

By: _Allison Lancaster-Poole_
Name: Allison Lancaster-Poole
Title: Vice-President

[Signature Page to Escrow Agreement]

## SCHEDULE A

1.    Escrow Funds.

Escrow Amount:                        $4,000,000

Escrow Funds wiring instructions:     U.S. Bank National Association
                                      ABA # 091000022
                                      Account # 173103781824
                                      Account Name:  Lab Corp/ BioLabs/
                                                     Westcliff Esc
                                      Ref: Acct # 141083000

2.    Escrow Agent Fees.

Acceptance Fee:                       $   250.00
Annual Escrow Fee:                    $2,000.00
    TOTAL                             $2,250.00

The Acceptance Fee and the Annual Escrow Fee are payable upon execution of the escrow documents. Annual fees cover a full year in advance, or any part thereof, and thus are not pro-rated in the year of termination.

The fees quoted in this schedule apply to services ordinarily rendered in the administration of an escrow account and are subject to reasonable adjustment based on final review of documents, or when the Escrow Agent is called upon to undertake unusual duties or responsibilities, or as changes in law, procedures, or the cost of doing business demand. Services in addition to and not contemplated in this Agreement, including, but not limited to, document amendments and revisions, non-standard cash and/or investment transactions, calculations, notices and reports, and legal fees, will be billed as extraordinary expenses.

Unless otherwise indicated, the above fees relate to the establishment of one escrow account. Additional sub-accounts governed by the same Escrow Agreement may incur an additional charge. Transaction costs include charges for wire transfers, checks, internal transfers and securities transactions.

Bidder and Seller agree among themselves that Bidder and Seller shall each be responsible for 50% of the Acceptance Fee, the Annual Escrow Fee, the Transactional Expenses and the Out-of-Pocket Expenses.

3.    Taxpayer Identification Numbers.

Bidder:  84-0611484

BioLabs:  56-2594352

A-1

Westcliff: 95-2557486

4. Investment Instructions

 U.S. Bank National Association Money Market Account DDAFC1.   See IMMA
Authorization attached as Exhibit A.

5. Representatives.

 The following person is hereby designated and appointed as Bidder Representative under
the Escrow Agreement:

    F. Samuel Eberts, III

 The following person is hereby designated and appointed as the Seller Representative
under the Escrow Agreement:

    Matthew Pakkala

6. Representative Information. The following information should be provided to Escrow
Agent separately by each Representative and any future Representative:

  1. Date of Birth
  2. Address
  3. Mailing Address, if different
  4. Social Security Number

7. Notice Addresses.

 If to Bidder at:  Laboratory Corporation of America
     531 South Spring Street
     Burlington, NC 27215
     Attn: General Counsel
     Facsimile No.: (336) 226-3835
     Telephone No.: (336) 436-6506

 With a copy to:  K&L Gates LLP
     4350 Lassiter at North Hills Avenue, Suite 300
     Raleigh, North Carolina 27619
     Attn: John R. Erwin, Esq.
     Facsimile No.: (919) 743-7358

Westcliff: [_____]

4.     Investment Instructions

U.S. Bank National Association Money Market Account DDAFC1.   See IMMA
Authorization attached as Exhibit A.

5.     Representatives.

The following person is hereby designated and appointed as Bidder Representative under
the Escrow Agreement:

_____
F. Samuel Eberts III

The following person is hereby designated and appointed as the Seller Representative
under the Escrow Agreement:

_____
Matthew Pakkala

6.     Representative Information. The following information should be provided to Escrow
Agent separately by each Representative and any future Representative:

       1. Date of Birth
       2. Address
       3. Mailing Address, if different
       4. Social Security Number

7.     Notice Addresses.

If to Bidder at:        Laboratory Corporation of America
                        531 South Spring Street
                        Burlington, NC 27215
                        Attn: General Counsel
                        Facsimile No.: (336) 226-3835
                        Telephone No.: (336) 436-6506

With a copy to:         K&L Gates LLP
                        4350 Lassiter at North Hills Avenue, Suite 300
                        Raleigh, North Carolina 27619
                        Attn: John R. Erwin, Esq.
                        Facsimile No.: (919) 743-7358
                        Telephone No.: (919) 743-7300



Telephone No.: (919) 743-7300

If to Seller at: BioLabs, Inc.
c/o Parthenon Investors II, L.P.
265 Franklin Street
18th Floor
Boston, MA 02110
Telecopy No.: (619) 960-4010
Attn: William Kessinger

With a copy to Westcliff Medical Laboratories, Inc.
(prior to Closing): 1821 E. Dyer Road, Suite 100
Santa Ana, CA 92705
Telecopy No.: (949) 222-1153
Attn: Robert E. Whalen

With a copy to Kirkland & Ellis LLP
(which shall not 300 North LaSalle
constitute notice): Chicago, Illinois 60654
Telecopy No.: (312) 862-2200
Attn: Jeffrey Seifman, P.C.
   Jason D. Osborn, Esq.

If to the Escrow
Agent at: U.S. Bank National Association, as Escrow Agent
Hearst Tower - 214 N. Tryon Street
27th Floor
Charlotte, NC 28202
Attn: US Bank Corporate Trust Services
Facsimile No.: (704) 335-4676
Telephone No.: (704) 335-4558

**Exhibit A**

### U.S. BANK NATIONAL ASSOCIATION
### MONEY MARKET ACCOUNT AUTHORIZATION FORM
### DESCRIPTION AND TERMS

The U.S. Bank Money Market account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers. U.S. Bank's trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

### AUTOMATIC AUTHORIZATION

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Account. The U.S. Bank Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

### Exhibit 4.3(d)

### GENERAL ASSIGNMENT AND BILL OF SALE

THIS **GENERAL ASSIGNMENT AND BILL OF SALE** is made this [___] day of [_____], 2010, by **BIOLABS, INC.**, a Delaware corporation ("BioLabs") and **WESTCLIFF MEDICAL LABORATORIES, INC.**, a California corporation ("Westcliff" and, together with BioLabs, collectively, "Seller"), for the benefit of **WAVE NEWCO, INC.**, a Delaware corporation ("Purchaser") and wholly-owned subsidiary of **LABORATORY CORPORATION OF AMERICA**, a Delaware corporation ("Parent").

WHEREAS, Seller, Purchaser and Parent have entered into an Asset Purchase Agreement dated as of May ___, 2010 (as amended, the "Purchase Agreement") providing, among other things, that Seller shall transfer to Purchaser certain of the properties and assets, tangible and intangible, of Seller upon the terms and conditions set forth in the Purchase Agreement (each capitalized term used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Purchase Agreement).

NOW, THEREFORE, Seller, for and in consideration of the purchase price set forth in the Purchase Agreement, does hereby grant, bargain, sell, assign, alienate, remise, release, convey, transfer, set over and confirm unto Purchaser and its successors and assigns free and clear of all Encumbrances other than Permitted Liens, all right, title and interest of Seller in and to the Purchased Assets, all agreed-upon contract rights to be assigned, and, to the extent assignable, all applicable warranties relating to the Purchased Assets.

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, to and for its and their use and benefit forever.

Notwithstanding the foregoing, Seller will retain and not transfer, and Purchaser will not purchase or acquire, the Excluded Assets.

The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of Seller and Purchaser.

This General Assignment and Bill of Sale shall be governed and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles.

To the extent that any provision of this Agreement is inconsistent or conflicts with the Purchase Agreement, the Purchase Agreement shall control.

### *(Signatures appear on the following page)*

**IN WITNESS WHEREOF**, Seller has caused this instrument to be duly executed and its corporate seal to be hereunto affixed the date first above written.

**BIOLABS, INC.**

By: _____
Name: _____
Its: _____

**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____
Name: _____
Its: _____

## Exhibit 4.3(e)

**[Form – Similar version to be entered into with Westcliff Medical Laboratories, Inc.]**

## NON-COMPETITION AGREEMENT

**THIS NON-COMPETITION AGREEMENT** (this "Agreement") is made this [___] day of May, 2010, by and between **BIOLABS, INC.**, a Delaware corporation ("Seller"), and **LABORATORY CORPORATION OF AMERICA**, a Delaware corporation ("Purchaser").

This Agreement is delivered to Purchaser pursuant to the Asset Purchase Agreement dated as of May [___], 2010 (as amended, the "Purchase Agreement") among Purchaser and Seller. Seller acknowledges that Purchaser would not enter into, or consummate, the Purchase Agreement and the transactions contemplated thereby without the execution and delivery of this Agreement by Seller. Each capitalized term used herein and not otherwise defined herein shall have the meaning ascribed to such term in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration including that set forth in the Purchase Agreement, the sufficiency of which is hereby acknowledged, for the purpose of inducing Purchaser to enter into the Purchase Agreement and intending to be legally bound hereby, the undersigned parties covenant and agree as follows:

1.    **Restricted Period.** The restrictions set forth in Sections 2 and 3 of this Agreement shall remain in effect for a period of five (5) years from and after the Closing Date (the "Restricted Period").

2.    **Non-Competition.** During the Restricted Period, except in furtherance of Purchaser's business (including, without limitation, pursuant to the Transition Agreement), or otherwise on behalf of Purchaser, or with the prior written consent of Purchaser, Seller shall not (a) engage, directly or indirectly, in a business that competes with or is substantially similar to the business of Purchaser (the "Business") within the Territory (as defined in Section 4 below); or (b) provide information to, solicit or sell for, organize or own any interest in, or become engaged by, or act as agent for, any person, corporation, or other entity that is directly or indirectly engaged in a business in the Territory which competes with or is substantially similar to the Business; provided, however, that nothing herein shall preclude Seller from holding (solely as a passive investment) not more than three percent (3%) of the outstanding shares of any publicly held company which may be so engaged in a trade or business substantially similar to or competitive with the Business.

3.    **Non-Solicitation.** During the Restricted Period, except in furtherance of Purchaser's business (including, without limitation, pursuant to the Transition Agreement), or otherwise on behalf of Purchaser, or with the prior written consent of Purchaser, Seller shall not influence or attempt to influence any:

(a)    customer listed on the Customer List, either directly or indirectly, to divert the purchases by such customer of products or services of the Business to any person, firm, corporation, institution, or other entity then in competition with the Purchaser or any subsidiary or affiliate of Purchaser; or

(b)    employee of Purchaser, or any subsidiary or affiliate of Purchaser, either directly or indirectly, to terminate his or her employment with Purchaser or such subsidiary or affiliate.

4.    **Territory.** As used herein, the term "Territory" shall mean the following counties in California, being those counties in which Seller has conducted laboratory testing, marketing and other related business: Kern, Ventura, Los Angeles, Monterey, Sacramento, San Bernardino, San Diego, San Francisco, Orange, Riverside and any other counties which the parties agree is applicable.

5.     **Specific Enforcement: Extension of Period.**

(a)     Seller acknowledges that the restrictions contained in this Agreement are reasonable and necessary to protect the legitimate interests of Purchaser and that Purchaser would not have entered into the Purchase Agreement in the absence of such restrictions. Seller also acknowledges that any breach by either of them of this Agreement will cause continuing and irreparable injury to Purchaser for which monetary damages would not be an adequate remedy. Seller agrees that it shall not, in any action or proceeding to enforce any of the provisions of this Agreement, assert the claim or defense that an adequate remedy at law exists. In the event of such breach by Seller, Purchaser shall have the right to enforce the provisions of this Agreement by seeking injunctive or other relief in any court, without a requirement that a bond be posted, and this Agreement shall not in any way limit remedies of law or in equity otherwise available to Purchaser.

(b)     If any provision of this Agreement is held to be in any respect an unreasonable restriction upon Seller, then such provision shall be deemed to extend only over the maximum period of time, geographic area, or range of activities as to which it may be enforceable. In the event that Seller shall be finally adjudicated to be in violation of the restrictive covenants in this Agreement, then the Restricted Period shall be extended for a period of time equal to the period of time during which such breach shall occur, and, in the event that Purchaser should be required to seek relief from such breach in any court, board of arbitration or other tribunal, then the Restricted Period shall be extended for the period of time required for the pendency of such proceedings, including all appeals.

6.     **Limitations.** Notwithstanding anything herein or in the Purchase Agreement to the contrary, (a) the provisions of this Agreement shall not be binding upon or deemed to limit or restrict in any way the actions of, and neither Purchaser nor any of its Related Persons shall seek enforcement of any provision hereof, against any of Seller's Related Persons, (b) the provisions of this Agreement shall not be deemed to limit Seller's right to collect the Seller Accounts Receivable and (c) nothing in this Agreement shall interfere with, limit or restrict the ability of Seller to prosecute the Bankruptcy Case and to wind up its affairs pursuant to the Bankruptcy Case.

7.     **Notice.** Any notice or other communication required or permitted to be given hereunder shall be given by telecopy (with a mailed confirmation) or by Federal Express or other established next day delivery service, by regular or certified mail, postage prepaid, addressed as follows (or to such other addresses as the parties may specify by due notice to the others):

| | |
|---|---|
| To Seller: | BioLabs, Inc. |
| | c/o Parthenon Investors II, L.P. |
| | 265 Franklin Street |
| | 18th Floor |
| | Boston, MA 02110 |
| | Telecopy No.:   (619) 960-4010 |
| | Attn: William Kessinger |
| | |
| With a copy to (which shall not constitute notice): | Kirkland & Ellis LLP |
| | 300 North LaSalle |
| | Chicago, Illinois 60654 |
| | Telecopy No.: (312) 862-2200 |

RA-3004772 v5

Attn: Jeffrey Seifman, P.C.
Jason D. Osborn, Esq.

With a copy to (which shall      Levene, Neale, Bender, Rankin & Brill L.L.P.
not constitute notice):          10250 Constellation Boulevard, Suite 1700
                                 Los Angeles, CA 90067
                                 Telecopy No.: (310) 229-1244
                                 Attn: Ron Bender, Esq.

To Purchaser:                    Laboratory Corporation of America
                                 531 South Spring Street
                                 Burlington, North Carolina 27215
                                 Telecopy No.: (336) 226-3835
                                 Attention: General Counsel

With a copy to:                  K&L Gates LLP
                                 4350 Lassiter at North Hills, Suite 300
                                 Raleigh, North Carolina 27619
                                 Telecopy No.: (919) 743-7358
                                 Attention: John R. Erwin, Esq.

8.    **Miscellaneous.**

(a)    **Successors and Assigns.**  This Agreement shall inure to the benefit of Purchaser and its successors and assigns.

(b)    **Waiver.**  The waiver by Purchaser of the breach of any term or provision of this Agreement shall not operate as or be construed to be a waiver of any other or subsequent breach of this Agreement.

(c)    **Governing Law; Consent to Jurisdiction.**  This Agreement shall be construed and enforced in accordance with the substantive laws of the State of California, without regard to the principles of conflicts of laws of any jurisdiction. Each of Seller and Purchaser agree that any proceeding in connection with or relating to this Agreement shall be brought in a court of competent jurisdiction located in Orange County, California, whether a state or federal court.

(d)    **Invalidity.**  If any provision of this Agreement shall be determined to be void, invalid, unenforceable or illegal for any reason, the validity and enforceability of all of the remaining provisions hereof shall not be affected thereby. If any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such amendment to apply only to the operation of such provision in the particular jurisdiction in which such adjudication is made.

(e)    **Section Headings.**  The section headings in this Agreement are for convenience only; they form no part of this Agreement and shall not affect interpretation.

*(Signatures appear on following page)*

3                                                                                RA-3004772 v5

**Exhibit 4.3(e)**

IN WITNESS WHEREOF, the undersigned have executed this Non-Competition Agreement on the day first above written.

**BIOLAS, INC.**

By: _____

Name: _____

Its: _____


**LABORATORY CORPORATION OF AMERICA**

By: _____

Name: _____

Its: _____

[Signature Page to Non-Competition Agreement]

**Exhibit 4.3(g)**

## TRANSITION AGREEMENT

      **THIS TRANSITION AGREEMENT** (this "Transition Agreement") is executed and made effective this ____ day of _____, 2010, by and among **LABORATORY CORPORATION OF AMERICA**, a Delaware corporation ("Parent"), **WAVE NEWCO, INC.**, a Delaware corporation ("Purchaser"), **BIOLABS, INC.**, a Delaware corporation ("BioLabs"), and **WESTCLIFF MEDICAL LABORATORIES, INC.**, a California corporation ("WestCliff" and, together with BioLabs, collectively, "Seller").

      **WHEREAS**, pursuant to that certain Asset Purchase Agreement, dated May 17, 2010, by and among Parent, Purchaser, and Seller (as amended, the "Purchase Agreement"), Purchaser has agreed to acquire selected operating assets of Seller that are used or held for use in connection with Seller's clinical laboratory testing services to hospitals, physicians and other Persons (the "Business"), with each capitalized term used herein and not otherwise defined herein having the meaning ascribed to such term in the Purchase Agreement;

      **WHEREAS**, Seller and Purchaser desire to provide for the efficient transition of the Business following the Closing; and

      **WHEREAS**, in order to promote such efficient transition and as a material inducement to enter into the Purchase Agreement, Seller and Purchaser have agreed to handle certain transitional matters in the manner stated in this Transition Agreement.

      **NOW, THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

      1.     Leased Employees; Continuation of Health Care Coverage.

      (a)     With respect to those employees of Seller set forth on Schedule 1A attached hereto (each, a "Leased Employee"), subject to the terms and conditions set forth herein, Seller shall lease the Leased Employees to Purchaser and shall continue to provide payroll services until the date on which all of the Leased Employees have either been entered into Purchaser's human resources system or identified by Purchaser as no longer being Leased Employees (such period, the "Continued Payroll Period"); provided, that in no event shall the Continued Payroll Period continue beyond [*16 weeks from Closing*] _____, 2010, unless the Continued Payroll Period is extended according to the mutual written consent of the parties hereto. Seller represents and warranties as of the date hereof that all Leased Employees meet the regulatory requirements for their position and are qualified to work in the United States. For the avoidance of doubt, Seller makes no other representation or warranty regarding the capacity, ability or fitness of any Leased Employee. During the Continued Payroll Period, Seller will not increase the compensation paid to any Leased Employee other than in the Ordinary Course of Business. Subject to the remainder of this Paragraph 1(a), Purchaser may amend Schedule 1A from time to time in Purchaser's sole discretion upon prior written notice to Seller as is reasonable under the circumstances. Purchaser shall not be entitled to include on Schedule 1A, and Seller shall not be required to provide the services of, any of employees set forth on Schedule 1B (the "Non-Leased Employees") until the date agreed upon by the parties hereto. The parties hereto agree to reasonably cooperate with respect to the addition of the Non-Leased Employees to Schedule 1A during the Continued Payroll Period.

      (b)    For purposes of this Transition Agreement, "<u>Employee Compensation</u>" means the actual out-of-pocket cost of direct salaries and wages due and owing in the Ordinary Course of Business to the Leased Employees with respect to the Continued Payroll Period (including, without limitation, Seller's portion of social security and Medicare taxes, state unemployment taxes, workers' compensation premiums and federal unemployment taxes). Notwithstanding anything herein to the contrary, Employee Compensation shall not include (and Seller shall remain solely responsible for) any severance payments, settlements of wage claims, any other payment of salary or wages that is not in the Ordinary Course of Business, and any liens or garnishments attached to Seller's payroll. Purchaser shall pay to Seller or fully reimburse Seller with respect to the Employee Compensation. Seller shall provide Purchaser with written notice (each such notice, an "<u>Employee Compensation Notice</u>"), at least one (1) Business Day prior to each pay date when Employee Compensation is due and payable by Seller, of the payments required to be made by Seller on such pay date, together with reasonably detailed documentation of the calculation of such payments (including the ADP payroll register for the applicable period). Purchaser shall, no later than five (5) Business Days after receipt of the Employee Compensation Notice, provide Seller with a notice (a "<u>Dispute Notice</u>") listing any amounts to which Purchaser takes exception. Purchaser agrees to wire transfer immediately available funds in the full amount of the Employee Compensation, subject to the last sentence of this Paragraph 1(b), required to be made by Seller pursuant to the preceding sentence no later than one (1) Business Day after the date on which Seller has delivered the Employee Compensation Notice, except that Purchaser may exclude from such payment any disputed amounts subject to the requirement that such amounts be included in a Dispute Notice as provided above. The parties hereto will attempt in good faith to resolve any differences as described in the Dispute Notice, and Purchaser agrees, upon such resolution, to promptly wire transfer immediately available funds as appropriate to satisfy any of Purchaser's obligations pursuant to such resolution. In the event that Seller does not timely receive the undisputed Employee Compensation from Purchaser or if there are disputed amounts, Seller may timely pay the Employee Compensation, in which case Purchaser shall reimburse Seller, no later than two (2) Business Days after such payment has been made, for undisputed amounts plus any out-of-pocket expenses incurred by Seller as a result of Purchaser's failure to timely fund the undisputed Employee Compensation; <u>provided</u> that, in the event that (i) Purchaser fails to timely fund the undisputed Employee Compensation, (ii) Seller has provided written notice of such failure to Purchaser, and (iii) Purchaser has not cured such failure in full or provided a Dispute Notice within five (5) Business Days following receipt by Purchaser of such written notice of failure to pay, Seller may immediately terminate the Continued Payroll Period by providing written notice to Purchaser; <u>provided</u> that no such termination shall relieve Purchaser of its obligation to pay any Employee Compensation Costs incurred by Seller prior to such termination. In the event Seller does not receive the Employee Compensation prior to payment by Seller of the Employee Compensation, such payment amounts shall incur interest from the date of payment at the rate of six percent (6%) per annum until paid in full. Seller shall in no event be entitled to pursue the remedies described in the previous two sentences based on Purchaser's good-faith dispute as to any items listed on the Dispute Notice or pursuant to the terms hereof. Seller shall establish a segregated DIP banking account, with Bankruptcy Court approval, for the receipt from Purchaser of the Employee Compensation and the payment of same as described in this Transition Agreement. In no event shall Seller commingle the funds received from Purchaser pursuant to this Transition Agreement with any other funds of Seller; <u>provided, however</u>, that Seller shall not be deemed to have comingled funds as a result of any transfer of funds from Seller's general operating account(s) to such DIP banking account

2

including, without limitation, funds transferred to such DIP banking account to pay (x) compensation to Non-Leased Employees and/or (y) to pay Employee Compensation to Leased Employees as a result of Purchaser's failure to pay when due the amount set forth in any Employee Compensation Notice (including as a result of a good-faith dispute). Within five (5) Business Days after each payment to be made by Purchaser pursuant to this Paragraph 1(b), Seller shall provide Purchaser written notice of the difference, if any, between the actual Employee Compensation for the applicable payment period and the amount actually paid by Purchaser to Seller for such payment period and such difference, if any, shall be applied as a credit or debit, as applicable, to the next payment required hereunder; provided, that in the event there is any difference between the actual Employee Compensation for the final payment period under this Transition Agreement and the amount actually paid by Purchaser to Seller for such final payment period, Purchaser or Seller, as the case may be, shall promptly refund such difference to the other party. Upon the later of (i) termination of the Continued Payroll Period and (ii) resolution of any matter set forth in a Dispute Notice, and notwithstanding anything herein to the contrary (including, without limitation, any restriction on comingling funds), any and all amounts in the DIP banking account described in this Paragraph 1(b) shall be returned to the general operating account of Seller.

(c)      For the duration of the Continued Payroll Period, subject to the provisions of the Seller Benefit Plans (as defined below) (which Seller agrees not to amend in a manner that would prevent coverage from continuing as provided in this Paragraph 1(c)), Seller shall continue the Seller Benefit Plans, and shall continue to administer the Seller Benefit Plans, in accordance with the terms of such Seller Benefit Plans; provided, that (i) such continued coverage is permitted by the applicable insurers, (ii) Leased Employees continue to pay their portion of insurance premiums when due, and (iii) Purchaser timely pays insurance premium amounts in accordance with this paragraph. Seller shall continue to subsidize the insurance premiums for such coverage to the same extent Seller subsidized such coverage immediately prior to the Closing. Seller shall provide Purchaser with a copy of each invoice received by Seller with respect to each Seller Benefit Plan five (5) Business Days following receipt by Seller of such invoice, and a determination of the amount of premium payments required for such insurance (net of amounts paid by Leased Employees), together with reasonably detailed documentation of the calculation of such payments, and a check in the amount of such invoice due in relation to Non-Leased Employees of Seller.  Purchaser agrees to pay on Seller's behalf (i) the full amount of the premium payments related to Leased Employees (net of amounts paid by Leased Employees, but including the portion of the premiums subsidized by Seller); (ii) such other out-of-pocket amounts incurred by Seller in conjunction with keeping such insurance coverage for Leased Employees in place during the Continued Payroll Period, including any employer subsidies for COBRA continuation coverage for Leased Employees required under any applicable Legal Requirement arising from a qualifying event occurring on or after the Closing Date (to the extent the cost of such subsidies exceeds Seller's applicable payroll tax credit); and (iii) the full amount of premium payments and other amounts due related to insurance coverage for Non-Leased Employees to the extent that Seller provides funds for such payment as provided above, in each case (with respect to (i), (ii) and (iii)) no later than one (1) Business Day prior to the premium due date. For purposes of this Transition Agreement, "Seller Benefit Plans" shall mean the policies shown on Schedule 1C attached hereto. Any cost related to any Seller Benefit Plan that accrues after the expiration of the Continued Payroll Period shall be the sole responsibility of Seller.

3

(d)      Purchaser shall, upon hiring any Leased Employee, provide such Leased Employee with full credit with respect to such Leased Employee's accrued but unused and unpaid vacation time accrued pursuant to Seller's Vacations policy set forth in section 5003 of the WML draft Employee Handbook provided to Purchaser by Seller (and specifically excluding Sick Leave time or any time off benefit not provided by Seller's referenced Vacations policy)pursuant to Purchaser's Personal Leave Bank policy for California-based employees.

(e)      While the Leased Employees are being leased to Purchaser, Purchaser shall have the right to manage the Leased Employees.  Parent and Purchaser agree, jointly and severally, to indemnify, defend and hold harmless Seller, its Affiliates and each of their respective officers, directors, shareholders, employees, agents and their respective successors and assigns (each a "Seller Indemnitee") from or against, for and in respect of, any and all Losses suffered, sustained, incurred or required to be paid by Seller arising out of, based upon, in connection with or as a result of (a) any Liability or obligation with respect to Leased Employees under the WARN Act or any similar state or local Legal Requirement arising on or after the Closing Date, (b) any Employee Claim brought or maintained by any Leased Employee, to the extent arising on or after the Closing Date, (c) the non-fulfillment, non-performance or other breach of any covenant or agreement to be performed by Purchaser pursuant to this Transition Agreement and/or (d) the performance of services by the Leased Employees while leased to Purchaser as set forth in this Section 1, except to the extent such Losses are caused by any negligent, intentional or wrongful act or omission (including wrongful interference with the performance of services by the Leased Employees) of Seller; provided, that Seller's failure to timely pay Employee Compensation where Purchaser has failed to timely provide funds to Seller in advance of the pay date for such Employee Compensation in accordance with Paragraph 1(a) of this Transition Agreement shall not be considered wrongful conduct for purposes of indemnification pursuant to this paragraph.  Notwithstanding anything herein to the contrary, Parent and Purchaser shall not indemnify, defend or hold harmless any Seller Indemnitee from or against, for or in respect of, any Losses proximately caused by Seller's breach of this Transition Agreement.  For purposes of this Transition Agreement, "Losses" means, collectively, any and all damages, losses, obligations, Liabilities, demands, judgments, injuries, penalties, claims, actions or causes of action, costs, and expenses (including, reasonable attorneys', experts' and consultants' fees).

(f)      Seller shall timely pay all taxes, governmental assessments and related penalties related to the Leased Employees, and Seller shall timely file with the appropriate Governmental Authorities (i) all Tax Returns, W-2 filings and other informational filings required in connection with payments, wages, withholdings from wages, social security and Medicare taxes, state and federal income taxes, and state and federal unemployment taxes related to the Leased Employees; (ii) all filings required in connection with the Seller Benefit Plans, the administration of benefits under the Seller Benefit Plans, workers compensation, unemployment compensation and any other benefit related to the Leased Employees; and (iii) all other filings which are required under any applicable Legal Requirement related to the Leased Employees.  Seller agrees to indemnify, defend and hold harmless Purchaser, Parent, their respective Affiliates and each of their respective officers, directors, shareholders, employees, agents and their respective successors and assigns (each a "Purchaser Indemnitee") from or against, for and in respect of, any and all Losses suffered, sustained, incurred or required to be paid by Purchaser arising out of, based upon, in connection with or as a result of Seller's failure to timely affect any of the filings or payments contemplated in this Paragraph 1(f).

4

(g)    Seller shall promptly report to Purchaser any complaints or grievances by or related to any Leased Employees, which complaints or grievances Seller is currently aware of or becomes aware of during the Continued Payroll Period.

(h)    Seller shall not be deemed to be in breach of this Transition Agreement as a result of the failure of any Leased Employee(s) to fulfill his or her obligations to Seller or Purchaser or any of their respective Affiliates.

(i)    Upon the termination of the Continued Payroll Period, Seller shall not have any Liability hereunder and none of Seller's representations, warranties, covenants or agreements hereunder shall survive such termination, except to the extent that Purchaser has provided written notice to Seller of a claim within sixty (60) days after such termination. The provisions of Section 11.4(b) of the Purchase Agreement shall apply *mutatis mutandis* to this Transition Agreement.

2.    Accounts Receivable. Purchaser and Seller shall forward to the other party any funds which are received by such party (or their respective Affiliates) but which relate to the accounts receivable of the other party. Purchaser and Seller each shall treat all funds received by it which relate to Seller Accounts Receivable (as defined on Schedule 2 attached hereto) in accordance with the guidelines set forth on Schedule 2. None of Purchaser, Seller or any of their Affiliates shall take any action that may hinder, delay or otherwise adversely affect the timely payment in full of the accounts receivable of the other party. Notwithstanding anything to the contrary stated herein, neither party shall have any responsibility to collect any of the other party's accounts receivable.

3.    Seller's Right to Use Purchased Assets. For the duration of the Continued Payroll Period, Purchaser shall make reasonably available to Seller physical space, equipment, supplies, computer systems and phone systems in an amount reasonably necessary for Seller to collect the Seller Accounts Receivable. Seller shall reimburse Purchaser for all such supplies and infrastructure provided by Purchaser at the rate of [$1.25] per square foot of physical space occupied by Seller, to be assessed on a monthly basis.

4.    Relationship of Parties. Seller is an independent contractor of Purchaser. Nothing herein contained shall be deemed or construed by the parties to this Transition Agreement or for any other party as creating the relationship of principal and agent or of a partnership or joint venture among the parties hereto.

5.    Amendment and Waiver. This Transition Agreement may be amended, or any provision of this Transition Agreement may be waived; provided, that any such amendment or waiver shall be binding upon Purchaser only if set forth in a writing executed by Purchaser, and any such amendment or waiver shall be binding upon Seller only if set forth in a writing executed by Seller. No course of dealing between or among any persons having any interest in this Transition Agreement shall be deemed effective to modify, amend, or discharge any part of this Transition Agreement or any rights or obligations of any person under or by reason of this Transition Agreement.

6.    Notices. The notice provisions of the Purchase Agreement shall govern this Transition Agreement.

5

7.    <u>Miscellaneous</u>.  This Transition Agreement does not create any rights in any person or party who is not a party to this Transition Agreement, including any employee or former employee of Seller.  The language used in this Transition Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any person.  This Transition Agreement shall be governed by the laws of the State of Delaware, without regard to conflicts-of-laws principles that would require application of any other law.  This Transition Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument.  The exchange of executed copies of this Transition Agreement by facsimile transmission or other electronic transmission shall constitute the effective execution and delivery of this Transition Agreement.  Except for matters set forth in the Purchase Agreement or other agreements contemplated therein, this Transition Agreement sets forth the complete agreement between the parties and supersedes any prior understandings, agreements, or representations by or between the parties, written or oral, that may have related to the subject matter hereof in any way.  In the event of any inconsistency between the Purchase Agreement and this Transition Agreement, the provisions of this Transition Agreement shall prevail.  Parent shall cause Purchaser to timely fulfill all of its obligations and comply with all of its agreements hereunder and, in the event that Purchaser fails to fulfill such obligations or comply with such agreements, Parent shall immediately satisfy such obligations and indemnify and hold harmless Seller from any Losses incurred as a result of such failure.

*(Signatures appear on following page.)*

IN WITNESS WHEREOF, the parties hereto have executed this Transition Agreement as of the day and year first above written.

**PARENT:**                    **LABORATORY CORPORATION OF AMERICA**

By: _____
Name: _____
Title: _____


**PURCHASER:**                 **WAVE NEWCO, INC.**

By: _____
Name: _____
Title: _____


**SELLER:**                    **BIOLABS, INC.**

By: _____
Name: _____
Title: _____


**WESTCLIFF MEDICAL LABORATORIES, INC.**

By: _____
Name: _____
Title: _____

**Schedule 1A**

**Leased Employees[1]**

[To be determined by Purchaser at Closing]

---

[1] It is the intent of the parties to this Transition Agreement that Schedule 1A will include all employees of Seller who are employees in good standing as of the Closing Date, other than (a) certain corporate officers of Seller and (b) employees of Seller set forth on Schedule 1B. To the extent that Schedule 1A includes any individual who is not an employee in good standing as of the Closing Date, no obligation shall arise to either party under this Transition Agreement with respect to that individual.

**Schedule 1B**

**Non-Leased Employees**

[To be determined by the parties hereto at Closing]

# Schedule 1C

## Seller Benefit Plans

[To be determined by the parties hereto at Closing]

**Blue Cross** - Employee Health, Dental Insurance, life insurance partially funded by Seller/partially funded by employee deferrals

**Guardian** - Supplemental Life Insurance and other specialized insurances, 100% employee deferrals, no Seller funding

**AFLAC** - Variety of specialized insurances, l/t and s/t disability, etc, 100% employee deferrals, no Seller funding

**Colonial** - Prior to Guardian, supplemental life insurance, only a handful of employees remain on the plan, 100% employee deferral

**Connexis** - Flexible Spending Plan - administered by Connexis, 100% employee deferrals

**Connexis** - Cafeteria Plan - administered by Connexis, 100% employee deferrals

**Oppenheimer Funds** - 401k Plan, 100% employee deferrals

**Connexis** - Cobra - administered by Connexis

## Schedule 2

### Payment of Seller Accounts Receivable

1.  Annex I, attached hereto, sets forth the description and the balance of each of Seller's accounts receivable as of the Closing (the "Seller Accounts Receivable").

2.  During the period ending 60 days after the Closing, any payment tendered to Purchaser or Seller by any Person that has Liability with respect to Seller Accounts Receivable that does not reference the Purchaser as the payee company and does not contain "Date of Service" detail or other information identifying the provider or invoice being paid or account to which it should be credited shall be deemed a payment on account of delinquent amounts owed to Seller.

3.  During the period beginning 61 days after the Closing and thereafter, any payment tendered to Purchaser by any Person that has Liability with respect to any Seller Accounts Receivable, which payment does not contain sufficient identifying account information (including, but not limited to, dates of service, account numbers, billing numbers, invoice numbers or the like) to determine whether the payment is tendered pursuant to such Person's account with Purchaser or with Seller, shall be deposited by Purchaser into a suspense account controlled by Purchaser. Purchaser will attempt in good faith and in accordance with its customary procedures and policies related to the allocation of unapplied funds to determine, within 30 days of Purchaser's receipt of such payment, to which party (Purchaser or Seller) the payment is due and owing, and upon making such determination shall promptly distribute the funds from the suspense account to Purchaser and/or Seller as appropriate. If Purchaser is unable to make such determination within 30 days of Purchaser's receipt of such payment, Purchaser shall provide Seller with an imaged copy of the payment, and Seller shall have 30 days to provide documented proof that such payment is tendered pursuant to Seller Accounts Receivable and is the property of Seller. If Seller provides such documented proof that the payment is tendered pursuant to Seller Accounts Receivable, Purchaser shall promptly distribute the funds from the suspense account to Seller. If Seller has not, within 30 days of Seller's receipt of the copy of the payment, provided documented proof that the payment is tendered pursuant to Seller Accounts Receivable, then such payment will be distributed from the suspense account entirely to Purchaser.

4.  During the period beginning 61 days after the Closing and thereafter, any payment tendered to Seller by any Person that has Liability with respect to any Seller Accounts Receivable, which payment does not contain sufficient identifying account information (including, but not limited to, dates of service, account numbers, billing numbers, invoice numbers or the like) to determine whether the payment is tendered pursuant to such Person's account with Purchaser or with Seller, shall be deposited by Seller into a suspense account controlled by Seller. Seller will attempt in good faith and in accordance with its customary procedures and policies related to the allocation of unapplied funds to determine, within 30 days of Seller's receipt of such payment, to which party (Purchaser or Seller) the payment is due and owing, and upon making such determination shall promptly distribute the funds from the suspense account to Purchaser and/or Seller as appropriate. If Seller is unable to make such

determination within 30 days of Seller's receipt of such payment, Seller shall provide Purchaser with an imaged copy of the payment, and Purchaser shall have 30 days to provide documented proof that such payment is tendered to Purchaser and is the property of Purchaser. If Purchaser provides such documented proof that the payment is tendered pursuant to Purchaser's accounts receivable, Seller shall promptly distribute the funds from the suspense account to Purchaser. If Purchaser has not, within 30 days of Purchaser's receipt of the copy of the payment, provided documented proof that the payment is tendered pursuant to Purchaser's accounts receivable, then such payment will be distributed from the suspense account entirely to Seller.

5. For 30 days following the Closing, Purchaser shall not issue invoices to any Person or account listed in the attached Annex 1; provided, however, that Purchaser shall not be required to withhold invoices pursuant to this paragraph which are to be sent to any third-party payors or individual patients.

6. Any capitation payment tendered to Purchaser or Seller which pertains to the month in which the Closing occurred (the "Closing Month") shall be distributed such that (i) Seller receives such payment pro-rated by the actual number of days in the Closing Month elapsed as of Closing over the number of calendar days in the Closing Month and (ii) Purchaser receives the remainder of such payment.

**Annex 1**

**Seller Accounts Receivable**

[To be determined by the parties hereto at Closing]

**Exhibit 7.3(b)(ii)(A)**

```
 1   RON BENDER (SBN 143364)
     JACQUELINE L. RODRIGUEZ (SBN 198838)
 2   TODD M. ARNOLD (SBN 221868)
     JOHN-PATRICK M. FRITZ (SBN 245240)
 3   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
     10250 Constellation Boulevard, Suite 1700
 4   Los Angeles, California 90067
 5   Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
     Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com;
 6   jpf@lnbrb.com
 7
     Attorneys for Chapter 11 Debtors and Debtors in Possession
 8
 9                 UNITED STATES BANKRUPTCY COURT
                   CENTRAL DISTRICT OF CALIFORNIA
10                      SANTA ANA DIVISION
11
     In re:                        )  [Proposed]
12                                 )  Lead Case No. 8:10-bk-16743
                                   )  [Proposed] Jointly Administered
13   WESTCLIFF MEDICAL LABORATORIES,)  with Case No. 8:10-bk-16746¹
     INC.,                         )
14                                 )
            Debtor.                )
15   _____)  Chapter 11 Cases
                                   )
16   BIOLABS, INC.,                )  ORDER SETTING HEARING ON SALE
                                   )  MOTION, APPROVING PROCEDURES
17          Debtor.                )  FOR THE SALE OF SUBSTANTIALLY
                                   )  ALL ASSETS OUT OF THE
18   _____)  ORDINARY COURSE OF BUSINESS AND
19   ☒ Affects Both Debtors        )  FREE AND CLEAR OF LIENS,
                                   )  APPROVING BID PROTECTIONS AND
20   ☐ Affects WESTCLIFF MEDICAL   )  BREAK UP FEE FOR STALKING HORSE
        LABORATORIES, INC. only    )  PURCHASER AND GRANTING OTHER
21                                 )  RELIEF
22   ☐ Affects BIOLABS, INC. only  )
                                   )  Court Scheduled Hearing:
23                                 )  Date:  May 25, 2010
                                   )  Time:  10:00 a.m.
24                                 )  Place: Courtroom "5D"
                                   )         411 West Fourth Street
25   _____)         Santa Ana, CA 92701-4593
26
27   _____
     ¹ Motion for Joint Administration pending.
28
```

RA-3004823 v3

1

2

3      The Court has considered the Emergency Motion filed on May 20,

2010 (the "Procedures Motion") by BIOLABS, INC. and WESTCLIFF

4      MEDICAL LABORATORIES, INC., jointly administered, Chapter 11

5      debtors and debtors in possession (collectively, the "Debtors"),

6      seeking the approval of the United States Bankruptcy Court for the

7      Central District of California (the "Court") of certain sale

8      procedures pursuant to various provisions of Title 11 of the United

9      States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy

10     Code") and Rules 6004, 6006, and 9014 of the Federal Rules of

11     Bankruptcy Procedure (the "Bankruptcy Rules"), and the local rules

12     of this Court.  Under the terms proposed in the Procedures Motion

13     (the "Sale Procedures"), the Debtors request authority to provide

14     notice of and to employ the Sale Procedures to permit interested

15     parties to seek to purchase certain assets, together with the

16     assumption and assignment of certain executory contracts and

17     unexpired leases; to provide the terms pursuant to which such

18     interested parties may become a qualified bidder; and to have the

19     winning bidder (the "Winning Bidder") for the sale of the assets be

20     approved by the Court at a hearing (the "Sale Hearing") to be held

21     no later than twelve calendar days after the Petition Date.  The

22     Debtors also ask this Court to approve certain bid protections for

23     WAVE NEWCO, INC., a Delaware corporation ("Stalking Horse

24     Purchaser"), a wholly-owned subsidiary of LABORATORY CORPORATION OF

25

26

27

28

AMERICA, a Delaware corporation, or the assignee thereof, in

connection with the Stalking Horse Purchaser's prepetition

agreement with the Debtors to purchase substantially all of the

Debtors' assets out of the ordinary course of business and free and

clear of all liens, claims and interests pursuant to 11 U.S.C.

§§105, 363(b) and (f), and 365 (the "APA"), which APA is the

subject of a separate and simultaneously filed motion (the "Sale

Motion"). This Court having reviewed the Procedures Motion and the

Sale Motion, together with the Declarations of the Debtors'

representatives filed in support thereof, found good and sufficient

cause to enter this Order as requested in the Procedures Motion.

IT IS THEREFORE ORDERED AS FOLLOWS:

1. The Procedures Motion is approved and allowed and the Sale

Procedures set forth in the Procedures Motion are adopted in their

entirety.

2. Specifically, the Court approves the following Sale Procedures

and provisions with respect to the transaction ("Transaction") as

contemplated by the Procedures Motion:

a. a break up fee in an amount equal to Two Million Two

Hundred Fifty Thousand Dollars ($2,250,000) (the "Break Up Fee")

shall be immediately due and payable to Stalking Horse Purchaser

from the proceeds of sale at Closing in the event another party is

determined to be the Winning Bidder, and the Break Up Fee shall not

be subject to the lien of any Encumbrance that might otherwise

attach to the proceeds of sale;

    b.   in the event there are one or more Qualified Bidders

seeking to make a competing bid in respect to that of the Stalking

Horse Purchaser, there shall be a required minimum initial overbid

of Two Million Nine Hundred Fifty Thousand Dollars ($2,950,000)

("Initial Overbid Amount") above the purchase price offered by the

Stalking Horse Purchaser;

    c.   in the event there are bids made by Qualified Bidders

after an Initial Overbid Amount, then such additional bids shall be

in increments of not less than One Hundred Thousand Dollars

($100,000);

    d.   in order for any interested party to be considered a

"Qualified Bidder," such bidder must, on or before two (2) Business

Days before the Sale Hearing, (i) submit to the Debtors and the

Stalking Horse Purchaser at the notice addresses for their

respective counsel on file with the Court, written confirmation of

the existence of committed financing or other available funds that

evidences that the proposed bidder has the financial ability to pay

the Purchase Price plus the Initial Overbid Amount, and (ii)

further must make a "good faith deposit" in an amount equal to Four

Million Dollars ($4,000,000) in immediately available funds in

escrow with counsel for the Debtors;

4

e.    the winning bid of a Qualified Bidder shall be the highest bid (the "Winning Bid") in dollars; provided, however, that if (x) the highest bid made by a Qualified Bidder other than the Stalking Horse Purchaser minus the Break Up Fee is less than (y) the highest bid of the Stalking Horse Purchaser, then the bid of the Stalking Horse Purchaser shall be the Winning Bid;

f.    any Qualified Bidder shall be subject to be determined to have provided a back up bid in connection with the Transaction (the "Back Up Bid");

g.    A Back Up Bid shall be equal to one of the following: (a) if the Winning Bid is made by the Stalking Horse Purchaser, the highest bid made by a Qualified Bidder other than the Stalking Horse Purchaser or (b) if the Winning Bid is made by a Qualified Bidder other than the Stalking Horse Purchaser, the second highest bid made by a Qualified Bidder; provided, however, that if (x) the second highest bid made by a Qualified Bidder (other than the Stalking Horse Purchaser) minus the Break Up Fee is less than (y) the highest bid made by the Stalking Horse Purchaser, then the Back Up Bid shall be the highest bid of the Stalking Horse Purchaser;

h.    the deposit posted by the maker of the Back Up Bid shall not be refunded until five (5) Business Days following the closing of the sale to the maker of the Winning Bid;

i.    the Sale Hearing shall be held on May __, 2010, at __:__ ___.m.;

5

j.   in the event the Winning Bidder fails to close the
Transaction as required by the Orders of this Court, then the maker
of the Back Up Bid shall be required to consummate the Transaction
within ten (10) days following receipt of written notice from the
Debtors of the failure of the maker of the Winning Bid to
consummate the Transaction, provided such written notice is
provided to the maker of the Back Up Bid within thirty-five (35)
days following the Petition Date; and

k.   In the event that the maker of the Back Up Bid fails to
consummate the Transaction as required by the preceding
subparagraph, then the maker of the Back Up Bid shall have
forfeited its entire good faith deposit to the Debtors.

3.   The Court has duly considered the Debtors' request with
respect to the procedures set forth in this Order and has concluded
that the terms are the best terms available under the circumstances
and that the sale to Stalking Horse Purchaser (unless there is a
higher Winning Bid, as defined above) is in the best interests of
the Debtors' estates.   In reaching this conclusion, the Debtors'
management has carefully weighed a number of considerations which
the Court finds persuasive, including the following:

a.   The Debtors undertook an intensive effort lasting more
than one year to identify a potential purchaser of their assets;

b.   The Stalking Horse Purchaser was the only party which
offered an acceptable proposal to the Debtors;

c.    The Debtors' Business may be deteriorating, and the Debtors are in immediate danger of losing both employees and their ongoing contracts to competitors, either of which would substantially impair the value of the Debtors' assets, which constitutes a danger of immediate and irreparable harm to the Debtors and their creditors;

d.    Any further delay by the Debtors to seek alternative or higher prices for their assets would instead likely result in further significant reduction in the size of the Debtors' business and asset values and likely impair the value of the Debtors' business in a significant manner;

e.    The Debtors are in default under their credit facility with their secured lender and their secured lender is no longer willing to fund the Debtors' ongoing and significant cash short falls and operating losses;

f.    The Debtors lack the cash necessary to sustain their operations or to satisfy their secured debt obligations absent the expedited sale of their assets as set forth in the APA.  Absent such an expedited sale of their assets, the Debtors will likely be forced to cease their business operations and liquidate their assets, with such liquidation likely producing insufficient sums to repay their secured creditor, let alone any unsecured creditors;

g.    The Debtors' operations have been hampered by ongoing

litigation with the State of California, further reducing the

prospect of a sale of the Debtors' assets outside of bankruptcy;

4.    The proposed sale procedures are reasonable under the exigent

circumstances of these cases and create the greatest prospect for

recovery by the Debtors' creditors.  The Debtors have demonstrated

to the Court that an extended period of time of even 30 days in

Bankruptcy results in a significant risk that the Debtors' asset

value will deteriorate to a degree that the applicable Material

Adverse Change provisions of the APA will become applicable,

allowing the Stalking Horse Purchaser to either reduce the purchase

price or terminate the Transaction entirely before consummation.

5.    An auction sale of the Debtors' assets pursuant to the

Procedures Motion, including the proposed Break Up Fee and the

other protections provided in this Order, together with the Sale

Motion and the APA, is in the best interests of the Debtors, their

creditors, and their bankruptcy estates.

6.    The Debtors are expressly authorized and empowered to offer

their assets for sale pursuant to this Procedures Order.

7.    In the event that any terms, provisions, or conditions of any

closing document or the APA conflict with the terms, provisions or

conditions of this Order, then the terms, provisions and conditions

of this Order shall control the implementation and interpretation

of such documents.

8.    Any capitalized, undefined terms contained in this Order shall have the meaning ascribed thereto in the APA.

9.    Notice of the Entry of this Order, a copy of this Order, notice of the Sale Hearing and notice of the Sale Motion shall be served by the Debtors immediately upon entry of this Order and in no event more than 24 hours after entry of this Order pursuant to the forms of notice (which forms are hereby approved in all respects) attached to the Procedures Motion on the following:

> (i) all Persons that claim any interest in or Encumbrance upon the Purchased Assets;
> (ii) all parties to Designated Contracts;
> (iii) all Governmental Authorities with taxing power that have, or as a result of the sale of the Purchased Assets may have, claims, contingent or otherwise, against the Debtors;
> (iv) all Persons that file requests for notices under Bankruptcy Rule 9010(b);
> (v) all interested Governmental Authorities, including those administering Governmental Programs;
> (vi) the attorneys general of all states in which the Purchased Assets are located,
> (vii) the Office of the United States Trustee;
> (viii) all Persons that expressed to the Debtors an interest in purchasing the Purchased Assets in the twelve (12) months prior to the date of the APA;
> (ix) any other Person reasonably requested by Purchaser;
> (x) any patient who has notified or threatened the Debtors with any claim; and
> (xi) all interested Private Programs.

10.    In addition, the Debtors shall serve Notice of the Sale Motion in the form approved by the Bankruptcy Court on the following:

> (i) all creditors (whether liquidated, unliquidated, contingent, noncontingent, unsecured, secured, contested or uncontested) of the Debtors, including, without limitation all individuals employed by either of the Debtors on or after January 1, 2008;
> (ii) all other Persons entitled to notification under Bankruptcy Rule 2002; and
> (iii) all other Persons entitled to notice pursuant to applicable Legal Requirements.

11.   Further, the Debtors shall post a copy of the Sale Motion on its website and publish notice of the Sale Motion in appropriate media outlets, including, without limitation, the following: [Debtors to propose list to insert here subject to the approval of Stalking Horse Purchaser].

12.   The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) appointing a Chapter 11 Trustee in either or both of the Debtors' cases; (b) converting the Chapter 11 cases to Chapter 7 cases; or (c) dismissing the Chapter 11 cases, and the terms and provisions of this Order shall continue in full force and effect notwithstanding the entry of such order or conversion or dismissal.


Dated:                        _____
                              UNITED STATES BANKRUPTCY JUDGE

**Exhibit 7.3(b)(ii)(B)**

1  RON BENDER (SBN 143364)
   JACQUELINE L. RODRIGUEZ (SBN 198838)
2  TODD M. ARNOLD (SBN 221868)
   JOHN-PATRICK M. FRITZ (SBN 245240)
3  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
   Telephone: (310) 229-1234; Facsimile: (310) 229-1244
5  Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com;
   jpf@lnbrb.com
6
7  Attorneys for Chapter 11 Debtors and Debtors in Possession
8
9                  UNITED STATES BANKRUPTCY COURT
                   CENTRAL DISTRICT OF CALIFORNIA
10                      SANTA ANA DIVISION
11
   In re:                          )  [Proposed]
12                                  )  Lead Case No. 8:10-bk-16743
   WESTCLIFF MEDICAL LABORATORIES,  )  [Proposed] Jointly Administered
13 INC.,                            )  with Case No. 8:10-bk-16746[1]
                                    )
14          Debtor.                 )  Chapter 11 Cases
                                    )
15 _____  )
                                    )  ORDER AUTHORIZING SALE OF ASSETS
16 BIOLABS, INC.,                   )  OUT OF THE ORDINARY COURSE OF
                                    )  BUSINESS, FREE AND CLEAR OF
17          Debtor.                 )  LIENS, ENCUMBRANCES, CLAIMS, AND
                                    )  INTERESTS; AUTHORIZING THE
18 _____  )  ASSUMPTION AND ASSIGNMENT OF
                                    )  UNEXPIRED LEASES AND EXECUTORY
19 ☒ Affects Both Debtors          )  CONTRACTS; AND GRANTING OTHER
                                    )  RELIEF PURSUANT TO 11 U.S.C.
20 ☐ Affects WESTCLIFF MEDICAL     )  SECTIONS 105, 363 AND 365
      LABORATORIES, INC. only       )
21                                  )
                                    )
22 ☐ Affects BIOLABS, INC. only    )  Court Scheduled Hearing:
                                    )  Date: _____
23                                  )  Time: _____
                                    )  Place: Courtroom "5D"
24                                  )        411 West Fourth Street
                                    )        Santa Ana, CA 92701-4593
25 _____  )
26
27 _____
   [1] Motion for Joint Administration pending.
28

RA-3004821 v3

The Court has conducted a hearing on May __, 2010 (the "Sale Hearing") upon the motion (the "Sale Motion") filed May _, 2010 of BIOLABS, INC. and WESTCLIFF MEDICAL LABORATORIES, INC., jointly administered, Chapter 11 debtors and debtors in possession (collectively, the "Debtors"), seeking this Court's authorization for the Debtors to sell certain assets (the "Purchased Assets") and to assume and assign certain unexpired leases and executory contracts ("Assumed Contracts") to WAVE NEWCO, INC., a Delaware corporation ("Purchaser"), a wholly-owned subsidiary of LABORATORY CORPORATION OF AMERICA, a Delaware corporation ("LabCorp"), or the assignee thereof, out of the ordinary course of business and free and clear of all liens, encumbrances, claims and interests pursuant to 11 U.S.C. §§105, 363(b) and (f), and 365, pursuant to various provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable local rules of this Court.  No parties having appeared to submit competing bids for the Purchased Assets, due and sufficient notice of the Sale Motion under the circumstances having been given, and the Sale Hearing having been held before this Court on May __, 2010 at which time the Court indicated that it would approve the relief requested in the Sale

Motion.  This Court having found good and sufficient cause

appearing to grant the relief as set forth in this Order:

IT IS FOUND that:

1.   On May 18, 2010 (the "Petition Date"), the Debtors filed

voluntary petitions in this Court for relief under chapter 11 of

the Bankruptcy Code.  The Debtors continue to operate their

business as Debtors in Possession pursuant to sections 1107 (a) and

1108 of the Bankruptcy Code.

2.   This Court has jurisdiction over the Sale Motion pursuant to

28 U.S.C. §§ 1334 and 157.  This is a core proceeding.  Venue of

these cases and the Sale Motion in this district is proper pursuant

to 28 U.S.C. §§ 1408 and 1409.

3.   The Debtors are private companies which are the owners and

operators of stand-alone, patient service center laboratories and

STAT labs that provide various services, including clinical

testing, pathology, reporting and support services for the benefit

of thousands of out-patients throughout California.

4.   The Debtors contend that they owe approximately $56 million

(the "Senior Debt") to a group of lenders (the "Senior Lenders")

for whom GE Business Financial Services, Inc. serves as agent.  The

Debtors and the Senior Lenders contend that the Senior Debt is

secured by a first priority security interest and lien against all

or substantially all of the Debtors' assets.

5.   The Debtors contend that they suffered a net loss of

approximately $87 million in 2008 (including expenses and write

offs of approximately $171 million) on net revenue of approximately

$84 million.  The Debtors contend that they suffered a net loss of

approximately $13 million in 2009 (including expenses and write
offs of approximately $110 million) on net revenue of approximately
$97 million.

6.    The Debtors concluded in early 2009 that the only viable
option available to the Debtors to avoid a shut down of their
business and the loss of employment by all of the Debtors'
employees would be for the Debtors to sell their business as a
going concern to the highest bidder.  The Debtors have been engaged
in an active sale process since early 2009.

7.    To assist the Debtors with this sale process, the Debtors
engaged MTS Health Partners, LP ("MTS") in October, 2009 as a
financial advisor to assist the Debtors with their sale process.[2]
MTS, working with the Debtors, conducted a sale process, which
involved the preparation of sale materials and discussions and
interactions with a number of prospective buyers, both strategic
buyers and financial buyers.  MTS contends that approximately
thirty-one prospective buyers were contacted.

8.    After having engaged in due diligence and negotiations with a
number of prospective buyers, MTS and the Debtors collectively
concluded that a to be formed wholly-owned subsidiary of LabCorp
was the optimal buyer of the Debtors' business for three primary
reasons.  First, LabCorp, which is in the same business as the
Debtors but is a much larger company, expressed the greatest
interest in purchasing the Debtors' business.  Second, LabCorp was
willing to pay a higher price for the Debtors' business than any

---

[2] The Debtors had used other professionals for this same purpose in the
past.

4

other prospective buyer.  Third, LabCorp has the financial means to

consummate its purchase of the Debtors' business.[3]

9.    The Debtors and Purchaser initially entered into a Letter of

Intent for the Debtors to sell certain of their assets to

Purchaser.  From and after the execution of the Letter of Intent,

the parties prepared, negotiated and executed the Asset Purchase

Agreement dated May 17, 2010 (the "APA").  All terms which are

defined in the APA but which are not defined in this Order shall

have the definitions provided for in the APA.  The parties had

considered various structures for completing the transaction in a

manner most beneficial to the Debtors, their creditors and

Purchaser.  Ultimately, the parties concluded that the transaction

could only be completed through a Bankruptcy Court approved sale

utilizing the provisions of 11 U.S.C. §§ 363 and 365 to do so.  The

APA was thus executed upon the condition that the Debtors would

promptly seek relief in this Court and promptly seek approval of

the APA and the sale procedures set forth in the APA.

10.    The approval of the sale procedures is the subject of a

separate motion (the "Sale Procedures Motion") that has been filed

with the Court prior to or simultaneously with the filing of the

Sale Motion and pursuant to which the Court has entered an order

(the "Sale Procedures Order"), which provides, among other things,

for an auction of the Purchased Assets and the Assumed Contracts

should qualified bidders comply with the Sale Procedures Order and

submit competing bids (the "Auction").

11.  A copy of the Asset Purchase Agreement between the Debtors, LabCorp and Purchaser is attached as Exhibit "3" to the Declaration of Matthew Pakkala filed in support of the Sale Procedures Motion and is attached as Exhibit "1" to the Declaration of Matthew Pakkala filed in support of the Sale Motion.

Debtor's Assets.

12.  As of the Petition Date, other than cash, accounts receivable and the other assets which are defined in the APA as the "Excluded Assets", the Debtors' assets consist primarily of those assets which are defined in Section 2.1 of the APA as the Purchased Assets.  The Debtors estimate that a liquidation of the Purchased Assets would have minimal value which is substantially less than the Aggregate Purchase Price being paid by Purchaser as set forth in Section 3.1 of the APA.

TERMS OF APA

Consideration.

13.  The APA provides that the Debtors shall sell to Purchaser the Purchased Assets and the Debtors shall assume and assign to Purchaser the Assumed Contracts.  The Debtors' cash, accounts receivable and avoidance causes of action are specifically excluded from the sale.

14.  The Aggregate Purchase Price to be paid by Purchaser is $57,500,000 payable in cash, subject to the reductions set forth in the APA.

---

[3]  LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp solely for the purpose of acquiring the Purchased Assets.

15.   The Debtors anticipate that all valid outstanding secured claims will be satisfied in full from the sale proceeds (subject to any agreed upon reductions); that all administrative expenses of the chapter 11 estates will be paid in full; and that funds will remain for distribution to priority and unsecured creditors in accordance with the priority scheme of the Bankruptcy Code.

16.   The Debtors also seek to assume and assign the Assumed Contracts to Purchaser.   The Debtors reserve the right to seek to assume and assign additional unexpired leases and executory contracts to Purchaser in the manner set forth in the APA and to reject unexpired leases and executory contracts which are not assigned to Purchaser.

Conditions of Closing.

17.   The APA generally provides that the acquisition by Purchaser will be subject to certain conditions more fully set forth in Article 8 of the APA but generally described below:

a.   Required approvals and consents;

b.   Entry by this Court of an Order authorizing the sale free and clear of Encumbrances (as defined below) on all Purchased Assets and authorizing the assumption and assignment of the Assumed Contracts and such Order shall not be stayed;

c.   Settlement of the so-called "Qui Tam" litigation;

d.   Continued accuracy of certain representations and warranties by the Debtors; and

e.   The non-occurrence of a "Material Adverse Change" (as defined in the APA).

7

Approval of Sale.

18.   The Debtors have concluded that the terms of the APA are the best terms available to the Debtors under the circumstances and that the sale to Purchaser is in the best interests of the Debtors' estates.   In reaching this conclusion, the Debtors carefully weighed a number of considerations, including the following:

a.   The Debtors undertook an intensive effort lasting more than one year to identify the optimal purchaser of their business;

b.   Purchaser was the only party which offered an acceptable proposal to the Debtors;

c.   The Debtors' business is deteriorating, and the Debtors are in immediate danger of losing to competitors both employees and their ongoing contracts, either of which would substantially impair the value of the Debtors' assets;

d.   Any further delay by the Debtors to seek alternative or higher prices for their business would pose an unacceptable risk to the Debtors' business and likely result in a further reduction in the size of the Debtors' business and thereby impair the value of the Debtors' business;

e.   The Debtors are in default under their credit facility with their Senior Lenders who are no longer willing to fund the Debtors' cash flow short falls and operating losses;

f.   The Debtors lack the cash necessary to sustain their operations on a long-term basis or to satisfy their secured debt absent consummation of the APA.   Absent a sale of their business,

8

the Debtors will ultimately be forced to cease their operations and liquidate their assets, with such liquidation likely producing insufficient sums to repay their Senior Debt, let alone any unsecured creditors;

g.    The Debtors have no ability to consummate a sale of their business without a settlement of the so-called "Qui Tam" litigation, and the Debtors do not believe that they have the ability to settle the "Qui Tam" litigation without consummating a sale of their business through a bankruptcy proceeding;

h.    The proposed purchase price is substantially more than the Debtors could expect to receive in a liquidation.

Other Agreements.

19.    In addition to the APA, the APA contemplates certain transition and other arrangements with respect to both executory contracts, leases and employment of some employees as follows:

a.    Contracts.    The Debtors have assembled a list of all executory contracts, unexpired leases and vendor contracts that may be assumed and assigned to Purchaser pursuant to 11 U.S.C. §365. Pursuant to Section 2.4 and corresponding schedules of the APA, Purchaser may designate contracts, leases and vendor contracts for assumption or rejection according to the timeframes provided therein (defined as the "Designated Contracts" in the APA).    As more fully detailed in Section 2.4 of the APA, Purchaser may designate certain contracts for assumption or rejection at Closing

and may reserve the right to further consider assumption of certain

contracts post-Closing ("Subsequent Designated Contracts").  All

contracts and leases which are ultimately assumed by the Debtors

and assigned to Purchaser are defined in the APA as the "Assumed

Contracts".  Adequate and proper notice has been provided to all

parties of such proposed assumption or rejection under the terms of

the APA and the applicable Bankruptcy Rules and local rules of this

Court.

  b. Employees.  The Debtors will manage their business

operations and the employment of all employees during a post-

Closing period (the "Transition Period") which will be governed by

the terms of a transition agreement attached as Exhibit 4.3(g) to

the APA ("Transition Agreement").  Pursuant to Section 7.10 of the

APA, Purchaser shall have the right (in its sole and absolute

discretion), but not the obligation, to offer employment, on an at

will basis, effective on the Closing Date, to any or all employees

of the Debtors.  In no event shall Purchaser be obligated to hire

or retain any employee of the Debtors for any period following the

Closing.

  The Court further CONCLUDES:

20.  The findings and conclusions of law set forth herein

constitute the Court's findings of fact and conclusions of law

pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of

the foregoing findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

21.  The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations contained in this Order are (i) Sections 105(a), 363, and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006, and 9014.

22.  As evidenced by the proofs of service and publication filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction and the Sale Hearing have been provided in accordance with Sections 102(1), 105, 363(b), and 365 of the Bankruptcy Code and in compliance with Bankruptcy Rules 2002, 6005, 6006, 9006, 9007, 9008, and 9014, the local rules of this Court, and in compliance with the Sale Procedures Order.  The Debtors also provided due and proper notice of the assumption, sale, and assignment of each Assumed Contract to each non-debtor party under each such Assumed Contract.  Such notice was good and sufficient and appropriate under the particular circumstances.  No other or further notice of the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts (including with respect to the payment by the Debtors of any cure amount due thereunder), or of the entry of this Order is necessary or shall be required.

23.  A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all persons as directed and required in the Sale Procedures Order.

24.  The Purchased Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates pursuant to 11 U.S.C. §541.

25.  The Debtors have demonstrated a sufficient basis and the existence of exigent circumstances requiring them to enter into the APA, to sell the Purchased Assets, and to assume and assign the Assumed Contracts under Sections 105(a), 363, and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors.  There can be no assurance that the value of the Purchased Assets would be maintained if any delay in the consummation of the transactions contemplated in the Sale Motion and APA were to occur.  Likewise, there can be no assurance that Purchaser would be willing to complete such transactions if delay in the consummation of the transactions were to occur.  The procedures set forth in the Sale Procedures Order were non-collusive, substantively and procedurally fair to all parties, were the result of arm's-length negotiations between the Debtors and Purchaser, and were reasonable and appropriate in the context of these cases.

26.  The Debtors and Purchaser have complied, in good faith, in all respects with the Sale Procedures Order.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record

at the Sale Hearing, through marketing efforts and a sale process
conducted in accordance with the Sale Procedures Order, the Debtors
(a) afforded interested potential purchasers a full, fair, and
reasonable opportunity to qualify as bidders and submit their
highest and/or otherwise best offer to purchase the Purchased
Assets, (b) provided potential purchasers, upon request, sufficient
information to enable them to make an informed judgment on whether
to bid on the Purchased Assets, (c) considered any bids submitted
on or before the deadline established in the Sale Procedures Order,
and (d) conducted the Auction (if any) on May ___, 2010.

27.   At the conclusion of the Auction (if any), the Debtors
announced that they had determined that the offer submitted by
Purchaser in the APA was the highest and/or otherwise best offer,
and Purchaser is the Winning Bidder for the Purchased Assets in
accordance with the Sale Procedures Order, or no bids were
submitted on or before the bid deadline other than the offer
submitted by Purchaser in the APA.

28.   The offer of Purchaser, on the terms and conditions set forth
in the APA, including the form and total consideration to be
realized by the Debtors pursuant to the APA, (i) is the highest
and/or best offer received by the Debtors; (ii) is fair and
reasonable; (iii) is in the best interests of the Debtors' estates
and the creditors thereof; (iv) constitutes full and adequate
consideration and reasonably equivalent value for the Purchased
Assets; and (v) will provide a greater recovery for the Debtors'
creditors and other interested parties than would be provided by
any other practically available alternative.

29.   Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and as interpreted by the decisions of this Court and higher courts regarding the meaning of 11 U.S.C. § 363(m).  The APA was negotiated and entered into in good faith, based on arm's-length bargaining, and without collusion or fraud of any kind.   The Auction was conducted in accordance with the Sale Procedures Order and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  Based on the record before this Court, neither the Debtors nor Purchaser has engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy Code or cause the application of or implicate Section 363(n) of the Bankruptcy Code to the APA or to the consummation of the sale transaction and transfer of the Purchased Assets and Assumed Contracts to Purchaser.  Purchaser is therefore entitled to all of the protections of Section 363(m) of the Bankruptcy Code, including with respect to all of the Purchased Assets.

30.   The Debtors have full power and authority to execute the APA and all other documents contemplated thereby, and the sale of the Purchased Assets to Purchaser as contemplated by the APA has been authorized and approved by the Debtors in accordance with the requirements of state law and its internal governance requirements. Other than as may be expressly provided for in the APA, no further consents or approvals are required by the Debtors to consummate such transactions.

31.   The Debtors have advanced sound business reasons for seeking to enter into the APA and to sell the Purchased Assets and to assume and assign the Assumed Contracts, as more fully set forth in

the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell the Purchased Assets and to consummate the transactions contemplated by the APA.  Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to Purchaser and the assumption and assignment of the Assumed Contracts is a legal, valid, and effective transfer of the Debtors' right, title and interest in the Purchased Assets and any Assumed Contracts.

32.  The terms and conditions of the APA, including the consideration to be realized by the Debtors pursuant to the APA, are fair and reasonable, and the transactions contemplated by the APA are in the best interests of the Debtors' estates.

33.  Except as otherwise provided in the APA, the Purchased Assets shall be sold free and clear of all liens, encumbrances, claims and interests (the "Encumbrances") with the Encumbrances to attach to the net proceeds to be received by the Debtors in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.  Purchaser would not enter into the APA to purchase the Purchased Assets or accept an assignment of the Assumed Contracts in the absence of the entry of this Order providing for such sale, assumption and assignment free and clear of all such Encumbrances.

34.  The transfer of the Purchased Assets to Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and, except as may otherwise be provided in the APA, shall vest Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all Encumbrances.

15

Except for the Assumed Liabilities as specifically provided in the APA or this Order, Purchaser shall not assume or become liable for any Encumbrances relating to the Purchased Assets being sold by the Debtors.

35.  Bankruptcy Code Section 363(f) provides for the sale of property of the estates free and clear of the Encumbrances upon the grounds stated in that subsection.

36.  The transfer of the Purchased Assets to Purchaser free and clear of all Encumbrances will not result in any undue burden or prejudice to holders of Encumbrances as all such Encumbrances shall attach to the net proceeds of the sale of the Purchased Assets received by the Debtors in the order of their priority, with the same validity, force, and effect that they now have, if any, as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto.  All persons having Encumbrances of any kind or nature whatsoever against or in the Debtors or the Purchased Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances against Purchaser, any of its assets, property, successors or assigns, or the Purchased Assets

37.  The Debtors may sell the Purchased Assets free and clear of the Encumbrances because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  All objections to the Sale Motion have been resolved or withdrawn or overruled.

38.  Not selling the Purchased Assets free and clear of all Encumbrances would adversely impact the Debtors' estates, and the

sale of the Purchased Assets other than free and clear of all Encumbrances would be of substantially less value to the Debtors' estates.

39.   The Debtors and Purchaser have, to the extent necessary, satisfied the requirements of Section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f) of the Bankruptcy Code, in connection with the sale and the assumption and assignment of the Assumed Contracts.  Purchaser has demonstrated adequate assurance of future performance with respect to the Assumed Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code. The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtors, their estates, creditors and other parties-in-interest thereof, and represents the exercise of sound and prudent business judgment by the Debtors.

40.   The Assumed Contracts are assignable notwithstanding any provisions contained in the Assumed Contracts to the contrary.   The Debtors have provided for the cure and/or other payments or actions required to assume and assign the Assumed Contracts to Purchaser.

41.   Purchaser will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in Closing the transactions contemplated by the APA at any time on or after the entry of this Order.

42.   The transactions contemplated under the APA do not amount to a consolidation, merger, or de facto merger of Purchaser and the Debtors and/or the Debtors' estates; there is not substantial continuity between Purchaser and the Debtors; there is no

17

continuity of enterprise between the Debtors and Purchaser;
Purchaser is not a mere continuation of the Debtors or their
estates; and Purchaser does not constitute a successor to the
Debtors or their estates.

43. The sale of the Purchased Assets outside of a plan of
reorganization pursuant to the APA neither impermissibly
restructures the rights of the Debtors' creditors nor impermissibly
dictates the terms of a liquidating plan of reorganization for the
Debtors. The sale does not constitute a sub rosa chapter 11 plan.

44. The APA, including Purchaser's bid contemplated thereunder, is
a valid and proper offer and "Qualified Bid" pursuant to the Sale
Procedures Order and sections 363(b) of the Bankruptcy Code.

45. The total consideration provided under the APA by Purchaser
for the Purchased Assets is the highest and/or best offer received
by the Debtors, and the Aggregate Purchase Price constitutes (a)
reasonably equivalent value under the Bankruptcy Code and the
Uniform Fraudulent Transfer Act, (b) fair consideration under the
Uniform Fraudulent Transfer Act, and (c) reasonably equivalent
value, fair consideration, and fair value under any other
applicable laws of the United States for the Purchased Assets.

46. Time is of the essence in consummating the sale. To maximize
the value of the Purchased Assets and the Assumed Contracts, it is
essential that the sale of the Purchased Assets and the assumption
and assignment of the Assumed Contracts occur within the time
constraints set forth in the APA. Accordingly, there is cause to
lift the 14-day stays imposed by Bankruptcy Rules 6004 and 6006.

47.   Other than the Assumed Liabilities and its obligations under the APA, Purchaser shall have no obligation with respect to any liability of the Debtors.

48.   Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Sale Hearing, and good and sufficient cause appearing therefore;

IT IS HEREBY ORDERED that:

1.   The Sale Motion is granted, subject to the terms and conditions set forth in this Order.

2.   All objections and responses to the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  If any such objection or response was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied.

3.   Notice of the Sale Hearing was fair and appropriate under the circumstances and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002, 6004, and 6006.

Approval of Sale

4.   The sale of the Purchased Assets, the terms and conditions of the APA (including all schedules and exhibits affixed thereto), the bid by Purchaser and the transactions contemplated thereby are approved in all respects.

5.   The sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts and the consideration provided by Purchaser under the APA is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably

equivalent value and fair consideration under the Bankruptcy Code

and any other applicable law.

6.    Purchaser is hereby granted and is entitled to all of the

protections provided to a good-faith purchaser under section 363(m)

of the Bankruptcy Code, including with respect to the transfer of

the Assumed Contracts as part of the sale of the Purchased Assets

pursuant to section 365 of the Bankruptcy Code and this Order.

7.    The Debtors are authorized and directed to fully assume,

perform under, consummate, and implement the terms of the APA

together with any and all additional instruments and documents that

may be reasonably necessary or desirable to implement and

effectuate the terms of the APA and this Order and sale of the

Purchased Assets contemplated thereby including, without

limitation, deeds, assignments, stock powers, and other instruments

of transfer, and to take all further actions as may reasonably be

requested by Purchaser for the purpose of assigning, transferring,

granting, conveying, and conferring to Purchaser or reducing to

possession any or all of the Purchased Assets or Assumed

Liabilities, as may be necessary or appropriate to the performance

of the Debtors' obligations as contemplated by the APA, without any

further corporate action or orders of this Court.  The parties

shall have no obligation to proceed with the Closing of the APA

until all conditions precedent to their respective obligations to

do so have been met, satisfied or waived.

8.    The Debtors and each other person or entity having duties or

responsibilities under the APA, any agreements related thereto or

this Order, and their respective directors, officers, employees,

members, agents, representative, and attorneys, are authorized and
empowered, subject to the terms and conditions contained in the
APA, to carry out all of the provisions of the APA and any related
agreements; to issue, execute, deliver, file, and record, as
appropriate, the documents evidencing and consummating the APA, and
any related agreements; to take any and all actions contemplated by
the APA, any related agreements or this Order; and to issue,
execute, deliver, file, and record, as appropriate, such other
contracts, instruments, releases, indentures, mortgages, deeds,
bills of sale, assignments, leases, or other agreements or
documents and to perform such other acts and execute and deliver
such other documents, as are consistent with, and necessary or
appropriate to implement, effectuate, and consummate, the APA, any
related agreements and this Order and the transactions contemplated
thereby and hereby, all without further notice to any person,
application to, or order of, the Court or further action by their
respective directors, officers, employees, members, agents,
representatives, and attorneys, and with like effect as if such
actions had been taken by unanimous action of the respective
directors, officers, employees, members, agents, representatives,
and attorneys of such entities.  The officers, directors, or any
other authorized representative of the Debtors are authorized to
certify or attest to any of the foregoing actions (but no such
certification or attestation shall be required to make any such
action valid, binding, and enforceable).  The Debtors are further
authorized and empowered to cause to be filed with the secretary of
state of any state or other applicable officials of any applicable

21

governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the APA, any related agreements and this Order, including amended and restated limited-liability-company agreements certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as the Debtors may determine are necessary or appropriate.

9.    Effective as of the Closing, (a) the sale of the Purchased Assets by the Debtors to Purchaser shall constitute a legal, valid, and effective transfer of the Debtors' right, title and interest in the Purchased Assets notwithstanding any requirement for approval or consent by any person, and shall vest Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets, free and clear of all Encumbrances of any kind, pursuant to sections 363(f) and (b) of the Bankruptcy Code.

10. The assumption of any Assumed Liabilities by Purchaser shall constitute a legal, valid and effective delegation of any Assumed Liabilities to Purchaser and shall divest the Debtors of all liability with respect to any Assumed Liabilities, and the assignment and assumption of the Assumed Contracts by Purchaser shall constituted a legal, valid and effective assumption of the Assumed Contracts by Purchaser, and shall divest the Debtors of all liability with respect to the future performance of the Assumed Contracts by Purchaser.

11. The sale of the Purchased Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

Transfer of Assets

12. Except to the extent specifically provided in the APA, upon the Closing pursuant to the APA, the Debtors are authorized, empowered, and directed, pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code, to sell the Purchased Assets to Purchaser. The sale of the Purchased Assets shall vest Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, with all such Encumbrances to attach to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Purchased Assets, subject to all claims and defenses the Debtors may possess with respect thereto.

13. Following the date of the Closing, no holder of any Encumbrances in the Purchased Assets shall interfere with Purchaser's use and enjoyment of the Purchased Assets based on or related to such Encumbrances, or any actions that the Debtors may take in their chapter 11 cases, and no person shall take any action

to prevent, interfere with, or otherwise enjoin consummation of the

transactions contemplated in or by the APA or this Order.

14. The provisions of this Order authorizing the sale of the

Purchased Assets free and clear of Encumbrances, other than Assumed

Liabilities, shall be self-executing, and neither the Debtors nor

Purchaser shall be required to execute or file releases,

termination statements, assignments, consents, or instruments to

effectuate, consummate, and implement the provisions of this Order.

However, the Debtors and Purchaser, and each of their respective

officers, employees, and agents, are authorized and empowered to

take all actions and execute and deliver any and all documents and

instruments that either the Debtors or Purchaser deem necessary or

appropriate to implement and effectuate the terms of the APA and

this Sale Order. Moreover, effective as of the Closing Date,

Purchaser and its successors and assigns shall be designated and

appointed the Debtors' true and lawful attorney and attorneys, with

full power of substitution, in the Debtors' name and stead, on

behalf and for the benefit of Purchaser, its successors and

assigns, to demand and receive any and all of the Purchased Assets

and to give receipts and releases for and in respect of the

Purchased Assets, or any part thereof.

15. Purchaser and its successors and assigns, may from time to

time as deemed appropriate institute and prosecute in the Debtors'

name, for the benefit of Purchaser, its successors and assigns,

matters relating to the collection or reduction to possession of

any of the Purchased Assets, and to do all acts and things with

respect to the Purchased Assets that Purchaser, its successor and

assigns, shall deem desirable.  The foregoing powers are coupled with an interest and are irrevocable by the Debtors.

16.  On or before the Closing Date, the Debtors' creditors are authorized to execute such documents and take all other actions as may be necessary to release any Encumbrances of any kind against the Purchased Assets, as such Encumbrances may have been recorded or may otherwise exist.

17.  To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and, to the extent transferable under applicable law, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing Date.

18.  All of the Debtors' rights, title and interests in the Purchased Assets to be acquired by Purchaser under the APA shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in Purchaser.  Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets under the APA transferring good and marketable, indefeasible title and interest in the Purchased Assets to Purchaser.

19.  Except for the Assumed Liabilities as expressly provided in the APA, Purchaser is not assuming nor shall it or any affiliate of Purchaser be in any way liable or responsible, as a successor or

otherwise, for any liabilities, debts, or obligations of the

Debtors in any way whatsoever relating to or arising from the

Debtors' ownership or use of the Purchased Assets prior to the

consummation of the transactions contemplated by the APA, or any

liabilities calculable by reference to the Debtors or their

operations or the Purchased Assets, or relating to continuing of

other conditions existing on or prior to consummation of the

transactions contemplated by the APA.

20.   Except as otherwise expressly provided in the APA, all

persons or entities, presently or on or after the Closing Date, in

possession of some or all of the Purchased Assets are directed to

surrender possession of the Purchased Assets to Purchaser on the

Closing Date or at such time thereafter as Purchaser may request.

Assumed Contracts.

21. The provisions of the APA relating to the assumption and

assignment of the Assumed Contracts are valid and binding, in full

force and effect, and enforceable in accordance with their terms.

22. Upon the Closing, or at such later time as provided in the

APA, in accordance with sections 363 and 365 of the Bankruptcy

Code, Purchaser shall be fully and irrevocably vested with all of

the Debtors' right, title and interest of each of the Assumed

Contracts.   The Debtors shall cooperate with, and take all actions

reasonably requested by, Purchaser to effectuate the foregoing.

23. Subject to the terms of the APA and the occurrence of the

Closing Date, the assumption by the Debtors of the Assumed

Contracts and the assignment of the Assumed Contracts to Purchaser,

as provided for or contemplated by the APA, is authorized and
approved pursuant to Sections 363 and 365 of the Bankruptcy Code.
24.  The Assumed Contracts shall be deemed valid and binding and in
full force and effect and assumed by the Debtors and assigned to
Purchaser at the Closing or at such later time as provided in the
APA, pursuant to sections 363 and 365 of the Bankruptcy Code,
subject only to (a) the payment of all cure and/or other payments
or actions required to assume and assign the Assumed Contracts to
Purchaser; and (b) Purchaser's right to exclude contracts and
leases from the definition of Assumed Contracts in accordance with
the terms of the APA, including the right of Purchaser to defer the
assumption and assignment of certain such contracts to a later date
pursuant to the Transition Agreement.  Purchaser shall be liable
for all obligations under such Assumed Contracts arising on and
after the Closing Date.

25.  Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy
Code, and except as otherwise provided in this Order, the Debtors
shall promptly pay or cause to be paid to the parties to any
Assumed Contracts the requisite cure amounts, if any, set forth in
the notice served by the Debtors on each of the parties to the
Assumed Contracts, except to the extent that the cure amount was
amended on the record of the Sale Hearing or otherwise ordered by
the Court (the "Cure Amounts").  The non-debtor parties to the
Assumed Contracts are forever bound by such Cure Amounts.

26. All monetary defaults under the Assumed Contracts arising
prior to the Closing (without giving effect to any acceleration
clauses or any default provisions of the kind specified in section

365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment
of the Cure Amounts.

27.  Any provision in any Assumed Contract that purports to declare
a breach, default, or payment right as a result of an assignment or
a change of control in respect of the Debtors is unenforceable.

28.  No sections or provisions of any Assumed Contract that purport
to provide for additional payments, penalties, charges, or other
financial accommodations in favor of the non-debtor third party to
the Assumed Contracts as a result of the Debtors' assumption and
assignment to Purchaser of the Assumed Contracts shall have any
force and effect with respect to the sale transaction and
assignments authorized by this Order, and such provisions
constitute unenforceable anti-assignment provisions under section
365(f) and/or are otherwise unenforceable under section 365(e) of
the Bankruptcy Code.  No assignment of any Assumed Contract
pursuant to the terms of the APA shall in any respect constitute a
default under any Assumed Contract.  Purchaser shall enjoy all of
the rights and benefits under each such Assumed Contract as of the
applicable date of assumption without the necessity of obtaining
such non-Debtor party's written consent to the assumption or
assignment thereof.

29.  Purchaser has satisfied all requirements under sections
365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate
assurance of future performance under the Assumed Contracts.
Purchaser shall be responsible for all post-Closing liabilities and
obligations under the Assumed Contracts, except as otherwise
provided in the APA.

30.  The Debtors and their estates shall be relieved of any
liability for any breach of any of the Assumed Contracts occurring
from and after Closing, pursuant to and in accordance with section
365(k) of the Bankruptcy Code.

Additional Provisions

31. Except to the extent expressly included in the Assumed
Liabilities, pursuant to sections 105(a), 363, and 365 of the
Bankruptcy Code, all persons and entities, including, without
limitation, the Debtors, all debt security holders, equity security
holders, the Debtors' employees or former employees, governmental,
tax, and regulatory authorities, lenders, parties to or
beneficiaries under any benefit plan, trade and other creditors
asserting or holding any Encumbrance with respect to the Purchased
Assets (whether legal or equitable, secured or unsecured, matured
or unmatured, contingent or non-contingent, senior or
subordinated), arising under or out of, in connection with, or in
any way relating to the Debtors, the Purchased Assets, the
operation of the Debtors' Business prior to the Closing Date or the
transfer of the Purchased Assets to Purchaser, shall be forever
barred, estopped, and permanently enjoined from asserting,
prosecuting or otherwise pursuing such Encumbrance against
Purchaser or any affiliate, successor or assign thereof and each of
their respective current and former members, officers, directors,
managed funds, investment advisors, attorneys, employees, partners,
affiliates and representatives (each of the foregoing in its
individual capacity), or the Purchased Assets.  To avoid doubt, the
foregoing shall not prevent the Debtors, their estates, successors,

29

or permitted assigns from pursing claims, if any, against Purchaser and/or its successors and assigns in accordance with the terms of the APA, and the foregoing shall not prejudice any other rights the Debtors have under the APA.

32. Purchaser has not assumed or is otherwise not obligated for any of the Debtors' liabilities other than the Assumed Liabilities as set forth in the APA, and Purchaser has not purchased any assets not defined as Purchased Assets. Consequently, all persons, Governmental Units (as defined in sections 101(27) of the Bankruptcy Code) and all holders of Encumbrances based on or arising out of liabilities retained by the Debtors are hereby enjoined from taking any action against Purchaser (or its affiliates) or the Purchased Assets to recover any Encumbrances or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the APA. All persons holding or asserting any Encumbrances in the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrances or cause of action against Purchaser or the Purchased Assets for any liability associated with the Excluded Assets.

33. Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of the Debtors and/or their estates including, without limitation, any bulk-sales law, successor or vicarious liability or similar liability except as otherwise expressly provided in the APA. Except to the extent Purchaser assumes the Assumed Liabilities pursuant to the APA, neither the

purchase of the Purchased Assets by Purchaser or its affiliates or designees, nor the fact that Purchaser or its affiliates or its designees are using any of the Purchased Assets previously operated by the Debtors, will cause Purchaser or any of its affiliates or designees to be deed a successor in any respect to the Debtors' business.

34. Subject to the terms of the APA, the APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates the APA and any related agreements.

35. The failure to specifically include any particular provision of the APA or any related agreements in this Order shall not diminish or impair the effectiveness of such provision. It is the intent of the Court, the Debtors and Purchaser that the APA and any agreement related thereto are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing.

36. To the extent any provisions of this Order conflict with the terms and conditions of the APA, this Order shall govern and control.

37. Nothing in this Order shall alter or amend the APA and the obligations of the Debtors and Purchaser under the terms of the APA. Any capitalized, undefined terms contained in this Order shall have the meaning ascribed thereto in the APA.

31

38.   This Order and the APA shall be binding on and govern the acts of all persons and entities, including without limitation, the Debtors and Purchaser, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in chapter 7 cases if these cases are converted from chapter 11, all creditors of the Debtors (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments related to the Purchased Assets.

39.   The provisions of this Order are non-severable and mutually dependent.

40.   Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in the chapter 11 cases, or any order issued in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

41.   Notwithstanding Bankruptcy Rules 6004, 6006, 7062, and 9021, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.   In the absence of any person or entity obtaining a stay pending appeal, the Debtors and Purchaser are free to close under the APA at any time, subject to the terms of the APA.   In the absence of any person or

entity obtaining a stay pending appeal, if the Debtors and
Purchaser close under the APA, Purchaser shall be deemed to be
acting in "good faith" and shall be entitled to the protections of
section 363(m) of the Bankruptcy Code as to all aspects of the
transactions under and pursuant to the APA if this Order or any
authorization contained herein is subsequently reversed or modified
on appeal.

42. The automatic stay under section 362(a) of the Bankruptcy Code
shall not apply to and otherwise shall not prevent the exercise or
performance by an party of its rights or obligations under the APA.

43. This Court shall retain exclusive jurisdiction to enforce the
terms and provisions of this Order, the Sale Procedures Order, the
APA in all respects and to decide any disputes concerning this
Order, the APA, or the rights and duties of the parties hereunder
or thereunder or any issues relating to the APA and this Order
including, without limitation, the interpretation of the terms,
conditions, and provisions hereof and thereof, the status, nature,
and extent of the Purchased Assets and any Assumed Contracts and
all issues and disputes arising in connection with the relief
authorized herein, inclusive of those concerning the transfer of
the Purchased Assets free and clear of all Encumbrances.

44. The stays provided by Bankruptcy Rules 6004 and 6006 are
hereby lifted and waived.

45. The provisions of this Order and any actions taken pursuant
hereto shall survive entry of any order which may be entered (a)
appointing a Chapter 11 Trustee in either or both cases; (b)
converting the Chapter 11 Cases to a Chapter 7 cases; or (c)

dismissing the Chapter 11 Cases, and the terms and provisions of

this Order shall continue in full force and effect notwithstanding

the entry of such order or conversion or dismissal.

Dated:                                    _____
                                          UNITED STATES BANKRUPTCY JUDGE

Execution Version 5/17/10

## Schedule A

### Disclosure Schedules

Matters reflected in these Disclosure Schedules may include certain matters not required to be reflected in the Disclosure Schedules.  Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature.  A disclosure made by Seller in any section of the Disclosure Schedules that is sufficient on its face to reasonably inform Purchaser of information required to be disclosed in another section of the Disclosure Schedules in order to avoid a misrepresentation thereunder shall be deemed, for all purposes of the Agreement, to have been made with respect to such other Section of such Disclosure Schedules.  The inclusion of information in the Disclosure Schedules shall not be construed as or constitute an admission or agreement that a violation, right of termination, default, liability or other obligation of any kind exists with respect to any item, nor shall it be construed as or constitute an admission or agreement that such information is material to any of Seller.  Further, neither the specification of any item or matter in any representation, warranty or covenant contained in the Agreement nor the inclusion of any specific item in the Disclosure Schedules is intended to imply that such item or matter, or other items or matters, are or are not in the Ordinary Course of Business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described in the Agreement or included in these Disclosure Schedules is or is not in the Ordinary Course of Business for purposes of the Agreement.

## Section 1

### Encumbrances

The following operating lease for equipment:

| Vendor | Filing Date | Filing # | Collateral | Location of Equipment | | | |
|--------|-------------|----------|------------|----------------------|---|---|---|
| Becton Dickinson | 2/15/2007 | 07-7103396187 | BACTEC Brand Culture Instrument and accessories | 1821 E Dyer Rd Suite 100 | Santa Ana | CA | 92705 |

**Section 5.1(a)**

**Jurisdiction**

California
Arizona

## Section 5.1(b)

## Ownership

Series A Preferred Stock

| Stockholder | Number of Shares |
|---|---|
| Parthenon Investors II, LP | 71,721,119 |
| PCIP Investors | 986,880 |
| J&R Founders' Fund II, LP | 1,107,229 |
| Daniel Angress | 490,094 |
| Brian Urban | 266, 523 |
| Joseph Barnes | 294,056 |
| TOTAL | 74,865,901 |

Series B Preferred Stock

| Stockholder | Number of Shares |
|---|---|
| Richard Nicholson | 9,333 |
| Richard Young | 667 |
| TOTAL | 10,000 |

Common Stock

| Stockholder | Shares |
|---|---|
| Parthenon Investors II, LP | 8,378,189.00 |
| PCIP Investors | 115,284.00 |
| J&R Founders' Fund II, LP | 129,342.00 |
| Parthenon Investors II, LP | 770,999.00 |
| J&R Founders' Fund II, LP | 11,903.00 |
| PCIP Investors | 10,609.00 |
| Gerald Nostadt | 3,022.00 |
| Daniel Angress | 349,541.00 |
| Brian Urban | 287,690.00 |
| Joseph Barnes | 41,944.00 |
| Robert Whalen | 539,533.00 |
| Douglas Harrington | 102,814.00 |
| Biolabs, Inc. | 36,117.00 |
| **TOTAL** | **10,776,987.00** |

4

<u>Options</u>

| Optionholder | Number of Options | Exercise Price per Option |
|---|---|---|
| Kip Vernaglia | 153,657 | $1.00 |
| Gayle Preciado | 5,231 | $1.00 |
| Hooshang Dalavarian | 175,500 | $2.00 |
| TOTAL | 334,388 | --- |

5

**Section 5.1(c)**

**Predecessors**

The Laboratory Choice, Inc.
Southern California Reference Laboratories, Inc.
NTI-Florida, Inc., D/B/A United West Laboratories, Inc.
The Clinical Pathology Laboratory of Antelope Valley, Inc.
Taurus West, Inc. (f/k/a Healthline Clinical Laboratories, Inc.)
Lancaster Cardiology Medical Group, Inc.

**Section 5.2(b)**

**No Conflict**

HSR Act approval, to the extent applicable after giving effect to the sale transactions.

The secured position of the State of California pursuant to the Settlement Agreement is subject to the consent of GE Business Financial Services, Inc.

7

## Section 5.3(a)

## Financial Statements

Please see Appendix I.