| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|
| RON BENDER (SBN 143364)<br>LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, California 90067<br>Telephone: (310) 229-1234; Facsimile: (310) 229-1244; Email<br>rb@lnbrb.com<br>Counsel for Debtors and Debtors in Possession | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>    WESTCLIFF MEDICAL LABORATORIES, INC.<br><br>    BIOLABS, INC.<br><br>                                        Debtor(s). | CASE NO.: 8:10-bk-16743TA<br>(Jointly Administered with<br>Biolabs, Inc.<br>Case No. 8:10-bk-16746-TA) |
|---|---|

## NOTICE OF SALE OF ESTATE PROPERTY

| **Sale Date:** 6/3/10 | **Time:** 2:00 p.m. |
|---|---|
| **Location:** Courtroom "5B" 411 West Fourth Street, Santa Ana, CA 92701-4593 | |

Type of Sale:  ☐ Public    ☑ Private        Last date to file objections:
6/2/10

Description of Property to be Sold:  Substantially all of the assets (excluding cash and accounts receivable) of
both WESTCLIFF MEDICAL LABORATORIES, INC. and BIOLABS, INC.

SEE EXHIBITS "1" & "2" REGARDING SPECIFIC ASSETS, OVERBIDDING PROCEDURES, DATES AND DEADLINES.

Terms and Conditions of Sale: _____
SEE EXHIBITS "1" & "2" REGARDING SPECIFIC ASSETS, OVERBIDDING PROCEDURES, DATES AND DEADLINES.

Proposed Sale Price:  SEE EXHIBITS "1" & "2"

Overbid Procedure (If Any): _____
SEE EXHIBITS "1" & "2" REGARDING SPECIFIC ASSETS, OVERBIDDING PROCEDURES, DATES AND DEADLINES.

If property is to be sold free and clear of liens or other interests, list date, time and location of hearing: See above.

Contact Person for Potential Bidders (include name, address, telephone, fax and/or e:mail address):

Ron Bender, Esq.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
(p) 310.229.1234; (f) 310.229.1244
rb@lnbrb.com

Curtis Lane/Brad Sitko
MTS Health Partners, L.P.
623 Fifth Avenue, 15th Floor
New York, NY 10022
Phone (212) 887-2103
lane@mtspartners.com
sitko@mtspartners.com

Date:  5/28/10

# EXHIBIT "1"

1 | RON BENDER (SBN 143364)
2 | JACQUELINE L. RODRIGUEZ (SBN 198838)
| TODD M. ARNOLD (SBN 221868)
3 | JOHN-PATRICK M. FRITZ (SBN 245240)
| LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
4 | 10250 Constellation Boulevard, Suite 1700
| Los Angeles, California 90067
5 | Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
| Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
6 |
| Proposed Attorneys for Chapter 11 Debtors
7 | and Debtors in Possession

8 |                     UNITED STATES BANKRUPTCY COURT
9 |                     CENTRAL DISTRICT OF CALIFORNIA
|                          (SANTA ANA DIVISION)

10 | In re:                          Lead Case No. 8:10-bk-16743-TA
|                                  Jointly Administered with Case No.
11 | WESTCLIFF MEDICAL               8:10-bk-16746-TA
|                                  Chapter 11 Cases
12 | LABORATORIES, INC.,

13 |          Debtor.
|                                  Chapter 11 Cases
14 |
15 | BIOLABS, INC.,
|                                  NOTICE OF AUCTION SALE OF
16 |          Debtor.               SUBSTANTIALLY ALL OF THE DEBTORS'
|                                  PERSONAL PROPERTY ASSETS AND
17 |                                OPPORTUNITY TO OVERBID

18 | ☒ Affects Both Debtors
19 | ☐ Affects WESTCLIFF MEDICAL     Auction Date and Time:
|     LABORATORIES, INC. only       Date:  June 3, 2010
20 | ☐ Affects BIOLABS, INC. only    Time:  2:00 p.m.
|                                  Place: Courtroom "5B"
21 |                                       411 West Fourth Street
22 |                                       Santa Ana, CA 92701-4593

23 |
24 |
25 |
26 |
27 |
28 |

1

1

2     PLEASE TAKE NOTICE that an auction sale of substantially all

3  of the assets of Westcliff Medical Laboratories, Inc.

4  ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11

5  debtors and debtors in possession herein (collectively, the

6  "Debtors"), will take place on June 3, 2010, at the above-

7  referenced time and location.

8     The Debtors commenced their bankruptcy cases by filing

9  voluntary petitions under Chapter 11 of the Bankruptcy Code on

10 May 19, 2010. BioLabs is the parent company to Westcliff, which

11 is the operating company. The only material asset owned by

12 BioLabs is its stock interest in the Debtor.

13 Westcliff is the operator of approximately 170 branded,

14 stand-alone, patient service center laboratories and STAT labs

15 that provide various services, including clinical testing,

16 pathology, reporting and support services for the benefit of

17 thousands of out-patients throughout California.

18

19 The Debtors' main clinical hub is an 80,000 square foot

20 facility located in Santa Ana, California that opened in 2006.

21 The Debtors' primary anatomical pathology lab is a 12,800 square

22 foot facility located in Monrovia, California that opened in

23 2008.

24

25 Working directly with patients and with contracted payors,

26 including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and

27

28

Medicare, Westcliff has grown and become a leading out-patient laboratory service company. Westcliff's lab operations demonstrate industry-leading results, with low testing turn-around times, high quality control scores, and a strong and experienced sales and marketing team.

Westcliff averages approximately 8,500 clinical requests per day and approximately 1,200 pathology requests per day, and performs approximately 250,000 cytology and 70,000 biopsy tests on an annual basis. Based on this performance, the Debtors had approximately $97 million in net revenue in 2009 and are the third largest clinical laboratory in California. Based on current volume, the Debtors account for approximately 5% of the California clinical laboratory testing market, which has estimated revenues of approximately $2 billion.

On May 17, 2010, the Debtors entered into an Asset Purchase Agreement (the "APA") with a wholly-owned subsidiary of Laboratory Corporation of America ("Purchaser") pursuant to which the Debtors are seeking to sell substantially all of the Debtors' personal property assets (excluding cash and accounts receivable) to Purchaser for an aggregate purchase price of $57.5 million, subject to certain adjustments.

The Debtors' asset sale to Purchaser is subject to overbid. At a hearing held on May 27, 2010, the Court approved the following overbid procedures:

1.    An auction sale (the "Auction Sale") will take place on June 3, 2010, at the above-referenced time and location.

2.    The opening bid at the auction sale will be the bid submitted by Purchaser in the in the APA.  If no qualified bidder appears at the Auction Sale and submits a qualified overbid, the Debtors will proceed to request the Court to approve Purchaser as the winning bidder at the hearing to be held on June 3, 2010 in accordance with the terms of the APA.

3.    In order to overbid Purchaser's bid, the minimum initial overbid must be at least $2.45 million higher than Purchaser's bid made in the APA, with minimum subsequent bid increments of $100,000.

4.    In order to be considered a "qualified bidder", a bidder must, on or before two business days before the Auction Sale, submit evidence to the Debtors of its financial ability to close the transaction, which means that the "qualified bidder" is able to demonstrate that it has available to it committed financing or other immediately available funds that indicate its ability to pay the purchase price plus the minimum required overbid.

5.    In order to be considered a "qualified bidder", prospective overbidders must, on or before two business days before the Auction Sale, provide the Debtors with the same good faith deposit of $4 million as Purchaser has provided.

6.    In order to be considered a "qualified bidder", a bidder must, on or before two business days before the Auction Sale, advise the Debtors of its approval of the same form of asset purchase agreement agreed to by the Debtors and Purchaser, or submit to the Debtors a redlined version of a proposed asset purchase agreement which indicates the prospective overbidder's changes to the APA.  Prospective overbidders at the Auction Sale will also be required to provide as part of their bid package, evidence demonstrating that they can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code with respect to any unexpired leases and executory contracts that they wish to have assigned to them if they are the winning bidder at the Auction Sale.

7.    The winning bid at the Auction Sale will be the highest bid made; provided, however, that if (x) the highest bid made by a "qualified bidder" other than the Purchaser minus the break up fee which would be owed to Purchaser is less than (y) the highest bid of the Purchaser, then the bid of the Purchaser will be the winning bid.

8.    The winning back up bid will be (a) if the winning bid is made by the Purchaser, the highest bid made by a "qualified bidder" other than the Purchaser or (b) if the winning bid is made by a qualified bidder other than the Purchaser, the second highest bid made; provided, however, that if (x) such second

highest bid made by a "qualified bidder" other than the Purchaser minus the break up fee to be paid to the Purchaser is less than (y) the highest bid made by the Purchaser, then the back up bid will be the highest bid made by the Purchaser.

9.    The deposit posted by the maker of the back up bid will not be refunded until five business days following the closing of the sale to the maker of the winning bid.

10.    The maker of the back up bid will be required to close the sale within ten days following receipt of written notice from the Debtors of the failure of the maker of the winning bid to consummate the sale provided such written notice is provided to the maker of the back up bid by June 23, 2010, with the maker of the back up bid to be deemed to forfeit its good faith deposit if it fails to consummate the sale within this time frame.

11.    Purchaser will receive a break-up fee in the amount of $2.25 million in the event of a successful overbid where a buyer other than Purchaser is the winning bidder.

PLEASE TAKE FURTHER NOTICE that any party desiring additional information about the Auction Sale should contact the following:

Curtis Lane/Brad Sitko
MTS Health Partners, L.P.
623 Fifth Avenue, 15th Floor
New York, NY 10022
Phone:  (212) 887-2103
lane@mtspartners.com/sitko@mtspartners.com
www.MTSPartners.com
(Investment Banker and Financial Advisor to the Debtors)

1

2

3
Matthew Pakkala, CIRA
Managing Director/Corporate Finance
FTI Consulting
633 West Fifth Street, 16th Floor
Los Angeles, California 90071
Phone:  (213) 452-6008
Matthew.Pakkala@FTIConsulting.com
www.fticonsulting.com
(Senior Officer of the Debtors)

4

5

6

7

8
Ron Bender, Esq./Jacqueline L. Rodriguez, Esq./Todd M. Arnold,
Esq./John-Patrick M. Fritz, Esq.
Levene, Neale, Bender, Rankin & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Phone:  (310) 229-1234
rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
www.lnbrb.com
(Bankruptcy Counsel to the Debtors)

9

10

11

12

13
Dated: May 27, 2010              WESTCLIFF MEDICAL LABORATORIES,
                                 INC.

14

15
                                 -and-

16
                                 BIOLABS, INC.

17
                                 /s/ Ron Bender
                                 _____
                                 RON BENDER

18
                                 JACQUELINE L. RODRIGUEZ
                                 TODD M. ARNOLD

19
                                 JOHN-PATRICK M. FRITZ

20
                                 LEVENE, NEALE, BENDER, RANKIN
                                   & BRILL L.L.P.

21
                                 (Proposed) Attorneys for Chapter 11
                                 Debtors and Debtors in Possession

22

23

24

25

26

27

28

EXHIBIT "2"

1  RON BENDER (SBN 143364)
   JACQUELINE L. RODRIGUEZ (SBN 198838)
2  TODD M. ARNOLD (SBN 221868)
   JOHN-PATRICK M. FRITZ (SBN 245240)
3  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
   Telephone: (310) 229-1234; Facsimile: (310) 229-1244
5  Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
6
   Proposed Attorneys for Chapter 11 Debtors
7  and Debtors in Possession

8                  UNITED STATES BANKRUPTCY COURT
                   CENTRAL DISTRICT OF CALIFORNIA
9                       (SANTA ANA DIVISION)

10 In re:                          Lead Case No. 8:10-bk-16743-TA
                                   Jointly Administered with Case
11 WESTCLIFF MEDICAL               No. 8:10-bk-16746-TA
   LABORATORIES, INC.,             Chapter 11 Cases
12
                                   NOTICE OF DEBTORS' MOTION FOR AN
13          Debtor.                ORDER: (1) APPROVING SALE OF
                                   SUBSTANTIALLY ALL OF THE DEBTORS'
14 _____        ASSETS (EXCLUDING CASH AND ACCOUNTS
                                   RECEIVABLE) FREE AND CLEAR OF ALL
15 BIOLABS, INC.,                  LIENS, CLAIMS AND INTERESTS; (2)
                                   APPROVING OF DEBTORS' ASSUMPTION AND
16          Debtor.                ASSIGNMENT OF UNEXPIRED LEASES AND
                                   EXECUTORY CONTRACTS AND DETERMINING
17 _____        CURE AMOUNTS; (3) WAIVING THE 14-DAY
                                   STAY PERIODS SET FORTH IN BANKRUPTCY
18 ☒ Affects Both Debtors          RULES 6004(h) AND 6006(d) AND
                                   HEARING THEREON
   ☐ Affects WESTCLIFF MEDICAL
19    LABORATORIES, INC. only
                                   Court Scheduled Hearing:
20 ☐ Affects BIOLABS, INC. only    Date:  June 3, 2010
                                   Time:  2:00 p.m.
21                                 Place: Courtroom "5B"
                                          411 West Fourth Street
22                                        Santa Ana, CA 92701-4593
23

24

25

26

27

28

                                   1

PLEASE TAKE NOTICE that a hearing will be held at the above-referenced date, time and location, for the Court to consider approval of a motion (the "Motion") filed by Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), for the entry of an order of the Court (A) pursuant to 11 U.S.C. § 363(f) approving the sale free and clear of all liens, claims and interests to Wave Newco, Inc. ("Purchaser"), a wholly-owned subsidiary of Laboratory Corporation of America ("LabCorp") or to a successful overbidder at an auction sale to be conducted by the Debtors, of substantially all of the Debtors' tangible and intangible assets designated for acquisition by Purchaser or the winning bidder (excluding the Debtors' cash, accounts receivable, avoidance causes of action and certain other excluded assets) (collectively, the "Purchased Assets"); (B) pursuant to 11 U.S.C. § 365, (i) authorizing the Debtors to assume executory contracts and unexpired leases ("Assumed Contracts and Assumed Leases") and assign them to Purchaser (or to a successful overbidder) and (ii) establishing the cure amounts, if any, payable under such Assumed Contracts and Assumed Leases; (C) waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d) to enable the sale to close as quickly as possible; and (D) granting certain

other related relief, including authorizing the Debtors to enter into a Transition Agreement in connection with the sale closing.

A copy of the Asset Purchase Agreement ("APA") between the Debtors, LabCorp and Purchaser is attached as Exhibit "1" to the Declaration of Matthew Pakkala which is annexed to the Motion (the "Pakkala Declaration").  **Attached as Exhibit "2" to the Pakkala Declaration is a list of all of the Contracts that may become Assumed Contracts and Assumed Leases and the amount of money that the Debtors believe needs to be paid to other parties to the Assumed Contracts and Assumed Leases to satisfy the cure requirements of Section 365(b) of the Bankruptcy Code.**  Attached as Exhibit "3" to the Pakkala Declaration is a form of Transition Agreement to be entered into in connection with the sale closing.

Westcliff is the owner and operator of approximately 170 branded and stand-alone patient service center laboratories and STAT labs located throughout California.  The Debtors have approximately 1,000 employees and are currently generating approximately $100 million of annual revenue.  BioLabs does not operate any business and its only material asset is its 100% equity interest in Westcliff, which is a wholly-owned subsidiary of BioLabs.

The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such

capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment. The Debtors also have a substantial amount of unsecured debt.

The Debtors suffered a net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171 million) on net revenue of approximately $84 million. The Debtors suffered a net loss of approximately $13 million in 2009 (including expenses and write offs of approximately $110 million) on net revenue of approximately $97 million.

While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued. Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy. Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

1  The only way the Debtors can survive as a stand alone going

2  concern business would be for the Debtors to raise many millions

3  of dollars of additional equity which is not possible given the

4  Debtors' debt structure.   It therefore became clear to the

5  Debtors in early 2009 that the only viable option available to

6  the Debtors to avoid a shut down of their business and the loss

7  of employment by all of the Debtors' employees would be for the

8  Debtors to sell their business as a going concern to the highest

9  bidder.   The Debtors have therefore been engaged in an active

10 sale process since early 2009.

11 

12  To assist the Debtors with this sale process, the Debtors

13 engaged MTS Health Partners, LP ("MTS") in October, 2009 as a

14 financial advisor to assist the Debtors with their sale process.[1]

15 MTS, working closely with the Debtors, conducted an exhaustive

16 sale process, having prepared detailed sale materials and having

17 had extensive discussions and interactions with numerous

18 prospective buyers, both strategic buyers and financial buyers.[2]

19 

20  After having engaged in substantial due diligence and

21 negotiations with a number of different prospective buyers over

22 the past many months, MTS and the Debtors collectively concluded

23 that LabCorp was the optimal buyer of the Debtors' assets for

24 three primary reasons.   First, LabCorp, which is in the same

25 

26 _____

27 [1] The Debtors had used other professionals for this same purpose in the past.
[2] A complete listing of the parties contacted by MTS is attached as Exhibit "5"

28

1    business as Westcliff but is a much larger company, expressed the

2    greatest interest in purchasing the Debtors' assets.  Second, it

3    was clear that LabCorp as a strategic buyer was willing to pay a

4    substantially higher price for the Debtors' assets than any other

5    prospective buyer.   Third, LabCorp clearly has the financial

6    means to consummate its purchase of the Debtors' assets.[3]

7

8         As indicated in Section 3.1 of the APA, subject to certain

9    adjustments, Purchaser has agreed to pay to the Debtors the sum

10   of $57.5 million for the Purchased Assets, while leaving with the

11   Debtor, among other things, all of the Debtors' accounts

12   receivable (which the Debtors estimate will result in an

13   additional net recovery of approximately $8,000,000 for the

14   Debtors' estates) and all of the Debtors' cash.  The Debtors and

15   MTS believe that the purchase price offered by Purchaser is

16   substantially higher than the purchase price that any other buyer

17   would be willing to pay for the Purchased Assets.

18

19        While the purchase price being paid by Purchaser is subject

20   to overbid (to insure that the highest price possible is paid for

21   the Purchased Assets), the Debtors and MTS believe that it is

22   highly unlikely that there is any other buyer that will be

23   willing to pay more for the Purchased Assets than Purchaser has

24   offered.   Moreover, the Debtors and MTS do not believe that the

26   _____

27   to the Declaration of Curtis Lane annexed to the Motion.
     [3] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp

prospect for a successful overbid would increase with the passage of time. To the contrary, the Debtors believe that it is critical that the Debtors consummate an immediate sale of the Purchased Assets because of the severe risk of a deterioration of Westcliff's business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and the Debtors and Purchaser do not believe that Westcliff will be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy. The Debtors believe that an expedited sale of the Debtors' business is necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

As set forth in Section 3.1 of the APA, the purchase price being paid by Purchaser will be adjusted downward if there is a meaningful reduction in Westcliff's post-petition business volume pending the closing of the sale[4]. Moreover, should that reduction reach the level of a Material Adverse Change[5],

solely for the purpose of acquiring the Purchased Assets.
[4] Purchase Price Decrease Adjustment is defined in the definitional Section of the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement Period Volume) times (b) $1,202.00.

[5] Material Adverse Change is defined in the definitional Section of the APA as an amount equal to 0.17 or more determined using the following formula: the quotient of (a) (the Baseline Volume minus the Measurement Period Volume); divided by (b) the Baseline Volume. For purposes of clarification, the Material Adverse Change may be expressed as a percentage equal to or greater than Seventeen Percent (17%). By way of example, if the Baseline Volume is 9,500 and the Measurement Period Volume is 7,885, then the calculation shall be equal to 0.17 and a Material Adverse Change shall have occurred.

Purchaser has the ability to walk away from this transaction completely. The risks to the Debtors' estates of failing to close the sale of the Purchased Assets to Purchaser on an expedited basis are therefore severe. The Debtors have no doubt that if they fail to consummate the sale to Purchaser, the Debtors will either be forced to sell their business for substantially less money than Purchaser has offered, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. A liquidation of the Debtors' business would have minimal value.

The Debtors believe that proceeding with a sale in such an expedited manner serves only to the substantial benefit of the Debtors' estates. Given the lengthy and exhaustive pre-petition sale process that the Debtors embarked upon, with the valuable assistance of MTS, the Debtors and MTS are highly confident that any potential overbidder has been identified and is extremely knowledgeable about the Debtors' business and the opportunity to purchase the Purchased Assets. The Debtors and MTS therefore believe that if there is any party willing and able to pay more for the Debtors' business than Purchaser has offered, they can do so within the time frame requested by the Debtors and nothing would change for the better if that time frame was expanded. To

the contrary, the risk to the Debtors' business of customer attrition and a corresponding reduction in the purchase price to be paid by Purchaser (or worse a complete walk away by Purchaser) from a protracted sale process is severe and significantly greater than any possible benefit that could be obtained from speculating that a higher price might be paid for the Purchased Assets.

The APA was extensively negotiated between the Debtors and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements over an extended period of time.  The Debtors and MTS have no doubt that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates.

The APA was extensively negotiated between the Debtors and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements over an extended period of time.  No insider of the Debtors has any interest in or connection with the Purchaser, and no insider of the Debtors will be receiving any special benefit as a result of the Debtors' sale of the Purchased Assets to Purchaser.  The Debtors and MTS believe that the result obtained from the sale of the Purchased Assets to Purchaser is the overwhelmingly optimal result for the Debtors' estates.

The Debtor will conduct an auction sale of the Purchased Assets (in open court at the hearing on this Motion or prior to the hearing on this Motion outside of the Court, whichever the Court would prefer). After the auction, the Debtor will request the Court to approve the sale of the Purchased Assets to Purchaser or to a successful overbidder.

For all of these reasons and those set forth in the Motion, the Debtors believe that selling the Purchased Assets to Purchaser in accordance with the terms of the APA or to a successful overbidder (in the event of a successful overbid made at the auction) free and clear of all liens, claims, encumbrances and interests ("Encumbrances") is in the overwhelming best interests of the Debtors' estates.

As described in detail in a concurrently filed settlement motion, Purchaser is not willing to consummate its purchase of the Debtors' business unless the Debtors are able to obtain an order of the Court approving a pre-bankruptcy settlement the Debtors reached with various "qui tam" litigants. (See Sections 8.4(b) and 8.8 of the APA). The "qui tam" litigants assert claims against the Debtors of more than $56 million. Absent a negotiated settlement, resolution of these litigation claims would have taken years, which would have made it impossible for the Debtors to consummate a going concern sale of their business to Purchaser. All other buyers would have required the same

closing condition because any buyer of the Debtors' business would insist on knowing that it has no monetary liability to the qui tam claimants and no ongoing reporting requirements to the State of California.  It would therefore not have been possible for the Debtors to have obtained Purchaser's pre-bankruptcy agreement to the APA had the Debtors not been able to obtain a pre-bankruptcy settlement with the qui tam claimants.  Court approval of that settlement agreement is therefore critically important and a condition precedent to the Closing of the Debtors' sale of the Purchased Assets to Purchaser.  Pursuant to that settlement agreement, the qui tam claimants will be receiving 10% of the net sale proceeds (after a deduction for all transaction expenses).

Particularly given the expedited nature of this sale, both the Debtors and the Senior Lenders recognize that it is very important that the sale of the Purchased Assets to Purchaser inure to the benefit of all creditors.  The Debtors and the Senior Lenders therefore engaged in a substantial amount of discussion in order to achieve this result.

While the Senior Lenders are owed approximately $56 million on account of the Senior Debt which is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets, in order to help facilitate an expedited sale of the Debtors' business for the benefit of all

constituents in these cases, it is the Debtors' expectation based upon numerous conversations with the Senior Lenders that the Senior Lenders and the Debtors (along with any Creditors' Committee which is appointed) will use their reasonable best efforts to attempt to negotiate a mutually acceptable allocation of the sale proceeds prior to the hearing on this Motion.

The following is a detailed description of the Debtors' currently projected distributions in these cases based upon the best information available to the Debtors at this time[6]:

$57,500,000 - gross sale proceeds

($2,850,000) - estimated reduction for lease and contract cure costs and set aside of funds for Equipment Lenders

$54,650,000 - remaining net sale proceeds

($5,200,000) - payment of qui tam settlement

($1,150,000) - payment of MTS remaining unpaid transaction fee

$48,300,000 - net remaining sale proceeds

$1,086,000 - estimated remaining cash at Closing[7]

$8,000,000 - estimated net collections from outstanding accounts receivable remaining at the Closing[8]

---

[6] This assumes no purchase price reduction by Purchaser.

[7] This figure is the Debtors' current best estimate based upon the Debtors' projections but this figure could be higher or lower depending upon a number of factors, including the Debtors' operating performance pending the Closing, the timing of the Closing and any settlements with vendors (including pre-closing assumption of vendor contracts). This figure also does not take into account the $2 million that the Debtors are required to place into a segregated Payroll Account for approximately 120 days pursuant to the Transition Agreement with Purchaser as the Debtors expect that they will ultimately receive all of these funds back.

[8] This figure assumes a net collection equal to 63% of the book amount of the Debtors' accounts receivable which are projected to be approximately $12.6

$57,386,000 – total projected funds available for wind-down costs of the Debtors and their bankruptcy estates and distribution to pre-petition creditors

($2,900,000) – total projected wind-down costs of the Debtors[9]

$54,486,000 – total estimated funds available to be distributed to pre-petition creditors, including the Senior Lenders[10]

The Debtors' books and records show that there are eight (8) leases which were intended as security, which have an aggregate unpaid balance of approximately $522,853.67. Six (6) of these secured equipment lenders recorded UCC financing statements with the California Secretary of State purporting to perfect their security interests and liens upon their respective equipment. These eight (8) purported secured equipment lenders (collectively, the "Equipment Lenders") and the unpaid balances owed to these Equipment Lenders are summarized as follows:

| Equipment agreement | Unpaid balance |
| --- | --- |
| 1.  Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087153046125 recorded with the California Secretary of State on April 7, 2008. | $72,787.27 |
| 2.  Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number | $62,004.97 |

million at the time of the Closing.
[9] This figure assumes that the bankruptcy cases will be concluded in November, 2010.
[10] As indicated above, it is the Debtors' expectation that the Senior Lenders and the Debtors (along with any Creditors' Committee which is appointed) will use their reasonable best efforts to attempt to negotiate a mutually acceptable allocation of these remaining sale proceeds prior to the hearing on this Motion.

| | |
|---|---|
| 20087163605844 recorded with the California Secretary of State on July 1, 2008 | |
| 3.   Liens asserted by Jules & Associates, Inc. with regard to property covered by UCC financing statement file number 20087142579518 recorded with the California Secretary of State on January 7, 2008. | $116,936.92 |
| 4.   Liens asserted by M&I Marshall & Ilsley Bank with regard to property covered by UCC financing statement file number 20067087720380 recorded with the California Secretary of State on October 10, 2006. | $41,440.30 |
| 5.   Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998664 recorded with the California Secretary of State on August 18, 2006. | $128,455.89 |
| 6.   Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998785 recorded with the California Secretary of State on August 18, 2006. | $99,747.30 |
| 7.   Liens asserted by Baytree Leasing (with regard to Lease No. 2953 pertaining to a Dade Behring Dimension Xpand HM Plus Analyzer) – NO UCC financing statement recorded by Baytree Leasing with respect to this property. | $116,170 |
| 8.   Liens asserted by Americorp/ACL Elite (with regard to an ACL Elite Coagulation System) – NO UCC financing statement recorded by Americorp/ACL Elite with respect to this property. | $31,900 |
| TOTAL | $522,953.67 |

The Debtors are required to deliver the Purchased Assets to Purchaser free and clear of all Encumbrances, including the liens asserted by the Equipment Lenders described above.  In connection with the Motion, the Debtors are requesting that all liens of all secured creditors, including all liens of the Equipment Lenders, attach to the net proceeds to be received by the Debtors from the

14

sale of the Purchased Assets in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.  Additionally, upon the Closing, the Debtors will segregate and impound the total sum of $522,853.67 into a separate bank account, with the liens, claims and interests asserted by the Equipment Lenders to attach to such funds in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.  The Debtors reserve all of their rights and claims with respect to any liens and claims asserted by the Equipment Lenders.

Other than the liens of the Senior Lenders and those of the Equipment Lenders, all of which are being satisfied in the manner described above, the Debtors are not aware of the existence of any other Encumbrances against the Purchased Assets.  If any other Encumbrances do exist, the sale order provides for all such liens to attach to the proceeds of the sale in the same validity and priority and subject to the same defenses and avoidability, if any, as before the Closing.

UNEXPIRED LEASES AND EXECUTORY CONRACTS TO BE ASSUMED BY THE DEBTORS AND ASSIGNED TO THE PURCHASER

Schedule 2.4(a) to the APA lists all of the Debtors' unexpired leases and executory contracts ("Contracts") that Purchaser may elect to have the Debtors assume and assign to

Purchaser at or following the Closing. Purchaser will have until the Closing to designate which of such Contracts it chooses to purchase and have the Debtors assume and assign to Purchaser at the Closing ("Initial Designated Contracts"). In addition, on or before the first Business Day following the 30th calendar day after the Closing Date with respect to Leases and the 180th calendar day after the Closing Date with respect to all other Contracts, Purchaser may designate additional Contracts it chooses to purchase and have the Debtors assume and assign to Purchaser ("Subsequent Designated Contracts" and, collectively with the Initial Designated Contracts, the "Designated Contracts" and such date being referred to as the "Contract Designation Date").

In order to clarify the above among the parties, at the Closing the remaining Contracts listed on Schedule 2.4(a) of the APA will be segregated into three (3) categories scheduled as follows. First, there shall be Contracts specifically rejected in writing by Purchaser on Closing, which shall be listed as Excluded Assets on Schedule 2.2, Schedule B-1 (Excluded Contracts) or Schedule B-2 (Excluded Leases), as the case may be. Second, there shall be certain Contracts that Purchaser identifies in writing at Closing that shall be specifically assumed by the Debtors and assigned to Purchaser at Closing, which shall be set forth on Schedule 2.4(a)-1 and upon assignment

16

to Purchaser shall become an Assumed Contract or Assumed Lease, as the case may be; provided, that, in the event that any such Contract is listed on either Schedule 2.4(a)-2 or Schedule B-1 or Schedule B-2 as of the date of the APA, such Contract shall be treated as a Subsequent Designated Contract for purposes of Section 7.12 of the APA.  Third, there shall be certain Contracts that Purchaser shall not purchase or reject at the Closing ("Potential Subsequent Designated Contracts"), which shall be set forth on Schedule 2.4(a)-2.  The Potential Subsequent Designated Contracts shall become Subsequent Designated Contracts if Purchaser notifies the Debtors in writing before the first Business Day following the 30th calendar day after the Closing Date or the 180th calendar day after the Closing Date, as applicable, of its intent to have any such Contract(s) assigned to it.

The Designated Contracts shall be identified by (i) the name and date of the Designated Contract, (ii) the other party to the Designated Contract and (iii) the address of such party for notice purposes, all included on Schedule 2.4(a)-1.  Attached as Exhibit "2" to the Pakkala Declaration is a schedule which contains all of the foregoing information as well as a description of the amounts the Debtors believe are necessary to cure any defaults under each of the Contracts that Purchaser may elect to have the Debtors assume and assign to Purchaser at or

following the Closing based on the Debtors' books and records, and a procedure for transferring to Purchaser the rights to any security deposits with the other party to any Designated Contract.

In connection with the Motion, the Debtors are requesting an order of the Court providing that the cure amounts set forth in Exhibit "2" to the Pakkala Declaration be the cure amounts which the Debtors must pay to the other parties to the Contracts that Purchaser may elect to have the Debtors assume and assign to Purchaser at or following the Closing to enable the Debtors to satisfy the cure requirements of Section 365(b)(1)(A) of the Bankruptcy Code.   The Debtors therefore submit that any party that fails to file a timely objection to the Motion should be deemed to have consented to the Debtors' proposed cure amount and be forever barred from challenging the Debtors' proposed cure amount.

In connection with the Motion, the Debtors are requesting an order of the Court providing that as of the Closing, all Initial Designated Contracts shall become Assumed Contracts and Assumed Leases, as the case may be, for purposes of the APA, which means that they will be assumed by the Debtors and assigned to Purchaser effective as of the Closing.   In connection with the Motion, the Debtors are also requesting an order of the Court providing that as of the applicable Contract Designation Date,

all Subsequent Designated Contracts shall become Assumed Contracts and Assumed Leases, as the case may be, for purposes of the APA, which means that they will be assumed by the Debtors and assigned to Purchaser effective as of the applicable Contract Designation Date.

In connection with the Debtors' assumption and assignment to Purchaser of the Designated Contracts, Purchaser shall be deemed to have assumed any on-going liabilities and obligations in connection with all Designated Contracts, and the Debtors will be responsible for the payment of all cure costs identified on Exhibit "2" to the Pakkala Declaration.

Purchaser shall provide any other parties to any Designated Contracts who request in writing such financial information as is reasonably required to enable Purchaser to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all Designated Contracts. Purchaser will also otherwise cooperate with the Debtors to assist the Debtors to obtain an order of the Court approving of the Debtors' assumption and assignment to Purchaser of the Designated Contracts.

Prospective overbidders at the Auction Sale will also be required to provide as part of their bid package, evidence demonstrating that they can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code

with respect to any unexpired leases and executory contracts that they wish to have assigned to them if they are the winning bidder at the Auction.

In connection with the Motion, the Debtors are requesting an order of the Court providing that all of the Excluded Contracts and all of the Excluded Leases will be deemed rejected as of the Closing, with the Debtors reserving the right to supplement this list as the Debtors obtain additional information from Purchaser.

In order to facilitate the most expeditious sale closing possible and to avoid immediate and irreparable harm, in the Motion, the Debtors are requesting that any order approving the sale of the Purchased Assets and the Debtors' assumption and assignment of the Assumed Contracts and Assumed Leases be effective immediately upon entry by providing that the fourteen-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are waived, and that any delay period provided in Bankruptcy Rule 6003 be waived.

PLEASE TAKE FURTHER NOTICE that any objection to any of the relief requested by the Debtors in the Motion must, on before June 2, 2010, be filed with the Court and served by same day service upon counsel to the Debtors, whose contact information is set forth in the upper, left-hand corner of the first page of this Notice, and counsel to Purchaser, Michael B. Lubic, Esq.,

1  K&L Gates LLP, 10100 Santa Monica Blvd., 7th Floor, Los Angeles,

2  California 90067.

3      PLEASE  TAKE  FURTHER  NOTICE  that  the  Court  may  deem  the

4  failure of any party in interest to file a timely objection to

5  the Motion to constitute consent to all of the relief requested

6  by the Debtors in the Motion.

7

8  Dated: May 27, 2010           WESTCLIFF MEDICAL LABORATORIES,
                                  INC.

9                                -and-

10                               BIOLABS, INC.

11                               /s/ Ron Bender

12                               RON BENDER
                                 JACQUELINE L. RODRIGUEZ

13                               TODD M. ARNOLD
                                 JOHN-PATRICK M. FRITZ

14                               LEVENE, NEALE, BENDER, RANKIN
                                    & BRILL L.L.P.

15                               (Proposed) Attorneys for Chapter 11

16                               Debtors and Debtors in Possession

17

18

19

20

21

22

23

24

25

26

27

28

| In re:<br>WESTCLIFF MEDICAL LABORATORIES, INC.<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER Lead Case No. 8:10-bk-16743-TA<br>Jointly Administered with Case No. 8:10-bk-16746-TA |
| --- | --- |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as

**NOTICE OF SALE OF ESTATE PROPERTY**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 28, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Todd M Arnold    tma@lnbrb.com
- Ron Bender    rb@lnbrb.com
- Jeffrey K Garfinkle    bkgroup@buchalter.com, jgarfinkle@buchalter.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Michael J Heyman    michael.heyman@klgates.com
- Rodger M Landau    rlandau@lgbfirm.com, kmoss@lgbfirm.com
- Michael B Lubic    michael.lubic@klgates.com
- Jacqueline L Rodriguez    jlr@lnbrb.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Sharon Z Weiss    sharon.weiss@hro.com

☐ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 28, 2010, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                      **F 9013-3.1**

| In re:<br>WESTCLIFF MEDICAL LABORATORIES, INC.<br><br><div align="right">Debtor(s).</div> | CHAPTER 11<br><br>CASE NUMBER Lead Case No. 8:10-bk-16743-TA<br>Jointly Administered with Case No. 8:10-bk-16746-TA |
|---|---|

<u>Via Attorney Service</u>
The Hon. Theodor C. Albert
United States Bankruptcy Court
411 West Fourth Street
Santa Ana, CA 92701

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 28, 2010 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                      **F 9013-3.1**