1  RON BENDER (SBN 143364)
   JACQUELINE L. RODRIGUEZ (SBN 198838)
2  TODD M. ARNOLD (SBN 221868)
   JOHN-PATRICK M. FRITZ (SBN 245240)
3  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
5  Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
   Email: rb@lnbrb.com; jlr@lnbrb.com; tma@lnbrb.com; jpf@lnbrb.com
6
   Proposed Attorneys for Chapter 11 Debtors
7  and Debtors in Possession

8                UNITED STATES BANKRUPTCY COURT
                 CENTRAL DISTRICT OF CALIFORNIA
9                    (SANTA ANA DIVISION)

10 In re:                          Lead Case No. 8:10-bk-16743-TA
                                   Jointly Administered with Case
11 WESTCLIFF MEDICAL                No. 8:10-bk-16746-TA
   LABORATORIES, INC.,             Chapter 11 Cases
12
                                   **DEBTORS' SECOND MOTION FOR AN ORDER:**
13            Debtor.              **(1) APPROVING SALE OF SUBSTANTIALLY
                                   ALL OF THE DEBTORS' ASSETS
14                                 (EXCLUDING CASH AND ACCOUNTS
                                   RECEIVABLE) FREE AND CLEAR OF ALL
15 BIOLABS, INC.,                  LIENS, CLAIMS AND INTERESTS; (2)
                                   APPROVING OF DEBTORS' ASSUMPTION AND
16            Debtor.              ASSIGNMENT OF UNEXPIRED LEASES AND
                                   EXECUTORY CONTRACTS AND DETERMINING
17                                 CURE AMOUNTS; (3) WAIVING THE 14-DAY
   ☒ Affects Both Debtors         STAY PERIODS SET FORTH IN BANKRUPTCY
18                                 RULES 6004(h) AND 6006(d); AND (4)
   ☐ Affects WESTCLIFF MEDICAL    GRANTING RELATED RELIEF; MEMORANDUM
19   LABORATORIES, INC. only       OF POINTS AND AUTHORITIES;
                                   DECLARATION OF MATTHEW PAKKALA IN
20 ☐ Affects BIOLABS, INC. only   SUPPORT THEREOF**

21                                 Court Scheduled Hearing:
22                                 Date:   June 18, 2010
                                   Time:   2:00 p.m.
23                                 Place: Courtroom "5B"
                                           411 West Fourth Street
24                                         Santa Ana, CA 92701-4593

25

26

27

28

1

1

TABLE OF CONTENTS

2

MEMORANDUM OF POINTS AND AUTHORITIES

3

I.    COMPANY BACKGROUND AND CHAPTER 11 BANKRUPTCY FILINGS .... 14

4

II.    THE ASSET SALE PROCESS ................................... 17

5

III.    THE NEW ASSET SALE PROCESS ............................. 22

6

IV.    DISCUSSION ............................................... 25

7

8    A. The Court Should Authorize the Debtors to Sell
     the Purchased Assets to the Winning Bidder (Subject
     to the Consent of the Senior Lenders and a Resolution
9    of the Asset Allocation Agreement that is Acceptable
     to the Debtors, the Creditors' Committee and the
10   Senior Lenders)   ..................................... 25
     1. Sound Business Purpose ............................ 27
11   2. Accurate and Reasonable Notice ..................... 29
     3. Fair and Reasonable Price .......................... 31
12   4. Good Faith ........................................ 32

13   B. Section 363(f) of the Bankruptcy Code Permits the
     Sale of the Purchased Assets to Be Free and Clear of
14   Any and All Liens, Claims and Interests  ............. 35

15   C. The Court Should Authorize the Debtors to Assume
     and Assign to Purchaser (or to a Successful
16   Overbidder) All Executory Contracts and Unexpired
     Leases that the Winning Bidder (or a Successful
17   Overbidder) Wishes to Have Assigned to it  ........... 39

18   D. The Debtors Request the Court to Waive the
     Fourteen-Day Waiting Periods Set Forth in
19   Bankruptcy Rules 6004(h) and 6006(d)  ................ 42

20   VIII.    CONCLUSION ........................................... 43

21   DECLARATION OF MATTHEW PAKKALA ............................... 46

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

**Page(s)**

FEDERAL CASES

3

4
Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re
Coastal Indus., Inc.)
5
  63 B.R. 361 (Bankr. N.D. Ohio 1986) ........................31

6
Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel
Corp.)
7
  722 F.2d 1063 (2d Cir. 1983) ........................25, 26, 27

8
In re Abbotts Dairies of Pennsylvania, Inc.
  788 F.2d 143 (3d Cir. 1986) ....................26, 31, 32, 33
9

10
In re AEG Acquisition Corp.
  127 B.R. 34 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50
11
  (9th Cir. B.A.P. 1993) .....................................40

12
In re Alpha Industries, Inc.
  84 B.R. 703 (Bankr. D. Mont. 1988) ........................33
13

14
In re Apex Oil Co.
  92 B.R. 847 (Bankr. E.D. Mo. 1988) ........................33

15
In re Atlanta Packaging Products, Inc.
  99 B.R. 124 (Bankr. N.D. Ga. 1988) ........................31
16

17
In re Bowman
  194 B.R. 227 (Bankr. D. Ariz. 1995) ........................40
18

19
In re Central Fla. Metal Fabrication, Inc.
  190 B.R. 119 (Bankr. N.D. Fla. 1995) ......................39

20
In re Continental Airlines, Inc.
  780 F.2d 1223 (5th Cir. 1986) ..............................27
21

22
In re Continental Country Club, Inc.
  114 B.R. 763 (Bankr. M.D. Fla. 1990) ......................39
23

24
In re Delaware and Hudson Ry. Co.
  124 B.R. 169 (D. Del. 1991) ...........................26, 30

25
In re Embers 86th Street. Inc.
  184 B.R. 892 (Bankr. S.D.N.Y. 1995) ........................40
26

27
In re Filtercorp, Inc.
  163 F.3d 570 (9th Cir. 1998) ..............................34
28

In re Gucci
  193 B.R. 411 (S.D.N.Y. 1996) ................................39

In re Huntington, Ltd.
  654 F.2d 578 (9th Cir. 1981) ...............................26

In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.
  77 B.R. 15 (Bankr. E.D. Pa. 1987) ..........................33

In re Integrated Resources, Inc.
  135 B.R. 746 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650
  (S.D.N.Y. 1992) ............................................31

In re Karpe
  84 B.R. 926 (Bankr. M.D. Pa. 1988) ......................30, 31

In re Klein Sleep Products, Inc.
  78 F.3d 18 (2d. Cir. 1996) .................................39

In re Martin (Myers v. Martin)
  91 F.3d 389 (3d Cir. 1996) .................................25

In re Prime Motors Inns
  124 B.R. 378 (Bankr. S.D. Fla. 1991) .......................39

In re Qintex Entertainment, Inc.
  950 F.2d 1492 (9th Cir. 1991) ..............................26

In re Rock Indus. Mach. Corp.
  572 F.2d 1195 (7th Cir. 1978) ..............................33

In re The Seychelles, Partnership and Genius Corp. v. Banyan
  Corp.
  32 B.R. 708 (N.D. Tex. 1983) ...............................31

In re Snyder
  74 B.R. 872 (Bankr. E.D. Pa. 1987) .........................31

In re Walter
  83 B.R. 14 (9th Cir. B.A.P. 1988) ..................26, 27, 28

In re Wilde Horse Enterprises
  136 B.R. 830 (Bankr. C.D. Cal. 1991) ...................31, 33

Titusville Country Club v. Pennbank (In re Titusville
  Country Club)
  128 B.R. 396 (Bankr. W.D. Pa. 1991) ........................26

Willemain v. Kivitz
    764 F.2d 1019 (4th Cir. 1985) ................................ 31

**FEDERAL STATUTES**

11 U.S.C. § 363(f) ......................................2, 35, 38

11 U.S.C. § 365 (i) ............................................2

11 U.S.C. § 365(b)(1) ........................................40

11 U.S.C. § 365(b)(1)(C) .....................................41

**OTHER AUTHORITIES**

Rules 6004(a) and (c) ........................................30

Rule 6004(h) .................................................42

Rules 6004(h) and 6006(d) ..........................2, 13, 42, 43

Rule 6006(d) .................................................42

Westcliff Medical Laboratories, Inc. ("Westcliff") and BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), hereby file this Second Motion (the "Second Sale Motion") for entry of an order of the Court (A) pursuant to 11 U.S.C. § 363(f) approving the sale free and clear of all liens, claims and interests to the highest and bid bidder at an auction sale to be conducted by the Debtors (the "Winning Bidder"), of substantially all of the Debtors' tangible and intangible assets designated for acquisition by the winning bidder (excluding avoidance causes of action) (collectively, the "Purchased Assets"); (B) pursuant to 11 U.S.C. § 365, (i) authorizing the Debtors to assume executory contracts and unexpired leases ("Assumed Contracts") and assign them to the Winning Bidder (or to a successful overbidder) and (ii) establishing the cure amounts, if any, payable under such Assumed Contracts; (C) waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d) to enable the sale to close as quickly as possible; and (D) granting certain other related relief, including authorizing the Debtors to enter into a Transition Agreement in connection with the sale closing if that is something the Winning Bidder requires.

In support of this Second Sale Motion, the Debtors allege as follows:

2

Westcliff is the owner and operator of approximately 170 branded and stand-alone patient service center laboratories and STAT labs located throughout California. The Debtors have approximately 1,000 employees and are currently generating approximately $95 million of annual revenue. BioLabs does not operate any business and its only material asset is its 100% equity interest in Westcliff, which is a wholly-owned subsidiary of BioLabs.

The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment. The Debtors also have a substantial amount of unsecured debt. An Official Committee of Unsecured Creditors (the "Creditors' Committee") has been formed to represent the interests of all unsecured creditors.

The Debtors suffered a net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171 million) on net revenue of approximately $84 million. The Debtors suffered a net loss of approximately $13 million in 2009

(including expenses and write offs of approximately $110 million) on net revenue of approximately $97 million.

While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued. Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy. Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

Given the Debtors' financial predicament, it became clear to the Debtors in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder, and it was only on that basis that the Senior Loan Agent continued to provide the Debtors with the Debtors' required financing. The Debtors have therefore been engaged in an active sale process since early 2009.

To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009 as a

4

financial advisor to assist the Debtors with their sale process.[1] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers.

After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that Wave Newco, Inc., a wholly-owned subsidiary of Laboratory Corporation of America ("LabCorp"), was the optimal buyer of the Debtors' assets for three primary reasons. First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets. Second, it was clear that LabCorp as a strategic buyer was willing to pay a substantially higher price for the Debtors' assets than any other prospective buyer. Third, LabCorp clearly has the financial means to consummate its purchase of the Debtors' assets.

Subject to certain adjustments, LabCorp agreed to pay to the Debtors the sum of $57.5 million for the Purchased Assets, while leaving with the Debtors, among other things, all of the Debtors' accounts receivable (which the Debtors estimate will result in an

---

[1] The Debtors had used other professionals for this same purpose in the past.

additional net recovery of approximately \$8,000,000 for the Debtors' estates) and all of the Debtors' cash. The Debtors and MTS believe that the purchase price offered by LabCorp is substantially higher than the purchase price that any other buyer would be willing to pay for the Purchased Assets.

In order to make sure that the purchase price being paid by LabCorp is the highest price possible for the Purchased Assets, the Debtors conducted an auction sale of the Purchased Assets following the Court's approval of overbid procedures. No party offered to pay more for the Purchased Assets than LabCorp, which was consistent with the expectations of the Debtors and MTS.

The Debtors therefore requested and urged the Court to approve the Debtors' sale of the Purchased Assets to LabCorp on a very expedited basis because of the severe risk of a deterioration of Westcliff's business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and the Debtors are concerned that Westcliff may not be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy. The Debtors therefore concluded that an expedited sale of the Purchased Assets is necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

As set forth in the Asset Purchase Agreement between the Debtors and LabCorp (the "LabCorp APA"), the purchase price being paid by LabCorp will be adjusted downward if there is a meaningful reduction in Westcliff's post-petition business volume pending the closing of the sale.[2]   Moreover, should that reduction reach the level of a Material Adverse Change[3], LabCorp has the ability to walk away from this transaction completely. The risks to the Debtors' estates of failing to close the sale of the Purchased Assets to LabCorp on an expedited basis are therefore severe.  The Debtors have no doubt that if they do not consummate their sale to LabCorp, the Debtors will either be forced to sell their business for substantially less money than LabCorp has offered (which could only occur with the consent of the Senior Lenders and the Court), or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of the going concern value of the Debtors' business.

---

[2] Purchase Price Decrease Adjustment is defined in the definitional Section of the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement Period Volume) times (b) $1,202.00.

[3] Material Adverse Change is defined in the definitional Section of the APA as an amount equal to 0.17 or more determined using the following formula: the quotient of (a) (the Baseline Volume minus the Measurement Period Volume); divided by (b) the Baseline Volume.  For purposes of clarification, the Material Adverse Change may be expressed as a percentage equal to or greater than Seventeen Percent (17%).  By way of example, if the Baseline Volume is 9,500 and the Measurement Period Volume is 7,885, then the calculation shall be equal to 0.17 and a Material Adverse Change shall have occurred.

7

At the urging of the Debtors and the Creditors' Committee, the Court approved the Debtors' proposed sale of the Purchased Assets to LabCorp at a hearing held on June 3, 2010, and the Court entered an order approving the Debtors' sale of the Purchased Assets to LabCorp on Wednesday, June 9, 2010 (the "LabCorp Sale Order"). Prior to the sale hearing, the Debtors, the Creditors' Committee and the Senior Lenders reached an agreement on an allocation of the LabCorp purchase price and the balance of the Debtors' assets (the "Asset Allocation Agreement") which was acceptable to all parties.

The LabCorp APA requires LabCorp to consummate its purchase of the Purchased Assets within two days following entry of the LabCorp Sale Order, which is Friday, June 11, 2010.

Unfortunately, at some point prior to June 11, 2010, the Federal Trade Commission (the "FTC") staff contacted Labcorp and the Debtors to "request information" related to the Debtors' sale of the Purchased Assets to LabCorp. The Debtors do not believe that this inquiry made by the FTC staff constitutes a "Proceeding" as that term is defined in the LabCorp APA that give LabCorp any legitimate basis to refuse to close its purchase of the Purchased Assets by Friday, June 11, 2010.

Quest is the largest participant in the marketplace of the Debtors' business (with significantly more market share than any other party); LabCorp is the second largest participant in the

marketplace of the Debtors' business; and Westcliff is the third largest participant in the marketplace of the Debtors' business. The FTC staff has told the Debtors that the FTC staff has concerns about whether a sale to LabCorp would lessen competition. The FTC staff would not have concerns if the Debtors sold the Purchased Assets to a buyer other than LabCorp or Quest. However, the FTC staff has told the Debtors that they recognize the Debtors' grave financial predicament and dire financial need to consummate a sale of the Purchased Assets on a very expedited basis.

The FTC staff suggested that the Debtors and MTS formulate a sale process to be conducted on a very expedited basis to see if there are any buyers other than Quest or LabCorp who can consummate a sale quickly and can receive Bankruptcy Court approval. The FTC staff has approved the form of letter (the "New Buyer Solicitation Letter") to be sent to parties who previously submitted a formal written indication of interest in purchasing Westcliff's business or its assets. The FTC staff has advised the Debtors that if no party other than Quest or LabCorp can satisfy the foregoing, the FTC staff will not challenge the Debtors' sale to LabCorp, which the Court has already approved, and the sale could close immediately.

The New Buyer Solicitation Letter provides that prospective new buyers have until 5:00 p.m. Eastern time on Thursday, June

17, 2010, to submit a written offer to the Debtors for the Purchased Assets and to demonstrate their financial ability to consummate their purchase and to satisfy the conditions of Sections 363 and 365 of the Bankruptcy Code. Given the extreme time exigencies in these cases, as the LC APA set an outside closing date of June 23, 2010 and in any event the Debtors risk running out of money, the Debtors requested the Court to schedule a hearing to be held on Friday, June 18, 2010 (or the first possible date thereafter) on this Second Sale Motion to enable the Debtors to conduct an auction of the Purchased Assets; to request the Court to approve the results of that auction sale; and to enable the Debtors to consummate a sale of the Purchased Assets to the Winning Bidder on Monday, June 21, 2010 or shortly thereafter to make sure the Debtors are able to avoid a shut down of their business and the loss of the jobs of the Debtors' approximately 1,000 employees.

It should be noted that the Debtors do not believe that they have the legal ability to sell the Purchased Assets to the Winning Bidder unless the net sale proceeds enable the Debtors to pay the full approximately $56 million owing to the Senior Lenders unless the Senior Lenders consent to that sale. The Debtors have no way of knowing how the Senior Lenders will respond to the outcome of the auction sale, and the Debtors suspect that the Senior Lenders will not be able to decide

whether they will consent to that sale until they know the outcome of the auction sale. The Debtors also have no way of knowing what the outcome of any such new sale would have on the Asset Allocation Agreement reached between the Debtors, the Creditors' Committee and the Senior Lenders, and the Debtors suspect that this will not become known until the parties know the outcome of the auction sale.

If the Senior Lenders agree to the bid made by the Winning Bidder and the Debtors, the Creditors' Committee and the Senior Lender are able to reach an agreement on an Asset Allocation Agreement, the Debtors will request the Court to approve the sale or the Purchased Assets to the Winning Bidder free and clear of all liens, claims, encumbrances and interests ("Encumbrances") at the hearing to be held on June 18, 2010.

The relief sought in this Second Sale Motion is based upon this Second Sale Motion, the Memorandum of Points and Authorities and Declaration of Matthew Pakkala annexed hereto, the statements, arguments and representations of counsel to be made at the hearing on this Second Sale Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Second Sale Motion.

**WHEREFORE**, the Debtors respectfully request that this Court:

1. approve the sale of the Purchased Assets to the Winning Bidder in accordance with the terms of the purchase offer made by

11

1   the Winning Bidder free and clear of all Encumbrances

2   (conditioned upon the consent of the Senior Lenders to the sale);

3   2.  find that the Winning Bidder is a good faith buyer

4   entitled to all of the protections afforded by Section 363(m) of

5   the Bankruptcy Code;

6

7   3.  approve (effective as of the date of the sale Closing)

8   the Debtors' assumption and assignment to the Winning Bidder of

9   all of the Debtors' unexpired leases and executory contracts

10  which the Winning Bidder desires to acquire in accordance with

11  the procedures outlined below;

12  4.  find that the cure amounts which must be paid in

13  connection with the Debtors' assumption and assignment of any of

14  their unexpired leases and executory contracts are as set forth

15

16  in exhibit "1" to the Pakkala Declaration[4] and that adequate

17  assurance of future performance, to the extent necessary, has

18  been demonstrated by the Winning Bidder;

19  5.  approve (effective as of the date of the sale Closing)

20  the Debtors' rejection of all of the Excluded Contracts and all

21  of the Excluded Leases (defined below), with the Debtors

22

23  reserving the right to supplement this list as the Debtors obtain

24  additional information from the Winning Bidder;

25

26  [4] Other than with regard to a small number of objections which were filed in
    connection with the Debtors' motion to sell the Purchased Assets to LabCorp,
    the Court has already approved the various cure amounts identified in exhibit
27  "1" to the Pakkala Declaration and those cure amounts are unchanged.

28

12

6.    authorize   the   Debtors   to   enter   into   a   Transition Agreement in connection with the sale Closing with the Winning Bidder as desired by the Winning Bidder;

7.    enter a sale order approving the Debtors' sale of the Purchased Assets to the Winning Bidder in a form substantially in conformity with the version of the sale order which the Court previously entered in connection with the Debtors' proposed sale of the Purchased Assets to LabCorp;

8.    waive the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

9.    grant such other and further relief as the Court deems just and proper.

Dated: June 14, 2010              WESTCLIFF MEDICAL LABORATORIES,
                                  INC.

                                  -and-

                                  BIOLABS, INC.

                                  /s/ Ron Bender
                                  RON BENDER
                                  JACQUELINE L. RODRIGUEZ
                                  TODD M. ARNOLD
                                  JOHN-PATRICK M. FRITZ
                                  LEVENE, NEALE, BENDER, RANKIN
                                      & BRILL L.L.P.
                                  (Proposed) Attorneys for Chapter 11
                                  Debtors and Debtors in Possession

13

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

I.

3

## COMPANY BACKGROUND AND CHAPTER 11 BANKRUPTCY FILINGS

4

Westcliff  Medical  Laboratories,  Inc.  ("Westcliff")  and

5

BioLabs, Inc. ("BioLabs"), the Chapter 11 debtors and debtors in

6

7 possession herein (collectively, the "Debtors"), commenced their

8 bankruptcy cases by filing voluntary petitions under Chapter 11

9 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on May 19,

10 2010 (the "Petition Date"). The Debtors continue to operate

11 their business, manage their financial affairs, and operate their

12 bankruptcy estates as debtors in possession pursuant to sections

13 1107 and 1108 of the Bankruptcy Code.

14

15 BioLabs is the parent company to Westcliff, which is the

16 operating company. The only material asset owned by BioLabs is

17 its stock interest in the Debtor. Biolabs was organized for the

18 purposes of acquiring 100% of the capital stock and other equity

19 interests of Westcliff.

20

Westcliff  was  founded  in  1964  as  a  community-based

21

laboratory and is headquartered in Santa Ana, California.

22

Westcliff is the operator of approximately 170 branded, stand-

23

24 alone, patient service center laboratories and STAT labs that

25 provide various services, including clinical testing, pathology,

26 reporting and support services for the benefit of thousands of

27

28

14

out-patients throughout California. The Debtors have nearly 1000 employees.

The Debtors' main clinical hub is an 80,000 square foot facility located in Santa Ana, California that opened in 2006. The Debtors' primary anatomical pathology lab is a 12,800 square foot facility located in Monrovia, California that opened in 2008.

Working directly with patients and with contracted payors, including United Health, Aetna, Cigna, Blue Cross, Medi-Cal and Medicare, Westcliff has grown and become a leading out-patient laboratory service company. Westcliff's lab operations demonstrate industry-leading results, with low testing turn-around times, high quality control scores, and a strong and experienced sales and marketing team.

Westcliff averages approximately 8,500 clinical requests per day and approximately 1,200 pathology requests per day, and performs approximately 250,000 cytology and 70,000 biopsy tests on an annual basis. Based on this performance, the Debtors had approximately $97 million in net revenue in 2009 and are the third largest clinical laboratory in California.

The California clinical laboratory testing market is the largest in the nation, with estimated revenues of approximately $2 billion. Approximately 8% of the nations' tests are performed in California, and over 200 million of California's tests are

15

conducted by independent labs (excluding hospital based labs). Based on current volume, the Debtors account for approximately 5% of the California market.

Much of the Debtors' growth has come from the acquisition of other labs, which caused the Debtors to incur a substantial amount of debt. The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent"). The Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment. The Debtors also have a substantial amount of unsecured debt. An Official Committee of Unsecured Creditors (the "Creditors' Committee") has been formed to represent the interests of all unsecured creditors.

While the Debtors' revenue is significant, due to the small profit margins in this business, despite substantial and continuing cost cutting measures undertaken by the Debtors, the Debtors are simply not able to operate sufficiently profitably to enable the Debtors to repay their debts.

The Debtors suffered a net loss of approximately $87 million in 2008 (including expenses and write offs of approximately $171

16

million) on net revenue of approximately \$84 million. The Debtors suffered a net loss of approximately \$13 million in 2009 (including expenses and write offs of approximately \$110 million) on net revenue of approximately \$97 million.

While the Debtors instituted as many expense reductions as were reasonably possible, the Debtors' losses continued. Since the beginning of 2009, the Debtors have been unable to make any debt service payments to the Senior Lenders, and the Debtors have been unable to remain current with their other debt obligations, including payments owing to former owners of companies the Debtors previously purchased as part of the Debtors' overall growth strategy. Indeed, the Debtors were only able to survive financially over the past approximately seventeen months because the Senior Loan Agent provided the Debtors with emergency funding to cover payroll and other vital expenses.

II.

THE ORIGINAL ASSET SALE PROCESS

Given the Debtors' financial predicament, it became clear to the Debtors in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder. The Debtors have therefore been engaged in an active sale process since early, 2009.

17

To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009 as a financial advisor to assist the Debtors with their sale process.[5] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic buyers and financial buyers.

After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that LabCorp was the optimal buyer of the Debtors' assets for three primary reasons. First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the Debtors' assets. Second, it was clear that LabCorp as a strategic buyer was willing to pay a substantially higher price for the Debtors' assets than any other prospective buyer. Third, LabCorp clearly has the financial means to consummate its purchase of the Debtors' assets.[6]

On May 17, 2010 (two days prior to the Petition Date), the Debtors into an Asset Purchase Agreement (the "APA") with LabCorp, which, among other things, provided for the Debtors to sell the Purchased Assets to LabCorp

---

[5] The Debtors had used other professionals for this same purpose in the past.

18

Subject to certain adjustments, LabCorp agreed to pay to the Debtors the sum of \$57.5 million for the Purchased Assets, while leaving with the Debtors, among other things, all of the Debtors' accounts receivable (which the Debtors estimate will result in an additional net recovery of approximately \$8,000,000 for the Debtors' estates) and all of the Debtors' cash. The Debtors and MTS believed that the purchase price offered by LabCorp is substantially higher than the purchase price that any other buyer would be willing to pay for the Purchased Assets.

In order to make sure that the purchase price being paid by LabCorp is the highest price possible for the Purchased Assets, the Debtors conducted an auction sale of the Purchased Assets following the Court's approval of overbid procedures. No party offered to pay more for the Purchased Assets than LabCorp, which was consistent with the expectations of the Debtors and MTS.

The Debtors therefore requested and urged the Court to approve the Debtors' sale of the Purchased Assets to LabCorp on a very expedited basis because of the severe risk of a deterioration of Westcliff's business resulting from the Debtors' bankruptcy filings. This is a highly sensitive and extremely competitive industry, and the Debtors were and remain concerned that Westcliff may not be able to retain its customer base for

---

[6] LabCorp has established Purchaser as a wholly-owned subsidiary of LabCorp solely for the purpose of acquiring the Purchased Assets.

1  any extended period of time while operating as a debtor in

2  bankruptcy.   The Debtors therefore concluded that an expedited

3  sale of the Purchased Assets is necessary to avoid immediate and

4  irreparable harm to the Debtors' business, creditors and

5  bankruptcy estates.

6

7      As set forth in the Asset Purchase Agreement between the

8  Debtors and LabCorp (the "LabCorp APA"), the purchase price being

9  paid by LabCorp will be adjusted downward if there is a

10 meaningful reduction in Westcliff's post-petition business volume

11 pending the closing of the sale.[7]   Moreover, should that

12 reduction reach the level of a Material Adverse Change[8], LabCorp

13 has the ability to walk away from this transaction completely.

14 The risks to the Debtors' estates of failing to close the sale of

15 the Purchased Assets to LabCorp on an expedited basis are

16

17 therefore severe.   The Debtors have no doubt that if they do not

18 consummate their sale to LabCorp, the Debtors will either be

19 forced to sell their business for substantially less money than

20 LabCorp has offered (which could only occur with the consent of

21

22 [7] Purchase Price Decrease Adjustment is defined in the definitional Section of
   the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement
23 Period Volume) times (b) $1,202.00.

24 [8] Material Adverse Change is defined in the definitional Section of the APA as
   an amount equal to 0.17 or more determined using the following formula: the
25 quotient of (a) (the Baseline Volume minus the Measurement Period Volume);
   divided by (b) the Baseline Volume.   For purposes of clarification, the
26 Material Adverse Change may be expressed as a percentage equal to or greater
   than Seventeen Percent (17%).   By way of example, if the Baseline Volume is
27 9,500 and the Measurement Period Volume is 7,885, then the calculation shall
   be equal to 0.17 and a Material Adverse Change shall have occurred.

28

the Senior Lenders and the Court), or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of the going concern value of the Debtors' business.

At the urging of the Debtors (with the full support of the Creditors' Committee and the Senior Lenders), the Court approved the Debtors' proposed sale of the Purchased Assets to LabCorp at a hearing held on June 3, 2010, and the Court entered an order approving the Debtors' sale of the Purchased Assets to LabCorp on Wednesday, June 9, 2010 (the "LabCorp Sale Order"). Prior to the sale hearing, the Debtors, the Creditors' Committee and the Senior Lenders reached an agreement on an allocation of the LabCorp purchase price and the balance of the Debtors' assets (the "Asset Allocation Agreement") which was acceptable to all parties.

The LabCorp APA requires LabCorp to consummate its purchase of the Purchased Assets within two days following entry of the LabCorp Sale Order, which is Friday, June 11, 2010.

Unfortunately, at some point prior to June 11, 2010, the Federal Trade Commission (the "FTC") staff contacted Labcorp and the Debtors to "request information" related to the Debtors' sale of the Purchased Assets to LabCorp. The Debtors do not believe that this inquiry made by the FTC staff constitutes a

"Proceeding" as that term is defined in the LabCorp APA that give LabCorp any legitimate basis to refuse to close its purchase of the Purchased Assets by Friday, June 11, 2010. Notwithstanding the foregoing, as a result of the FTC situation, LabCorp has not close its purchase of the Purchased Assets, and LabCorp has advised the Debtors that it is not willing to close its purchase of the Purchased Assets give the current FTC situation.

III.

#### THE NEW ASSET SALE PROCESS

Quest is the largest participant in the marketplace of the Debtors' business (with significantly more market share than any other party); LabCorp is the second largest participant in the marketplace of the Debtors' business; and Westcliff is the third largest participant in the marketplace of the Debtors' business. The FTC staff has told the Debtors that the FTC staff has concerns about whether a sale to LabCorp would lessen competition. The FTC staff has told the Debtors that the FTC staff would not have concerns if the Debtors sold the Purchased Assets to a buyer other than LabCorp or Quest. However, the FTC staff has told the Debtors that they recognize the Debtors' grave financial predicament and dire financial need to consummate a sale of the Purchased Assets on a very expedited basis.

The FTC staff suggested that the Debtors and MTS formulate a sale process to be conducted on a very expedited basis to see if

there are any buyers other than Quest or LabCorp who can consummate a sale quickly and can receive Bankruptcy Court approval. The FTC staff has approved the form of letter (the "New Buyer Solicitation Letter") to be sent to parties who previously submitted a formal written indication of interest in purchasing Westcliff's business or its assets. The FTC staff has advised the Debtors that if no party other than Quest or LabCorp can satisfy the foregoing, the FTC staff will not challenge the Debtors' sale to LabCorp, which the Court has already approved, and the sale could close immediately.

The New Buyer Solicitation Letter provides that prospective new buyers have until 5:00 p.m. Eastern Time on Thursday, June 17, 2010, to submit a written offer to the Debtors for the Purchased Assets and to demonstrate their financial ability to consummate their purchase and to satisfy the conditions of Sections 363 and 365 of the Bankruptcy Code.

As requested by the FTC, MTS has sent the New Buyer Solicitation Letter to all parties who previously submitted a formal written indication of interest in purchasing Westcliff's business or its assets, and MTS (and the Debtors) will facilitate due diligence with all such prospective buyers who desire to conduct due diligence.

Given the extreme time exigencies in these cases, as the LC APA set an outside closing date of June 23, 2010 and in any event

the Debtors risk running out of money, the Debtors requested the Court to schedule a hearing to be held on Friday, June 18, 2010 (or the first possible date thereafter) on this Second Sale Motion.   The Court has accommodated the Debtors and has scheduled a hearing on this Second Sale Motion to be held on Friday, June 18, 2010 at 2:00 p.m.

The Debtors will not know until the bid deadline of June 17, 2010 at 5:00 p.m. Eastern Time has passed whether any new bids are made for the Purchased Assets and, if any new bids are made, the terms of those bids.   If one acceptable bid is made by the bid deadline, the Debtors will request the Court to approve a sale of the Purchased Assets to the Winning Bidder at the hearing on June 18, 2010 at 2:00 p.m.   If more than one acceptable bid is made by the bid deadline, the Debtors will conduct an auction sale of the Purchased Assets on June 18, 2010 (either inside the Courtroom or outside the Courtroom with this issue to be determined), and then request the Court to approve the sale of the Purchased Assets to the Winning Bidder at the hearing on June 18, 2010 at 2:00 p.m.

It should be noted that the Debtors do not believe that they have the legal ability to sell the Purchased Assets to the New Buyer unless the net sale proceeds enable the Debtors to pay the full approximately $56 million owing to the Senior Lenders or the Senior Lenders consent to that sale.   The Debtors have no way of

1    knowing how the Senior Lenders will respond to the outcome of the
2    auction sale, and the Debtors suspect that the Senior Lenders
3    will not be able to decide whether they will consent to that sale
4    until they know the outcome of the auction sale.    The Debtors
5    also have no way of knowing what the outcome of any such new sale
6    would have on the Asset Allocation Agreement reached between the
7    Debtors, the Creditors' Committee and the Senior Lenders, and the
8    Debtors suspect that this will not become known until the parties
9    know the outcome of the auction sale.
10
11                                 IV.
12                              DISCUSSION
13   A.    The Court Should Authorize the Debtors to Sell the Purchased
14         Assets to the Winning Bidder (Subject to the Consent of the
15         Senior Lenders and a Resolution of the Asset Allocation
16         Agreement that is Acceptable to the Debtors, the Creditors'
17         Committee and the Senior Lenders).
18
19         Section 363(b) of the Bankruptcy Code provides that a debtor
20   "after notice and a hearing, may use, sell or lease, other than
21   in the ordinary course of business, property of the estate."    To
22   approve a use, sale or lease of property other than in the
23   ordinary course of business, the court must find "some
24   articulated business justification."    See, e.g., In re Martin
25   (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996) citing In re
26   Schipper (Fulton State Bank v. Schipper), 933 F.2d 513, 515 (7th
27
28

25

Cir. 1991); Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. In re Huntington, Ltd., 654 F.2d 578 (9th Cir. 1981); In re Walter, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. In re Qintex Entertainment, Inc., 950 F.2d 1492 (9th Cir. 1991).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. Titusville Country Club v. Pennbank (In re Titusville Country Club), 128

26

B.R. 396, 399 (Bankr. W.D. Pa. 1991); see also, In re Walter, 83 B.R. at 19-20.

The Debtors submit that their proposed sale of the Purchased Assets to the Winning Bidder comports with each of these four criteria and demonstrates that the Debtors' business judgment to proceed with the sale is sound (subject to the consent of the Senior Lenders and a resolution of the Asset Allocation Agreement that is acceptable to the Debtors, the Creditors' Committee and the Senior Lenders).

1.    Sound Business Purpose.

There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy court may order such disposition under Section 363(b). In re Lionel Corp., 722 F.2d at 1070. The Ninth Circuit Bankruptcy Appellate Panel in Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b). In Walter, the Bankruptcy Appellate Panel, adopting the reasoning of the Fifth Circuit in In re Continental Airlines, Inc., 780 F.2d 1223 (5th Cir. 1986) and the Second Circuit in In re Lionel Corp., supra, articulated the standard to be applied under Section 363(b) as follows:

27

1

2

3

4

5

6

7

8

9

10

11

12

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike. He might, for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

13

14

15

In Re Walter, 83 B.R. at 19-20, *citing* In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986).

16

17

18

19

20

21

22

23

24

The facts pertaining to the Debtors' proposed sale of the Purchased Assets to the Winning Bidder substantiate the Debtors' business decision that such contemplated sale serves the best interests of the Debtors' estates and their creditors and merits the approval of the Court (subject to the consent of the Senior Lenders and a resolution of the Asset Allocation Agreement that is acceptable to the Debtors, the Creditors' Committee and the Senior Lenders).

25

26

27

28

The Debtors have no ability to survive on any long-term basis without an infusion of additional funds, and the Debtors believe that if they fail to consummate an expedited sale of the

Purchased Assets, the Debtors risk running out of money and having to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. The Debtors further believe that a liquidation of the Debtors' business would have substantially less value than a going concern sale of the Debtors' business.

The Debtors have concluded that proceeding with an expedited sale to the Winning Bidder (subject to the consent of the Senior Lenders and a resolution of the Asset Allocation Agreement that is acceptable to the Debtors, the Creditors' Committee and the Senior Lenders) is in the best interests of their estates and their creditors. The Debtors therefore submit that their proposed sale is justified by sound business purposes, satisfying the first requirement for a sale under Section 363(b) of the Bankruptcy Code.

2. Accurate and Reasonable Notice.

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors. The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is

in the best interest of the estate." In re Delaware & Hudson Railway Co., 124 B.R. 169, 180 (D. Del. 1991). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. In re Karpe, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. Id.

In connection with the filing of this Second Sale Motion, the Debtors will serve notice of this Second Sale Motion on the Creditors' Committee, the Senior Lenders, the UST, the FTC, the Debtors, and those parties who have filed a request for special notice.

The Debtors submit that the foregoing satisfies the requirements of Bankruptcy Rules 6004(a) and (c), which provide as follows:

> "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k)
> ...
> (c) ... A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession..."

Fed. R. Bankr. P. 6004(a)(c). The Debtors have complied with all noticing procedures required by the Bankruptcy Rules and the

1  Court.

2      3.   Fair and Reasonable Price.

3      In order to be approved under Section 363(b) of the
4  Bankruptcy Code, the purchase price must be fair and reasonable.
5
6  Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re
7  Coastal Indus., Inc.), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986).
8  Several courts have held that "fair value" is given for property
9  in a bankruptcy sale when at least 75% of the appraised value of
10 such property is paid.   See In re Karpe, 84 B.R. at 933; In re
11 Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149 (3d Cir.
12 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th Cir. 1985); In re
13 Snyder, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); In re The
14
15 Seychelles, Partnership and Genius Corp. v. Banyan Corp., 32 B.R.
16 708 (N.D. Tex. 1983).   However, the Debtor also realizes that
17 "its main responsibility, and the primary concern of the
18 bankruptcy court, is the maximization of the value of the asset
19 sold."   In re Integrated Resources, Inc., 135 B.R. 746, 750
20 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992).   "It
21 is a well-established principle of bankruptcy law that the
22 objective of bankruptcy rules and the [debtor's] duty with
23
24 respect to such sales is to obtain the highest price or greatest
25 overall benefit possible for the estate."   In re Atlanta
26 Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga.
27 1988); see also In re Wilde Horse Enterprises, 136 B.R. 830, 841
28

31

(Bankr. C.D. Cal. 1991) ["in any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold"].

This second sale process undertaken by the Debtors (with the assistance of MTS) is in conformity with that which the FTC requested of the Debtors and is designed to insure that the highest price possible is obtained for the Purchased Assets, under the Debtors' current circumstances.  MTS is a highly experienced professional which has assisted and advised the Debtors throughout this sale process.  All interested and viable buyers will be provided with equal access to the Debtors and their financial information and will therefore have the same opportunity to become the Winning Bidder.  The Debtors therefore submit that the result of the auction will be the highest and best price available to be paid for the Purchased Assets at this time under the Debtors' current circumstances, recognizing that LabCorp and Quest (the Debtors' two largest competitors) are not participating in this second sale process.

4.    Good Faith.

When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of Purchaser.  In re Abbotts Dairies, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of

Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith. Id. at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction. In re Wilde Horse Enterprises, 136 B.R. at 842. With respect to the debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction." See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders." In re Abbotts Dairies, 788 F.2d at 147, In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); In re Wilde Horse Enterprises, Inc., 136 B.R. at 842; In re Alpha Industries, Inc., 84 B.R. 703, 706 (Bankr. D. Mont. 1988). In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." In re Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), *citing* In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983).

33

In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'" [citations omitted.] [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" [citations omitted.]

Filtercorp, 163 F.3d at 577.

The Ninth Circuit made clear in Filtercorp that this standard for determining good faith is applicable even when the buyer is an insider.

None of the prospective buyers who may become the Winning Bidder that the Debtors are aware of is an "insider" of the Debtors or has received any special treatment from the Debtors or from MTS. Neither the Debtor nor MTS is aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Additionally, the Debtors anticipate that any sale agreement with any such Winning Bidder will be negotiated at arm's length with all parties involved acting in good faith. Based on the foregoing, the Debtors submit that the Court should find that the Winning Bidder is a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

34

B.   Section 363(f) of the Bankruptcy Code Permits the Sale of the

Purchased Assets to Be Free and Clear of Any and All Liens,

Claims and Interests.

Section 363(f) of the Bankruptcy Code provides, in relevant

part, as follows:

The trustee may sell property under subsection (b) . . . of
this section free and clear of any interest in such
property of an entity other than the estate, only if—
(1) applicable non-bankruptcy law permits the sale of such
property free and clear of such interest; ...
(2) such entity consents;
(3) such interest is a lien and the price at which such
property is to be sold is greater than the aggregate value
of all liens on such property;
(4) Such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such
interest.

11 U.S.C. § 363(f).   Section 363(f) of the Bankruptcy Code was

drafted in the disjunctive.   Thus, a debtor need only meet the

provisions of one of the five subsections of Section 363(f) in

order for a sale of property to be free and clear of liens,

claims and interests.

As previously indicated, the Debtors do not believe that

they have the legal ability to sell the Purchased Assets to the

Winning Bidder free and clear of the Encumbrances of the Senior

Lenders unless, pursuant to Section 363(f)(2) of the Bankruptcy

Code, the Senior Lenders consent to the sale.   As a result,

following the conclusion of the auction sale, the Debtors will

request the Court to approve the sale of the Purchased Assets to

the Winning Bidder in accordance with the terms of the highest and best bid made at the auction sale on the condition that the Senior Lenders consent to the sale and a resolution of the Asset Allocation Agreement is reached that is acceptable to the Debtors, the Creditors' Committee and the Senior Lenders.

Other than the liens asserted by the Senior Lenders, the only other liens which the Debtors believe might exist against any of the Purchased Assets are those asserted by certain equipment lenders. In particular, pre-petition, the Debtors entered into a number of lease agreements with equipment providers, which are not "true leases," but rather, leases intended as security (i.e., secured financing transactions). Typically, these agreements provide for the Debtors to purchase the affected equipment at the end of the lease terms with no or nominal additional consideration.

The Debtors' books and records show that there are eight (8) leases which were intended as security, which have an aggregate unpaid balance of approximately $522,853.67. Six (6) of these secured equipment lenders recorded UCC financing statements with the California Secretary of State purporting to perfect their security interests and liens upon their respective equipment. These eight (8) purported secured equipment lenders (collectively, the "Equipment Lenders") and the unpaid balances owed to these Equipment Lenders are summarized as follows:

| Equipment agreement | Unpaid balance |
|---|---|
| 1. Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087153046125 recorded with the California Secretary of State on April 7, 2008. | $72,787.27 |
| 2. Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087163605844 recorded with the California Secretary of State on July 1, 2008 | $62,004.97 |
| 3. Liens asserted by Jules & Associates, Inc. with regard to property covered by UCC financing statement file number 20087142579518 recorded with the California Secretary of State on January 7, 2008. | $116,936.92 |
| 4. Liens asserted by M&I Marshall & Ilsley Bank with regard to property covered by UCC financing statement file number 20067087720380 recorded with the California Secretary of State on October 10. 2006. | $41,440.30 |
| 5. Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998664 recorded with the California Secretary of State on August 18, 2006. | $128,455.89 |
| 6. Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998785 recorded with the California Secretary of State on August 18, 2006. | $99,747.30 |
| 7. Liens asserted by Baytree Leasing (with regard to Lease No. 2953 pertaining to a Dade Behring Dimension Xpand HM Plus Analyzer) – NO UCC financing statement recorded by Baytree Leasing with respect to this property. | $116,170 |
| 8. Liens asserted by Americorp/ACL Elite (with regard to an ACL Elite Coagulation System) – NO UCC financing statement recorded by Americorp/ACL Elite with respect to this property. | $31,900 |
| TOTAL | $522,953.67 |

To the extent the Winning Bidder wishes to have the

Purchased Assets include any of the equipment which is secured by the liens of the Equipment Lenders, the sale order will provide that the liens of those Equipment Lenders whose equipment is included in the Purchased Assets will attach to the net sale proceeds to be received by the Debtors in the same validity and priority and subject to the same defenses and avoidability, if any, as before the sale closing.   The Debtors reserve all of their rights and claims with respect to any liens and claims asserted by the Equipment Lenders.

The Debtors submit that the foregoing treatment of the liens of the Equipment Lenders satisfies the requirements of Section 363(f)(3) and (5) of the Bankruptcy Code to enable the Debtors to sell to the Winning Bidder all of the Purchased Assets which may be encumbered by liens in favor of the Equipment Lenders free and clear of all Encumbrances.

Other than the liens of the Senior Lenders and those of the Equipment Lenders, all of which are being satisfied in the manner described above, the Debtors are not aware of the existence of any other Encumbrances against the Purchased Assets.   If any other Encumbrances do exist, the sale order provides for all such liens to attach to the proceeds of the sale in the same validity and priority and subject to the same defenses and avoidability, if any, as before the closing, thereby satisfying the provisions of Section 363(f) of the Bankruptcy Code.

C.    The Court Should Authorize the Debtors to Assume and Assign
      to the Winning Bidder All Executory Contracts and Unexpired
      Leases that the Winning Bidder (or a Successful Overbidder)
      Wishes to Have Assigned to it.

Barring exceptions not herein relevant, Sections 365(a) and
1107(a) authorizes a debtor in possession, "subject to the
Court's approval, ... [to] assume or reject any executory
contract or unexpired lease of the debtor." A debtor in
possession may assume or reject executory contracts for the
benefit of the estate. In re Klein Sleep Products, Inc., 78 F.3d
18, 25 (2d. Cir. 1996); In re Central Fla. Metal Fabrication,
Inc., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); In re Gucci, 193
B.R. 411, 415 (S.D.N.Y. 1996). In reviewing a debtor in
possession's decision to assume or reject an executory contract,
a bankruptcy court should apply the "business judgment test" to
determine whether it would be beneficial to the estate to assume
it. In re Continental Country Club, Inc., 114 B.R. 763, 767
(Bankr. M.D. Fla. 1990); see also In re Gucci, 193 B.R. at 415.
The business judgment standard requires that the court follow the
business judgment of the debtor unless that judgment is the
product of bad faith, whim, or caprice. In re Prime Motors Inns,
124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), citing Lubrizol
Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th
Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

Pursuant to Section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with Section 365(b)(1), and provides adequate assurance of future performance by the assignee. Pursuant to Section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995), In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993).

The assumption and assignment of executory contracts furthers the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred. In re Embers 86th Street. Inc., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

In connection with any sale closing, the Debtors will seek to assume and assign to the Winning Bidder any unexpired leases and executory contracts of the Debtors which the Winning Bidder

wishes to have assigned to it. The Debtors will work with the Winning Bidder and the Court to arrive at a mutually acceptable procedure to accomplish the foregoing, given that the Debtors do not know at this time the identity of the Winning Bidder or the terms of its winning bid.

It is the Debtors' expectation that in connection with the Debtors' assumption and assignment to the Winning Bidder of executory contracts and unexpired leases, the Winning Bidder will be deemed to have assumed any on-going liabilities and obligations in connection with all such executory contracts and unexpired leases, and the Debtors will be responsible for the payment of all cure costs identified on Exhibit "1" to the annexed Pakkala Declaration (subject to any further ruling of the Court).

It is also the Debtors' expectation that, to the extent necessary, the Winning Bidder will provide any other parties to any such assumed and assigned executory contracts and unexpired leases who request in writing such financial information as is reasonably required to enable the Winning Bidder to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all such executory contracts and unexpired leases.

Prospective bidders at the auction sale will be required to provide as part of their bid package, evidence demonstrating that

they can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code with respect to any unexpired leases and executory contracts that they wish to have assigned to them if they are the Winning Bidder.

In connection with this Second Sale Motion, the Debtors are requesting an order of the Court providing that all of the Debtors' executory contracts and unexpired leases which are not assumed and assigned to the Winning Bidder be deemed rejected as of the sale closing date, subject to any changes made by the Debtors in subsequent pleadings to be filed with the Court.

D.  The Debtors Request the Court to Waive the Fourteen-Day Waiting Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d).

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) has a similar provision with respect to an order approving of a debtor's assumption and assignment of unexpired leases and executory contracts.

For all of the reasons set forth above, the Debtors believe that it is critically important that the Debtors and the Winning Bidder be permitted to consummate the closing of their sale transaction as soon after entry of the sale order as possible.

1   In order to facilitate the most expeditious sale closing

2   possible, the Debtors request that any order approving the sale

3   of the Purchased Assets and the Debtors' assumption and

4   assignment of executory contracts and unexpired leases be

5

6   effective immediately upon entry by providing that the fourteen-

7   day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are

8   waived.

9                                VIII.

10                             CONCLUSION

11       Based upon all of the foregoing, the Debtors respectfully

12   request that this Court:

13

14       1.   approve the sale of the Purchased Assets to the Winning

15   Bidder in accordance with the terms of the purchase offer made by

16   the Winning Bidder free and clear of all Encumbrances

17   (conditioned upon the consent of the Senior Lenders to the sale);

18       2.   find that the Winning Bidder is a good faith buyer

19   entitled to all of the protections afforded by Section 363(m) of

20   the Bankruptcy Code;

21       3.   approve (effective as of the date of the sale Closing)

22   the Debtors' assumption and assignment to the Winning Bidder of

23

24   all of the Debtors' unexpired leases and executory contracts

25   which the Winning Bidder desires to acquire in accordance with

26   the procedures outlined below;

27

28

                                43

4.   find  that  the  cure  amounts  which  must  be  paid  in connection with the Debtors' assumption and assignment of any of their unexpired leases and executory contracts are as set forth in exhibit "1" to the Pakkala Declaration[9] and that adequate assurance of future performance, to the extent necessary, has been demonstrated by the Winning Bidder;

5.   approve (effective as of the date of the sale Closing) the Debtors' rejection of all of the Excluded Contracts and all of  the  Excluded  Leases  (defined  below),  with  the  Debtors reserving the right to supplement this list as the Debtors obtain additional information from the Winning Bidder;

6.   authorize  the  Debtors  to  enter  into  a  Transition Agreement in connection with the sale Closing with the Winning Bidder as desired by the Winning Bidder;

7.   enter a sale order approving the Debtors' sale of the Purchased Assets to the Winning Bidder in a form substantially in conformity with the version of the sale order which the Court previously entered in connection with the Debtors' proposed sale of the Purchased Assets to LabCorp;

8.   waive the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

---

[9] Other than with regard to a small number of objections which were filed in connection with the Debtors' motion to sell the Purchased Assets to LabCorp, the Court has already approved the various cure amounts identified in exhibit "1" to the Pakkala Declaration and those cure amounts are unchanged.

1    9.    grant such other and further relief as the Court deems

2  just and proper.

3  Dated: June 14, 2010          WESTCLIFF MEDICAL LABORATORIES,
4                                INC.

5                                -and-

6                                BIOLABS, INC.

7                                */s/ Ron Bender*
                                 RON BENDER
8                                JACQUELINE L. RODRIGUEZ
                                 TODD M. ARNOLD
9                                JOHN-PATRICK M. FRITZ
                                 LEVENE, NEALE, BENDER, RANKIN
10                                   & BRILL L.L.P.
                                 (Proposed) Attorneys for Chapter 11
11                               Debtors and Debtors in Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

45

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF MATTHEW PAKKALA

I, MATTHEW PAKKALA, HEREBY DECLARE AS FOLLOWS:

1.   I have personal knowledge of the facts stated herein and would and could competently testify thereto.

2.   I am a Managing Director of FTI Consulting, Inc. ("FTI"), which maintains its main offices at 500 E. Pratt Street, Suite 1400, Baltimore, Maryland.  My business office is located at 633 West 5th Street, 16th Floor, Los Angeles, California.

3.   I hold a B.A. from the University of California, San Diego, a J.D. from Loyola Law School, and an M.B.A. from the Anderson School of Business at UCLA.  I have more than 13 years of restructuring and related advisory and management experience. My work focuses on advising distressed and underperforming companies on restructuring alternatives and strategies for maximizing performance and value, and my expertise includes providing financial and operational restructuring, asset sales and expert witness services in the healthcare, retail, manufacturing and airline industries.  Prior to joining FTI, I worked in the restructuring groups of PricewaterhouseCoopers and Price Waterhouse in Los Angeles.

4.   FTI is a global business advisory firm with over 3,000 professionals located in major business centers around the world. FTI provides services in areas ranging from corporate finance and interim management to economic consulting, forensic and

46

litigation consulting, strategic communications and technology. FTI's clients include many corporations in the Global 1000 as well as a majority of the largest 25 banks and top 100 law firms in the world.

5.   FTI has advised management, senior lenders and unsecured creditors in many of the most significant restructurings and turnarounds in recent years.   FTI and its professionals have also recently provided interim management services in a number of healthcare and other restructurings including, but not limited to, Downey Regional Medical Center, Fremont Investment & Loan, SyntaxBrillian, Daughters of Charity Health System; Methodist Hospital, Gary, IN; Quincy Medical Center; Nanticoke Memorial; Northern Berkshire; Regional Medical Center Memphis; and Boca Raton Community Hospital.

6.   Effective on or about April 1, 2010, I became the Chief Restructuring Officer ("CRO") for Westcliff Medical Laboratories, Inc. ("Westcliff") and its parent corporation, BioLabs, Inc. ("BioLabs"), Chapter 11 Debtors and Debtors in Possession (collectively, the "Debtors").

7.   The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 19, 2010.   The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession.

47

8.     My primary functions serving as the CRO is to manage the Debtors' business operations in the optimal manner given the financial constraints facing the Debtors and to assist the Debtors to consummate a going concern sale of their business for the most money possible in the most expeditious manner possible.

9.     Westcliff is the owner and operator of approximately 170 branded and stand-alone patient service center laboratories and STAT labs located throughout California.  The Debtors have approximately 1,000 employees and are currently generating approximately $95 million of annual revenue.  BioLabs does not operate any business and it is my understanding that its only material asset is its 100% equity interest in Westcliff, which is a wholly-owned subsidiary of BioLabs.

10.     The Debtors owe approximately $56 million (the "Senior Debt") to a group of lenders (the "Senior Lenders") for whom GE Business Financial Services, Inc. acts as agent (in such capacity, the "Senior Loan Agent").  It is my understanding that the Senior Debt is secured by a first priority security interest and lien against all or substantially all of the Debtors' assets. Any other secured debt of the Debtors is relatively small in nature and relates to liens against only certain of the Debtors' equipment.    The Debtors also have a substantial amount of unsecured debt.    An Official Committee of Unsecured Creditors (the "Creditors' Committee") has been formed to represent the

1  interests of all unsecured creditors.

2     11. According to the Debtors' books and records, the
Debtors suffered a net loss of approximately $87 million in 2008
(including expenses and write offs of approximately $171 million)
on net revenue of approximately $84 million.    The Debtors
suffered a net loss of approximately $13 million in 2009
(including expenses and write offs of approximately $110 million)
on net revenue of approximately $97 million.

10    12. While I understand the Debtors instituted as many
expense reductions as were reasonably possible, the Debtors'
losses continued. Since the beginning of 2009, the Debtors have
been unable to make any debt service payments to the Senior
Lenders, and the Debtors have been unable to remain current with
their other debt obligations, including payments owing to former
owners of companies the Debtors previously purchased as part of
the Debtors' overall growth strategy.    Indeed, it is my
understanding that the Debtors were only able to survive
financially over the past approximately seventeen months because
the Senior Loan Agent provided the Debtors with emergency funding
to cover payroll and other vital expenses.

24    13. I believe that the only way the Debtors can survive
long-term as a stand alone going concern business would be for
the Debtors to raise many millions of dollars of additional
equity which I believe is not possible given the Debtors' debt

structure. I understand that it became clear to the Debtors in early 2009 that the only viable option available to the Debtors to avoid a shut down of their business and the loss of employment by all of the Debtors' employees would be for the Debtors to sell their business as a going concern to the highest bidder. I understand that the Debtors have therefore been engaged in an active sale process since early 2009.

14. To assist the Debtors with this sale process, the Debtors engaged MTS Health Partners, LP ("MTS") in October, 2009 as a financial advisor to assist the Debtors with their sale process.[10] MTS, working closely with the Debtors, conducted an exhaustive sale process, having prepared detailed sale materials and having had extensive discussions and interactions with numerous prospective buyers, both strategic and financial buyers.

15. After having engaged in substantial due diligence and negotiations with a number of different prospective buyers over the past many months, MTS and the Debtors collectively concluded that Wave Newco, Inc., a wholly-owned subsidiary of Laboratory Corporation of America ("LabCorp"), was the optimal buyer of the Debtors' assets for three primary reasons. First, LabCorp, which is in the same business as Westcliff but is a much larger company, expressed the greatest interest in purchasing the

---

[10] The Debtors had used other professionals for this same purpose in the past.

Debtors' assets. Second, it was clear that LabCorp as a strategic buyer was willing to pay a substantially higher price for the Debtors' assets than any other prospective buyer. Third, LabCorp clearly has the financial means to consummate its purchase of the Debtors' assets.

16. Subject to certain adjustments, LabCorp agreed to pay to the Debtors the sum of $57.5 million for the Purchased Assets, while leaving with the Debtors, among other things, all of the Debtors' accounts receivable (which the Debtors estimate will result in an additional net recovery of approximately $8,000,000 for the Debtors' estates) and all of the Debtors' cash. The Debtors and MTS believe that the purchase price offered by LabCorp is substantially higher than the purchase price that any other buyer would be willing to pay for the Purchased Assets.

17. To make sure that the purchase price being paid by LabCorp was the highest price possible for the Purchased Assets, the Debtors conducted an auction sale of the Purchased Assets following the Court's approval of overbid procedures. No party offered to pay more for the Purchased Assets than LabCorp, which was consistent with the expectations of the Debtors and MTS.

18. The Debtors therefore requested and urged the Court to approve the Debtors' sale of the Purchased Assets to LabCorp on a very expedited basis because of the severe risk of a deterioration of Westcliff's business resulting from the Debtors'

bankruptcy filings.    This is a highly sensitive and extremely competitive industry, and I am concerned that Westcliff may not be able to retain its customer base for any extended period of time while operating as a debtor in bankruptcy.    I therefore concluded that an expedited sale of the Purchased Assets is necessary to avoid immediate and irreparable harm to the Debtors' business, creditors and bankruptcy estates.

19.    As set forth in the Asset Purchase Agreement between the Debtors and LabCorp (the "LabCorp APA"), the purchase price being paid by LabCorp will be adjusted downward if there is a meaningful reduction in Westcliff's post-petition business volume pending the closing of the sale.[11]    Moreover, should that reduction reach the level of a Material Adverse Change[12], LabCorp has the ability to walk away from this transaction completely.    I believe that the risks to the Debtors' estates of failing to close the sale of the Purchased Assets to LabCorp on an expedited basis are therefore severe.    I have no doubt that if the Debtors

---

[11] Purchase Price Decrease Adjustment is defined in the definitional Section of the APA as the product of (a) ((Baseline Volume times 0.95) minus Measurement Period Volume) times (b) $1,202.00.

[12] Material Adverse Change is defined in the definitional Section of the APA as an amount equal to 0.17 or more determined using the following formula: the quotient of (a) (the Baseline Volume minus the Measurement Period Volume); divided by (b) the Baseline Volume.    For purposes of clarification, the Material Adverse Change may be expressed as a percentage equal to or greater than Seventeen Percent (17%).    By way of example, if the Baseline Volume is 9,500 and the Measurement Period Volume is 7,885, then the calculation shall be equal to 0.17 and a Material Adverse Change shall have occurred.

52

are unable to consummate the sale to LabCorp, the Debtors will either be forced to sell their business for substantially less money than LabCorp has offered (which I understand could only occur with the consent of the Senior Lenders and the Court), or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of approximately 1,000 jobs and the decimation of the going concern value of the Debtors' business.

20. At the urging of the Debtors and the Creditors' Committee, the Court approved the Debtors' proposed sale of the Purchased Assets to LabCorp at a hearing held on June 3, 2010, and the Court entered an order approving the Debtors' sale of the Purchased Assets to LabCorp on Wednesday, June 9, 2010 (the "LabCorp Sale Order"). Prior to the sale hearing, the Debtors, the Creditors' Committee and the Senior Lenders reached an agreement on an allocation of the LabCorp purchase price and the balance of the Debtors' assets (the "Asset Allocation Agreement") which was acceptable to all parties.

21. The LabCorp APA requires LabCorp to consummate its purchase of the Purchased Assets within two days following entry of the LabCorp Sale Order, which is Friday, June 11, 2010.

22. Unfortunately, at some point prior to June 11, 2010, the Federal Trade Commission (the "FTC") staff contacted Labcorp and the Debtors to "request information" related to the Debtors'

sale of the Purchased Assets to LabCorp.    The Debtors do not believe that this inquiry made by the FTC staff constitutes a "Proceeding" as that term is defined in the LabCorp APA that give LabCorp any legitimate basis to refuse to close its purchase of the Purchased Assets by Friday, June 11, 2010.

23.    It is my understanding that Quest is the largest participant in the marketplace of the Debtors' business (with significantly more market share than any other party); LabCorp is the second largest participant in the marketplace of the Debtors' business; and Westcliff is the third largest participant in the marketplace of the Debtors' business.    The FTC staff has told the Debtors in phone calls in which I have participated as the Debtors' representative that the FTC staff has concerns about whether a sale to LabCorp would lessen competition.    The FTC staff would not have concerns if the Debtors sold the Purchased Assets to a buyer other than LabCorp or Quest.    However, the FTC staff has told the Debtors in phone calls in which I have participated as the Debtors' representative that they recognize the Debtors' grave financial predicament and dire financial need to consummate a sale of the Purchased Assets on a very expedited basis.

24.    In phone calls in which I have participated as the Debtors' representative, the FTC staff suggested that the Debtors and MTS formulate a sale process to be conducted on a very

expedited basis to see if there are any buyers other than Quest or LabCorp who can consummate a sale quickly with Bankruptcy Court approval. The FTC staff has approved the form of letter (the "New Buyer Solicitation Letter") to be sent to parties who previously submitted a formal written indication of interest in purchasing Westcliff's business or its assets. The FTC staff advised the Debtors in phone calls in which I have participated as the Debtors' representative that if no party other than Quest or LabCorp can satisfy the foregoing, the FTC staff will not challenge the Debtors' sale to LabCorp, which the Court has already approved, and the sale could close immediately.

25. The New Buyer Solicitation Letter provides that prospective new buyers have until 5:00 p.m. Eastern Time on Thursday, June 17, 2010, to submit a written offer to the Debtors for the Purchased Assets and to demonstrate their financial ability to consummate their purchase and to satisfy the conditions of Sections 363 and 365 of the Bankruptcy Code.

26. As requested by the FTC, MTS has advised me that MTS sent the New Buyer Solicitation Letter to all parties who previously submitted a formal written indication of interest in purchasing Westcliff's business or its assets, and MTS (and the Debtors) will facilitate due diligence with all such prospective buyers who desire to conduct due diligence.

55

27. Given the extreme time exigencies in these cases, as the LC APA set an outside closing date of June 23, 2010 and in any event the Debtors risk running out of money, the Debtors requested the Court to schedule a hearing to be held on Friday, June 18, 2010 (or the first possible date thereafter) on this Second Sale Motion. The Court has accommodated the Debtors and has scheduled a hearing on this Second Sale Motion to be held on Friday, June 18, 2010 at 2:00 p.m.

28. The Debtors will not know until the bid deadline of June 17, 2010 at 5:00 p.m. Eastern Time has passed whether any new bids are made for the Purchased Assets and, if any new bids are made, the terms of those bids. If one acceptable bid is made by the bid deadline, the Debtors will request the Court to approve a sale of the Purchased Assets to the Winning Bidder at the hearing on June 18, 2010 at 2:00 p.m. If more than one acceptable bid is made by the bid deadline, the Debtors will conduct an auction sale of the Purchased Assets on June 18, 2010 (either inside the Courtroom or outside the Courtroom with this issue to be determined), and then request the Court to approve the sale of the Purchased Assets to the Winning Bidder at the hearing on June 18, 2010 at 2:00 p.m.

29. It should be noted that the Debtors do not believe that they have the legal ability to sell the Purchased Assets to the New Buyer unless the net sale proceeds enable the Debtors to pay

1  the full approximately $56 million owing to the Senior Lenders or
2  the Senior Lenders consent to that sale.  The Debtors have no way
3  of knowing how the Senior Lenders will respond to the outcome of
4  the auction sale, and the Debtors suspect that the Senior Lenders
5  will not be able to decide whether they will consent to that sale
6
7  until they know the outcome of the auction sale.  The Debtors
8  also have no way of knowing what the outcome of any such new sale
9  would have on the Asset Allocation Agreement reached between the
10 Debtors, the Creditors' Committee and the Senior Lenders, and the
11 Debtors suspect that this will not become known until the parties
12 know the outcome of the auction sale.
13
14     30.  I submit that the facts pertaining to the Debtors'
15 proposed sale of the Purchased Assets to the Winning Bidder
16 substantiate the Debtors' business decision that such
17 contemplated sale serves the best interests of the Debtors'
18 estates and their creditors and merits the approval of the Court
19 (subject to the consent of the Senior Lenders and a resolution of
20 the Asset Allocation Agreement that is acceptable to the Debtors,
21 the Creditors' Committee and the Senior Lenders).
22
23     31.  The Debtors have no ability to survive on any long-term
24 basis without an infusion of additional funds, and I believe that
25 if the Debtors fail to consummate an expedited sale of the
26 Purchased Assets, the Debtors risk running out of money and
27 having to shut down their business and liquidate, which would
28

result in the loss of approximately 1,000 jobs and the decimation of any going concern value of the Debtors' business. I further believe that a liquidation of the Debtors' business would have substantially less value than a going concern sale of the Debtors' business.

32. The Debtors have concluded that proceeding with an expedited sale to the Winning Bidder (subject to the consent of the Senior Lenders and a resolution of the Asset Allocation Agreement that is acceptable to the Debtors, the Creditors' Committee and the Senior Lenders) is in the best interests of their estates and their creditors. I therefore submit that the Debtors' proposed sale is justified by sound business purposes.

33. I am advised that in connection with the filing of this Second Sale Motion, the Debtors will serve notice of this Second Sale Motion on the Creditors' Committee, the Senior Lenders, the UST, the FTC, the Debtors, and those parties who have filed a request for special notice.

34. I believe that this second sale process undertaken by the Debtors (with the assistance of MTS) is in conformity with that which the FTC requested of the Debtors and is designed to insure that the highest price possible is obtained for the Purchased Assets, under the Debtors' current circumstances. MTS is a highly experienced professional which has assisted and advised the Debtors throughout this sale process. All interested

and viable buyers will be provided with equal access to the Debtors and their financial information and will therefore have the same opportunity to become the Winning Bidder. I therefore submit that the result of the auction sale will be the highest and best price available to be paid for the Purchased Assets at this time under the Debtors' current circumstances, recognizing that LabCorp and Quest (the Debtors' two largest competitors) are not participating in this second sale process.

35. None of the prospective buyers who may become the Winning Bidder that I am aware of is an "insider" of the Debtors or has received any special treatment from the Debtors or from MTS. I am not aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Additionally, I anticipate that any sale agreement with any such Winning Bidder will be negotiated at arm's length with all parties involved acting in good faith. Based on the foregoing, I submit that the Court should find that the Winning Bidder is a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

36. As previously indicated, the Debtors do not believe that they have the legal ability to sell the Purchased Assets to the Winning Bidder free and clear of the Encumbrances of the Senior Lenders unless the Senior Lenders consent to the sale. As a result, following the conclusion of the auction sale, the

1  Debtors will request the Court to approve the sale of the
2  Purchased Assets to the Winning Bidder in accordance with the
3  terms of the highest and best bid made at the auction sale on the
4  condition that the Senior Lenders consent to the sale and a
5
6  resolution of the Asset Allocation Agreement is reached that is
7  acceptable to the Debtors, the Creditors' Committee and the
8  Senior Lenders.

9      37.  Other than the liens asserted by the Senior Lenders,
10 the only other liens which I believe might exist against any of
11 the Purchased Assets are those asserted by certain equipment
12 lenders.  In particular, pre-petition, the Debtors entered into a
13 number of lease agreements with equipment providers, which are
14
15 not "true leases," but rather, leases intended as security (i.e.,
16 secured financing transactions).  Typically, these agreements
17 provide for the Debtors to purchase the affected equipment at the
18 end of the lease terms with no or nominal additional
19 consideration.

20     38.  The Debtors' books and records show that there are
21 eight (8) leases which were intended as security, which have an
22
23 aggregate unpaid balance of approximately $522,853.67.  It is my
24 understanding that Six (6) of these secured equipment lenders
25 recorded UCC financing statements with the California Secretary
26 of State purporting to perfect their security interests and liens
27 upon their respective equipment.  It is my understanding that
28

60

these eight (8) purported secured equipment lenders (collectively, the "Equipment Lenders") and the unpaid balances owed to these Equipment Lenders are summarized as follows:

| Equipment agreement | Unpaid balance |
|---|---|
| 1. Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087153046125 recorded with the California Secretary of State on April 7, 2008. | $72,787.27 |
| 2. Liens asserted by Leasing Associates of Barrington with regard to property covered by UCC financing statement file number 20087163605844 recorded with the California Secretary of State on July 1, 2008 | $62,004.97 |
| 3. Liens asserted by Jules & Associates, Inc. with regard to property covered by UCC financing statement file number 20087142579518 recorded with the California Secretary of State on January 7, 2008. | $116,936.92 |
| 4. Liens asserted by M&I Marshall & Ilsley Bank with regard to property covered by UCC financing statement file number 20067087720380 recorded with the California Secretary of State on October 10. 2006. | $41,440.30 |
| 5. Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998664 recorded with the California Secretary of State on August 18, 2006. | $128,455.89 |
| 6. Liens asserted by Norlease, Inc. with regard to property covered by UCC financing statement file number 20067081998785 recorded with the California Secretary of State on August 18, 2006. | $99,747.30 |
| 7. Liens asserted by Baytree Leasing (with regard to Lease No. 2953 pertaining to a Dade Behring Dimension Xpand HM Plus Analyzer) – NO UCC financing statement recorded by Baytree Leasing with respect to this property. | $116,170 |
| 8. Liens asserted by Americorp/ACL Elite (with regard to an ACL Elite Coagulation | $31,900 |

| System) - NO UCC financing statement recorded by Americorp/ACL Elite with respect to this property. | |
|---|---|
| TOTAL | $522,953.67 |

39.  To the extent the Winning Bidder wishes to have the Purchased Assets include any of the equipment which is secured by the liens of the Equipment Lenders, the Debtors will seek to have the sale order provide that the liens of those Equipment Lenders whose equipment is included in the Purchased Assets will attach to the net sale proceeds to be received by the Debtors in the same validity and priority and subject to the same defenses and avoidability, if any, as before the sale closing.  The Debtors reserve all of their rights and claims with respect to any liens and claims asserted by the Equipment Lenders.

40.  Other than the liens of the Senior Lenders and those of the Equipment Lenders, all of which are being satisfied in the manner described above, I am not aware of the existence of any other Encumbrances against the Purchased Assets.  If any other Encumbrances do exist, the Debtors will seek to have the sale order provide for all such liens to attach to the proceeds of the sale in the same validity and priority and subject to the same defenses and avoidability, if any, as before the closing.

41.  In connection with any sale closing, the Debtors will seek to assume and assign to the Winning Bidder any unexpired leases and executory contracts of the Debtors which the Winning

62

Bidder wishes to have assigned to it. The Debtors will work with the Winning Bidder and the Court to arrive at a mutually acceptable procedure to accomplish the foregoing, given that the Debtors do not know at this time the identity of the Winning Bidder or the terms of its winning bid.

42. It is my expectation that in connection with the Debtors' assumption and assignment to the Winning Bidder of executory contracts and unexpired leases, the Winning Bidder will be deemed to have assumed any on-going liabilities and obligations in connection with all such executory contracts and unexpired leases, and the Debtors will be responsible for the payment of all cure costs identified on Exhibit "1" hereto (subject to any further ruling of the Court).

43. It is also my expectation that, to the extent necessary, the Winning Bidder will provide any other parties to any such assumed and assigned executory contracts and unexpired leases who request in writing such financial information as is reasonably required to enable the Winning Bidder to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all such executory contracts and unexpired leases.

44. Prospective bidders at the auction sale will be required to provide as part of their bid package, evidence demonstrating that they can provide adequate assurance of future

63

performance as required by Section 365 of the Bankruptcy Code with respect to any unexpired leases and executory contracts that they wish to have assigned to them if they are the Winning Bidder.

45.   In connection with this Second Sale Motion, the Debtors are requesting an order of the Court providing that all of the Debtors' executory contracts and unexpired leases which are not assumed and assigned to the Winning Bidder be deemed rejected as of the sale closing date, subject to any changes made by the Debtors in subsequent pleadings to be filed with the Court.

46.   For all of the reasons set forth above, I believe that it is critically important that the Debtors and the Winning Bidder be permitted to consummate the closing of their sale transaction as soon after entry of the sale order as possible. In order to facilitate the most expeditious sale closing possible, the Debtors request that any order approving the sale of the Purchased Assets and the Debtors' assumption and assignment of executory contracts and unexpired leases be effective immediately upon entry by providing that the fourteen-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are waived.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

64

1    Executed on this 14th day of June, 2010, at Santa Ana,

2    California.

3

4    MATTHEW PAKKALA, Declarant

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

**Schedule 2.4(a)-1**

**Assumed Contracts and Assumed Leases**

To be updated at Closing, pursuant to Section 2.4 of the Agreement.

Schedule C of these Disclosure Schedules is hereby incorporated by reference.

Commercial Contracts:

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| Mckesson Information Solutions | 3/1/3010 | 2/28/2011 | HLAB SystemCare Services | | 2UX7260097 | 93,144.03 |
| Mckesson Information Solutions | 3/1/3010 | 2/28/2011 | HLAB Software Maintenance Fee | | 2UX7260091 | |
| Mckesson Information Solutions | 3/1/3010 | 2/28/2011 | HLAB SystemCare Services | | 2UX7260093 | |
| Mckesson Information Solutions | 3/1/3010 | 2/28/2011 | HLAB Interface Manager Oracle License | | 2UX7260092 | |
| Xifin | 1/1/2010 | 12/31/2011 | Billing System – Accounts Receivable System | | N/A | |
| Mckesson Information Solutions | 8/28/2009 | 8/28/2014 | Horizon Anatomic Pathology Services | | See above | |
| Mckesson Information Solutions | 8/28/2009 | 9/30/2010 | Horizon Anatomic Pathology Services - Beta Testing | | See above | |
| Mckesson Information Solutions | | 9/30/2010 | Horizon Anatomic Pathology Services - Beta Testing | | See above | |

Real Property Leases:

| Address | City | Zip | Cure Amount |
|---|---|---|---|
| 29501 Canwood St., Ste. 110 | Agoura Hills | 91301 | 0 |
| 26671 Aliso Creek Rd, #100 | Aliso Viejo | 92656 | 0 |
| 3400 Ball Rd., Suite 104 | Anaheim | 92804 | 0 |
| 16049 Tuscola #C | Apple Valley | 92307 | 0 |
| 18522 Highway 18 | Apple Valley | 92307 | 0 |
| 19341 Bear Valley Rd. , Ste. 102 | Apple Valley | 92344 | 0 |
| 624 W. Duarte Rd. #206 | Arcadia | 91007 | 0 |
| 3550 "Q" Street, Suite 102 | Bakersfield | 93309 | 0 |
| 500 S. 7th St., Ste D. | Barstow | 92311 | 0 |
| 701 Highland Springs Rd., #3 | Beaumont | 92223 | 0 |
| 421 N. Rodeo Drive | Beverly Hills | 90210 | 0 |
| 9401 Wilshire Blvd., Ste. 515, | Beverly Hills | 90212 | 0 |
| 8641 Wilshire Blvd., Ste. 220 | Beverly Hills | 90211 | 0 |
| 9735 Wilshire Blvd, #219/233--90212 | Beverly Hills | 90212 | 0 |
| 2275 Las Posas Rd. | Camarillo | 93012 | 0 |
| 374 "H" St., Ste. 103 | Chula Vista | 91910 | 0 |
| 1293 W. 6th St.- | Coachella | 92336 | 0 |
| 900 S. Main, Suite 207 | Corona | 92882 | 0 |
| 1650 Adams Avenue--92626 | Costa Mesa | 92626 | 0 |
| 3831 Hughes Ave. #600B | Culver City | 90323 | 0 |
| 4340 Overland Ave | Culver City | 90323 | 0 |
| 227 E. Lexington | El Cajon | 92020 | 0 |
| 750 E. Grand Ave. | Escondido | 92025 | 0 |
| 1241 E. Hillsdale Blvd. | Foster City | 94404 | 0 |
| 9940 Talbert Ave #303 | Fountain Valley | 92708 | 0 |
| 10900 Warner #114 | Fountain Valley | 92708 | 0 |
| 11100 Warner Ave., #160 | Fountain Valley | 92708 | 0 |
| 2287 Mowry Ave. Suite A | Fremont | 94538 | 0 |
| 3004 N. Fresno St. | Fresno | 93711 | 0 |
| 1095 E. Warner St., 103 | Fresno | 93710 | 0 |
| 7131 N. Eleventh, Ste. 103 | Fresno | 93720 | 0 |
| 1383 Herndon Ave., , Ste 105-B | Fresno | 93720 | 0 |
| 1125 E. Spruce Ave., Ste 201 | Fresno | 93720 | 0 |
| 1950 Sunny Crest Dr., #1800 | Fullerton | | 0 |
| 1510 S. Central Ave. #520 | Glendale | 91204 | 0 |
| 210 S. Grand Ave. #220 | Glendora | 91741 | 0 |
| 869 W. Lacey Blvd. | Hanford | 93230 | 0 |
| 1251 W. Tennyson Rd., Ste. 1 | Hayward | 94544 | 0 |
| 1288 E. Latham Ave. | Hemet | 92543 | 0 |

| | | | |
|---|---|---|---|
| 17450 Main Street, Ste. C | Hesperia | 92345 | 0 |
| 17822 Beach #242 --92647 | Huntington Beach | 92647 | 0 |
| 19582 Beach Blvd, #117 | Huntington Beach | 92648 | 0 |
| 18821 Delaware #105 | Huntington Beach | 92648 | 0 |
| 81-880 Dr. Carreon #B-104 | Indio | 92201 | 0 |
| 81-767 Dr. Carreon, Ste. 204 | Indio | 92201 | 0 |
| 501 E.Hardy, Suite 150 | Inglewood | 90301 | 0 |
| 4724 Barranca Pkwy.--92604 | Irvine | 92604 | 0 |
| 4870 Barranca #290--92604 | Irvine | 92604 | 0 |
| Bld 3, 5565 Grossmont Ctr. Ste. 352 | La Mesa | 91910 | 0 |
| 43860 N. 10th Street | Lancaster | 93534 | 0 |
| 44725 N. 10th St W, Suite 240 | Lancaster | 93534 | 0 |
| 1672 West Ave. "J" | Lancaster | 93534 | 0 |
| 43839 N. 15th St. W | Lancaster | 93534 | 0 |
| 3939 Atlantic Ave., #205 | Long Beach | 90807 | 0 |
| 4425 S. Central Ave. | Los Angeles | 90011 | 0 |
| 15251 National Ave. #107 | Los Gatos | 95032 | 0 |
| 360 Dardanelli Ln., Ste. 1E | Los Gatos | 95032 | 0 |
| 27800 Medical Ctr Rd., #118 | Mission Viejo | 92691 | 0 |
| 26800 Crown Valley Pky, Ste. 360 | Mission Viejo | 92691 | 0 |
| 26732 Crown Valley Parkway #443 | Mission Viejo | 92691 | 12900.00 |
| 605 E. Huntington Dr.,Ste. 209,--91016 | Monrovia | 91016 | 0 |
| 12730 Heacock, | Moreno Valley | 92553 | 0 |
| 2500 Hospital Drive, Bld. 7, | Mountain View | 94040 | 0 |
| 25405 Hancock Ave, #106 | Murrieta | 92562 | 0 |
| 24400 Jackson Drive, Suite B | Murrieta | 92562 | 0 |
| 558 N. Ventu Park Road--91360 | Newbury Park | 91360 | 0 |
| 307 Placentia #102 and 101 | Newport Beach | 92663 | 0 |
| 1401 Avocado, #208 | Newport Beach | 92660 | 0 |
| 1601 Avocado Avenue, Suite #101 | Newport Beach | 92660 | 0 |
| 415 Old Newport Blvd. Suite 101 | Newport Beach | 92646 | 0 |
| 360 San Miguel #103 | Newport Beach | 92660 | 0 |
| 1501 Superior #110 | Newport Beach | 92663 | 0 |
| 320 Superior Ave.-#200 | Newport Beach | 92663 | 0 |
| 20162 S. W. Birch Street | Newport Beach | 92660 | 0 |
| 361 Hospital Rd. #222, | Newport Beach | 92663 | 0 |
| 3300 Webster St., Ste. 107 | Oakland | 94609 | 0 |
| 1234 W. Chapman Ave., Suite 101 | Orange | 92868 | 0 |
| 1310 W. Stewart Dr. | Orange | 92868 | 0 |
| 705 W La Veta Avenue, Suite 102 | Orange | 92868 | 0 |
| 1701 Solar Dr. #190 | Oxnard, CA | 93030 | 0 |
| 555 E. Tachevah Rd. Bldg 2 E., 201 | Palm Springs | 92262 | 0 |
| 1100 North Palm Canyon Drive, Suite 207 | Palm Springs | 92262 | 0 |
| 41210 11th St. W. Ste. I & E | Palmdale | 93551 | 0 |
| 2260 E. Palmdale Blvd | Palmdale | 93534 | 0 |

| | | | |
|---|---|---|---|
| 126 Avocado Ave. | Perris | 92571 | 0 |
| 3936 Phelan Rd., Unit F4 | Phelan | 92371 | 0 |
| 590 W Putman Ave | Porterville | 93257 | 0 |
| 355 Terrcina, Ste. B | Redlands | 92373 | 0 |
| 3975 Jackson St, #104 | Riverside | 92503 | 0 |
| 6927 Brockton Ave., Ste. 1B | Riverside | 92506 | 0 |
| 550 Deep Valley Dr., Ste. 319 | Rolling Hills Est | 90274 | 0 |
| 22032 El Paseo, #100 | RSM | 92688 | 0 |
| 2020 Waterman #A,B,C,D,E,F & G, | S.B. | 92404 | 0 |
| 7275 E. Southgate #101 | Sacramento | 95823 | 0 |
| 1326 Natividad Rd., Suite A | Salinas | 93906 | 0 |
| 1906 Commercenter E. , Ste. 202 | San Bernardino | 92123 | 0 |
| 2124 N. Waterman Ave.--Parking Lot | San Bernardino | 92404 | 0 |
| 2970 5th Avenue #140 | San Diego | 92103 | 0 |
| 1081 Market Place, Ste. 400 | San Ramon | 94583 | 0 |
| 1821 E. Dyer Road | Santa Ana | 92705 | 0 |
| 225 W Pueblo Street Ste. #C | Santa Barbara | 93108 | 0 |
| 801 E. Chapel St., Ste. 6 | Santa Maria | 93454 | 0 |
| 1145 E. Clark Avenue, Ste. A | Santa Maria | 93455 | 0 |
| 1450 Tenth Street- #406 | Santa Monica | 90405 | 0 |
| 1304 15th Street- #103 | Santa Monica | 90405 | 0 |
| 1633 Erringer Rd., Ste. 201B | Simi Valley | 93065 | 0 |
| 5525 Etiwanda Ave., Ste. 304 | Tarzana | 91356 | 0 |
| 44274 George Cushman Ct, suite 104 | Temecula | 92592 | 0 |
| 27450 Ynex Rd., #110-C | Temecula | 92591 | 0 |
| 31493 Rancho Pueblo, Unit 4 | Temecula | 91361 | 0 |
| 425 Haaland Dr., Ste. 106 | Thousand Oaks | 91301 | 0 |
| 23441 Madison St. #110 | Torrance | 90510 | 0 |
| 4201 Torrance Blvd, #240 | Torrance | 90503 | 0 |
| 1217 N. Cherry | Tulare | 93274 | 0 |
| 13422 Newport Avenue- Ste. H | Tustin | 92780 | 0 |
| 100 N. Tustin Avenue | Tustin | 92780 | 0 |
| 1330 San Bernardino Rd, #H | Upland | | 0 |
| 2961 Loma Vista Rd. | Ventura | 93003 | 0 |
| 12332 Hesperia Rd. | Victorville | 92395 | 0 |
| 12677 Hesperia Rd., Ste. 170 | Victorville | 92395 | 0 |
| 205 S. West St. , Ste. F | Visalia | 93291 | 0 |
| 1135 S. Sunset Ave., 316 | West Covina | 91790 | 0 |
| 7325 Medical Center Dr., Ste. 208 | West Hills | 91307 | 0 |
| 32144 Agoura Rd. No. 202 | Westlake Village | 91362 | 0 |
| 36320 Inland Valley Drive | Wildomar | 92595 | 0 |
| 34845 Yucaipa Boulevard, Ste. B | Yucaipa | 92399 | 0 |
| 56994 29 Palms Hwy, Unit B | Yucca Valley | 92284 | 0 |

**IPA Locations not assocated with a leased facility**

| | | | | Cure Amount |
|---|---|---|---|---|
| WV5 | 4580 Caifornia Avenue | Bakersfield | 93309 | 0 |
| WV6 | 3400 Calloway Drive Bldg 400 | Bakersfield | 93312 | 0 |
| WV7 | 5601 Auburn St, Suite A | Bakersfield | 93306 | 0 |
| IPA | 4308 Birch St | Lake Isabella | 93240 | 0 |

## Schedule 2.4(a)-2

## Potential Subsequent Designated Contract

To be updated at Closing, pursuant to Section 2.4 of the Agreement.

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| LABarrington | 3/9/2007 | 3/8/2012 | Biotest Tango Blood Bank Analyzers(2) | #3 | 9142400246 | 2,019.50 |
| Siemens | 12/1/2009 | 11/30/2014 | Advia Centuar System | #2 | 9142400211 | 787,915.01 |
| | | | | 1 | 1670 | |
| | | | | 2 | 3363 | |
| | | | | 3 | IRL44600420 | |
| | | | | 4 | IRL58610627 | |
| | | | | 5 | IRL57140630 | |
| | | | | 6 | IRL98120937 | |
| | | | | 7 | IRL96150938 | |
| Beckman Coulter | Unknown | | ACL-Elite Coagulation System | | #1051286, #6080187,# 0609217, #06090224, #06080212, #06050156 | 71,439.97 |
| Beckman Coulter | Unknown | | ACL Top Hemostasis System | | 1072238 | |
| Beckman Coulter | Unknown | | 6 items Starting with Cytomics FC 500 and ending with TQ Prep Workstation | Entire System | | |
| Beckman Coulter | Unknown | | ACL Elite Coagulation System | | 504518 #1051286, #6080187,# 0609217, #06090224, #06080212, #06050156 | |
| Beckman Coulter | Unknown | | 13 items Starting with PT FIB Kit and ending with Cleaning Agent B 1X50 ML | | Reagents | |
| Specialty Laboratories | 5/1/2007 | 4/30/2010 | Lab Services Agreement | | N/A | 1,338,599.00 |

72

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| Becton Dickinson | 1/9/2007 | 1/9/2012 | Bactec 9240 | | | 104,159.99 |
| Becton Dickinson | 1/10/2007 | 1/10/2007 | Media | | DB6021 | |
| BioMerieux | 10/4/2007 | 10/3/2008 | Vitek | | reagents | 112,314.31 |
| | | | | VITEK 1 | 5180028B | |
| | | | | VITEK 1 - READER #3 | DCSA 6741 | |
| | | | | VITEK 1 - READER #1 | DCSA 1843 | |
| | | | | VITEK 1 - READER #2 | DCSA 6356 | |
| | | | | VITEK SEALER #1 | SPSA 1574 | |
| | | | | VITEK 2 | W0419R | |
| | | | | VITEK 2 - READER #1 | DCSA 5484 | |
| | | | | VITEK 2 - READER #2 | DCSA 6127 | |

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| | | | | VITEK 2 - READER #3 | DCSA 6549 | |
| Bio-Rad Laboratories | 12/1/2006 | 11/30/2006 | Equipment rental and service | VITEK SEALER #2 | SPSA 3393 | 43,901.44 |
| | | | | Ewoi | 9163700368 | |
| Biotest(Supplier) | | | Reagents assockated with above | PR2100 | 306C0998259 | 21,612.70 |
| Blood Source | 3/1/2010 | 2/28/2011 | Donor testing lab | | reagents | 0.00 |
| Diasorin | 3/30/2009 | 3/30/2012 | Liason | | send-out lab | 334,868.76 |
| Diasorin | 12/21/2006 | 12/21/2009 | Liason | | 2229003196 | |
| Enterprise | | | | | 2229001812 | 48,876.58 |
| Hologic | 11/1/2007 | 10/31/2012 | Rental of the ThinPrep 2000 Processor, ThinPrep 3000 Processor, Imagers and purchase of corresponding kits | | N/A Thin Prep 2000 Processor- Units #A-05618, #B-06235, #C-07616, #1-07016, #2-06741, #3-07287, #4-006652 Thin Prep 3000 Processors #1-80130H03A0, #2-60214.06C0 Imagers-#1-20239B05A1, #2-20281E05C1, #320234B05A1, #4-20211A05D1,#5- | 341,736.31 |

74

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| | | | | | 20236B05A1 | |
| LABarrington | 6/24/2008 | 6/23/2013 | Immulate 2000 | | | above |
| LABarrington | 3/6/2008 | 3/5/2013 | ADIVA 1200 (Spruce Ave) | | M5095 | above |
| Phadia | 10/31/2007 | 10/31/2013 | ImmunoCap 250-1000 | | CA12260074 | 181,786.59 |
| | | | | 250 | N00503 | |
| Qiagen | 8/28/2009 | 8/28/2011 | HPV | 1000 | N00220 | 250,334.68 |
| Roche | 9/30/2006 | 9/29/2011 | Modular(2) | | 4008 | 709,272.22 |
| | | | | ISE-2 | 1540-17 | |
| | | | | D2-2 | 1573-06 | |
| | | | | D5-2 | 2032-03 | |
| | | | | P2-2 | 1656-19 | |
| | | | | P4-2 | 1842-06 | |
| | | | | ISE-4 | 1968-17 | |

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| | | | | D3-4 | 2032-02 | |
| | | | | D4-4 | 2031-05 | |
| | | | | P3-4 | 1842-05 | |
| | | | | P6-4 | 1988-16 | |
| | | | | ISE-3 | 0229-04 | |
| | | | | P800 | 1830-05 | |
| Roche | 8/1/2006 | 8/1/2011 | Taqman | E170 | 1989-20 | |
| Roche | 8/1/2006 | 8/1/2011 | Amplicor | | 3223 | |
| | | | | 1 | 395344 | |
| | | | | 2 | 395342 | |
| | | | | 3 | 394975 | |
| | | | | 4 | 396609 | |

| Supplier | Effective Date 8/1/2006 | End Date 8/1/2011 | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| Roche | | | Lightcycler | | 1415832 | |
| Roche | 10/30/2008 | 10/29/2011 | Taqman | | 2161 | 767,915.61 |
| Siemens | 9/6/2006 | 9/5/2011 | Advia Urinalysis Workcell System | | 110672 | |
| | | | | BAYER ATLAS SYSTEM | 110894 | |
| | | | | BAYER ATLAS SYSTEM | 110675 | |
| | | | | BAYER ATLAS SYSTEM | A1242 | |
| | | | | BAYER UF-100 SYSTEM | A1249 | |
| | | | | BAYER UF-100 SYSTEM | A1243 | |
| | | | | BAYER UF-100 SYSTEM | | |
| Siemens | 3/5/2007 | 3/5/2012 | Immulite(System 340) | | #3456 | |
| Siemens | 11/29/2005 | 11/28/2010 | Advia 1200's (8 (Stat Labs x 6 and Lab x2) | 1 | CA12260074, CA12230041, CA12240074, CA12220078, CA12220077, CA12230039 | |
| Siemens | 8/10/2006 | 8/9/2011 | Advia 120 and 2120 x 5 | 2 | 36710420 | |
| | | | | | 28880224 | |

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| | | | | 3 | 11490629 | |
| | | | | 4 | 11510629 | |
| Tripath | 5/29/2008 | 5/29/2011 | GYN-Surepath | 5 | IR04230929 Prep Stain #1- 050822006, #2- 050602002001 Vortexer #1-050822006, #2- 050602002001 Centrifuge #1- 307100065, #2- 003306-02-00 Prep Mate - #1-1129, #2- 2076R | 174,633.48 |
| Tripath | 1/18/2008 | 1/18/2012 | Imager | | | |
| Mechatronics | 12/1/2009 | 11/30/2010 | Call center services agreement | 1 | #0356 | 2,247.27 |
| | | | | 2 | 96122074 | |
| AT&T Cell Services | | | | | 96122072 | 171,362.87 |
| AT&T Data Center | 2/11/2008 | 3/31/2011 | Space & Power rental - Irvine Data Center | | N/A | |
| AT&T Data Circuits | | | | | N/A | |
| AT&T Land Lines (Convergent) | | | | | N/A | |
| | | | | | N/A | |

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple Instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| Atlas Corporation | 12/16/2008 | on-going | Labworks client results review | | | 62,305.47 |
| Atlas Corporation | 8/28/2003 | on-going | PSC & client-based orders/results | | N/A | |
| Atlas Corporation | | | EMR Interface Services - Development | | N/A | |
| Atlas Corporation | 8/21/2009 | | eprescribing Module | | N/A | |
| Atlas Corporation | | | EMR Interface Services - Maintenance | | N/A | |
| Dynamic Services | 1/1/2010 | 12/31/2010 | Barcode printer maintenance for HLAB devices | | N/A | 9,453.96 |
| Elekta | 1/1/2010 | 12/31/2010 | Monrovia PowerPath maintance | | N/A | 0.00 |
| IronMountain | | | Offsite storage | | N/A | 1,793.61 |
| LifePoint | 5/6/2009 | | EMR Interface Services - Development | | N/A | 24,500.00 |
| LifePoint | 5/6/2009 | | EMR Interface Services - Maintenance | | N/A | |
| Mark Sires Consulting | | | Cache' Maintenance | | N/A | |
| OptiSource | | | Data Archiving | | N/A | 150.00 |
| | | | | | N/A | |

79

| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| Pacific Blue Micro (PBM) | 9/1/2008 | 8/31/2010 | Network Monitoring | | N/A | 29,491.00 |
| Pacific Blue Micro (PBM) | 1/1/2010 | 12/31/2010 | CISCO Smartnet Warranty | | N/A | |
| Pacific Blue Micro (PBM) | 1/1/2010 | 12/31/2010 | CISCO Unity Software Support | | N/A | |
| Software One (Microsoft reseller) | 8/3/2008 | 8/3/2011 | Microsoft enterprise licenses | | N/A | 33,433.44 |
| Sprint / Nextel Cell Services | | | | | 1-IVYG58 | 7,957.82 |
| The Spider | | | Website Host | | N/A | 4,000.00 |
| Toshiba / Docuware | 7/1/2009 | 7/1/2010 | | | N/A | 15,051.00 |
| Verizon Cell Services | | | | | N/A | 24,589.86 |
| Verizon Client | | | | | N/A | |
| Verizon Land Lines | | | | | N/A | |
| VL Systems | | | Active Directory / Email Migration | | N/A | |
| VL Systems | | | Sales Support Application Consolidation | | N/A | 16,477.50 |
| | | | | | N/A | |



| Supplier | Effective Date | End Date | Equipment Detail | Sub-components or multiple instruments | Serial Number | Cure Amount (Total Amounts by Supplier) |
|---|---|---|---|---|---|---|
| Hologic | 1/1/2006 | 12/31/2009 | The Fetal Fibronectin Test | | 3887 | |

Real Property Leases:

| Address | City | Zip | Cure Amount |
|---|---|---|---|
| 51 N. Fifth Ave., #301 | Arcadia | 91006 | 0 |
| 99 N. La Cienega Blvd., Ste. 203 | Beverly Hills | 90211 | 0 |
| 2006 Durfee Ave. | El Monte | 91733 | 0 |
| 317 N. El Camino Real #105 | Encinitas | 92023 | 0 |
| 650 Mowry Avenue | Fremont | 94539 | 0 |
| 302 Fresno St., #107 | Fresno | 93706 | 0 |
| 44105 15th Street W,  204 | Lancaster | 93534 | 0 |
| 1753 W. Avenue "J" | Lancaster | 93534 | 0 |
| 24022 Calle de la Plata, #485 | Laguna Hills | 92653 | 0 |
| 10861 Cherry St, #307 | Los Alamitos | 90720 | 0 |
| 8540  S. Sepulveda Blvd., Ste. 107 | Los Angeles | 90045 | 0 |
| 501 E. Almond Ave., Ste. 113 | Madera | 93637 | 0 |
| 26732 Crown Valley Parkway #572 | Mission Viejo | 92691 | 0 |
| 25460 Medical Ctr. Dr., Ste. 100 | Murrieta, CA | 92562 | 0 |
| 2400 E. 8th Street | National City | 91950 | 0 |
| 320 Superior #320 | Newport Beach | 92663 | 0 |
| 3300 W. Coast Highway | Newport Beach | 92663 | 2,500.00 |
| 1120 W. La Veta Ave.-#150 | Orange | 92668 | 0 |
| 971 W. 7th St., Ste. C | Oxnard | 93030 | 0 |
| 73-211 Fred Waring Dr. Ste 101 | Palm Desert | 92260 | 0 |
| 55 E. California-3rd Floor | Pasadena | 91105 | 0 |
| 1568 N. Orange Grove | Pomona | 91767 | 0 |
| 1902 Royalty Dr., Ste. 140 | Pomona | 91767 | 0 |
| 729 Sunrise Ave., #800 | Roseville | 95661 | 0 |
| 4600 47th Ave. #115 | Sacramento | 95824 | 0 |
| 675 Camino de los Mares, Ste. 302 | San Clemente | 92673 | 0 |
| 1855 First Ave #200-B | San Diego | 92101 | 0 |
| 4045 Third Ave #202 | San Diego | 92103 | 0 |
| 2645 Ocean Ave. #201 | San Francisco | 94132 | 0 |
| 2380 Montpelier Dr., Ste. 400 | San Jose | 95116 | 0 |
| 2581 Samaritan Drive, Suite 200 | San Jose | 95121 | 0 |
| 2039 Forest Ave., #303 | San Jose | 95128 | 0 |
| 2512 Samaritan Ct Ste. R, | San Jose | 95128 | 0 |
| 27994 Bradley Rd., Ste. C | Sun City | 92586 | 0 |
| 29798 Haun Rd., Ste. 102 | Sun City | 92568 | 0 |
| 500 E. Remington Dr., #18 | Sunnyvale | 94087 | 0 |
| 27699 Jefferson, #210B | Temecula | 92590 | 0 |
| 8135 S. Painter Ave.-#204 | Whittier | 90602 | 0 |

**IPA Locations not associated with a leased facility**　　　　　　　　　　**Cure Amount**

　　　　　IPA　　1400 South Grand Avenue, Suite 700　　Los Angeles　　90015

| | |
|---|---|
| In re:<br>WESTCLIFF MEDICAL LABORATORIES, INC.<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER Lead Case No. 8:10-bk-16743-TA<br>Jointly Administered with Case No. 8:10-bk-16746-TA |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as DEBTORS' SECOND MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS (EXCLUDING CASH AND ACCOUNTS RECEIVABLE) FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS; (2) APPROVING OF DEBTORS' ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MATTHEW PAKKALA IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On June 14, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Todd M Arnold    tma@lnbrb.com
- Richard L Barnett    rick@barnettrubin.com, rlbsec@barnettrubin.com
- Ron Bender    rb@lnbrb.com
- Jennifer Witherell Crastz    jcrastz@hemar-rousso.com
- Carol J Fogleman    mfrost@bwslaw.com
- John-patrick M Fritz    jpf@lnbrb.com
- Jeffrey K Garfinkle    bkgroup@buchalter.com, jgarfinkle@buchalter.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Michael J Heyman    michael.heyman@klgates.com
- Mark D Houle    mark.houle@pillsburylaw.com
- Andy Kong    Kong.Andy@ArentFox.com
- Rodger M Landau    rlandau@lgbfirm.com, kmoss@lgbfirm.com
- Michael B Lubic    michael.lubic@klgates.com
- Aram Ordubegian    ordubegian.aram@arentfox.com
- Justin E Rawlins    jrawlins@winston.com, docketla@winston.com
- Jacqueline L Rodriguez    jlr@lnbrb.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Sharon Z Weiss    sharon.weiss@hro.com

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On June 14, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**See Attached Service List-All Entities Served Via Federal Express**

☒ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:<br>WESTCLIFF MEDICAL LABORATORIES, INC. | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER Lead Case No. 8:10-bk-16743-TA<br>Jointly Administered with Case No. 8:10-bk-16746-TA |

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 14, 2010, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**Please See Attached Email Service List**

☒  Service information continued on attached page

Via Attorney Service
The Hon. Theodor C. Albert
United States Bankruptcy Court
411 West Fourth Street
Santa Ana, CA 92701

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 14, 2010 | John Berwick | /s/ John Berwick |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                                            F 9013-3.1

In re Westcliff Medical Laboratories
File Prospective Buyers on 2nd Sale
Motion

Mr. David Schultz, CEO
Sonic Healthcare USA
9737 Great Hills Trail, Suite 100
Austin, TX 78759

Mr. Brian Miller, Partner
Linden LLC
111 S. Wacker Drive, Suite 3350
Chicago, IL 60606

Mr. Eric Lev, Principal
Water Street Healthcare Partners
333 West Wacker Drive
Suite 2800
Chicago, IL 60606

Mr. Sean Traynor, General Partner
Welsh, Carson, Anderson & Stowe XI,
L.P.
320 Park Avenue, Suite 2500
New York, NY 10022

Nathan A. Schultz, Esq.
Greenberg Traurig, LLP
2450 Colorado Avenue
Suite 400E
Santa Monica, CA 90404

Adam J. Reiss
ROPES & GRAY LLP
T +1 212 841 0650 | F +1 646 728 1645
1211 Avenue of the Americas
New York, NY 10036-8704

Gregory R. Metz
ROPES & GRAY LLP
T +1 312 845 1327 | F +1 312 845 5532
111 South Wacker Drive, 46th Floor
Chicago, IL 60606

In re Westcliff Medical Laboratories
File No. 4367
Creditor Committee

SPECIALTY LABORATORIES
Attn: Sharon Z. Weiss
Holes Roberts & Owen LLP
800 W. Olympic Blvd., 4th Floor
Los Angeles, CA 90015-1367

SIEMENS HEALTHCARE
DIAGNOSTICS
Attn: Yesim Brisbane
P.O. Box 6101, MS 802
Newark, DE 19714-6101

ROCHE DIAGNOSTICS
CORPORATION
Attn: Wayne Mathias
9115 Hague Road
Indianapolis, IN 46250

DIASORIN INC.
Attn: Neal Domeyer
1951 Northwestern Avenue
P.O. Box 285
Stillwater, MN 55082

QIAGEN
Attn: Jonathan Isaac
1201 Clopper Road
Gaithersburg, MD 20878

IRVINE CORPORATE CENTER, LLC
Attn: Jim Savory
252 Clayton Street
Denver, CO 80206

GENZYME CORPORATION
Attn: D. Ross Martin
Ropes & Gray LLP
One International Place
Boston, MA 02110

In re Westcliff Medical Laboratories
File No. 4367
RSN

Proposed Committee-RSN
Benjamin Seigel/Jeffrey Garfinkle
Buchalter Nemer
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017-2457

Debtor
Westcliff Medical Laboratories, Inc.
BioLabs, Inc.
1821 E. Dyer Road, #100
Santa Ana, CA 92705-0000

Frank Cadigan
Nancy Goldenberg
Terry Biers
Office of the U.S. Trustee
411 West Fourth St. Suite 9041
Santa Ana, CA 92701

Westcliff Medical Laboratories, Inc.
File No. 4367
Supplemental service

MATTSON RESOURCES
Attn: Shannon Boston, Office Mgr.
Attn. Taelor Truong, Controller
959 South Coast Drive, Suite 300
Costa Mesa, CA 92626

QIAGEN, Legal Department
c/o Jonathan S. Isaac, Asst. Gen.
Counsel
1201 Clopper Road
Gaithersburg, MD 20878

ROCHE DIAGNOSTICS
CORPORATION
Attn: Judy L. Wagner, CCE. MBA
9115 Hague Road, Building H
Indianapolis, IN 46250

GRIFOLS
Attn: Javier Chagoyen
2410 Lillyvale Avenue
Los Angeles, CA 90032

Attorneys for PHADIA US INC
Robert B. Boros, Esq,
Jim Palmere, Esq.
Kreiss, Enderic, Hudgins & Boros, P.C.
PO Box 4010
Kalamazoo, MI 49003-4010

McKESSON TECHNOLOGIES INC.
Attn: Michael S. Jones, Collections-East
Region
5995 Windward Parkway, ATHQ-1700
Alpharetta, GA 30005

Attorneys for SPECIALTY
LABORATORIES, INC.
Brett Fallon
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494

Westcliff Medical Laboratories, Inc.
File No. 4367
Secured Creditors (Westcliff)
20 Largest (BioLabs)

Bank of America, N.A.
As Successor by Merger to LaSalle
Bank N
135 South LaSalle Street
Chicago, IL 60603

Becton Dickinson & Co.
Attn: Officer/Director/Legal Dept.
1 Becton Drive
Franklin Lakes, NJ 07417

BMT Leasing, Inc.
Attn: Officer/Director/Legal Dept.
P.O. Box 692
Bryn Mawr, PA 19010

CapitalSource Finance LLC
Gregory Browne, Managing Partner
4445 Willard Avenue, Twelfth Floor
Chevy Chase, MD 20815

Cisco Systems Capital Corp.
Attn: Officer/Director/Legal Dept.
170 W. Tasman Drive, MS SJ13-3
San Jose, CA 95134

CYTYC Limited Partnership
Attn: Officer/Director/Legal Dept.
250 Campus Drive
Marlborough, MA 01752

Diasorin, Inc.
Attn: Officer/Director/Legal Dept.
1951 Northwestern Avenue
Stillwater, MN 55082

GE Business Financial Serv., Inc.
Attn: Officer/Director/Legal Dept.
2 Bethesda Metro Ctr., Suite 600
Bethesda, MD 20814

GE Capital Business Fin. Serv., Inc
Attn: Officer/Director/Legal Dept.
2 Bethesda Metro Center, Suite 600
Bethesda, MD 20814

Jules and Associates, Inc.
Attn: Officer/Director/Legal Dept.
515 S. Figueroa St., Suite 1950
Los Angeles, CA 90071

Leasing Assoc. of Barrington, Inc.
Attn: Officer/Director/Legal Dept.
33 W. Higgins Road, Suite 1030
South Barrington, IL 60010

M & I Marshall & Ilsley Bank
Attn: Officer/Director/Legal Dept.
770 N. Water Street
Milwaukee, WI 53202

Merril Lynch Capital
Attn: Officer/Director/Legal Dept.
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Merril Lynch Capital, a Division of
Merril Lynch Bus. Fin. Serv., Inc., as A
222 North LaSalle St., 16th Fl.
Chicago, IL 60601

Norlease, Inc.
Attn: Officer/Director/Legal Dept.
50 South LaSalle Street
Chicago, IL 60675

Olympus America, Inc.
Attn: Officer/Director/Legal Dept.
3500 Corporate Parkway
Center Valley, PA 18034

Phadia US Inc.
Attn: Officer/Director/Legal Dept.
4169 Commercial Ave.
Portage, MI 49002

Pitney Bowes Credit Corp.
Attn: Officer/Director/Legal Dept.
27 Waterview Drive
Shelton, CT 06484

Pitney Bowes Global Fin. Serv., Inc
Attn: Officer/Director/Legal Dept.
27 Waterview Drive
Shelton, CT 06484

Roche Diagnostics Corporation
Attn: Officer/Director/Legal Dept.
9115 Hague Road
Indianapolis, IN 46250

Sandelman Finance 2006-1, Ltd
C/O Sandelman Partners LP, Bill Brown
500 Park Avenue, 3rd Fl.
New York, NY 10022

TCF Equipment Finance, Inc.
Attn: Officer/Director/Legal Dept.
11100 Wayzata Blvd., Suite 801
Minnetonka, MN 55305

Counsel to GE Business Financial
Services, Inc.
Randy Rogers
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

BioLabs, Inc.
Westcliff Medical Laboratories
File No. 4367
Title to Assets Service List


BAYTREE LEASING COMPANY, LLC
P.O. BOX 94125
Palatine, IL 60094-4125

AMERICORP FINANCIAL, LLC
877 SOUTH ADAMS ROAD
Birmingham, MI 48009

Westcliff Medical Laboratories, Inc.
BioLabs, Inc.
File No. 4367
Email List

Email Block:

Debtors
mapakkala@gmail.com; lane@mtspartners.com; Matthew.pakkala@fticonsulting.com;
bewingwhalen@yahoo.com; l.contreras@westcliffabs.com;

Office of the U.S. Trustee
Frank.Cadigan@usdoj.gov;  nancy.goldenberg@usdoj.gov; Terry.Biers@usdoj.gov

Debtors' Corporate Counsel
michael.dolan@kirkland.com; carl.pickerill@kirkland.com; JOsborn@kirkland.com;

Debtors' Special Healthcare Counsel
dgee@gsblaw.com

Labcorp/Labwest
michael.lubic@klgates.com; Lee.Hogewood@klgates.com; john.erwin@klgates.com;
grayson.hale@klgates.com; Margaret.Westbrook@klgates.com; Michael.heyman@klgates.com

Counsel to GE Business Financial Services, Inc.
rrogers@winston.com; jrawlins@winston.com

Counsel for MTS
brian.greer@dechert.com

FTC
Stephanie Wilkinson (swilkinson@ftc.gov)
Jonathan Klarfeld (jklarfeld@ftc.gov)
Michael Moiseyev (mmoiseyev@ftc.gov)

Counsel for Committee
bseigel@buchalter.com; jgarfinkle@buchalter.com

Committee/Counsel for Committee
Sharon.Weiss@hro.com; yesim.h.brisbane@siemens.com; wayne.mathias@roche.com;
neal.domeyer@diasorin.com; jonathan.isaac@QIAGEN.com; jsavory@broe.com;
ross.martin@ropesgray.com; Jonathan.Reisman@ropesgray.com; bseigel@buchalter.com;
jgarfinkle@buchalter.com

Secured
info@julesandassociates.com; lolandese@labarrington.com; cjanik@labarrington.com;
rrogers@winston.com; mweiss@capitalsource.com; info@hologic.com; general_askml@ml.com;
askmlbiz@ml.com; joseph.e.jones@diagnostics.com; rborsos@kreisenderle.com;
wendy.brewer@btlaw.com; sales@tcfef.com; rrogers@winston.com; telebank@bmtc.com